UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex. rel.* ELIN BAKLID-KUNZ, | |
| **Relator,** | **CIVIL ACTION FILE NO. _____** |
| vs. | 6:09-cv-1002-Orl-31DAB |
| HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM, a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC., | **FILED UNDER SEAL** |
| **Defendants.** | **[FALSE CLAIMS ACT –QUI TAM]** |

COMPLAINT

## TABLE OF CONTENTS

| Page | Topic |
|---|---|
| 2 | I.    Jurisdiction and Venue |
| 2 - 4 | Parties |
| 4 | II.    Statutory Background of Governmental Healthcare Programs |
| 4 – 8<br>9 – 11 | A.    Medicare – Title XVIII of Social Security Act 42 U.S.C.A. §§ 1395 – 95ccc |
| 11 – 13 | B.    Medicaid – 42 U.S.C.A. § 1396<br>C.    TRICARE/CHAMPUS – 10 U.S.C.A. §§ 1071 - 1106 |
| | III.    Applicable Federal and State Statutes |
| 13 – 15 | A.    False Claims Act ("FCA") 31 U.S.C.A. § 3729-3733 |
| 15 – 17 | B.    *Stark* – 42 U.S.C.A. § 1395 nn |
| 17 – 21 | CMS Medical Necessity Regulations and Requirements |
| | IV.    Overview of Fraudulent Acts Which Violate the False Claims Act and *Stark* Laws |
| | A.    False Claims Violations |
| 23 – 27 | 1.   Improper Admissions With No Medical Necessity |
| | 2.   Inpatient Specific Evidence Regarding Short Stay Admissions |
| 27 – 30 | a.   March 2009 Short Stay – 45% Error Rate |
| 30 – 31 | b.   April 2008 – March 2009 – Chest Pain Admissions 60% Error Rate |
| 31 – 32 | c.   April 1, 2009 – April 28, 2009 – "Chest Pain" Admissions – 82% Error Rate |
| 32 – 33 | d.   October 1, 2008 – March 31, 2009 – Cardiac Admissions – 50% Error Rate |
| 33 | e.   April 1, - April 30, 2009 – Cardiac Admissions – 59% Error Rate |
| 34 – 35 | f.   Admissions Have Occurred Without Establishing Medical Necessity From At Least 2000 to Present |
| | B.    *Stark* Violations Which Constitute False Claims Act Violations |
| | 1.   Executive Compensation to Physicians and Medical Directors |
| 36 – 37 | a.   Oncologists |

| Page | | Topic |
|---|---|---|
| | B. | *Stark* Violations (Con't.) |
| 37 – 38 | b. | Urologists |
| 37 – 42 | c. | Neurologists |
| 42 – 45 | | i.  Dr. Vinas – Billing and Coding Frauds |
| 46 – 48 | | ii.  Dr. Khanna – Billing and Coding Frauds |
| 49 | d. | Improper Compensation – Medical Directors |
| 50 – 51 | e. | Relator's Protestations and Efforts to Get Defendant to Comply |
| 52 – 53 | | Count One – FCA – Violation of 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B) and (a)(1)(G) |
| 53 – 54 | | Count Two – Conspiracy and Violation of 31 U.S.C. § 3729(a)(1)(C) |
| 54 | | Count Three – Violations of *Stark* Statutes, 42 U.S.C. § 1395 (nn) *et seq.* |
| | | Prayers for Relief |

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA *ex. rel.* ELIN
BAKLID-KUNZ,

        **Relator,**

**vs.**

HALIFAX HOSPITAL MEDICAL CENTER
d/b/a HALIFAX HEALTH a/k/a HALIFAX
COMMUNITY HEALTH SYSTEM, a/k/a
HALIFAX MEDICAL CENTER and HALIFAX
STAFFING, INC.,

        **Defendants.**

CIVIL ACTION FILE
NO. _____

FILED UNDER SEAL

[FALSE CLAIMS ACT –QUI TAM]

## COMPLAINT

**COMES NOW**, ELIN BAKLID-KUNZ, ("Relator") in the above-styled action, by and

through her counsel of record, WILBANKS & BRIDGES, L.L.P. and JAMES, HOYER,

NEWCOMER, SMILJANICH & YANCHUNIS, P.A., and states that this is an action brought on

behalf of the United States of America by Relator against HALIFAX MEDICAL CENTER d/b/a

HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX

MEDICAL CENTER, and HALIFAX STAFFING, INC. (hereinafter sometimes collectively referred

to as " HALIFAX") pursuant to the Qui Tam provisions of the Civil False Claims Act, 31 U.S.C. §

3729-33 *et. seq.* As will be set forth hereafter with great specificity, the Defendant hospitals have

improperly admitted thousands of inpatients even though no medical necessity existed for the

admissions and the Defendant hospitals have routinely paid excessive compensation and provided

profit-sharing incentives, as well as compensation pooling, to staff physicians in violation of the *Stark* laws.

## I. JURISDICTION AND VENUE

### 1.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a) and 3730(b). This Court has jurisdiction to entertain a qui tam action. Relator is an "original source" and is otherwise authorized to maintain this action in the name of the United States as contemplated by the Civil False Claims Act, 31 U.S.C. § 3729-33.

### 2.

Venue is appropriate as to the Defendants, in that one or more of Defendant's entities can be found in, reside in, and/or transact business in this judicial district. Additionally, acts proscribed by 31 U.S.C. § 3729 have been committed by one or more of the Defendant's entities in this judicial district. Within the meaning of 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732(a), venue is proper.

### 3.

Relator has made voluntary disclosures to the United States Government prior to the filing of this lawsuit as required by 31 U.S.C. § 3730(b)(2).

## THE PARTIES

### 4.

Plaintiff ELIN BAKLID-KUNZ is a Norwegian citizen and permanent resident of the U.S. She resides in the State of Florida. She brings this *qui tam* action based upon direct and unique information obtained during Relator's employment with Halifax Medical Center, located in Daytona

Beach, Florida.   As characterized by the False Claims Act, Plaintiff will be referred to as "Relator" hereafter.

**5.**

Defendant HALIFAX HOSPITAL MEDICAL CENTER. (hereafter "HALIFAX") is a special tax district, that owns and operates hospital and clinic medical facilities in East Central Florida. It is a large healthcare provider with a tertiary and community hospital with 764 licensed beds.   It has more than 500 physicians on its medical staff, representing 46 medical specialties. It recently expanded its services to New Smyrna Beach and other Southeast Volusia County communities with the opening of the Medical Center of Port Orange.   HALIFAX is a governmental entity created by Florida statute as a special tax district. It is neither a state agency nor an "arm of the state". It is therefore not entitled to any Eleventh Amendment Immunity under the Federal False Claims Act.   In the past, HALIFAX has been known as HALIFAX MEDICAL CENTER, HALIFAX COMMUNITY HEALTH SYSTEM and HALIFAX HOSPITAL MEDICAL CENTER.

**6.**

Defendant HALIFAX STAFFING, INC., is a subsidiary and affiliated not for profit Florida Corporation, of HALIFAX, which provides staffing personnel for HALIFAX. Its principal address is 303 North Clyde Morris Boulevard, Daytona Beach, Florida 32114.

**7.**

The registered agent for HALIFAX and HALIFAX STAFFING, INC. is DAVID J. DAVIDSON, 303 N. Clyde Morris Boulevard, Daytona Beach, Florida 32114.   The controlled

3

entities and subsidiaries of Halifax will be collectively referred to as "Defendants" throughout this Complaint.

**8.**

Relator is presently employed by Defendant HALIFAX as the Director of Physician Services for the past year. She has worked for Defendant over 15 years, including three and one-half (3-1/2) years in the Compliance Department as Revenue Integrity Coordinator and seven (7) years in the Finance Department as a financial analyst and Revenue Coordinator. She also teaches physician billing at a local college and she has published articles on topics related to medical practice compliance and coding/reimbursement regulations. She has been a speaker at numerous national seminars on health care matters. The allegations made in this Complaint are based on Relator's personal knowledge, obtained in her capacity as an employee of Defendant Halifax. Relator has specific inside knowledge of the frauds set forth hereafter.

## II.  STATUTORY BACKGROUND OF GOVERNMENTAL HEALTH PROGRAMS

**9.**

### A.  The Medicare Program – Title XVIII of Social Security Act – 42 U.S.C.A. §§ 1395 – 95ccc

The Medicare Program was enacted in 1965 by Congress to pay for the costs of certain health services. Those persons who are entitled to Medicare are based on age, disability or affliction with end-stage renal disease. Title XVIII of the Social Security Act; *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Defendant's hospitals, derive a substantial portion of their revenue from the Medicare Program.

4

**10.**

As detailed below, Defendant hospitals submitted claims both for specific services provided to individual Medicare beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

**11.**

Medicare provides reimbursement to provider hospitals in several ways depending on the status of the patient as either inpatient or outpatient.

**12.**

Hospital outpatient services are reimbursed on the Hospital Outpatient Prospective Payment System ("HOPPS"). All such services are classified into groups called Ambulatory Payment Classifications ("APCs"). Services in each APC are similar clinically and in terms of the resources they require. A payment rate is established for each APC. Depending on the services provided, hospitals may be paid for more than one APC for an encounter.

**13.**

Hospital inpatient services are reimbursed under the Inpatient Prospective Payment System ("IPPS"). This is a system developed for Medicare to classify hospital cases into one of approximately 500 groups, also referred to as DRGs, which are expected to have similar hospital resource use. DRGs are assigned by a "grouper" program based on ICD diagnoses, procedures, age, sex, and the presence of complications. DRGs have been used since 1983 to determine how much Medicare pays the hospital, since patients within each category are similar clinically and are expected to use the same level of hospital resources. DRGs may be further grouped into Major Diagnostic

Categories ("MDCs"). The process of forming the DRGs was begun by dividing all possible principal diagnoses into 25 mutually exclusive principal diagnosis areas called MDCs. Surgical patient cases are further defined based on the precise surgical procedure performed while medical patients are defined based on the precise principal diagnosis for which they are admitted to the hospital. Medical patients are assigned to DRGs based upon their principal diagnosis, as well as their age, sex, discharge status or the presence of complications.

**14.**

Due to the greater reimbursement paid by Medicare for inpatients (versus outpatients), there is a significant incentive to unlawfully admit patients as inpatients.

**15.**

Following the discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. These hospitals submit patient-specific claims for interim payments on a CMS Form UB-04 (formerly UB-92). As a prior condition to payment by Medicare, CMS requires hospitals to submit on an annual basis a form CMS-2552, more commonly known as the "Hospital Cost Report". These Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries. After the conclusion of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than

6

already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

**16.**

Defendant's hospitals were, at all times relevant to this complaint, required to submit Hospital Cost Reports to their fiscal intermediaries.

**17.**

The Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-04s) during the course of the fiscal year.  On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

**18.**

Thus where patients are improperly admitted as inpatients rather as outpatients, the DRG and outlier reimbursements and cost reports are unlawfully increased to the financial advantage of the Defendant hospitals.

**19.**

Each Hospital Cost Report contains an express certification that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

**20.**

The Hospital Cost Report Certification is a preface to the cost report's certification, the

following warning appears:

> **MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.**

> **This advisory is followed by the actual certification language itself:**

> <u>**CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER(S)**</u>

> **I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations (emphasis added). (This is followed by: signature of facility's officer, title and date).**

**21.**

Defendant hospitals are required to be familiar with the laws and regulations governing the

Medicare Program, including requirements relating to the completion of cost reports.

**22.**

Thus, a hospital is required to disclose all known errors and omissions in its claims for

Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-

7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A)
> his initial or continued right to any such benefit or payment . . . conceals or
> fails to disclose such event with an intent fraudulently to secure such benefit
> or payment either in a greater amount or quantity than is due or when no such
> benefit or payment is authorized  . . .  shall in the case of such a . . .
> concealment or failure . . . be guilty of a felony.

**23.**

Hospital Cost Reports submitted by Defendant hospitals were, at all times material to this

complaint, signed by Defendant's employees (including employees of its various predecessors),

usually a hospital official and, in some cases, a Corporate Reimbursement Department employee,

who attested, among other things, to the certification quoted above.

**24.**

**B.**     **The Medicaid Program – 41 U.S.C.A. § 1396**

The Medicaid Program is a joint federal-state program that provides health care benefits for

certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is primarily

limited to providing matching funds and ensuring that states comply with minimum standards in the

administration of the program.

**25.**

The Federal Medicaid statute sets forth certain minimum requirements for state Medicaid

programs to qualify for federal funding, which is called federal financial participation (FFP).  42

9

U.S.C. §§ 1396, *et seq*. As part of such minimum requirements, each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2). In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

26.

In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement. In other states, provider hospitals file a separate Medicaid cost report. Medicaid providers incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

27.

Most states who require the submission of a Medicaid cost report also require an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

28.

Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled. The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

**29.**

Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well. When a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.  False claims submitted to Medicare and/or Medicaid will constitute a violation of the False Claims Act.

**30.**

All of Defendant's hospitals sought reimbursement from designated state Medicaid programs for the time period pertinent to this Complaint so the Federal Government was damaged from the acts of fraud and concealment described hereafter.

**31.**

**C.      The TRICARE/CHAMPUS Program - 10 U.S.C.A. §§ 1071 - 1106**

Defendant's hospitals were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services, known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

**32.**

Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces, as well.  10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

11

**33.**

In addition to individual patient costs, TRICARE/CHAMPUS reimburses hospitals for two types of costs based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6. A facility seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the Medicare cost report for that facility.

**34.**

This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

**35.**

Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility.

**36.**

Defendant's hospitals submitted Requests for Reimbursement for their hospitals to TRICARE/CHAMPUS that were based on their Medicare cost reports. Whenever Defendant's Medicare cost reports contained falsely inflated or incorrect data or information from which

12

Defendant derived its Requests for Reimbursement submitted to TRICARE/CHAMPUS, those

Requests for Reimbursement were also false.

**37.**

On each occasion where Defendant's Requests for Reimbursement were false due to falsity in

its Medicare cost reports, Defendant falsely certified that the information contained in its Requests

for Reimbursement was "accurate and based upon the hospital's Medicare cost report." (emphasis

added).

**38.**

Defendant Halifax knew that false claims contained in its Medicare cost reports would affect

TRICARE/CHAMPUS reimbursement as well and result in damage to the Government.

III.    **APPLICABLE FEDERAL AND STATE STATUTES**

**39.**

A.    **FEDERAL FALSE CLAIMS ACT**

*Title 31 USCA Section 3729 of the Federal False Claims Act provides as follows:*

*"(a) Liability for Certain Acts-*

> *(1) IN GENERAL- Subject to paragraph (2), any person who—*

>> *(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;*

>> *(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;*

>> *(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);*

>> *(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to*

13

*be delivered, less than all of that money or property;*

*(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;*

*(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge property; or*

*(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,*

*is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.*

*(2) REDUCED DAMAGES- If the court finds that—*

*(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;*

*(B) such person fully cooperated with any Government investigation of such violation; and*

*(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,*
*the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.*

14

*(3) COSTS OF CIVIL ACTIONS- A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.*

**40.**

**B.      THE *STARK* STATUTE, 42 U.S.C. § 1395 nn**

**41.**

Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "*Stark* Statute") prohibits a hospital (or other entity providing healthcare items or services) from submitting Medicare claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital.  The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service performed under a prohibited referral must refund all collected amounts on a timely basis. 42 C.F.R. § 411.353.

**42.**

The *Stark* Statute establishes the clear rule that the government will not pay for items or services prescribed by physicians who have improper financial relationships with other providers. In enacting the statute, Congress found that improper financial relationships between physicians and entities to which they refer patients can compromise the physician's professional judgment as to whether an item or service is medically necessary, safe, effective, or of good quality.  Congress relied upon various academic studies consistently showing that physicians who had financial relationships with hospitals and other entities used more of those entities services than similarly situated

15

physicians who did not have such relationships.   The statute was designed specifically to reduce the loss suffered by the Medicare program due to such increased questionable utilization of services.

**43.**

Congress enacted the *Stark* Statute in two parts, commonly known as *Stark* I and *Stark* II. Enacted in 1989, *Stark* I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992 by physicians with a prohibited financial relationship with the clinical lab provider.   *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

**44.**

In 1993, Congress extended the *Stark* Statute (*Stark* II) to referrals for ten additional designated health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

**45.**

As of January 1, 1995, *Stark* II applied to patient referrals by physicians with a prohibited financial relationship for the following ten additional "designated health services": (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parenteral and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services.   <u>See</u> 42 U.S.C. § 1395nn(h)(6).

In pertinent part, the *Stark* Statute provides:

(a)      Prohibition of certain referrals

(1)     In general
Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then

    (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

    (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).
42 U.S.C. § 1395nn (emphasis added).

**46.**

*Stark* is a strict liability statute. *Stark* prohibits profit-sharing between DHS providers and employee physicians. If a prohibited relationship does not meet an exception or if an employment agreement is void for failing to meet an exception, every referral made by the implicated physician could be considered a prohibited referral.

**47.**

If no exception applies to a *Stark* violation, then all referrals from the referring employee physician to the DHS entity are subject to prohibition.

17

C.  **APPLICABLE REGULATORY REQUIREMENTS WHICH MANDATE THAT EACH ADMISSION MEET MEDICAL NECESSITY BEFORE SUBMISSION OF A CLAIM TO A GOVERNMENT PAYOR**

**48.**

Hospital providers are required by the Medicare conditions of participation to ensure that services provided to Medicare beneficiaries are in fact medically necessary.

**49.**

Hospital providers are required to assess the medical necessity of impatient admissions. The Government has urged hospital providers to establish compliance programs to insure that they are not in violation of program requirements. Hospital providers are required to establish Utilization Review committees.   42 C.F.R § 482.30.

**50.**

In order for an admission to be considered medically necessary under the Medicare program, the patient must have a condition requiring treatment that can only be provided in the inpatient setting. In this regard, the condition and treatment should be clearly documented in the medical record. If the patient can safely receive treatment in a less intensive setting, such as outpatient observation, the patient must not be admitted as an inpatient into a hospital.

**51.**

Medicare and other government programs only pay for those services that meet appropriate medical necessity standards. Medicare defines medical necessity as reasonable and necessary services. Providers may not bill for services that do not meet the applicable standards set by Medicare for medical necessity.

18

**52.**

If a physician is unsure about the need for an admission or feels that a patient will respond rapidly to treatment, the patient should be placed in outpatient observation. If the physician believes that a patient is acute and requires admission because of this acute condition, these facts should be clearly documented in the medical record.

**53.**

The use of outpatient observation instead of inpatient admission is appropriate when the need for inpatient admission cannot be medically determined and when additional time is needed to evaluate the patient or when the physician believes the patient will respond rapidly to treatment. Medicare coverage for outpatient observation is limited to a 48 hour period unless the fiscal intermediary grants an exception.

**54.**

Observation Services are defined by CMS as follows: those services furnished by a hospital on its premises, including the use of a bed and at least periodic monitoring by a hospital's nursing or other staff, which are reasonable and necessary to evaluate an outpatient's condition or determine the need for a possible inpatient admission. The purpose of observation is to evaluate and treat a patient's medical condition to determine if there is a need for further treatment or a need for inpatient admission. CMS Manual, Pub. 100-02. Observation is an outpatient status. Documentation is critical. A physician's order <u>must</u> specify "admit to observation" and be signed, dated and timed.

**55.**

The time to commence billing is based on the file entries as to when the patient is placed in

19

the observation bed to initiate observation services and ends with the time of the actual hospital discharge pursuant to a physician's discharge. When a patient has been in observation status for 24 hours, documentation in the progress notes must include the need to continue observation status with plan for discharge within the next 12-24 hours or the need to convert to inpatient, documenting the medical necessity for admission or medical stability for discharge and a plan for follow-up as needed.

## 56.

Medical necessity for admission must be met and documented at the time of conversion from observation to inpatient status. Only physicians can change admission status to inpatient prior to discharge. Conversions can also be made from inpatient to observation status prior to discharge if a physician determines that the inpatient admission is unnecessary or the original order was ambiguous and the physician clarifies that original order. Any change in admission status must be supported by the contemporaneous medical record (physician notes and orders). Continuous monitoring, such as telemetry, can be provided in an observation or inpatient status. The physician must consider the overall severity of illness and intensity of services in determining admission status rather than any single or specific intervention.

## 57.

Hospitals can use specialty inpatient areas (including CCU or ICU) to provide observation services (e.g. for telemetry). The level of care, not physical location of the bed, dictates the admission status. Where the patient condition is for Asthma, CHF and Chest Pain only, separate hospital reimbursement is available when patients with these medical conditions are observed and treated for more than 8 hours, up to a maximum of 48 hours. All other hospital observation services

20

are reimbursed as packaged services.

58.

The average reimbursement to the hospital provider for an inpatient admission is 3-4 times higher than for observation reimbursement. This economic reality results in an implicit incentive for non compliance and fraud.

## IV.    OVERVIEW OF FRAUDULENT ACTS AND OMISSIONS

59.

The purpose of the fraudulent actions described in this Complaint was to obtain unlawful and excess reimbursement by Medicare, Medicaid and TriCare/Champus as well as other private insurers. Defendants have submitted fraudulent claims for reimbursement in express violation of federal and state statutes, rules and regulations as described herein. Defendants have engaged in the following intentional, unlawful and fraudulent activities:

I.    Failure to comply with   inpatient and observation   criteria required to bill Government Payors;

II.    Failure to comply with medical necessity inpatient criteria that must be met in order to bill Government Payors;

III.    Failure to follow any legitimate compliance protocols or provide the corporate oversight needed to ensure the accuracy of billings presented to Government Payors;

IV.    Failure to implement or enforce the utilization review protocols required by Medicare as a condition of program participation;

V.    Failure to comply with one-day inpatient stay criteria needed to establish medical

21

necessity for inpatient admissions;

VI.    Failure to comply with and/or obtain appropriate physician orders needed to establish medical necessity for appropriate admissions, discharges or levels of patient care billed to Government Payors;

VII.    Failure to make self disclosures in the time and manner required by law;

VIII.    Failure to return overpayments and/or make adjustments for improper payments received from Government Payors;

IX.    Repetitive "over-coding" or "upcoding" of evaluation and management ("E and M") services by utilizing only the highest code level from all categories, e.g., using only level 4 and level 5 codes for CPT codes including, but not limited to, CPT codes 99214, 99244, 99223, 99233, 99255 and 99291;

X.    Improper billing by physicians for hospital services, e.g., hospital rounds, which were in fact improperly performed by registered nurses (RNs) instead of nurse practitioners and/or physician assistants;

XI.    Violations of the *Stark* law as a result of providing of improper financial incentives to staff physicians (who are referring Medicare and other Government beneficiaries) unrelated to their personal performance of services; the *Stark* violations include, but are not limited to, the oncology and urologist groups employed by the Defendant;

XII.    Paying excessive compensation which greatly exceeded fair market value to staff physicians in violation of the *Stark* laws;

XIII.    Paying physicians excessive compensation which exceeds fair market value for

22

Medical Directorships; and

XIV.   Paying Medical Directorships without any legitimate directorship services being performed or provided to Defendant.

XV.   Improperly admitting and retaining Medicare beneficiaries as inpatients for three (3) day stays in order to promote the discharge of said patients to a skilled nursing facility ("SNF").

## A.   SPECIFIC FRAUDULENT ACTS AND OMISSIONS OF DEFENDANTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT

### 1.   DEFENDANT HALIFAX HAS UNLAWFULLY BILLED GOVERNMENT PAYORS FOR INPATIENT ADMISSIONS WHICH DO NOT MEET REQUIRED MEDICAL NECESSITY CRITERIA AND HAS FAILED TO DISCLOSE OR RETURN KNOWN OVERPAYMENTS RESULTING FROM SUCH UNLAWFUL ADMISSIONS

**60.**

Defendant Halifax is submitting claims for short stay inpatient admissions, without meeting the criteria required for inpatient stays.  The majority of fraudulent admissions discussed hereafter involve one (1) and two (2) - day inpatient stays.

**61.**

These services cannot be legally re-billed as observation claims, because they have physician orders which improperly specify that the admissions should be made as "inpatient" admissions.

**62.**

The economic motive for the over utilization of inpatient services is enormous.  Defendant receives huge Medicare reimbursements for admissions each year.  From fiscal years 2005 through

23

2008, Medicare paid in excess of $53,000.000.00 for cases at Defendant hospital involving one (1) and two (2) -day stays.

| Oct. to Sept. | No. of Cases Involving Short Stays | Medicare Payment for Short Stays | No. of Cases Involving One-Day Stays | Medicare Payment for One Day | No. of Cases Involving Two-Day Stays | Medicare Payment for Two Day Stays |
|---|---|---|---|---|---|---|
| FY 2008 | 2,502 | $11,911,462 | 1,331 | $ 6,457,268 | 1,171 | $ 5,454,194 |
| FY 2007 | 2,678 | $15,015,489 | 1,517 | $ 9,431,941 | 1,161 | $ 5,583,548 |
| FY 2006 | 2,684 | $14,357,049 | 1,452 | $ 8,194,798 | 1,232 | $ 6,162,251 |
| FY 2005 | 2,520 | $12,707,691 | 1,345 | $ 7,212,442 | 1,175 | $ 5,495,249 |
| 4 year total | 10,384 | $53,991,691 | 5,645 | $31,296,449 | 4,739 | $22,695,242 |

**63.**

In FY 2008 alone, Medicare paid Halifax over $81,000,000 for inpatient charges. Medicaid paid over $23,000,000 and CHAMPUS paid over $1,200,000 to Halifax for 2008 charges. Defendant Halifax is the dominant Medicare provider in its geographic market.

**64.**

Defendant has actual knowledge of daily fraudulent submissions and overcharges to the Government resulting from inappropriate short-day inpatient admissions. In fact, Defendant's management, at the highest levels, has asked for and received internal and external reviews. They are aware of the systemic occurrence of inpatient admission deficiencies which cause overcharges to the Government. Defendant's management recently told Relator that there are at least 30-50 inpatient admissions every month that do not meet Medicare criteria for an inpatient stay. The

24

Defendant is not overly concerned with the high perpetual levels of inpatient errors because of two

(2) separate but equally important reasons: Defendant thinks (erroneously) that because Halifax was

formed as a taxing district that they have immunity from FCA liability; and, Defendant has not taken

appropriate curative measures because it receives tens of millions of dollars from orchestrating

fraudulent inpatient admissions despite the absence of medical necessity.

**65.**

On more than one (1) occasion, Relator has discussed the chronic failures of the Defendant to

meet medical necessity criteria for inpatient admissions with her managers and superiors. Despite

the concerns and protestations made by Relator, the fraudulent conduct and patterns described herein

persist on a large scale today. In a recent meeting, Relator was told by the VP that "we want a

balance between Compliance complaining that the money should be returned and the CFO claiming

we are too aggressive in admitting to observation." The CFO stated that "We have already lost

$3,000,000.00 due to too many observations already this year." From a cost perspective, Defendant

does not want to spend the money required to provide training to the case managers on InterQual

criteria (InterQual is a system used to assess the medical necessity, or lack thereof, of an inpatient

admission) and/or pay higher wages to case managers once certified to use InterQual. Accordingly,

none of Defendants case managers are properly trained to use the InterQual criteria. The high error

rates attributable to short-stay admissions which are designed hereafter are well known to both the

Halifax compliance department and Halifax administration.

**66.**

For example, Relator met with the Defendant's Director of Cardiology in January, 2008, to discuss improper one-day stay admissions which were occurring within the hospital. During that meeting, Relator was told that all defibrillation cases were done as inpatient because "the hospital will not make any money if these patients are treated as outpatient cases." Clearly, the motivation behind the systemic frauds at issue is raising inpatient revenues. There is no doubt that it is more profitable to submit claims to the Government payors for inpatient claims as compared to observation status claims or claims for lower levels of care. Because of this fact, Medicare has instituted rigorous requirements that all inpatient admissions must meet medical necessity criteria with regard to both severity of illness and the intensity of service required for an inpatient admission. These requirements are being ignored at Defendant hospital and the Government is losing substantial money every day as a result. Defendant knows that it is overcharging the Government yet refuses to return overpayments.

**67.**

The Vice President of Defendant's Business Office stated that he felt that the Defendant should not be "too aggressive" in classifying patients as being appropriately placed into observation status because that practice would "hurt our revenue cycle by millions." With regard to corporate economics, the lost profits from using observation status is perceived to be a steep price to pay compared to making nominal repayments to the RACs for the random times when a few inpatient admissions are found to be unfunded. However, Halifax has greatly underestimated its economic risk by underestimating the applicability and power of the federal FCA.

**68.**

Physicians employed by Halifax have stated that the payments they receive for admitting to lower levels of care such as observation status "is not worth their time coming to the hospital." On more than one occasion, the physicians have said in staff meetings that if they couldn't routinely admit for an inpatient admission, that they would just "leave the patient in the emergency room."

**69.**

The net result of the corporate greed and the intentional failure to adhere to Government rules and regulations is that the medical necessity error rates are very substantial at Defendant's hospital, as will be shown in great detail hereafter using specific patient data and internal records.

**2.    PATIENT SPECIFIC EVIDENCE AND PROOF OF INTENT REGARDING THE DEFENDANT'S FRAUDULENT BILLING PRACTICES INVOLVING SHORT-STAY INPATIENT ADMISSIONS**

**70.**

In order to understand the breadth and repetition of the Defendant's fraudulent practices involving short-stays, it is very helpful to review specific examples that illustrate both the false billings and the Defendant hospitals' knowledge thereof.

**(a)    MARCH 2009 FRAUDULENT ADMISSIONS  – DOCUMENTED 45% ERROR RATE**

**71.**

In March, 2009, Halifax internally reviewed charts involving short-stay admissions. Sixty-four (64) Medicare patient files were reviewed by Halifax employees and clinical appeals representatives. The sixty-four (64) charts make up fifty-eight percent (58%) of the total of one hundred eleven (111) Medicare one-day stays for March, 2009. Of the sixty-four (64) reviewed,

27

twenty-nine (29) Medicare patients were improperly admitted. This reflects an error rate of forty-five percent (45%). These twenty-nine (29) patients did not meet the necessary medical necessity criteria for an inpatient admission. False claims were submitted for all 29 Medicare patients.

### 72.

Attached to this complaint as Exhibit "1" is a document prepared by the Defendant which acknowledges and quantifies the forty-five percent (45%) error rate for March, 2009 Medicare admissions in detail. Exhibit 1 breaks the March error review into categories by DRG, patient identification number, attending physician and diagnosis code. Exhibit 1 also reflects the reasons why each inpatient admission was inappropriate and medically unnecessary.

### 73.

Attached as Exhibit "2" is another document prepared by Defendant which reveals that Medicare paid $98,550.00 for the twenty-nine (29) patients who were improperly admitted as inpatients in March, 2009 at Defendant hospital. As stated above, numerous other improper admissions for Medicare (and Medicaid) patients occurred during the same time frame but were not included in the sampling referenced in Exhibits 1 and 2.

### 74.

Exhibit "3" is a document which again quantifies the aforementioned forty-five percent (45%) error rate, the Medicare improper payments of $98,550.00 and the specific DRGs and attending physicians who ordered the twenty-nine (29) inappropriate inpatient admissions for the March, 2009 review. Relator discovered that high error rates for inpatient admissions have existed for years.

28

**75.**

Attached as Exhibit "4" is a chart documenting the trends for observation and one-day stay admissions from FY 2000 to FY 2006.  Exhibit 4 reflects that the admission patterns referenced heretofore have been consistent throughout the decade.  From 2000 to 2006, there has been a twenty-one percent (21%) increase in one-day stays which sharply contrasts with the downward trending for observation status patients.  With regard to the latter, there has been a forty-four percent (44%) decrease in observation status from 2000 to 2006.

**76.**

Defendant has had very specific and concrete knowledge about the medical necessity deficiencies related to its inpatient admissions since at least 2003.  In 2003 alone, Relator has knowledge that at least five-hundred twenty-one (521) Medicare patients were denied payment because of a failure to establish the requisite medical necessity needed for an inpatient claim.  Many of these medical necessity deficiencies were brought to the Defendant's attention as a part of the RAC reviews completed in the past.

**77.**

Despite the Defendant's undeniable knowledge of the problems set forth above, the monthly error rates continue to increase for improper one and two-day inpatient admissions.  As a direct result of these fraudulent admissions, Government payors are being damaged by millions of dollars each year.

**78.**

The Defendant has flawless written rules, regulations and compliance standards. Halifax has written "Medical Necessity – Inpatient Hospital" protocols. The problem is not with the protocols – the problem is that the Defendant <u>DOES</u> <u>NOT</u> <u>FOLLOW</u> its own written protocols. Having good compliance materials and written protocols are important. They establish that Defendant understands the Medicare requirements at issue. The fact that Defendant still actively ignores the law and its own written policies and procedures validates the need for the imposition of FCA penalties against Defendants.

**79.**

In addition to the knowledge that Defendant has with regard to the overall error rates involving short inpatient stays, Defendant has been acutely aware of erroneous inpatient admissions involving chest pain patients for years. It is a well known fact that on a local and national level, many chest pain admissions do not have documented justification to support an acute inpatient admission. Despite the Defendant's knowledge regarding the illegality of the conduct described herein and despite the efforts of quality improvement organizations in Florida to eliminate inpatient admission abuses, inappropriate chest pain inpatient admissions continue on a daily basis at Defendant's hospital today.

**(b)    <u>APRIL 2008 – MARCH, 2009 FRAUDULENT "CHEST PAIN" ADMISSIONS 60% ERROR RATE</u>**

**80.**

By way of specific example, one need look no further than the review conducted for short-stay chest pain admissions from April 1, 2008 to April 1, 2009. This information is attached hereto

as Exhibit "5." A zero percent error rate was expected because Defendant opened up a chest management pain center on October 1, 2007 and implemented a case management protocol review at that time. This protocol was designed to direct chest pain patients to the Emergency Department ("ED") to the chest pain center operated by Halifax. The admission to the chest pain center is an outpatient (versus inpatient) admission.

**81.**

Exhibit 5 reveals that Defendant examined as short-stay discharges to review the accuracy of chest pain admissions during each and every month from April, 2008 through April, 2009. A 60.9% error rate was discovered within Defendant hospital. This error rate is admitted by Defendant for the March 31, 2008 through April 1, 2009 period and is reflected on Exhibit 5.

(c)    **APRIL 1 – APRIL 28, 2009 "CHEST PAIN" REVIEW 82% ERROR RATE**

**82.**

According to a very recent internal document and memo prepared by the Halifax Clinical Appeals Representative, the error rate from April 1, 2009 to April 28, 2009, has risen to an 82% error rate! The email disclosing the eighty-two percent (82%) error rate (or eighteen percent (18%) "success" rate) to Relator from the Halifax Clinical Appeals Representative is attached as Exhibit "6." This means that presently eight (8) out of every ten (10) Medicare patients who are admitted to Defendant's hospital with chest pains should not be admitted. Medicare and Medicaid are being defrauded at exorbitant levels as a direct result of the Defendant's flagrant and frequent medical necessity abuses.

31

**83.**

Attached as Exhibit "7" is the Medicare Error Rate April Review for short-stay chest pain admissions which again verifies the error rates referenced above.  On Exhibit 7, the patient account, InterQual Criteria Assessment, DRG diagnosis, amount paid and patient status are reflected for eleven (11) Medicare patients which  received treatment(s) at Defendant's facility in April, 2009.  This document confirms the eighty-two percent (82%) error rate referred to in Exhibit "6."  Each claim submitted for the Medicare patients constituted a violation of the FCA.

**84.**

Despite the Defendant's express knowledge of the fraudulent admissions and billings set forth above, the high error rates for admissions have existed for years.

**85.**

Defendant has regularly admitted Medicare patients for years with the diagnosis of "chest pain" inappropriately.  By way of example, Relator has provided the Government with information concerning fiscal year 2007 short stay chest pain admissions.  Relator provided examples of one hundred seventy (170) Medicare patients admitted during 2007 with a diagnosis of "chest pain."  Medicare made payments to Defendant in an amount exceeding $408,000 for those one hundred seventy (170) admissions.

**(d)**     **OCTOBER 1, 2008 – MARCH 31, 2008  CARDIAC ADMISSIONS  59% ERROR RATE**

**86.**

By way of example, in April, 2009, a fifty-nine percent (59%) error rate resulted from the Defendant's **internal review of cardiac** one-day admissions from October 1, 2008 to March 31,

2009.   This was a target review and only included patients that had cardiac catherizations or stent placements.  A zero error rate was anticipated because Defendant's attending physicians had been told not to admit these patients in a memo on August 7, 2008.  It is clear that Defendant has knowledge of the law, but refuses to police its own physicians internally because of the money being gained from these illegal acts.

### 87.

Attached hereto as Exhibit "8" is a document which reflects nineteen (19) specific Medicare patients who were improperly admitted with cardiac related problems from October, 2008 to March, 2009.  You will also notice on Exhibit 8 that these inappropriate admissions resulted in improper Medicare payments of $145,605.00 for that period.  That amounts to an average dollar loss per Medicare patient of over $7,663.00 per improper admission.  This list of improper Medicare admissions is not a complete list of improper Medicare or Medicaid admissions for that month.

**(e)   APRIL 1 – APRIL 30, 2009 – CARDIAC ADMISSIONS
59% ERROR RATE**

### 88.

Exhibit "9" provides specific information with regard to the April, 2009 fifty-nine percent (59%) error rate for cardiac cases at Defendant hospital.  In addition to the patient number and admitting physician information, notes are provided which explain why each admission does not meet the medical necessity requirements for inpatient admission.

### 89.

Relator and other employees have cautioned Defendant's admitting physicians and hospital management and staff who are responsible for the appropriateness of inpatient admissions with

regard to the illegality of treating and billing for elective cardiac procedures as if they involved

inpatient admissions. Over the years, the Defendant has admitted a large number of patients for

elective Caths and other cardiac procedures (example: PCTA, PCI, and AICD pacemakers) which

should be properly designated as outpatient procedures and not billed as inpatient admissions to

Government payors.

### (f)   DEFENDANT HAS ILLEGALLY AND CONSISTENTLY ADMITTED INPATIENTS WITHOUT ESTABLISHING MEDICAL NECESSITY SINCE AT LEAST 2000 THROUGH THE PRESENT DATE

**90.**

Attached as Exhibit "10" is a memo from Defendant's Clinical Appeals Representative to the

Defendant's admitting physicians. This memo was previously referenced in Paragraph 89 above.

Within Exhibit 10, Defendant's Clinical Appeals Representative unequivocally informs the doctors

that Medicare guidelines require that all PTCA, PCI and AICD pacemaker procedures be designated

as <u>outpatient procedures</u>. Under the Medicare rules, once the patient leaves the catherization (Cath)

lab and is transferred to the hospital floor, the doctor's orders should designate the patient for

twenty-three (23) hour observation status. Only in the event of an unforeseen urgent medical need or

complication should inpatient status be utilized. The FMAQI Release which supports the use of

observation status for these procedures is attached as Exhibit "11."

**91.**

Exhibits 8 and 9 described previously provide concise evidence that the admitting physicians

and the Defendant have not complied with Defendant's own written internal policies with regard to

elective cardiac procedures.  The fifty-nine percent (59%) error rate in the review performed for the period from October 1, 2008 through March 31, 2009, is proof positive of the continuing widespread false billings associated with these procedures.  It is very unsettling that these abuses have continued despite the warnings and statements regarding Medicare requirements set forth in Exhibit 10.

### 92.

There are several different types of medical necessity errors which permeate the inappropriate Cath admissions.  In most of the cases, the admissions should have been made for a lower level of appropriate care such as observation status.  However, in a number of cases, medical necessity would have been met if the required physician order would have been issued.  Unfortunately, as reflected in Exhibit "12", both types of errors are still occurring which result in the Government making improper and unnecessary payments for Cath procedures.

### 93.

Exhibit 12 reflects a series of emails between Relator and the Halifax Clinical Appeals Representative.  Relator made inquiries about five (5) specific Medicare patients concerning inappropriate admissions.  The Halifax Clinical Appeals Representative determined that the first three (3) specific patients identified and discussed within the email chain should have not been admitted to inpatient.  These three (3) patients did not meet inpatient criteria.  Although the last two (2) patients referenced by Relator might otherwise have satisfied the medical components of the inpatient criteria, there was no inpatient admission order    The absence of an order is not inconsequential.  To the contrary, it is an absolutely essential element that must be present and in the patient record as a condition of payment for every Medicare inpatient admission.  A valid written

order is crucial to medical necessity. CMS demands no less. Accordingly, it is clear that there are a number of deficiencies within Defendant's system which contribute to the false billing of Government payors on a very large scale. Despite the fact that Halifax knew that each admission was illegal, no funds were repaid to the Government and all payments were retained.

**B.**     *STARK* **VIOLATIONS WHICH CONSTITUTE FCA VIOLATIONS**

    **1.**     **DEFENDANT HOSPITAL IS VIOLATING THE** *STARK* **LAWS AND THE FCA BY PROVIDING UNLAWFUL AND EXCESSIVE COMPENSATION TO PHYSICIANS AND PAYING EXCESSIVE AMOUNTS FOR MEDICAL DIRECTORSHIPS**

**94.**

Defendant Hospital unlawfully pays incentives to staff physicians unrelated to their personally performed services. Several key physicians are paid a percentage of overall hospital revenues to refer patients to Defendant's hospital and radiation oncology program. This arrangement is essentially a profit-sharing scheme which violates the *Stark Act*. Defendant Hospital has never disclosed or returned the payments made by Government payors which were tainted by unlawful payments made by Defendant to physicians.

    **(a)**     **MEDICAL ONCOLOGY PHYSICIANS**

**95.**

Defendant Hospital pays its Medical Oncology Group employees a portion of an "incentive compensation pool" which is equal to 15% of the operating margin for the Medical Oncology Program. The hospital's profit margin for oncology after the professional fee losses are $1.7M, and the medical oncology group receives 15% ($255,000) calculated quarterly and paid annually. The

hospital's annual gross revenue for oncology is approximately $45,000,000.00, compared to less than $4,000,000.00 for the professional charges for oncology services. The Medical Oncologists refer patients to the Defendant's radiation oncology program. Medicare and Medicaid patients comprise a major portion of the referrals by the medical oncology group to Defendant hospital and the radiation oncology program. All of these referrals are tainted by the profit-sharing scheme existing between Defendant and the Medical Oncology Group.

96.

Defendant Hospital employs physicians who execute contracts with Defendant Halifax Staffing, Inc. who actually hires the physician employees of the hospital. Exhibit "13" is an agreement between Defendant and a physician where the "Incentive Compensation Pool" equal to "15% of the operating margin for the Medical Oncology program" is detailed. This verbiage was commonly used in the oncologist's agreements from at least 2004 to 2008. Under existing law, employed physicians may only be incentivized based on their own personally performed services. The hospital's current incentive structure takes into account much more than personally performed services of the physician receiving the incentive. The compensation scheme is essentially profit sharing. Profit sharing is unlawful and not permitted with employed physicians. The Defendant's incentive program would not run afoul of the law if the doctors at issue were part of a group practice. However, the doctors at issue are not part of a group practice. Defendant is aware that the employment exception to the *Stark Act* does not apply to the physicians identified herein.

37

### 97.

Relator has discussed the illegality of the physician contracts and relationships involving the medical oncology employees with her superiors. Despite Relator's concern and her superior's knowledge that these contract violate the *Stark* laws, the Government has not been notified of this fact and no disclosures regarding the illegal incentives paid to the physicians have been made by Defendant to any Government Payor to the best of Relator's knowledge.

### (b)   **UROLOGY PHYSICIANS**

### 98.

Similarly, the Hospital's incentive plan for the employed urologist physicians is designed to give the physicians a straight percentage of the facility revenue. For example, for a procedure where the professional component is $575 under the Medicare Physician Fee schedule and the facility component is reimbursed under the Hospitals Outpatient Prospective Payment System (HOPPS) at $2,450, the physician would get 80% of collections from both components. That scheme is unlawful and also violates the Stark Act. The urologists' contracts are set up to give the urologists a percentage of the facility fees (hospital revenue), in addition to their personally performed services of the employed physicians.

### (c)   **NEUROSURGICAL GROUP**

### 99.

Defendant Hospital employs three (3) neurosurgeons. The names of these neurosurgeons are: Dr. Rohit Khanna, Dr. William Kuhn and Dr. Frederico Vinas. Two (2) of the neurosurgeons, Dr. Khanna and Dr. Vinas, receive compensation that greatly exceeds fair market value.

**100.**

The neurosurgeons' financial incentive paid by Defendant is straight-forward (yet blatantly illegal.) They receive 100% of collections after they cover their salary and compensation for one (1) office staff salary (usually the medical secretary). As one might imagine, the neurosurgeons are very important referral sources for Defendant hospital. They produce Twenty-Two Millions Dollars ($22,000,000.00) annually in hospital revenues to Halifax from surgeries.

**101.**

In addition to the compensation scheme described above, the Defendant Hospital also pays for all of the other expenses for the doctor, including the salaries of their office staff (except for one (1) staff employee) and the physician assistants' salaries. It should also be noted that the Defendant's hospital included the Physicians Assistants' ("PAs") salaries and benefits in its cost report, even though they are reimbursed for these services under Part "B" as "incident to" the physicians. The physicians retain reimbursement for services by the PA provided incident to them and billed to Government Payors.

**102.**

In March 2009, Relator informed management that the neurosurgeons' salaries exceeded fair market value. Relator suggested that an outside fair market value ("FMV") analysis should be performed. A meeting was held with management, the three (3) neurosurgeons and the VP of Defendant's Business Office. Fair market value was not discussed at said meeting. Instead, it was agreed that the hospital would provide the physicians "credit" for services related to worker's compensation for hospital employees, district charity, and self-pay patients in addition to their

current compensations.   Incredibly, the net effect was to _increase_ their current compensation packages.   The Hospital also agreed to retroactively pay for these types of claims going back to March 1, 2008.   This new compensation scheme is also a ruse.   The doctors will actually receive more money from Halifax, although a different scheme will be used to accomplish the funneling of the same excessive dollars to the neurosurgeons.

**103.**

The cash and financial compensation for the two neurosurgeons is shown below.   The compensation for Dr. Khanna and Dr. Vinas, which exceeds $1,700,000 each per year, is excessive and far beyond FMV.   Dr. Kuhn's compensation package is the lowest of the three (3) neurosurgeons.   These neurosurgeons are being overpaid because of the large amount of money they generate through referrals and surgeries.

| CY2008 Actual Source: Payroll | R. Khanna | W. Kuhn | F. Vinas |
|---|---|---|---|
| Salary | 325,000 | 325,000 | 250,000 |
| Call Coverage | 117,150 | 120,700 | 113,850 |
| Incentive* (100% of Collections) | 1,271,772 | 702,854 | 1,519,864 |
| Car allowance | 10,080 | 10,800 | 13,500 |
| Longevity | 250 | 50 | 80 |
| Life Insurance | 330 | 759 | 230 |
| **Total Compensation CY 2008** | **1,725,302** | **1,160,163** | **1,897.524** |
| Benefits 20% of Salary | 319,354 | 205,571 | 353,973 |
| **Total Compensation Including Benefits** | **2,044,656** | **1,365,734** | **2,251,497** |
| Comparing Compensation w/o Benefits to Fair Market Value: | | | |
| MGMA Fair Market Value (FMV) | 1,200,051 | 1,200,051 | 1,200,051 |
| Above MGMA 90th Percentile | 525,251 | (39,888) | 697,473 |

| Percentage Above The 90th Percentile | 44% | -3% | 58% |
|---|---|---|---|
| AMGA FMV | 844,703 | 844,703 | 844,703 |
| Above AMGA 90th Percentile | 880,599 | 315,460 | 1,052,821 |
| Percentage Above The 90th Percentile | 104% | 37% | 125% |

| Expenses Paid By Hospital | R. Khanna | W. Kuhn | F. Vinas |
|---|---|---|---|
| Physician's Assistant (Vinas No. PA, Instead 1.5 RNs) | $ 97,315 | 83,130 | 83,130 |
| Office Staff (Office Manager and 1.5 Additional Staff | 131,250 | 131,250 | 131,250 |
| Non-Salary Operating Expenses* | 79,062 | 93,925 | 86,742 |
| Total Subsidy From Hospital In Addition To Salary | 307,627 | 310,305 | 303,122 |
| *Excludes Rent | | | |
| **Additional Subsidies Not Provided To Other Physicians:** | | | |
| 1.      200% of Medicare Fee Schedule for all trauma patients. | | | |
| 2.      Reimbursement for hospital employees Worker's Compensation | | | |
| 3.      Collection expense is not deducted from collections. | | | |
| 4.      Bad debt expense is not deducted from collections. | | | |
| 5.      Reimbursement 80% of Medicare Fee Schedule for district charity and self-pay when on call. | | | |

**104.**

Because Defendants know the amounts being paid to the neurosurgeons are conspicuously

high, discussions have ensued as to how these payments can be justified.  Invariably, as one might

predict, the Defendant has decided to attempt to defend these levels of compensation by claiming that the two (2) physicians at issue are extremely "productive" and should be paid as such. There is no dispute that the doctors are billing Government Payors at levels well above the ninetieth percentile (90%) of their peers. However, much of the "productivity" that is attributed to the neurosurgeons is the direct and inescapable result of improper coding, unbundling and inappropriately billing for services performed by non-physicians. This upcoding and unbundling will be described hereafter with specificity.

**105.**

Providers are allowed to pay bonuses to highly productive physician employees. However, the bonus is limited to "services personally performed by the physician." The large bonuses and incentives paid to the neurosurgeons are not limited to "services personally performed by the physician." These neurosurgeons and all of their billings relating to Halifax are tainted.

**(i) DR. VINAS – BILLING AND CODING FRAUDS**

**106.**

Dr. Vinas bills for half of the procedures done by the three (3) neurosurgeons. However, his high work Relative Value Units ("RVU"s) are in fact the direct result of improper upcoding services performed by his nurse and his other staff personnel. The Halifax's Compliance Department has investigated Dr. Vinas because of his extremely high volumes for certain CPTs. A review of Dr. Vinas' RVUs proved that he was allegedly working more hours in a month than could be possible. Relator observed that Dr. Vinas records reflected that his RVUs were many times higher than the national average and much higher than the number of hours the OIG would tolerate if this

42

information was presented to the Government.   Defendant has not disclosed these facts to any Government Payor.

**107.**

Defendant's Compliance Department looked at a detailed and specific review of the specific procedures performed by Dr. Vinas.  That review confirmed the findings of the external audit and internally raised alarms that a problem existed because Dr. Vinas' annualized RVUs were over four hundred fifty (450%) percent higher than the national average.  Halifax was informed at that time about the OIG's tolerance (or lack thereof) with regard to the amount of assessed hours reported by a physician.  As noted above, the assessed work time attributed to Dr. Vinas was significantly in excess of the OIG's limits.  Despite the Defendant's knowledge of these abuses, no disclosures were made to the Government by Defendant Halifax.

**108.**

In addition to the discovery of the excessive hours being claimed and billed by Dr. Vinas, the Defendant's own internal business review also concluded that Dr. Vinas was using an RN to perform his hospital rounds.   Defendant concluded that over 90% of the time that Dr. Vinas was using his RN to do his rounding, but Dr. Vinas still billed the encounter as a professional E/M service.  This is fraudulent.   Nurses can not perform physician services.   Therefore, Relator was told that Defendant's Compliance Department recommended that Defendant refund all overpayments received for the services performed by Dr. Vinas' nurses.  However, to the best of Relator's knowledge, no overpayments were refunded and no follow-up audit has been completed.

43

**109.**

In addition to the high error rate attributable to Dr. Vinas' E/M billing and coding practices, Defendant's compliance personnel discovered in the early winter of 2007 that problems existed for Dr. Vinas with regard to upcoding for established office visits and hospital visits. They found problems existed with regard to Dr. Vinas' over-coding and over-utilization of outpatient consults.

**110.**

Apart from his coding/billing improprieties, Halifax and Relator reviewed allegations that Dr. Vinas was conducting Post Lumbar Interbody Fusion or "spinal fusion." (PLIF) surgeries, which were not medically necessary. An additional impetus for this study was a settlement on July 26, 2007 involving a Florida neurosurgeon and a hospital for unnecessary spinal surgeries. Relator provided a copy of the press release and settlement agreement to the Chief Compliance Officer regarding that settlement for unnecessary surgeries.

**111.**

The objective of the internal review was to determine the likelihood that Dr. Vinas was billing for unnecessary medical procedures. Inpatient utilization data for fiscal years 2006 and 2007 for Dr. Vinas, Dr. Kuhn, and Dr. Khanna, as well as Dr. Boulter were reviewed by Halifax.

**112.**

The findings were astounding. Despite the fact that Dr. Kuhn was seeing more patients than Dr. Vinas from the same patient population, Dr. Vinas performed thirty-five percent (35%) more PLIF surgeries in 2006 and one hundred nine percent (109%) more PLIF surgeries in 2007 than Dr. Kuhn,

**113.**

Dr. Vinas also performed one hundred six percent (106%) more PLIF surgeries in 2006 and two hundred twenty-two  percent (222%) more PLIF surgeries in 2007 than Dr. Khanna.

**114.**

In 2006, Dr. Vinas fused 4-8 vertebrae three hundred twenty-one percent (321%) more than Dr. Kuhn and one hundred seventy-five percent (175%) more often than Dr. Khanna.  In 2007, Dr. Vinas fused 4-8 vertebrae three hundred twenty-seven percent (327%) more often than Dr. Kuhn and fifty-five percent (55%) more often than Dr. Khanna.

**115.**

Perhaps the most disturbing finding from the review(s) dealt with the inordinate and extremely high number of spinal fusion procedures that were being performed by Dr. Vinas.  Dr. Vinas performs more than two (2) times the number of spinal procedures performed by Dr. Kuhn and Dr. Khanna, neurosurgeons on the same population.

**116.**

The chart below reflects the high percentage of spinal procedures performed by Dr. Vinas when compared with the other two (2) neurosurgeons on the same patient population:

| ICD-9PX | Procedure | Khanna | Kuhn | Avg. Khanna/Kuhn | Vinas | Variance Vinas and Avg. |
|---------|-----------|--------|------|------------------|-------|-------------------------|
| 8108 | PLIF | 85 | 116 | 101 | **227** | **126%** |
| 8162 | 2 – 3 Verteb. | 205 | 208 | 207 | **417** | **102%** |
| 8163 | 4 – 8 Verteb. | 25 | 21 | 23 | **37** | **61%** |

45

**117.**

Relator was informed that Dr. Kuhn and his office manager complained to the Defendant's Administration in 2007 about Dr. Vinas and his improper business practices as well.  It was disclosed to Halifax that Defendant has been paying Dr. Vinas to entertain and dine important referring physicians.  Dr. Vinas has also permitted his medical assistant to receive kickbacks from sales representatives for "fitting" patients with a particular type of brace.

**118.**

**(ii)    DR. KHANNA – BILLING AND CODING FRAUDS**

A business review audit was also performed by Defendant with regard to Dr. Khanna's services.  Relator learned that there was a high error rate for upcoding and over-coding for all E/M services billed by Dr. Khanna.  For instance, the following results were documented and disclosed to Halifax regarding Dr. Khanna:

1. One hundred percent (100%) of the time Dr. Khanna bills a Level 4 for CPT Code 99214 for established outpatients;
2. Ninety-five percent (95%) of the time Dr. Khanna bills at Level 4 (CPT 99244) for out patient consults;
3. Ninety-eight percent (98%) of the time, Dr. Khanna bills at Level 3 – which is the highest possible billing – for CPT Code 99223 for hospital admissions;
4. One hundred percent (100%) of the time Dr. Khanna bills at Level 3 – which is the highest possible level for CPT Code 99233 for subsequent hospital visits; and
5. One hundred percent (100%) of the time Dr. Khanna bills at Level 5 for CPT Code 99255 for inpatient consults.
6. Fifty percent (50%) of his evaluation and management visits are critical care services CPT codes 99291 and 99292.  This is significant since the two (2) other neurosurgeons do not use this code at all.  Dr. Khanna used these codes 1,300 times in CY 2007 and received reimbursement of $436,829.00 (all payors).

**119.**

CPT Code 99291 and 99292 are used to report critical care services.  These codes are

considered to be evaluation and management ("E/M") codes, but are different from other E/M codes because they are time-based codes. These codes require that actual time spent with individual patients be recorded in the record. When time is not documented for critical care services, the services should be documented as subsequent hospital visit (CPT 99233) which is reimbursed at approximately sixty-two percent (62%) less than the aforementioned critical care CPT codes. For Dr. Khanna, one-hundred percent (100%) of his critical care services reviewed did not have time documented. Each of these critical care services should have been coded as subsequent hospital visits. Accordingly, overpayments occurred each and every time Dr. Khanna billed CPT 99291 or CPT 99292. These two (2) codes account for almost fifty percent (50%) of Dr. Khanna's CPT utilization for the seven (7) months that were reviewed as part of the Halifax internal review. During that time, Dr. Khanna billed using these critical care services CPT codes approximately seven hundred thirty-four (734) times. Each of these 734 billings constituted a violation of the FCA.

### 120.

In addition to the aforementioned problems, the internal audit also found that Dr. Khanna was using his physician's assistant ("PA") for hospital rounding, then billing for the work of the PA as if Dr. Khanna had performed it himself. The files reviewed demonstrated that all key components of the E/M services are being performed by the PA and that Dr. Khanna does no more than sign the report thereafter. It was determined that seventy-four percent (74%) of the critical care services billed by Dr. Khanna were, in fact, performed by his PA. These services should have been billed under the PA's provider number and reimbursement should have been reduced eighty-five percent (85%) for Medicare patients. Each of these overcharges is a violation of the FCA.

**121.**

It is also important to note that <u>none</u> of the critical care services which were billed by Dr.

Khanna and reviewed as a part of the internal business review met the requisite medical necessity

standards. Therefore, in each instance where critical care services were billed to a Government

Payor, an overpayment and violation of the FCA occurred.

**122.**

Defendant knew that Dr. Khanna was also billing at utilization levels far in excess of both

peer comparisons and OIG standards. The volumetric analysis performed by Relator and others,

revealed that Dr. Khanna was billing at utilization levels four (4) times higher (400%) than fair

market values. Relator confirmed with Halifax that billing and upcoding abuses existed for both Dr.

Khanna and Dr. Vinas. Despite the Defendant's knowledge of these billing abuses, no disclosures

were made to Government Payors.

**123.**

One of the most disturbing things to Relator about her findings regarding Dr. Vinas and Dr.

Khanna was the fact that the Hospital has done little to nothing to take corrective action. In fact, the

only ascertainable action taken by Halifax as a result of the internal audit was to put more pressure

on Dr. Kuhn to artificially raise his RVUs to a higher level and perform more surgeries so that the

Hospital's revenues could be similarly enhanced.

**124.**

Under the 2009 IPPS Rules, because the employment arrangement between Doctors Vinas

and Khanna violate the *Stark Act*, all claims submitted by Halifax for all Medicare beneficiaries

admitted or referred by them are not legally payable.  The *Stark* sanctions apply even if services are provided and the amounts paid are fair market value.  *Stark* is a strict liability statute.

### (d)   ILLEGAL COMPENSATION - DIRECTORSHIPS

#### 125.

Defendant hospital has provided hospital directorships to certain staff physicians without any legitimate director services being performed.

#### 126.

The hospital has several Medical Directorships that have been in place for years without any accounting for services performed for such compensation. Relator has confirmed that many of these greatly exceed fair market value and are paid without any services being performed.  For example, the Hospital has had a contract with a psychiatrist, Dr. Moore, since June 1, 1993 for Medical Directorship of Psychiatric Services.  Dr. Moore has been paid $66,150.00 per year or $275.63 per hour since for the last seventeen (17) years.  This amount is 190% above MGMA's 2007 90th percentile for psychiatrists.  In addition to this amount, the hospital has also provided him with free office space in the hospital and a "free" hospital billing employee that is paid by Defendant.  Dr. Moore is not an employee.

#### 127.

Excessive directorship fees are another way that Defendant is able to pay excessive fees to physicians, in addition to compensation packages.

(e)     **RELATOR'S FAILED EFFORTS TO IMPROVE INPATIENT ADMISSION AND PHYSICIAN BILLING COMPLIANCE AT DEFENDANT HOSPITAL**

**128.**

In the spring of 2007, Relator prepared a comprehensive business plan for "Medical Professional Revenue Integrity Program" highlighting the need for a coding program. This proposal for a medical auditing function would have provided assurance to management that:

- Medical practitioners and support staff are knowledgeable in documentation requirements,
- Practitioners are adequately documenting the services that they provide,
- Claims for medical services are accurately prepared,
- Halifax is not being overpaid nor underpaid for medical services.

**129.**

The Compliance Officer presented this to the Hospital Administration in June 2007. The plan was approved, and recruitment was started in November 2007. However, the program was cut before it could even be implemented. An improved compliance program would have eliminated improper inpatient admissions and improved physician billing practices, but it would also cause Defendant to lose millions of dollars annually.

**130.**

Relator has urged Defendant to return overpayments to the Government. In an email on July 7, 2008 Relator expressed her concern that the Hospital had not paid back the known overpayments that had been documented internally. Relator asked again on Thursday July 24, 2008 (the day after the compliance Committee meeting the day before on July 23, 2008) if they discussed the overpayments and whether the Defendant hospital was going to pay them back. The Compliance

Officer's response was "the interest is not there." The VP of the Defendant's business office understands the risks of retaining improper overpayments, and explained the risks to the CFO in the meeting. However, the CFO is unwilling to return the monies owed to Medicare or Medicaid at this time. This failure to return the monies to Government Payors is a violation of the FCA.

### 131.

Again on Thursday October 23, 2008, the day after the Compliance Committee meeting on October 22, 2008, Relator asked if overpayments were discussed.

### 132.

The response from the Compliance Officer was that there is "no appetite" to return any money at this time.

### 133.

In a October 10, 2008 meeting (email), Relator notified the VP of her concerns again:

- Concerns with two of the three neurosurgeons high utilization;
- Concerns with known overpayments not paid back;
- Concerns that Halifax was not following the OIG guidance for audit and monitoring responsibilities for physician practices, and that Halifax should consider having at least one auditor constantly reviewing physician charges;
- Concern with Urology incentive based on office procedure.

### 134.

Just as before, Relator's concerns were ignored and no corrective action was implemented by Defendant.

## COUNT ONE

### VIOLATION OF FEDERAL FALSE CLAIMS ACT31 U.S.C. § 3729-33

Paragraphs 1 through 134 are incorporated into Count I as if fully set forth herein.

### 135.

This is a civil action brought by Relator on behalf of the United States against the Defendant under the Federal False Claims Act, 31 U.S.C. § 3729-33.

### 136.

The Defendant knowingly or reckless disregarded or in deliberate ignorance of the truth or the falsity of the information involved, presented or caused to be presented, false or fraudulent claims for payment to federally-funded health insurance programs, in violation of, inter alia 31 U.S.C. § 3729(a)(1)(A).

### 137.

Further, the Defendant in reckless disregard or deliberate ignorance of the truth or the falsity of the information involved, made, used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia 31 U.S.C. § 3729(a)(1)(B).

### 138.

The Government Payors, unaware of the falsity of the claims and/or statements made or caused to be made by the Defendant, and in reliance on the accuracy of these claims and/or statements, paid for purported medical procedures and services provided to individuals insured by federally-funded health insurance programs, including Medicare and other Government Payors. Had

the United States known that the bills presented by Defendant for payment were false and misleading, payment would have not have been made for such claims.

**139.**

Additionally, Defendant has violated 31 U.S.C. 3729(a)(1)(G) by knowingly making, using or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

**140.**

As a result of Defendant' actions, the Government Payors have been severely damaged.

## COUNT TWO

## CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(C)

**141.**

Paragraphs 1 through 140 are incorporated into Count Two as if fully set forth herein.

**142.**

Defendant Halifax and Halifax Staffing conspired with one another to get false and fraudulent claims allowed and paid by the Government Payors.  Said Defendants also conspired to pay physicians excessive compensation in violation of the *Stark* laws .

**143.**

These Defendants conspired with others and withheld information specifically known to said Defendants regarding the fraudulent billing of patients and the improper payment of excessive compensation and illegal incentives to physicians who were in a position to refer and/or influence referrals of Medicare patients to Defendants' hospitals.

### 144.

Accordingly, the Defendants acted in a concerted fashion to defraud the Government Payors, and the Defendants acted with others in keeping the facts necessary to investigate the fraud and the damages caused by the fraud away from the United States.  Accordingly, the Defendants violated 31 U.S.C. § 3729(a)(1)(C).

### 145.

As a result of the Defendants' actions, the Government Payors have been severely damaged.

### <u>COUNT THREE</u>

### VIOLATION OF STARK STATUTE (42 U.S.C. §1395(nn) *et seq.*)

Paragraphs 1 through 145 are incorporated into Count Four as if fully set forth herein.

### 146.

Defendants' conduct described herein constituted a violation of the Stark statutes, 42 U.S.C. §1395(nn) *et seq.*

### 147.

As a direct result therefrom, Government Payors and the taxpayers of the United States have been directly damaged.

WHEREFORE, Relator prays for judgment against Defendant as follows:

(a)     That Defendant be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. § 3729-33;

(b)     That judgment be entered in favor of the United States and Relator and against the Defendant in the amount of each and every false or fraudulent claim multiplied as provided by 31

U.S.C. § 3729, plus a civil penalty of not less than Five Thousand Five Hundred and No/100

($5,500.00) Dollars, and no more than Eleven Thousand and No/100 ($11,000.00) Dollars per claim,

as provided by 31 U.S.C. § 3729, to the extent such multiplied penalties shall fairly compensate the

United States of America for losses resulting from the various schemes undertaken by Defendant,

together with penalties for specific claims to be identified at trial after full discovery; and

      (c)     That Relator be awarded the maximum amount permissible according to 31 U.S.C.

§ 3730(c); and

      (d)     That judgment be granted for the United States of America and Relator for all

violations by the Defendant of all violations of the False Claims Act, and *Stark* laws as well as all

other applicable laws referenced herein;

      (e)     That judgment be granted for the United States of America and Relator and against

Defendant for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees

incurred by Relator in the prosecution of this case;

      (f)     That the United States and Relator be granted such other and further relief as the

Court deems just and proper.

      Respectfully submitted this _12^{TH}_ day of _JUNE_, 2009.

WILBANKS & BRIDGES, LLP

By: _____
Marlan B. Wilbanks
Georgia Bar No. 758223

By: _____
Ty M. Bridges
Georgia Bar No. 081500

3414 Peachtree Road, NE
Suite 1075
Atlanta, Georgia  30326
(404) 842-1075 (tel)
(404) 842-0559 (fax)
mbw@wilbanks-bridgeslaw.com
tmb@wilbanks-bridgeslaw.com

ELAINE STROMGREN
Florida Bar No. 0417610
estromgren@jameshoyer.com
JOHN R. NEWCOMER
Florida Bar No. 143380
jnewcomer@jameshoyer.com
CHRISTOPHER CASPER
Florida Bar No. 048320
ccasper@jameshoyer.com
JAMES, HOYER, NEWCOMER,
SMILJANICH & YANCHUNIS, P.A.
4830 W. Kennedy Boulevard
One Urban Centre, Suite 550
Tampa, Florida 33609-2589
Telephone: (813) 286-4100
Facsimile: (813) 286-4174

56

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished by Certified Mail, Return Receipt Requested, this 15th day of June , 2009 to the following:

Honorable Eric H. Holder, Jr.
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, D.C. 20530-0001

United States Attorney A. Brian Albritton
United States Attorney's Office
Middle District of Florida
Orlando Division
501 W. Church Street
Suite 300
Orlando, Florida 32805

Civil - Process Clerk
United States Attorney's Office
Middle District of Florida
Orlando Division
501 W. Church Street
Suite 300
Orlando, Florida 32805

Tyline Medina
Civil Division
United States Attorney's Office
Middle District of Florida
Orlando Division
501 W. Church Street
Suite 300
Orlando, Florida 32805

Elaine Stromgren