**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex.rel.* ELIN BAKLID-KUNZ )<br><br>Relator )<br><br>vs. )<br><br>HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC. )<br><br>Defendants ) | CASE NO.: 6-09-CV-1002<br><br>FILED UNDER SEAL<br><br>[FALSE CLAIMS ACT – QUI TAM] |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS SECOND AMENDED COMPLAINT**

**<u>INTRODUCTION</u>**

Defendants Halifax Hospital Medical Center d/b/a Halifax Health a/k/a Halifax Community Health System a/k/a Halifax Medical Center and Halifax Staffing, Inc. (collectively "Halifax") by its undersigned counsel, offer the following arguments in support of its Motion to Dismiss the Second Amended Complaint ("Motion to Dismiss") filed by Plaintiff/Relator Elin Baklid Kunz ("Relator") in the above-captioned matter (Docket 2). For the reasons stated below, the Second Amended Complaint ("the Complaint") should be dismissed with prejudice.

## I.      PROCEDURAL HISTORY

Relator filed the initial complaint under seal over 20 months ago on June 16, 2009 and filed an amended complaint on December 23, 2009 (Docket Nos. 1-2).  More than nine months ago, on June 3, 2010, the United States, through its counsel the United States Department of Justice ("DOJ") notified the court of its decision not intervene in this matter (Docket No. 3).  Relator, however, did not serve the complaint on Halifax at that time. Rather, Halifax was informed that the complaint had been unsealed during a meeting with the DOJ on September 16, 2010.  Halifax and Relator later agreed to extend to on or before February 26, 2010 (Docket 18) the deadline for filing a responsive pleading.  Relator subsequently filed her Second Amended Complaint on February 18, 2011 (Docket 29), postponing to March 4, 2011 Halifax's deadline to file a responsive pleading.  On March 4, 2011, the court granted to both parties short extensions to the briefing deadlines for Halifax's Motion to Dismiss (Docket 32).

## II.     BACKGROUND

### A.      Halifax Is An Entity Of The State Of Florida

Halifax Hospital Medical Center is a community-owned hospital, owned by the residents of the Halifax Special Taxing District ("the District") in Volusia County, Florida, and is organized under the laws of the State of Florida as a special taxing district created pursuant to an act of the Florida Legislature.  *See* 1979 Fla. Laws 577.  Halifax  provides a continuum of health care services to central Florida through a network of organizations including a 764-bed hospital with the only Level II Emergency/Trauma Department in Volusia County, a tertiary hospital, psychiatric services, four cancer treatment centers, the

area's largest hospice organization, and a preferred provider organization.  Consistent with Florida law, including 2003-374, Laws of Florida, and Chapter 768, Florida Statutes, the District created Halifax Staffing, a not-for-profit Florida corporation, for the sole purpose of providing individuals to staff the District's health care facilities.  The District (and consequently, Halifax) is governed by a Board of Commissioners appointed by the Governor of Florida.  *See* Chapter 2003-374, Laws of Florida.

Halifax is the principal charity care and safety net provider for the region.  Halifax treats all patients who come to its Emergency Department regardless of their ability to pay.  In 2009, Halifax provided $74.8 million in community benefits, including uninsured, Medicare/Medicaid shortfall, physician services, preventive health, Medicaid match, trauma services, neonatal and pediatrics, and child behavioral services.

**B.**     **Relator's Allegations**

Medicare requires that inpatient hospital services be provided on a medically necessary basis.  *See generally* 42 U.S.C.S. 1395y(a)(1)(A).  The "medical necessity" of a patient admission is, however, a complex clinical determination that relies on the medical judgment of the admitting physician, not the staff of the hospital at which the patient presents.  Medicare Benefit Policy Manual ("MBPM") Ch. 1 § 10, entitled "*Covered Inpatient Hospital Services Covered Under Part A*."[1]  The MBPM states that "[t]he physician or other practitioner responsible for a patient's care at the hospital is also responsible for deciding whether the patient should be admitted as an inpatient."  MBPM Ch. 1 § 10.

---

[1]  However, "the decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number of factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting."  MBPM Ch. 1 § 10.

The Complaint alleges the following two broad claims:  (1) medically unnecessary patient admissions and (2) services agreements that incorporated kickbacks and other illegal remuneration to physicians – many of whom are Halifax employees – in violation of the False Claims Act, 31 U.S.C. §§ 3729-33 *et. seq.* ("FCA"), the Stark Law, 42 U.S.C. §§ 1395nn(a)(1) *et seq.* , and Federal Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b(b) *et seq.* ("AKS").  The Complaint is replete with conclusory allegations about complex clinical decisions made by highly trained health care professionals.  Relator does not allege anyone employed by or associated with Halifax has lied about whether treatments or procedures given to Halifax patients were medically necessary.  The Complaint does not malign the quality of care in any respect.  Relator, instead, asserts that Halifax engaged in fraud in admitting some unidentified volume of these needy patients to the hospital for their treatment.  Relator makes these allegations absent an expert clinical assessment of the condition or needs the patients.

All of Relator's *qui tam* claims fail on several grounds.  First and as to the entire Complaint, Halifax, as an instrumentality of the State of Florida, is immune from suit under the FCA as the Court has no subject matter jurisdiction.  Beyond this overarching defense, Relator's medical necessity allegations also fail because she (1) lacks standing to pursue her claims in this court under Fed. R. Civ. P. 12(b)(1), as the Court has no subject matter jurisdiction due to the operation of the public disclosure bar of the FCA; and (2) has failed to plead plausible facts to support the elements required to state a claim for a violation of the FCA, either under either Fed. R. Civ. P. 8 or the particularized pleading requirement of  Fed. R. Civ. P. Rule 9(b).  Nor do the Complaint's "kickback" allegations meet either Rule 8 or

9(b)'s requirement that the allegations include plausible facts to support the elements required to state a claim for a violation of the FCA, Stark Laws, or AKS.[2]  The Court should, accordingly, grant Halifax's motion to dismiss.

## III.   LEGAL STANDARD

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a federal court is to accept as true all facts set forth in the plaintiff's complaint.  *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted); and Fed. R. Civ. P. 12(b)(6).  Further, courts must draw all reasonable inferences in the light most favorable to the plaintiff.  *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1273 n.1 (11th Cir. 1999);  Fed. R. Civ. P. 12(b)(6).  To satisfy the pleading requirements of Fed. R. Civ. P. 8, a complaint must contain a short and plain statement showing an entitlement to relief, and the statement must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.  *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002);  Fed. R. Civ. P. 8.  *See also Bell Atl.*

---

[2] Even should Relator overcome the substantial pleading deficiencies in her Complaint, Halifax would still be immune from any assessment of punitive damages under the FCA due to its status as a state entity.  *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247 (1981) (holding City of Newport not subject to punitive damages under 42 U.S.C. § 1983).  *See also United States ex rel. Baker v. Cmty. Health Sys., Inc.,* 709 F. Supp. 2d 1084 (D.N.M. 2010) (analyzing whether the 2009 amendments to the FCA or the pre-2009 FCA applied to the claims at issue and whether retroactive application of the amended FCA implicated the *Ex Post Facto* Clause, the court held that the treble damages of the FCA as applied retroactively through the 2009 amendments were punitive and, thus, violate the *Ex Post Facto* Clause of the Constitution); *Kennedy v. Mendoza-Martinez,* 372 U.S. 144, 168-69 (1963) (applying a seven-factor test in determining that damages against defendants were punitive in nature); *United States ex. rel. Sanders v. Allison Engine Co.,* 667 F. Supp. 2d 747, 756-58 (S.D. Ohio 2009) (finding that four of the seven *Kennedy* factors weighed in favor of finding that the treble damages under the FCA were punitive in nature); and *Wilmink v. Kanawha County Bd. of Ed.,* No. 2:03-0179, 2005 U.S. Dist. LEXIS 42384, *3-4, *19-20 (S.D.W.Va. 2005) (holding that a school board was not subject to punitive damages for federal claims pursuant to 42 U.S.C. § 1983 and Title IX of the Education Amendments, as well as certain state claims, and granting defendant's motion to dismiss on the claim for punitive damages).  While the Supreme Court found that the FCA damages multiplier "has a compensatory function as well as a punitive one," *Cook County v. United States ex rel. Chandler,* 538 U.S. 119, 130 (2003), the high court has also recognized that the FCA's treble damages are "essentially *punitive* in nature."  *PacifiCare Health Systems, Inc. v. Book,* 538 U.S. 401, 405 (2003).

*Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (citations omitted); and *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346-47 (2005).

The Supreme Court has introduced the plausibility standard for motions to dismiss requiring that the non-movant's factual allegations must raise the right to relief above the speculative level. *See Twombly,* 550 U.S. at 553-61. The Supreme Court has recently clarified the conditions under which a complaint satisfies the substantive requirements of Fed. R. Civ. P. 8(a)(2). In *Iqbal,* the Court stated that "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556-57). The Court further explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* As *Twombly* established, "[A] plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (internal citations omitted). The Supreme Court has made clear that courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud and mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). It is "well settled and self-evident that the False Claims Act is a fraud statute for the purposes of Rule 9(b)" and that the heightened pleading requirements of Rule 9(b) apply fully to actions under the FCA. *United States ex rel. Clausen v. Lab. Corp. of Am.,Inc.,* 290 F.3d 1301,

1309-10 (11th Cir. 2002).  In articulating the factual specificity required to satisfy Rule 9(b), the Eleventh Circuit has observed that the rule "serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (citation omitted).

The Eleventh Circuit has held that a complaint satisfies the pleading requirements of Rule 9(b) if it sets forth:

> (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

*Id*.  Relator has failed to meet her burden at every turn.

## IV.   ARGUMENT

### A.   Halifax Is Absolutely Immune From Suit Under The FCA As An "Arm Of The State" Under The Eleventh Amendment Sovereign Immunity Clause

The Eleventh Amendment to the U.S. Constitution bars Relator's claims because Halifax as a member of the District is entitled to immunity as an instrumentality or agency of the State of Florida.[3]  By implication, the Eleventh Amendment also applies to suits by a

---

[3] The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend. XI.

citizen of the defendant state.  *Hans v. Louisiana*, 134 U.S. 1 (1890).  Thus, the Eleventh Amendment bars Relator's causes of action.[4]

The Supreme Court has repeatedly held that the Eleventh Amendment bars FCA causes of action against a state or state agency because a state or state agency is not a "person" within the meaning of the FCA.  *Vermont Agency of Natural Res. v. United States ex. rel. Stevens*, 529 U.S. 765 (2000); *see also*, *N. Ins. Co. of N.Y. v. Chatham County,* 547 U.S. 189, 193 (2006) ("states and arms of the State possess immunity from suits authorized by federal law").

In the Eleventh Circuit, Eleventh Amendment immunity includes agents and instrumentalities of a state.  *See Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (*en banc*).  Courts in the Eleventh Circuit apply a four-factor balancing test to determine whether an entity is an "arm of the state" in carrying out a particular function.  *Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n.,* 226 F.3d 1226, 1231-34 (11th Cir. 2000).  No single factor is dispositive.  *Id.*  The four factors are as follows: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity.  *Miccosukee Tribe,* 226 F.3d at 1231-34; *see also Manders*, 338 F.3d at 1309 ("whether an entity is an arm of the State for Eleventh Amendment purposes is ultimately a question of federal law . . . [b]ut the federal question can be answered only after considering provisions of state law").

---

[4] The DOJ has declined to intervene, but the Eleventh Amendment would also bar its claims had it intervened against Halifax.

Three of the four "arm of the State" factors weigh in favor of finding that Halifax is an instrumentality of the state and, therefore, immune from suit under the FCA.

1.    Florida Defines Halifax As A Governmental Instrumentality

Halifax is clearly a state instrumentality under Florida law.  Halifax is a special taxing district created pursuant to an act of the Florida Legislature.  *See* 1979 Fla. Laws 577. Hospital districts have been defined in state statutes as a "state agency or instrumentality." *Id*. For the purposes of Florida sovereign immunity under Fl. Sta. § 768.28(2), "state agencies or subdivisions" is defined to include "independent establishments of the state." Florida courts have determined that hospital districts fall within "state agencies or subdivisions" for the purposes of § 768.28(2).  *Eldred v. N. Broward Hosp. Dist.*, 498 So. 2d 911, 913 (Fla. 1986); *Lee v. S. Broward Hosp. Dist.*, 473 So. 2d 1322, 1323 (Fla. 4th DCA 1985).   Further, the Florida Supreme Court has specifically held on a number of occasions that a hospital district is a public agency subject to the rights and responsibilities of public agencies.  *See, e.g., State ex rel Robinson v. N. Broward Hosp. Dist.*, 95 So. 2d 434, 436 (Fla. 1957) (subject to bond validation); and *State v. Halifax Hosp. Dist.*, 159 So. 2d 231, 235 (Fla. 1963) (same); *see also Berbusse v. N. Broward Hosp. Dist.*, 117 So. 2d 550, 551 (Fla. 2d DCA 1960) (subject to public bidding requirements).

Halifax is required by statute to comply with Florida's Public Records Act, Chapter 119, Florida Statutes, which is only applicable to a state, county, or municipal agency or authority.  *See Halifax Hosp. Med. Ctr. v. News-Journal Corp.*, 724 So. 2d 567, 568 (Fla. 1999) (applying Public Records Act to Halifax Hospital).  *See also Campus Comm'ns., Inc. v. Shands Teaching Hosp.*, 512 So. 2d 999, 1000 (Fla. 1st DCA 1987) (holding private

teaching hospital not subject to Public Records Act).   Other Florida state courts have found hospital districts subject to other constraints imposed only on public agencies.   *See Michael v. Douglas*, 464 So. 2d 545, 546 (Fla. 1985) (Marion County Hospital District subject to Public Records Act); *Nat'l Union of Hosp. v. S.E. Volusia Hosp. Dist.*, 436 So. 2d 294 (Fla. 1st DCA 1983) (hospital district subject to Public Employees Relations Act); *Mizell v. N. Broward Hosp. Dist.*, 392 F.2d 580 (5th Cir. 1968) (medical staff privileges for public hospital governed by principles applicable to other public officers).[5]

2.      The State Exercises A High Degree Of Control Over Halifax

The State of Florida exercises a high degree of control over Halifax.   Halifax is overseen by a governor-appointed Board of Commissioners, which may be suspended by the governor pursuant to Section 7, Article IV of the Florida Constitution.   *Id.*, §§1-2.   In other contexts, state authority over the appointment of board members lends support to finding that an instrumentality is an arm of the State for Eleventh Amendment purposes.   *See Fouche v. Jeckyll Island-State Park Auth.*, 713 F.2d 1518, 1520-21 (11th Cir. 1983) (affirming immunity for Park Authority, after finding it both instrumentality of the state and public corporation, the Court noted that (1) "[t]hree members of the Park Authority are state officials and the other four members are appointed by the Governor;" (2) the fiscal life of the Park Authority "is controlled by the state;" and (3) "[t]he Park Authority serves a public

---

[5] Halifax, moreover, is an "agency" as defined by section 20.03 of the Florida Statutes.   Section 20.03(11) reads in pertinent part that: "'Agency', means an official, officer, commission, authority, council, committee, department, division, bureau, board, section, or another unit or entity of government."   The inclusion of Halifax in this definition is evidenced by the fact that the hospital is permitted to enter into "interagency" agreements under Florida law with other state agencies.   Halifax, has, at times, entered into interagency agreements with other state agencies.   *See* Exhibit 1 (Interagency agreement between Halifax Behavioral Services and School Board of Flagler County, Florida)**.**   School boards are explicitly defined as state agencies under the Florida's Administrative Procedure Act ("APA").   Fla. Stat. § 120.52(6).

purpose.").  The state also controls the voting requirements of and mandates public access to Halifax's board meetings through the Public Records Act.  Fla. Stat. § 286 et seq.

The State's Auditor General has jurisdiction to audit Halifax's financial books and reports.  1979 Fla. Laws 577, §18.  The District, of which Halifax is a part, is subject to the Uniform Special District Act of 1989, which requires independent districts to prepare various agency review reports and file various annual facilities reports.  Fla. Stat.  §§ 189.415, 189.418.

Unlike private hospital systems, the State exercises a high degree of control over Halifax's patient admission policies and other mission-specific interactions with the patient population Halifax serves.  The State, for example, requires that Halifax accept all indigent patients from the District.  *See Eldred*, 498 So. 2d at 913 (holding that special taxing districts are  "state agencies or subdivisions" for the purposes of, Florida's governmental liability statute, FLA. STAT. § 768.28(2) (1975)).  The requirements for health care administration and licensure are also regulated by statute.  *See, e.g.,* Fla. Stat. §§ 408.801 *et seq*.  The daily operations are fully regulated by administrative regulations promulgated by the Agency for Health Care Administration ("AHCA") and the Department of Health ("DOH").  *See, e.g.,* F.A.C. 59A-35, *et seq.* (licensing through AHCA); F.A.C. 64J-2, *et seq.* (trauma center regulation through DOH).

3.    Unlike Private Hospitals, The State Controls Halifax's Fiscal Life

Even though Halifax may collect *ad valorum* taxes to pay for its own expenses, Halifax is still an instrumentality of the State because the State controls its fiscal life.  *See Miccosukee Tribe*, 226 F.3d at 1233 (citing to *Fouche*, 713 F.2d at 1520-21 (holding that

although Park Authority raised own money and was self-sufficient, the State controlled Park's fiscal life because the Park had to submit its budget and annual reports to the legislature)).

The State's control manifests clearly across all aspects of Halifax's operations. First, the State exercises control over the way Halifax receives and pays out its funds. For example, the State retains oversight for the use of all state funding received by Halifax. Fla. Stat. § 189.413. Halifax is required by statute to purchase commodities and contractual services through competitive bids. *Id.*, § 189.4221.[6] There can be no question that Halifax's services are of critical importance to the local community. No comparable comprehensive alternative health care services are readily available, and accordingly, it is unlikely that a viable alternative could be developed quickly.

Second, the State exercises control over Halifax's financial reporting. As stated above, the District's books and reports are subject to audit by the Florida's Auditor General. 1979 Fla. Laws 577, §18. Also, as noted above, Halifax is subject to Florida's Public Records Act. *See* Fla. Stat. § 119.011; and *News-Journal Corp.*, 724 So. 2d 567.

4.   Responsibility For Judgments Against Halifax

Only one of the four factors – that special hospital districts in Florida are liable for judgments rendered against them – weighs against Halifax's state entity status argument. *See generally* 1951 Fla. Laws 27438 (enabling act giving hospital districts the power to sue and

---

[6] Halifax is also subject to an oversight review process that can determine whether a transfer of services to another district is warranted by, among other factors (1) the degree to which Halifax's services are essential to the well-being of the community; (2) the continuing community need for Halifax's services; (3) whether there is a less costly alternative method of delivering services to the District; and (4) whether transfer of the services to another entity can be accomplished without jeopardizing existing contracts, bonds, or outstanding indebtedness.

be sued).   Even here, the State's oversight and control over Halifax's budget mandates Halifax's accountability to the State for any judgments Halifax incurs.   Ultimately, if Relator were to prevail in this case, the State and its taxpayers would be obligated to pay the costs.

On balance and taking all of the factors into consideration, this Court has ample basis to find that Halifax is an arm of the State for the purposes of Eleventh Amendment sovereign immunity from suit under the FCA.

**B.**      **Relator's Medical Necessity Claims Fail Because The False Claims Act's Public Disclosure Bar Prohibits Opportunistic *Qui Tam* Complaints**

The Complaint must be dismissed, pursuant to Fed. R. Civ. P. 12(b)(1), because the Court has no subject matter jurisdiction due to the operation of the public disclosure bar. Under the FCA,

> [n]o court shall have jurisdiction over [an FCA qui tam action] based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).[7]   In the Eleventh Circuit, the court must determine if subject matter jurisdiction exists in a *qui tam* FCA claim through a three-part inquiry: "(1) have the allegations made by the [relator] been publicly disclosed; (2) if so, is the disclosed information the basis of the [relator]'s suit; (3) if yes, is the [relator] an 'original source' of that information."   *Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006).   *See also United States ex rel. Brown v. Walt Disney World Co.*, 361 Fed. App'x 66, 68 (11th Cir.

---

[7]   The Relator's Complaint, filed in June 2009 predates the subsequent amendments to the "original source" provisions of the False Claims Act which were enacted into law in 2010 as part of the Patient Protection and Affordable Care Act at Section 10104.

2010) ("[t]he FCA precludes suits based in *any part* on publicly disclosed information" unless the relator is an original source).

Here, Relator's medical necessity allegations, first filed by her on June 16, 2009, were initially identified as a potential concern for the United States when Halifax received an information request on July 29, 2008 from the DOJ and the Office of Inspector General of the Department of Health and Human Services, related to a government review of the medical necessity of inpatient admissions for certain procedures.  Relator was aware of this DOJ request for information.  These procedures involved well-publicized FCA claims about the medical necessity of patient admissions for the kyphoplasty treatment.  The kyphoplasty medical necessity allegations were well documented in the public record, legal and health care compliance trade journals, and the news media which are the types of sources contemplated by the public disclosure bar.  *See* 31 U.S.C. § 3730(e)(4)A); and *United States ex rel. Radcliffe v. Purdue Pharma L.P.*, 582 F. Supp. 2d 766, 770 (W.D. Va. 2008).

On May 22, 2008, the DOJ announced in a press release that Kyphon, the medical device company involved in marketing the procedure to hospitals such as Halifax, had entered into a $75 million settlement with the government to resolve allegations that the company encouraged providers to admit kyphoplasty patients without medical necessity justification.[8]  The media followed this closely.  The New York Times, for example, reported the Kyphon settlement on May 23, 2008[9] and the CBS Evening News included a segment

---

[8] Available at http://www.justice.gov/opa/pr/2008/May/08-civ-455.html.
[9] Available at http://www.nytimes.com/2008/05/23/business/23device.html.

during its broadcast on August 8, 2008.[10]   The DOJ's follow-on medical necessity investigation of *hospitals* was also covered widely in health care fraud enforcement trade journals.  *See, e.g.,* David M. Glaser, *Nationwide Kyphoplasty Investigation* (July 2008);[11] *New National Kyphoplasty Enforcement Initiative*, False Claims Act/Qui Tam Strategic Blog (Feb. 6, 2009);[12] and *HealthEast Reaches Settlement on Kyphoplasty Billing Investigation*, Marketwire (May 21, 2009).[13]  Many more examples exist.

Due to the existence of many public disclosures regarding the type of medical necessity claims raised by Relator, here, she must establish that she is an original source of the information.  Relator cannot do that.  An "original source" is "an individual who has direct and independent knowledge of the information *on which the allegations are based* and has voluntarily provided the information to the Government before filing an action."  31 U.S.C. § 3730(e)(4)(B) (emphasis added).  *See also Battle*, 468 F.3d at 762; and *United States ex rel. Dodge v. ACS State & Local Solutions, Inc.*, No. 8:03-cv-65-T-305TW, 2009 U.S. Dist. LEXIS 34495, at *10 - *11 (M.D. Fla. Apr. 3, 2009) (citations omitted) (finding that a relator is an original source if she has "first hand knowledge," occurring, for example, if the relator has "personally investigated [the fraud], formed [her] own conclusions, and [was] the 'moving force' behind [the investigation]").  Relator is not a clinician who provides medical care or diagnoses to patients.  She has no capacity to review patient medical charts

---

[10] Available at available at
http://www.cbsnews.com/stories/2008/08/08/eveningnews/main4334787.shtml?tag=mncol;lst;1.
[11] Available at http://www.fredlaw.com/articles/health/heal_0807_dmg.html.
[12] Available at http://fcaexpert.blogspot.com/2009/02/new-national-kyphonplasty-enforcement.html.
[13] Available at http://www.marketwire.com/press-release/HealthEast-Reaches-Settlement-on-Kyphoplasty-Billing-Investigation-993418.htm.

and assess whether a physician's medical judgment regarding a decision to admit was clinically justifiable.

The widespread disclosures alerted the Relator to potential medical necessity concerns at Halifax and ultimately were the basis of the filing of her original complaint in June 2009. All of Relator's alleged support for her medical necessity claims post-date these public disclosures and the DOJ's July 2008 request for information directed at Halifax:

- March 2009 internal audit regarding "fraudulent admissions." Complaint, ¶¶ 75-83.

- April 2008 - March 2009 internal audit regarding "fraudulent chest pain" admissions. *Id.*, ¶¶ 84-85.

- April 1- April 28, 2009 – internal "chest pain" review. *Id.*, ¶¶ 86-89.

- October 1, 2008 - March 31, 2009 internal audit regarding cardiac admissions. *Id.*, ¶¶ 90-91.

- April 1-30 2009 internal audit regarding cardiac admissions. *Id.*, ¶¶ 92-93.

A Relator must be an original source as to each allegation in her complaint. Specifically, "Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. We, along with every court to have addressed the question, conclude that § 3730(e)(4) does not permit such claim smuggling." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 476 (2007).

Relator has failed to allege sufficient facts to establish that she is an original source of the information contained in any of the internal audits. To the contrary, Relator fails to identify any specific Halifax personnel as having performed the audits – which post-date the public disclosures in any event – cited in the Complaint. None of the facts included in Relator's Complaint show that she directly participated in any of the audits on which she

relies.  Furthermore, Relator does not refer to any of her own research or documentation to prove that she has direct and independent knowledge of the findings contained in the internal audits.

### C.      Relator Has Failed To Satisfy The Pleading Requirements With Respect To The False Claims Act

Relator has not pled fraud with particularity.  The Complaint neither identifies specific false claims that were paid, patients who were fraudulently admitted or specific Diagnostic Related Codes for procedures that were subject to false claims.  Rule 9(b)'s particularized pleading requirement applies to claims arising under the FCA.  *See Lab. Corp. of Am., Inc.*, 290 F.3d at 1309-10 (noting "it was 'well settled' and 'self-evident' that the False Claims Act is a 'fraud statute' for the purposes of Rule 9(b)"); *Cooper v. Blue Cross,* 19 F.3d 562, 568-69 (11th Cir. 1994) (holding that relator alleging that health plan administrator improperly submitted claims to Medicare needed to comply with Rule 9(b)); *Corsello v. Lincare, Inc.,* 428 F.3d 1008, 1012 (11th Cir. 2005) ("[C]omplaints alleging violations of the [FCA] are governed by Rule 9(b)").

To satisfy Rule 9(b)'s particularity requirement, Relator must allege "facts as to time, place, and substance of the defendant's alleged fraud, [and] the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *Clausen*, 290 F.3d at 1310 (quoting *Cooper*, 19 F.3d at 567-68) (internal quotations omitted).  The Eleventh Circuit has made clear that, in addition to pleading the basic elements of a FCA violation, "an FCA relator must also plead the details of the allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Shurick v. Boeing Co.*, 2008 U.S. Dist. LEXIS 94927, *8 (M.D. Fla. Nov. 21, 2008) (citing *Clausen*, 290 F.3d at 1310).

Thus, Relator cannot meet Rule 9(b)'s particularity requirement simply by pleading fraudulent conduct on information and belief.  *Id.*  To prevail in a claim pursuant to Section 3729(a)(1), a *qui tam* plaintiff must prove: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false."  *United States ex rel. Walker v. R&F Props. of Lake County, Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).  In the Eleventh Circuit, the submission of a false claim is the *sine qua non* of the False Claims Act.  Accordingly, for an FCA claim to satisfy the requirements of Rule 9(b), Relator must establish the nexus between the defendant's fraudulent conduct and the actual submission of a false claim or statement to the Government.

The Eleventh Circuit has routinely held that Rule 9(b) requires "some indicia of reliability in the complaint to support the allegation of an *actual false claim* for payment being made to the Government."  *Mitchell v. Beverly Enters*, 248 Fed. Appx. 73, 74-75 (11th Cir. 2007) (citing *Clausen*, 290 F.3d at 1311).  Relator cannot recover simply by describing a generalized scheme to commit health care fraud, even if certain details of the scheme are described with particularity.  *Id.*  As the *Clausen* court explained, the FCA does not permit a plaintiff "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.  In *United States v. Aggarwal*, the plaintiff alleged, among other things, that a physician falsely created diagnoses to justify billing Medicare for consults and pre-surgical care and authorized procedure that were not medically necessary.  *Id.,* No. 6:03-cv-117-Orl-31KRS,

2005 WL 6011259, *3-6 (M.D. Fla. Feb. 10, 2005).  The *Aggarwal* plaintiff alleged that she "observes payments come in from Medicare for patients . . . for whom there was a lack of documentation supporting the diagnosis."  *Id*. at *5.  The *Aggarwal* plaintiff failed, however, to provide claim numbers, names of patients, dates on which claims were filed, the amount of claims, to whom the claims were made, who made the claim, and what any or all of the defendants obtained as a result.  *Id*.  The *Aggarwal* court, citing *Clausen,* found the allegations insufficient to meet the particularity requirement in Rule 9(b).  *Id.*  Allegations of defendant's "practice and custom" of submitting false claims, without firsthand knowledge of defendant's billing practices, did not have the requisite allegations in *Aggarwal* and are analogous to the Relator's generalized allegations here.

In her Complaint, Relator has not provided any specific supporting information for claims regarding short-stay inpatient payments made by Medicare, such as billing records or records of payments made to Halifax.   Rather, Relator discusses a litany of internal Halifax audits that identify various purported error rates related to, among other issues, chest pain.

- March 2009 internal audit regarding "fraudulent admissions" and purportedly evidencing a 45% error rate.  Complaint, ¶¶  75-83.

- April 2008 - March 2009 internal audit regarding "fraudulent chest pain" admissions and purportedly evidencing a 60% error rate.  *Id.*, ¶¶ 84-85.

- April 1- April 28, 2009 – internal "chest pain" review and purportedly evidencing an 82% error rate.  *Id.*, ¶¶ 86-89.

- October 1, 2008 - March 31, 2009 internal audit regarding cardiac admissions and purportedly evidencing a 59% error rate.  *Id.*, ¶¶ 90-91.

- April 1-30 2009 internal audit regarding cardiac admissions and purportedly evidencing a 59% error rate. *Id.*, ¶¶ 92-93.

These purported error rates alone – without supporting documentation of actual payments made by the government – do not constitute a sufficiently pled FCA claim.  With the exception of cardiac/chest pain related audits, Relator has not made any reference to or inclusion of specific billing records or documentation of payments made by Medicare on behalf of specific patients.  The law in the Eleventh Circuit and Middle District of Florida is clear that Relator must plead some detail regarding actual submission of claims to Medicare, billing and payment for services provided to Medicare patients, and the submission of the certification of billing compliance.  *Clausen*, 290 F.3d at 1311-14.  Here, Relator has merely cited to internal Halifax audits without providing any documentation of actual false claims to the government or payments made to Halifax pursuant to such false claims.

**D.  Relator Has Failed To Satisfy The Pleading Requirements With Respect To The Stark Laws**

The federal physician self-referral prohibition, commonly referred to as the Stark Law, prohibits a physician from making a Medicare or Medicaid referral to an entity for the furnishing of designated health services for which payment may be made by the Medicare or Medicaid program if (1) the physician has a financial relationship with the entity, and (2) none of the law's myriad exceptions apply.  42 U.S.C. §1395nn(a)(1).  The Act also prohibits the submission of any claim or bill for services furnished pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(2).

In order to prove a violation of the Stark Law, Plaintiff  must provide evidence that (1) physicians have financial relationships with the defendants that do not qualify for an exception, 42 U.S.C. §1395nn(a)(1), (a)(2)(B) and (e); and (2) these physicians made Medicare or Medicaid referrals to defendants for designated health care services.  42 U.S.C.

§1395nn(a)(2)(B) and (e).   In this case, Relator has not provided evidence of either.  Relator, instead, tries to establish the inference that lawful claims submitted by Halifax were tainted by Stark Law violations.  Accordingly, the Complaint's Stark Law claims must be dismissed.

1.   Relator's Allegations Regarding Halifax Physician Agreements Do Not, As A Matter Of Law, Constitute Violations Of The Stark Laws

Section IV(B) of the Relator's Complaint fails to plead Stark Law violations to the extent required by Fed. R. Civ. P. 12(b)(6).  Relator makes the conclusory statement that Halifax's physician employment agreements represent a "profit sharing scheme" that violates the Stark Laws.  Relator further states that Halifax "has never disclosed or returned the payments made by government payors . . . derived by unlawful referrals prohibited by the Stark Act."  Complaint at ¶ 98.  This is a pleading leap made with no legs.  Relator cannot establish the existence of a claim by merely reciting the terms of the various agreements.

Halifax pays physician compensation based on personal clinical productivity and at fair market value as set forth by (1) the bona fide employment exception, 42 C.F.R. § 411.357(c), (2) the Personal Services Exception, 42 C.F.R. § 411.357(d), and (3) the Fair Market Value Exception, 42 C.F.R. § 411.357(l), to the Stark Laws.  Relator's bare assertion that Halifax pays physician compensation that exceeds Fair Market Value is deficient and cannot alone sustain her claim that any physician's compensation was illegally based on the value or volume of their referrals to or other business generated for the hospital.

2.   Relator Has Failed To Either Establish That Improper Referrals Were Made Or Identify The Allegedly False Claims

The crux of an FCA claim is the submission of a false claim.  The Complaint's lack of any detail regarding the referrals and submission of the certification renders the FCA

claim fatal.  Without pleading some detail regarding actual Medicare referrals, billing and payment for services provided to a specific Medicare patient, and the submission of the certification of billing compliance, a complaint cannot sufficiently allege a claim under the FCA for violations of the Stark Laws.  *See also Peterson v. Cmty. Gen. Hosp.*, No. CV-05-766-PHX, 2003 U.S. Dist. LEXIS 1783, at *3 - *6 (N.D. Ill. 2003).

The Complaint fails to identify any Halifax Medicare or Medicaid patient or Halifax claim for payment that resulted from these alleged fraudulent referrals.  Nor does the Complaint identify any Halifax personnel who falsely certified Halifax's compliance with federal law.  Relator's vague allegations about supposedly "Stark-tainted" physician compensation should be dismissed.  *See, e.g., Peterson*, 2003 U.S. Dist. LEXIS 1783, at *5 - *6.

In *Peterson v. Cmty. Gen. Hosp.*, the plaintiff brought a *qui tam* action under the FCA against three hospitals for falsely certifying they complied with the Stark Law.  *Id.*  The *Peterson* court noted that the relator essentially alleged that:

> (1) defendants provided financial remunerations and other benefits to various physicians; (2) in exchange, those physicians referred Medicare patients to defendants; (3) defendants billed Medicare for the services they provided to those patients; and (4) defendants falsely certified their claims complied with federal law.

*Id.*, at *3 - *4.  The *Peterson* court dismissed the complaint, holding that "[a]lthough he has provided ample detail about (1), relator has made only the sketchiest allegations concerning (2), (3), and (4)."  *Id.* at *4.  The absences of allegations specifying the identity of the patients referred by the physicians or including evidence of the specific claims for payment was fatal to the complaint.  *Id.*  There is ample basis for the same result here.

**E.** **Relator Has Failed To Satisfy The Pleading Requirements With Respect To The Anti-Kickback Statute**

The Complaint's pleading deficiencies as reflected in the Stark Law allegations also apply to the alleged AKS violations.  The AKS prohibits a hospital from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b).  Relator fails to allege facts showing that physicians referred patients to Halifax in exchange for compensation which would represent the requisite *quid pro quo* required by § 1320a-7b(2) of the AKS.  Relator cannot establish an AKS violation without alleging Halifax paid remuneration either to "induce" the payee to either (a) "refer an individual" for the furnishing of services or "arrange" the same, or (b) "purchase, lease, order" etc. any goods or services or "recommend" the same.  *Id.* at § 1320a-7b(2).  Relator has, at most, made allegations that establish that the physicians received compensation linked to the personal performance of services.

Relator has failed to plead a causal relation between the violation of the AKS Law and violation of the FCA.   The Relator has not alleged any certification of compliance with the AKS with specificity nor has the Relator alleged that the government relied on such a certification in making payments to Halifax.  Absent pleading such allegations, the Relator cannot successfully "bootstrap" her alleged AKS violations into FCA violations.[14]

Under the false certification theory of liability, the FCA violation arises from the certification of compliance, not the payment or acceptance of remuneration.  *See, e.g., United*

---

[14]  The initial complaint pre-dates the subsequent amendments to the AKS contained in the 2010 Patient Protection and Affordable Care Act.

*States ex rel. Bennett v. Medtronic,* __ F. Supp. 2d. __, No. H-08-3408, 2010 WL 3909447 (S.D. Tex. Sept. 30, 2010) (dismissing AKS allegations where relator failed to allege defendant caused false certifications and did not provide "reliable indicia that physicians or hospitals falsely certified compliance").  FCA liability can arise when a claim is falsely certified, either expressly or implicitly.  Under the express false certification of liability, an FCA action can be premised on "a claim that falsely certifies compliance with a particular statute [or] regulation" where compliance with the statute or regulation is a prerequisite to payment.  *United States ex rel. Mikes v. Straus,* 274 F.3d 687, 698 (2d Cir. 2001).  Here Realtor has not alleged that Halifax made *any* false certification of compliance, much less alleged the "who, what, where, when and how" of the alleged false certifications.  *See Medronic,* 2010 WL 3909447, at *33-34.

Here, Relator's AKS allegations similarly fail under an implied false certification theory.  An implied false certification claim is based on idea that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules as a precondition to payment.  *See McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256, 1259-60 (11th Cir. 2005).  A relator must allege that compliance with the AKS Law is a prerequisite to payment and that Halifax made claims for reimbursement *knowing* that it was ineligible for the payments derived from those claims.  *See id.*  Relator has made no such allegations and her general or speculative allegations are not sufficient to survive a motion to dismiss.  *See id.*  Relator's bare AKS allegations do not provide reliable indicia of a scheme to defraud and, consequently, Relator's FCA claims based on violation of the AKS Law must be dismissed.  *Clausen,* 290 F.3d at 1311-14.

**V.      CONCLUSION**

For the foregoing reasons, this Court should dismiss Relator Kunz's Complaint with

prejudice.

Dated: March 15, 2011                                Respectfully submitted,

                                                     s/ Anthony N. Upshaw
                                                     Anthony N. Upshaw
                                                     Fla. Bar. No. 0861091
                                                     MCDERMOTT WILL & EMERY LLP
                                                     201 South Biscayne Boulevard,
                                                     Suite 2200
                                                     Miami, FL 33131
                                                     Tel: (305) 358-3500
                                                     Fax: (305) 347-6500
                                                     Email: aupshaw@mwe.com

                                                     T. Reed Stephens (admitted *pro hac vice*)
                                                     David O. Crump (admitted *pro hac vice*)
                                                     Amandeep S. Sidhu (admitted *pro hac vice*)
                                                     MCDERMOTT WILL & EMERY LLP
                                                     600 13th Street, NW
                                                     Washington, DC 20005
                                                     Tel: (202) 756-8000
                                                     Fax: (202) 756-8087
                                                     Email: trstephens@mwe.com
                                                     Email: dcrump@mwe.com
                                                     Email: asidhu@mwe.com

                                                     *Counsel to Defendants Halifax Medical Center
                                                     and Halifax Staffing, Inc.*