**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**
*ex. rel.* **and ELIN BAKLID-KUNZ, Relator,**

        **Plaintiffs,**

-vs-                                            Case No. 6:09-cv-1002-Orl-31DAB

**HALIFAX HOSPITAL MEDICAL**
**CENTER, d/b/a Halifax Health, a/k/a**
**Halifax Community Health System, a/k/a**
**Halifax Medical Center and HALIFAX**
**STAFFING, INC.,**

        **Defendants.**

## ORDER

This matter comes before the Court without a hearing on the Motion to Dismiss (Doc. 34) and accompanying legal memorandum (Doc. 35) filed by Defendant Halifax Hospital Medical Center d/b/a Halifax Health a/k/a Halifax Community Health System a/k/a Halifax Medical Center and Defendant Halifax Staffing, Inc. (collectively, "Halifax"). In resolving the motion, the Court has also considered the memorandum in opposition (Doc. 36) filed by the Relator, Elin Baklid-Kunz ("Baklid-Kunz"), the statement of interest (Doc. 40-1) filed by the United States of America ("United States"), the reply (Doc. 44) filed by Halifax, and the sur-reply (Doc. 45) filed by Baklid-Kunz.

    **I.**    **Background**

Qui tam relator Baklid-Kunz brings this suit under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (the "Act" or the "FCA"). According to the allegations of the Second Amended Complaint

(Doc. 29), which are accepted as true for purposes of resolving this motion, Baklid-Kunz is the Director of Physician Services for Halifax. She contends that Halifax has improperly admitted thousands of patients even though no medical necessity existed for their admission, thereby improperly boosting the amount for which Halifax could (and did) bill Medicare. Baklid-Kunz also contends that Halifax participated in improper financial arrangements with and paid excessive compensation to certain physicians, in violation of the Stark Amendment to the Medicare Act[1] and the Anti-Kickback Act[2].

By way of the instant motion, Halifax seeks to have the Second Amended Complaint dismissed on the grounds of Eleventh Amendment immunity. Halifax also contends that Baklid-Kunz has failed to state a claim for violation of the FCA, the Stark Amendment, or the Anti-Kickback Act and argues that Baklid-Kunz's FCA claims are barred because they were publicly disclosed prior to her asserting them.

## II.     Legal Standards

### A.     Motions to Dismiss

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," so as to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Conley v. Gibson*, 35 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *overruled on other grounds*, *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,

---

[1] 42 U.S.C. § 1395nn, commonly referred to as the Stark Statute or Stark Amendment, prohibits a hospital from submitting Medicare claims based on patient referrals from physicians having certain kinds of financial relationships with the hospital, such as an ownership interest, that might improperly influence the physicians' medical judgment.

[2] 42 U.S.C. § 1320a-7b.

127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milbum v. United States*, 734 F.2d 762, 765 (11th Cir.1984).  In ruling on a motion to dismiss, the Court must accept the factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir.1988).  The Court must also limit its consideration to the pleadings and any exhibits attached thereto.  FED. R. CIV. P. 10(c); *see also GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1510 (11th Cir. 1993).

The plaintiff must provide enough factual allegations to raise a right to relief above the speculative level,  *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1966, and to indicate the presence of the required elements, *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1302 (11th Cir.2007).  Conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.  *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003).

In *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court explained that a complaint need not contain detailed factual allegations, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. . . . A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. at 1949 (internal citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the plaintiff is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

**B.     Eleventh Amendment**

Article III of the Constitution provides that the judicial power of the United States "shall extend to . . . controversies . . . between a state and citizens of another state." U.S. Const. art. III, § 2.  In *Chisolm v. Georgia*, 2 U.S. 419 (1793), the United States Supreme Court held that, based on this language, a state could be forced to defend itself in federal court against a suit filed by citizens of another state.  This proved to be a controversial result, and within a few years the states approved a constitutional amendment to undo it.  *See Edelman v. Jordan*, 415 U.S. 651, 661-63 94 S.Ct. 1347, 1354-55, 39 L.Ed.2d 662 (1974) (describing background of the passage of the Eleventh Amendment).  *See also Cohens v. Virginia*, 19 U.S. 264, 406, 5 L.Ed. 257 (1821) (Marshal, C.J.) (observing that, at the time the Constitution was adopted, all the states were greatly indebted, and the "apprehension that these debts might be prosecuted in the federal Courts" prompted swift passage of the Eleventh Amendment).

The Eleventh Amendment to the United States Constitution limits the jurisdiction of the federal courts.  It provides that the judicial power of the United States "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. Baklid-Kunz, a Norwegian citizen, is a permanent resident of the United States who resides in Florida.  For jurisdictional purposes, she is deemed to be a Florida citizen.  28 U.S.C. § 1332(a). By its terms, the Eleventh Amendment does not apply to suits brought against a state by citizens of that state.  However the same notions of sovereign immunity behind the Eleventh Amendment's ban on suits against nonconsenting states by out-of-state citizens also bar suits against

nonconsenting states by citizens of that state. *Hans v. Louisiana*, 134 U.S. 1, 10-17, 10 S.Ct. 504, 505-08, 33 L.Ed. 842 (1890).

The Eleventh Amendment may bar a suit even where no state is named as a party. Where a suit involves private parties seeking to impose a liability which must be paid from public funds in the state treasury, the state is the real, substantial party in interest, and the Eleventh Amendment applies. *Edelman*, 415 U.S. at 663, 994 S.Ct. at 1356 (citing *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945), among others). However, the effect on the state treasury is not the sole criterion. For example, a state cannot confer Eleventh Amendment immunity on an agency by volunteering to pay judgments that may be entered against it. *Jackson v. Georgia Dept. of Transportation*, 16 F.3d 1573 (11th Cir. 1994) (holding that, in suit against state employee, existence of trust fund that would pay any judgment against state employees did not make state real party in interest for Eleventh Amendment purposes where state had voluntarily established the fund).[3]

### C.   The False Claims Act

The FCA was enacted in 1863 with the principal goal of stopping the massive frauds perpetrated by private contractors during the Civil War. *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 781, 120 S.Ct. 1858, 1867, 146 L.Ed.2d 836 (2000) (citing *United States v. Bornstein*, 423 U.S. 303, 309, 96 S.Ct. 523, 528, 46 L.Ed.2d 514 (1976)). It permits private

---

[3]The converse is also true; the fact that the state treasury will not be affected by a judgment against a party does not necessarily preclude a party from claiming entitlement to Eleventh Amendment immunity. *See Regents of the University of California v. Doe*, 519 U.S. 425, 431, 117 S.Ct. 900, 904-05, 137 L.Ed.2d 55 (1997) (fact that federal government would indemnify university for costs of litigation, including adverse judgment, did not divest university of Eleventh Amendment immunity).

persons to file a form of civil action – known as *qui tam* – against (and recover damages on behalf of the United States from) any person who (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A)-(B).

### III.   Analysis

#### A.   Eleventh Amendment

To determine whether the Eleventh Amendment provides immunity to a particular entity, courts within this Circuit examine four factors: (1) how state law characterizes the entity; (2) how much control the state maintains over the entity; (3) where the entity's funds come from; and (4) whether the state would ultimately be responsible to pay any judgments entered against the entity. *Miccosukee Tribe of Indians of Florida v. Florida State Athletic Commission*, 226 F.3d 1226, 1231 (11th Cir. 2000).  The four factors are analyzed in turn below.

##### 1.   Characterization under state law

The determination of entitlement to Eleventh Amendment immunity is a question of federal law, but that question can only be answered after consideration of the provisions of state law that define the entity's character. *Regents of the University of California v. Doe*, 519 U.S. 425, 430 n.5, 117 S.Ct. 900, 904 n.5, 137 L.Ed.2d 55 (1997)  The answer depends, at least in part, upon the nature of the entity created by state law. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).  The more that state law defines the entity as something resembling a political subdivision (such as a county or similar municipal corporation) rather than an arm of the state, the less likely it is that the entity will be

entitled to Eleventh Amendment immunity. *Id.* For example, in the *Mt. Healthy City School* case, the Supreme Court concluded that an Ohio school district was not entitled to immunity in part because under a particular Ohio statute, the definition of "State" did not include "political subdivisions," whereas the statute's definition of "political subdivisions" *did* encompass local school districts. *See id.*

In arguing that it is "clearly a state instrumentality under Florida law," (Doc. 35 at 9), Halifax places great weight on the fact that Florida law has defined hospital districts as a "state agency or instrumentality." This assertion, though not untrue, misses the mark. The question is not whether Halifax is a state agency or instrumentality, but whether a state agency or instrumentality such as Halifax is entitled to Eleventh Amendment immunity. *See, e.g., Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309, 1314 (11th Cir. 2003) (stating that "[i]n deciding whether a state agency or instrumentality may invoke the state's immunity as an arm of the state, we have recognized three factors: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; and (3) from where the entity derives its funds and who is responsible for satisfying the judgments against the entity.").[4] Thus a showing that Halifax is defined as a state agency or Florida instrumentality does not itself establish that Halifax is entitled to assert Eleventh Amendment immunity.

Halifax points to a number of examples of its treatment under state law, but none of them are particularly helpful to Halifax's position. Halifax cites to Fla. Stat. § 768.28, which governs the state's waiver of sovereign immunity for certain tort actions. Section 768.28(2) defines the

---

[4]The Court notes that the four-factor test in *Miccosukee Tribe of Indians* is functionally identical to the three-factor test described in *Vierling*.

term "state agencies or subdivisions" as including "independent establishments of the state," and Halifax notes that some state courts have found that hospital taxing districts fall within the definition of "independent establishments of the state." *See, e.g.*, *Eldred v. North Broward Hosp. Dist.*, 498 So.2d 911 (Fla. 1986). However, Section 768.28(2) also defines the phrase "independent establishments of the state" as including "counties and municipalities." Counties and municipalities do not enjoy Eleventh Amendment immunity – at least not simply by virtue of their status as counties or municipalities. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (stating that Supreme Court "has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power,'" and citing cases). The fact that counties and municipalities share the status of an "independent establishment of the state" with hospital taxing districts greatly weakens any argument that "independent establishments of the state" under Florida law are *per se* entitled to Eleventh Amendment immunity.

    Halifax also notes that Florida courts have held that a hospital district is a "public agency subject to the rights and responsibilities of public agencies," such as bond validation and public bidding requirements. *See State ex rel Robinson v. N. Broward Hosp. Dist.*, 95 So.2d 434, 436 (Fla. 1957) (bond validation) *and Berbusse v. N. Broward Hosp. Dist.*, 117 So.2d 550, 551 (Fla. 2d DCA 1960) (public bidding). Again, however, the question is not whether Halifax is a public entity but whether Florida law treats it as an arm of the state itself. Halifax points out that it is required to comply with the state's Public Records Act (Ch. 119, Florida Statutes). However, the public records act applies to county and municipal records, as well as state records, Fla. Stat.

§ 119.011(2), and thus Halifax's obligation to abide by that act falls short of showing an absence of independence on Halifax's part.

        2.        State Control

Halifax argues that the state "exercises a high degree of control" over it.  Halifax points out that it is overseen by a Board of Commissioners appointed by the Governor, that Florida requires it to accept all indigent patients within the District, that the state imposes administrative and licensing requirements, and that its daily operations are "fully regulated by administrative regulations promulgated by the Agency for Health Care Administration and the Department of Health."  (Doc. 35 at 11).  Contrary to Halifax's assertions, this does not show that the state exercises a great deal of control over its operations.  Halifax's strongest argument in this regard is that the Governor appoints the commissioners that run it; however, merely appointing board members falls far short of establishing that the state runs the hospital's operations.  As for the other cited examples, such as licensing requirements and administrative regulations, Halifax has not shown that it is subject to any more state control than private hospitals are subject to.  And the fact that Halifax must admit all indigent patients is not indicative of any sort of control; it is simply an obligation that Halifax must comply with.

Halifax also attempts to rely on the fact that it must comply with the Public Records Act, and that it is required to prepare audits and annual reports.  The Relator asserts (and Halifax does not dispute) that private hospitals also bear these same burdens, demonstrating that Halifax is not subject to any unusual degree of control by the state.

### 3. Source of Funds/Fiscal Autonomy

Halifax possesses the power to assess ad valorem taxes, a power denied to the state by the Florida Constitution.[5] Nonetheless, Halifax argues that it is an "arm of the state" because the state "controls its fiscal life." (Doc. 35 at 11). The fiscal constraints imposed upon it are comparatively minor, however. Halifax asserts that the state "retains oversight for the use of all state funding" it receives. (Doc. 35 at 12). But the statute it points to in support of this assertion – Fla. Stat. § 189.413 – simply imposes minimal oversight responsibilities on state agencies that administer funding programs for which special districts are eligible. The only oversight responsibilities explicitly required are (1) to report the program's existence to Florida's Department of Community Affairs and (2) to submit an annual list of participating special districts to the Special District Information Program of the Department of Community Affairs. It is not accurate to describe such obligations as control of any entity's fiscal life. Similarly, the requirements that Halifax be subject to audits from the state's Auditor General and be subject to the Public Records Act fall far short of demonstrating that it lacks fiscal autonomy.

Compare the situation in *Fouche v. Jekyll Island-State Park Authority*, 713 F.2d 1518 (11th Cir. 1983). In that case, the court found that the state of Georgia "control[led] the fiscal life" of the Park Authority, even though the Park Authority raised its own funds by issuing bonds and operating businesses such as hotels and golf courses on its property. In finding that the state exerted sufficient fiscal control to turn the Park Authority into an arm of the state, the *Fouche* court noted that the Park Authority's budget had to be submitted to the state legislature; that all of

---

[5]Article 7 § 1(a) of the Florida Constitution provides in pertinent part that "[n]o state ad valorem taxes shall be levied upon real estate or tangible personal property."

its financial records had to be submitted to the state auditor annually; that its leases were deemed to be contracts between itself, the lessee, and the state; that the state legislature had to approve the sale of any Park Authority land; and that any income from Park Authority hotels and other such operations had to be used "for the sole purpose of beautifying, improving, developing, enlarging, maintaining, administering, managing, and promoting Jekyll Island State Park at the lowest rates reasonable and possible for the benefit of the people of the State of Georgia." *Id.* at 1521-22. The control exerted by the state of Florida over Halifax is nowhere near as widespread as that exerted by the State of Georgia over the Park Authority.

### 4. Responsibility for Judgments

Even Halifax admits that it, rather than the state, would be legally responsible for any judgment that might be entered against it in this case. (Doc. 35 at 11-12). Halifax attempts to argue that the state would "ultimately" have to pay any judgment entered against it, but provides no factual or precedential support for this contention. Even assuming the state would opt to pay such a judgment – so as to, for example, minimize disruption to the system of medical treatment for the indigent in the area served by Halifax – it would not justify an assertion of Eleventh Amendment immunity here. *See Jackson v. Georgia Dept. of Transportation*, 16 F.3d 1573 (11th Cir. 1994) (holding that Eleventh Amendment does not apply where state voluntarily undertakes obligation to pay party's judgment).

All told, none of the four factors weigh in favor of finding that Halifax is entitled to Eleventh Amendment, and the fourth factor – financial responsibility for judgments – points strongly in the other direction. After considering the foregoing, the Court concludes that Halifax is not entitled to Eleventh Amendment immunity.

-11-

### B. Public Disclosure

The FCA's public disclosure bar generally forecloses *qui tam* suits that are "based upon the public disclosure of allegations or transactions . . . in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless . . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(a). *See Schindler Elevator Corp. v. U.S. ex rel Kirk*, 131 S.Ct. 1885 (2011) (dismissing FCA suit pursuant to public disclosure bar where relator learned of defendant's misdeeds through Labor Department responses to FOIA requests). Halifax contends that what it describes as "Relator's medical necessity allegations,"[6] which were first filed by her on June 16, 2009, were

> initially identified as a potential concern for the United States when Halifax received an information request on July 29, 2008 from the [Department of Justice] related to a government review of the medical necessity of inpatient admissions for certain procedures.

(Doc. 35 at 14). Halifax also points to a May 22, 2008 announcement of a settlement between DOJ and a company marketing a particular procedure known as "kyphoplasty," resolving allegations that the company encouraged providers to admit patients for the procedure without medical necessity. (Doc. 35 at 14).

After making these allegations, however, Halifax makes no effort to show that admissions related to kyphoplasty (or any other procedure that might have been the subject of the government's July 2008 information request) are also at issue in this case. Halifax also makes no

---

[6] In other words, Baklid-Kunz's allegations that Halifax routinely admits Medicare patients who do not meet the criteria for inpatient admission.

effort to show that the information request or the settlement announcement actually *disclosed* anything at all, much less that either disclosed any information that formed part of the basis of this case. For her part, Baklid-Kunz denies that the transactions she alleges are improper involve these procedures. The Court finds that Halifax has failed to show that Baklid-Kunz's suit is prohibited by the public disclosure bar.

### C. Failure to State a Claim

As the False Claims Act is a fraud statute, Federal Rule of Civil Procedure 9(b) requires that FCA claims be stated with particularity. *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). Particularity means that "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *Id*. at 1310 (quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567-68 (11th Cir.1994)).

> Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.

*Clausen,* 290 F.3d at 1311 (quoting Rule 9(b)).

The submission of a false claim is the *sine qua non* of a False Claims Act violation. *Id.* Courts cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity or ignoring that the "true essence of the fraud" of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme. *U.S. ex. rel. Atkins v. McInteer*, 470

F.3d 1350, 1357 (11th Cir. 2006). Rather, the complaint must provide some "indicia of reliability" to support the allegation of an actual false claim for payment to the government. *Id.*

Halifax complains that Baklid-Kunz has failed to satisfy Rule 9(b)'s requirements in that she fails to identify "specific false claims that were paid, patients who were fraudulently admitted or specific Diagnostic Related Codes[7] for procedures that were [the] subject [of] false claims." (Doc. 35 at 17). In particular, Halifax asserts that Baklid-Kunz has not provided billing records or records of payments made to Halifax and instead relies on internal audits that purport to identify fraudulent admissions. (Doc. 35 at 19).

The audits on which Baklid-Kunz relies do purport to identify fraudulent admissions, but they do more than just that. As an example, one such audit is found at Exhibit 3 (Doc. 29-1 at 6-12) to the Second Amended Complaint. Exhibit 3 is a list of 64 people, each identified by a "Patient ID Number,[8]" who were admitted to Halifax on an inpatient basis in March 2009. The list includes DRG codes and names, the name of the attending physician, and comments – including, in numerous instances, statements that the patient did not meet the criteria for inpatient admission. For example, the record for the first person on the list – Patient ID number 20025305721 (henceforth, "Patient '5721") – shows that the patient's attending physician was Scott Gilroy, the patient's DRG number was 87, and the principal diagnosis code was 853.01. (Doc. 29-1 at 6).

---

[7]Presumably, Halifax is referring to Diagnosis Related Group (or "DRG") codes, which are used to classify hospital cases into one of several hundred groups for purposes of Medicare payments. Patients in a particular Diagnosis Related Group are expected to utilize similar levels of hospital services and, therefore, entitle the hospital to similar amounts of payment from Medicare.

[8]Baklid-Kunz asserts that the patients' names were redacted to protect their privacy, and that Halifax knows the patient name behind each ID number.

The record also includes the comment that Patient '5721 "fell out front" and "did not meet IP criteria". (Doc. 29-1 at 6). Exhibit 1 (Doc. 29-1 at 2) to the Second Amended Complaint is also a list of patients who were inpatients at Halifax during the same time frame, but it purports to include only patients who did not meet the inpatient criteria. Exhibit 1 also includes the amount of charges the patient accrued and the amount paid by Medicare in regard to that patient. (Doc. 29-1 at 2). Patient '5721 appears on Exhibit 1, with the same attending physician, DRG number and principal diagnosis code as on Exhibit 3. (Doc. 29-1 at 2). According to Exhibit 1, Patient '5721 accrued $13,995 in charges, and Medicare paid $3,547. (Doc. 29-1 at 2). In addition, Baklid-Kunz alleges that, despite learning that it was systematically admitting patients without medical necessity and therefore sending inflated bills to Medicare, and despite learning that particular patients whose charges had been paid by Medicare should not have been admitted, Halifax has not notified Medicare of the overbillings or refunded the overpayments.

Patient '5721 is not the only example. Indeed, Exhibit 5 (Doc. 29-1 at 16-25) to the Second Amended Complaint purports to identify 216 patients who were improperly admitted and in regard to whom Medicare overpaid nearly $850,000 to Halifax. But one example is enough to show that Halifax was incorrect to assert that Baklid-Kunz failed to identify "specific false claims that were paid, patients who were fraudulently admitted or specific Diagnostic Related Codes for procedures that were [the] subject [of] false claims". (Doc. 35 at 17).

Rule 9(b) exists to prevent spurious charges and provide notice to defendants of their alleged misconduct, not to require plaintiffs to meet a summary judgment standard before proceeding to discovery. *U.S. ex rel. Longest v. Dyncorp*, 2006 WL 47791, *5 (M.D.Fla. 2006). "When Rule 9(b) applies to a complaint, a plaintiff is not expected to actually *prove* his

allegations." *Clausen* at 1313 (emphasis in original).  Halifax has failed to show that Baklid-Kunz has not met the specificity requirements of Rule 9(b).

Finally, Halifax also asserts that Baklid-Kunz has failed to state a claim in regard to her allegations that certain claims for payment from the government were false in that they were tainted by violations of the Stark Amendment or the Anti-Kickback Act.  These assertions do not merit extended discussion.  Baklid-Kunz has identified the particular financial relationships and payments that allegedly violated the Stark Amendment and the Anti-Kickback Act, respectively, and the physicians involved, and she has provided records of Medicare payments for patients referred by some of those physicians.  For present purposes, that is sufficient.

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion to Dismiss (Doc. 34) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 6, 2011.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party