**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **BAKLID-KUNZ,** | § § § § | **Civ. Act. No. 6:09-CV-1002-ORL-31 DAB** |
| **Plaintiff,** | § § | |
| **v.** | § § | **JUDGE Gregory A. Presnell** |
| **HALIFAX HOSP. MED. CTR., et al.** | § § § | |
| **Defendants.** | § § § | |

## UNITED STATES' COMPLAINT IN INTERVENTION

The United States of America ("United States" or "Government") brings this action to recover damages from false claims submitted to the Medicare and Medicaid programs as a result of the conduct of the defendants, Halifax Hospital Medical Center a/k/a Halifax Medical Center a/k/a Halifax Health a/k/a Halifax Community Health System ("Halifax Hospital") and Halifax Staffing, Inc. ("Halifax Staffing"). Beginning on or about 2000, Halifax Hospital and/or Halifax Staffing (collectively "Defendants") entered into various compensation agreements with employed physicians that included compensation based on the volume or value of physician referrals, other business generated by the physicians, profit-sharing incentives, illegal kickbacks, or pooled compensation, in violation of federal law. By knowingly submitting claims for reimbursement based on referrals generated by physicians who received compensation based on these terms, Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, et seq., the Stark Act, were unjustly enriched, and were paid by mistake.

## I.    NATURE OF ACTION

1.    The United States brings this action to recover treble damages and civil penalties under the FCA and the common law or equitable theories of unjust enrichment and payment by mistake of fact.

2.    Within the time frames detailed below, Defendants knowingly submitted thousands of false claims to the United States for reimbursement which resulted in millions of dollars of reimbursement that would not have been paid but for Defendants' misconduct.

## II.    JURISDICTION AND VENUE

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1367(a).

4.    This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) and because Defendants reside and transact business in the Middle District of Florida.

5.    Venue is proper in the Middle District of Florida under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Defendants reside and transact business in this District.

## III.    PARTIES

6.    The United States brings this action on behalf of: 1) the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), which administers the Medicare Program, 42 U.S.C. §§ 1395 et seq. ("Medicare"), and the Medicaid program, 42 U.S.C. §§ 1396 et seq. ("Medicaid").

7.    Elin Baklid-Kunz ("Relator") is a Norwegian citizen and permanent resident alien of the United States.  She resides in the State of Florida.  Currently she is employed by Halifax Staffing as the Director of Physician Services.  She has been employed by Defendants since

1995. In June 2009, Relator filed an action alleging violations of the FCA on behalf of herself and the United States pursuant to the qui tam provisions of the FCA, 31 U.S.C. § 3730(b)(1).

8.      Defendant Halifax Hospital owns and operates hospitals and medical facilities in Volusia County, Florida and surrounding counties. Halifax Hospital's primary business is to provide inpatient and outpatient health care services.

9.      Halifax Hospital was created under Florida law as a special taxing district. Pursuant to its enabling statute, Halifax Hospital funds its operations through revenue generated from services performed at its facilities, *ad valorum* taxes levied on residents of the special taxing district, and revenue from the sale of bonds.

10.     The registered agent for Halifax Staffing is David J. Davidson, 303 N. Clyde Morris Boulevard, Daytona Beach, Florida 32114.

11.     Defendant Halifax Staffing, Inc. is a subsidiary of Halifax Hospital. Halifax Staffing provides staffing services to Halifax Hospital in exchange for payments from Halifax Hospital to cover the cost of employee salaries and benefits and administrative costs. Halifax Staffing is wholly owned and operated by Defendant Halifax Hospital.

12.     The registered agent for Halifax Staffing is David J. Davidson, 303 N. Clyde Morris Boulevard, Daytona Beach, Florida 32114.

## IV.    THE FALSE CLAIMS ACT

13.     The FCA provides for the award of treble damages and civil penalties for, *inter alia*, knowingly causing the submission of false or fraudulent claims for payment to the United States government. 31 U.S.C. § 3729(a)(1).

14.     The FCA provides, in pertinent part, that a person who:

> (a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

(a)(1)(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains. . . .

31 U.S.C. § 3729.[1]  For purposes of the False Claims Act,

the term "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

require no proof of specific intent to defraud.

31 U.S.C. § 3729(b).

## V.    THE MEDICARE PROGRAM

15.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of healthcare services for certain individuals.  HHS is responsible for the administration and supervision of the Medicare program, which it does through CMS, an agency of HHS.

---

[1]    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Given the nature of the claims at issue, Sections 3279(a)(1) and 3279(a)(7) of the prior statute, and Section 3729(a)(1)(A) and 3729(a)(1)(G) of the revised statute are all applicable here.  Sections 3729(a)(1) and 3729(a)(7) apply to conduct that occurred before FERA was enacted, and sections 3729(a)(1)(A) and 3729(a)(1)(G) apply to conduct after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

16.     Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§ 1395c-1395i-4.  Part B primarily covers physician and other ancillary services.  *See* 42 U.S.C. § 1395k.

17.     To assist in the administration of Medicare Part A, CMS contracted with "fiscal intermediaries."  42 U.S.C. § 1395h.  Fiscal intermediaries, typically insurance companies, were responsible for processing and paying claims and cost reports.

18.     To assist in the administration of Medicare Part B, CMS contracted with "carriers."  Carriers, typically insurance companies, were responsible for processing and paying Part B claims.

19.     Beginning in November 2006, Medicare Administrative Contractors ("MACs") began replacing both the carriers and fiscal intermediaries.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  The MACs generally act on behalf of CMS to process and pay Part A and Part B claims and perform administrative functions on a regional level.  *See* 42 § C.F.R. 421.5(b).

20.     In Florida, First Coast Service Options, Inc. ("First Coast") served as the fiscal intermediary and carrier until September 2008, at which time it was awarded a contract to serve as MAC for the Florida region.

21.     Providers who wish to be eligible to participate in Medicare Part A must periodically sign an application to participate in the program.  The application, which must be signed by an authorized representative of the provider, contains a certification statement that states "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that payment of a claim by Medicare is conditioned upon the

claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

22.     Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.

23.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for inpatient and outpatient items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92 or UB-04.

24.     As detailed below, Halifax Hospital submitted or caused to be submitted claims both for specific inpatient and outpatient services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

25.     As a prerequisite to payment under Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report.   Cost reports are the final claim that a provider submits to the fiscal intermediary or MAC for items and services rendered to Medicare beneficiaries.

26.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary or MAC, stating the amount of Part A reimbursement the provider believes it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20.  *See also* 42 C.F.R. § 405.1801(b)(1).  Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

27.     Halifax Hospital was, at all times relevant to this complaint, required to submit annually a hospital cost report to First Coast.

28.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s and UB-04s) during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

29.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries and MACs, had the right to audit the hospital cost reports and financial representations made by Halifax Hospital to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  *See* 42 C.F.R. § 413.64(f).

30.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

31.     For all relevant years, the responsible provider official was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

32.     For the entire period at issue, the hospital cost report certification page also included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

33.     Thus, the provider was required to certify that the filed hospital cost report is (1) truthful, i.e., that the cost information contained in the report is true and accurate; (2) correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Statute (described below).

34.     For each of the years at issue, Halifax Hospital submitted cost reports to First Coast attesting, among other things, to the certification quoted above.

35.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary or MAC.

36.     In addition to Part A claims, doctors or other providers submit Medicare Part B claims to the carrier or MAC for payment.

37.     Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l (a)(1), 1395y(a)(1). For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality. *See* 42 C.F.R. §§ 405.502-504.

## VI. THE MEDICAID PROGRAM

38.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

39.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP).  42 U.S.C. §§ 1396 et seq.

40.     In order to qualify for FFP, each state's Medicaid program must meet certain minimum requirements, including the provision of hospital services to Medicaid beneficiaries. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

41.     In the State of Florida, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the Florida Agency for Health Care Administration ("AHCA") for payment.

42.     In addition, the AHCA requires hospitals participating in the Medicaid program to file a copy of their Medicare cost report with the AHCA.

43.     The AHCA uses Medicaid patient data and the Medicare cost report to determine the reimbursement to which the facility is entitled based in part on the number of Medicaid patients treated at the facility.

## VII. THE STARK STATUTE

44.     Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as

defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.

45.     The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers.  The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

46.     The Stark Statute explicitly states that Medicare may not pay for any designated health service provided in violation of the Stark Statute.  *See* 42 U.S.C. § 1395nn(g)(1).  In addition, the regulations implementing the Stark Statute expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353 (2006).

47.     Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies.   *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

48.     In 1993, Congress passed Stark II, which extended the Stark Statute to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

49.     The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the

hospital has a "financial relationship," unless a statutory exception applies. "Designated health services" include inpatient and outpatient hospital services. *See* 42 U.S.C. § 1395nn(h)(6).

50.     In pertinent part, the Stark Statute provides:

> (a) Prohibition of certain referrals
>> (1)     In general
>> Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –
>>> (A)     the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>>> (B)     the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

51.     Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a). *See* 42 U.S.C. § 1395nn(g)(1).

52.     "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

53.     The Stark Statute and companion regulations contain exceptions for certain compensation arrangements. These exceptions include, among others, "bona fide employment relationships," "personal services arrangements," "fair market value arrangements," and "indirect compensation relationships."

54.     In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory

requirements: (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital. *See* 42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

55. In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute). *See* 42 U.S.C. § 1395nn(e)(3)(A)(v).

56. A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S.C. § 1395nn(e)(3)(B)(ii).

57. In order to qualify for the Stark Statute's exception for fair market value compensation, there must be an agreement in writing, the agreement must set forth all services to be furnished, all compensation must be set in advance and consistent with fair market value, the agreement must not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement must not violate federal or state law. *See* 42 C.F.R. § 411.357(l).

58. In order to qualify for the Stark Statute's exception for indirect compensation arrangements, defined as any instance where compensation flows from the entity providing designated health services through an intervening entity and then to the referral source (*see* 42

C.F.R. § 411.354(c)(2)), there must be a written agreement, the compensation must be consistent with fair market value, the compensation may not take into consideration the volume or value of referrals or other business generated by the referring physician, and the agreement cannot violate the Anti-Kickback Statute. *See* 42 C.F.R. § 411.357(p).

59.     The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. *See* 42 U.S.C. § 1396b(s).

## VIII.   THE FRAUD SCHEME

60.     Beginning in February 2000 and continuing at least until December 2010, Halifax devised a scheme by which it:

> a.     entered into compensation arrangements with physicians in violation of the Stark Statute, specifically by paying the physicians (who referred designated health services) under contracts that exceeded fair market value, were not commercially reasonable, and/or took into account the volume or value of the referrals or other business generated between the physician and Halifax; and

> b.     submitted and/or caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by the physicians who had improper contracts which violated the Stark Statute.

## A. Neurosurgeons

61. Defendant Halifax Staffing currently employs three neurosurgeons – Dr. Rohit Khanna, Dr. William Kuhn, and Dr. Federico Vinas.

62. Each physician has an employment contract with Halifax Staffing.

63. Although the employment agreements between Halifax Staffing and each individual neurosurgeon changed over time, the agreements all provided for Halifax Staffing to pay the neurosurgeon a fixed base salary and one or more bonus payments.

64. In addition, each neurosurgeon would receive various perquisites such as the full cost of operating and maintaining office space (including office staff expenses), malpractice insurance, reimbursement for costs associated with continuing medical education, and an automobile allowance between $900 and $1100 a month.

65. In exchange for the compensation set forth in the employment agreement, each neurosurgeon agreed to render neurosurgical services to Halifax Hospital and assign the right to bill for his or her professional services to Halifax Staffing.

66. In February 2000, Dr. Vinas entered into an employment agreement with Halifax Staffing. The employment agreement called for Dr. Vinas to receive an annual salary of $250,000, a signing bonus of $20,000, and incentive compensation equal to "all cash collections which exceed $250,000.00 during each twelve month period of this Agreement."

67. An addendum to the employment agreement specified that Dr. Vinas would be required to be on-call for twelve days per month, but provided no details of his compensation for providing this service other than to state he would be "eligible to participate in all reimbursement programs that are offered to neurosurgeons taking call."

68.     Neither Dr. Khanna nor Dr. Kuhn's employment agreements contain provisions to address the compensation to be provided to either neurosurgeon for providing call coverage.

69.     Nevertheless, Drs. Khanna, Kuhn, and Vinas each received over $100,000 annually for providing call coverage.

70.     In October 2000, the employment agreement was amended effective July 10, 2000 to provide for Dr. Vinas to receive additional compensation of 200% of the Medicare Physician Fee payment for all Trauma services provided to Halifax Staffing.

71.     In November 2009, the employment agreement was amended effective April 1, 2009 to provide for Dr. Vinas to receive additional compensation of 110% of the Medicare Physician Fee payment for all patients referred to Dr. Vinas through clinics operated by Halifax Hospital, "self-pay" patients, charity patients, and employees of Halifax Hospital, Halifax Staffing, and affiliated entities.

72.     From 2004 through 2010, the neurosurgeon employment agreements also called for Halifax Staffing to pay "any other reasonable compensation as determined by the company from time to time."

73.     The employment agreements between Halifax Staffing and Dr. Khanna and Dr. Kuhn contain similar terms, with slight variations to the base salary provided and the dates of various amendments.

74.     A number of the employment agreements between Halifax Staffing and the neurosurgeons were either never signed, or signed after the effective date of the employment agreement.

75.     Based primarily on the generous incentive compensation provided to the neurosurgeons employed by Halifax Staffing, the neurosurgeons were able to achieve compensation levels over four times their respective annual base salaries.

76.     As set forth below, in 2007 and 2008, incentive compensation was by far the largest component of neurosurgeon compensation, ranging between two and six times each neurosurgeons' annual salary for the same time period.

**2007 Neurosurgeon Compensation**

| Neurosurgeon | Annual Salary | Incentive Compensation | Additional Compensation | Total Compensation |
|---|---|---|---|---|
| Khanna | $325,000 | $1,270069.98 | $110,086.25 | $1,705,156.23 |
| Kuhn | $325,000 | $776,414.78 | $108,332.01 | $1,209,746.79 |
| Vinas | $250,000 | $1,070768.25 | $123,665.40 | $1,444,433.65 |
| Total | $900,000 | $3,117,253.01 | $342,083.66 | $4,359,336.67 |

**2008 Neurosurgeon Compensation**

| Neurosurgeon | Annual Salary | Incentive Compensation | Additional Compensation | Total Compensation |
|---|---|---|---|---|
| Khanna | $325,000 | $1,271772.03 | $128,530.00 | $1,725302.03 |
| Kuhn | $325,000 | $702,853.88 | $132,309.12 | $1,160,163.00 |
| Vinas | $250,000 | $1,519,863.28 | $127,660.40 | $1,897,523.68 |
| Total | $900,000 | $3,494,489.19 | $388,499.52 | $4,782,988.71 |

77.     The compensation paid to each neurosurgeon by Halifax Staffing exceeded the value of collections obtained by Halifax Hospital for their professional services.

78. For example, in 2008, Halifax Staffing paid the three neurosurgeons total compensation of $4,782,988.71. However, Halifax Hospital only received $3,993,484.00 in collections for professional services performed by the neurosurgeons.

79. In addition, one or more of the neurosurgeons did not perform some of the professional services on which Halifax Staffing based its bonus compensation payment. Those professional services were performed by a nurse or physician assistant.

80. All three physicians also referred patients to Halifax Hospital for neurosurgical procedures.

81. Between 2004 and 2010, Halifax Hospital charged Medicare over $35 million for neurosurgical services.

82. Defendants tracked the referrals generated by each neurosurgeon. In a December 2009 electronic mail message from Eric Peburn, the Chief Financial Officer of Halifax Hospital, to Gerry Neff, the Director of Finance, Mr. Peburn requested that Mr. Neff quantify referral volume by physician.

83. Halifax Hospital determined that despite paying the three neurosurgeons more than the amount collected for personally performed services, the neurosurgeons were still some of the most profitable physicians in the hospital based on income generated from referrals by these physicians.

84. Based on 2009 financial data, the neurosurgeons placed third, fifth, and sixth out of over 500 physicians in terms of net revenue to Halifax Hospital. Each neurosurgeon individually generated over $2 million in profits for Halifax Hospital in 2009.

85.     In 2009, Defendants commissioned a third party to perform an analysis of the compensation paid to its neurosurgeons.  Based on that analysis, all three neurosurgeons were paid above the 90th percentile in terms of compensation nationally.

86.     Given that each neurosurgeon was paid total compensation that exceeded the collections received for neurosurgical physician services, Defendants could not reasonably have concluded that the compensation arrangements in those contracts were fair market value for the neurosurgeons' services or were commercially reasonable.

87.     Given that each neurosurgeon received compensation that took into account the volume or value of referrals or other business generated by the referring physician, received compensation that was not set forth in advance in the employment agreement, and that many of the contracts were signed after their effective date, Halifax Hospital and Halifax staffing could not reasonably have concluded that the neurosurgeon agreements did not violate the Stark Statute.

88.     Based on the contractual and financial relationship between the neurosurgeons and Defendants, none of the statutory or regulatory exceptions to the Stark Statute apply.

**B.      Medical Oncologists**

89.     Defendant Halifax Staffing currently employs seven medical oncologists – Dr. Boon Chew, Dr. Ruby Anne Deveras, Dr. Walter Durkin, Dr. Greg Favis, Dr. Kelly Molpus, Dr. Abdul Sorathia, and Dr. Richard Weiss.

90.     Each physician has an employment contract with Halifax Staffing.

91.     Although the employment agreements between Halifax Staffing and each individual medical oncologist changed over time, the agreements all provided for Halifax Staffing to pay the medical oncologist a fixed base salary and one or more bonus payments.

In addition, each medical oncologist would receive various perquisites such as the full cost of operating and maintaining office space, malpractice insurance, reimbursement for costs associated with continuing medical education, and advertising/marketing expenses.

92.     In exchange for the compensation set forth in the employment agreement, each medical oncologist agreed to render medical oncology services to Halifax Hospital and assign the right to bill for his or her services to Halifax Staffing.

93.     In 2004 and 2005, the medical oncology employment agreements provided for each medical oncologist to receive an "equitable portion" of a bonus pool that consisted of 85 percent or more of all cash collections exceeding a pre-determined amount ($2,342,286) and attributable to professional services performed by one of the medical oncologists related to patient care.  This bonus therefore was not pre-determined, but varied based on the services performed by the medical oncologists.

94.     In 2004 and 2005, the medical oncologists also received a second bonus consisting of an "equitable portion" of a pre-determined bonus pool (set at $1,005,964 for 2004 and $1,132,000 for 2005) provided that all of the medical oncologists combined exceeded 1500 billable patient visits a month and maintained adequate staffing to allow for new patient visits to be scheduled within 10 business days.

95.     Beginning in 2006, the medical oncology employment agreements were modified. While the agreements maintained a pre-determined base salary and a bonus based on collections obtained from professional services performed by the medical oncologist, the pre-determined bonus based on patient encounters and scheduling was removed.

96.     Instead, beginning in 2006, Halifax Staffing entered into employment agreements providing for it to pay each medical oncologist an "equitable portion" of a bonus pool consisting of fifteen percent of the operating margin of Halifax Hospital's medical oncology program.

97.     From 2004 through 2010, the medical oncology employment agreements also called for Halifax Staffing to pay "any other reasonable compensation as determined by the company from time to time."

98.     A number of the employment agreements between Halifax Staffing and the neurosurgeons were either never signed, or signed after the effective date of the employment agreement.

99.     In addition, some of the medical oncologists received compensation for services performed by others.  For example, in July 2004, Dr. Kelly Molpus and Halifax Staffing signed an employment agreement that called for Halifax Staffing to pay Dr. Molpus a base salary, a bonus equal to 85 percent of all cash collections exceeding the base salary and attributable to professional services performed Dr. Molpus, and "any other reasonable compensation as determined by the company from time to time."

100.    The contract also called for Halifax Staffing to employ a physician assistant to assist Dr. Molpus in performing his duties under the contract.  The employment agreement originally called for Halifax Staffing to retain all billings and collections attributed to the physician assistant.

101.    On July 23, 2004, Dr. Molpus and Halifax Staffing changed this provision and instead agreed that once Halifax Staffing recouped all salary expenses related to the physician assistant, Dr. Molpus would receive 85 percent of all cash collections from the physician assistant "as an incentive compensation."

102.     Dr. Molpus and Halifax Staffing amended the employment agreement effective January 1, 2007 to include a bonus consisting of an equitable portion of a bonus pool equal to "fifteen percent (15%) of the operating margin for Surgical procedures as defined by the financial statements produced by [Halifax Hospital's] Finance Department on a quarterly basis." The amendment did not make any change to the "incentive compensation" based on physician assistant billings and collections.

103.     Based on the generous incentive compensation provided to medical oncologists employed by Halifax Staffing, the medical oncologists were able to achieve compensation levels over twice the amount of their respective annual salary.

104.     For example, Halifax Hospital calculated 2009 total compensation for the seven medical oncologists as follows:

| Medical Oncologist | Annual Salary | Pool Compensation | Incentive Compensation | Total Compensation |
|---|---|---|---|---|
| Weiss | $135,000 | $286,709 | $38,922 | $442,631 |
| Chew | $135,000 | $309,015 | $46,860 | $490,875 |
| Deveras | $135,000 | $142,959 | $31,062 | $309,021 |
| Durkin | $135,000 | $233,082 | $42,686 | $410,768 |
| Favis | $135,000 | $172,547 | $30,122 | $337,669 |
| Sorathia | $135,000 | $383,287 | $65,331 | $583,618 |
| Molpus | $400,000 | $0 | $50,637 | $450,637 |
| Total | $1,210,000 | $1,509,599 | $305,620 | $3,025,219 |

105.     The medical oncologists performed oncology services for patients at Halifax Hospital.  For each year between 2004 and 2010, Halifax Hospital charged approximately $4 million annually in professional charges for oncology services.

106.     In addition to the professional services performed by the medical oncologists, the medical oncologists referred patients to Halifax Hospital for radiation oncology treatment.

107.     Between 2004 and 2010, Halifax Hospital charged Medicare over $100 million for medical oncology services.

108.     Defendants tracked the referrals generated by each medical oncologist.  In February 2010, Eric Peburn, the chief financial officer of Halifax Hospital, questioned why Dr. Sorathia generated a comparatively low dollar value of referral services when he saw more patients than any of the other medical oncologists.

109.     In 2009, Defendants conducted an analysis of the compensation paid to some of the medical oncologists and determined that at least one medical oncologist received compensation that exceeded fair market value compensation and was outside acceptable tolerances.

110.     Given that one or more medical oncologists was paid total compensation that exceeded fair market value, Defendants could not reasonably have concluded that the compensation arrangements in those contracts were fair market value for the medical oncologists' services or were commercially reasonable.

111.     Given that each medical oncologist received compensation that took into account the volume or value of referrals or other business generated by the referring physician and that many of the contracts were signed after their effective date, Halifax Hospital and Halifax staffing

could not reasonably have concluded that the medical oncologists' agreements did not violate the Stark Statute.

112.    Based on the contractual and financial relationship between the medical oncologists and Defendants, none of the statutory or regulatory exceptions to the Stark Statute apply.

**VIII.    False and Fraudulent Claims and Statements**

113.    The physicians with whom Halifax Staffing entered into financial relationships specified in paragraphs 61 and 89 above referred patients, including Medicare and Medicaid patients, to Halifax Hospital in violation of the Stark Statute.

114.    Halifax Hospital, in turn, presented, or caused to be presented through the fiscal intermediary and MAC, claims for payment to the Medicare program for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 61-112. Halifax Hospital also presented, or caused to be presented through the State of Florida's AHCA, claims for payment to the Medicaid program for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 61-112. Defendants thereby obtained payments from the United States in violation of the Stark Statute.

115.    Under the False Claims Act, 31 U.S.C. § 3729(a)(1), the claims set forth in paragraph 114 above were false and/or fraudulent because Defendants were prohibited by the Stark Statute from obtaining payment from the United States upon claims for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 61-112.

116.    Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by making false statements, or causing false statements to be made by the fiscal intermediary and MAC, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom they had entered into prohibited financial relationships as set forth in paragraphs 61-112.  Halifax Hospital's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because the Stark Statute prohibited Defendants from receiving payments from the United States for those claims.

117.    Defendants knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States (*i.e.*, to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7).  The false certifications, made with each annual cost report submitted to the government, were part of Defendant's unlawful scheme to defraud Medicare and Medicaid.

118.    All claims submitted to Medicare or Medicaid by Defendants for designated health services referred by any of the physicians identified in paragraphs 61 and 89 after the date of the contracts specified in paragraphs 62-73 and 90-102 above were false claims submitted to the United States.  Halifax Hospital and Halifax Staffing submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by the physicians who had improper contracts which violated the Stark Statute, submitted and caused others to submit false and fraudulent claims for payment to

24

Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by the physicians who had improper contracts which violated the Stark Statute.

119.    Defendants presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

## FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1) and (a)(1)(A))

120.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

121.    Halifax Hospital and Halifax Staffing knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement (identified in paragraphs 114-118 above) for designated health services rendered to patients who were referred by physicians with whom Halifax Staffing had entered into prohibited financial relationships in violation of the Stark Statute.

122.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## SECOND CAUSE OF ACTION
(False Claims Act: Using False Statements to Get False Claims Paid)
(31 U.S.C. § 3729(a)(1)(B))

123.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

124.    Halifax Hospital and Halifax Staffing made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to

be made by Halifax Hospital and Halifax Staffing when initially submitting the false claims for payments and the false certifications made by Halifax Hospital in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

125. Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendants' statements and actions.

126. The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

127. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### THIRD CAUSE OF ACTION
(False Claims Act: False Record Material to Obligation to Pay)
(31 U.S.C. § 3729(a)(7) and (a)(1)(G))

128. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

129. Halifax Hospital and Halifax Staffing made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

130. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### FOURTH CAUSE OF ACTION
(Unjust Enrichment)

131. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

132.     This is a claim for the recovery of monies by which Halifax Hospital has been unjustly enriched.

133.     By directly or indirectly obtaining government funds to which it was not entitled, Halifax Hospital was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

### FIFTH CAUSE OF ACTION
(Payment by Mistake)

134.     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

135.     This is a claim for the recovery of monies paid by the United States to Halifax Hospital (directly or indirectly) as a result of mistaken understandings of fact.

136.     The United States paid Halifax Hospital for claims for designated health services rendered by physicians who were in a financial relationship prohibited by the Stark Statute without knowledge of material facts, and under the mistaken belief that Halifax Hospital was entitled to receive payment for such claims, which were not eligible for payment.  The United States' mistaken belief was material to its decision to pay Halifax Hospital for such claims. Accordingly, Halifax Hospital is liable to account and pay to the United States the amounts of the payments made in error to Halifax Hospital by the United States.

### SIXTH CAUSE OF ACTION
(Disgorgement, Constructive Trust, and Accounting)

137.     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

138.     This is a claim for disgorgement of profits earned by Halifax Hospital because of excess payments Halifax Staffing made to physicians.

139. Halifax Hospital concealed its illegal activity through false statements, claims, and records, and failed to abide by their duty to disclose such information to the United States.

140. The United States did not detect Halifax Hospital's illegal conduct.

141. This court has the equitable power to, among other things, order Halifax Hospital to disgorge the entire profit Halifax Hospital earned from business generated as a result of their violations of the Stark Statute, the common law and the False Claims Act.

142. By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Halifax Hospital on referrals from physicians to whom it paid excess remuneration, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against defendants as follows:

I.	On the First Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.	On the Second Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

III.	On the Third Count under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

IV.	On the Fourth Count for unjust enrichment, for the damages sustained and/or amounts by which Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

V.	On the Fifth Count for payment by mistake, for the damages sustained and/or amounts by which Defendants were paid by mistake or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

VI.	On the Sixth Count for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Defendants and such further equitable relief as may be just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

The United States demands a jury trial in this case.

Respectfully submitted,

TONY WEST
ASSISTANT ATTORNEY GENERAL

ROBERT E. O'NEILL
UNITED STATES ATTORNEY

Dated: November 4, 2011     By:       <u>  /s/ Ralph E. Hopkins           </u>
Ralph E. Hopkins
Assistant United States Attorney
501 W. Church Street, Suite 800
Orlando, FL 32805
(407) 648-7562
Fla. Bar # 0972436
Email: ralph.hopkins@usdoj.gov

JOYCE R. BRANDA
MICHAEL D. GRANSTON
ADAM J. SCHWARTZ
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 514-6831
Email: adam.schwartz2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 4, 2011, I caused a true and accurate copy of the foregoing to be filed using the Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.


___/s/ Adam J. Schwartz_____
ADAM J. SCHWARTZ
Trial Attorney