**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex.rel.* | ) | |
| ELIN BAKLID-KUNZ | ) | |
| | ) | |
| Relator | ) | |
| | ) | |
| vs. | ) | CASE NO.: 6-09-CV-1002 |
| | ) | |
| | ) | FILED UNDER SEAL |
| HALIFAX HOSPITAL MEDICAL CENTER | ) | |
| d/b/a HALIFAX HEALTH a/k/a HALIFAX | ) | [FALSE CLAIMS ACT – QUI TAM] |
| COMMUNITY HEALTH SYSTEM a/k/a | ) | |
| HALIFAX MEDICAL CENTER and | ) | |
| HALIFAX STAFFING, INC. | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

<u>**MEMORANDUM IN SUPPORT OF**</u>

<u>**MOTION TO DISMISS COMPLAINT IN INTERVENTION**</u>

# **TABLE OF CONTENTS**

**Page**

I.     PROCEDURAL HISTORY ............................................................................2

II.    LEGAL STANDARD..................................................................................3

     A.     Criteria For Stating A Claim Under Fed. R. Civ. P. 12(b)(6).........................3

     B.     Criteria For Alleging Fraud With Particularity Under Fed. R. Civ. P.
          9(b) ............................................................................................4

III.   ARGUMENT ............................................................................................6

     A.     The DOJ's Claims Regarding Alleged False Claims To Medicaid Fail
          As A Matter Of Law..............................................................................7

     B.     DOJ's Allegations Regarding The Necessity For Signed Writings and
          Compensation That is Set In Advance Do Not State Stark Or FCA
          Claims ............................................................................................9

          1.     Neurosurgeons' Agreements ................................................................9

          2.     Medical Oncologists' Agreements ......................................................10

     C.     The Complaint Does Not Allege Either A Direct Or Indirect Financial
          Relationship Between Halifax And The Physicians .................................10

     D.     The DOJ Does Not Allege Facts That Permit The Conclusion That The
          Arrangements Between The Employed Neurosurgeons And Halifax
          Do Not Satisfy The Exception For Bona Fide Employment
          Arrangements .................................................................................13

          1.     The Bona Fide Employment Exception Protects The
               Neurosurgeons' Agreements From The DOJ's Stark
               Allegations .................................................................................13

          2.     Neurosurgeon Bonuses Based On A Percentage Of Collections
               For Physician Services Do Not Take Into Account The Volume
               Or Value Of Referrals As A Matter Of Law....................................14

          3.     The DOJ Allegations Regarding Neurosurgeon Billing For
               Nurse Or PA Services Do Not Specify Whether The Services
               Provided Were Relevant Under Stark.............................................15

          4.     Unit-Based Compensation Is Deemed Not To Take Into
               Account The Volume Or Value Of Referrals....................................15

          5.     Random Factual Observations In The Complaint Do Not Allow
               For The Inference That The Neurosurgeons' Compensation
               Was Not Fair Market Value Or Otherwise Out Of Compliance
               With The Statutory Definition Of Fair Market Value ......................16

**TABLE OF CONTENTS**
(continued)

6.  The DOJ Avoids Defining Commercial Reasonableness Or Setting Forth A Legal Test For Assessing The Neurosurgeon Compensation ...................................................................................18

E.  The DOJ Does Not Allege Facts That Permit The Conclusion That The Arrangements Between The Employed Medical Oncologists And Halifax Do Not Satisfy The Exception For Bona Fide Employment Arrangements ...................................................................................19

    1.  The Bona Fide Employment Exception Protects The Agreements From The DOJ's Stark Allegations ...............................19

    2.  The Complaint Does Not Allege Facts Permitting The Inference That The Medical Oncologists' Compensation Took Into Account The Volume Or Value Of Referrals ...........................20

    3.  The Absence Of Either Fair Market Value Or Lack Of Commercial Reasonableness Cannot Be Inferred ...........................22

F.  The Allegations Are Insufficient To Conclude That All Of The Physician Agreements Are Not Protected By The Exception for Indirect Compensation Arrangements ...........................................................23

G.  The Complaint Does Not Comply With Rule 9(b) In Any Respect .............26

    1.  Failure To Identify The Specific Physician Agreements That Allegedly Violated The Stark Act ...................................................26

    2.  Failure To Allege Which Neurosurgeon Or Medical Oncologist Agreements Were Not Executed Or Not Timely Executed ..............26

    3.  Failure To Identify Which Components Of Physician Compensation Were Based On The Volume Or Value Of Referrals ...................................................................................27

    4.  Failure To Identify Which Components Of Neurosurgeon Or Medical Oncologist Agreements Were Not Based On Fair Market Value ...................................................................................28

    5.  Failure To Identify Specific Instances Of Improper Treatment Of Nurse Or Physician Assistant Services .........................................28

H.  12(B)(6) Motion To Dismiss For Failure To State A Claim Under The False Claims Act Citing All Three FCA Counts .........................................29

I.  12(b)(1) Motion To Dismiss For Lack Of Subject Matter Jurisdiction For Stark, FCA And Common Law Causes Of Action ................................30

J.  12(b)(6) Motion To Dismiss Under Common Law Causes Of Action ..........30

    1.  Unjust Enrichment .........................................................................30

# TABLE OF CONTENTS
(continued)

**Page**

2. Payment By Mistake ..................................................................31

3. Disgorgement, Constructive Trust, and Accounting .........................31

K. Halifax Is Absolutely Immune From Suit Under The FCA As An "Arm Of The State" Under The Eleventh Amendment Sovereign Immunity Clause ........................................................................32

1. Florida Defines Halifax As A Governmental Instrumentality ...........33

2. The State Exercises A High Degree Of Control Over Halifax ..........33

3. Unlike Private Hospitals, The State Controls Halifax's Fiscal Life.................................................................................34

4. Responsibility For Judgments Against Halifax.................................34

IV. CONCLUSION ..................................................................................35

## TABLE OF AUTHORITIES

Page

**Cases**

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009)..................................................................................5

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...............................................................................4, 5

*Berbusse v. N. Broward Hosp. Dist.,*
  117 So. 2d 550 (Fla. 2d DCA 1960)...........................................................38

*Brenner v. Future Graphics, LLC,*
  2006 U.S. Dist. LEXIS 98271, (N.D. Ga. Nov. 14, 2006) ...............................36

*Bryant v. Avado Brands, Inc.,*
  187 F.3d 1271  (11th Cir. 1999).................................................................4

*Clausen,*
  290 F.3d at 1311......................................................................................6

*Collinson v. Miller,*
   903 So. 2d 221 (Fla. Dist. Ct. App. 2005)..................................................35

*Diamond "S" Dev. Corp. v. Mercantile Bank,*
  989 So. 2d 696 (Fla. Dist. Ct. App. 2008)............................................35, 36

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005) .................................................................................4

*Eldred v. N. Broward Hosp. Dist.,*
  498 So. 2d 911 (Fla. 1986) ......................................................................38

*Fouche,* 713 F.2d at 1520-21 .....................................................................39

*Grossman v. Nationsbank, N.A.,*
  225 F.3d 1228 (11th Cir. 2000)..................................................................3

*Hans v. Louisiana,* 134 U.S. 1 (1890)...........................................................36

*Lee v. S. Broward Hosp. Dist.,*
  473 So. 2d 1322 (Fla. 4th Dist. Ct. App. 1985) ...........................................38

*Manders v. Lee,*
  338 F.3d 1304 (11th Cir. 2003)................................................................37

*Media Servs. Grp. v. Bay Cities Commc'ns., Inc.,*
  237 F.3d 1326 (11th Cir. 2001).................................................................34

*Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n,*
  226 F.3d 1226 (11th Cir. 2000)................................................................37

*Mitchell v. Beverly Enters., Inc.,*
   248 Fed. Appx. 73 (11th Cir. 2007) ........................................................................6, 7

*N. Ins. Co. of N.Y. v. Chatham Cnty.,*
   547 U.S. 189 (2006) ....................................................................................................37

*Papasan v. Allain,*
   478 U.S. 265, 286 (1986) ..............................................................................................5

*State ex rel Robinson v. N. Broward Hosp. Dist.,*
   95 So. 2d 434 (Fla. 1957) ...........................................................................................38

*State v. Halifax Hosp. Dist.,*
   159 So. 2d 231 (Fla. 1963) .........................................................................................38

*Swierkiewicz v. Sorema N.A.,*
   534 U.S. 506 (2002) ......................................................................................................4

*Swindell v. Crowson,*
   712 So. 2d 1162 (Fla. Dist. Ct. App. 1998) ...............................................................34

*U.S. v. Garrahan,*
   614 F. Supp. 152 (N.D. Fla. 1985) .............................................................................35

*U.S. v. Wurts,*
   303 U.S. 414 (1938) ....................................................................................................35

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.,*
   290 F.3d 1301 (11th Cir. 2002) ....................................................................................5

*United States ex rel. Hendow v. University of Phoenix,*
   461 F.3d 1166 (9th Cir. 2006) ....................................................................................32

*United States ex rel. Hochman v. Nackman,*
   145 F.3d 1069 (9th Cir. 1998) ....................................................................................32

*United States ex rel. Kosenke v. Carlisle HMA, Inc.,*
   554 F.3d 88 (3d Cir. 2009) .........................................................................................13

*United States ex rel. Villafane v. Solinger,*
   543 F. Supp. 2d 678 (W.D. Ky. 2008) ........................................................................19

*United States v. Aggarwal,*
   2005 Westlaw 6011259 (M.D. Fla. Feb. 10, 2005) ......................................................7

*United States v. Campbell,* No. 08-1951, 2011 U.S. Dist. LEXIS 1207 (D.N.J. Jan. 4, 2011)
   ....................................................................................................................................13

*United States v. Dekalb Cnty.,*
   729 F.2d 738 (11th Cir. 1984) ....................................................................................35

*United States v. Mackby,*
   261 F.3d 821 (9th Cir. 2001) ........................................................................................8

*United States v. Southland Mgmt. Corp.*,
  326 F.3d 669 (5th Cir. 2003) ...................................................................9

*Vt. Agency of Natural Res. v. United States ex. rel. Stevens*,
  529 U.S. 765 (2000) .............................................................................36

*Ziemba v. Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ..............................................................6


**Statutes**

31 U.S.C. § 3729 ...................................................................................1

31 U.S.C. § 3729(b) ...............................................................................9

31 U.S.C. § 3731(b) ..............................................................................33

31 U.S.C. § 3731(c) ..............................................................................34

42 U.S.C. § 1395b ..................................................................................9

42 U.S.C. § 1395nn .................................................................................1

42 U.S.C. § 1395nn(a)(1)(A)-(B) .........................................................8, 10

42 U.S.C. § 1395nn(e) .............................................................................8

42 U.S.C. § 1395nn(e)(2) ...................................................................17, 24

42 U.S.C. § 1396b(s) .............................................................................10

Fla. Stat. § 189.413 ..............................................................................40

Fla. Stat. § 189.4221 ............................................................................40


**Other Authorities**

§ 1877 of the Social Security Act ..............................................................1

1951 Fla. Laws 27438 ...........................................................................40

2003 Fla. Laws 374 ..............................................................................37

60 *Fed. Reg.* 16054 (Mar. 26, 2004) ........................................................26

69 *Fed. Reg.* 16054 (Mar. 26, 2004) .............................................17, 21, 23

69 *Fed. Reg.*, 10607 .......................................................................27, 28

F.A.C. 59A-35 .....................................................................................39

F.A.C. 64J-2 .......................................................................................39

Florida Constitution, Section 7, Article IV ...............................................39

**Rules**

Fed. R. Civ. P. 12(b)..............................................................................................1

Fed. R. Civ. P. 12(b)(6) ......................................................................................3, 4

Fed. R. Civ. P. 8 ...................................................................................................4

Fed. R. Civ. P. 8(a)(2) ...........................................................................................5

Fed. R. Civ. P. 9(b)............................................................................................2, 5

**Regulations**

42 C.F.R. § 411.354(a)(2)(i) ................................................................................13

42 C.F.R. § 411.354(a)(2)..................................................................................13

42 C.F.R. § 411.354(c)(2)...................................................................................14

42 C.F.R. § 411.354(d)(3)...................................................................................28

42 C.F.R. § 411.357 .............................................................................................8

42 C.F.R. § 411.357(c)........................................................................................16

42 C.F.R. § 411.357(p)(2) ..................................................................................11

**PRELIMINARY STATEMENT**

Despite being provided thousands of pages of documents related to this matter and investigating the claims in suit for over two years, the Department of Justice ("DOJ") has produced a complaint in intervention ("Complaint") against Halifax Hospital Medical Center and Halifax Staffing (collectively referred to as "Halifax") that consists of factually unsupported conclusions, misstatements of the requirements of the Stark Act, evasions of pleading basic facts, and irrelevant commentary that, even if accepted as true, do not set forth a plausible violation of either the False Claims Act (the "FCA") (31 U.S.C. § 3729, *et seq.*) or Ethics in Patient Referrals Act (the "Stark Act") (42 U.S.C. § 1395nn; § 1877 of the Social Security Act).[1]   Stripped of its rhetoric and legal conclusions about "fair market value" and compensation based on the "volume or value of referrals," the Complaint does not even allege *prima facie* facts, such as whether there is a financial relationship for Stark Act purposes or whether the arrangements were "direct" or "indirect," necessary to state a claim under either the FCA or the Stark Act and, therefore, must be dismissed pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b).

The Complaint contains neutral factual observations regarding the Halifax physicians' compensation and the administration of the agreements but does not link these alleged facts to any relevant legal requirements under which a trier of fact could plausibly conclude that the Stark Act was violated.   Without specifying how Halifax's physician

---

[1] Halifax is a statutory governmental subdivision of the State of Florida, located in Daytona Beach, Florida. More specifically, Halifax is organized under the laws of the State of Florida as a special taxing district created pursuant to an act of the Florida Legislature.   Halifax Staffing is the instrumentality by which Halifax employs the individuals who work at Halifax facilities.   Pursuant to an agreement between Halifax Staffing and Halifax (commencing March 6, 1994), Halifax Staffing assumed the employment of the individuals who had up to that time been employed by the Halifax district, and became the entity used by Halifax to staff its facilities.   Halifax pays its employees through a Halifax Staffing "sweep" account.

agreements violate the law, the inference cannot be drawn that the Complaint states a claim.

Even to the extent the Complaint identifies an actual claim, the entire pleading – which purportedly sounds in fraud – is defective under Fed. R. Civ. P. 9(b). Rather than recounting either the complex requirements of the Stark Act or the details of the alleged fraud, the Complaint obscures the facts and law wherever possible rather than articulate the who, what, when or where of the alleged "fraud scheme." The DOJ has not identified the specific physician agreements from which its claims arise. Nor has the DOJ alleged the fraudulent claims submitted by Halifax or that the physicians were actually paid the compensation that led to this lawsuit. Failing to allege the basic elements of a Stark Act violation, the DOJ has not pled its FCA causes of action with the requisite particularity. Absent a cognizable Stark Act or FCA violation, the DOJ's common law causes of action should also be dismissed with prejudice.

## I.     PROCEDURAL HISTORY

Elin Baklid- Kunz ("Relator") filed the initial complaint in this matter under seal over two years ago on June 16, 2009.[2] The Complaint contained sprawling allegations of fraudulent billing, kickbacks, and violations of the Stark Act. Initially, the Office of the Inspector General ("OIG") for the U.S. Department of Health and Human Services ("DHHS") issued three subpoenas to Halifax requesting information related to the allegations in Relator's complaint. On December 14, 2009, the OIG served two of the subpoenas on Halifax. In response, Halifax produced over 50,000 pages of documents to the OIG covering a wide variety of relevant subjects, including the relevant physician agreements.

---

[2] Relator filed an amended complaint on December 23, 2009 (Docket Nos. 1-2).

Despite the possession of thousands of pages of Halifax documents, the DOJ notified the court on June 3, 2010 that it could not make an intervention decision (Docket No. 3). The Court then unsealed the *qui tam* complaint, but Relator did not serve it on Halifax.  Nor did the DOJ notify Halifax that there was an unsealed *qui tam* complaint until September 16, 2010.  Instead, the DOJ and Relator, who is still employed by Halifax, apparently decided to continue clandestine investigative activities in furtherance of their claims.  From September 2010 to September 2011, Halifax continued to cooperate with the DOJ's investigation, meeting with DOJ on a number of occasions to provide additional information about Halifax's finances, the relationship between Halifax Staffing and the Halifax special taxing district, the physician financial arrangements, physician productivity, and Halifax's interpretation of the Stark Act.  On September 9, 2011, DOJ moved this court for leave to intervene, in part, as to the Relator's Stark Act allegations involving Halifax medical oncologist and neurosurgeon contracts only.  On November 4, 2011, DOJ filed its Complaint.

## II.   **LEGAL STANDARD**

### A.   Criteria For Stating A Claim Under Fed. R. Civ. P. 12(b)(6)

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a federal court is to accept as true all facts set forth in the plaintiff's complaint. *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000) (citation omitted); Fed. R. Civ. P. 12(b)(6). Further, courts must draw all reasonable inferences in the light most favorable to the plaintiff. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1274 n.1 (11th Cir. 1999);  Fed. R. Civ. P. 12(b)(6).  To satisfy the pleading requirements of Fed. R. Civ. P. 8, a complaint must contain a short and plain statement showing an entitlement to relief, and the statement must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002);  Fed. R. Civ. P.  8.  *See also Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) (citations omitted); and *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005).

The Supreme Court has introduced the plausibility standard for motions to dismiss requiring that the non-movant's factual allegations must raise the right to relief above the speculative level.  *See Twombly,* 550 U.S. at 583-61 .  The Supreme Court has clarified the conditions under which a complaint satisfies the substantive requirements of Fed. R. Civ. P. 8(a)(2).  In *Iqbal,* the Court stated that "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly,* 550 U.S. at 556-57).  The Court further explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949.  As *Twombly* established, a plaintiff's burden "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly,* 550 U.S. at 555 (internal quotations omitted).  The Supreme Court has made clear that courts are not "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

B.   Criteria For Alleging Fraud With Particularity Under Fed. R. Civ. P. 9(b)

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud and mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  It is "well settled and self-evident that the False Claims Act is a fraud statute for the purposes of Rule 9(b)" and that the heightened pleading requirements of Rule 9(b) apply fully to actions under the FCA.  *United States ex rel. Clausen v. Lab. Corp. of Am., Inc*., 290 F.3d 1301,

1309 (11th Cir. 2002) (internal quotations omitted).  The Eleventh Circuit has observed that

Rule 9(b) "serves an important purpose in fraud actions by alerting defendants to the 'precise

misconduct with which they are charged' and protecting defendants 'against spurious charges

of immoral and fraudulent behavior.'"  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202

(11th Cir. 2001) (internal quotations omitted).

The Eleventh Circuit has held that a complaint satisfies the pleading requirements of

Rule 9(b) if it sets forth:

> (1) precisely what statements were made in what documents or oral
> representations or what omissions were made, and (2) the time and place
> of each such statement and the person responsible for making (or, in the
> case of omissions, not making) same, and (3) the content of such
> statements and the manner in which they misled the plaintiff, and (4) what
> the defendants obtained as a consequence of the fraud.

*Id*.  The Eleventh Circuit has also held that Rule 9(b) requires "some indicia of reliability in

the complaint to support allegations of an *actual false claim* for payment being made to the

Government."  *Mitchell v. Beverly Enters., Inc.*, 248 Fed. App'x. 73, 75 (11th Cir. 2007)

(citing *Clausen*, 290 F.3d at 1311).  Plaintiff cannot recover simply by describing a

generalized scheme to commit health care fraud, even if certain details of the scheme are

described with particularity.  *Id*.  As the *Clausen* court explained, the FCA does not permit a

plaintiff "merely to describe a private scheme in detail but then to allege simply and without

any stated reason for his belief that claims requesting illegal payments must have been

submitted, were likely submitted or should have been submitted to the government."  *Id.*

In *United States v. Aggarwal*,  the plaintiff alleged, among other things, that a

physician falsely created diagnoses to justify billing Medicare for consults, pre-surgical care,

and pre-authorized procedures that were not medically necessary.  *Id., 2005 WL 6011259

(M.D. Fla. Feb. 10, 2005), at *3-6.  The plaintiff alleged that the provider received Medicare payments for which she believed documentation was lacking.  *Id*. at *5.  The *Aggarwal* court, citing *Clausen*, dismissed the complaint because plaintiff failed to provide claim numbers, patient names, dates, claim amounts, payors, payees, and what any or all of the defendants obtained as a result.  *Id*.  The *Aggarwal* allegations are analogous to the DOJ's generalized allegations here.

III.   **ARGUMENT**

The Complaint fails to inform the Court on the relevant requirements of the Stark Act.  The Stark Act contains a two-part prohibition: (i) a physician may not make a referral to an entity for the furnishing of designated health services ("DHS") if the physician (or an immediate family member of the physician) has a financial relationship with the entity; and (ii) an entity may not submit a claim to Medicare or bill any party for DHS furnished as a result of a prohibited referral.  42 U.S.C. § 1395nn(a)(1)(A)-(B).

The Stark Act and its implementing regulations establish several exceptions that protect specific types of arrangements between physicians and entities from enforcement action.  *See, e.g.*, § 1395nn(e); 42 C.F.R. § 411.357.  Where an exception applies, the arrangement between the referring physician and the entity does not constitute a "financial relationship" under the Stark Act, and the referral and billing prohibitions do not apply.  The Complaint fails to allege a financial relationship between the physicians and Halifax such that the arrangements would even need to satisfy an exception.  Moreover, even if the Complaint did properly allege a financial relationship, Halifax's physician employment agreements qualify for protection under the Stark Act's exception for *bona fide* employment arrangements as well as under the exception for indirect compensation arrangements.

To state a claim under the FCA, a complaint must allege the following: "(1) a 'false or fraudulent' claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with knowledge that the claim was false." *United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001). Further, "[i]t is only those claims for money or property to which a defendant is not entitled that are 'false' for purposes of the False Claims Act." *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003). A defendant is deemed to "know" a claim is false or fraudulent if he or she: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)). The Halifax physician agreements do not violate the Stark Act and, therefore, Halifax did not submit any false claims.

A.     The DOJ's Claims Regarding Alleged False Claims To Medicaid Fail As A Matter Of Law

The Complaint erroneously alleges at Compl. ¶¶ 60(b), 113-114, 117, and 118 that, due to alleged Stark Act violations, Halifax submitted false claims to the Medicaid program. This theory is a legal impossibility. Even if the Court accepted as true the DOJ's allegations of Stark Act violations, neither the Stark Act nor the Medicaid statute prohibit the payment of the claims that resulted. Thus, the DOJ states no false claims relating to Medicaid.

The federal government provides matching funds to state Medicaid programs that meet certain minimum requirements. *See* 42 U.S.C. § 1395b. These matching funds are known as federal financial participation ("FFP"). The Medicaid statute establishes the applicability of the Stark Act to the Medicaid program:

Notwithstanding the preceding provisions of this section, no payment shall be made *to a State* under this section for expenditures for medical assistance under the State plan consisting of a designated health service (as defined in subsection (h)(6) of section 1395nn of this title) furnished to an individual on the basis of a referral that would result in the denial of payment for the service under subchapter XVIII of this chapter if such subchapter provided for coverage of such service to the same extent and under the same terms and conditions as under the State plan, and *subsections (f) and (g)(5) of such section shall apply to a provider* of such a designated health service for which payment may be made under this subchapter in the same manner as such subsections apply to a provider of such a service for which payment may be made under such subchapter.

42 U.S.C. § 1396b(s) (emphasis added). Section 1396b(s) does not incorporate the Stark Act's prohibitions on physician referrals and billing for DHS furnished pursuant to a prohibited referral, which are set forth in 42 U.S.C. § 1395nn(a)(1)(A) and (a)(1)(B) respectively. To the contrary, section 1396b(s) expressly incorporates only subsections (f) and (g)(5), which establish certain reporting requirements and sanctions for failure to meet these reporting requirements.

The statute clearly states that no payment will be made *to a State – i.e.* no FFP – for DHS furnished based on a physician referral if that referral would result in a denial of payment for the services under the Medicare program if Medicare covered the services to the same extent and under the same terms and conditions as Medicaid. The statute does not, however, prohibit payment *to providers* by the State Medicaid plan. Halifax is a provider as the DOJ is well aware.

Even accepting the allegations in the Complaint as true, contrary to the assertion in Compl. ¶ 113, referrals of Medicaid patients by the physicians cannot constitute a violation of either the Stark Act or the FCA. Likewise, contrary to Compl. ¶ 114, the submission of "claims for payment to the Medicaid program for [DHS] provided on referrals from the

physicians with whom they had entered into prohibited financial relationships as set forth in ¶¶ 61-112" would not result in any Stark Act violations either.

      B.      <u>DOJ's Allegations Regarding The Necessity For Signed Writings and Compensation That is Set In Advance Do Not State Stark Or FCA Claims</u>

      1.      <u>Neurosurgeons' Agreements</u>

As with its Medicaid claims, the DOJ misstates the law's requirements as to the timing and necessity for signed writings and compensation that is set in advance.  The Complaint alleges that Halifax failed to obtain proper signatures on employment agreements between Halifax and its employed neurosurgeons (Compl. ¶ 74.), that the employment agreements did not cover some of the call coverage services provided by the neurosurgeons (Compl. ¶ 68.), and that the compensation was not "set forth in advance" (Compl. ¶ 87). Even if true, the DOJ's allegations would not constitute a violation of the Stark Act because the Act does not require employment relationships to be memorialized in a signed writing or that compensation paid to employees be set in advance.  As is clear from the plain language of Section 1395nn(e)(2), the Stark Act does not require employment relationships to be memorialized in a signed agreement, nor does it require employment agreements to be signed on or before the effective date of the agreement.  *See also* 42 C.F.R. § 411.357(p)(2) (stating that an employment agreement does not need to be memorialized in a signed contract to satisfy the exception for indirect compensation arrangements).  Likewise, neither Section 1395nn(e)(2) nor the indirect compensation exception (42 C.F.R. § 411.357(p)) requires that the compensation paid to an employed physician be set in advance.

The DOJ does not allege that the neurosurgeons were not employed physicians.[3] Because the Stark Act does not require a signed employment agreement or compensation that is set in advance as a condition of compliance, the DOJ's allegations that certain, unidentified agreements were not signed within a certain time frame and that all aspects of the compensation were not set in advance does not state a Stark Act violation.

2.      Medical Oncologists' Agreements

The DOJ attempts to reprise the allegation regarding the timing and necessity of written agreements with respect to Halifax's employed medical oncologists.  (*See* Compl. ¶ 98.)    Although Section VIII(B) of the Complaint carries the heading, "Medical Oncologists," ¶ 98 of that section repeats verbatim ¶ 74, which, as discussed, alleges that an unidentified number of Halifax neurosurgeon agreements went unsigned or were signed late. As a result, the DOJ does not actually allege that Halifax failed to obtain proper signatures on its employment agreements with its medical oncologists.  If the Court puts aside this error to give the paragraph its likely meaning, ¶ 98 of the Complaint still suffers from the same pleading deficiencies as ¶ 74 under Rule 12(b)(6).

C.      The Complaint Does Not Allege Either A Direct Or Indirect Financial
        Relationship Between Halifax And The Physicians

Nowhere in the Complaint does the DOJ articulate its theory of the case by asserting the nature of the financial relationship – *i.e.* direct or indirect – between Halifax and the various physicians identified in the Complaint (the "Physicians").    The DOJ, instead,

---

[3] Despite referring to the physicians exclusively as employees in the Complaint, the DOJ refers to two Stark Act exceptions– the exceptions for personal service arrangements and fair market value compensation – that only apply when the physician is an independent contractor.  (*See* Compl. ¶¶ 53, 55, 56, 57.)  These exceptions – and their heightened requirements regarding signed writings and compensation that is set in advance – are irrelevant here.  The DOJ's reference to these exceptions reflects a misapplication of the law to the known facts.

obfuscates with respect to this most fundamental aspect of its Stark Act allegations.  Under the Stark Act, the DOJ has the burden of establishing the existence of a financial relationship. *See, e.g.*, *United States ex rel. Kosenke v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009) ("Once the plaintiff or the government has established proof of each element of a violation under the [Stark] Act, the burden shifts to the defendant to establish that the conduct was protected by an exception"); and *United States v. Campbell*, No. 08-1951, 2011 U.S. Dist. LEXIS 1207 (D.N.J. Jan. 4, 2011).   The Court cannot infer a financial relationship recognized under the Stark Act if the DOJ has not alleged one.

The Stark regulations specify that there are two types of financial relationships, direct and indirect. 42 C.F.R. § 411.354(a)(2).  To establish a direct financial relationship, the DOJ must allege that "remuneration passes between the referring physician […] and the entity furnishing DHS without any intervening persons or entities between the entity furnishing DHS and the referring physician […]." *Id.* at § 411.354(a)(2)(i).  Nowhere in the Complaint does the DOJ allege facts regarding remuneration paid to the Physicians from an entity that furnishes DHS.  The DOJ has, therefore, failed to allege facts that permit the conclusion that the Physicians have or had a direct financial relationship with Halifax.

To establish an indirect compensation arrangement, the DOJ must allege facts to demonstrate that:

> (i) Between the referring physician […] and the entity furnishing DHS there exists an unbroken chain of any number (but not fewer than one) of persons or entities that have financial relationships (as defined in paragraph (a) of this section) between them (that is, each link in the chain has either an ownership or investment interest or a compensation arrangement with the preceding link);
>
> (ii) The referring physician […] receives aggregate compensation from the person or entity in the chain with which the physician […] has a direct

financial relationship that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS, regardless of whether the individual unit of compensation satisfies the special rules on unit-based compensation under paragraphs (d)(2) or (d)(3) of this section. […]; and

(iii) The entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician (or immediate family member) receives aggregate compensation that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS.

42 C.F.R. § 411.354(c)(2).

The Complaint does not allege an unbroken chain of relationships between the Physicians identified in Compl. ¶¶ 61 and 89 and Halifax.  As elaborated in Sections III.D and III.E, *infra*, the Complaint also does not allege facts from which it could be inferred that the Physicians received aggregate compensation from the entity with which the Physicians have direct financial relationships that varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS.  Nor does the Complaint allege that the entity furnishing the DHS had actual knowledge of, or acted in reckless disregard or deliberate ignorance of, the nature of the compensation received by the Physicians.  The DOJ has, therefore, failed to allege facts that permit the inference that the Physicians have or had an indirect compensation arrangement with Halifax and that the arrangements must satisfy the exception for indirect compensation arrangements.

Accordingly, the DOJ has not met its burden under Rule 12(b)(6) to allege facts supporting the existence of a Stark financial relationship between the Physicians and an entity furnishing DHS.

D.     The DOJ Does Not Allege Facts That Permit The Conclusion That The
       Arrangements Between The Employed Neurosurgeons And Halifax Do Not
       Satisfy The Exception For Bona Fide Employment Arrangements

       1.     The *Bona Fide* Employment Exception Protects The Neurosurgeons'
              Agreements From The DOJ's Stark Allegations

As described in Section III.C, *supra*, the Complaint does not allege that the
neurosurgeons have either a direct or indirect financial relationship with Halifax and thus
fails to state a claim.  However, even if the Court concludes that the DOJ has met its burden
regarding the existence of a financial relationship, the Complaint still fails to state a claim
because it does not allege facts that, even if true, deny Halifax the protection of the Stark
exception for *bona fide* employment relationships.

The exception for *bona fide* employment relationships protects remuneration paid by
an employer to a physician if:

(1) The employment is for identifiable services.

(2) The amount of the remuneration under the employment is

    (i) Consistent with the fair market value of the services; and

    (ii) Except as provided in paragraph (c)(4) of this section, is not
         determined in a manner that takes into account (directly or indirectly)
         the volume or value of any referrals by the referring physician.

(3) The remuneration is provided under an agreement that would be
    commercially reasonable even if no referrals were made to the employer.

(4) Paragraph (c)(2)(ii) of this section does not prohibit payment of
    remuneration in the form of a productivity bonus based on services
    performed personally by the physician (or immediate family member of
    the physician).

42 C.F.R. § 411.357(c).  As set forth below, the facts alleged in the Complaint do not permit
the inference that Halifax's compensation arrangements with the neurosurgeons do not

satisfy the requirements of the exception for *bona fide* employment arrangements.

2.   <u>Neurosurgeon Bonuses Based On A Percentage Of Collections For Physician Services Do Not Take Into Account The Volume Or Value Of Referrals As A Matter Of Law</u>

At Compl. ¶ 87, the DOJ alleges in conclusory fashion that the neurosurgeons received compensation that took into account the volume or value of referrals. The Complaint, however, only sets forth a few stray allegations regarding the neurosurgeons' compensation (*see* Compl. ¶¶ 64, 66, 69-72), without specifying which aspects of that compensation allegedly took into account the volume or value of referrals. The DOJ's theory is a legal impossibility as pled because the compensation components cited by the DOJ cannot take into account the volume or value of referrals.

DOJ first cites compensation based on a percentage of collections for physician services. (*see* Compl. ¶ 66). As a matter of law, this type of bonus does not take into account the volume or value of referrals. The Stark definition of "referral" expressly excludes services personally performed by the physician. 42 C.F.R. § 411.351. Thus, a bonus based on a percentage of collections for personally performed services is, by definition, not a bonus based on "referrals." *See accord* 69 Fed. Reg. 16054, 16067 (Mar. 26, 2004) ("we defined 'referral' under the statute to include only DHS referrals and to *exclude* personally performed DHS. In short, personally performed work – DHS or otherwise – is not considered a "referral" under section 1877 of the Act. […] Thus, a productivity bonus based on personally performed work would not be based on the volume or value of 'referrals.'") (emphasis in original).

Moreover, the exception for *bona fide* employment arrangements expressly permits productivity bonuses based on personally performed services. 42 U.S.C. § 1395nn(e)(2); 42

C.F.R. § 411.357(c)(4).

The DOJ's effort to shore up its allegation regarding compensation being based on the volume or value of referrals is limited to a single reference at ¶ 82 of the Complaint where a single December 2009 email is paraphrased rather than attached as an exhibit. The 2009 email by a Halifax employee refers purportedly to "tracking" referral(s). Paragraph 82 does not specify any neurosurgeon by name or reference any compensation decisions made by Halifax. This email, even if the DOJ's paraphrasing is accepted as true, cannot support the inference that compensation for the neurosurgeon agreements from 2000 – 2009 was determined in a manner that took into account the volume or value of referrals.

3.    <u>The DOJ Allegations Regarding Neurosurgeon Billing For Nurse Or PA Services Do Not Specify Whether The Services Provided Were Relevant Under Stark</u>

The Complaint further alleges at ¶ 79 that some of the services upon which the neurosurgeons' bonuses were based were performed by a nurse or a physician assistant ("PA"). Even if true, this bare allegation cannot establish the existence of compensation that took into account the volume or value of referrals. The DOJ must allege that the services provided by nurses or PAs were DHS. If the services at issue were not DHS, there was no "referral" for purposes of a Stark analysis. The exception for *bona fide* employment arrangements does not prohibit compensation that takes into account non-DHS services performed by others.

4.    <u>Unit-Based Compensation Is Deemed Not To Take Into Account The Volume Or Value Of Referrals</u>

Unit-based compensation, such as the payments based on a fee schedule alleged at ¶¶ 70 and 71, does not to take into account the volume or value of referrals under the special

rules on compensation at 42 C.F.R. § 411.354(d)(2).  The DOJ has not alleged facts that permit the inference that these fee schedule-based payments do not qualify for protection under the special rules on compensation.

5.     Random Factual Observations In The Complaint Do Not Allow For The Inference That The Neurosurgeons' Compensation Was Not Fair Market Value Or Otherwise Out Of Compliance With The Statutory Definition Of Fair Market Value

Throughout the Complaint, the DOJ cites random facts as evidence of the absence of fair market value and, therefore, Stark Act violations without providing any legal basis for the assertion or sufficient facts from which any contextual understanding can be gleaned. These facts do not constitute a claim as required by Rule 12(b)(6).  In fact, there is a statutory definition of fair market value for Stark Act purposes.

At Compl. ¶ 85, the DOJ alleges that a 2009 third party analysis of compensation paid to the three Halifax neurosurgeons concluded that the compensation "was above the 90th percentile in terms of compensation nationally."  This fact may well be interesting, but, alone, has no legal significance under the Stark Act.  The DOJ does not even allege that whoever performed this analysis concluded that the compensation was not fair market value. Nor does the DOJ allege why compensation "above the 90th percentile" is not fair market value in 2009 or any other year at issue in the Complaint.

Reference to a statistical benchmark alone is insufficient to permit the inference that the compensation was not fair market value.  For example, in *United States ex rel. Villafane v. Solinger*,  the court rejected an expert's findings of compensation in excess of the 75th and 90th percentiles as evidence of a lack of fair market value because the expert's findings were "merely . . . a series of statistical observations" without any finding that the salaries were

"either above fair market value or . . . unreasonable." *Id.*, 543 F. Supp. 2d 678, 691-92

(W.D. Ky. 2008). The court further states that

> [a]ny definition of fair market value that would automatically deem anything
> over the median or indeed, anything at the 80th percentile, as necessarily not
> being fair market value would seem illogical. After all, *any distribution of
> salaries in a marketplace will show some higher or lower than others.*
> Provided a salary is well within a statistical distribution defining the market
> as a whole, it seems difficult to argue that it is not fair market value. The
> [c]ourt suspects this is in part why the rule makers opted against defining
> fair market value in terms of standard deviations and other statistical
> measurements, and instead did so in terms of "arm's-length transactions."

*Id.* at 692 (emphasis added). Similarly, at Compl. ¶¶ 77- 78, the DOJ alleges that the

compensation paid to the Neurosurgeons exceeded the Hospital's collections for professional

services. In Compl. ¶ 86, the DOJ states without citing any law, statute or regulation that,

based on this allegation, Halifax "could not reasonably have concluded that the compensation

arrangements in those contracts were fair market value." This is a conclusory statement that

ignores the fact that physicians are paid to provide services to patients regardless of whether

a hospital is paid for the services. The DOJ is aware that Halifax's neurosurgeons provide

care to the indigent, uninsured patients, Halifax employees, and many others who may not

pay for these services, and that the dollar amount of Halifax's collections is not a legal proxy

for fair market value.

Further undermining this allegation is the fact that the DOJ's Complaint

acknowledged at Compl. ¶ 71 that at least one of the neurosurgeon's "employment agreement

was amended effective April 1, 2009 to provide for Dr. Vinas to receive additional

compensation of 110% of the Medicare Physician Fee payment for all patients referred to Dr.

Vinas through clinics operated by Halifax Hospital, 'self-pay' patients, charity patients, and

employees of Halifax Hospital, Halifax Staffing, and affiliated entities." Based on this

allegation, the DOJ is patently aware that the Halifax neurosurgeons were compensated for treating patients who *did not have* the capacity to pay for the services.

The relevant regulations, which the DOJ does not cite, define "fair market value" as:

> [T]he value in arm's-length transactions, consistent with the general market value. ''General market value'' means the price that an asset would bring as the result of *bona fide* bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of *bona fide* bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the time of the service agreement. Usually, the fair market price is the price at which *bona fide* sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition, or the compensation that has been included in *bona fide* service agreements with comparable terms at the time of the agreement, where the price or compensation has not been determined in any manner that takes into account the volume or value of anticipated or actual referrals.

42 C.F.R. § 411.351. The Complaint does not allege that the agreements between the Hospital and the neurosurgeons were not the result of arm's length negotiation. The DOJ also never alleges that paying in excess of collections for professional services is inconsistent with the "general market value." Without alleging what the law requires, the DOJ cannot credibly allege that Halifax did not act "reasonably" in entering into these agreements.

      6.      The DOJ Avoids Defining Commercial Reasonableness Or Setting Forth A Legal Test For Assessing The Neurosurgeon Compensation

The DOJ also alleges at Compl. ¶ 86 that it was not "commercially reasonable" for Halifax to pay the neurosurgeons more that what was collected by the hospital for their professional services. Even if the DOJ statement regarding collections is true, this fact alone cannot establish that the arrangements were not commercially reasonable. The DOJ fails to provide the Court with the standard for measuring "commercial reasonableness."

Neither the Stark Act nor its implementing regulations define commercial reasonableness.  In the preamble to Phase II of its regulatory implementation of the Stark Act, however, the Centers for Medicare and Medicaid Services stated "[a]n arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals." 69 Fed. Reg. at 16093 .  The DOJ has not alleged any facts addressing whether a reasonable entity of a similar type and size to Halifax would have entered into similar arrangements with neurosurgeons even if there were no potential for referrals from the neurosurgeons.  Given that Compl. ¶ 71 establishes that the DOJ is aware that Halifax's neurosurgeons are contractually obligated to provide charity care, the Complaint does not allege why this is not commercially reasonable.

     E.     The DOJ Does Not Allege Facts That Permit The Conclusion That The Arrangements Between The Employed Medical Oncologists And Halifax Do Not Satisfy The Exception For *Bona Fide* Employment Arrangements

          1.     The *Bona Fide* Employment Exception Protects The Agreements From The DOJ's Stark Allegations

As set forth in Section III.C, *supra*, the DOJ's Complaint dodges its obligation to allege either a direct or an indirect financial relationship between the employed medical oncologists and Halifax and thus fails to state a claim.  However, even if the Court permits the DOJ to overcome this fatal deficiency, the Complaint still fails to state a claim because it does not allege facts that, even if true, permit the conclusion that the medical oncology employment agreements are not protected by the Stark Act exception for *bona fide* employment relationships.   The elements of the exception for *bona fide* employment

relationships are set forth in section C, *supra*.

    2.    <u>The Complaint Does Not Allege Facts Permitting The Inference That The Medical Oncologists' Compensation Took Into Account The Volume Or Value Of Referrals</u>

The Complaint's allegations cannot support the inference that any medical oncologist compensation was based on the volume or value of referrals. At Compl. ¶ 111, the DOJ makes this assertion and purports to identify relevant components of the medical oncologists' compensation (*see* Compl. ¶¶ 91, 93-97, 99, 102). The DOJ, however, only cites bonus compensation during various years that was based on personally performed physician services. These bonuses do not take into account the volume or value of referrals as a matter of law and do not violate the Stark Act.

The DOJ at Compl. ¶ 93, for example, describes a bonus based on an "equitable portion of a bonus pool that consisted of 85 percent or more of all cash collections exceeding a pre-determined amount ($2,342,286) and attributable to professional services performed by one of the medical oncologists related to patient care." Similarly, in Compl. ¶ 99, the DOJ alleges that the employment agreement for Dr. Kelly Molpus, who is not a medical oncologist, provided for "a bonus equal to 85 percent of all cash collections exceeding the base salary and attributable to the professional services performed by Dr. Molpus." These facts do not describe bonuses that took into account the volume or value of referrals. To the contrary, the allegations demonstrate the exact opposite: that the bonuses did *not* take into account the volume or value of referrals.

As previously discussed, the definition of "referral" for purposes of the Stark Act expressly *excludes* personally performed services. *See* 42 C.F.R. § 411.351. Therefore, a bonus based on collections for personally performed services does not, by definition, take

into account the volume or value of "referrals."  *See accord* 69 Fed. Reg. at 16067 ("we defined 'referral' under the statute to include only DHS referrals and to *exclude* personally performed DHS. In short, personally performed work –DHS or otherwise—is not considered a ''referral'' under section 1877 of the Act. […] Thus, a productivity bonus based on personally performed work would not be based on the volume or value of 'referrals.'") (emphasis in original).   Moreover, the exception for *bona fide* employment arrangements expressly permits productivity bonuses based on personally performed services.  42 U.S.C. § 1395nn(e)(2); 42 C.F.R. § 411.357(c)(4).

The DOJ describes at Compl. ¶ 94 a bonus to be distributed on an equitable basis from a pre-determined bonus pool provided that the medical oncologists maintained adequate staffing for Halifax patients and provided strong customer service by not keeping patients waiting unduly for their appointments.[4]  The Complaint does not allege that this bonus was based on anything other than personally performed services.   The *bona fide* employment exception permits bonuses based on personally performed services, and personally performed services (DHS or otherwise) are not "referrals" for purposes of the Stark Act.  *See* 42 C.F.R. § 411.357(c).  This bonus could not have violated the Stark Act.

The DOJ in Compl. ¶ 96 describes another bonus arrangement whereby each medical oncologist would be paid an equitable portion of a bonus pool consisting of fifteen percent of the operating margin of the Hospital's medical oncology program.  Similarly, in Compl. ¶ 102, the DOJ describes a bonus arrangement whereby Halifax surgeon Dr. Kelly Molpus

---

[4]   The DOJ does not allege that this or any other bonus was actually paid to the medical oncologists.  The compensation data set forth in Compl. ¶ 104 is only for 2009 and makes ambiguous and unclear references to "pool compensation" and "incentive compensation."

would receive an equitable portion of a bonus pool comprised of fifteen percent of the operating margin for surgical procedures. As with the other compensation incentives, the Complaint does not allege that these bonuses were based on anything other than personally performed services. Because personally performed services (DHS or otherwise) are not "referrals" for purposes of the Stark Act, this bonus cannot violate the Stark Act.

As was the case with its allegations involving the neurosurgeon agreements, the DOJ's claim that the medical oncologists' compensation was based on the volume or value of referrals rests on a single document. The DOJ again only paraphrases the document rather than including it as an exhibit to its pleading. The DOJ's allegations do not logically lead to the inference that the DOJ seeks. Here, the Complaint at ¶ 108 refers to a February 2010 Halifax document that discusses the referrals of a single medical oncologist, Dr. Sorathia, who, according to the DOJ's recitation, generated "a comparatively low dollar value of referral services." Yet the DOJ's Complaint at ¶ 104 alleges that Dr. Sorathia was by far the highest paid medical oncologist in 2009. Logic suggests that, if the DOJ's theory had any plausible basis, Dr. Sorathia – the highest paid medical oncologist – would also have the highest level of referrals. Instead, the Complaint's allegations lead to the opposite inference.

3.  The Absence Of Either Fair Market Value Or Lack Of Commercial Reasonableness Cannot Be Inferred

As with the neurosurgeon agreements, the DOJ avoids making a plain statement of the government's own guidance on the definition of either "commercial reasonableness" or of "fair market value" which Halifax has set forth in Section III.D.5 and III.D.6, *supra*. The Complaint does not reflect any factual allegations of how reasonable market participants would negotiate medical oncology agreements consistent with "general market value" in

light of the type, quality, and quantity of services provided by the medical oncologists.  The Complaint also does not allege that any of the agreements between Halifax and the medical oncologists were not the result of arm's length negotiations.  DOJ has not alleged that a reasonable entity of a similar type and size to Halifax would not have entered into similar arrangements with the medical oncologists even if there were no potential for referrals. *See* 60 Fed. Reg. at 16093 ("An arrangement will be considered 'commercially reasonable' in the absence of referrals if the arrangement would make commercial sense if entered into by a reasonable entity of similar type and size and a reasonable physician (or family member or group practice) of similar scope and specialty, even if there were no potential DHS referrals.")

Instead, the DOJ alleges that a 2009 Halifax analysis determined that "at least one medical oncologist received compensation that exceeded fair market value compensation and was outside acceptable tolerances" (*see* Compl. ¶ 109).  The DOJ does not provide any details of this analysis or explain why an alleged finding regarding one medical oncologist's compensation during one year is sufficient to taint the compensation of every other medical oncologist for every other year at issue in the Complaint.  The DOJ's own allegations at Compl. ¶ 104 illustrate that, in 2009, the medical oncologists' compensation varied widely with a $270,000 variance between the low and the high alleged "total compensation."

     F.    <u>The Allegations Are Insufficient To Conclude That All Of The Physician Agreements Are Not Protected By The Exception for Indirect Compensation Arrangements</u>

As set forth in Section III.C, *supra*, the Complaint fails to allege that the Physicians had either a direct or indirect financial relationship with Halifax and thus does not state a claim.  Insofar as the Court finds that the DOJ can meet its burden regarding the existence of

an indirect compensation arrangement, the Complaint nonetheless fails to allege sufficient facts to permit the conclusion that the arrangements failed to satisfy the exception for indirect compensation arrangements.

As previously noted, the Complaint characterizes the Physicians as "employees." Where the physician is employed, the elements of the exception for indirect compensation arrangements are almost identical to the elements of the exception for *bona fide* employment arrangements.  In relevant part, this exception protects indirect compensation arrangements with employed physicians if the following requirements are met:

> (1)(i) The compensation received by the referring physician […] is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS. […]
> (2) The compensation arrangement […] is set out in writing, signed by the parties, and specifies the services covered by the arrangement, except in the case of a bona fide employment relationship between an employer and an employee, in which case the arrangement need not be set out in a written contract, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer.
> (3) The compensation arrangement does not violate the anti-kickback statute (section 1128B(b) of the Act), or any Federal or State law or regulation governing billing or claims submission.

42 C.F.R. § 411.357(p).

As set forth in Sections III.D and III.E., *supra*, the Complaint does not allege sufficient facts to permit an inference that the compensation was not fair market value. Likewise, as set forth in Sections III.D. and III.E, *supra*, the compensation arrangements alleged in the Complaint do not permit the conclusion that the Physicians received compensation that took into account the volume or value of referrals, even without reference to the *bona fide* employment exception's provision expressly permitting productivity

bonuses. *See accord* 69 Fed. Reg. at 10607 ("all physicians, whether employees, independent contractors, or academic medical center physicians, can be paid productivity bonuses based on work they personally perform.").

The exception for indirect compensation arrangements imposes an additional requirement, above and beyond the requirements of the *bona fide* employment exception, which the Complaint fails to allege that Halifax's compensation agreements did not meet. That added requirement is that the compensation may not take into account the volume or value of "other business generated by the referring physician for the entity furnishing DHS." The Stark Act regulations clarify that "other business generated" does not include services personally performed by the physician. 42 C.F.R. § 411.354(d)(3); *see accord* 69 Fed. Reg. at 10607 ("We have clarified the regulations at § 411.354(d)(3) to reflect that ''other business generated'' does not include personally performed services."). Therefore, allegations of compensation based on personally performed services do not, as a matter of law, describe compensation that took into account the volume or value of other business generated by the referring physician for the entity furnishing DHS. With respect to the allegation at Compl. ¶ 79 that the neurosurgeons did not perform some of the services on which the bonus payments were based, the DOJ fails to allege that the neurosurgeons actually generated any of the services provided by the nurse or physician assistant or that these services were generated for an entity that furnishes DHS. The special rules on compensation also provide that unit-based compensation, such as payments based on a fee schedule, is deemed not to take into account the volume or value of other business generated by the referring physician for the entity furnishing DHS. 42 C.F.R. § 411.354(d)(3). The DOJ has not alleged facts that permit the inference that these fee schedule-based payments do

not qualify for this deemed status.  *See id.*  Thus, the Complaint fails to allege that the compensation took into account "other business generated" by the neurosurgeons.

As addressed in Section III.D and III.E, *supra*, the Complaint fails to allege sufficient facts to permit the conclusion that the arrangements with the Physicians were not commercially reasonable.

The Complaint also does not allege that the arrangements violate the Anti-Kickback Statute (§ 1128B(b) of the Act), or any federal or state law or regulation governing billing or claims submission.

G.    The Complaint Does Not Comply With Rule 9(b) In Any Respect

1.    Failure To Identify The Specific Physician Agreements That Allegedly Violated The Stark Act

Perhaps the most glaring deficiency in the Complaint is the DOJ's failure to identify each Halifax agreement at issue for any of the Physicians.  The Complaint makes only vague references to "the agreements."  Nowhere does the Complaint list the offending agreements that spanned several years of employment for the various physicians.

The DOJ, for example, makes no effort to provide specific allegations as to each of the various medical oncologist identified in the Complaint.  The DOJ provides an allegation that only one unidentified medical oncologist agreement was not fair market value.  (Compl. at ¶¶ 109-110)  The DOJ then imputes alleged absence of fair market value to all other medical oncologists and Halifax's agreements with them.  These evasive pleading tactics cannot comply with Rule 9(b).

2.    Failure To Allege Which Neurosurgeon Or Medical Oncologist Agreements Were Not Executed Or Not Timely Executed

As set forth above, the DOJ's allegations regarding the necessity of obtaining

- 26 -

signatures do not state a claim.  Even if they did, the Complaint does not articulate which physician agreements were defective as required by Rule 9(b).  Instead, the Complaint vaguely alleges at ¶ 74 that "a number of the employment agreements" were either never signed or were signed after the effective date of the agreement.  The DOJ attempts to articulate a similar allegation with respect to the medical oncologist agreements at ¶ 98.  The DOJ has had all of these physician agreements for nearly two years yet the Complaint contains insufficient information to provide Halifax notice to defend against the claims.

3.    Failure To Identify Which Components Of Physician Compensation
Were Based On The Volume Or Value Of Referrals

At Compl. ¶ 87, the DOJ alleges in conclusory fashion that the neurosurgeons received compensation that took into account the volume or value of referrals.  The Complaint, however, only sets forth a few stray allegations regarding the neurosurgeons' compensation (*see* Compl. ¶¶ 64, 66, 69-72), without specifying which aspects of that compensation allegedly took into account the volume or value of referrals.  This, alone, is cause for dismissal for lack of specificity.

In an attempt to shore up this allegation, the Complaint makes a single reference at ¶ 82 of the Complaint to a single December 2009 email which it paraphrases rather than simply attaching as an exhibit.  The 2009 email by a Halifax employee purportedly refers to "tracking" physician referrals.  The DOJ does not specify at ¶ 82 any neurosurgeon by name or reference any compensation decisions made by Halifax as a result of the alleged tracking.

The DOJ resorts to this same pleading tactic with respect to the medical oncologists.  The Complaint cites a single Halifax document from February 2010 that refers to only one of the medical oncologists.  Here, the Complaint at ¶ 108 alleges that the Halifax employee

noted that Dr. Sorathia generated a comparatively low dollar value of referral services. This is insufficient to give Halifax notice of how Halifax's compensation arrangements with Dr. Sorathia or any of the other medical oncologists violated the Stark Act.

4.     <u>Failure To Identify Which Components Of Neurosurgeon Or Medical Oncologist Agreements Were Not Based On Fair Market Value</u>

The Complaint's allegations are deficient in giving notice as to what aspects of the neurosurgeon and medical oncologists' compensation were not based on fair market value. The Complaint does not set forth the relevant law regarding fair market value thereby depriving Halifax of fair notice as to what was false or improper about any of the physician agreements. Instead the Complaint cites factual allegations with no legal context, such as that the neurosurgeons' compensation exceeded Halifax's collections for professional services (Compl. ¶¶ 77- 78) and that the neurosurgeons' compensation was 90% percentile or greater "in terms of compensation nationally." (Compl. ¶ 85). DOJ makes no attempt to identify what about the compensation was false or why Halifax could not "reasonably" conclude that the agreements reflected fair market value.

5.     <u>Failure To Identify Specific Instances Of Improper Treatment Of Nurse Or Physician Assistant Services</u>

The DOJ alleges at ¶ 79 of the Complaint that "one or more of the neurosurgeons did not perform some of the professional services on which Halifax Staffing based its bonus compensation payment. Those professional services were performed by a nurse or physician assistant." The Complaint does not allege which neurosurgeons' compensation was affected by this practice. Nor does the Complaint identify any PAs or nurses, when these services were allegedly provided, or what legal requirements were not met by Halifax if, indeed, any PAs or nurses provided professional services to the Halifax neurosurgical patients.

H.    <u>12(B)(6) Motion To Dismiss For Failure To State A Claim Under The False Claims Act Citing All Three FCA Counts</u>

The Complaint's allegations do not state a claim under 31 U.S.C. § 3729(a)(1) and (a)(1)(A), 31 U.S.C. § 3729(a)(1)(B), or 31 U.S.C. § 3729(a)(7) and (a)(1)(G). The Complaint does not identify any false records, false statements or the presentment of any false claims by Halifax. The Complaint also does not allege facts that could establish that Halifax acted "knowingly" under the FCA.

The FCA confers liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement" that is material to a "false or fraudulent claim for payment or approval" by the United States government. 31 U.S.C. § 3729(a)(1)-(2). Under the FCA's scienter requirement, "innocent mistakes, mere negligent misrepresentations and differences in interpretations" will not suffice to create liability. *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (internal citations omitted).

In order for DOJ to sufficiently plead that Halifax acted with fraudulent intent under the FCA, DOJ must allege that Halifax knew that its statements were false, or that it was deliberately indifferent to or acted with reckless disregard of the truth of the statements. *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998) ("Absent evidence that the defendants knew that the…Guidelines on which they relied did not apply, or that the defendants were deliberately indifferent to or recklessly disregardful of the alleged inapplicability of those provisions, no False Claims Act liability can be found."). Specifically, the Complaint must allege that Halifax knew, or acted with reckless disregard of the fact, that its compensation agreements with the employed neurosurgeons and medical oncologists violated the Stark Act.

- 29 -

The Complaint fails to make any such allegation.  Instead, DOJ alleges that Halifax acted "unreasonably" in entering into the agreements with its neurosurgeons and medical oncologists.  Accordingly, the DOJ's scienter allegations do not meet the standard required under the FCA and should be dismissed.

I.      12(b)(1) Motion To Dismiss For Lack Of Subject Matter Jurisdiction For Stark, FCA And Common Law Causes Of Action

The DOJ's damages for claims under either the "overall fraud scheme' (Compl. ¶ 60), the specific claims related to the neurosurgery agreements (Compl. ¶ 66) or the medical oncology agreements (Compl. ¶ 70) must be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction to the extent such claims arose prior to June 16, 2003.  The FCA provides that claims must be brought within six years of the date on which the alleged violations of 31 U.S.C. § 3729 occurred.  31 U.S.C. § 3731(b).  However, when the DOJ elects to intervene and proceed with an action initially brought by a *qui tam* relator by either filing its own complaint or by amending the relator's complaint

> any such Government pleading shall relate back to the filing date of the complaint of the person who originally brought the action, to the extent that the claim of the Government arises out of the conduct, transactions, or occurrences set forth, or attempted to be set forth, in the prior complaint of that person.

31 U.S.C. § 3731(c).  Therefore, the statute of limitations bars the government's claims that arose prior to the June 16, 2003, which constitutes six years from the date on which Relator's complaint was initially filed.

J.      12(b)(6) Motion To Dismiss Under Common Law Causes Of Action

1.      Unjust Enrichment

In its complaint, the DOJ makes no attempt to allege a prima facie case for unjust

enrichment.  The elements of a cause of action for unjust enrichment under Florida law are:

> (1) the Plaintiff has conferred a benefit on the Defendant;
>
> (2) the Defendant has knowledge of the benefit;
>
> (3) the Defendant has accepted or retained the benefit conferred; and,
>
> (4) the circumstances are such that it would be inequitable for the Defendant
> to retain the benefit without paying fair value.

*Media Servs. Grp. v. Bay Cities Commc'ns., Inc.*, 237 F.3d 1326, 1330-31 (11th Cir. 2001)

(citing *Swindell v. Crowson*, 712 So. 2d 1162, 1163 (Fla. Dist. Ct. App. 1998)).  The naked

assertion that Halifax has "obtain[ed] government funds to which it was not entitled" is

insufficient under Florida law.  As such, DOJ's unjust enrichment claims must be dismissed.

### 2.   Payment By Mistake

The DOJ's claims for payment by mistake are inextricably linked to the success of its

FCA and Stark Act claims.  Under federal common law, the United States may sue for the

recovery of funds paid from the federal treasury whether or not there exists any specific

statutory authorization.  *United States v. Dekalb Cnty.*, 729 F.2d 738, 741 (11th Cir. 1984)

(citing *U.S. v. Wurts*, 303 U.S. 414, 415-16 (1938)); *see also U.S. v. Garrahan*, 614 F. Supp.

152, 155 (N.D. Fla. 1985).  "The Government's right to recover funds, from a person who

received them by mistake and without right, is not barred unless Congress has 'clearly

manifested its intention' to raise a statutory barrier."  *Wurts*, 303 U.S. at 416 (1938).  The

failure of the DOJ's FCA and the Stark Act claims doom its payment by mistake claim.

### 3.   Disgorgement, Constructive Trust, and Accounting

The common law concepts of disgorgement, constructive trust, and accounting are

not causes of action, but rather equitable remedies linked to the success of the underlying

causes of action.  Under Florida law, "a constructive trust is not a traditional cause of action, but an equitable remedy that must be based upon an established cause of action."  *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008) (citing *Collinson v. Miller*, 903 So. 2d 221, 228 (Fla. Dist. Ct. App. 2005)).  Where a party cannot advance an underlying recovery theory, there can be no constructive trust remedy.  *See Diamond*, 989 So. 2d at 697; *See also Brenner v. Future Graphics, LLC*, 2006 U.S. Dist. LEXIS 98271, at *15-16 (N.D. Ga. Nov. 14, 2006).  Without its FCA and Stark Act claims, the DOJ is entitled to no relief under these equitable remedies.

> K.  Halifax Is Absolutely Immune From Suit Under The FCA As An "Arm Of The State" Under The Eleventh Amendment Sovereign Immunity Clause

The Eleventh Amendment to the United States Constitution bars suite against a State without its consent.[5]  *See Hans v. Louisiana*, 134 U.S. 1 (1890) .  Halifax is a Special Taxing District entitled to immunity as an instrumentality or agency of the State of Florida.  The Supreme Court has held that the Eleventh Amendment bars FCA causes of action against a state or state agency because a state or state agency is not a "person" within the meaning of the FCA.  *Vt. Agency of Natural Res. v. United States ex. rel. Stevens*, 529 U.S. 765 (2000); *see also N. Ins. Co. of N.Y. v. Chatham Cnty.,* 547 U.S. 189, 193 (2006) ("states and arms of the State possess immunity from suits authorized by federal law").  In the Eleventh Circuit, Eleventh Amendment immunity extends to agents and instrumentalities of a state, *see Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (*en banc*), and has applied a four-factor balancing test to determine whether an entity is an "arm of the state" in carrying

---

[5] The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.

out a particular function. *Miccosukee Tribe of Indians v. Fla. State Athletic Comm'n,* 226 F.3d 1226, 1231-34 (11th Cir. 2000). The four factors – none of which are dispositive – are: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Id.* at 1231-34. Three of the "arm of the State" factors weigh in favor of Halifax's assertion that it is an instrumentality of the state and, therefore, immune from this FCA suit.

### 1.   Florida Defines Halifax As A Governmental Instrumentality

Halifax is a state instrumentality under Florida law. Halifax is a special taxing district created pursuant to an act of the Florida Legislature. *See* 2003 Fla. Laws 374. Hospital districts have been defined in state statutes as a "state agency or instrumentality." *Id.* For the purposes of Florida sovereign immunity under Fl. Sta. § 768.28(2), "state agencies or subdivisions" is defined to include "independent establishments of the state." Florida courts have determined that hospital districts fall within "state agencies or subdivisions" for the purposes of § 768.28(2). *Eldred v. N. Broward Hosp. Dist.*, 498 So. 2d 911, 913 (Fla. 1986); *Lee v. S. Broward Hosp. Dist.*, 473 So. 2d 1322, 1323 (Fla. 4th Dist. Ct. App. 1985). Further, the Florida Supreme Court has specifically held that a hospital district is a public agency subject to the rights and responsibilities of public agencies. *See, e.g., State ex rel Robinson v. N. Broward Hosp. Dist.*, 95 So. 2d 434, 436 (Fla. 1957) (subject to bond validation); and *State v. Halifax Hosp. Dist.*, 159 So. 2d 231, 235 (Fla. 1963) (same); *see also William A. Berbusse, Jr., Inc. v. N. Broward Hosp. Dist.*, 117 So. 2d 550, 551 (Fla. 2d DCA 1960) (public bidding requirements).

### 2.   The State Exercises A High Degree Of Control Over Halifax

Halifax is overseen by a governor-appointed Board of Commissioners, which may be

suspended by the governor pursuant to Section 7, Article IV of the Florida Constitution. *Id.*, §§ 1-2. Unlike private hospital systems, the State dictates Halifax's patient admission policies and other mission-specific interactions with the patient population Halifax serves. The State, for example, requires that Halifax accept all indigent patients from the District. The daily operations are fully regulated by administrative regulations promulgated by the Agency for Health Care Administration ("AHCA") and the Department of Health ("DOH"). *See, e.g.,* F.A.C. 59A-35, *et seq.* (licensing through AHCA); F.A.C. 64J-2, *et seq.* (trauma center regulation through DOH).

### 3.   Unlike Private Hospitals, The State Controls Halifax's Fiscal Life

Halifax's collection of *ad valorum* taxes is not dispositive because the State controls Halifax's fiscal life. *See Miccosukee Tribe*, 226 F.3d at 1233 (citing to *Fouche*, 713 F.2d at 1520-21 (holding that although Park Authority raised own money and was self-sufficient, the State controlled Park's fiscal life because the Park had to submit its budget and annual reports to the legislature)). The State's control manifests clearly across all aspects of Halifax's operations, exercising control over the way Halifax receives and pays out its funds. For example, the State retains oversight for the use of all state funding received by Halifax. Fla. Stat. § 189.413. Halifax is required by statute to purchase commodities and contractual services through competitive bids and is also subject to oversight review that can determine whether to transfer services to another district. *Id.*, § 189.4221. There can be no question that Halifax's services are of critical importance to the local community and no comparable alternative health care services are readily available.

### 4.   Responsibility For Judgments Against Halifax

Special hospital districts in Florida are liable for judgments rendered against them

which weighs against Halifax's assertion of immunity, but is not dispositive. *See generally* 1951 Fla. Laws 27438 (enabling act giving hospital districts the power to sue and be sued). In fact, the state may be held liable for a judgments against special taxing districts in certain circumstances.  Regardless, if the DOJ were to prevail in this case, the State and its taxpayers would be obligated to pay the costs.  On balance and taking all of the factors into consideration, this Court has ample basis to find that Halifax is an arm of the State for the purposes of Eleventh Amendment sovereign immunity from suit under the FCA.

## IV.    CONCLUSION

For the foregoing reasons, this Court should dismiss DOJ's Complaint with prejudice.

Dated: November 29, 2011                                    Respectfully submitted,

                                                                          s/ Amandeep S. Sidhu
                                                                          _____

T. Reed Stephens (admitted *pro hac vice*)          Anthony N. Upshaw
David O. Crump (admitted *pro hac vice*)            Fla. Bar. No. 0861091
Amy Kearbey (admitted *pro hac vice*)               MCDERMOTT WILL & EMERY LLP
Amandeep S. Sidhu (admitted *pro hac vice*)        201 South Biscayne Boulevard
MCDERMOTT WILL & EMERY LLP                      Suite 2200
600 13th Street, NW                                      Miami, FL 33131
Washington, DC 20005                                   Tel: (305) 358-3500
Tel: (202) 756-8000                                      Fax: (305) 347-6500
Fax: (202) 756-8087                                      aupshaw@mwe.com
trstephens@mwe.com
dcrump@mwe.com
akearbey@mwe.com
asidhu@mwe.com

*Counsel to Defendants Halifax Medical Center and Halifax Staffing, Inc.*

- 35 -

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Florida using the CM/ECF system on November 29, 2011.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


s/ Amandeep S. Sidhu
Amandeep S. Sidhu