# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BAKLID-KUNZ, | § § § § | Civ. Act. No. 6:09-CV-1002-ORL-31GAP-TBS |
| Plaintiffs, | § § § | |
| v. | § § | JUDGE Gregory A. Presnell |
| HALIFAX HOSP. MED. CTR, et al. | § § | |
| Defendants. | § § | |

## PLAINTIFF UNITED STATES OF AMERICA'S
## MOTION FOR PARTIAL SUMMARY JUDGEMENT

Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc. (collectively, Halifax) knowingly violated the Stark Law and the False Claims Act during a four-year period by entering into employment agreements with six medical oncologists that compensated the physicians based on the operating margin of Halifax's medical oncology program. In the words of Audrey Pike, Halifax's then-associate general counsel, "this arrangement is not permitted under the STARK regulations." HAL-1 0691036-38 (Ex. 28), at HAL-1 0691036 (capitalization in original). Ms. Pike also acknowledged that "the physician may not refer any DHS to the entity during the period of the noncompliant relationship and that the entity may not bill Medicare for DHS referred to it by the physician during that period." *Id.*, at HAL-1 0691038. This Motion for Partial Summary Judgment will show that the Stark Law applied to Halifax's contracts with the medical oncologists, that Halifax cannot meet its burden of demonstrating that the contracts met an exception to the Stark Law, and that Halifax acted with knowledge that it was violating the Stark Law when it submitted claims to Medicare. Because Halifax submitted

claims for services in violation of the Stark Law, the United States is entitled to partial summary judgment on Counts One through Five of its Complaint in Intervention (Dkt. No. 73) alleging that Halifax violated various provisions of the False Claims Act and the common law.[1]

## I.  GENERAL LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A fact is material "if, under the applicable substantive law, it might affect the outcome of the case."  *Id.*, at 1259-60.

The moving party bears the burden of demonstrating that there is no dispute as to any material fact in the case.  *See Celotex*, 477 U.S. at 323; *Hickson Corp.*, 357 F.3d at 1260.  Once the movant satisfies this burden, the non-moving party must establish "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.*, 32 F.3d 520, 524 (11th Cir. 1994).  The party opposing summary judgment "must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997); *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla. 1995) (non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception).

---

[1] The United States is not seeking summary judgment regarding its claims that Halifax violated the Stark Law with respect to its contracts with Drs. William Kuhn, Federico Vinas, and Rohit Khanna.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      Halifax Hospital Medical Center (Halifax Hospital) owns and operates hospitals and medical facilities in Volusia County, Florida, and surrounding counties.  Halifax Hospital's primary business is to provide inpatient and outpatient health care services.  Compl. (Dkt. No. 73) ¶ 8; Answer (Dkt. No. 112) ¶ 8.

2.      Halifax Hospital is a governmental subdivision of the State of Florida and is a special taxing district.  Halifax Staffing, Inc. (Halifax Staffing) is an instrumentality of Halifax Hospital and is the vehicle through which Halifax Hospital employs the individuals who work at Halifax Hospital.  Answer ¶ 61.  Halifax Staffing employs all Halifax Hospital employees.  Peburn 30(b)(6) Depo. Tr. (Ex. 1), at 122:7-123:6.

3.      Employees are paid through a Halifax Staffing sweep account.  Answer ¶ 61.  Funds are transferred from the Halifax Hospital Medical Center Special Taxing District master account to the Halifax Staffing sweep account in an amount large enough to only cover checks presented.  Halifax's Responses and Objections to United States' Interrogatory No. 3 (Ex. 2).

4.      During the fiscal year ending September 2004, wholly owned subsidiaries of Halifax Hospital entered into an agreement with a physician group to provide outpatient imaging services to patients under the name East Coast Florida Outpatient Imaging (ECFOI).  The wholly owned Halifax Hospital subsidiaries own 50 percent of ECFOI.  Financial Statements, Halifax Hospital Medical Center, (Dec. 10, 2004) (Ex. 3), at HAL-1_0033676-77.

5.      In 1965, Congress created the Medicare Program through Title XVII of the Social Security Act.  The Medicare Program pays for institutional hospital care, known as Part A, and physician and other ancillary services, known as Part B, for certain individuals who meet the

participate requirements of age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A, 1395c-1395i-4, 1395K; Compl. ¶¶ 15-16; Answer ¶¶ 15-16.

6.      The Centers for Medicare and Medicaid Services (CMS) is the entity within the Department of Health and Human Services responsible for the administration and supervision of the Medicare Program. Compl. ¶ 15; Answer ¶ 15. To assist in the administration of Medicare Part A, CMS contracted with fiscal intermediaries; to assist with the administration of Medicare Part B, CMS contracted with carriers. Compl. ¶¶ 17-18; Answer ¶¶ 17-18. Beginning in November 2006, Medicare Administrative Contractors (MACs) began replacing both fiscal intermediaries and carriers to process and pay both Part A and Part B claims. 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006); 42 C.F.R. 421.5(b); Compl. ¶ 19; Answer ¶ 19.

7.      First Coast Service Options, Inc. (First Coast) served as both the fiscal intermediary and carrier for Florida until September 2008, at which time First Coast was awarded a contract to serve as the MAC for Florida. Compl.¶ 20; Answer ¶ 20.

8.      To participate in the Medicare Part A program, providers must periodically submit a completed Form CMS-855A. The Form CMS-855A includes the following statement:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

CMS-855A, § 15, at 48, available at: http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (Ex. 4);Compl. ¶ 21; Answer ¶ 21.

9.      The certification statement requires at least one signature from an authorized official. That certification statement says:

I have read the contents of this application. My signature legally and financially binds this provider to the laws, regulations, and program instructions of the Medicare program. By my signature, I certify that the information contained herein is true, correct, and complete, and I authorize the Medicare fee-for-service contractor to verify this information. If I become aware that any information in this application is not true, correct, or complete, I agree to notify the Medicare fee-for-service contractor of this fact in accordance with the time frames established in 42 CFR § 424.520(b).

CMS-855A (Ex. 4), at 49; Compl. ¶ 21; Answer ¶ 21.

10.     Halifax Hospital submitted Form CMS-855A several times from 2006 to 2010, agreeing each time to abide by all requirements of the Medicare Program. Rahn 30(b)(6) Depo. Tr. (April 11, 2013) (Ex. 5), at 94:10-15, 96:16-20, 112:19-23, 116:6-9, 117:14-18, 118:2-5. In filling out Form CMS-855A, Halifax undertook no steps to ensure compliance with the requirements of the Medicare Program. *Id.*, at 127:15-20.

11.     Under the Medicare Part A Program, providers submit claims for institutional items and services rendered to patients on both an inpatient and outpatient basis using a Form UB-92 or, beginning on March 1, 2007, Form UB-04. Compl. ¶ 23; Answer ¶ 23.

12.     Field 82 of Form UB-92 is called "Attending Phys. ID." Form UB-92 (Ex. 6). The Medicare Claims Processing Manual (Claims Processing Manual) defines this field as "the clinician primarily responsible for the care of the patient from the beginning of the inpatient episode" for inpatient claims, and for outpatient claims as "the physician that requested the surgery, therapy, diagnostic tests or other services." Claims Processing Manual (Ex. 7).

13.     Field 83 of Form UB-92 is named "Other Phys. ID." Form UB-92 (Ex. 6). The Claims Processing Manual defines "other physician" for inpatient claims as the physician who performed the principal procedure. If no principal procedure is performed, the hospital enters the UPIN and name of the physician who performed the surgical procedure most closely related to the principal diagnosis. If no procedure is performed, the hospital leaves this item blank." For

outpatient claims, the "other physician" is defined as "the operating physician."  Claims

Processing Manual (Ex. 7).

14.     Field 76 of Form UB-04 is named "Attending."  Form UB-04 (Ex. 8).  The

Claims Processing Manual states: "Required when claim/encounter contains any services other

than nonscheduled transportation services.  If not required, do not send.  The attending provider

is the individual who has overall responsibility for the patient's medical care and treatment

reported in this claim/encounter."  Claims Processing Manual, Ch. 25 (Ex. 9),

http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c25.pdf.

15.     The title of field 77 of Form UB-04 is "Operating."  Form UB-04 (Ex. 8).  For the

"Operating" field, the Claims Processing Manual states: "Required when a surgical procedure

code is listed on this claim.  If not required, do not send.  The name and identification number of

the individual with the primary responsibility for performing the surgical procedure(s)."  Claims

Processing Manual, Ch. 25 (Ex. 9).

16.     From 2001 to 2011, Halifax Hospital submitted claims to First Coast for

reimbursement by Medicare.  Halifax's Responses and Objections to United States' Requests for

Admission Nos. 230-240 (Ex. 10).  When Halifax submitted UB-92 and UB-04 claims it was

submitting those claims in accordance with all of the requirements of the Form CMS-855A.

Rahn 30(b)(6) Depo. Tr. (March 19, 2013) (Ex. 5), at 37:20-25, 61:16-20.

17.     For inpatient and outpatient claims, the physician identified by Halifax in field 82

of Form UB-92 and field 76 of Form UB-04 was the physician who established a plan of care for

the patient.  *Id.*, at 44:1-7, 57:10-17.  Halifax also listed the admitting physician in field 76 of

Form UB-04.  Lewis 30(b)(6) Depo. Tr. (Ex. 11), at 49:10-25.

18.     In field 83 of Form UB-92 Halifax indicated any physician performing a principal procedure on a patient.  Rahn 30(b)(6) Depo. Tr. (March 19, 2013) (Ex. 5), at 44:8-15.  Halifax indicated any operating physicians in Field 77 of Form UB-04.  *Id*., at 57:18-23.

19.     Physicians and suppliers submit claims to Medicare using a Form 1500. Medicare Claims Processing Manual, Ch. 26 (Ex. 12), http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/clm104c26.pdf.  Field 17 of Form 1500 is "Name of Referring Provider or Other Source."  Form 1500 (Ex. 13).  The Claims Processing Manual describes field 17 as "the name of the referring or ordering physician if the service or item was ordered or referred by a physician.  All physicians who order services or refer Medicare beneficiaries must report this data."  Medicare Claims Processing Manual, Ch. 26 (Ex. 12).

20.     Halifax Hospital used an entity called Halifax Healthcare Systems, Inc. to bill Medicare with a Form 1500.  Rahn 30(b)(6) Depo. Tr. (March 19, 2013) (Ex. 5), at 69:6-8. Halifax Healthcare Systems, Inc. has submitted Form 1500 claims to Medicare from 2004 to 2009.  *See* supporting data to expert report of Mr. Ian Dew (Ex. 14).

21.     When Halifax submitted a Form 1500, the provider entered in field 17 was the physician who referred the patient for service.  Rahn 30(b)(6) Depo. Tr. (March 19, 2013) (Ex. 5), at 69:15-20.  Halifax's general business definition of referral was "[t]he physician who is requesting service for the patient."  *Id.*, at 69:23-70:7.

22.     ECFOI has submitted Form 1500 claims to Medicare from 2004 to 2009.  *See* supporting data to expert report of Mr. Ian Dew (Ex. 14).

23.     Halifax Staffing had employment agreements effective March 1, 2004 through February 28, 2009 (collectively, the contracts), with the following medical oncologists: Dr. Boon Chew, Dr. Walter Durkin, Dr. Ruby Anne Deveras, Dr. Abdul Sorathia, Dr. Richard Weiss, and

Dr. Gregory Favis (collectively, the Medical Oncologists). Halifax's Responses and Objections to United States' Request for Admission Nos. 265- 271 (Ex. 15).

24. The Medical Oncologists had a financial relationship with Halifax Hospital and made referrals to Halifax Hospital. Rousis Depo. Tr. (Nov. 1, 2012) (Ex. 16), at 240:13-23.

25. The contracts contained the following provision:

The Company shall pay to Employee as compensation for services the following:

> c. Beginning with the fiscal year ending September 30, 2005, an equitable portion of an Incentive Compensation pool which is equal to 15% of the operating margin for the Medical Oncology program as defined by the financial statements produced by the Finance Department on a quarterly basis. The amount of the incentive compensation distributed to the Employee shall be determined by the Medical Oncology Practice Management Group. This compensation shall be paid annually according to the operating margin for the fiscal year.

*E.g.*, HAL-1 0044568-80 (Ex. 17); Halifax's Responses and Objections to United States' Request for Admission Nos. 265-271 (Ex. 15). Halifax's fiscal year runs October 1 to September 30.

26. Operating Margin, as defined in the contracts, included: "revenue and direct expenses from outpatient medical oncology services. Revenue consisted of outpatient medical oncology services, physician services, and related outpatient oncology pharmacy charges." Halifax's Responses and Objections to United States' Interrogatory No. 6 (Ex. 18).

27. The Medical Oncologists treated patients at Halifax on an inpatient basis. *See* Durkin Depo. Tr. (Ex. 19), at 38:2-12. The treatment of a patient on an inpatient basis constitutes an inpatient hospital service. 42 C.F.R. § 411.351; Medicare Benefit Policy Manual, Chapter 6-10 (Ex. 21).

28. The Medical Oncologists treated patients at Halifax on an outpatient basis. *See* Durkin Depo. Tr., at 38:19-41:10 (Ex. 19). The treatment of a patient based on an outpatient

basis constitutes an outpatient hospital service. 42 C.F.R. § 411.351; Medicare Benefit Policy Manual, Chapter 6-20, 20.4, 20.6, 30 (Ex. 21).

29.     The Medical Oncologists ordered or requested outpatient prescription drugs and certain other imaging services as part of a treatment plan for patients at Halifax.

30.     By requesting the services identified in SUMF ¶¶ 27-29, the Medical Oncologists either: (1) requested the provision of Designated Health Services; (2) established a plan of care that included the provision of a Designated Health Service; (3) certified the need for a patient to receive a Designated Health Service; or (4) re-certified the need for a Designated Health Service. *See, e.g.*, Sorathia Depo. Tr. (Ex. 22), at 20:11-21; Weiss Depo. Tr. (Ex. 23), at 98:11-99:10.

31.     Each time one of the Medical Oncologists performed a Medicare-reimbursable procedure on a Medicare beneficiary, Halifax submitted two claims for payment to the Medicare program: (1) one for the facility fee for that procedure; and (2) one for the professional component of the service. *See* Peburn 30(b)(6) Depo. Tr. (Ex. 1), at 221:6-22; 247:9-21; Rahn 30(b)(6) Depo. Tr. (March 19, 2013) (Ex. 5), at 27:25-28:3; 33:11-13.

32.     From October 1, 2004 through February 28, 2009, Halifax submitted 1,496 claims to First Coast for inpatient services where one of the Medical Oncologists was listed as the attending or operating physician on the request for payment. *See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14); Halifax Objections and Responses to Requests for Admissions Nos. 233-237 (Ex. 24).

33.     From October 1, 2004 through February 28, 2009, Halifax submitted 24,097 claims to First Coast for outpatient services where one of the Medical Oncologists was listed as the attending or operating physician on the request for payment. *See* Declaration of Ian Dew

(Ex. 36); supporting data to Dew expert report (Ex. 14); Halifax Objections and Responses to Requests for Admissions Nos. 233-37 (Ex. 24).

34.     From October 1, 2004 through February 28, 2009, ECFOI submitted 6,735 claims to First Coast for services where one of the Medical Oncologists was listed as the rendering or referring provider on the request for payment. *See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

35.     From October 1, 2004 through February 28, 2009, Halifax Health Care Systems, Inc. submitted 13,114 claims to First Coast for services where one of the Medical Oncologists was listed as the rendering or referring provider on the request for payment. *See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

36.     First Coast reimbursed Halifax $11,457,981 for the facility fees associated with Medicare inpatient procedures ordered by the Medical Oncologists from October 1, 2004 through February 28, 2009. *See See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

37.     First Coast reimbursed Halifax $19,393,003 for the facility fees associated with Medicare outpatient procedures ordered by the Medical Oncologists from October 1, 2004 through February 28, 2009. *See See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

38.     First Coast reimbursed ECFOI $2,372,825 for the DHS associated with Medicare procedures ordered by the Medical Oncologists from October 1, 2004 through February 28, 2009. *See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

39.     First Coast reimbursed Halifax Health Care Systems, Inc. $1,044,858 for DHS associated with Medicare procedures ordered by the Medical Oncologists from October 1, 2004

through February 28, 2009.  *See See* Declaration of Ian Dew (Ex. 36); supporting data to Dew expert report (Ex. 14).

40.     For Halifax's fiscal years 2005 through 2009, each of the Medical Oncologists received a bonus based on the operating margin of Halifax's medical oncology program.  *See* Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 72:10-13; Halifax Responses and Objections to United States' Requests for Admissions Nos. 175-198 (Ex. 26).

41.     The Operating Margin of the medical oncology program was determined by subtracting direct expenses from revenue for outpatient medical oncology services.  *See* Halifax Objection and Response to United States' Interrogatory No. 6 (Ex. 18); Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 69:25-70:3.

42.     Halifax distributed the Operating Margin bonus to each Medical Oncologist based on a formula that calculated the percentage of personally performed services completed by the individual Medical Oncologist as compared to the personally performed services completed by all Medical Oncologists for the time period in question.  *See* Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 127:23-129:16; Peburn 30(b)(6) Depo. Tr. (Ex. 1), at 204:12-205:3.

43.     The Operating Margin for the medical oncology program varied based on "what's happening with the program."  Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 93:21-94:5; *see* Rousis Depo. Tr. (Feb. 19, 2013) (Ex. 16), at 446:10-448:1.  As the Operating Margin increased, the physician compensation pool paid to the Medical Oncologists increased as well.  *See* Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 94:6-10.

44.     In Fiscal Year 2005, the Operating Margin for the medical oncology program was $1,541,564, and the physician incentive compensation pool (comprising fifteen percent of the operating margin) was $231,234.60.  HAL-1 0325436 (Ex. 35).  In Fiscal Year 2006, the

Operating Margin for the medical oncology program was $1,935,015, and the physician incentive compensation pool was $290,252.25.  HAL-1 0325344 (Ex. 35).  In Fiscal Year 2007, the Operating Margin for the medical oncology program was $1,492,933.77, and the physician incentive compensation pool was $223,940.07.  HAL-1 0325269 (Ex. 35).  In Fiscal Year 2008, the Operating Margin of the medical oncology program was $1,699,886, and the physician incentive compensation pool was $254,983.  HAL-1 0325216 (Ex. 35).

45.     Halifax's chief compliance officer, George Rousis, sent Halifax executives periodic updates regarding developments related to the Stark Law.  *See* HAL-1_0013349-75 (Ex. 32).  In a summary dated March 24, 2004, Mr. Rousis advised Halifax leadership that the Stark Law precluded the payment of bonuses based on referrals for ancillary services.  *Id.*, at HAL-1_0013352.  Mr. Rousis recognized that Medicare could not reimburse providers for any DHS provided pursuant to a referral by a physician who maintained a prohibited financial arrangement with a DHS provider.  *See* Rousis Depo. Tr. (Nov. 1, 2012) (Ex. 16), at 252:17-253:10.

46.     In October 2008, relator Elin Baklid-Kunz, who is not an attorney, attended a conference in Philadelphia sponsored by the Health Care Compliance Association.  *See* Baklid-Kunz Depo. Tr. (Aug. 20, 2012) (Ex. 27), at 72:24-73:9; 75:6-76:7.  At the October 2008 conference, Ms. Baklid-Kunz attended presentations regarding the Stark Law.  *See* Baklid-Kunz Depo. Tr. (April 4, 2013) (Ex. 27), at 206:23-207:4.

47.     Prior to October 2008, Ms. Baklid-Kunz's only Stark Law training consisted of watching an hour-long computer-based PowerPoint training presentation available on Halifax's internal website.  *See* Baklid-Kunz Depo. Tr. (April 4, 2013) (Ex. 27), at 206:7-12.

48.     Based on information presented in the PowerPoint she watched at Halifax and the presentations at the October 2008 conference, Ms. Baklid-Kunz concluded that the employment

agreements between Halifax Staffing and the Medical Oncologists may violate the Stark Law. *See* Baklid-Kunz Depo. Tr. (April 4, 2013) (Ex. 27), at 212:9-21.

49. Ms. Baklid-Kunz advised Ms. Audrey Pike, then-Associate General Counsel of Halifax, of her view that the Medical Oncology employment agreements violated the Stark Law in approximately October or November 2008. *See* HAL-1 0691036 (Ex. 28); Baklid-Kunz Depo. Tr. (April 4, 2013) (Ex. 27), at 207:10-208:10; Pike Depo. Tr. (Ex. 29), at 23:19-25:11.

50. In 2008, Halifax determined that the Medical Oncology employment agreements "are not permitted under the STARK regulations." HAL-1 0691036-38 (Ex. 28); HAL-1 0691071-72 (Ex. 30); *see* Baklid-Kunz Depo. Tr. (Aug. 20, 2012)(Ex. 27), at 71:7-19; 72:4-19; 97:16-98:1; s*ee* Garthwaite Depo. Tr. (Feb. 19, 2013) (Ex. 25), at 333:2-334:4.

51. After determining that the Medical Oncologists' employment agreements violated the Stark Law, Halifax deemed it necessary to amend the employment agreements. *See* Garthwaite Depo. Tr. (May 1, 2012) (Ex. 25), at 119:6-13.

52. Despite determining that the Medical Oncology employment agreements violated the Stark Law at some point in 2008, Halifax nevertheless paid the Medical Oncologists a bonus in March 2009 pursuant to the terms of their employment agreements. *See* Baklid-Kunz Depo. Tr. (Aug. 20, 2012) (Ex. 27), at 70:14-71:6; 98:20-101:16; PTF 0010062 (Ex. 31).

53. Halifax amended the Medical Oncology employment agreements in 2010, with a retroactive contract start date of March 1, 2009. *See* Weiss Depo. Ex. 6 (Ex. 23).

## III.  SUMMARY OF ARGUMENT

The Stark Law prohibits providers from having financial relationships with physicians who refer patients to that provider for designated health services. If a provider has a financial relationship with a physician, then the provider cannot submit claims for referred services to

Medicare unless an exception to the Stark Law applies. If a provider cannot demonstrate that it meets all the requirements of a Stark Law exception, then Medicare cannot pay any claims submitted by that provider for designated health services referred by the physician. All claims submitted to Medicare in violation of the Stark Law constitute an overpayment that the United States is entitled to recoup. If the provider knowingly (that is, with actual knowledge, with deliberate ignorance, or in reckless disregard of the law) violates the Stark Law and submits claims for payment to Medicare, then that provider also violates the False Claims Act.

As set forth in this Motion for Partial Summary Judgment, Halifax violated the Stark Law from 2005 through 2009, and did so knowingly. Halifax paid bonuses to six physicians based on the amount of services those physicians referred to Halifax Hospital. Halifax's actions are exactly what the Stark Law was enacted to prevent: physicians basing referral decisions on financial gain rather than a patient's best interests. Section IV sets for the Stark Law and regulations and explains how the Stark Law is applicable to Halifax and that Halifax cannot meet either of the exceptions raised in its Answer to the Complaint in Intervention. Section V outlines Halifax's liability on the United States' common law claims of unjust enrichment and payment by mistake. Section VI discusses Halifax's liability under the False Claims Act and sets forth the evidence that Halifax acted with knowledge that it was violating the Stark Law. Finally, Section VII sets forth the bases for summary judgment on six of Halifax's eight affirmative defenses.

IV.     **THE STARK LAW AND REGULATIONS**

The Stark Law, 42 U.S.C. § 1395nn, prohibits health care providers from submitting claims for payment to the Medicare program based on patient referrals from physicians having a statutorily prohibited financial relationship with the hospital. Prior to the passage of the Stark Law, academic studies had shown that when physicians had a financial relationship with a

facility, they referred more patients to that facility than they would have in the absence of such a relationship. *See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities with Which They Have Financial Relationships, 66 Fed. Reg. 856, 859 (Jan. 4, 2001). The Stark Law was designed to protect the integrity of the Medicare program by preventing a doctor's personal financial interests from influencing his or her medical decision-making and ensuring that such decisions were based solely on the best interests of the patient.

Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Stark I applies to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204. Stark II extends the law to referrals for ten additional types of health services, including inpatient and outpatient hospital services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. At all times relevant to this action, the Stark Law has applied to referrals for designated health services, including inpatient and outpatient hospital services, by physicians with a prohibited financial relationship with a hospital. *See* 42 U.S.C. § 1395nn(h)(6).

**A.** **General Prohibitions Established by the Stark Law**

The Stark Law establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital. *See U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012); *United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008). In pertinent part, the Stark Law provides:

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –

    (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

    (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (a)(1). Designated Health Services (DHS) are listed in section (h) of the statute and include inpatient and outpatient hospital services and radiology services. *See* 42 U.S.C. § 1395nn(h)(6). In addition to prohibiting hospitals from submitting claims for DHS under these circumstances, the Stark Law also prohibits payment by the Medicare program of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

**B.**    **Pertinent Definitions**

The Stark Law broadly defines prohibited financial relationships to include "compensation arrangements" in which any "remuneration" is paid "directly or indirectly, in cash or in kind," by a hospital to a referring physician. *See* 42 U.S.C. § 1395nn(a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c). The regulations identify two types of compensation arrangements that are subject to the Stark prohibitions: direct and indirect. A direct compensation arrangement exists if remuneration passes between the hospital and the referring physician (or his or her family member) without going through any intervening persons or entities. 42 C.F.R. §§ 411.354(a), (c)(1). An indirect compensation arrangement exists when the following circumstances are present:

(1) between the referring physician (or immediate family member) and the hospital, there is an unbroken chain of any number of persons or entities that have financial relationships between them (whether an ownership or investment interest or a compensation arrangement);

(2) the referring physician (or immediate family member) receives aggregate compensation from the person or entity within the chain with which the physician (or immediate family member) has a direct financial relationship that varies with, or otherwise reflects, the volume or value of referrals or other business generated by the referring physician for the hospital; and

(3) the hospital has actual knowledge of, or acts in reckless disregard or deliberate ignorance of the fact that the compensation arrangement with the physician (or family member) varies with, or otherwise reflects, the volume or value of referrals or other business generated by the referring physician for the hospital.

42 C.F.R. § 411.354(c)(2).[2]

The Stark Law defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services."  42 U.S.C. § 1395nn(h)(5)(A).  The accompanying regulations interpreting the statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ."  42 C.F.R § 411.351.  A referring physician is defined as "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity."  *Id*.

When a physician performs a procedure at a facility, the entity submits two bills to Medicare: one for the physician's personally performed service and one for the facility fee.  The

---

[2] In 2007, the Department of Health and Human Services altered the language of the second element of the definition to replace "otherwise reflects" with "takes into account." 72 Fed. Reg. 51012, 51087 (Sept. 5, 2007).  The Department of Health and Human Services explained that it was doing so to make the language more consistent with other parts of the regulation, but that the change was "non-substantive." *Id.* at 51027.

facility fee, also known as the "facility component" or "technical component" is submitted by the entity to Medicare on a Form UB-92 or UB-04, depending on which form was in effect when the service occurred.  In promulgating the Stark regulations, CMS responded to a comment about exclusion of personally performed services by explaining:

> We have concluded that when a physician initiates a designated health service and personally performs it him or herself, that action would not constitute a referral of the service to an entity . . . .  However, in the context of inpatient and outpatient hospital services, there would still be a referral of any hospital service, technical component, or facility fee billed by the hospital in connection with the personally performed service.  Thus, for example, in the case of an inpatient surgery, there would be a referral of the surgical service, even though the referring physician personally performs the service.  If the referring physician has a financial relationship with the hospital, that relationship must fit in an exception.

66 Fed. Reg. 856, 941 (Jan. 4, 2001).  Applying CMS's guidance, the Fourth Circuit found that "the facility component of the physicians' personally performed services, and the resulting facility fee billed by Tuomey based upon that component" was a referral, and was therefore prohibited by the Stark Law if there was a financial relationship between the physician and the entity.  *Tuomey Healthcare Sys.*, 675 F.3d at 407.

The physician identified on the UB-92 claim form in box 82 ("attending phys. ID") and box 83 ("other phys. ID") is the referring physician under the Stark Law.  *Rogan*, 459 F. Supp. 2d at 713-14.  For inpatient claims, the physician identified in box 82 is "the clinician primarily responsible for the care of the patient from the beginning of the inpatient episode"; for outpatient claims, the physician identified in box 82 is "the physician that requested the surgery, therapy, diagnostic tests or other services."  Claims Processing Manual (Ex. 7).  For inpatient claims, an entity is required to fill out box 83 "if a procedure is performed" and must enter identifying information for "the physician who performed the principal procedure."  *Id.*  For outpatient claims, the entity populates box 83 with identifying information for the "operating physician."

*Id.* "These manual provisions were adopted to meet Congress's requirement that the identification number of referring physicians be reported with claims made to Medicare." *Rogan*, 459 F. Supp. 2d at 713-14 (*citing* Hospital Manual, Transmittal No. 637, May 1, 1992).

Applying the Stark Law to the current claims manual and form, the physicians identified in boxes 76 and 77 of the UB-04 claim form are referring physicians under the Stark Law. The physician the entity identifies in box 76 of the UB-04 form is described as "the individual who has overall responsibility for the patient's medical care and treatment reported in this claim/ encounter." Claims Processing Manual (Ex. 9). The physician the entity identifies in box 77 of the UB-04 form is "the individual with the primary responsibility for performing the surgical procedure(s)." *Id.* Just as the definitions for the form UB-92 were adopted to implement the requirement that entities identify referring physicians, so were the definitions for the form UB-04 adopted. *Cf. Rogan*, 459 F. Supp. 2d at 713-14.

Non-institutional claims are submitted on a Form 1500. SUMF ¶ 19. Box 17 of Form 1500 is "Name of Referring Provider or Other Source." *Id.* The Claims Processing Manual describes box 17 as "the name of the referring or ordering physician if the service or item was ordered or referred by a physician. All physicians who order services or refer Medicare beneficiaries must report this data." *Id.*

C. **Statutory and Regulatory Exceptions**

The Stark Law and its regulations define specific exceptions to the general referral and billing prohibitions. In order to avoid the referral and billing prohibitions, a hospital must, by a preponderance of the evidence, demonstrate that an exception applies. *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3rd Cir. 2009); *Rogan*, 459 F. Supp. 2d at 716. In its Answer to the Complaint in Intervention, Halifax asserted the following affirmative defense:

Exceptions to the Stark Law: Insofar as any of the United States' causes of action in the Complaint allege violations of the Stark Law; the employment agreements at issue meet the requirements of the Bona Fide Employee Exception, or, in the alternative, the Indirect Compensation Exception to the statute. Accordingly, no financial relationship within the meaning of the Stark Law exists.

Answer to Complaint in Intervention, Affirmative Defenses, ¶ 8.

### 1. Indirect Compensation Exception

Where an indirect compensation arrangement exists, referrals are prohibited unless the

compensation arrangement satisfies all the following conditions:

> (a) "The compensation received by the physician . . . is fair market value for services and items actually provided and not determined in any manner that takes into account the value or volume of referrals or other business generated by the referring physician" for the hospital.

> (b) The compensation arrangement must be in writing, signed by the parties, specifying the services covered by the agreement, except in the case of a bona fide employment relationship, "in which case the agreement need not be in writing, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer."

> (c) The compensation does not violate the Anti-Kickback Statute or any other federal or state law regarding billing and claims submission.

42 C.F.R. § 411.357(p).

### 2. Bona Fide Employment Exception

The bona fide employment exception is available where a direct compensation

arrangement exists if the following conditions are met:

> (a) The employment agreement must be for identifiable services.

> (b) The remuneration for the employment must be set in advance, consistent with fair market value for the services provided and "not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." However, the exception generally allows payment of remuneration in the form of a productivity bonus based on services personally performed by the employed physician.

(c)　　The remuneration must be provided under an agreement that would be commercially reasonable even if no referrals were made to the employer.

42 U.S.C. § 1395nn(e)(3); 42 C.F.R. § 411.357(c).

Both the Bona Fide Employee and the Indirect Compensation exceptions require that the amount of remuneration paid to the physician is not determined in a manner that directly or indirectly takes into account the volume or value of any referrals by the referring physician.  42 C.F.R. § 411.357(c), (p).  CMS provided the following guidance in response to a comment:

> *Comment*: Commenters also wished us to clarify whether the following arrangements take into account the volume or value of referrals or other business generated between the parties: (1) Payments based on a percentage of gross revenues; (2) payments based on a percentage of collections; (3) payments based on a percentage of expenses; and (4) payments based on a percentage of a fee schedule.
> *Response*: A compensation arrangement does not take into account the volume or value of referrals or other business generated between the parties if the compensation is fixed in advance and will result in fair market value compensation, and the compensation does not vary over the term of the arrangement in any manner that takes into account referrals or other business generated.  The first three arrangements described by the commenters are neither aggregated fixed compensation amounts, nor fixed "per service," "per use," or "per time period" amounts.  Percentage compensation that is determined by calculating a percentage of a fluctuating or indeterminate amount, such as revenues, collections, or expenses, is not fixed in advance.  Accordingly, the first three arrangements do not meet the requirement that compensation be fixed in advance.

66 Fed. Reg. 856, 877-78 (Jan. 4, 2001).

*　　　　　　*　　　　　　*

If a relationship between a physician and a hospital does not meet one of the exceptions in the statute or the regulations, the hospital is prohibited from billing Medicare for any DHS referred by that physician, regardless of the legality of the physician's other business at the hospital.  42 U.S.C. § 1395nn(a)(1), (g)(1); *Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 815 (W.D. La. 2007).  If a hospital submits prohibited claims and collects

payment, the Stark regulations expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353.

## V. THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON ITS CLAIMS FOR PAYMENT BY MISTAKE AND UNJUST ENRICHMENT BASED ON HALIFAX'S VIOLATION OF THE STARK LAW

The United States' payment by mistake theory is premised upon the long-standing principle that "[t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. 'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute. . . .'" *United States v. Wurts*, 303 U.S. 414, 415-16 (1938) (footnote omitted) (quoting *United States v. Bank of the Metropolis*, 15 Pet. 377, 401 (1841)). Further, "the Government's right to recover funds, from a person who received them by mistake and without right, is not barred unless Congress has 'clearly manifested its intention' to raise a statutory barrier." *Wurts*, 303 U.S. at 416 (citation omitted). To prevail on a claim for payment by mistake, "the Government must show that the . . . program 'made . . . payments under an erroneous belief which was material to the decision to pay.'" *Roberts,* 474 F. Supp. 2d at 818 (citation omitted).

The United States is also pursuing a recovery for funds obtained by Halifax in violation of the Stark Law under the theory of unjust enrichment. To prevail under this theory, the United States must show that: (1) the government had a reasonable expectation of payment; (2) the defendant should reasonably have expected to pay, or (3) "society's reasonable expectations of person and property would be defeated by nonpayment." *Provident Life & Accident Ins. Co. v. Waller*, 906 F.2d 985, 993-94 (4th Cir. 1990); *accord Rogan*, 459 F. Supp. at 728. Significantly for this case, "where the disbursement of public funds is concerned, the government is not under

the obligation of showing either that the recipient was unjustly enriched or that the balance of equities otherwise lies in its favor." *Mt. Vernon Co-op Bank v. Gleason*, 367 F.2d 289, 291 (1st Cir. 1996). This principle has been widely recognized for over a century. *See United States v. Burchard*, 125 U.S. 176, 181 (1888) (mistaken overpayment of retirement funds by U.S. Navy "may be corrected"); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 15–16, n.16 (1st Cir. 2005) (United States has a "longstanding" right to recover Medicare overpayments).

Given that the Stark Law prohibits payment for any DHS referred by a physician with whom the entity performing the DHS has a prohibited financial relationship, the United States could not have lawfully paid Halifax if it had been apprised of the financial relationship between Halifax and the Medical Oncologists. The United States therefore is entitled to recover all amounts paid to Halifax for these services. Similarly, because the employment agreements between Halifax and the Medical Oncologists violated the Stark Law, Halifax was unjustly enriched in the amount of the Medicare reimbursements paid by the United States for DHS ordered by the Medical Oncologists. The United States is therefore entitled to summary judgment on its common law claims of payment by mistake and unjust enrichment based on Halifax's violation of the Stark Law.

A.  **The Medical Oncologists had a Financial Relationship with Halifax Hospital Medical Center from 2004-2009**

As described above, in order for there to exist a financial relationship between an entity and a physician there must be either an indirect or direct employment relationship. There is no dispute that Halifax Hospital is an entity that provides DHS to Medicare beneficiaries. There is no dispute that the Medical Oncologists had employment agreements with Halifax Staffing from 2004 through 2009, and that the Medical Oncologists had financial relationships with Halifax Hospital. SUMF ¶¶ 23-24. There is no dispute that the Medical Oncologists received

remuneration from a Halifax Staffing account. SUMF ¶¶ 2-3, 44. Because Halifax Staffing is a separate legal entity, there existed an indirect compensation relationship between the Medical Oncologists and Halifax Hospital.[3]

**B.** **The Medical Oncologists made Referrals for DHS to Halifax Hospital Medical Center from 2004-2009**

There is no dispute that the Medical Oncologists performed services at Halifax Hospital on inpatient and outpatient bases. SUMF ¶¶ 27-29. There is no dispute that Halifax Hospital submitted claims to First Coast for reimbursement by Medicare for the facility fees associated with the Medical Oncologists' inpatient and outpatient services provided to Medicare beneficiaries. SUMF ¶ 31. The chief compliance officer at Halifax Hospital admits that the Medical Oncologists referred patients to Halifax Hospital. SUMF ¶ 24. Applying the agency guidance and the *Tuomey* Fourth Circuit opinion, all of the technical components associated with the Medical Oncologists' inpatient and outpatient services are referrals. 66 Fed. Reg. 856, 941 (Jan. 4, 2001); *Tuomey Healthcare Sys.*, 675 F.3d at 407.

There is no dispute that Halifax Hospital identified the Medical Oncologists in boxes 82 and 83 of Forms UB-92 and in boxes 76 and 77 of Forms UB-04 submitted to First Coast from 2004-2009. There is no dispute that for inpatient and outpatient claims, the physician identified by Halifax in field 82 of Form UB-92 and field 76 of Form UB-04 was the physician who established a plan of care for the patient. SUMF ¶ 17. There is no dispute that in field 83 of Form UB-92 Halifax would indicate any physician performing a principal procedure on a patient. SUMF ¶ 18. There is no dispute that in field 83 of Form UB-92 Halifax would indicate any physician performing a principal procedure on a patient, and that Halifax indicates any operating

---

[3] Halifax does not dispute that the Medical Oncologists had an employment relationship with Halifax Hospital, but responded in its Answer that the relationship was direct rather than indirect. As discussed in section V.C, *infra*, it is irrelevant whether the employment relationship is direct or indirect because under either circumstance Halifax cannot meet the requirements of any exception.

physicians in Field 77 of a Form UB-04.  *Id*.  There is no dispute that Medicare paid these claims.  SUMF ¶¶ 32-33, 36-37.

There is no dispute that Halifax, through the entity Halifax Healthcare Systems, Inc., submitted Forms 1500 to First Coast.  SUMF ¶ 20.  There is no dispute that Halifax identified the Medical Oncologists in box 17 of Forms 1500 submitted to First Coast.  SUMF ¶ 35.  There is no dispute that Halifax, as the Claims Processing Manual required, identified the physician ordering the service in box 17 of the Forms 1500.  SUMF ¶ 21.  There is no dispute that Medicare paid the claims submitted by Halifax Healthcare Systems, Inc. that identified a medical oncologist as the referring physician.  SUMF ¶ 39.

There is no dispute that Halifax has an ownership interest in ECFOI.  SUMF ¶ 4.  There is no dispute that ECFOI submitted Forms 1500 for payment by Medicare to First Coast.  SUMF ¶¶ 22, 34.  There is no dispute that ECFOI identified the Medical Oncologists in box 17 of Forms 1500.  SUMF ¶ 34.  There is no dispute that the Claims Processing Manual required that the physician identified in box 17 of Form 1500 be the physician who ordered the service.  SUMF ¶ 19.  There is no dispute that Medicare paid these claims.  SUMF ¶ 38.

Because the physician identified in box 82 of Form UB-92, box 83 of Form UB-92, box 76 of Form UB-04, box 77 of Form UB-04, and box 17 of a Form 1500 is a referring physician, the Medical Oncologists were referring physicians for all claims in which they were identified in one of those boxes.

### C.     The Medical Oncologists' Employment Agreements Took Into Account the Volume or Value of Referrals

Because there is no dispute that the Medical Oncologists had a financial relationship with Halifax Hospital and made referrals for DHS to Halifax Hospital, all claims submitted by Halifax Hospital to First Coast for payment by Medicare were not payable, unless an exception to the

Stark Law applies. Halifax raised two exceptions in its Answer to the Complaint in Intervention: the Bona Fide Employee exception and the Indirect Compensation exception. Because the Medical Oncologists' employment agreements took into account the volume or value of referrals to Halifax Hospital, Halifax cannot meet the requirements of either exception.

It is undisputed that the Medical Oncologists' employment agreements called for a distribution of "an equitable portion of an Incentive Compensation pool which is equal to 15% of the operating margin for the Medical Oncology program as defined by the financial statements produced by the Finance Department on a quarterly basis." SUMF ¶ 25. It is undisputed that the operating margin included the following components: "outpatient medical oncology services, physician services, and related outpatient oncology pharmacy charges." SUMF ¶ 26. It is undisputed that the Medical Oncologists were compensated according to the terms of this agreement. SUMF ¶¶ 40, 44. It is undisputed that this incentive compensation was not fixed in advance. SUMF ¶ 43. It is undisputed that two elements of this incentive compensation, outpatient prescription drugs and outpatient services, are DHS. 42 U.S.C. § 1395nn(h)(6)(J)-(K); SUMF ¶ 26.

Therefore, the incentive compensation paid to the Medical Oncologists varied with the volume or value of referrals, and Halifax cannot meet the requirements of either the Bona Fide Employee or Indirect Compensation exception.

### D.     Stark Law Damages

The Stark Law prohibition on Medicare payment for DHS provided in violation of the statute, *see* 42 U.S.C. § 1395nn(g)(1), entitles the United States to recover damages in this matter based on the common law principal of unjust enrichment or payment by mistake equal to the

amount paid for DHS referred to Halifax by the Medical Oncologists for the entire period the Medical Oncologists' employment agreements violated the law.

As established in *Tuomey* and *Rogan,* the statutory and regulatory definition of referral encompasses Medicare claims for facility fees on which a physician with whom an entity has a prohibited financial relationship is identified as the attending or operation physician. *Tuomey Healthcare Sys.*, 675 F.3d, at 407; *Rogan*, 459 F. Supp. 2d, at 713-14. Applying the same definition of referral to this case, the uncontroverted factual record shows that Halifax improperly received Medicare reimbursements totaling $34,268,667 from 45,442 claims[4] for DHS referrals generated by the Medical Oncologists in violation of the Stark Law from October 1, 2004 through February 28, 2009. SUMF ¶¶ 32-39. The number and value of the claims was determined by Ian Dew, the government's expert in the field of Medicare claims analysis.

As set forth in Mr. Dew's expert report, the CMS Office of Information Systems provided three datasets containing Medicare Part A inpatient, Medicare Part B outpatient, and Medicare Part B non-institutional outpatient claims. *See* Expert Report of Ian Dew (Ex. 14), at 3-4. Mr. Dew filtered the Medicare institutional claims data to isolate only those claims where a physician named in the United States' Complaint in Intervention was identified as the attending or operating physician on the claim submitted by Halifax. *See id.*, at 4. Halifax's own claims analysis expert, Mr. Donald Moran, validated this approach, and was able to replicate Mr. Dew's analysis to within 0.02 percent. *See* Expert Report of Mr. Donald Moran (Ex. 20), at 12 (Table 1) and Att. 4. Mr. Dew used a similar process to identify only those non-institutional outpatient claims submitted by ECFOI or Halifax Healthcare Systems, Inc. where a physician named in the

---

[4] This number is the total number of claims for inpatient and outpatient hospital services submitted by Halifax Hospital where one of the Medical Oncologists is listed as either the attending or operating physician and claims submitted by ECFOI and Halifax Healthcare Systems, Inc. where one of the Medical Oncologists is identified as the referring physician for the period October 1, 2004 through February 28, 2009.

United States' Complaint in Intervention was identified as the referring physician on the claim

submitted by Halifax or an entity affiliated with Halifax. The United States, through the

supporting data to Mr. Dew's report, has identified the specific claims for DHS services referred

by each of the Medical Oncologists while the contracts violated the Stark Law. The United

States will provide this same information to the Court upon request.

As set forth in section IV.B, the United States requests that this Court follow the holding

and rationale articulated in *Rogan* and *Tuomey*. As Judge Easterbrook explained in *Rogan*,

"[t]he government offers a subsidy (from the patient's perspective, a form of insurance), with

conditions. When the conditions are not satisfied, nothing is due. Thus the entire amount that

[defendant] received of these . . . claims must be paid back." 517 F.3d at 453. The United States

is therefore entitled to summary judgment under the theory of unjust enrichment or payment by

mistake in the amount of $34,268,667.

## VI.  THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT UNDER MULTIPLE PROVISIONS OF THE FALSE CLAIMS ACT

The False Claims Act, 31 U.S.C. §§ 3729, *et seq.*(FCA), is one of the United States' most

important tools for combating fraud against the federal government. Enacted in 1863 in response

to fraud during the Civil War, the FCA has been amended several times to bolster the fight

against false claims for payment made to the United States. The statute was intended "to reach

all types of fraud, without qualification, that might result in financial loss to the Government."

*United States v. Niefert-White*, 390 U.S. 228, 232 (1968). Many courts have held that the statute

should be construed "broadly" or "expansively" to accomplish the statute's remedial goal of

protecting public funds from false and fraudulent claims. *See e.g.*, *United States ex rel. Clausen*

*v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1307 (11th Cir. 2002).

A violation of the FCA occurs, *inter alia*, when any person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A).[5]  Liability under this section of the FCA requires plaintiffs to demonstrate: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; and (3) with the knowledge that the claim was false."  *United States ex rel. Walker v. R & F Properties of Lake Cty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).

The FCA also imposes liability on a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."  31 U.S.C. § 3729(a)(2)(2003); *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009).[6]  In order to establish a violation of this section, the government must establish "that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statements caused the government to actually pay a false claim, either to the defendant itself, or to a third party."  *Hopper*, 588 F.3d at 1327.

In addition, 31 U.S.C. § 3729(a)(1)(G), also known as the FCA's "reverse false claim" provision, prohibits the use of false statements to conceal or avoid an obligation to pay money to

---

[5] The FCA was amended by the Fraud Enforcement and Recovery Act of 2009, Pub.L. 111-21, May 20, 2009, 123 Stat.1617.  The amendments apply to conduct on or after May 20, 2009, except that section 3729(a)(1)(B) is effective June 7, 2008; also, § 3731(b) is effective for all matters pending on May 20, 2009.

[6] The United States respectfully disagrees with the footnote in *Hopper* stating that § 3729(a)(1)(B) applies only to claims for payment, rather than legal claims, pending on or after June 7, 2008, and instead believes that the better interpretation is that § 3729(a)(1)(B) was made applicable to all pending cases. *See U.S. ex rel. Sanders v. Allison Engine Co.*, 703 F.3d 930, 941-42 (6th Cir. 2012) ("using the technical definition in context ('claims under the False Claims Act') provides a strained reading").  Consistent with *Hopper*, however, the United States is relying on the old version of the statute, because the majority of the claims at issue in this Motion were not pending as of June 7, 2008, and since application of the old version makes no difference in this case.

the United States.  To establish a claim under this section, the government must prove: "(1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant made, used or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation."  *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (*citing United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008)).

With respect to each provision of the FCA, knowledge is defined as: (1) having actual knowledge of the information; (2) acting in deliberate ignorance of the truth or falsity of the information; or (3) acting in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  Under the FCA, no proof of specific intent is required.  *Id.*, § 3729(b)(1)(B).  In defining knowledge for FCA purposes, "Congress adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'"  *United States v. Kaman Precision Products, Inc.*, No. 6:09-cv-1911-Orl-31GJK, at *4, 2011 WL 3841569 (M.D. Fla. Aug. 30, 2011) (*quoting* S. Rep. No. 99-345, at 20 (1986)).  The knowledge standard was designed "to preclude 'ostrich' type situations, where an individual has 'buried his head in the sand' and failed to make any inquiry which would have revealed the false claim."  *United States v. Entin*, 750 F. Supp. 512, 518 (S.D. Fla. 1990) (*quoting False Claims Reform Act of 1985*, S. Rep. No. 345, 99th Cong., 2nd Sess., *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266).

A.  <u>**Halifax Knowingly Presented False or Fraudulent Claims to the United States for Approval**</u>

As set forth in section V, the Medicare claims identified by the United States as having been submitted by Halifax in violation of the Stark Law are false because: (1) a financial

relationship existed between Halifax and the Medical Oncologists, (2) the Medical Oncologists referred patients to Halifax for DHS, and (3) the financial relationships do not meet a statutory or regulatory exception because the agreements take into account the volume or value of referrals. It is undisputed that Halifax, in turn, presented to the government thousands of Medicare claims for DHS referred by the Medical Oncologists. *See* Declaration of Ian Dew (Ex. 36). The Stark Law expressly prohibits Medicare from paying these claims. 42 U.S.C. § 1395nn(g)(1).

The undisputed facts make clear that Halifax acted with reckless disregard or deliberate ignorance of the law from the very inception of the employment agreements at issue. In conjunction with the publication of regulations implementing the Stark Law, CMS published comments clearly stating that payments based on a percentage of either revenue, collections, or expenses all varied with the volume or value of referrals because they "do not meet the requirement that compensation be fixed in advance." 66 Fed. Reg. 856 (Jan. 4, 2001), at 877. Given this published position, Halifax could not have reasonably concluded that the medical oncology employment agreements, which varied based on the revenue and expenses of the hospital's medical oncology program, did not vary with the volume and value of referrals. *See Heckler v. Cmty. Health Servs. of Crawford*, 467 U.S. 51, 64 1984 ("[a]s a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements"); *Anesthesiologists Affiliated v. Sullivan*, 941 F.2d 678, 681 (8th Cir. 1991) (if the defendants believed at the time that there was an ambiguity, they had a duty to inquire and clarify any such ambiguities). This is the exact "'ostrich' type situation" the FCA knowledge standard was meant to address.

Halifax's reckless disregard of the law is evident when juxtaposed with the ease with which relator, who is not an attorney, was able to identify the problematic nature of the medical

oncology employment agreements.  Solely based on watching a one hour training video at Halifax and attending a health care compliance seminar, Ms. Kunz determined that the Medical Oncology employment agreements may violate the Stark Law.  SUMF ¶ 48.  Once relator shared this information with her supervisors, Halifax decided it was necessary to amend the employment agreements, entering into new contracts effective March 1, 2009.  SUMF ¶ 51. Given these circumstances, it strains credulity to envision a scenario whereby Halifax, simply by exercising a minimal level of regard for the law, would not have come to the same conclusion as a layperson regarding the improper nature of the Medical Oncologists' employment agreements.

The record is replete with evidence demonstrating that Halifax acted with knowledge that it was violating the Stark Law.  In periodic advisories and transmittals, the chief compliance officer, Mr. George Rousis, updated Halifax executives, including the chief financial officer and the general counsel, on recent developments of interest regarding the Stark Law.  SUMF ¶ 45. Specifically, on March 26, 2004, Mr. Rousis summarized recent CMS Stark regulations and advised Halifax leadership that "CMS eliminated a proposed restriction on productivity bonuses, making it clear that physician employees may be paid bonuses based on their personal productivity (but not referrals for ancillary services)."  *Id.*  Even after its own chief compliance officer disseminated information that physician bonuses could not be based on "referrals for ancillary services," Halifax, with full knowledge that Medicare could not reimburse Halifax for any services performed in violation of the Stark Law, entered into employment agreements whereby the Medical Oncologists received bonuses derived from revenue generated from ancillary services such as outpatient hospital services and outpatient drug utilization.  *Id.*

In response to concerns raised by Ms. Kunz with respect to the legality of the Medical Oncologists' employment agreements, Halifax's then-associate general counsel in a memo dated

November 2008 determined that the agreements providing compensation based on operating margin "is not permitted under the STARK regulations." SUMF ¶ 50. Ms. Pike was unequivocal that the Medical Oncologists "may only be incentivized based on their personally performed services. The current incentive structure takes into account much more than personally performed services." *Id.* Ms. Pike shared her conclusion with, among others, Halifax's general counsel and the relator.[7] The general counsel, in turn, advised Thomas Garthwaite, the service line administrator for Halifax's medical oncology program, that the contracts violated the Stark Law. *Id.*

Deposition testimony further demonstrates Halifax knew that the operating margin bonus provision in the medical oncology employment agreements varied with the volume or value of referrals. During his deposition, Halifax's compliance officer, while attempting to label the issue as "undecided," admitted that the Medical Oncologist compensation varied with referrals.

> Q. You think a provision that's based on the operating margin of the medical oncology program is an open question about whether it varies with volume or value of referrals?
> A. Yes, I think that's an open question.

---

[7] Halifax for the first time on May 15, 2013, approximately one month after the close of discovery and pursuant to Judge Smith's Order (Dkt. No. 266), notified the United States that it intended to rely on advice of counsel. As set forth in both the United States' Cross-Motion for Exclusion of Evidence (Dkt. No. 231) and Motion to Amend the Second Amended Case Management and Scheduling Order (Dkt. No. 271), the United States throughout discovery asked Halifax whether it was either asserting a defense of advice of counsel or relying on advice of counsel to negate the FCA's knowledge element. Halifax repeatedly stated it was not relying on advice of counsel in any way. Consistent with this position, Halifax withheld from production attorney-client communications, refused to answer interrogatories, and instructed witnesses not to answer certain questions at depositions based on attorney-client privilege. Because Halifax did not assert advice of counsel until after the close of discovery, and it is unclear whether Halifax has produced all responsive documents in support of this defense, and the United States has not had the opportunity to seek any discovery on this defense, and because Judge Smith declined to extend the deadline for filing dispositive motions set forth in the Second Amended Case Management and Scheduling Order (Dkt. No. 189), the United States submits that it would be inappropriate for Halifax to rely on any evidence asserting that it relied on the advice of counsel, and that any such information should be stricken from the record.

MR. STEPHENS: Objection as to form, asking for a legal conclusion.

BY MR. SCHWARTZ: Q. Okay. Why do you think that's an open question?

A. Because there can be an inverse relationship between margin and referrals.

Q. How so?

A. Because the purpose of the incentive was for the oncologists to assist the hospital in running an efficient department. It would be possible to increase the margin with -- and still -- and refer less to the hospital or the same -- keep the referrals the same and increase margin.

Q. So you could refer more patients to the hospital and the margin would go down potentially?

A. No, that's not what I said. I said you can refer less patients, have the margin go up and thereby increase the incentive.

Q. Okay. So you could refer less patients and the margin could go up, correct?

A. Correct.

Q. So wouldn't that vary with the volume or value of referrals?

A. Yes, but in a good way.

SUMF ¶ 43.

Based on these uncontroverted facts, Halifax knew within the meaning of the FCA that it was submitting claims for payment by Medicare in violation of the Stark Law. As a result, Halifax violated the FCA and the United States should be granted summary judgment.

## B. <u>Halifax Made False Records or Statements to Induce the United States to Pay False Claims</u>

FCA liability also is appropriate as to those who knowingly make, use, or cause to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the government. *See* 31 U.S.C. § 3729(a)(2). *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009).[8]

---

[8] If the current version of the statute (31 U.S.C. § 3729(a)(1)(B)) applies, there is an additional requirement that the government show that the defendant intended to affect the government's payment decision, which is demonstrated by a showing that "people usually intend the natural consequences of their actions." *Reno v. Bossier Parish School Bd.*, 520 U.S. 471, 487 (1997); *see also Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 277 (1979) (recognizing "the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions."); *United States v. Lawrence*, 405 F.3d 888, 899 (10th Cir. 2005) (approving jury instructions in Medicare fraud case permitting jury to infer that "a person intends the natural and probable consequences of acts knowingly done or knowingly omitted."). Here, there is no dispute that the natural consequence of the defendants' violation of the Stark Law is the submission of false claims to the government.

The record evidence clearly establishes that Halifax's provider agreements and Medicare claims contained false statements because they falsely certified that Halifax was in compliance with federal program legal requirements, including the Stark Law. On multiple occasions Halifax signed the Medicare provider agreement, expressly stating that it agreed to abide by all Medicare rules, regulations, and instructions, and that payment was conditioned on compliance with all requirements, "including, but not limited to, the Federal anti-kickback statute and the Stark law." SUMF ¶¶ 8, 10. Halifax also certified the veracity of the information contained on every claim form it filed for Medicare reimbursement, acknowledging "[a]ny one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal Laws." SUMF ¶¶ 6, 8, 16.

By virtue of Halifax's submission of Medicare claims for reimbursement, there can be no question that Halifax's false statement of compliance with all Medicare statutes were made in order to get the United States to pay false claims—Medicare claims for reimbursement submitted in violation of the Stark Law. Thus, the United States should be granted summary judgment on its claim that Halifax violated 31 U.S.C. § 3729(a)(2).

**C. Halifax Knowingly Made False Statements to the United States to Avoid the Obligation to Return Medicare Overpayments**

Halifax's FCA liability also can be predicated on the use of false statements to conceal or avoid an obligation to pay money to the United States. 31 U.S.C. § 3729(a)(1)(G).

Halifax's obligation to make restitution to the government once it learned of the Stark Law violations at issue arose under: (1) the Stark Law itself, 42 U.S.C. § 1395nn(g)(2), which requires Medicare providers to "refund on a timely basis" any amounts billed in violation of the statute; and (2) the regulations implementing the Stark Law, 42 C.F.R. § 411.353, which require

that any entity collecting payment for a health care service "performed under a prohibited referral must refund all collected amounts on a timely basis."

For the reasons discussed with regard to other provisions of the FCA in sections VI.A and VI.B, the false statements made by Halifax that it was in compliance with all Medicare rules and regulations on its provider agreements and on each claim submitted for reimbursement violated 31 U.S.C. § 3729(a)(1)(G). Halifax knowingly did so with the understanding that if it advised Medicare of the structure of the compensation arrangement with the Medical Oncologists, which violated the Stark Law, Medicare could not have reimbursed Halifax for any claims submitted for DHS and would have required Halifax to pay back the money previously received.

**D. False Claims Act Damages are Indisputable**

Under each of the above-mentioned provisions of the FCA, any person who violates the FCA is liable to the United States for civil penalties "plus 3 times the amount of damages which the government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). As set forth in section V, there is no factual basis for concluding that the government's damages are less than $34,268,667. Based on Halifax's knowing submission of claims to Medicare in violation of the Stark Law, the FCA entitles the United States to treble damages, or $103,806,001, plus statutorily mandated civil penalties of between $5,500 and $11,000 for each of the 45,442 false claims submitted by Halifax to the United States for payment.

**VII. THE UNITED STATES IS ENTITLED TO SUMMARY JUDGMENT ON HALIFAX'S AFFIRMATIVE DEFENSES NOS. 1-3, 5-7, AND 9**

The United States should also be granted summary judgment on seven of Halifax's nine affirmative defenses. Halifax raised affirmative defenses of failure to state a claim (affirmative defense 1), estoppel (affirmative defense 2), waiver (affirmative defense 3), limitations on damages (affirmative defense 5), fraud with particularity (affirmative defense 6), public

disclosure (affirmative defense 7), and reservation of defenses (affirmative defense 9). In denying the United States' motion to strike these affirmative defenses, the Court said, "To the extent that discovery reveals that these defenses lack support, they should be withdrawn by the Defendants or attacked via a motion for summary judgment." Order (Dkt. No. 119), at 2. Discovery has now revealed Halifax's affirmative defenses are baseless. Because Halifax has not withdrawn the defenses, this Motion for Partial Summary Judgment should be granted.

### A. Halifax's "Affirmative Defenses" are not Affirmative Defenses

#### 1. Failure to State a Claim; Fraud with Particularity

A defendant's evidence that the plaintiff has failed to meet its burden of proof is not an affirmative defense. *In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense."); *Zikovic v. Southern California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).

Halifax's first and sixth affirmative defenses are not proper affirmative defenses because they attack only the United States' *prima facie* case and do not seek to avoid liability. *See Ford Motor Co. v. Transport Indemnity Co.*, 795 F.2d 538, 546 (6th Cir. 1986); *Pandora Jewelers 1995, Inc. v. Pandora Jewelery, LLC*, 2010 WL 5393265 at *2 (M.D. Fla. Dec. 21, 2010); *Quintana v. Baca*, 233 F.R.D. 562 (C.D. Cal. 2005) (striking defense of "failure to state a claim" because "it is not an affirmative defense that must be pled or waived"); *see also* 5 Wright & Miller, *Federal Practice and Procedure* 3d, § 1381. The Court already rejected these "defenses" when it denied Halifax's motion to dismiss the Complaint in Intervention. *See generally* Order Denying in Part and Granting in Part Halifax's Motion to Dismiss (Dkt. No. 109).

Even assuming that the failure to state a claim and plead fraud with particularity are in fact affirmative defenses, Halifax claims that the United States' failure to "specif[y] what

constitutes a 'referring physician' or a 'referral' under the Stark Law." Halifax's Amended Objections and Responses to the United States' Interrogatory No. 2 (Ex. 33). Halifax is not relying on any other information in support of these defenses. *See* Rousis 30(b)(6) Depo. Tr. (Feb. 20, 2013), at 156:13-20, 158:10-16, 162:20-23 (Ex. 34). As explained above, the United States has specified who is a referring physician and the claims that constitute referrals under the Stark Law. *See, supra* section IV.B.

### 2. Reservation of Defenses

Reservation of defenses that have not been raised is not a proper affirmative defense at this stage of the litigation. If Halifax had additional affirmative defenses that it intended to raise, it should have already sought leave of Court and amended its answer.

### B. <u>Halifax Asserts Affirmative Defenses that are Inapplicable to the United States</u>

### 1. Public Disclosure

Public disclosure is not an affirmative defense to a claim by the United States. The FCA's public disclosure bar is a jurisdictional limit to FCA cases brought by a relator, but does not bar FCA claims brought by the United States or by a relator in which the United States intervenes. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 478 (2007). Indeed, the public disclosure bar expressly exempts an action "brought by the Attorney General." 31 U.S.C. § 3730(e). Because the public disclosure bar is inapplicable to claims brought by the United States, Halifax's affirmative defense as to the United States' claims fails.

### 2. Waiver and Estoppel

Waiver and estoppel are not affirmative defenses that are available against the United States in a FCA case. "[E]quitable estoppel will not lie against the Government as it lies against private litigants." *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 419, (1990); *see also*

*Johnson v. Guhl*, 357 F.3d 403, 409 (3d Cir. 2004). In particular, "claims for estoppel cannot be entertained where public money is at stake." *Richmond*, 496 U.S. at 429; *see also Community Health Servs. of Crawford*, 467 U.S. at 66 (rejecting a health care provider's attempt to avoid administrative recoupment of overpayments made under the Medicare program by asserting equitable estoppel against the Government). The Eleventh Circuit has followed *Richmond* squarely, rejecting estoppel arguments against the Government. *See Shuford v. Fidelity Nat. Property & Cas. Ins. Co.,* 508 F.3d 1337, 1343 (11th Cir. 2007) (applying *Richmond* and rejecting estoppel defenses against an insurance company acting as a fiscal agent of the United States, where the insurance company provided benefits paid from the federal treasury). Because public money is at stake in this case, in the form of Medicare payments, Halifax's affirmative defenses based on estoppel fail as a matter of law.

Waiver is also an equitable defense, and it is therefore precluded under *Richmond*. 496 U.S. at 419; *see also Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1226 n.13 (10th Cir. 2006) (describing waiver as an "equitable doctrine[]"). Further, "the only governmental body authorized to waive or ratify the rights of the United States [in an FCA case] is the Department of Justice."[9] *United States ex rel. Dye v. ATK Launch Sys., Inc.*, No. 1:06-CV-39 TS, 2008 WL 4642164, at *3 (D. Utah Oct. 16, 2008); *see also U.S. ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, 2009 WL 4576097 (D.N.J. Dec. 1, 2009), at *7 ("Violations of the FCA . . . may only be waived by the Department of Justice, and the unauthorized statements of United States agents may not serve to waive the Government's claims."). Accordingly, a waiver defense to an FCA claim fails if Defendant "has not pled that the DOJ waived these rights." *United States v.*

---

[9] The Department of Justice (DOJ) has the sole responsibility to conduct litigation under the FCA. 28 U.S.C. § 516 (conduct of litigation in which the United States is a party is reserved to DOJ except as otherwise authorized by law); 31 U.S.C. § 3730 (a) (the Attorney General investigates and brings actions under the FCA); 28 C.F.R. § 0.45 (d) (FCA claims are "assigned to, and shall be conducted, handled, or supervised by, the Assistant Attorney General, Civil Division").

*Cushman & Wakefield, Inc.*, 275 F. Supp. 2d. 763, 771 (N.D. Tex. 2002); *see also Hernandez, Kroone and Assocs., Inc. v. United States*, 95 Fed. Cl. 395, 398 (2010) (striking waiver defense because defendant did not allege that DOJ waived Government's FCA claims). Because equitable defenses do not apply against the United States, and because there is no allegation or evidence that the United States waived the claims at issue in this action, Halifax's affirmative defenses based on waiver fail as a matter of law.

## VIII. <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully asks the Court to grant this Motion for Partial Summary Judgment and:

1) Award the United States $102,806,001 in damages;

2) Award penalties in an amount of $5,500 to $11,000 for each of the 45,442 claims; and

3) Dismiss Halifax's Affirmative Defenses Nos. 1-3, 5-7, and 9.

Respectfully submitted,

ROBERT E. O'NEILL
United States Attorney

STUART F. DELERY
Acting Assistant Attorney General


<u>/s *Adam J. Schwartz*</u>

RALPH E. HOPKINS
Assistant United States Attorney
400 W. Washington Street, Suite 300
Orlando, FL 32801
(407) 648-7562
Fla. Bar # 0972436
Email: ralph.hopkins@usdoj.gov

MICHAEL D. GRANSTON
ADAM J. SCHWARTZ
PATRICIA M. FITZGERALD
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 514-6831
Facsimile: (202) 514-0280
Email: Adam.Schwartz2@usdoj.gov

Attorneys for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2013, I caused a true and correct copy of the foregoing to be filed with the Court's CM/ECF system, which will send an electronic notice of the filing to all counsel of record.

/s *Adam J. Schwartz*
ADAM J. SCHWARTZ
Trial Attorney