# Exhibit

# 31

From:       Tyler, Lisa
To:         Baklid-Kunz, Elin
Subject:    FW: Med Onc Incentive
Date:       Thursday, March 19, 2009 9:18:58 AM

fyi

Thank you,

Lisa

**From:** Pike, Audrey
**Sent:** Wednesday, March 04, 2009 4:42 PM
**To:** Foster, Andy
**Cc:** Tyler, Lisa; Stewart, Nancy; Davidson, David
**Subject:** RE: Med Onc Incentive

Andy –

It is acceptable to process the checks as set forth below.

Thank you,

Audrey A. Pike
Associate General Counsel
Halifax Health
254-4340

Electronic communications originating from or sent to Halifax Health (HH) are subject to monitoring and public inspection under § 119.07, Florida Statutes. This message and any attachments are the property of HH and are intended to be received only by the individuals or entities identified in the message. If you have received this message in error, please take notice: 1) that any use, copying, printing, forwarding or distribution of this message in any form is strictly prohibited, and 2) please notify the HH Compliance Department at (386) 254-4278 and/or forward the message to compliance@halifax.org, and please delete or destroy all copies of the message and any attachments.

**From:** Foster, Andy
**Sent:** Wednesday, March 04, 2009 1:31 PM
**To:** Pike, Audrey
**Cc:** Tyler, Lisa; Stewart, Nancy
**Subject:** Med Onc Incentive

Audrey,
Tom advised me we will be paying the FY08 incentive comp to the medical oncologists. This is the one whereby they split 15% of the direct margin from patient care.

Would you please "reply to all" stating if we are okay to process these checks?

Thanks.

Andy Foster
Manager of Decision Support
Halifax Health

# Exhibit

# 32

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | James Foster, COO, HFCH <br> Ned Heverin, CFO, HFCH |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department     Phone: 254-4279 (ext. 4279) <br> Fax:   254-4364 (HMC ext. 4364) <br> E-mail: george.rousis@halifax.org |
| **Subject:** | **HHS Issues Final Rule on Physician Self-referrals** |
| **Priority:** | ☑ Advisory/Information     ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

### Advisory/Alert Text:

The January 4 Federal Register included the final regulations addressing self-referrals by physicians. Known as Stark II, the self-referral law prohibits physicians from referring Medicare patients for certain health care services to entities in which the physicians or their immediate family members have a financial relationship. A financial relationship can be either an ownership interest or a compensation arrangement, and can be either direct or indirect.

The final rule prohibits physicians from making referrals for the targeted services to most entities which the physicians own in whole or in part. In contrast to the proposed rule, however, the final rule generally permits physicians to refer to entities with which they have a compensation relationship, as long as the compensation paid to the physician is no more than would be paid to someone who provided the same services but was not in a position to generate business for the entity.

The final rule substantially reduces the potential financial liability of hospitals and other entities that provide any of the targeted services and submit claims for prohibited referrals if they neither knew nor had reason to suspect that they had entered into an indirect financial relationship with a referring physician. The proposed rule held that any claim submitted by an entity for services rendered pursuant to a prohibited referral would have been denied, even if the entity had no reason to suspect that it had an indirect financial relationship with the referring physician.

The final rule offers clarification on some of the exceptions to the self-referral prohibition and provides guidance on how to structure financial arrangements in order to comply with the exceptions. The final rule also allows exceptions to permit certain indirect compensation arrangements; to allow small, non-monetary gifts; and to protect financial arrangements between academic medical centers and their faculties if certain criteria are met.

In addition to the self-referral prohibition for clinical laboratory services contained in Stark I, Stark II addresses the following designated health services: physical therapy services; occupational therapy services; radiology services and supplies; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment, and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient hospital services.

To allow providers time to adjust existing business arrangements that would not previously have triggered the self-referral prohibition, the rule will be effective on January 4, 2002.

Please feel free to contact me for more information on this topic.

---

CONFIDENTIAL/FOIA EXEMPT        HAL-1_0013349

**HALIFAX HEALTH**  *Our Values In Action*
*From the Compliance Officer's Desk*

Source:  Florida Hospital Association, Fiscaletter 1/8/01.

CONFIDENTIAL/FOIA EXEMPT                                              HAL-1_0013350

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Harry Reese; David Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |
| **Subject:** | **Phase II of Physician Self-Referral Regulations Issues by CMS** |
| **Priority:** | ☑ Advisory/Information   ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

From field phone block:
Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

## Advisory/Alert Text:

Below is the CMS Press Release on Phase II of the Physician Self-Referral Regulations, a/k/a/ Stark II, that were released last week. Financial relationships with physicians may need to be reviewed in the context of these new regulations.

[Start of CMS Press Release]

CMS News, 3/25/2004

CMS ISSUES INTERIM FINAL RULE ADDRESSING PHYSICIAN SELF-REFERRALS

The Centers for Medicare & Medicaid Services today issued the second phase of its final regulations addressing physician referrals to entities with which they have a financial relationship. This interim final regulation will protect beneficiaries and taxpayers from abusive referral patterns, while providing straightforward rules for physicians and providers to comply with the law.

"The new regulations will protect Medicare and Medicaid beneficiaries from potentially abusive referrals, while accommodating legitimate business and financial arrangements, including those that enhance the emerging national health information infrastructure," said CMS Acting Administrator Dennis Smith. "Overall, there shouldn't be any additional burden on physicians trying to structure their business arrangements to comply with the law, and the regulations will not prevent doctors from continuing to provide high quality health care services to their patients."

The physician self-referral law prohibits a physician from referring Medicare and Medicaid patients for certain designated health services to entities with which the physician (or a member of they physician's immediate family) has a financial relationship, unless an exception applies. The law also prohibits an entity from billing for services provided as a result of a prohibited referral. There are eleven designated health services to which the prohibition applies, including clinical laboratory services, physical therapy services, including speech-language pathology services; occupational therapy services; radiology and certain other imaging services; radiation therapy services and supplies; durable medical equipment and supplies; parenteral and enteral nutrients, equipment and supplies; prosthetics, orthotics, and prosthetic devices and supplies; home health services; outpatient prescription drugs; and inpatient and outpatient hospital services. A financial relationship can be either a compensation arrangement or an ownership or investment interest, and it can be either direct or indirect.

The law was passed after studies conducted by the Department of Health and Human Services' Office of the Inspector General and other agencies showed that excessive use of some services is encouraged when

CONFIDENTIAL/FOIA EXEMPT                          HAL-1_0013351



# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

physicians have a financial relationship with the entities to which they refer patients.

Final regulations applicable only to physician referrals for clinical laboratory services were published in August 1995. A proposed rule applicable to physician referrals for all designated health services was published in January 1998. In January 2001, CMS published the "Phase I" final rule, which finalized a significant portion of the 1998 proposed rule. The Phase I final rule defined many of the terms in the statute, interpreted some of the major statutory exceptions, and created a number of new regulatory exceptions.

This second phase of the regulations responds to comments CMS received on the first phase of the regulations, covers the remaining statutory exceptions not covered in the first phase, and creates several new regulatory exceptions for nonabusive financial relationships. The new regulations will be published in the Federal Register on Friday, March 26, 2004 and will be effective on July 24, 2004. In general, the new regulation conforms to existing coverage and payment rules; protects beneficiary access to care; and establishes bright-line rules and administrative simplicity where possible.

In responding to comments on the first phase of the regulation, CMS protected legitimate arrangements involving certain specialty groups that primarily furnish oncology and radiology services. In addition, CMS revised the definition of compensation that is "set in advance" to permit certain common percentage compensation arrangements; made the academic medical centers exception more flexible; expanded the medical staff incidental benefits exception to include facilities other than hospitals; and expanded the exception for certain dialysis-related drugs to include more drugs used in connection with dialysis treatment.

The statutory exceptions addressed in this second phase include those for physician investment interests in publicly traded securities and mutual funds and physician ownership of rural providers and hospitals. The new regulation revises the hospital ownership exception to reflect the new 18-month moratorium on physician ownership of specialty hospitals, which was recently enacted in section 507 of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA 2003).

The new regulations also interpret a number of statutory exceptions for compensation arrangements involving physicians, including the exceptions for space and equipment rentals, employment relationships, personal services arrangements, and physician recruitment. Regarding the employment exception, CMS eliminated a proposed restriction on productivity bonuses, making it clear that physician employees may be paid bonuses based on their personal productivity (but not referrals for ancillary services). The new regulations contains a new provision that deems certain hourly payments to physicians to be consistent with fair market value, a key requirement for most compensation arrangement exceptions. CMS also expanded the recruitment exception to apply to physician recruitment conducted by federally qualified health centers (FQHCs).

This second phase of the regulations creates exceptions for Medicaid managed care plans; professional courtesy arrangements; certain inadvertent and temporary lapses in compliance with an existing exception; charitable contributions by physicians to entities that furnish designated health services; payments made by a hospital or FQHC to a physician to retain the physician's needed medical practice in a health professional shortage area; and technology items or services furnished to physicians to enable their participation in a community-wide health information system.

The exception for community wide health information systems is related to the Department's efforts to encourage provider use of electronic health records, which are fundamental to the National Health Information Infrastructure. The exception involves certain items or information technology services provided by an entity to a physician that allow access to patient electronic health care records, general

CONFIDENTIAL/FOIA EXEMPT

HAL-1_0013352

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

health information, medical alerts, and related information for patients served by community providers. This exception for community-wide health information systems will have very positive advantages for American health care by enhancing the country's movement toward a national health information infrastructure that will serve consumers, patients, health care providers and public health professionals. Local community health information infrastructures, with privacy and security protections, will make it easier for health care providers to share relevant patient information and for public health professionals to identify emerging public health threats. The widespread use of health information technology will dramatically improve the quality, safety and efficiency of medical treatment for all Americans.

Although the statute requires entities that provide designated health services to report information concerning their financial relationships with physicians, the new regulations specify that such information need not be reported on a regular or periodic basis. Instead, the new regulations require providers to make the information available only upon the Department's request.

[End of CMS Press Release]
☐
Feel free to contact me for more information on this topic.  Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                                                          HAL-1_0013353

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Dave Davidson; Bill Griffin; Kathy Leonard; Harry Reese; Fran Davis; Pat Bauries; Harry Reese; Jeff Feasel; Dan Lang; Mark Ledman; Lisa Reese |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |
| | Phone: 254-4279 (ext. 4279) |
| | Fax:    254-4364 (HMC ext. 4364) |
| | E-mail: george.rousis@halifax.org |
| **Subject:** | **Medicare: Stark II Effective 7/26/04** |
| **Priority:** | ☑ Advisory/Information        ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

### Advisory/Alert Text:

The second phase of federal physician self-referral "Stark II" regulations go into effect 7/26/04. The rules spell out safe harbors for financial relationships between physicians and entities to which they refer health care business, like hospitals, labs, diagnostic facilities and even a physician's own practice. If a relationship is out of compliance, and the physician refers Medicare patients to the entity, penalties of $11,000 per claim or Medicare exclusion may result. Whistleblowers can also use the False Claims Act to file suits on behalf of the government (although this "bootstrapping" of the False Claims Act is controversial).

In some cases, a 90-day grace period is afforded to entities with arrangements discovered to be out of compliance. Some experts advise conducting a "Stark Audit" of all financial relationships with physicians, to include all remuneration, not just arrangements subject to a contract. This includes an assessment of the amount of non-monetary compensation provided to physicians. As of now, we have no plans to conduct such an audit, but we will make information available to the leadership team so they can conduct a self-assessment of the relationships for which they are responsible. This will probably take the form of an electronic questionnaire managers can complete about physician financial relationships for which they are responsible. Informational material will be available on Doc-U-Net within 2 weeks.

At a minimum, all new arrangements and any renegotiation of existing arrangements should be reviewed by General Counsel to ensure they come within a safe harbor or do not violate the new rules.

In the meantime, feel free to contact my office for more information. Please forward this message as you deem appropriate.

Source: March 26, 2004 Federal Register; corrected in April 6 Federal Register

CONFIDENTIAL/FOIA EXEMPT                                                        HAL-1_0013354

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Selected HCHS Leaders |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:   254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

| | |
|---|---|
| **Subject:** | **Physician Recruiting Contracts** |
| **Priority:** | ☑ Advisory/Information        ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

## Advisory/Alert Text:

The Centers for Medicare and Medicaid Services recently posted this question and answer on physician recruiting contracts and compliance with the new Stark regulations.

Question:

My hospital has physician recruiting contracts that predate the Stark Phase II interim final regulations. Do these contracts need to comply with the new regulations?

Answer:

Yes, all recruiting arrangements must comply with the new regulations as of July 26, 2004. Each financial relationship with a physician must be evaluated for compliance with the Stark law based on its specific facts and circumstances. However, we are mindful of the concerns raised by the question and can offer the following observations. First, the Stark law is a self-implementing statute that went into full force and effect on January 1, 1992 with respect to referrals for clinical lab services and January 1, 1995 with respect to referrals for other designated health services. Accordingly, parties have had a legal obligation to comply with the statute since those effective dates. In the absence of final regulations for a particular exception, parties must have complied with a reasonable interpretation of the statute. Second, the Phase II regulation, including the new exception at § 411.357(e)(4) for certain joint recruitment arrangements, goes into full force and effect on July 26, 2004. Thus, a hospital-funded recruitment arrangement in which the recruited physician is subject to a restriction against competing with the group will not comply with the new joint recruiting exception in the Phase II regulations. Parties should document that any non-compete clause is void and will not be enforced. Third, continuing obligations (i.e., obligations for which performance is not yet required or is not yet complete) under a pre-existing recruitment arrangement must comply with the Phase II regulations as of July 26, 2004. For example, past payments under an income guarantee need not be recalculated so long as, at the time they were paid, the arrangement complied with a reasonable interpretation of the statute. Finally, in addition to the Stark law, all recruitment arrangements are also subject to the Federal anti-kickback statute located at section 1128B(b) of the Social Security Act (42 U.S.C.1320a-7b(b)), which may prohibit recruitment arrangements even if they do not violate the Stark law. Inquiries with respect to that statute should be directed to the Office of Inspector General.

Additional information on the Stark law and regulations is available at THE ENCLOSED LINK.

Source: Centers for Medicare & Medicaid Services, Frequently Asked Questions, Answer ID 3163.
☐
Feel free to contact me for more information on this topic.  Please forward this message as you deem

CONFIDENTIAL/FOIA EXEMPT                                                          HAL-1_0013355

## HALIFAX HEALTH

appropriate.

http://www.cms.hhs.gov/medlearn/refphys.asp

CONFIDENTIAL/FOIA EXEMPT

HAL-1_0013356

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Lori Delone; David Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

| | |
|---|---|
| **Subject:** | **Stark Rules: Financial Relationships with Physicians that Involve the Provision of Information Technology** |
| **Priority:** | ☑ Advisory/Information        ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

### Advisory/Alert Text:

In March 2004, the Centers for Medicare and Medicaid Services issued a final rule referred to as "Stark II Phase II", prohibiting certain financial relationships with physicians that can result in abuse of the Medicare/Medicaid programs.   There are a variety of exceptions to the rule, including one relating to community health information networks (CHINs).   The provision of information technology products and services that do not fit into this exception, or one of the others, such as the fair market value exception, can potentially violate the rule.

Since at least the late 80's, Halifax Medical Center has provided information technology support to physicians. We even had a department devoted to it called the "Practice Enhancement Group". To avoid violating anti-kickback rules, PEG was merged into the Information Systems Department around 1993, and the hospital began providing IT services on a fee-for-service basis, unless it was part of a broader IT initiative available to all members of the medical staff.   Examples of such initiatives include the IMS Community Health Information Network offered during the mid-1990's, and its replacement, the Forward Advantage fax server, and the E-Chart Internet portal into Meditech.

Now we have Stark II Phase II with a specific safe harbor exception for CHINS.  If we are providing IT outside this exception, or the fair market value exception, the arrangement should be reviewed by legal counsel.  The following is an excerpt from the preamble to the rule that can help you determine the need to look at or eliminate questionable arrangements.

"A hospital's provision of a computer or other technology that is wholly dedicated to use in connection with hospital services provided to the hospital's patients would be for the hospital's benefit and convenience and would not constitute remuneration to a physician for purposes of section 1877 of the Act. Moreover, while we believe that the provision of valuable information technology, such as computer hardware or software, to physicians may be subject to abuse, using our authority under section 1877(b)(4) of the Act, we are creating a new regulatory exception at Sec. 411.357(u) for the provision of information technology items and services (including both hardware and software) by a [designated health service] DHS entity to a physician to participate in a community-wide health information system designed to enhance the overall health of the community, so long as certain conditions are met.

The health information system must be community-wide, that is, available to all providers, practitioners, and residents of the community who desire to participate. The health care system must be one that allows community providers and practitioners to access and share electronic health care records. In addition to health care records, the system may permit access to, and sharing of, complementary drug information systems, general health information, medical alerts, and related information for patients served by

CONFIDENTIAL/FOIA EXEMPT                                                HAL-1_0013357

# HALIFAX HEALTH  *Our Values In Action*
*From the Compliance Officer's Desk*

community providers and practitioners. The DHS entity may only provide information technology items and services that are necessary to enable the physician to participate in the health information system.

Thus, for example, if a physician already owns a computer, it may only be necessary to provide software or training specific to the health information system. Likewise, it would not be considered necessary to provide Internet access to a physician who already has Internet service. In all cases, the information technology items or services furnished under the exception must principally be used by the physician as part of the community-wide health information system. The items and services may not be provided in any manner that takes into account the volume or value of referrals or other business generated by the physicians. Thus, the exception would not apply to the selective provision of items and services to referral sources. Finally, as with all exceptions under section 1877(b)(4) of the Act, the arrangement must not violate the anti-kickback statute and all claims and billing must comply with pplicable Federal and State laws and regulations. Under these circumstances, we do not believe that an exception for the provision of community-wide information technology items and services poses a risk of program or patient abuse; however, we will revisit the terms of the exception if we become aware of abusive arrangements."

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

Source: Federal Register, Vol 69, No 59, March 26, 2004, pages 16054-16146

CONFIDENTIAL/FOIA EXEMPT                                    HAL-1_0013358

# HALIFAX HEALTH  

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Eric Peburn; Bill Griffin |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

| | |
|---|---|
| **Subject:** | **Regulatory Doors Swing Open to Gainsharing Arrangements** |
| **Priority:** | ☑ Advisory/Information       ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

## Advisory/Alert Text:

☐
Nice summary of OIG's gainsharing guidance, by Kathy reep, at the Florida Hospital Association.

-- George

-----Original Message-----
From: Compliance Alert [mailto:fha@fha.org]
Sent: Saturday, March 12, 2005 1:35 PM
To: Rousis, George
Subject: Compliance Alert, March 12, 2005

Compliance Alert
Compliance Alert (Mar 11, 2005)
By: Kathy Reep

Route to: CEO, CFO, Compliance Officer, General Counsel, Director/Patient Financial Services, Director/Health Information Management, Director/Reimbursement, and Internal Auditor.

Regulatory Doors Swing Open to Gainsharing Arrangements

Thanks to Edward J. Hopkins, Esq., Partner with Broad and Cassel in West Palm Beach, for the following:

The OIG issued a series of favorable advisory opinions (Nos. 05-01 – 05-04) on gainsharing programs subject to strict controls relating to applicable cost savings, utilization, payments, and transparency to regulators, the public and patients.

Following a four-year hiatus in advisory opinion activity, and in the same breath as a MedPAC recommendation to Congress, the HHS Office of Inspector General (OIG) has issued four favorable advisory opinions this year on what have come to be known as "gainsharing" arrangements. Two more favorable opinions are to be issued shortly, and it does appear that the regulatory door is opening to such arrangements that meet the strict criteria described in the opinions.

Gainsharing and its Regulatory History
Gainsharing is an arrangement between a hospital and physicians on its medical staff who refer to the hospital and provide services to the hospital's patients, under which the hospital pays to physicians a

---

CONFIDENTIAL/FOIA EXEMPT                                        HAL-1_0013359



# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

portion of a hospital's savings in exchange for the physicians implementing certain cost-saving strategies. It is intended to align incentives between physicians who bear none of the burdens of such costs, and the hospital, which bears them all.

While variations of gainsharing arrangements have been discussed since before the enactment of the hospital inpatient prospective payment system (PPS), the present generation of such arrangements can be traced back to the late 1990s. It was in response to these proposals that the OIG, almost regrettably, issued a Special Advisory Bulletin in July 1999, in which it advised existing and prospective gainsharing participants that they would be subject to civil monetary penalties ("CMPs") under 42 U.S.C. §1320a-7a(b)(1) if they knowingly made a payment directly or indirectly to a physician as an inducement to reduce or limit services to Medicare or Medicaid beneficiaries in the physician's care.

Despite rather harsh commentary at the time from several advisers to the healthcare industry, the OIG did not relent in its position; however, in January 2001, the OIG issued its first advisory opinion (No. 01-01) in which it declined to impose sanctions on a gainsharing arrangement structured much like the arrangements described in the 2005 advisory opinions. Other than occasional commentary, e.g., in its recommended compliance guidance for hospitals, that was the last formal communication from the OIG on the subject.

At its January 12, 2005 meeting, MedPAC issued a recommendation to Congress that it enact legislation permitting the Centers for Medicare & Medicaid Services (CMS) to authorize gainsharing arrangements under strict rules CMS would adopt. At the same time, the OIG was finalizing the six new gainsharing opinions, each submitted by an Atlanta-based consulting firm, for programs it designed for client hospitals seeking to achieve cost savings either from their cardiac surgery programs or cardiac catheterization laboratories. Some of these opinion applications had been under OIG scrutiny for as long as 2-1/2 years; the programs had already been completed, and the gainsharing payments placed in escrow pending favorable OIG opinions.

The programs before the OIG had the following major elements in common:

Each program included a hospital and one or more physician groups already on the hospital's medical staff, whose physicians provided all of the hospital's cardiac surgery or cardiac catheterization services.

The consultant was hired as a Program Administrator to manage the program for a fixed fee. Among the Program Administrator's responsibilities were to prepare a "Practice Pattern Report" examining both historic practices at the applicable hospital department and among the participating physicians, and then to present cost-saving recommendations based on these findings. These recommendations typically fell into the following categories: 1) "open as needed" supplies savings, 2) blood cross-matching as needed, 3) substitution of less costly items, and 4) product standardization.

The Program Administrator also established a base line for costs and utilization, and controls to ensure that participating physicians were not rewarded for reducing costs, increasing referrals, or cherry picking patients for the program.

Participating physician groups were to be paid 50 percent of the documented cost savings resulting from adoption of the recommendations in the Practice Pattern Report for the first year of the program only. No provision was made for sharing in savings in subsequent years. Physician groups receiving gainsharing payments also agreed to distribute such funds per capita among group members.

CONFIDENTIAL/FOIA EXEMPT                                                        HAL-1_0013360

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

The arrangement was to be disclosed to patients prior to admission, unless emergency circumstances did not permit, in which case disclosure had to be made at least prior to the subject procedure. The parties were expected to document the patients' authorizations in writing.

The OIG's Analysis

As it did in its previous Special Advisory Bulletin and Advisory Opinion No. 01-01, the OIG noted that the present arrangements could be subject to CMPs, and, if unlawful intent was present, could violate 42 U.S.C §1320a-7b(b), the federal anti-kickback statute. The OIG also noted that the arrangements could implicate federal Stark II referral prohibitions (42 U.S.C. §1395nn), but declined to opine regarding Stark II, that falling within CMS's jurisdiction. The OIG also declined to opine on the implications of the arrangements for the tax-exempt status of any of the applicant tax-exempt hospitals.

Despite the potential in the OIG's opinion for the proposed gainsharing arrangements to violate one or more of these authorities, the OIG declined to impose CMPs, or to commence an enforcement action under the federal anti-kickback statute. The OIG noted that each arrangement before it had built-in program safeguards, leading the OIG to conclude that these particular gainsharing programs posed little prospect for Medicare or Medicaid program abuse. The safeguards included the following:

Cost-saving actions and the savings resulting from them were clearly and separately identified, allowing for public scrutiny and individual physician accountability for any adverse effects of the arrangements.

Credible medical support existed indicating that patient care would not suffer.

Payments were to be based on all procedures regardless of the patient's insurance, which procedures were not disproportionately performed on Medicare/Medicaid beneficiaries; savings were based on actual hospital out-of-pocket expenses.

Baseline thresholds for cost and utilization protected against inappropriate reductions in services.

Even after adopting product standardization recommendations, physicians would still have the same devices available to them, should patient care considerations dictate one product or another in the physician's judgment.

The arrangements would be transparent to the patient, who could make an informed decision before undergoing the particular procedure.

Financial incentives were reasonably limited in duration and amount, and were mitigated vis-à-vis an individual physician by per capita distributions.

Caveats and Recommendations

Advisory Opinion Nos. 05-01 through 05-04 are expressly limited to their facts, and applicable only to the requesting parties. Moreover, the OIG makes it clear in each opinion that it is only approving these arrangements, each of which is subject to the strict safeguards described above. Programs that are more open-ended and indefinite regarding the savings to be shared or the term are not likely to be acceptable to the OIG, although the opinions did leave open the possibility of a program exceeding one year in length if appropriate safeguards were in place to prevent abuse.

CONFIDENTIAL/FOIA EXEMPT                                                                    HAL-1_0013361



**HALIFAX HEALTH**

*Our Values In Action*
*From the Compliance Officer's Desk*

Potential participants should also note that gainsharing payments from a hospital to a referring physician would constitute a compensation arrangement subject to the federal Stark II patient referral prohibitions. Thus, such payments would have to be structured to satisfy one of the Stark II statutory or regulatory exceptions to enable the participating physicians to continue to refer Medicare and Medicaid inpatients and outpatients patients to the hospital, and to allow the hospital to bill for its covered services furnished to such patients.

In addition, physicians participating in a gainsharing arrangement with a tax-exempt hospital may already be (or may become by reason of the arrangement) "disqualified persons" vis-à-vis the hospital for purposes of the Internal Revenue Service's excess benefit transaction regulations. Participating tax-exempt hospitals should consider taking the steps within their own organizations to qualify for the rebuttable presumption of reasonableness to protect against the possible imposition of excise taxes under those regulations.

Finally, on a positive note, even though the applicants were seeking opinions about cardiac service programs, there is no indication in the opinions that gainsharing programs with similar safeguards and applicable to other high-cost services (e.g., orthopedics) could not receive a favorable OIG opinion. Indeed, the gates may open wider to acceptance of gainsharing programs if Congress accepts MedPAC's recommendations, and permits CMS to authorize gainsharing programs, i.e., removes legislatively the spectre of CMPs for such programs.

Until then, hospitals and physicians desiring to enter into gainsharing arrangements should proceed cautiously, and under professional advice. Potential gainsharing program participants should seek their own advisory opinions from the OIG, may wish to seek Stark II advisory opinions from CMS as well, and should vet these transactions thoroughly with their governing boards to avoid unfavorable tax consequences.

For additional information about gainsharing, these OIG opinions, and/or the advisory opinion process in general, please contact the author at (561) 366-5322 or by e-mail at ehopkins@broadandcassel.com.

-------------------------------------------------------------------------------

Click Here if you forgot your password.

Need to change your topics? Click here.
Want to unsubscribe from this e-mail?
E-mail Luanne at luannem@fha.org with the subject line of this e-mail.

☐
Feel free to contact me for more information on this topic.  Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT

HAL-1_0013362

# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Bill Griffin, Eric Peburn, Dave Davidson; Harry Reese |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department   Phone: 254-4279 (ext. 4279)<br>Fax:   254-4364 (HMC ext. 4364)<br>E-mail: george.rousis@halifax.org |
| **Subject:** | **Gainsharing Arrangements may Implicate Stark Rules** |
| **Priority:** | ☑ Advisory/Information      ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | ... |

## Advisory/Alert Text:

With six OIG advisory opinions favorable to the concept of physician-hospital gainsharing arrangements, it is tempting to consider such relationships to encourage physicians to cooperate in hospital cost-saving strategies.

However, the OIG advisory opinions relate ONLY to the civil money penalty sanctions under the Anti-kickback Statute. The OIG has not advised providers on whether such arrangements implicate the Stark Law prohibiting certain financial relationships with physicians. Nor is the OIG authorized by law to do so. Based on a presentation I attended last week, there appears to be uncertainty among experts as to whether some gainsharing arrangements may in fact constitute prohibited payments under Stark, while operating safely within the Anti-kickback Statute.

Bottom line: Any gainsharing arrangement requires careful legal analysis. Avoidance of civil money penalties under the Anti-kickback Statute will not guarantee avoidance of false claims arising out of a Stark issue.

On the positive side, momentum is building for Congress to soon pass legislatio to require HHS to develop rules that allow gainsharing and remove some of the cloudiness that exists today. This may occur as early as June 2005.

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                    HAL-1_0013363

# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Fran Davis; Raul Zimmerman; Tony Trovato |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **Medicare: Hospice Pre-election and Counseling Services**

**Priority:**  ☑ Advisory/Information          ☐ Alert - Immediate Action May Be Needed

**Recommended action:** ...

## Advisory/Alert Text:

Attached for your information is the section from the Medicare Benefit Policy Manual that describes coverage requirements for hospice pre-election evaluation and counseling services. This is a new covered service (eff. 1/1/2005) provided as part of the Medicare Modernization Act of 2003. Note that the services must be initiated upon a decision by the beneficiary or the beneficiary's physician that is not also a hospice employed medical director or physician.

Furthermore, hospice may not make payments to physicians in a position to refer patients for the service, unless such payments fit with a safe-harbor of the anti-kickback or Stark statutes.
☐
Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                                HAL-1_0013364

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Dave Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **U.S., Ex Rel, David Clayman vs. Fred L. Steinberg, et al**

**Priority:** ☑ Advisory/Information          ☐ Alert - Immediate Action May Be Needed

**Recommended action:** ...

## Advisory/Alert Text:

At a recent meeting of the Florida Compliance Officers Group, Ed Hopkins, liaison from the Florida Attorney Group, distributed the attached synopsis of a qui tam complaint filed with the Florida Southern District Federal Court in Palm Beach County. This complaint serves as a good refresher of the risk associated under various federal statutes relating to financial relationships with physicians.

This case involves False Claims Act violations arising through alleged illegal kickbacks and Stark II violations.

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                          HAL-1_0013365

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Physician Billing Group |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **Medicare: 2006 Physician Fee Schedule Proposed Rule Highlights**

**Priority:** ☑ Advisory/Information          ☐ Alert - Immediate Action May Be Needed

**Recommended action:** ...

## Advisory/Alert Text:

Physicians would receive a cut of 4.3 percent in Medicare payments under the proposed rule published in the August 8, 2005, Federal Register. The proposed rule details policy changes and proposed payment rates under the 2006 Medicare physician fee schedule.

Some of the highlights:

Practice Expense Relative Value Units (RVUs):
CMS proposes changing the methodology for determining resource based practice RVUs to a bottom up method of determining the relative direct cost for services that sums up the cost of the resources.

ESRD Payment:
CMS would revise the payment rate for separately billable drugs and biologicals furnished by end-stage renal disease (ESRD) facilities to the average sales price (ASP) plus 6 percent.

Drugs and Biologicals:
CMS would establish a dispensing fee amount that will accurately cover the cost of the services that fall within the scope of the dispensing fee. This is likely to be lower than the 2005 monthly amount.

Payment Reduction for Multiple Diagnostic Imaging Procedures:
Payments for the technical component of "subsequent procedures" would be reduced by 50 percent, as recommended by the Medicare Payment Advisory Commission. That is, when a physician performs more than one diagnostic imaging procedure within a designated family of procedures, the technical component payment for the second and any subsequent procedures would be reduced by 50 percent. CMS identified 11 families of imaging procedures based on imaging modality (CTA, MRI, and MRA) and contiguous body part to which the new payment rates would apply. (See FR page 45849.)

Physician Referrals for Nuclear Medicine Services and Supplies:
Nuclear medicine services and supplies would be added to the definition of radiology services included as "designated health services" under the Stark law. Under the rule, physicians would be prohibited from referring patients for nuclear medicine services and supplies to facilities in which they or an immediate family member have financial relationships. (See FR page 45854.)

Other Notable Changes:
• Update of malpractice RVUs (FR page 45784)
• Revisions to Medicare telehealth services (FR page 45786)
• Payments for teaching anesthesiologists (FR page 45789)

CONFIDENTIAL/FOIA EXEMPT                                              HAL-1_0013366

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

- Supplemental payments to federally qualified health centers (FQHCs) subcontracting with Medicare Advantage plans (FR page 45852)
- National coverage decisions timeframes (FR page 45853)
- Coverage of screening for glaucoma (FR page 45853)
☐

Please see attached link for a complete copy of the proposed rule.

Feel free to contact me for more information on this topic.  Please forward this message as you deem appropriate.

Source: HFMA Express News 9/16/05
Federal Register 8/8/05

http://www.cms.hhs.gov/providerupdate/regs/cms1502P.pdf

CONFIDENTIAL/FOIA EXEMPT                                    HAL-1_0013367

*Our Values In Action*
*From the Compliance Officer's Desk*

# HALIFAX HEALTH 

| To: | Lori Delone; David Davidson; James Shepherd; Audrey Pike | |
|---|---|---|
| Route to: | Staff as you deem appropriate | |
| From: | Compliance Department | Phone: 254-4279 (ext. 4279)<br>Fax:    254-4364 (HMC ext. 4364)<br>E-mail:  george.rousis@halifax.org |
| Subject: | **Proposed anti-kickback safe harbors for electronic prescriptions and electronic health records** | |
| Priority: | ☑ Advisory/Information | ☐ Alert - Immediate Action May Be Needed |
| Recommended action: | ... | |

## Advisory/Alert Text:

The DHHS Office of Inspector General has proposed new anti-kickback safe-harbors for electronic prescription technology and providing electronic health record technology. A summary follows. No action is necessary at this time. This is a proposed rule.

As required by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), Public Law 108-173, this proposed rule would establish a new safe harbor under the Federal anti-kickback statute for certain arrangements involving the provision of electronic prescribing technology.

Specifically, the safe harbor would protect certain arrangements involving hospitals, group practices, and prescription drug plan (PDP) sponsors and Medicare Advantage (MA) organizations that provide to specified recipients certain nonmonetary remuneration in the form of hardware, software, or information technology and training services necessary and used solely to receive and transmit electronic prescription drug information.

In addition, the OIG is also proposing separate safe harbor protection for certain electronic health records software and directly related training services. These exceptions are consistent with the President's goal of achieving widespread adoption of interoperable electronic health records for the purpose of improving the quality and efficiency of health care, while maintaining the levels of security and privacy that consumers expect.

This rule, if finalized, would appear to remove one barrier to providing IT to physicians for free or below fair market value. We have yet to hear from CMS as to financial arrangements with physicians based on referrals under the Stark rules. Hopefully, they will follow suit with similar safe harbors. The proposed rule can be obtained at the enclosed link.
☐
Feel free to contact me for more information on this topic.

Please forward this message as you deem appropriate.

http://oig.hhs.gov/authorities/docs/05/100605E-PrescriberuleC.pdf

---

Transmittal: 1541 - 10/07/2005

Page 20 of 27

CONFIDENTIAL/FOIA EXEMPT                    HAL-1_0013368

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Lori Delone; Audrey Pike; David Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:     254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **Safe Harbors for Health Care IT Provided to Physicians**

**Priority:** ☑ Advisory/Information          ☐ Alert - Immediate Action May Be Needed

**Recommended action:** ...

## Advisory/Alert Text:

Attached are two memoranda that summarize recently finalized rules under the federal anti-kickback and physician financial relationships statutes, a/k/a the Stark law. They describe new safe harbors for providing electronic prescribing and health record technology to physicians.

Memorandum #1 is a section-by-section synopsis of the rules.

Memorandum #2 is a summary of the guidance materials contained in the preamble to the rules published in the Federal Register.

Any arrangement (present or future) involving the provision of health care IT to physicians, for free or below fair market value cost, should be carefully reviewed in the context of these rules.

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                      HAL-1_0013369

# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Lori Delone; Audrey Pike; David Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail:  george.rousis@halifax.org

**Subject:** **Anti-kickback and Stark Law Safe Harbors**

**Priority:**  ☑ Advisory/Information          ☐ Alert – Immediate Action May Be Needed

**Recommended action:**  ...

## Advisory/Alert Text:

At a Florida Compliance Officers meeting yesterday, I received memoranda summarizing the recently finalized anti-kickback and Stark law safe harbors for health care information technology provided to physicians.  I am forwarding copies to you via interoffice mail.

I also developed a questionnaire that can be used to evaluate whether donated health care  IT fits within these safe harbors.  It can be obtained here:

http://info.halifax.org/compliance_office/StandardsFiles/FI-FinancialRelationships/ITSafeHarborQuestionnaire.doc

The questionnaire will not yield a yes/no answer as to whether an arrangement falls within a safe harbor. It's simply a tool to assist in the analysis.

Feel free to contact me for more information on this topic.  Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT

HAL-1_0013370

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Compliance Committee; Shelly Shiflet |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department      Phone: 254-4279 (ext. 4279)<br>Fax: 254-4364 (HMC ext. 4364)<br>E-mail: george.rousis@halifax.org |
| **Subject:** | **Professional Courtesy Discounts** |
| **Priority:** | ☑ Advisory/Information      ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | Information only. Comment as you deem appropriate. |

## Advisory/Alert Text:

Recently I was asked about our policies on professional courtesy discounts, and it occurred to me we do not have a policy that addresses the Stark exception for professional courtesy provided by a hospital to members of its medical staff (or their immediate family members). In response to this and potential future inquiries by staff, I drafted Legal/Compliance Policy LL-125 here:

http://info.halifax.org/compliance_office/StandardsFiles/LL-Legal/LL-125_ProfessionalCourtesyDiscounts.doc

The policy DOES NOT in itself create or allow a professional courtesy discount by any HH entity. It only spells out the requirements for such a policy, should a HH entity elect to have one.

To meet the Stark rule exception, a professional courtesy discount policy requires the approval of the entity's governing body per 42 CFR 411.357(s). The Legal/Compliance Policy also requires the approval of the Administrator of the HH entity that provides the discount and the PBFS VP.

An important feature of the Stark exception for professional courtesy is that the discount, if offered, must be provided to any member of the medical staff (or local community) without regard to the volume or value of referrals or other business generated between the parties.

PBFS Policy/Procedure R 1210, Administrative Adjustments, may need to be reviewed and revised to be consistent with this policy.

Some elements in this policy are "negotiable, i.e., not a Stark rule requirement, such as the maximum amount of discount that can be offered, which the regulation does not address.

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT      HAL-1_0013371

# HALIFAX HEALTH

| | |
|---|---|
| **To:** | Compliance Committee; Bill Griffin |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax:    254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **Item of interest: Florida Hospital Pays $7.8 Million after self-disclosing Stark violation**

**Priority:**  ☑ Advisory/Information        ☐ Alert - Immediate Action May Be Needed

**Recommended action:** Information only.

## Advisory/Alert Text:

This was reported recently in in the Miami Herald, Modern healthcare and elswhere. I have a copy of the settlement agreement if you care to see it.

Baptist Health South Florida will pay about $7.8 million to settle claims with authorities that it broke federal law when it overpaid for services provided by an oncology group that also refers patients to its hospitals.

Baptist officials said the overpayments were inadvertent and that it reported them itself to the Department of Health and Human Service's Office of Inspector General in 2006 after discovering them.

How much Baptist overpaid wasn't disclosed, nor how the settlement figure was reached.
☐
Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT

HAL-1_0013372

# HALIFAX HEALTH 

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Legal Department; HH Administrators |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department     Phone: 254-4279 (ext. 4279)<br>Fax:  254-4364 (HMC ext. 4364)<br>E-mail: george.rousis@halifax.org |
| **Subject:** | **Medicare: Written Agreements and Signature Requirements in Financial Relationships with Physicians** |
| **Priority:** | ☑ Advisory/Information     ☐ Alert - Immediate Action May Be Needed |
| **Recommended action:** | Please review and comment within 5 business days. Policy will be considered final in 30 days. |

## Advisory/Alert Text:

A new compliance policy has been developed to reflect a change to the Stark regulations that effects signature requirements on written agreements for certain types of financial relationships with physicians. The change allows a temporary period of non-compliance with the signature requirement. The grace period is 30 or 90 days depending on whether the failure to obtain signatures is inadvertent or not.

Policy Title: LL-101.1, Financial Relationships; Signature Requirements

The draft policy can be retrieved here:

http://info.halifax.org/compliance_office/StandardsFiles/LL-Legal/LL-101.1_Financial%20Relationships_SignatureRequirements.doc

Or navigate as follows:

info.halifax.org > Compliance > Standards > LL-Legal > LL-101.1

Comments on the policy are welcome. The regulation from which the policy is derived takes effect 10/1/2008.

Feel free to contact me for more information on this topic. Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT        HAL-1_0013373

# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

| | |
|---|---|
| **To:** | Lori Myers; Laura Cason; Dan Lang; Kency Mocombe; Donald Stoner, MD; Eric Peburn; Clay Presswood; Gerry Neff; Audrey Pike; David Davidson |
| **Route to:** | Staff as you deem appropriate |
| **From:** | Compliance Department |

Phone: 254-4279 (ext. 4279)
Fax: 254-4364 (HMC ext. 4364)
E-mail: george.rousis@halifax.org

**Subject:** **Other Regulatory: Lease/Rental Agreements with Physicians**

**Priority:** ☑ Advisory/Information          ☐ Alert - Immediate Action May Be Needed

**Recommended action:** Please review and comment within 5 business days.

## Advisory/Alert Text:

The Compliance Department has developed a draft policy establishing requirements for lease/rental agreements with physicians that refer business to Halifax Health under the applicable exception in the Stark regulations. The Stark regulations prohibit referrals from a physician with whom a hospital has a financial relationship, unless the financial relationship meets an exception. The policy can be retrieved using the enclosed link.

The exception for lease and rental agreements was changed in Phase IV of the Stark regulations published August 19, 2008. The major change is a prohibition on percentage-based or per-click-based rental and lease payments. Lease or rental payments must be "set in advance." The compliance date of the change 10/1/2009.

CMS will not prohibit time-based leases, including the common "block lease" arrangements in which, for example, a clinician rents time on an MR scanner at an imaging center for X hours per week or month. CMS believes that time-based leases can meet applicable Stark exceptions but will monitor them and may issue future rules.

Percentage-based formulae are still permitted for compensating personally performed services.

If you are aware of any per-click-based or percentage-based rental or lease agreements with physicians, they may need to be modified.

Link to physician lease/rental compliance policy:

http://info.halifax.org/compliance_office/StandardsFiles/LL-Legal/LL-104_SpaceEquipemtnLeaseAgreements.doc

Link to all financial relationship policies developed to date:

http://info.halifax.org/compliance_office/StandardsPages/standards_ll.htm#Fin

Link to an overview of the Stark Rule:

CONFIDENTIAL/FOIA EXEMPT          HAL-1_0013374



# HALIFAX HEALTH

*Our Values In Action*
*From the Compliance Officer's Desk*

☐
Feel free to contact me for more information on this topic.  Please forward this message as you deem appropriate.

CONFIDENTIAL/FOIA EXEMPT                                                    HAL-1_0013375

# Exhibit

# 33

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA *ex.rel.*, and )
ELIN BAKLID-KUNZ, Relator )
                                )
     Plaintiffs                 )
                                  )    CASE NO.: 6-09-CV-1002-ORL-31TBS
     vs.                     )
                                  )    JUDGE GREGORY A. PRESNELL
HALIFAX HOSPITAL MEDICAL CENTER )
d/b/a HALIFAX HEALTH a/k/a HALIFAX )    [FALSE CLAIMS ACT – QUI TAM]
COMMUNITY HEALTH SYSTEM a/k/a )
HALIFAX MEDICAL CENTER and )
HALIFAX STAFFING, INC. )
                                  )
     Defendants               )

---

**DEFENDANTS HALIFAX HOSPITAL MEDICAL CENTER AND HALIFAX
STAFFING, INC.'S AMENDED OBJECTIONS AND RESPONSES TO
THE UNITED STATES' INTERROGATORY NOS. 2, 9, 10, AND 11**

      Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant

Halifax Hospital Medical Center and Halifax Staffing, Inc. ("HALIFAX")[1] by its

attorneys, hereby responds and objects to the United States' Interrogatory Nos. 2, 9, 10,

and 11 as follows.   HALIFAX incorporates by references the General Responses and

General Objections included in all prior Objections and Responses to the United States'

First, Second, and Third Sets of Interrogatories.

---

[1]  Halifax Hospital Medical Center is a statutory governmental subdivision of the State of Florida, located in Daytona Beach, Florida.  More specifically, Halifax Hospital Medical Center is organized under the laws of the State of Florida as a special taxing district created pursuant to an act of the Florida Legislature. Halifax Staffing, Inc. is the instrumentality by which Halifax Hospital Medical Center employs the individuals who work at Halifax Hospital Medical Center facilities.  Pursuant to an agreement between Halifax Staffing and Halifax Hospital Medical Center (commencing March 6, 1994), Halifax Staffing assumed the employment of the individuals who had up to that time been employed by the Halifax Hospital Medical Center district, and became the entity used by Halifax Hospital Medical Center to staff its facilities.  Halifax Hospital Medical Center pays its employees through a Halifax Staffing "sweep" account.

## INTERROGATORY NO. 2

2.     Identify all documents, communications, and facts Halifax Hospital Medical Center and Halifax Staffing, Inc. relied upon or intend to rely upon in support of the affirmative defenses asserted by Halifax Hospital Medical Center and Halifax Staffing, Inc. it (sic) the Answer to the United States' Compliant (sic) in Intervention.

## RESPONSE TO INTERROGATORY NO. 2:

HALIFAX incorporates by reference all General Statements and Objections, set forth above, and further objects as this request calls for attorney-client privileged and/or attorney work product information.  Subject to and without waiving its general and specific objections, HALIFAX responds as follows:

HALIFAX raised the following affirmative defenses in its April 5, 2012 Answer to the United States' Complaint-in-Intervention: (1) exceptions to the Stark Law; (2) waiver; (3) estoppel; (4) good faith; (5) public disclosure; (6) limitation on damages; (7) failure to state a claim; and (7) fraud with particularity.  With respect to each of HALIFAX's affirmative defenses, please see the responses below which are intended only to summarize these affirmative defenses and are in no way intended to limit HALIFAX's presentation of the scope of any of these defenses from a factual, evidentiary or legal perspective.

(a)     Exceptions To The Stark Law

Halifax Hospital Medical Center is a special taxing district established by the State of Florida that owns and operates health care facilities in Volusia County, Florida, including a hospital in Daytona Beach, Florida.  Halifax Hospital Medical Center has a provider agreement with the Medicare Program and submits claims to the Medicare Program for hospital and other health care services.

- 2 -

Halifax Staffing, Inc. ("Halifax Staffing") operates as an instrumentality of Halifax Hospital Medical Center, and was created to provide the individuals who work at Halifax Hospital Medical Center's facilities. Pursuant to an agreement between Halifax Staffing and Halifax Hospital Medical Center (commencing March 6, 1994), Halifax Staffing employed the individuals who had up to that time been employed by Halifax Hospital Medical Center directly, and then leased their services back to Halifax Hospital Medical Center.

Halifax Hospital Medical Center continues to obtain the services of all of its employees, including many physicians, from Halifax Staffing. Halifax Hospital Medical Center bills patients and third-party payers under its name, tax identification number and provider number for the professional medical services rendered by these employed physicians. Halifax Hospital Medical Center retains collections derived from such billing.

Payroll checks to the employed physicians are cut in the name of Halifax Staffing through a zero-balance bank account ("ZBA"). When a payroll check is presented to the bank, the bank pays it out of the Halifax Staffing ZBA, and then sweeps funds from Halifax Hospital Medical Center's account to cover the amount of the payroll check. Halifax Hospital Medical Center directly pays for all employee benefits and required withholdings, so that the Halifax Staffing ZBA receives only the net amounts due for payroll. For all intents and purposes, as established by the evidence in this case, Halifax Staffing is one and the same as Halifax Hospital Medical Center.

The determination of whether an individual should be considered as an employee of an entity is based upon an IRS test set forth in Section 3121(d)(2) of the Internal

Revenue Code of 1986. This IRS test has been adopted by CMS for Stark Law analytical purposes as confirmed by the testimony of the United States' 30(b)(6) witness CMS employee Troy Barsky. According to the IRS test, an entity that controls the results of an individual's work, establishes the details of the work, provides the means to accomplish the work, and actually supervises the individual is the actual employer. This analysis goes beyond which entity is identified on a contract, or issues a W-2 to the individual.

Halifax Hospital Medical Center is the entity that fits each element of the IRS test in regards to each of the ten (10) physicians identified in the United States' Complaint-in-Intervention, not Halifax Staffing. Accordingly, Drs. Rohit Khanna, William Kuhn, Frederico Vinas, Boon Chew, Walter Durkin, Gregory Favis, Adbul Sorathia, Richard Weiss, Ruby Anne Deveras, and Kelly Molpus ("Identified Physicians") should be considered as employees of Halifax Hospital Medical Center for purposes of Stark Law analysis. Halifax Hospital Medical Center is the provider of Designated Health Services ("DHS") for purposes of the Stark Law.

DHS entities such as Halifax Hospital Medical Center may structure compensation arrangements in accordance with the requirements of certain specific Stark Law exceptions. The employed physicians at Halifax Hospital Medical Center qualify for the "bona fide employment exception" to the Stark Law. This exception protects compensation paid to employees that is: fair market value ("FMV"); for identifiable services; provided under an agreement that would be commercially reasonable even if no referrals were made to the employer; and, except for permitted productivity bonuses, is not determined in a manner that takes into account the volume or value of any referrals by the referring physician. *See* 42 C.F.R. § 411.357(c).

Separately, under the "indirect referral exception" to the Stark Law, *see* 42 CFR 411.353(e), Halifax Hospital Medical Center is not subject to the Stark Law billing prohibition where it had no knowledge of, and did not act in reckless disregard or deliberate ignorance of, the fact that an Identified Physician was the referring physician for the DHS for which Halifax Hospital Medical Center presented a claim. Thus, to the extent the United States asserts in its Complaint-in-Intervention that all claims for patients treated by one or more of the Identified Physicians violate the Stark Law, Halifax Hospital Medical Center had no knowledge of a referral by one of the Identified Physicians, and the presentation of the claim was proper.

Alternatively, and to the extent the Identified Physicians are treated as employees of Halifax Staffing and the United States establishes the existence of an indirect compensation arrangement, the physician arrangements qualify for the exception for indirect compensation arrangements. This exception protects compensation paid to employed physicians that is fair market value for identifiable items and services actually provided, does not take into account the volume or value of referrals or other business generated for the DHS entity, is provided under an agreement that is commercially reasonable even if no referrals are made to the employer, and that does not otherwise violate the anti-kickback statute or any Federal or State law or regulation governing billing or claims submission.

Each of the employment agreements for the Identified Physicians meets the requirements of the indirect compensation exception. The Identified Physicians were all compensated at FMV under commercially reasonable terms for personally performed services, as defined by the terms of their employment agreements. At no time was the

compensation of any of the Identified Physicians determined in a manner that took into account the volume or value of any referrals made by or other business generated by an Identified Physician. The arrangements also did not violate the anti-kickback statute or any other Federal or State laws regarding billing and claims submission.

    (b)    <u>Waiver And Estoppel</u>

For the reasons set forth below, the United States has waived its claims and causes of action that any of the Identified Physicians made referrals to Halifax Hospital Medical Center that were prohibited by the Stark Law, and, further, the United States should be estopped from asserting such claims and causes of action due to Halifax Hospital Medical Center's reliance on the United States' representations regarding compliance with the applicable laws, regulations, and relevant guidance. The Stark Law defines DHS to include twelve categories of services, including "inpatient hospital services." 42 U.S.C. § 1395nn(h)(6). Medicare pays for inpatient hospital services under the Inpatient Prospective Payment System ("IPPS"). Under the IPPS, payments for inpatient hospital services are based on the patient's diagnosis, rather than the specific services that are actually provided to a particular patient during an inpatient stay. Inpatient and outpatient hospital services are billed to Medicare using CMS Form 1450.[2] The Medicare Claims Processing Manual (the "Claims Manual") provides instructions for completing CMS Form 1450. *Medicare Claims Processing Manual*, CMS Pub. 100-04, ch. 25. For inpatient hospital services, the Claims Manual instructs that the hospital must report the principal diagnosis, up to eight additional diagnoses, and up to six procedures performed during the inpatient stay. Diagnoses and procedures are reported on CMS

---

[2] Prior to March 1, 2007, CMS 1450 was the UB-92. CMS transitioned to the UB-04 beginning on March 1, 2007. Beginning on May 23, 2007, providers were required to use the UB-04.

Form 1450 using ICD-9 codes.[3]  Halifax Hospital Medical Center relied on the United States' representations of policy in the Claims Manual.

The Claims Manual instructs that Health Care Common Procedures Coding System ("HCPCS") codes that identify the specific services provided during an inpatient stay (for example, laboratory tests and imaging services) should not be reported on CMS Form 1450.  This is in contrast to claims for outpatient hospital services, which are paid under a distinct prospective payment system that is based on the items and services furnished to the patient, rather than the patient's diagnosis, and for which hospitals are instructed to list the HCPCS codes on the claim form.

The Fiscal Intermediary or Medicare Administrative Contractor ("FI/MAC") processes the claims using the GROUPER Program, which classifies claims into diagnosis-related groups ("DRGs").  Payment is then made to the hospital on the basis of the DRG.

When a hospital presents a claim to the Medicare program for an inpatient stay, the category of DHS for which the claim is presented is inpatient hospital services.  Thus, the presentation of a claim for an inpatient stay by Halifax Hospital Medical Center only implicates the Stark Law billing prohibition if the inpatient hospital services for which the claim is presented were furnished pursuant to a referral by an Identified Physician.

Consistent with the IPPS framework, when Halifax Hospital Medical Center presented a claim for inpatient hospital services, the claim form requested payment for the inpatient stay as a whole, not the individual services provided during the stay.  To the extent there is a referring physician for the inpatient hospital services for which the claim

---

[3] ICD-9 codes refer to the ninth edition of the International Classification of Diseases codes, which were used by CMS throughout the relevant time period in this case.

is presented, it could only be the admitting physician and/or the physician who established a plan of care that included the inpatient hospital stay. Identified Physicians who were otherwise involved in a patient's inpatient care have not made a referral for the inpatient hospital services for which the claim is presented under the Stark Law. Accordingly, the claims submitted by Halifax Hospital Medical Center for inpatient hospital services for patients treated by one or more Identified Physicians were proper unless the United States can establish that an Identified Physician made a referral to Halifax Hospital Medical Center and was either the admitting physician or established a plan of care involving the inpatient hospital stay.

Because the United States' Complaint in Intervention seeks to implicate all claims that involved services provided by one or more of the Identified Physicians, these assertions have been waived to the extent that an Identified Physician is not specifically identified on the CMS Form 1450 as the admitting physician and/or identified as the physician that established a plan of care involving inpatient hospital services. The United States' should further be estopped from pursuing its allegations against Halifax Hospital Medical Center under the Stark Law – and derivative FCA allegations – because Halifax Hospital Medical Center relied on the United States' representations in the Claims Manual.

    (c)    <u>Good Faith</u>

As articulated above, Halifax acted in good faith and with the understanding that its employment agreements with the Identified Physicians did not violate the Stark Law and, as necessary, met the requirements of the bona fide employment exception. Halifax also met the requirements of the indirect referral exception to the Stark Law and any claims submitted on behalf of the Identified Physicians were properly presented to

Medicare consistent with the policy and terms prescribed by CMS through its Claims Manual. Halifax Hospital Medical Center's good faith actions also did not violate the federal False Claims Act, which includes an element of "knowing" conduct on the part of the defendant.

(d)  Public Disclosure

Under 31 U.S.C. § 3730(e), *qui tam* actions cannot be based on publicly disclosed information. Relator Elin Baklid-Kunz is not the original source for the alleged short stay admission False Claims Act allegations against Halifax Hospital Medical Center. Nor is Baklid-Kunz the first to file regarding short stay admission False Claims Act allegations. The Relators in *United States ex rel. v. Halifax Health, et al.* (W.D.N.Y.) filed an under seal *qui tam* complaint in, at least, 2008, naming Halifax Hospital Medical Center as one of several defendants in a *qui tam* alleging that admissions for certain short stay procedures at Halifax Hospital Medical Center were not medically necessary. Due to extensive public discussion regarding the Department of Justice's investigation of these short stay medical necessity allegations and the DOJ's direct communications with Halifax Hospital Medical Center in March 2009 regarding its investigation of Halifax Hospital Medical Center, Baklid-Kunz was aware of these allegations prior to the filing of her *qui tam* complaint in June 2009. The Court, therefore, does not have jurisdiction over the Relator's non-intervened *qui tam* causes of action.

(e)  Limitations Of Damages

For the reasons stated above, the United States' damages in this case should be limited to the extent that its FCA damages hinge upon establishment of Stark Law violations. In the absence of evidence that Halifax Hospital Medical Center violated the Stark Law, the United States cannot establish any damages in this case. To the extent

- 9 -

that the United States is able to prove that an Identified Physician made referrals for DHS in violation of the Stark Law, the scope of damages should be limited to only those Medicare claims where an Identified Physician was specifically identified on CMS Form 1450 as the admitting physician and/or identified as the physician that established a plan of care involving inpatient hospital services.

      (f)     <u>Failure To State A Claim And Fraud With Particularity</u>

For the reasons stated above, the United States' has failed to state a claim upon which relief can be granted and has failed to plead fraud with particularity. Specifically, the United States has not specified what constitutes a "referring physician" or a "referral" under the Stark Law. Neither the United States' Complaint-in-Intervention nor any materials produced during discovery (including expert reports) identify specific claims where an Identified Physician made "referrals" – as defined under the Stark Law – to Halifax Hospital Medical Center. Therefore, the United States cannot establish any of its claims that the Identified Physicians violated the Stark Law through alleged "referrals" to Halifax Hospital Medical Center for DHS.

## INTERROGATORY NO. 9

9.     Identify all discoverable information known by Mr. David Davidson, Ms. Audrey Pike, and Ms. Shelly Shiflet, forming the basis for their inclusion on Halifax's Rule 26(a)(1)(A) initial disclosures.

## RESPONSE TO INTERROGATORY NO. 9:

Halifax incorporates by reference its general objections, set forth above, and further objects as this request calls for attorney-client privileged and/or attorney work product information. Subject to and without waiving its general and specific objections, Halifax responds as follows: HALIFAX has produced or will produce all non-privileged, responsive information and incorporates by reference its amended response to

# Exhibit

# 34

## In the Matter Of:

USA vs. HALIFAX HOSPITAL MEDICAL CENTER, et al.

---

## VIDEOTAPED DEPOSITION OF

## 30(B)(6) GEORGE ROUSIS

*February 20, 2013*

---



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150

USA vs. HALIFAX HOSPITAL MEDICAL CENTER, et al.
30(B)(6) GEORGE ROUSIS on 02/20/2013

VIDEOTAPED DEPOSITION OF
Pages 154..157

Page 154

1    The chief human resources officer also makes a
2  report.  The chairman of the medical staff will provide
3  a medical staff appointment and credentialing type of
4  report.  There's a -- sometimes there's a report from
5  the head of the fundraising foundation and the hospital
6  auxilliary, the volunteer organization, that will
7  provide a report to the board.
8    And occasionally other managers are called
9  upon by Jeff Peasel to give reports or portions of
10  reports on his behalf.
11    Q    Okay.  Other than those individuals you named,
12  can you think of anyone else who reports to the board?
13    A    Dave Davidson will make a report to the board
14  regarding certain transactions or any legal decisions
15  that need to be made, major transactions sometimes that
16  require board approval.  As an example, there's a
17  partnership project going on with another healthcare
18  provider to provide an inpatient rehab hospital, so the
19  manager of the rehab service line would give a report to
20  the board on that project, its budget and talk about its
21  budget, the status of the project and so forth.
22    So depending on the agenda of the board, it
23  could be different individuals in the organization that
24  would give a report.
25    Q    Okay.  And beyond that, can you think of

Page 155

1  anyone else?
2    A    Sometimes the board receives reports from
3  third parties, consultants that are engaged by hospital
4  management.  As an example, Florida Statutes require us
5  to do a fair market value analysis on the entire
6  hospital, and there was a report on that on behalf of --
7  it was actually part of Jeff Peasel's report.
8    Kim Fulcher is the director of human
9  resources.  She will occasionally give a report.  There
10  is a report -- a routine part of the board package
11  that's provided by Kim Fulcher, the director of human
12  resources.
13    Q    Anything else?
14    A    Not that I recall.
15    Q    Okay.  Let's move on to topic 41, which is all
16  facts and information -- this is topic 41 on the notice
17  of 30(b)(6) deposition.
18    It says, All facts and information Halifax
19  Hospital Medical Center relied upon or intends to rely
20  upon in support of its affirmative defenses, and each
21  affirmative defense is labeled.
22    I'm going to ask you to turn to Deposition
23  Exhibit 10.  I think I see it in the stack to your left.
24  And a lot of this information is laid out in response to
25  interrogatory number two if that helps you.

Page 156

1    (Exhibit 16 was marked for identification.)
2  BY MR. SCHWARTZ:
3    Q    The court reporter is also going to hand you,
4  if you want to consult it, Mr. Rousis, Deposition
5  Exhibit Number 16, which is Halifax's answer in this
6  case.
7    Did you consult the answer in preparation for
8  your deposition today?
9    A    I don't recall if this was in the package of
10  materials.  I just remember reviewing the
11  interrogatories and the requests for admissions and
12  requests for production.
13    Q    Okay.  Now, under topic 41 of Exhibit 1,
14  it's -- the first affirmative defense is failure to
15  state a claim.
16    Can you state the factual basis for that
17  defense?
18    A    The basis for that is in interrogatory number
19  two and our response to that.  And that's what we're
20  relying on.  It's page 10(f).
21    Q    Okay.  So here it says the United States has
22  failed to state a claim upon which relief can be granted
23  and has failed to plead fraud with particularity.  Is
24  that what you're referring to?
25    A    Yes.

Page 157

1    Q    Okay.  It says, Specifically, the United
2  States has not specified what constitutes a referring
3  physician or a referral under the Stark Law?
4    A    That's correct.  That's the second sentence of
5  our response.
6    Q    And so other than what is stated in section
7  (f) of the response of Exhibit 10 -- is that Exhibit --
8  other than page ten, section (f), is there anything else
9  you're relying on for the --
10    MR. STEPHENS:  Counsel, you gave me an exhibit
11  that's got some handwriting on it.  I don't know if
12  you want to --
13    MR. SCHWARTZ:  I don't know that it even
14  matters.  I appreciate that.
15    In the interest of moving things along, as
16  long as you don't constitute that a waiver of work
17  product privilege, I'm happy to allow the scribble
18  on here to --
19    MR. STEPHENS:  That's fine.  I mean, I don't
20  even know what it is, so --
21    MR. SCHWARTZ:  So it's not being constituted
22  as a work product waiver.
23    MR. STEPHENS:  I'll scribble mine out.
24    MR. SCHWARTZ:  Okay.
25    MR. STEPHENS:  Steve, it's up to you what you



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER, et al.
30(B)(6) GEORGE ROUSIS on 02/20/2013

VIDEOTAPED DEPOSITION OF
Pages 158..161

Page 158

1    want to do with it.
2        I mean, there's also various underlinings
3    throughout.
4        MR. SCHWARTZ:  As long as you're not
5    interpreting that as a waiver of work product
6    privilege, I am fine having you look at that.
7        Is that an accurate portrayal of your
8    position?
9        MR. STEPHENS:  Yes, that's fine.
10       THE WITNESS:  I believe the question was, is
11   there any other information that we're relying on
12   with respect to that?
13   BY MR. SCHWARTZ:
14       Q    Correct.
15       A    No, we don't have any additional information
16   that we're relying on.
17       Q    Okay.  The next defense is estoppel, and the
18   one after that is waiver.  And it appears to me that
19   based on the response of interrogatory number two,
20   Halifax is treating waiver and estoppel as the same,
21   section (b) of the response to interrogatory number two?
22       A    Yes.
23       Q    Okay.  What is -- what is Halifax's argument
24   with respect to waiver?
25       MR. STEPHENS:  Objection as to form to the

Page 159

1    extent that it requires the statement of
2    attorney/client privilege or work product
3    information.
4        THE WITNESS:  Our response to -- our response
5    related to that defense is as stated in the
6    response to interrogatory number two.  And the
7    basis for it was developed by legal counsel working
8    with -- our legal department working with outside
9    counsel.
10   BY MR. SCHWARTZ:
11       Q    Okay.  And it appears that the basis for the
12   waiver and estoppel argument is related to the way
13   payment is made under the inpatient prospective payment
14   system; is that accurate?
15       A    Are you referring to a particular statement in
16   the response?
17       Q    Well, it's in the first paragraph of the
18   response on page six.  And you said you reviewed this in
19   preparation for your deposition today, correct?
20       A    Yes, I familiarized myself with -- with this
21   particular interrogatory.
22       Q    Okay.  Good.
23       A    And the question again, please?  Are you
24   waiting for a response to the question?
25       Q    I was waiting for a response from you.

Page 160

1        A    I'll need your question read again, please.
2        Q    Okay.
3        (The question was read by the reporter as
4    follows: "And it appears that the basis for the waiver
5    and estoppel argument is related to the way payment is
6    made under the inpatient prospective payment system; is
7    that accurate?")
8        THE WITNESS:  I'm sorry, that was a little
9    fast for me.
10       (The question was read again by the reporter.)
11       THE WITNESS:  Yes.  I would -- yes.  The basis
12   has something to do with how -- how claims are
13   paid, as stated in the first paragraph.
14   BY MR. SCHWARTZ:
15       Q    So Halifax is not making a waiver and estoppel
16   argument with respect to outpatient payments?
17       MR. STEPHENS:  Objection as to form to the
18   extent that it calls for attorney/client privileged
19   or work product information to be disclosed.
20       Go ahead and answer.
21       THE WITNESS:  I can't say one way or the
22   other.
23   BY MR. SCHWARTZ:
24       Q    So you don't know if Halifax is asserting the
25   advice of waiver and estoppel with respect to outpatient

Page 161

1    claims?
2        MR. STEPHENS:  Objection as to form.
3        THE WITNESS:  By reference to the HCPCS coding
4    on page seven, which is applicable to outpatient
5    claims, I guess -- I really -- I can't say one way
6    or the other.
7    BY MR. SCHWARTZ:
8        Q    Do you have an answer, Mr. Rousis?
9        A    Yeah, my answer was I couldn't say one way or
10   the other.
11       Q    So you don't know whether the waiver and
12   estoppel defenses apply to claims for reimbursement
13   under the outpatient prospective payment system?
14       A    No, I cannot say one way or the other.
15       Q    Did Halifax advise CMS that the contracts with
16   the neurosurgeons violated the Stark Law before seeking
17   reimbursement for claims?
18       MR. STEPHENS:  Objection as to form.
19       THE WITNESS:  I don't know the answer to that
20   question.
21   BY MR. SCHWARTZ:
22       Q    Did Halifax advise CMS that its contract with
23   the medical oncologists violated the Stark Law before
24   seeking reimbursements for claims where one of those
25   physicians was the attending or operating physician?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER, et al.
30(B)(6) GEORGE ROUSIS on 02/20/2013

VIDEOTAPED DEPOSITION OF
Pages 162..165

Page 162

1           MR. STEPHENS:  Objection as to form.
2           THE WITNESS:  I don't know.
3    BY MR. SCHWARTZ:
4      Q    Let's look at 41(e), defense of limitation to
5    damages -- or limitation on damages.
6           What facts does Halifax have to support that
7    defense?
8      A    Other than what's stated here, I'm not aware
9    of any.
10     Q    Halifax has no information beyond what's
11   listed in Exhibit 10, section 2(e)?
12          MR. STEPHENS:  Objection as to form.
13          THE WITNESS:  That's correct.
14   BY MR. SCHWARTZ:
15     Q    Does Halifax have any additional information
16   beyond what is stated in response to interrogatory 2(e)
17   in support of its defense?
18     A    No, that is the information that we're relying
19   upon.
20     Q    Okay.  And I believe we already looked at 2(f)
21   which included the defense of fraud with particularity;
22   is that correct?
23     A    Yes.
24     Q    Okay.  Let's look at the public disclosure
25   defense.  What's the basis for your defense of public

Page 163

1    disclosure?
2      A    Nothing else other than what's stated here.
3      Q    Okay.  Are you asserting this defense as to
4    the United States?
5           MR. STEPHENS:  Objection to the extent that it
6           calls for disclosure of attorney/client
7           communication or attorney work product.
8           THE WITNESS:  I don't understand the question.
9    BY MR. SCHWARTZ:
10     Q    Well, I actually don't understand the defense
11   you're asserting as to the United States, which is why
12   I'm seeking clarification.  Because typically public
13   disclosure is not a defense as to claims brought by the
14   United States, so I'm wondering if in preparing for your
15   deposition today, you've been advised that I'm wrong in
16   that conclusion.
17          MR. STEPHENS:  Objection as to form to the
18          extent it requires the disclosure of
19          attorney/client privileged or work product
20          information.
21          THE WITNESS:  I haven't been advised of
22          anything related to the defense other than
23          what's -- what's been stated here.
24   BY MR. SCHWARTZ:
25     Q    Okay.  Based on what's stated here, is Halifax

Page 164

1    asserting a defense of public disclosure against the
2    United States' claims in this matter?
3      A    I don't see any qualification, but I don't
4    feel qualified to answer that.
5      Q    Okay.  Who would be qualified to answer it?
6      A    Our legal department.
7      Q    Okay.  And did you consult with them regarding
8    the defense of public disclosure?
9           MR. STEPHENS:  Objection to the extent that it
10          calls for the disclosure of attorney/client
11          privileged or work product information.
12          THE WITNESS:  No, other than to determine who
13          prepared this particular response.
14   BY MR. SCHWARTZ:
15     Q    Okay.  Can you tell me who prepared this
16   particular response?
17     A    It would be our general counsel working with
18   our outside counsel from McDermott, Will & Emery.
19     Q    And would that be the same response for all of
20   the responses for interrogatory number two?
21     A    Yes.
22     Q    And did you make any inquiries as to the
23   factual basis for the information contained in the
24   response for interrogatory number two?
25     A    No.

Page 165

1      Q    If we can go back to the public disclosure
2    section, 2(d) on page nine.
3           With respect to the Relator's claims, it says
4    Relator Elin Baklid-Kunz is not the original source for
5    the alleged short-stay, False Claims Act allegations
6    against Halifax Hospital Medical Center.
7           Do you see --
8      A    Yes, I see it.
9      Q    Okay.  What's the basis for that conclusion?
10     A    Other than what's stated here, I have --
11   there -- we don't have any additional information other
12   than what's stated here.
13     Q    Do you have any understanding of the scope of
14   the complaint in this WDNY case referenced in here?
15     A    Is that Western District of New York?
16     Q    I believe so, yes.
17     A    I believe it pertains to the kyphoplasty case
18   that that district is pursuing.
19     Q    Okay.  Is it -- does that case relate at all
20   to chest pain admissions?
21     A    No.
22     Q    Does it relate to admissions from the
23   emergency department?
24     A    It could.
25     Q    With respect to claims for kyphoplasty



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

# Exhibit

# 35

**Halifax Medical Center**
**Medical Oncology Grand Total**
**Fiscal Year 2005: October - September**

| | HMC Rollup | BFMC Total | Medical Oncology Physicians | Med Onc Grand Total | | |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Patient Service Revenue | 27,480,938 | 5,593,761 | 2,801,477 | 35,876,176 | | |
| Other Operating Revenue | 1,416 | - | 335,024 | 336,440 | | |
| Total Gross Revenue | 27,482,353 | 5,593,761 | 3,136,501 | 36,212,615 | | |
| | | | | | | |
| Net Revenue | 11,995,687 | 2,069,692 | 1,981,555 | 16,046,933 | | |
| | | | | | | |
| **Direct Expense** | | | | | | |
| Salaries | 1,557,576 | 165,641 | 2,418,352 | 4,141,569 | | |
| Benefits | 311,515 | 42,120 | 203,409 | 557,044 | | |
| Pro Fees | 850 | 4,998 | - | 5,848 | | |
| M/S Supplies | 7,703,440 | 1,294,451 | - | 8,997,891 | | |
| Supplies | 54,129 | 2,932 | - | 57,060 | | |
| Utilities | 89,660 | - | 9,773 | 99,433 | | |
| Purchased Svcs | 22,465 | 1,138 | 191,945 | 215,548 | | |
| Other Direct Exp | 16,339 | 205 | 178,326 | 194,870 | | |
| Lease & Rentals | 135,203 | 84,516 | - | 219,719 | | |
| Depreciation | 16,389 | - | - | 16,389 | | |
| Total Direct Expense | 9,907,563 | 1,596,001 | 3,001,805 | 14,505,369 | | |
| | | | | | | |
| **Operating Margin** | 2,088,124 | 473,691 | (1,020,250) | 1,541,564 | 4,163,325 | |
| | | | | | 2,852,996 | |
| | | | | | 69% | |

CONFIDENTIAL SUBJECT TO PROTECTIVE AGREEMENT

HAL-1 0325436

**Halifax Medical Center**
**Medical Oncology Grand Total**
**Fiscal Year 2006: October - September**

| | HMC Rollup | BFMC Total | Medical Oncology Physicians [1] | Med Onc Grand Total |
|---|---|---|---|---|
| **Revenue** | | | | |
| Patient Service Revenue | 30,803,964 | 7,080,540 | 3,478,517 | 41,363,021 |
| Other Operating Revenue | 1,916 | - | 369,945 | 371,861 |
| Total Gross Revenue | 30,805,880 | 7,080,540 | 3,848,462 | 41,734,882 |
| | | | | |
| Net Revenue | 12,952,241 | 2,619,800 | 2,018,647 | 17,590,688 |
| | | | | |
| **Direct Expense** | | | | |
| Salaries | 1,680,538 | 179,657 | 2,423,694 | 4,283,889 |
| Benefits | 336,108 | 44,127 | 162,727 | 542,961 |
| Pro Fees | - | 4,998 | 1,241 | 6,239 |
| M/S Supplies | 8,263,022 | 1,690,813 | - | 9,953,835 |
| Supplies | 94,126 | 3,334 | 2,048 | 99,507 |
| Utilities | 111,976 | - | 10,562 | 122,538 |
| Purchased Svcs | 29,170 | 517 | 175,502 | 205,189 |
| Other Direct Exp | 16,664 | - | 170,890 | 187,554 |
| Lease & Rentals | 135,096 | 84,516 | 296 | 219,908 |
| Depreciation | 34,052 | - | - | 34,052 |
| Total Direct Expense | 10,700,751 | 2,007,963 | 2,946,960 | 15,655,673 |
| | | | | |
| **Operating Margin** | 2,251,491 | 611,837 | (928,313) | 1,935,015 |

Bonus Calculation - 15% of Operating Margin          290,252.25

BFMC share at 22%                      (204,228.88)

CONFIDENTIAL SUBJECT TO PROTECTIVE AGREEMENT                    HAL-1 0325344

**Halifax Medical Center**
**Medical Oncology Grand Total**
**Fiscal Year 2007: October - September**

| | HMC Rollup | BFMC Total | Medical Oncology Physicians [1] | Med Onc Grand Total |
|---|---|---|---|---|
| **Revenue** | | | | |
| Patient Service Revenue | 33,714,339 | 8,326,710 | 3,594,869 | 45,635,918 |
| Other Operating Revenue | 3,106 | - | 335,024 | 338,130 |
| Total Gross Revenue | 33,717,446 | 8,326,710 | 3,929,893 | 45,974,049 |
| | | | | |
| Net Revenue | 13,963,625 | 3,312,620 | 2,101,774 | 19,378,019 |
| | | | | |
| **Direct Expense** | | | | |
| Salaries | 1,826,842 | 194,696 | 2,812,896 | 4,834,434 |
| Benefits | 367,142 | 44,573 | 169,219 | 580,934 |
| Pro Fees | - | 4,998 | - | 4,998 |
| M/S Supplies | 9,653,505 | 1,998,835 | - | 11,652,340 |
| Supplies | 70,176 | 2,247 | 1,696 | 74,120 |
| Utilities | 93,257 | - | 8,497 | 101,754 |
| Purchased Svcs | 32,245 | 6,868 | 164,698 | 203,811 |
| Other Direct Exp | 22,730 | 305 | 147,677 | 170,712 |
| Lease & Rentals | 137,928 | 85,842 | - | 223,769 |
| Depreciation | 38,213 | - | - | 38,213 |
| Total Direct Expense | 12,242,037 | 2,338,365 | 3,304,683 | 17,885,085 |
| | | | | |
| **Operating Margin** | 1,721,588 | 974,256 | (1,202,909) | 1,492,933.77 |
| | | | | |
| 15% of Operating Margin | | | | 223,940.07 |
| | | | | |
| BFMC share at 22% | | | (240,581.89) | |

1/13/2010

OutMedOnc 07q4.xls - Total YTD

CONFIDENTIAL SUBJECT TO PROTECTIVE AGREEMENT

HAL-1 0325269

**Halifax Medical Center**
**Medical Oncology Grand Total**
**Fiscal Year 2008: October - September**

| | HMC Rollup | BFMC Total | Medical Oncology Physicians | Med Onc Grand Total |
|---|---|---|---|---|
| **Revenue** | | | | |
| Patient Service Revenue | 33,131,688 | 7,796,678 | 3,941,050 | 44,869,415 |
| Other Operating Revenue | 3,930 | - | 404,363 | 408,293 |
| Total Gross Revenue | 33,135,618 | 7,796,678 | 4,345,413 | 45,277,708 |
| | | | | |
| Collection rate | 39.1% | 39.1% | 54.3% | 40.9% |
| Net Revenue | 12,972,098 | 3,187,738 | 2,359,227 | 18,519,062 |
| | | | | |
| **Direct Expense** | | | | |
| Salaries | 2,061,057 | 219,135 | 2,680,253 | 4,960,445 |
| Benefits | 453,433 | 41,708 | 159,723 | 654,864 |
| Pro Fees | - | 4,998 | | 4,998 |
| M/S Supplies | 8,919,733 | 1,733,944 | - | 10,653,676 |
| Supplies | 69,211 | 2,225 | 569 | 72,005 |
| Utilities | 73,275 | - | 11,834 | 85,109 |
| Purchased Svcs | 32,750 | 946 | 18,963 | 52,659 |
| Other Direct Exp | 31,506 | 213 | 68,986 | 100,705 |
| Lease & Rentals | 47,051 | 85,326 | - | 132,377 |
| Depreciation | 102,342 | - | - | 102,342 |
| Total Direct Expense | 11,790,357 | 2,088,495 | 2,940,328 | 16,819,179 |
| | | | | |
| **Direct Margin** | 1,181,745 | 1,099,243 | (581,101) | 1,699,886 |
| | | | | |
| 15% of Direct Margin | | | | 254,983 |

1/13/2010

OutMedOnc 08q4.xls - Total YTD

CONFIDENTIAL SUBJECT TO PROTECTIVE AGREEMENT

HAL-1 0325216

# Exhibit

# 36

**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BAKLID-KUNZ, | § § § § § § § § § § § § § | Civ. Act. No. 6:09-CV-1002-ORL-31DAB |
| Plaintiff, | | |
| v. | | JUDGE Gregory A. Presnell |
| HALIFAX HOSP. MED. CTR, et al. | | |
| Defendant. | | |

**DECLARATION OF IAN DEW**

Pursuant to 28 U.S.C. § 1746, I, Ian M. Dew, hereby declare, affirm, and state the following:

1.      I am over twenty-one years of age and, if called to provide testimony at a hearing in this matter, will testify to the following facts of which I have personal knowledge;

2.      In 2012 I was retained by the United States Department of Justice to review Medicare claims data for claims submitted by Halifax Hospital Medical Center and various other entities;

3.      In reviewing this data, I determined that the claims data reflects that Halifax Hospital Medical Center submitted 1,496 claims with service end dates from October 1, 2004 through February 28, 2009 for inpatient hospital services where one of the following physicians was listed as either the attending or operating physician: Dr. Boon Chew, Dr. Ruby Anne Deveras, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul

Sorathia, and Dr. Richard Weiss, resulting in reimbursements by Medicare in the amount of $11,457,981;

4.      I also determined that the claims data reflects that Halifax Hospital Medical Center submitted 24,097 claims with service end dates from October 1, 2004 through February 28, 2009 for outpatient hospital services where one of the following physicians was listed as either the attending or operating physician: Dr. Boon Chew, Dr. Ruby Anne Deveras, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul Sorathia, and Dr. Richard Weiss, resulting in reimbursements by Medicare in the amount of $19,393,003;

5.      I also determined that the claims data reflects that Halifax Health Care Systems, Inc. submitted 13,114 claims with service end dates from October 1, 2004 through February 28, 2009 for services where one of the following physicians was listed as the referring physician: Dr. Boon Chew, Dr. Ruby Anne Deveras, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul Sorathia, and Dr. Richard Weiss, resulting in reimbursements by Medicare in the amount of $1,044,858;

6.      I also determined that the claims data reflects that East Coast Florida Outpatient Imaging submitted 6,735 claims with service end dates from October 1, 2004 through February 28, 2009 for services where one of the following physicians was listed as the referring physician: Dr. Boon Chew, Dr. Ruby Anne Deveras, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul Sorathia, and Dr. Richard Weiss, resulting in reimbursements by Medicare in the amount of $2,372,825.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: May 28, 2013

_____
Ian M. Dew