**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.*, and ELIN BAKLID-KUNZ, Relator | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | CASE NO.: 6:09-CV-1002-ORL-31TBS |
| | ) | JUDGE GREGORY A. PRESNELL |
| HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC. | ) ) ) ) ) | [FALSE CLAIMS ACT – QUI TAM] **DISPOSITIVE MOTION** |
| | ) ) | |
| Defendants | ) ) | |

<u>**DEFENDANTS HALIFAX HOSPITAL MEDICAL CENTER AND HALIFAX STAFFING, INC.'S
MOTION FOR SUMMARY JUDGMENT ON THE UNITED STATES' COMPLAINT IN
INTERVENTION ON CAUSES OF ACTION ONE THROUGH SIX**</u>

## TABLE OF CONTENTS

I.    **INTRODUCTION** ...................................................................................1

II.    **STATEMENT OF MATERIAL FACTS AND ALLEGATIONS** ...............3

III.    **SUMMARY JUDGMENT LEGAL STANDARD**..................................5

IV.    **LEGAL FRAMEWORK** ...................................................................6

   A.   **The Stark Law** ........................................................................6

   B.   **The False Claims Act** ............................................................8

V.    **LEGAL ARGUMENT REGARDING FIRST CAUSE OF ACTION ALLEGING VIOLATION OF THE STARK LAW AND 31 U.S.C. §§ 3729(a)(1) and (a)(1)(A)**...............9

   A.   **The Neurosurgeon Contracts Are Direct Compensation Arrangements That Comply With The *Bona Fide* Employment Exception**....................................................10

      1.   There Is No Material Dispute Of Fact That The Neurosurgeon Arrangements Are Direct Compensation Arrangements ..........................................................11

      2.   **Halifax's Compensation Arrangements With The Neurosurgeons Comply With The *Bona Fide* Employment Exception.** .............................................14

   B.   **The Medical Oncologists' Contracts Are Direct Compensation Arrangements Complying With The *Bona Fide* Employment Exception** .....................................21

      1.   The Medical Oncology Contracts Are Direct Compensation Arrangements...............22

      2.   It Is Undisputed The Medical Oncologists' Contracts Are Fair Market Value And Commercially Reasonable .....................................................22

      3.   As A Matter Of Law, The Medical Oncologists' Compensation Includes A Permissible Productivity Bonus Because The Payment Of The Bonus Was Based On Each Medical Oncologist's Personally Performed Services .......................................23

   C.   **The Compensation Arrangement With Dr. Molpus Satisfies The *Bona Fide* Employment Exception.** .....................................................26

   D.   **The Compensation Arrangements With The Physicians Also Satisfy The Indirect Compensation Arrangement Exception** .....................................26

      1.   All Of The Physician Arrangements Were Commercially Reasonable In The Absence Of Referrals To Halifax Staffing.......................................27

      2.   None Of The Physician Agreements Violated The Anti-Kickback Statute, Nor Does the United States Allege They Did........................................27

      3.   The Compensation Arrangements With The Neurosurgeons Satisfy All Criteria In The Indirect Compensation Arrangement Exception.............................27

      4.   The Medical Oncologists' Arrangements Do Not Take Into Account The Volume Or Value Of Referrals Or Other Business Generated ..............................28

   E.   **The United States Erroneously Includes Claims That Are Not Implicated By The Stark Law** ......................................................................28

      1.   Evaluation And Management Services Are Not DHS.................................29

      2.   Physicians' Professional Services At Issue Are Not DHS..........................29

      3.   Claims For Services Performed On Patients Who Self-Referred To Halifax Are Not Subject To The Stark Law Billing Prohibition. ......................................30

      4.   Claims For Services Furnished By Entities Other Than Halifax Should Be Excluded.30

      5.   Designation Of The "Attending Physician" Or "Operating Physician" On CMS Form 1450 Does Not Provide Sufficient Evidence Of A Referring Physician.............................31

VI.    **LEGAL ARGUMENT ON FALSE CLAIMS ACT CAUSES OF ACTION** ...........33

A.   **The United States' FCA Causes Of Action One Through Three** ..............................33
B.   **Halifax Did Not Knowingly Submit, Present Or Use False Statements To Obtain Payment For False Claims** ...........................................................................................34
   1.   The Neurosurgeons' Agreements ...................................................................35
   2.   The Medical Oncologists' Agreements .........................................................35
C.   **The Halifax Claims Are Not False** .........................................................................38
D.   **Failure To Identify Prohibited Referrals Or Any FCA Damages** ...........................38
VII.   **LEGAL ARGUMENT ON COMMON LAW CAUSES OF ACTION** ....................39
VIII.   **CONCLUSION** .......................................................................................................40

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...............................................6

*Benjamin v. Holy Cross Hospital, Inc.*, No. 11-62142-CIV, 2013 WL 1334565 (S.D. Fla. Mar. 29, 2013)...............................................................................................................46

*Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237 (S. D. Fla. 2007) ...............................................................................................................................42

*Brooks v. United States*, 64 F.3d 251 (7th Cir. 1995) ...............................................40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)............................................................5

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir.1991) ......................................6

*Hindo v. Univ. of Health Sciences*, 65 F.3d 608 (7th Cir. 1995)................................11

*Holloman v. Mail-Well Corp.*, 443 F.3d 832 (11th Cir. 2006)....................................6

*Hosp. Res. Pers. v. United States*, 68 F.3d 421 (11th Cir. 1995) ...............................15

*Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202 (11th Cir. 2010) ...............................42

*Mee Indus. v. Dow Chem. Co.*, No. 6:05-cv-1520-Orl-310AB, 2008 U.S. Dist. LEXIS 116722 (M.D. Fla. Oct. 31, 2008)....................................................................................43

*Nolin v. Isbell*, 207 F.2d 1253 (11th Cir. 2000)..........................................................46

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935 (11th Cir. 1997) .......46

*SEC v. Mut. Benefits Corp.*, 2004 U.S. Dist. LEXIS 23008 (S.D. Fla. Nov. 10, 2004) ...............42

*Shurick v. Boeing Co.*, No. 6:07–cv–1974–Orl–31GJK, 2010 WL 258788 (M.D. Fla. Jan. 20, 2010), *aff'd*, 623 F.3d 1114 (11th Cir. 2010) ...............................................................6

*United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542 (7th Cir. 1999) ................11

*United States ex rel. Hochman v. Nackman*, 145 F.3d 1069 (9th Cir. 1998) ................11, 40

*United States ex rel. Jamison v. McKesson*, Civ. No. 2:08cv214-SA-JMV, 2012 U.S. Dist. LEXIS 17856 (N.D. Miss. Feb. 14, 2012)................................................................21

*United States ex rel. Kaimowitz v. Ansley*, 250 Fed. Appx. 912 (11th Cir. 2007)........................7, 9

*United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88 (3d Cir. 2009) ....................34

*United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998).............11

*United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329 (M.D. Ga. 2011).........................................................................................................................11

*United States ex rel. Samuel L. Armfield, III, and Patricia Armfield v. James P. Gills, et al.*, Case No. 8:07-cv-2374-T-27TBM, 2012 U.S. Dist. LEXIS 154749 (M.D. Fla. Oct. 29, 2012).......21

*United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247 (S.D. Fla. 1989).........................................................................................................................9

*United States ex rel. Walker v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349 (11th Cir. 2005).........................................................................................................................9

*United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, Civ. No. 98-6698, 2003 U.S. Dist. LEXIS 2054 (E.D. Pa. Feb. 11, 2003)...............................................................10, 12, 40

*United States ex rel. Wilkins v. North Am. Construction Corp.*, 173 F. Supp. 2d 601 (S.D. Tex. 2001).........................................................................................................................10

*United States ex rel. Williams v. Renal Care Group*, 696 F.3d 518 (6th Cir. 2012) ...................45

*United States v. Condon*, 132 F.3d 653 (11th Cir. 1998)..........................................42

*United States v. Eisenstein*, 731 F.2d 1540 (11th Cir. 1984) ....................................43

*United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997)............................................40

*United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742 (N.D. Tex. 2003), *aff'd in part, rev'd in part*, 2008 U.S. App. LEXIS 17946 (5th Cir. 2008)................................................................12

*United States v. Newport News Shipbuilding, Inc.*, 276 F. Supp. 2d 539 (E.D. Va. 2003)...........42

*United States v. Pasquariello*, No. 89-6196-Cr-Ungaro-Benages, 1994 U.S. Dist. LEXIS 20924 (S.D. Fla. Apr. 19, 1994) ................................................................................................43

*United States v. Rogan*, 459 F.Supp.2d 692 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ................................................................................................................................38

*United States v. Southland Mgmt. Corp.*, 326 F.3d 669 (5th Cir. 2003) (Jones, J., Concurring).11, 41

*United States v. Taber Extrusions, LP*, 341 F.3d 843 (8th Cir. 2003) .........................................11

*United States v. Warning*, Civil Action No. 93-4541, 1994 U.S. Dist. LEXIS 10402 (E.D. Pa. July 26, 1994)..........................................................................................................10

**Statutes**

28 U.S.C. § 1367(c)(3) ................................................................................................................46

31 U.S.C. § 3729(a)(1) ..................................................................................................................9

31 U.S.C. § 3729(a)(2) ................................................................................................................10

31 U.S.C. § 3729(b) ....................................................................................................................10

31 U.S.C. §§ 3729 *et seq.* ..............................................................................................................1

31 U.S.C. §§ 3729(a)(1)-(2) ..........................................................................................................9

42 U.S.C. § 13951(q) .........................................................................................................37, 38, 39

42 U.S.C. § 13951(q)(1) ..............................................................................................................38

42 U.S.C. § 1395nn ........................................................................................................................1

42 U.S.C. § 1395nn(a)(1)(A) .......................................................................................................35

42 U.S.C. § 1395nn(a)(1)(A)-(B) ..................................................................................................7

42 U.S.C. § 1395nn(a)(1)(B) ..................................................................................................34, 35

42 U.S.C. § 1395nn(e)(2) ..............................................................................................1, 8, 28, 29

42 U.S.C. § 1395nn(h)(5) ............................................................................................................37

**Rules and Regulations**

1979 Fla. Laws 577 ........................................................................................................................3

42 C.F.R. § 411.351 ........................................................................................................7, 14, 29, 34

42 C.F.R. § 411.354 ........................................................................................................................8

42 C.F.R. § 411.354(c)(1) ..............................................................................................................8

42 C.F.R. § 411.354(d)(3) .............................................................................................................32

42 C.F.R. § 411.357(c) ..............................................................................................................9, 28

42 C.F.R. § 411.357(p) .................................................................................................................31

42 C.F.R. § 411.357(p)(2) ............................................................................................................32

Chapter 2003-374, Laws of Florida .................................................................................................4

Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase III), 72 Fed. Reg. 51,012 (Sept. 5, 2007) ....................................................................15

Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, 66 Fed. Reg. 856 (Jan. 4, 2001) .............................................................................................passim

Physicians' Referrals to Health Care Entities With Which Thy Have Financial Relationships (Phase II), 69 Fed. Reg. 16,054 (Mar. 26, 2004) ................................................................9, 30

Treas. Reg. § 31.3121(d)-1(c)(2) ..................................................................................................14

**Secondary Authorities**

Rev. Rul. 87-41, 1987-1 C.B. 296 .........................................................................................12

## I.      INTRODUCTION

Defendants Halifax Hospital Medical Center ("Halifax") and Halifax Staffing hereby move for summary judgment. This case, fundamentally, is about two sets of compensation agreements with certain employed physicians (collectively, the "Physicians").[1] There is no genuine dispute of fact that these agreements do not violate 42 U.S.C. § 1395nn (the "Stark Law") or result in claims that violate 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act" or "FCA"). Nor is the United States entitled to the draconian fines and penalties it demands for its hyper-technical reading of the Stark Law.

The Stark Law is a payment rule, administered by the Centers for Medicare and Medicaid Services ("CMS"), that prohibits Medicare payment for certain types of designated health services ("DHS") if the physician who referred the service has a financial relationship with the entity that provided the service, unless that relationship satisfies one of the exceptions set out in the statute and accompanying regulations. Despite the fact that CMS has vaguely interpreted the Stark Law, Halifax designed its physician agreements in good faith and took the necessary steps to comply with the Stark Law, specifically the criteria of the *Bona Fide* Employment Exception. 42 U.S.C. § 1395nn(e)(2) (hereinafter the "*Bona Fide* Employment Exception"). Pursuant to applicable regulations, Halifax also used reasonable methodologies to assess the fair market value ("FMV") and commercial reasonableness of the Physicians' agreements.

Halifax is entitled to summary judgment with respect to all the Neurosurgeon claims because the United States failed to provide any analysis on the reasonableness of Halifax's FMV methodology under the Stark Law. With respect to the Neurosurgeons, the United States' FMV

---

[1] The Physicians are neurosurgeons Drs. Rohit Khanna, William Kuhn, and Federico Vinas (the "Neurosurgeons"); medical oncologists Drs. Boon Chew, Ruby Anne Deveras, Walter Durkin, Gregory Favis, Abdul Sorathia, Richard Weiss (the "Medical Oncologists"), and gynecological surgeon Dr. Kelly Molpus.

expert, Ms. Kathy McNamara, cannot raise a material dispute of fact regarding the reasonableness of Halifax's FMV methodology because she ignored the law and the testimony of the United States' own 30(b)(6) witness, Troy Barsky, and substituted her own FMV assessment methodology for Halifax's in order to justify her own conclusions. Further, Halifax is entitled to summary judgment because the United States cannot offer evidence that any term of the Neurosurgeons' agreements is illegal or were negotiated, implemented, or paid in anything less than good faith compliance with the Stark Law. Without such evidence, the United States cannot carry its FCA burden to show Halifax knowingly submitted false Medicare claims.

Halifax is also entitled to summary judgment with respect to the Medical Oncologist claims because the United States did not provide an expert opinion on either FMV or commercial reasonableness for the Medical Oncologists' compensation. Halifax staff who negotiated the Medical Oncologists' contracts testified unequivocally the contracts were FMV, any bonuses paid were based upon each Medical Oncologist's personally performed services, they believed the strategy of directly employing physicians was commercially reasonable, compensation was determined by market conditions and Halifax's budget constraints, not by actual or anticipated referrals, and the underlying rationale for the compensation structure was to retain the best physicians at the lowest cost based on market conditions. In opposition, the United States relies solely on an illogical reading of the *Bona Fide* Employment Exception to justify its allegations.

Moreover, all of the United States' FCA claims must fail given the vagueness and ambiguity of the Stark Law. The United States cannot demonstrate a material dispute of fact exists as to the alleged falsity of the claims, or that Halifax acted knowingly in submitting any false claims to the United States. The evidence shows Halifax implemented the incentive bonus for the Medical Oncologists for Fiscal Year 2005 after a good faith, deliberative process,

including an advance, substantive review and approval by the General Counsel, and continued
without issue during Fiscal Years 2006 and 2007. After Relator raised a concern, and before
paying the bonus for Fiscal Year 2008, Halifax sought legal advice from competent outside
counsel that confirmed the incentive bonus complied with the *Bona Fide* Employment Exception.
That counsel for the United States, but no Stark Law expert testifying on its behalf, has a
different interpretation of the requirements of the *Bona Fide* Employment Exception is further
evidence that Halifax could not have acted knowingly when submitting Medicare or Medicaid
claims.

Moreover, the United States' Complaint in Intervention ("Complaint") includes Dr. Kelly
Molpus, an employed gynecological surgeon, but it cannot offer any evidence to rebut the fact
Dr. Molpus never received any incentive bonus payments. Summary judgment is warranted for
any Halifax claims identified by the United States for any services associated with Dr. Molpus.

Last, due to the absence of evidence supporting Causes of Action One through Three, the
United States' common law Causes of Action Four through Six must also be dismissed.

## II.   STATEMENT OF MATERIAL FACTS AND ALLEGATIONS

Halifax is a community hospital owned by the District,[2] and is organized under the laws
of the state of Florida as a special taxing district created pursuant to an act of the Florida
Legislature. *See* 1979 Fla. Laws 577. Halifax provides comprehensive care to the local service
area through a network of organizations including a 764-bed hospital with the only Level II
Trauma Center in Volusia and Flagler Counties. Consistent with Florida law, including 2003-374,
Laws of Florida, and Chapter 768, Florida Statutes, the District created Halifax Staffing, a not-
for-profit Florida corporation, which leases the individuals who staff the District's health care

---

[2] Halifax Hospital Medical Center is a community hospital owned by the residents of the Halifax Special Taxing
District (the "District"). They are one and the same. Halifax Staffing is an instrumentality of the District.

facilities. The District is governed by a Board of Commissioners appointed by the Governor of Florida. *See* Chapter 2003 Fla. Laws 374.

Halifax is the principal charity care provider serving Volusia and Flagler Counties. As one of only 14 member hospitals in Florida's Safety Net Hospital Alliance, Halifax treats all patients who come to its Emergency Department regardless of their ability to pay.[3] In 2009, Halifax provided $76.8 million in community benefits, including uncompensated care to the uninsured, trauma services, and neonatal and pediatric services. *See* Ex. 1 Halifax Health Community Benefits Factsheet.[4] In 2011, Halifax handled over one-third of all admissions in Volusia County – over 23,000. Ex. 2 Volusia County, Florida Hospital Admissions, Calendar Year 2011, *available at*: www.floridahealthfinder.gov.

Halifax provides significant charity-based cancer care. Since charity care is not as lucrative as private practice, many local medical oncologists have elected to enter private practice so as to avoid charity care patients. Ex. 3, Durkin Dep., at 43:5-44:12. As a result, Halifax serves as the safety net provider for cancer patients. Ex. 3, Durkin Dep., at 43:12-19.

Halifax has employed three neurosurgeons, Dr. Khanna, Dr. Kuhn, and Dr. Vinas, since July 7, 2001; February 14, 2003; and July 10, 2000, respectively. Ex. 4, Khanna Decl., ¶ 2; Ex. 5, Kuhn Decl., ¶ 2; Ex. 6, Vinas Decl., ¶ 2. Halifax developed a compensation structure that provides each Neurosurgeon with a base salary plus an incentive bonus equal to the collections for each Neurosurgeon's personally performed services if he exceeds his base salary. The United States alleges that the Neurosurgeons' compensation is excessive and that Halifax submitted

---

[3] *See* Safety Net Hospital Alliance of Florida – Member Hospitals, publicly available at http://safetynetsflorida.org/member-hospitals.
[4] Halifax Health Community Benefits Factsheet, publicly available at http://extranet.acsysweb.com/vsitemanager/Halifax/Public/Upload/SubmittedDocuments/0309-0679%20Community%20Benefits%202012.pdf.

false claims throughout the tenure of each employed Neurosurgeon.

During the relevant time period, Halifax has employed six Medical Oncologists. Dr. Boon Chew, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul Sorathia, and Dr. Richard Weiss were all employed by Halifax when the March 1, 2004 compensation agreements became effective. Dr. Ruby Anne Deveras joined Halifax effective August 23, 2005. Ex. 7, Chew Decl., ¶ 2; Ex. 8, Deveras Decl., ¶ 2; Ex. 9, Durkin Decl., ¶ 2; Ex. 10, Favis Decl., ¶ 2; Ex. 11, Sorathia Decl., ¶ 2; Ex. 12, Weiss Decl., ¶ 2. Beginning March 1, 2004, Halifax's agreements with these physicians provided a modest base salary of $135,000 and two productivity bonuses that Halifax distributed based exclusively on each Medical Oncologist's personally performed services. Ex., 13, Medical Oncology Employment Agreement. Beginning Fiscal Year 2005, Halifax slightly modified the composition of one bonus pool. Halifax calculated the new bonus pool based on 15% of the operating margin of the Medical Oncology Program. The allocation of the bonus pool was, however, still based on each physician's personal productivity. The United States alleges Halifax improperly billed Medicare for medical oncology claims from 2004 through 2010, but only alleges Stark Law violations for the bonuses paid for Fiscal Years 2005 through 2008.

## III.   SUMMARY JUDGMENT LEGAL STANDARD

"Under Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836–37 (11th Cir. 2006).

Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *see also Shurick v. Boeing Co.*, No. 6:07–cv–1974–Orl–31GJK, 2010 WL 258788, at *1-2 (M.D. Fla. Jan. 20, 2010), *aff'd*, 623 F.3d 1114 (11th Cir. 2010).

Under FCA jurisprudence, summary judgment is proper when the party opposing summary judgment fails to provide evidence rebutting affidavits or other evidence presented by the movant explicitly denying certain required elements of the FCA. *See United States ex rel. Kaimowitz v. Ansley*, 250 Fed. Appx. 912, 915 (11th Cir. 2007) (affirming summary judgment, stating, "The Defendants filed affidavits from various individuals explicitly denying the presentation of a false claim to the United States with regard to the transactions surrounding the Boca Club project. Kaimowitz filed nothing in opposition.").

## IV.   LEGAL FRAMEWORK

### A.   The Stark Law

The Stark Law contains a two-part prohibition: (i) a physician may not make a referral to an entity for the furnishing of DHS if the physician has a "financial relationship" with the entity (the "Referral Prohibition"); and (ii) an entity may not submit a claim to Medicare or bill any

party for DHS furnished as a result of a prohibited referral (the "Billing Prohibition").[5] 42 U.S.C. § 1395nn(a)(1)(A)-(B). CMS defines a "referral" as "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] … or a request by a physician that includes the provision of any [DHS] for which payment may be made under Medicare, [or] the establishment of a plan of care …." 42 C.F.R. § 411.351.

A "financial relationship" is, *inter alia*, a "direct or indirect compensation arrangement . . . with an entity that furnishes DHS. 42 C.F.R. § 411.354. A direct compensation arrangement exists if "remuneration passes between the referring physician . . . and the entity furnishing DHS without any intervening persons or entities." 42 C.F.R. § 411.354(c)(1). An employer that has a direct compensation arrangement with a physician may pay incentive compensation that complies with the *Bona Fide* Employment Exception.

Under the *Bona Fide* Employment Exception, an entity may pay the following:

Any amount paid by an employer to a physician (or an immediate family member of such physician) who has a bona fide employment relationship with the employer for the provision of services if—

(A)     the employment is for identifiable services,

(B)     the amount of the remuneration under the employment—

  (i) is consistent with the fair market value of the services, and

  (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

(D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

Subparagraph (B)(ii) shall not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician (or

---

[5] CMS has identified an exhaustive list of Designated Health Services. Ex. 14, 42 C.F.R. § 411.351.

an immediate family member of such physician).

42 U.S.C. § 1395nn(e)(2).

The *Bona Fide* Employment Exception does <u>not</u> require compensation to be set in advance. Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase II), 69 Fed. Reg. 16,054, 16,067 (Mar. 26, 2004). Further, personally performed services do not constitute "referrals." 42 C.F.R. § 411.357(c); 69 Fed. Reg. at 16,067.

        B.      **The False Claims Act**

The United States alleges violations of Sections 3729(a)(1), (2), and (7) of the FCA. To establish a cause of action under the FCA, a plaintiff must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *Kaimowitz*, 250 Fed. Appx. at 915 (citing *United States ex rel. Walker v. R&F Properties of Lake Cnty., Inc.,* 433 F.3d 1349, 1355 (11th Cir. 2005)).

To establish a violation of Section 3729(a)(1), the United States must prove: (1) Halifax presented or caused to be presented to the government a claim for payment; (2) the claim was false or fraudulent; and (3) Halifax knew it was presenting a false or fraudulent claim for payment. *See United States ex rel. Stinson v. Provident Life & Accident Ins. Co*., 721 F. Supp. 1247, 1258-59 (S.D. Fla. 1989); *United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, Civ. No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *13-16 (E.D. Pa. Feb. 11, 2003); *United States ex rel. Wilkins v. North Am. Construction Corp.*, 173 F. Supp. 2d 601, 618-19 (S.D. Tex. 2001). Section 3729(a)(2) requires proof that: (1) Halifax made or caused to be made a record or statement to get a claim against the United States paid; (2) the record or statement and the claim were false or fraudulent; and (3) Halifax knew the record or statement and the claim were false or fraudulent. *See Stinson*, 721 F. Supp. at 1259; *United States v. Warning*, Civ. Action No. 93-

4541, 1994 U.S. Dist. LEXIS 10402, at *10-11 (E.D. Pa. July 26, 1994). Knowing means, with respect to information, a person (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).

Imprecise statements or a difference in interpretation growing out of a disputed legal question are not false under the FCA. *See, e.g.*, *United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1339 (M.D. Ga. 2011); *see also United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 986 (E.D. Wis. 1998) (same). Innocent mistake and mere negligence cannot form the basis for FCA liability. *See United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1074 (9th Cir. 1998); *United States v. Taber Extrusions, LP*, 341 F.3d 843, 845 (8th Cir. 2003); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681 (5th Cir. 2003) (Jones, J., Concurring); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544 (7th Cir. 1999); *Hindo v. Univ. of Health Sciences*, 65 F.3d 608, 613-14 (7th Cir. 1995); *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 771 (N.D. Tex. 2003), *aff'd in part, rev'd in part*, 2008 U.S. App. LEXIS 17946 (5th Cir. 2008) ("Merely submitting a false claim does not show the necessary scienter for fraud."); *Watson*, 2003 U.S. Dist. LEXIS 2054, at *16. The requisite scienter is the "knowing presentation of what is known to be false." *Id.*

## V.   LEGAL ARGUMENT REGARDING FIRST CAUSE OF ACTION ALLEGING VIOLATION OF THE STARK LAW AND 31 U.S.C. §§ 3729(a)(1) and (a)(1)(A)

The Physicians' agreements do not, factually or as a matter of law, violate the Stark Law because they meet the requirements of the *Bona Fide* Employment Exception set forth in Section (IV)(A). There is no material dispute of fact the Physicians' agreements are direct compensation arrangements that provide FMV compensation, are commercially reasonable, and do not impermissibly take into account the volume or value of referrals to Halifax.

Each Physician received a fixed base salary and productivity bonus(es) based on his or her personally performed services, which is what the law requires. The United States' FMV/commercial reasonableness expert, Ms. McNamara, shirked her responsibility to perform a reasonableness analysis of Halifax's FMV assessment methodology.

The United States also cannot carry its burden to offer credible evidence identifying prohibited "referrals" made by the Physicians. The United States' damages rely solely on Medicare claim forms that include many claims for categories of services that, as a matter of law, are not referrals. Ex. 15, Dew Dep., at 148:12-149:4. Halifax provides undisputed evidence as to why patient medical records, not Medicare claim forms, are the only credible evidence for establishing whether a prohibited referral was made, and by whom. The United States could have used patient records to identify referrals but chose not to obtain these records despite repeated requests by Halifax. Ex. 31, First Set of Reqs. for Production from the United States (Feb. 27, 2012). To the extent the United States asserts that the Physicians' agreements were indirect compensation arrangements, there is no dispute of fact the agreements also satisfy the indirect compensation arrangement exception.

A.   **The Neurosurgeon Contracts Are Direct Compensation Arrangements That Comply With The *Bona Fide* Employment Exception**

The United States' case is shockingly devoid of evidence about the compensation market for neurosurgeon services. As set forth by Halifax's FMV/commercial reasonableness expert, the market for neurosurgeons is a highly competitive, national market suffering from a shortage. Ex. 16, O'Brien Rep., at 32. Halifax recruited the Neurosurgeons under these market conditions using reasonable criteria for a Level II Trauma Center in a small, regional market. Ex. 17, Peburn Dep., at 110:22-111:18. The United States' FMV expert ignored the law and the testimony of the United States' own 30(b)(6) witness, Troy Barsky, a CMS employee testifying on the United

States' interpretations of FMV and commercial reasonableness. *See, e.g.*, Ex. 18, McNamara

Dep., at 26:1-4. Instead of performing a reasonableness analysis of Halifax's FMV methodology,

Ms. McNamara substituted, *de novo*, her own FMV methodologies in order to justify her

conclusions. Ms. McNamara also testified that she excluded from her report her findings that

some criteria used by Halifax were commercially reasonable. Ex. 19, McNamara Dep., at

120:11-121:17; 171:4-172:6. Mr. Barsky's testimony makes clear the arbitrary, substitute criteria

relied upon by Ms. McNamara for her Neurosurgeon analysis do not have any basis in the United

States' Stark Law policy, statutes, or regulations.

    1.  <u>There Is No Material Dispute Of Fact That The Neurosurgeon</u>
        <u>Arrangements Are Direct Compensation Arrangements</u>

   There is no material dispute of fact that Halifax's Neurosurgeon agreements constitute

direct compensation arrangements subject to the *Bona Fide* Employment Exception. The Stark

Law defines "employee" as "any individual who, under the common law rules that apply in

determining the employer-employee relationship (as applied for purposes of section 3121(d)(2)

of the Internal Revenue Code of 1986), is considered to be employed by, or an employee of, an

entity." 42 C.F.R. § 411.351; Physicians' Referrals to Health Care Entities With Which They

Have Financial Relationships, 66 Fed. Reg. 856, 946 (Jan. 4, 2001); Ex. 20, Barsky Dep., at

180:20-181:19. Thus, if the relationship between an entity and a particular physician meets the

employment test adopted by the Internal Revenue Service ("IRS"), the physician is considered an

employee of that entity for purposes of the Stark Law.

   Under the IRS test, a common law employer-employee relationship exists when the

person for whom services are performed has the right to "control and direct the individual who

performs the services, not only as to the result to be accomplished by the work but also as to the

details and means by which that result is accomplished." Treas. Reg. § 31.3121(d)-1(c)(2). The

IRS uses 20 non-exclusive factors to determine the existence of an employment relationship. Ex. 21, Rev. Rul. 87-41, 1987-1 C.B. 296, 298-99; *see also James v. Comm'r*, 25 T.C. 1296 (1956) (finding a pathologist was a hospital employee because of the integration of his work to the hospital and community need for his services). The Eleventh Circuit has adopted the IRS' 20-factor test for an analysis of an employee's status. *Hosp. Res. Pers. v. United States*, 68 F.3d 421, 427 (11th Cir. 1995) (citing Rev. Rul. 87-41, 1987-1 C.B. 296). The IRS uses the 20-factor test to analyze "the employee status of physicians practicing medicine in a hospital setting." Ex. 22, I.R.S. Proposed Coordinated Issue Paper, Employee Status of Hospital-Based Physicians and on Student Nurse Exclusion from Definition of Employment (Mar. 26, 1993) (the "Proposed Coordinated Issue Paper"). The IRS focuses on "whether the institution has the right to direct and control the manner and means of the business aspects of the physician's medical practice." *Id.* CMS states:

> . . . the actual conduct of the relationship is determinative. To determine whether an employer-employee relationship exists, the various factors, including those regarding supervision, used by the Internal Revenue Service (IRS) to determine employee status apply. Whereas the receipt of a W–2 from an entity and the written terms of the arrangement are relevant, neither controls whether an individual meets the definition of ''employee'' for purposes of the physician self-referral law; rather, the focus is on the actual relationship between the parties.

Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase III), 72 Fed. Reg. 51,012, 51,014 (Sept. 5, 2007).

Under the IRS test, Halifax is the Neurosurgeons' employer for Stark Law purposes. Halifax sets the budget for the neurosurgery department and bills Medicare and private payers for Neurosurgeon services. The Neurosurgeons must comply with all medical staff bylaws, and Halifax manages their practices. Ex. 23, Peburn Dep., at 271:23-273:3. Halifax – through the hospital's chief of staff and its Board of Directors – has ultimate oversight over these physicians. Ex. 24, Peburn Dep., at 279:6-281:20. The Neurosurgeon services have been fully integrated into

Halifax's services, with all services performed on Halifax's campus. Ex. 25, Dr. Khanna Dep., at 16:10-23. In addition, Halifax pays for certain business expenses, including continuing medical education, computer hardware and software, and office furniture. Ex. 26, Vinas Dep., at 39:17-41:11. Indeed, the Physicians believe Halifax is their employer. *See, e.g.*, Ex. 27, Khanna Dep., at 11:18-24.

Halifax Staffing is merely an alter ego of Halifax established to enable Halifax to move its employees from the Florida state retirement system into a self-funded retirement program. Ex. 29, Peburn Dep., at 122:7-123:6. The IRS confirmed in a 1995 ruling letter obtained in connection with the creation of Halifax Staffing that the entity is an instrumentality of Halifax. Ex. 30, IRS Ruling Letter; Ex. 23, Peburn Dep., at 271:25-272:5. Halifax Staffing has no board of its own, instead sharing Halifax's Board of Commissioners. Ex. 32, Peburn Dep., at 238:4-21. Halifax Staffing's only bank account is a zero-balance sweep account funded solely through direct transfers from Halifax's bank accounts in order to satisfy employee payroll. Ex. 33, Halifax Staffing Bank Account Info.; Ex. 23, Peburn Dep., at 272:6-13. Moreover, CMS has expressly stated leased employees may qualify as *bona fide* employees under the relevant tests: "to the extent that a leased employee is a bona fide employee of the DHS entity under IRS rules, remuneration paid to that employee would be eligible under the [*bona fide* employment] exception." 69 Fed. Reg. at 16,087.

The United States' evidence to the contrary is superficial. Payment of employee salaries, issuance of W-2 tax forms and the fact that several of the Physicians' agreements identify Halifax Staffing as the counterparty are insufficient to establish Halifax Staffing as the Physicians' employer. The Court should find as a matter of law that the totality of the factors shows that the Neurosurgeons are Halifax employees.

2.     **Halifax's Compensation Arrangements With The Neurosurgeons Comply With The *Bona Fide* Employment Exception.**

a.     The Compensation Is Fair Market Value

(i)     A Provider May Use Any Reasonable Method To Determine FMV In Compliance With The Stark Law

It is undisputed that CMS is prohibited from opining on FMV and accepts "any method that is commercially reasonable and provides [CMS] with evidence that the compensation is comparable to what is ordinarily paid for an item or service in the location at issue, by parties in arm's length transactions who are not in a position to refer to one another." 66 Fed. Reg. at 944. The United States' 30(b)(6) witness confirmed this. Ex. 34, Barsky Dep., at 65:17-66:16. The United States' FMV expert agreed that a provider may use "any method that is commercially reasonable." Ex. 35, McNamara Dep., at 161:11-162:13. CMS does not require independent valuations by outside consultants. 66 Fed. Reg. at 945. Accordingly, the appropriate inquiry is whether Halifax used a reasonable methodology to conduct its FMV review, not whether the United States' expert could come to the opposite conclusion using her own FMV methodology. 66 Fed. Reg. at 944 ("The burden of establishing the 'fairness' of an agreement rests with the parties involved in the agreement.").

Halifax's process complied with the widely discretionary FMV guidance published by CMS. As stated by Halifax's expert, Kevin O'Brien, the test is whether the compensation is justified by the level of productivity of the physician. Ex. 16, O'Brien Rep., at 12. Mr. Barsky testified that third-party comparative salary survey "percentiles" are irrelevant to FMV, and that CMS assigns no weight to whether compensation falls within the 50th, 75th, or 90th percentile of any third-party comparative survey. Ex. 36, Barsky Dep., at 82:4-86:22.

Halifax has always analyzed the FMV of each physician contract. Ex. 37, Peburn Dep., at 31:4-13; Ex. 38, Lang Dep., at 19:11-20:5; Ex. 39, Rousis Dep. (Nov. 1, 2012), at 251:4-18; Ex.

40, Rousis Dep. (Feb. 20, 2013), at 32:6-37:17. Mr. Barsky testified that while parties should

"consider" obtaining written assurances, the presence of a writing regarding FMV is not required.

66 Fed. Reg. at 966; Ex. 41, Barsky Dep., at 69:1-71:2. Halifax employees used third-party

compensation data from sources including Medical Group Management Association, Sullivan,

Cotter & Associates, and Estes and Associates in negotiating physician agreements. Ex. 42,

Peburn Dep., at 38:12-39:8, 46:21-47:7; Ex. 38, Lang Dep., at 19:11-20:5. In Stark Law

preamble guidance, CMS has previously deemed various third-party survey sources as reliable

for this purpose. 69 Fed. Reg. at 16,128.

    Halifax is the only Level II Trauma Center in its region, so it reviewed compensation

data from other Level II Trauma Centers when negotiating the Neurosurgeons' employment

agreements and amendments. Ex. 44, Peburn Dep., at 38:12-39:8, 67:5-9, 103:4-17; Ex. 38, Lang

Dep., at 19:11-20:5; Ex. 45, Cason Dep., at 32:22-33:3. CMS agrees with this approach where

there are no local comparables. 66 Fed. Reg. at 944. The Legal Department reviewed each

agreement, including the terms of the financial arrangements, to ensure they complied with the

FMV criterion of the *Bona Fide* Employment Exception. Ex. 46, Peburn Dep., at 67:20-69:22;

Ex. 47, Halifax Compliance Standards No. LL-101; Ex. 45, Cason Dep., at 32:19-33:6. Further,

Halifax had procedures in place to regularly reassess the terms of the physician contracts because

of the competitive markets for specialty physicians. Ex. 43, Peburn Dep., at 40:21-41:8.

    (ii)    Halifax's Neurosurgeon Compensation Was FMV

    Each time Halifax looked at comparables and the third-party compensation data, it

concluded the compensation was FMV based on their high productivity, significant levels of

charity care, and the call coverage they provided for the Level II Trauma Center.[6] *See, e.g.*, Ex. 6, Vinas Decl. Halifax knew similar trauma centers paid substantially more than Halifax for call coverage. Ex. 48, Lang Dep., at 149:17-150:11. Halifax's expert, Mr. O'Brien, analyzed the compensation per relative value unit of work ("wRVU"),[7] a measurement of productivity CMS has adopted to assess the relative level of time, skill, training, and intensity of a procedure. Ex. 16, O'Brien Rep., at 12. The compensation per wRVU methodology correlates compensation to productivity. Ex. 16, O'Brien Rep., at 12; Ex. 49, McNamara Rep., at 10. Mr. O'Brien concluded each Neurosurgeon's compensation was FMV based on his productivity.

In response to assertions that the Neurosurgeons' productivity was suspect, Mr. O'Brien took the additional step of assuming, *arguendo*, all of the billing and coding allegations raised by the United States' expert were true. Ex. 16, O'Brien Rep., at 13-16. For all of the CPT codes associated with the allegations, Mr. O'Brien substituted an average wRVU for the wRVUs reported by each Neurosurgeon.[8] *Id.* at 14. This step eliminated any impact of the allegations on the Neurosurgeon's overall productivity. *Id.* Mr. O'Brien's conclusions did not change. *Id.* at 19.

Mr. O'Brien also assessed the accuracy of the Neurosurgeons' surgical logs. Ex. 51, O'Brien Dep., at 254:19-255:2. In doing so, he verified that "the neurosurgeons completed their surgeries in significantly less time than suggested in the CMS Physician Time File."[9] Ex. 16, O'Brien Rep., at 17. The Neurosurgeons simply work longer and more efficiently than the average physician. Ex. 52, Lewis Dep., at 54:5-9; Ex. 53, Vinas Dep., at 127:21-128:2. Halifax's

---

[6] Halifax also considered these comparables when determining the appropriate payment for the call coverage and trauma services the Neurosurgeons provide. Ex. 50, Lewis Dep., at 47:15-48:24.
[7] A unique wRVU is assigned to each Current Procedural Terminology (CPT®) code, which is used to report procedures.
[8] Mr. O'Brien assumed an average level of productivity for these codes based upon an expected distribution for neurosurgeons in Florida. Ex. 16, O'Brien Rep., at 15.
[9] The CMS Physician Time File contains time averages per CPT code based on physician surveys. http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/PhysicianFeeSched/PFS-Federal-Regulation-Notices-Items/CMS-1590-FC.html?DLPage=1&DLSort=3&DLSortDir=descending.

Neurosurgeons are high wage earners. However, their income is consistent with the range of publicly available tax data from other non-profit hospitals, as compiled by Halifax's FMV expert. Ex. 54, Neurosurgeon Compensation at Not-For-Profit Entities. Several neurosurgeons on the chart earn substantially more than the Neurosurgeons. *Id.* Ms. McNamara's report also summarizes the Neurosurgeons' annual compensation for the relevant years and shows their compensation falls within the appropriate range. Ex. 49, McNamara Rep., at 4.

(iii)    The United States Cannot Produce Any Credible Evidence<br>That Halifax's FMV Methodology Was Unreasonable

The United States cannot offer credible expert testimony establishing that Halifax's FMV methodology was unreasonable. Ms. McNamara did not reach any conclusions in her report about the reasonableness of Halifax's FMV methodology. Her report reflects only her personal opinions about the terms of the compensation arrangements, instead of any actual step-by-step analysis of how Halifax performed its FMV assessment. *See generally United States ex rel. Samuel L. Armfield, III, and Patricia Armfield v. James P. Gills, et al.*, Case No. 8:07-cv-2374-T-27TBM, 2012 U.S. Dist. LEXIS 154749 (M.D. Fla. Oct. 29, 2012) (finding that in order to defeat summary judgment, the party must submit an expert report).

Ms. McNamara's report often directly conflicts with Mr. Barsky's 30(b)(6) testimony on FMV. Ms. McNamara testified she did not use – or even review – CMS policies or statements about FMV methodologies when developing her report. Ex. 55, McNamara Dep., at 41:11-42:7. Nor did she even know about or take into account Mr. Barsky's testimony, taken three months before her report was submitted on December 21, 2012. Ex. 56 McNamara Dep., at 26:1-27:11, 35:22-36:20, 39:15-22. Ms. McNamara testified "[t]ypically when I have done such reports, I have not reviewed the deposition testimony of CMS representatives . . . I have felt -- I didn't feel it was necessary, because I feel I have a good level of understanding and expertise in the subject

matter." Ex. 56, McNamara Dep., at 36:11-20. Mr. Barsky stated parties to an agreement are responsible for determining FMV, but Ms. McNamara ignored his testimony while agreeing his statement could be relevant to her conclusions. Ex. 57, McNamara Dep., at 39:10-42:12.

To the extent Ms. McNamara performed an analysis, she did not offer benchmarking data from comparable Level II Trauma Centers to counter Halifax's fact witness and expert testimony, or discuss how her FMV methodologies reflect – or even take into consideration – the guidance published by CMS. Ex. 58, McNamara Dep., at 392:16-393:4. Instead, Ms. McNamara reached outside her area of expertise to insinuate the Neurosurgeons faked their productivity through three schemes for which she has done no independent analysis or investigation. Ex. 59, McNamara Dep., at 288:5-19; 296:7-22. Ms. McNamara, a certified public accountant, not a clinician, opined that the Neurosurgeons' compensation was inflated because (i) Dr. Vinas allegedly conducted medically unnecessary surgeries; (ii) Dr. Khanna and Dr. Vinas allegedly improperly billed for services performed by certain medical assistants; and (iii) Dr. Khanna allegedly improperly coded certain procedures. Ex. 49, McNamara Rep., at 20-24.

None of these allegations have any credible support, and Ms. McNamara's report is devoid of any actual analysis of how these allegations, even if true, would materially impact the Neurosurgeons' productivity data. Ex. 60, McNamara Dep., at 306:16-307:14. As set forth in Section (2)(a)(ii), Halifax's expert verified the accuracy of the Neurosurgeons' wRVUs, while Ms. McNamara did not undertake the same steps. Other Halifax experts, Dr. Schoettle and David Yarin, examined the clinical medical necessity and the statistical relevance of the United States' evidence, the AllMed Report. Mr. Yarin concluded the AllMed Report was not credible because the process was not consistent with Halifax's peer review process. Ex. 61, Yarin Rep., at 5. Relator admitted to cherry-picking the cases forming the sample, admitted the sample was not

statistically valid or representative, and failed to ensure the AllMed reviewers received complete medical records. Ex. 61, Yarin Rep., at 6; Ex. 62, Relator Dep., at 114:7-120:12. Moreover, the AllMed Report neither identified the reviewers' qualifications nor the medical necessity criteria used to reach their conclusions. Ex. 61, Yarin Rep., at 7. Dr. Schoettle performed an independent review of the complete medical record for each case in the AllMed Report and determined all of Dr. Vinas' procedures were medically necessary and surgically sound. Ex. 63, Schoettle Rep., at 3-16. The United States does not dispute Dr. Schoettle's or Mr. Yarin's findings.

Based on her failure to perform the proper analysis of Halifax's FMV methodology and her disregard of the United States' 30(b)(6) testimony, this Court should disregard any FMV opinions in Ms. McNamara's report.

        b.      <u>Halifax Had A Commercially Reasonable Rationale For The Neurosurgeon Agreements</u>

The Neurosurgeon agreement terms were commercially reasonable. CMS allows the parties to an agreement to use "any reasonable method of valuation" to arrive at commercially reasonable terms, and accords wide latitude to the parties. 66 Fed. Reg. at 919; Ex. 64, Barsky Dep., at 38:12-39:2, 40:1-17, 41. According to CMS' vague guidance, a commercial reasonableness analysis must assess whether the agreement would make commercial sense for a "reasonable entity of similar type and size and a reasonable physician . . . of similar scope and specialty" in the absence of referrals. 69 Fed. Reg. at 16,093.

Halifax's expert testified hospitals must consider whether the arrangement is reasonable given the availability of specialty physicians; the trauma designation of the hospital; the need to provide indigent care; and the need for the hospital to succeed in its mission. Ex. 65, O'Brien Dep., at 80:3-11. Halifax's other commercial reasonableness expert testified that "the projected physician supply needs relative to a population that's within a defined service area." Ex. 66,

Vance Dep., at 86:9-11; *see also* Ex. 67, Vance Rep., at 5. Ms. McNamara agreed that the analysis must assess whether "there is a particular specialty that is not prevalent or not available in the community . . . ." Ex. 68, McNamara Dep., at 72:22-73:14. Halifax did exactly that in determining commercially reasonable compensation for its Neurosurgeons.

The evidence shows Halifax identified an unmet community need for neurosurgical call coverage and undertook to fill this need despite a widely known nationwide neurosurgeon shortage. Ex. 69, Peburn Dep., at 82:4-83:10, 110:20-113:5, 118:2-8.[10] As a Level II Trauma Center, Florida requires Halifax to have a neurosurgeon available at all times.[11] This is an onerous obligation on on-call Neurosurgeons to stay within reach of the hospital, and required Halifax to consider this burden when negotiating with the Neurosurgeons. Ex. 50, Lewis Dep., at 47:15-48:3. Ms. McNamara's commercial reasonableness opinion gives no consideration to the special staffing obligations of a "reasonable entity of similar type and size," *i.e.*, another Level II Trauma Center. Ex. 70, *Id.* at 229:5-14. Yet in her testimony, she admitted to intentionally excluding from her report her conclusion that it was commercially reasonable for Halifax to employ the Neurosurgeons to provide call coverage. Ex. 71, McNamara Dep., at 121:10-17.

The United States' commercial reasonableness argument is based on the flawed and unsupported position it is commercially unreasonable for a hospital to run unprofitable physician practices. Ms. McNamara asserted it "does not make sense from a business prospective [sic]" to pay a bonus of 100 percent of cash collections after recovering the base salary. Ex. 49, McNamara Rep., at 28. Ms. McNamara's testimony contradicted her report: "I'm not stating that it's commercially unreasonableness to incur a loss. Hospitals do incur losses at various

---

[10] Gottfried, ON, Rovit RL et al. Neurosurgical workforce trends in the United States. J. Neurosurgery. 102:2 (2005). *See also* Ex. 16, O'Brien Rep., at 31-32.
[11] Fl. Dep't Health, Trauma Center Standards, chpt. 3, Standard III(B) (Jan. 2010), *available at* http://www.doh.state.fl.us/demo/trauma/PDFs/TraumaCntrStandDOHPamphlet150-9-2009rev1-14-10-FinalVer.pdf.

departments." Ex. 72, McNamara Dep., at 221:22-222:2. She also testified recently at trial as an expert that it can be commercially reasonable to pay a specialist more money than they collect. Ex. 73, McNamara Tuomey testimony, Trial Transcript (Apr. 24, 2013), 36:24-37:2. In addition, the United States' 30(b)(6) not-for-profit witness, Dr. Daniel Duvall, testified CMS does not have any policy requiring a hospital service line to be profitable, underscoring the arbitrary and contradictory criteria Ms. McNamara employed. Ex. 74, Duvall Dep., at 46:10-47:3.

Ms. McNamara's analysis ignored the financial burden to Halifax of the extensive charity care the Neurosurgeons provided. Charity care meets a community need, and the Neurosurgeons should be compensated for non-revenue-generating patient care. Ex. 75, Peburn Dep., at 141:13-143:19. Halifax reasonably considered a physician's obligation to provide substantial charity care when negotiating the Neurosurgeons' agreements. Ex. 76, Peburn Dep., at 103:12-17; Ex. 77, Henley Letter. The IRS has agreed it is appropriate for non-profit hospitals to compensate physicians for treating charity care patients. *See* Revenue Ruling 97-21, 1997-1, C.B. 121.

       c.    The Incentive Compensation For The Neurosurgeons Was A Permissible Productivity Bonus

As shown in Section IV(A), the *Bona Fide* Employment Exception expressly permits the Neurosurgeons' productivity bonuses. There is no evidence the compensation arrangements take into account the volume or value of referrals to Halifax because the productivity bonuses were based solely on the services that each Neurosurgeon personally performed. Moreover, CMS agrees the productivity bonuses are proper *even if* there is a corresponding DHS associated with the personally performed service (*e.g.*, a facility fee). 69 Fed. Reg. at 16,088-89.

       **B.**     **The Medical Oncologists' Contracts Are Direct Compensation Arrangements Complying With The *Bona Fide* Employment Exception**

The *Bona Fide* Employment Exception expressly permits the personal productivity

bonuses that were paid to the Medical Oncologists, and the United States has not offered any evidence to suggest that the compensation arrangements with the Medical Oncologists fail to meet the other requirements of the *Bona Fide* Employment Exception. The United States asserts the operating margin bonus constitutes impermissible compensation, despite the undisputed fact this bonus is a productivity bonus based on each Medical Oncologist's personally performed services. With respect to FMV and commercial reasonableness, the United States elected not to obtain any expert opinion on the Medical Oncologists' agreements. Halifax is entitled to judgment as a matter of law that the compensation arrangements with the six Medical Oncologists for Fiscal Years 2005 through 2008 comply with the *Bona Fide* Employment Exception. Halifax is also entitled to judgment as a matter of law as to the Stark Law compliance of the terms of any other Medical Oncology agreements in the years prior or subsequent.

1.      The Medical Oncology Contracts Are Direct Compensation Arrangements

There is no material dispute of fact the Medical Oncologists are employees of Halifax. The analysis and conclusions in Section V(A)(1) above with respect to the Neurosurgeons apply equally to the Medical Oncologists. Accordingly, Halifax is entitled to judgment as a matter of law the agreements with the Medical Oncologists are direct compensation arrangements.

2.      It Is Undisputed The Medical Oncologists' Contracts Are Fair Market
        Value And Commercially Reasonable

Halifax's expert provided uncontroverted testimony that the Medical Oncologists' compensation was FMV and commercially reasonable. Ex. 16, O'Brien Rep., at 11, 22; Ex. 69, Peburn Dep., at 110:15-113:5. The United States' expert excluded the Medical Oncologists entirely from the scope of her final report even though the statement of work in her initial expert report included an FMV and commercial reasonableness analysis of their contracts. Ex. 49, McNamara Rep. (Aug. 31, 2012); Ex. 78, McNamara Dep., at 93:3-13, 99:2-12. The United

States cannot deny, however, that Ms. McNamara agreed Exhibit D of her initial report included "many instances where the physician compensation was below what [she] calculated to be the MGMA median cash compensation." Ex. 79, McNamara Dep., at 97:6-13. As such, the evidence indisputably shows the compensation paid to the Medical Oncologists met the FMV and commercial reasonableness criteria of the *Bona Fide* Employment Exception.

        3.    <u>As A Matter Of Law, The Medical Oncologists' Compensation Includes A Permissible Productivity Bonus Because The Payment Of The Bonus Was Based On Each Medical Oncologist's Personally Performed Services</u>

The United States premises its entire case against the Medical Oncologists' agreements on a flawed argument that the bonuses paid out of a pool funded by the Medical Oncology Department's operating margin in Fiscal Years 2005 through 2008 impermissibly took into account the volume or value of referrals. This count fails as a matter of law because the *Bona Fide* Employment Exception makes clear the prohibition on compensation taking into account the volume or value of referrals does not apply to productivity bonuses based on a physician's personally performed services. Indeed, CMS revised the definition of "referral" to affirmatively exclude personally performed services from the definition. 66 Fed. Reg. at 871.

The Medical Oncologists' bonuses were calculated on the basis of each physician's own personal productivity. Ex. 80, Cason Dep., at 108:22-110:9; Ex. 81, Peburn Dep., at 199:4-200:2; Ex. 82, Garthwaite Dep., at 228:2-10. The text of the statutory exception is unambiguous, and states as follows:

      (2) Any amount paid by an employer to a physician [. . .] who has a *bona fide* employment relationship with the employer for the provision of services if—
[. . .]
      (B) the amount of the remuneration under the employment—
         (i) is consistent with the fair market value of the services, and
         (ii) is not determined in any manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician […]

<u>Subparagraph (B)(ii) shall not prohibit the payment of remuneration in the form</u>

<u>of a productivity bonus based on services performed personally by the physician</u>
<u>(or an immediate family member of such physician).</u>

42 U.S.C. § 1395nn(e)(2) (emphasis added); *see also* 42 C.F.R. § 411.357(c).

The prohibition on compensation that *directly* or *indirectly* takes into account the volume or value of referrals generated by the physician in subparagraph (B)(ii) is limited by the phrase at the end of the statutory provision, which protects all productivity bonuses that are allocated based on personally performed services. The productivity bonus qualification limits, and is not in addition to, subparagraph (B)(ii). In fact, the productivity bonus provision nullifies the volume or value of referral prohibition in (B)(ii) when the bonus is allocated based on personally performed services. 42 U.S.C. § 1395nn(e)(2). Ex. 83, Barsky Dep., at 151:2-9 ("So generally, if a physician is personally performing services, essentially, if they're referring to themselves for services with services that they perform personally, it's not even considered a referral for purposes of the Stark law, you don't even need to determine whether you fit within an exception, because you haven't even violated the law.").

Through regulations, CMS removed personally performed services from the definition of "referral." 42 C.F.R. § 411.351; Ex. 83, Barsky Dep., at 151:2-9. Logically, there is no benefit from the productivity bonus provision if only personally performed services can apply because those services do not need the safe harbor provided by the provision since they are not even referrals. The statute is not clear what services are protected by the productivity bonus provision if not personally performed services. As such, so long as the bonus is allocated based upon the physician's personally performed services, it complies with the productivity bonus provision.

Here, there is no dispute Halifax allocated and distributed the bonus pool based solely on each Medical Oncologist's personal productivity. Ex. 108, Peburn Dep., at 198:19-199:3. The Medical Oncology bonuses allow the physician's compensation to vary based upon how hard she

works, *not* based on referrals of DHS. 42 U.S.C. § 1395nn(e)(2).

The United States argues the bonus payments *indirectly* took into account the volume or value of referrals. The evidence of the purported indirect connection is irrelevant because the productivity bonus provision nullifies the volume or value of referrals provision in the *Bona Fide* Employment Exception. Further, the evidence of this purported indirect connection is tenuous at best. The department's operating margin, of which only 15% was included in the bonus pool, is influenced by a host of financial metrics that bear no relation to the volume or value of referrals, such as the salary costs of ancillary support staff. The *Bona Fide* Employment Exception does not require compensation to be set in advance, and, in any case, expressly permits percentage compensation if the *methodology* is set in advance and does not change over the course of the arrangement. 69 Fed. Reg. at 16,066. Of course, individual physicians could not be paid a percentage of the revenues generated by their referrals, but that is not what is happening here. The percentage of the operating margin, which bears at most an attenuated relationship to referrals, simply determines the size of the pool, and not the amount of any individual physician's distribution, which is based on the physician's personal productivity.

Halifax did not calculate the bonus pool to maximize the inclusion of DHS. Halifax calculated the operating margin to include outpatient prescription drugs and facility fees associated with outpatient office visits, but excluded revenue from laboratory services, radiology services, and inpatient services. Ex. 84, Foster Dep., at 69:2-71:3; Ex. 85, Garthwaite Dep., at 66:13-67:24. As shown by Exhibit 86, each Medical Oncologist's annual compensation bore no correlation to the volume or value of his or her referrals, but rather to their personal productivity. Ex. 86, Medical Oncology Compensation Graph.

C.   **The Compensation Arrangement With Dr. Molpus Satisfies The *Bona Fide* Employment Exception.**

Dr. Molpus is erroneously identified by the United States as a Medical Oncologist, and is actually a gynecological oncologist compensated under an entirely different compensation arrangement. Dr. Molpus' compensation arrangement complied with the *Bona Fide* Employment Exception in all respects. The United States' FMV/commercial reasonableness expert did not include any analysis or conclusions about his compensation in her final report. Ex. 49, McNamara Rep. More importantly, there is no dispute of fact Dr. Molpus was never paid an incentive bonus of the kind paid to the Medical Oncologists. *See* Dr. Molpus Decl. Ex. 87,; Ex. 88, Garthwaite Dep., at 40:2-41:15, 105:23-106:4. Dr. Molpus was eligible for incentive bonus, but these bonuses were never paid. Ex. 89, Garthwaite Dep., at 125:6-17; Ex. 87, Molpus Decl. Ex. 89, Garthwaite Dep., at 125:18-25; Ex. 87, Molpus Decl. Accordingly, Halifax is entitled to judgment as to any claims associated with Dr. Molpus.

D.   **The Compensation Arrangements With The Physicians Also Satisfy The Indirect Compensation Arrangement Exception**

Even if this Court determines that Halifax has an indirect compensation arrangement with the physicians listed in the Complaint, Halifax is entitled to judgment as a matter of law that the arrangements with the Neurosurgeons and Medical Oncologists satisfy the indirect compensation arrangement exception and that the United States has not identified any prohibited referrals to Halifax Staffing by the Physicians. 42 C.F.R. § 411.357(p).

This exception protects an indirect compensation arrangement between a physician and the entity furnishing DHS if the following are met: (1) the physician's compensation is FMV and not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the DHS entity; (2) for *bona fide* employment relationships, the contract is for identifiable services and is commercially reasonable even if no

referrals are *made to Halifax Staffing*; and (3) the compensation arrangement does not violate the

Anti-Kickback Statute ("AKS"). *Id.* (emphasis added). The exception has no requirement that the

compensation to the physician be set in advance. CMS' position is that "all physicians, whether

employees, independent contractors, or academic medical center physicians, can be paid

productivity bonuses based on work they personally perform." 69 Fed. Reg. at 16,067.

> 1.    All Of The Physician Arrangements Were Commercially Reasonable In
>       The Absence Of Referrals To Halifax Staffing

If the Physicians' agreements were indirect with Halifax Staffing as the employer, they

were commercially reasonable for the reasons set forth in Sections V(A)(2)(b) and V(B)(2)(c),

and because there were no referrals to Halifax Staffing that could have unduly influenced the

terms in the agreements. 42 C.F.R. § 411.357(p)(2); Ex. 49, McNamara Rep., at 31.

> 2.    None Of The Physician Agreements Violated The Anti-Kickback Statute,
>       Nor Does the United States Allege They Did

There is no material dispute of fact that there is no evidence any of the Physicians'

agreements violated the AKS, and the United States does not allege that they do.

> 3.    The Compensation Arrangements With The Neurosurgeons Satisfy All
>       Criteria In The Indirect Compensation Arrangement Exception

As stated in Section V(A)(2)(a) of this motion, Halifax's Neurosurgeons' agreements are

based on FMV. Ex. 90, Peburn Decl.; Ex. 91, Peburn Dep., at 102:14-103:17. Further, their

compensation was not determined in any manner that takes into account the volume or value of

referrals or other business generated because the compensation was based solely on personally

performed services. CMS has made clear productivity bonuses based on personally performed

services are permissible for all physicians. 69 Fed. Reg. at 16,067 ("The result of these

interpretations is that all physicians, whether employees, independent contractors, or academic

medical center physicians, can be paid productivity bonuses based on work they personally

perform."). CMS has determined "other business generated" excludes personally performed services. 42 C.F.R. § 411.354(d)(3). Halifax is entitled to judgment as a matter of law the Neurosurgeons' agreements satisfy the indirect compensation arrangement exception.

4.   The Medical Oncologists' Arrangements Do Not Take Into Account The Volume Or Value Of Referrals Or Other Business Generated

The United States has not offered any expert evidence that the Medical Oncologists' agreements were not FMV.  Nor was the Medical Oncologists' compensation determined in a manner that took into account the volume or value of referrals or other business generated because it was derived from a fixed salary and productivity bonuses. The bonuses paid for Fiscal Years 2005 through 2008 were distributed exclusively on the basis of each individual Medical Oncologist's personally performed services. CMS expressly excluded personally performed services from the definition of referral so that a "productivity bonus based on personally performed work would not be based on the volume or value of referrals." 69 Fed. Reg. at 16,067. There is no question, as a matter of law, that physicians may receive personal productivity bonuses. Moreover, the undisputed facts make clear the Medical Oncologists' compensation did not, in practice, vary with the volume or value of referrals to Halifax. *See* Ex. 86. For the foregoing reasons, Halifax is entitled to judgment as a matter of law that the Medical Oncology agreements satisfy the indirect compensation arrangement exception.

E.   **The United States Erroneously Includes Claims That Are Not Implicated By The Stark Law**

Thousands of claims included by the United States cannot, as a matter of law, reflect referrals covered by the Stark Law's Billing Prohibition. The United States bears the burden of establishing a referral was made to an entity, *i.e.*, Halifax violated the Billing Prohibition by submitting claims for services resulting from prohibited referrals. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009) ("Once the plaintiff or the government has

28

established proof of each element of a violation under the [Stark] Act, the burden shifts to the

defendant to establish that the conduct was protected by an exception."). The United States'

purported claims expert, Ian Dew, analyzed hospital inpatient and outpatient claims, which

reflect the facility or technical fee component of services rendered to Medicare beneficiaries, and

non-institutional outpatient claims, which reflect the professional fees for services rendered to

Medicare beneficiaries ("Carrier Claims"). Mr. Dew's analysis blindly relies on information

reflected on Halifax Medicare claim forms as proof of purported referrals and, therefore includes

thousands of claims that cannot under any circumstances be evidence of prohibited referrals.

1.   Evaluation And Management Services Are Not DHS

The Stark Law prohibits the submission of claims for DHS. 42 U.S.C. § 1395nn(a)(1)(B).

The regulations contain an exhaustive list of items and services that are DHS. E&M services are

not on that list. 42 C.F.R. § 411.351; *see also* Moran Rep., at 15. The United States' 30(b)(6)

witness agreed E&M services are not DHS. Ex. 92, Stone Dep., at 37:4-6. Nonetheless, Mr. Dew

included Carrier Claims where the only services reported are professional E&M services. These

are not claims *for DHS* and must be dismissed as not subject to the Billing Prohibition.

2.   Physicians' Professional Services At Issue Are Not DHS

As discussed in Section V(A), personally performed services are, by definition, not

"referrals," even when for DHS. 42 C.F.R. § 411.351; 66 Fed. Reg. at 871; Ex. 93, Barsky Dep.,

at 150:16-152:16. Accordingly, a claim for personally performed services does not violate the

Billing Prohibition because there has been no "referral" for Stark Law purposes – even if the

treating physician has a prohibited financial relationship with the entity.

It is undisputed that when a physician is listed in the "Rendering Provider" field on a

Carrier Claim, it is a professional physician service, which are not DHS. Ex. 94, 30(b)(6) Sandlin

Dep., at 180:1-3; Ex. 95, Moran Rep., at 16. Even if they are DHS, personally performed

services are not DHS. Despite this undisputed fact, Mr. Dew included Carrier Claims where at

least one of the Physicians was a "Rendering Provider." These claims forms do not, therefore,

identify prohibited "referrals" by the Physician. Halifax is entitled to judgment as a matter of law

on all of these Carrier Claims where a Physician is identified as the Rendering Provider.

3.   Claims For Services Performed On Patients Who Self-Referred To Halifax
Are Not Subject To The Stark Law Billing Prohibition.

The Stark Law Referral Prohibition does not prohibit claims for payment where there has

been no "referral." The Referral Prohibition prohibits referrals "to the entity" if the physician has

a financial relationship with that entity. 42 U.S.C. § 1395nn(a)(1)(A). The Billing Prohibition, in

turn, prohibits the submission of claims for services furnished in violation of the Referral

Prohibition. 42 U.S.C. § 1395nn(a)(1)(B). CMS has stated, "[T]he relevant inquiry is whether the

physician has made a referral, directly or indirectly, to the entity furnishing DHS, in other words,

whether he or she is referring 'to' that entity." 66 Fed. Reg. at 873.

Many Halifax claims reflect services furnished to patients that were either self-referred to

Halifax's Emergency Department or were transferred from an unrelated provider. Ex. 95, Moran

Rep., at 13-14; Ex. 96, Sandlin Dep., at 86:14-87:10; Ex. 97, Rooke Dep., at 45:16-47:12.

Common sense dictates that a patient who self-referred or was transferred to Halifax from

another provider was not referred to Halifax by one of the Physicians. In such instances, the

physician cannot be said to have referred a patient *to Halifax*, even if he or she ordered,

requested, certified or recertified the need for an item or service, or established a plan of care.

The United States' disregard of this flaw in its reliance on the Medicare claim forms is further

evidence that the forms are not credible evidence of prohibited referrals.

4.   Claims For Services Furnished By Entities Other Than Halifax Should Be
Excluded

Halifax's expert identified 3,174 claims in the United States' claims summary that were

not submitted for payment by Halifax. Ex. 95, Moran Rep., at 16. These claims were submitted

by a variety of different entities, including East Central Florida Outpatient Imaging, LLC

("ECFOI"), none of which are named by the United States in its Complaint. The United States

has offered no evidence, and Halifax has expressly denied, that it bills and collects for services

provided by ECFOI. *See* Ex. 98, Objections and Responses to United States' Eighth Set of Reqs.

for Production and Sixth Set of Req. for Admis. (Apr. 10, 2013); Ex. 99, Rahn Dep. at 69:9-14.

In addition to not naming other legal entities in its Complaint, the United States offered no

evidence to establish the existence of a financial relationship between the Physicians and these

non-Halifax legal entities. If there is no financial relationship, the Stark Law does not apply.

Halifax is therefore entitled to judgment as a matter of law as to these claims.

5.     Designation Of The "Attending Physician" Or "Operating Physician" On
       CMS Form 1450 Does Not Provide Sufficient Evidence Of A Referring
       Physician

As set forth above, the United States' sole reliance on Halifax's Medicare claims forms

results in the incorrect and inappropriate inclusion of thousands of claims for which it could

never be entitled to relief. Reliance on Medicare claims forms alone should not be sufficient to

establish that a prohibited referral was made. The United States could have relied upon Halifax's

patient records obtained during the course of discovery but did not. To shortcut its burden of

proof of referrals, the United States erroneously relies on the designation of a Physician as the

"attending physician" or the "operating physician" on a Halifax claim form.

During the relevant time period, claims for hospital services have been submitted using

two versions of the same claim form (the CMS Form 1450): the UB-92 and the UB-04. CMS

provides instructions to hospitals regarding which physicians should be listed as attending

physician and operating physician. Ex. 100, CTRS. MEDICARE & MEDICAID SERVS., MEDICARE

INTERMEDIARY MANUAL, § 3604 (2001) (instructing hospitals to list in the "attending/referring

physician" field on the UB-92 the physician "primarily responsible for the care of the patient from the beginning of the hospital episode."); Ex. 101, CTRS. MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL, ch. 25, § 75.5 (2013) (instructing hospitals to list in the "attending provider" field of the UB-04 the individual with "overall responsibility for the patient's medical care and treatment" and in the "operating provider" field the individual with "primary responsibility for performing the surgical procedure(s)"). CMS' instructions regarding identification of the attending or operating physician bear no relation to the Stark Law definition of "referring physician," which is the physician who orders, requests, or certifies or recertifies the need for, an item or service, or establishes a plan of care. 42 U.S.C. § 1395nn(h)(5). Indeed, CMS' instructions do not suggest that hospitals could possibly be on notice that by listing a physician in the attending or operating physician field they are designating such a physician as a "referring physician" for purposes of the Stark Law (*e.g.*, a reference to 42 U.S.C. § 13951(q)).

The disconnect between the claims forms and the concept of a Stark Law referral is unsurprising as the claims forms are designed for hospital billing and claims processing purposes, not to identify referrals or referring physicians. The United States' attempt to leverage these forms as proof of Stark Law referrals is a failed attempt to fit a square peg into a round hole.

The Court should disregard the finding of the Northern District of Illinois in *United States v. Rogan,* 459 F.Supp.2d 692 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 (7th Cir. 2008) that the attending provider must be the referring physician for Stark Law purposes. The *Rogan* court considered this question *sua sponte* and without reviewing any arguments submitted by either party. Unlike this Court, the *Rogan* court did not have the benefit of expert or 30(b)(6) testimony from CMS officials on these very questions. In reaching its conclusion, the *Rogan* court mistakenly focused on the requirement to designate a referring physician in 42 U.S.C. §

13951(q)(1) and a misguided citation to the *Home Health Agency Manual*, which, as the name suggests, has nothing to do with hospital services.

42 U.S.C. § 13951(q) requires hospitals to list the name and unique personal identification number of a referring physician, if "the [hospital] knows or has reason to believe there has been a referral by a referring physician." By its express terms, the requirement is only applicable for hospital outpatient claims, not inpatient claims. Ex. 107, United States' Responses and Objections to Halifax's Third Set of Reqs. for Admis. no. 38 (Dec. 10, 2012). This statute is only applicable where the hospital has knowledge there has been a referral. Thus, section 13951(q) does not apply to inpatient claims and claims where the hospital has no knowledge of a referral. *See accord* Ex. 102, Sandlin Dep., at 85:2-12. In contrast, CMS requires a hospital to list an attending physician on *every* claim, and an operating physician where there is one. The *Rogan* court's reliance on section 1395l(q) to establish a nexus between an attending/operating physician on a claim form has superficial appeal but no regulatory support – one simply does not flow from the other. A physician listed as attending or operating physician on a claim form *may* be, but is not necessarily, a Stark Law referring physician. Ex. 103, Sandlin Dep., at 84:21-85:5. In fact, there may be no referring physician at all. *Id.* This is further reason why the patient medical record should be the basis for identifying Stark Law referrals.

## VI.   LEGAL ARGUMENT ON FALSE CLAIMS ACT CAUSES OF ACTION

### A.   The United States' FCA Causes Of Action One Through Three

The United States' Causes of Action under Section 3729(a), subsections (1)(A)-(B), (1)(G), and (a)(7), are dependent on a finding Halifax violated the Stark Law.  The FCA elements are set forth in Section V(B) and incorporated here. Of particular importance are the falsity and knowledge elements for which the United States bears the burden of proof. Imprecise statements or differences in interpretation growing out of a disputed legal question, by law, are not false

under the FCA.

      B.      **Halifax Did Not Knowingly Submit, Present Or Use False Statements To Obtain Payment For False Claims**

      The United States cannot maintain its FCA Causes of Action regardless of whether this Court finds that a Stark Law violation occurred. So long as Halifax had a reasonable basis for believing that the terms of the contracts at issue met the criteria for the applicable Stark Law exception and were commercially reasonable and for FMV, Plaintiffs cannot prove by the necessary preponderance of the evidence that Halifax's Medicare claims for payment were false or that Halifax "knowingly" submitted or presented false claims or used false statements to get payment of false claims. *See Brooks v. United States*, 64 F.3d 251, 255 (7th Cir. 1995) (noting that the Government bears the burden of proving the violation by a preponderance of the evidence); *see also United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.,* Civ. No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *16 (E.D. Pa. Feb. 11, 2003). This scienter requirement is "critical to the operation of the False Claims Act," and, ultimately, to the resolution of this case. *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998).

      As set forth in the authorities identified in Section IV(B), the United States cannot establish knowing conduct through imprecise statements or difference in interpretation growing out of a disputed legal question, by law, are not false under the FCA. The "reckless disregard" standard for FCA liability has been held to require at least a showing of an aggravated form of gross negligence, or, "gross negligence-plus." *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997). Numerous courts have held that mere noncompliance with a statute, regulation or contractual provision, without more, cannot constitute a "knowing" FCA violation. *See United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681 (5th Cir. 2003) (Jones, J., Concurring); *see also* cites *supra,* Section IV(B).

1.     The Neurosurgeons' Agreements

The United States cannot show the requisite scienter to maintain its FCA claims regarding the Neurosurgeons without evidence Halifax knew the agreements did not comply with the Stark Law. The United States does not allege any provision in the Neurosurgeon agreements violated the Stark Law, and the bonuses fit squarely within the requirements of the *Bona Fide* Employment Exception.

2.     The Medical Oncologists' Agreements

Halifax always believed that the Fiscal Years 2005-2008 Medical Oncology incentive bonuses fit within the *Bona Fide* Employment Exception as well. The Stark Law is vague on the meaning of the "volume or value of referrals," and its interpretation of the productivity bonus provision ignores the fact that the provision nullifies the volume or value of referrals prohibition. While the parties have two different interpretations of the Stark Law's treatment of the phrase "take into account the volume or value of referrals," the United States cannot cite to any evidence Halifax did not act in good faith in the process of negotiating and approving the incentive bonus for Fiscal Years 2005, 2006, and 2007. To the contrary, Halifax incorporated a legal Stark Law review into the drafting of every Physician's agreement. *E.g.*, Ex. 104, Peburn Dep., at 130:1-9, 156:16-24, 170:5-17; Ex. 47, Contract Management Review Policy.

Halifax relied in good faith on the advice of counsel from the General Counsel at the inception of the incentive bonus for 2005, 2006, and 2007 and, later, in 2008 upon competent outside counsel after Relator raised a concern about the issue. Halifax's conduct both at the inception of the incentive bonus for 2005 through 2007 and during 2008 meets the requirements for establishing good faith reliance on the advice of counsel. The assertion of good faith reliance on the advice of counsel has applicability in both civil and criminal cases. *SEC v. Mut. Benefits Corp.*, 2004 U.S. Dist. LEXIS 23008, at *71-72 (S.D. Fla. Nov. 10, 2004) (stating that "[g]ood

faith reliance on the advice of counsel may negate, or mitigate against a finding of, scienter"). In

a civil FCA case, the request for and receipt of the advice of counsel can be relevant to whether

the defendant acted knowingly. *See United States v. Newport News Shipbuilding, Inc.*, 276 F.

Supp. 2d 539, 565-66 (E.D. Va. 2003) (explaining that evidence of the advice of counsel may

"contradict any suggestion that a [defendant] 'knowingly' submitted a false claim"). In the

Eleventh Circuit, the assertion of the advice of counsel requires proof of two elements: (1) full

disclosure of all relevant facts to counsel and (2) good faith reliance on the advice of counsel.

*See United States v. Condon*, 132 F.3d 653, 656 (11th Cir. 1998); *Boca Raton Cmty. Hosp., Inc.

v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237, 1255 (S.D. Fla. 2007) (laying out same

standard in context of civil RICO action) "The issue of good faith reliance is . . . a fact question."

*Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1219 (11th Cir. 2010). Full disclosure of all

relevant facts requires that a "full, correct, and fair statement of all material facts" be provided to

the counsel from whom the advice is requested. *See Mee Indus. v. Dow Chem. Co.*, No. 6:05-cv-

1520-Orl-310AB, 2008 U.S. Dist. LEXIS 116722, at *14-15 (M.D. Fla. Oct. 31, 2008); *see also

United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir. 1984) (stating the defendant must

first make "a full disclosure of all facts that are relevant to the advice for which he consulted the

attorney"); *United States v. Pasquariello*, No. 89-6196-Cr-Ungaro-Benages, 1994 U.S. Dist.

LEXIS 20924, at *50 (S.D. Fla. Apr. 19, 1994) (stating "[a]nother element of the advice of

counsel . . . defense is that the Defendant [make] a full and accurate report of all material facts of

which he had the means of knowledge to his expert").

  Halifax meets the test of good faith reliance on advice of counsel because it did not adopt

the incentive bonus for Fiscal Year 2005 until after the General Counsel reviewed and approved

the agreements. His review and approval is established by his initialing of the contract review

cover sheets for each agreement. Ex. 13, Contract Review Cover Sheet.

Years later, in October 2008, when Relator first raised a concern about the incentive bonus, the Associate General Counsel immediately began, at the General Counsel's direction, an analysis of the complex legal issue, resulting in a series of preliminary research memoranda. *See, e.g.*, Ex. 105, Davidson Decl. at E, A. Pike Mem., Nov. 10, 2008. In order to obtain the benefit of an independent legal analysis, the General Counsel solicited a legal memorandum from competent outside counsel analyzing the relevant Stark Law issue, assigned Associate General Counsel Pike to oversee the progress of the outside counsel review, and ultimately received and relied upon the outside counsel memorandum prior to authorizing Halifax's accounting department to pay the Fiscal Year 2008 bonus. *Id.* at F, D. Davidson email to I. Coleman, Nov. 10, 2008; Ex. 106, A. Pike Fax, Nov. 20, 2008, to D. Melvin With Medical Oncology Agreement Attach.; Ex. 105 at G, McDermott Will & Emery Mem. Feb 09, 2009; *Id.* at I, D. Davidson Email to T. Garthwaite, Mar.  06 , 2009; Ex.109, A. Pike email to A. Foster, Mar. 4, 2009.

Ms. Pike's memoranda regarding her preliminary conclusion that the Medical Oncology agreements violated the Stark Law is not evidence that Halifax acted "knowingly" under the FCA. Any reliance by the United States on these documents is contradicted by Ms. Pike's deposition testimony.  Ms. Pike testified unequivocally that Halifax acted responsibly in investigating the concerns raised by Relator and by her preliminary analysis. *E.g.*, Ex. 110, Pike Dep. (May 20, 2013), at 7-11, 14-20. More importantly, Ms. Pike testified that at the time she authored the memoranda she had very little experience conducting stark analyses and that the memoranda "[did not] go through what a real Stark analysis goes through" and, therefore, indicated that she was "not fully appreciating the complexities of Stark" at the time she prepared them. *Id.* at 35, 153, 157-61 (rough transcript). Ms. Pike also testified that given her current

experience, she now recognizes that the Stark statute is "an incredibly complicated law" and that her first-time analysis in her memorandum "was not correct." *Id.* at 35.

The General Counsel and Associate General Counsel communicated with absolute candor to outside counsel about the terms of the Medical Oncologists' bonus and waited until receiving the completed advice of outside counsel before authorizing payment of the 2008 bonus. There is no evidence Halifax compromised the integrity of the outside counsel legal advice which concluded that, by paying an incentive bonus based on each Medical Oncologist's personally performed services, the agreement complied with the *Bona Fide* Employment Exception.

### C.     The Halifax Claims Are Not False

The United States has no evidence to counter Halifax's evidence regarding its good faith interpretation of the *Bona Fide* Employment Exception. Given the wide latitude CMS gives to providers to establish FMV and commercial reasonableness methodologies, the United States' stunning lack of expert testimony or reasoning contradicting Halifax's evidence leads to the inexorable conclusion Halifax's claims cannot be false for purposes of FMV or commercial reasonableness. In addition, the United States' 30(b)(6) witness testified that CMS does not provide specific guidance about how to apply the relevant FMV and commercial reasonableness tests. Exs. 34, 64, Barsky Dep., at 40:1-17, 65:17-66:16. Halifax indisputably had a good faith basis for believing the contracts were based on FMV, were commercially reasonable, and did not impermissibly take into account the volume or value of referrals. Plaintiffs' FCA claims therefore must fail. *See United States ex rel. Williams v. Renal Care Group*, 696 F.3d 518, 532 (6th Cir. 2012) ("The False Claims Act is not a vehicle to police technical compliance with complex federal regulations.").

### D.     Failure To Identify Prohibited Referrals Or Any FCA Damages

As set forth in Section VI(E), the United States has failed to identify any referrals

prohibited by the Stark Law. The gargantuan scope of the damages demanded by the United

States – treble damages for years of Medicare reimbursement for any claims for hospital services

provided to any patient that one of the Physicians saw – demands that the United States prove

that the Physicians made prohibited referrals for DHS. The United States has been on notice

from Halifax for nearly a year during discovery that Halifax would demand proof of prohibited

referrals that tainted Medicare claims that resulted in damages suffered by the United States.

## VII.    LEGAL ARGUMENT ON COMMON LAW CAUSES OF ACTION

Due to the lack of evidence supporting the DOJ's Stark Law and FCA claims, the DOJ's

common law Causes of Action Four (Unjust Enrichment), Five (Payment By Mistake), and Six

(Equitable Remedies of Disgorgement, Constructive Trust, and Accounting) must also be

dismissed. The Eleventh Circuit has explicitly provided that where summary judgment is entered

dismissing the federal claims, the district court may dismiss the remaining state and common law

claims. *Nolin v. Isbell*, 207 F.3d 1253 (11th Cir. 2000); *Republic of Panama v. BCCI Holdings*

*(Luxembourg) S.A.*, 119 F.3d 935, 951 n. 26 (11th Cir. 1997) ("After dismissing Panama's

federal claims against the . . . defendants, the district court correctly dismissed its remaining state

law claims against these defendants"); *see also Benjamin v. Holy Cross Hospital, Inc.*, No. 11-

62142-CIV, 2013 WL 1334565, at *13-14 (S.D. Fla. Mar. 29, 2013) ("Because summary

judgment will be entered . . . on all federal claims, the remaining potential state and common law

claims will be dismissed"). Dismissing the United States' common law claims is also supported

by 28 U.S.C. § 1367(c)(3), which provides that "[t]he district courts may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed

all claims over which it has original jurisdiction."

To the extent the United States asserts independent liability for Causes of Action Four

and Five, Halifax asserts its fact evidence in the defense of Causes of Action One though Three.

Halifax has provided all of the health care services set forth in its claims for Medicare payment.

Likewise, the United States has not mistakenly paid for any items or services that Halifax

provided to it. Absent an equitable basis, the United States is not entitled to equitable relief.

## VIII.   CONCLUSION

For the reasons stated herein, Halifax is entitled to judgment as a matter of law on the

subject Stark Law and FCA claims.

Dated: May 28, 2013                        Respectfully submitted,

T. Reed Stephens (admitted *pro hac vice*)        s/ David O. Crump
David O. Crump (admitted *pro hac vice*)          Anthony N. Upshaw
Amy H. Kearbey (admitted *pro hac vice*)          Fla. Bar. No. 0861091
Amandeep S. Sidhu (admitted *pro hac vice*)       MCDERMOTT WILL & EMERY LLP
Emre N. Ilter (admitted *pro hac vice*)           333 Avenue of the Americas
Brandon H. Barnes (admitted *pro hac vice*)       Suite 4500
MCDERMOTT WILL & EMERY LLP                        Miami, FL 33131
The McDermott Building                            Tel: (305) 358-3500
500 North Capitol Street NW                       Fax: (305) 347-6500
Washington, DC 20001                              Email: aupshaw@mwe.com
Tel: (202) 756-8000
Fax: (202) 756-8087
Email: trstephens@mwe.com

*Counsel to Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc.*

UNITED STATES OF AMERICA *ex rel.*, and)
ELIN BAKLID-KUNZ, Relator                )
                                         )
    Plaintiffs                       )
                                         )
    v.                               )  CASE NO.: 6:09-CV-1002-ORL-31TBS
                                         )
HALIFAX HOSPITAL MEDICAL CENTER)  JUDGE GREGORY A. PRESNELL
d/b/a HALIFAX HEALTH a/k/a HALIFAX)
COMMUNITY HEALTH SYSTEM a/k/a)  [FALSE CLAIMS ACT – QUI TAM]
HALIFAX MEDICAL CENTER and)
HALIFAX STAFFING, INC.                   )  **DISPOSITIVE MOTION**
                                         )
    Defendants                       )
_____)

## PROPOSED ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion for Summary Judgment is granted as to the following findings of fact and conclusions of law.

1.    A provider may use any reasonable methodology to determine whether a proposed employed physician arrangement is based on Fair Market Value ("FMV").

2.    If the provider used a reasonable FMV methodology and implemented that methodology in good faith, the employed physician arrangement is based on FMV.

3.    The United States may only challenge the FMV aspect of an employed physician arrangement by analyzing the reasonableness of the provider's FMV methodology.

4.    The United States cannot substitute its own expert's differing FMV methodology in order to support the analytical result that it seeks.

5.    The Neurosurgeons' compensation arrangements were negotiated and implemented based on a reasonable FMV methodology.

1

6.     There is no genuine dispute of material fact that the compensation arrangements with the Neurosurgeons were based on FMV.

7.     There is no dispute of material fact that the Medical Oncologists' compensation arrangements were negotiated and implemented based on a reasonable FMV methodology.

8.     There is no genuine dispute of material fact that all of the Halifax compensation arrangements with the Medical Oncologists are based on FMV.

9.     The United States has not publicly announced any specific criteria for determining if an arrangement is commercially reasonable under the Stark Law.

10.    The compensation arrangements with the Neurosurgeons were commercially reasonable.

11.    Halifax's compensation arrangements with the Medical Oncologists were commercially reasonable.

12.    The Medical Oncologists' incentive bonus for Fiscal Years 2005 through 2008 was allocated based on each physician's personally performed services, and, therefore, met the productivity bonus provision of the *Bona Fide* Employment Exception.

13.    If the Neurosurgeons' compensation arrangements did not violate the Stark Law, Halifax cannot be liable under the FCA.

14.    If the Medical Oncologists' compensation arrangements did not violate the Stark Law, Halifax cannot be liable under the FCA.

15.    Dr. Kelly Molpus, employed Halifax oncological surgeon, was not paid any incentive bonuses of the kind identified in the Complaint. Therefore, his agreement does not raise any of the factual or legal issues in the Complaint.

16.    Halifax acted in good faith in the negotiation of the Medical Oncologists'

-2-

compensation arrangements as shown by the competent legal advice applied by Halifax's General Counsel at the time the Medical Oncologists' agreements were negotiated and approved for Fiscal Year 2005 and, therefore, could not have violated the FCA for any incentive bonuses paid for Fiscal Years 2005, 2006 or 2007.

17.     Halifax acted in good faith in the negotiation of the Medical Oncologists' compensation arrangements as shown by its reliance on the competent outside counsel legal advice applied by its General Counsel during Fiscal Year 2008 after concerns were first raised by Relator about the arrangements' compliance with the Stark Law.

18.     The United States may not prove that prohibited referrals were made under the Stark Law by relying solely on the information identified on the provider's Medicare claims for payment and that the patient medical record is the best evidence for establishing whether a provider order, certified or re-certified a prohibited Designated Health Services for purposes of Stark Law liability or damages.

19.     Medicare and Medicaid claims for Evaluation and Management (E&M) Services are not claims for DHS, patient self-referrals, patient transfers from other providers to Halifax, and claims for personally performed services are not prohibited referrals under the Stark Law.

20.     Halifax did not submit false claims to any Medicaid program.

21.     The United States has not taken any discovery of the clinical medical necessity of the coding levels used by any of the Neurosurgeons for determining the complexity of each patient case.

22.     The Neurosurgeons were compensated at FMV based on the wRVU-to-compensation metric.

23.     The United States has not provided any evidence that it has analyzed the work

Relative Value Units for either the Medical Oncologists or the Neurosurgeons to support its FMV expert's assertion that the work RVUs are unreliable or invalid for purposes of determining any individual Physician's compensation.

24.     The United States has not established that it is entitled to relief under any of the common law Causes of Action (Four, Five or Six) in its Complaint.

For the reasons that follow, the Motion for Summary Judgment is granted as to:

1.     Cause of Action I, allegations of presentation of false claims in violation of the FCA, 31 U.S.C. § 3729(a)(1) and (a)(1)(A);

2.     Cause of Action II, allegations of using false statements to get false claims paid in violation of the FCA under 31 U.S.C. § 3729(a)(1)(B);

3.     Cause of Action III, allegations that Halifax made a false record material to an obligation to pay in violation of the FCA under 31 U.S.C. § 3729(a)(7) and (a)(1)(G);

4.     Cause of Action IV, allegations of unjust enrichment;

5.     Cause of Action V, allegations of payment by mistake; and

6.     Cause of Action IV, claims of disgorgement of profits, constructive trust, and accounting.

## CONCLUSION

In view of the above, Defendants Halifax Hospital Medical Center and Halifax Staffing's Motion for Summary Judgment (Doc. No. __) is GRANTED.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, and ELIN BAKLID-KUNZ, Relator<br><br>Plaintiffs<br><br>v.<br><br>HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC.<br><br>Defendants | CASE NO.: 6:09-CV-1002-ORL-31TBS<br><br>JUDGE GREGORY A. PRESNELL<br><br>[FALSE CLAIMS ACT – QUI TAM]<br><br>DISPOSITIVE MOTION |

**REQUEST FOR ORAL ARGUMENT IN SUPPORT OF HALIFAX MOTION FOR SUMMARY JUDGMENT ON THE UNITED STATES COMPLAINT IN INTERVENTION**

Pursuant to Local Rule 3.01(j) Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc., ("Halifax") by and through their attorneys, respectfully request that the Court grant oral argument on Halifax's Motion for Summary Judgment on the United States Complaint in Intervention. Defendants believe that the Court will benefit from oral argument given the complexity of the issues addressed in its Motion for Summary Judgment. Defendants estimate that approximately one hour (30 minutes per side) will be required for oral argument including time reserved for rebuttals.

Dated: May 28, 2013

Respectfully submitted,

s/ David O. Crump

Anthony N. Upshaw
Fla. Bar. No. 0861091
MCDERMOTT WILL & EMERY LLP
333 Avenue of the Americas
Suite 4500
Miami, FL 33131
Tel: (305) 358-3500
Fax: (305) 347-6500
Email: aupshaw@mwe.com

T. Reed Stephens (admitted *pro hac vice*)
David O. Crump (admitted *pro hac vice*)
Amy H. Kearbey (admitted *pro hac vice*)
Amandeep S. Sidhu (admitted *pro hac vice*)
Emre N. Ilter (admitted *pro hac vice*)
Brandon H. Barnes (admitted *pro hac vice*)
MCDERMOTT WILL & EMERY LLP
The McDermott Building
500 North Capitol Street NW
Washington, DC 20001
Tel: (202) 756-8000
Fax: (202) 756-8087
Email: trstephens@mwe.com
Email: dcrump@mwe.com
Email: akearbey@mwe.com
Email: asidhu@mwe.com
Email: eilter@mwe.com
Email: bbarnes@mwe.com

*Counsel for Defendants Halifax Medical Center
and Halifax Staffing, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the

United States District Court for the Middle District of Florida using the CM/ECF system on May

28, 2013.  I certify that all participants in the case are registered CM/ECF users and that service

will be accomplished by the CM/ECF system.

s/ David O. Crump

David O. Crump
