# In the Matter Of:

## USA vs. HALIFAX HOSPITAL MEDICAL CENTER

---

## VIDEOTAPED DEPOSITION OF

## 30(B)(6) ERIC PEBURN

### *February 26, 2013*

---



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 2 of 143 PageID 14564

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                 VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                          Page 1

```
 1                UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF FLORIDA
 2                     ORLANDO DIVISION

 3       CIVIL ACTION FILE NO.:  6:09-cv-1002-Orl-31DAB

 4   UNITED STATES OF AMERICA ex. rel. ELIN
     BAKLID-KUNZ,
 5
               Relator,
 6
     vs.
 7
     HALIFAX HOSPITAL MEDICAL CENTER d/b/a
 8   HALIFAX HEALTH a/k/a HALIFAX
     COMMUNITY HEALTH SYSTEM a/k/a
 9   HALIFAX MEDICAL CENTER and HALIFAX
     STAFFING, INC.,
10
               Defendants.
11   _____

12

13              VIDEOTAPED DEPOSITION OF

14           ERIC PEBURN 30(b)(6) Designee

15            Tuesday, February 26, 2013

16                    9:36 a.m.

17

18

19           United States Attorneys Office

20       400 West Washington Street, Suite 300

21               Orlando, FL  32801

22

23

24           Georgeanne Rodriguez, RPR

25
```



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

**Page 2**

```
1   APPEARANCES:

2         On behalf of Relator Elin Baklid-Kunz:
          KATHERINE V. HERNACKI, Esquire
3         Wood, Hernacki & Evans, LLC
          1180 West Peachtree Street Northwest, Suite 2400
4         Atlanta, GA  30309
          Telephone:  404.891.1402
5         Facsimile:  404.506.9111
          lwood@whetriallaw.com

6
          On behalf of the United States of America:
7         PATRICIA M. FITZGERALD, Esquire
          U.S. Department of Justice - Civil Division
8         601 D Street Northwest, PHB Room 9537
          Washington, DC  20004
9         Telephone:  202.514.6831
          patricia.m.fitzgerald@usdoj.gov
10
          On behalf of Defendants:
11        T. REED STEPHENS, Esquire
          AMY H. KEARBY, Esquire
12        McDermott, Will & Emery, LLP
          600 13th Street Northwest
13        Washington, DC  20005
          Telephone:  202.756.8380
14        Facsimile:  202.756.8087
          asidhu@mwe.com
15
          STEPHEN SIEGEL, Esquire
16        Broad and Cassel
          2 South Biscayne Tower, 21st Floor
17        Miami, FL  33131
          Telephone:  305.373.9424
18        Facsimile:  305.995.6386
          shsiegel@BroadandCassel.com
19

20

21   ALSO PRESENT:

22        David Ramirez, Video Technician.

23

24                  - - -

25
```

**Page 3**

```
1             INDEX OF EXAMINATION

2   WITNESS:

3   DIRECT EXAMINATION BY MS. FITZGERALD: ..............8

4   CROSS-EXAMINATION BY MS. HERNACKI: ..............237

5   REDIRECT EXAMINATION BY MS. FITZGERALD: ..........299
```

**Page 4**

| | Exhibit | Description | Page |
|---|---|---|---|
| 3 | 22 | Amended Notice of 30(b)(6) Deposition | 9 |
| 4 | 23 | Halifax Policies and Procedures, Authorized | 16 |
| 5 | | Signatures, effective date 12/91 | |
| 6 | 24 | Halifax Policies and Procedures, Contract Management, effective date 4/29/2009 | 25 |
| 8 | 25 | Halifax Compliance Standards LL-101, revised 12/19/2008 | 62 |
| 9 | 26 | Halifax Compliance Standards LL-145, revised 12/18/2008 | 73 |
| 11 | 27 | Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc.'s Amended Objections and Responses to the United States' Interrogatory Nos. 7 and 8 | 98 |
| 14 | 28 | Halifax Compliance Standards LL-145, revised 1/22/2008 | 107 |
| 16 | 29 | July 7, 2001, Dr. Khanna Employment Agreement | 118 |
| 17 | 30 | July 7, 2004, Dr. Khanna Employment Agreement | 131 |
| 18 | 31 | October 1, 2007, Dr. Khanna Amendment to Employment Agreement | 147 |
| 19 | 32 | April 1, 2009, Dr. Khanna Second Amendment to Employment Agreement | 153 |
| 21 | 33 | Dr. Khanna Incentive Spreadsheets, 2000 through 2009 | 160 |
| 22 | 34 | February 14, 2003, Dr. Kuhn Employment Agreement | 167 |
| 23 | 35 | February 14, 2003, Dr. Kuhn Amendment to Employment Agreement | 174 |

**Page 5**

INDEX TO EXHIBITS (continued)

| | Exhibit | Description | Page |
|---|---|---|---|
| 3 | 36 | February 2, 2007, Dr. Kuhn Second Amendment to Employment Agreement | 177 |
| 4 | 37 | Dr. Kuhn Third Amendment to Employment Agreement | 179 |
| 5 | 38 | Collection of Incentive Spreadsheets for Dr. Kuhn, 2003 and 2006 through 2010 | 180 |
| 7 | 39 | Dr. Vinas Employment Agreement executed February 9, 2000, with attached Amendments First through Third | 182 |
| 9 | 40 | April 1, 2009, Dr. Vinas Fifth Amendment to Employment Agreement | 186 |
| 11 | 41 | Dr. Vinas Incentive Spreadsheets for years 2003 through 2004 and 2006 through 2010 | 188 |
| 13 | 42 | Halifax Fair Market Value Survey Analysis, Neurosurgery, HAL-1 0047541 | 189 |
| 15 | 43 | Halifax Fair Market Value Survey Analysis, Neurosurgery, HAL-1 0047619 | 189 |
| 17 | 44 | September 30, 2005, Medical Oncology Employment Agreement | 197 |
| 19 | 45 | Various Medical Oncology Spreadsheets, HAL-1 0325344 through -364 | 207 |
| 20 | 46 | Various Medical Oncology Spreadsheets, HAL-1 0325436 through -458 | 208 |
| 21 | 47 | Various Medical Oncology Spreadsheets, HAL-1 0325216 through -229 | 223 |
| 23 | 48 | March 1, 2009, Medical Oncology Employment Agreement for Dr. Chew | 223 |
| 24 | 49 | January 26, 2010, email, Subject:  Oncology | 233 |



Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 6..9

---

Page 6

INDEX TO EXHIBITS (continued)

| Exhibit | Description | Page |
|---|---|---|
| 50 | Medical Oncology Contract Review, August 2009 | 234 |
| 51 | November 13, 2012 Quarterly Disclosure | 253 |
| 52 | Halifax Staffing, Inc., 2006 Form 990 | 261 |
| 53 | March 1, 2009, Medical Oncology Employment Agreement for Dr. Sorathia | 265 |
| 54 | Summary of Insurance Coverages for Halifax Medical Center | 290 |

(Original Exhibits 22 through 54 attached to the original transcript.)

---

Page 7

30(b)(6) VIDEOTAPED DEPOSITION OF ERIC PEBURN
February 26, 2013
- - -

VIDEO TECHNICIAN: The time is approximately 9:36 a.m. This is the beginning of disk number one for the deposition of Tom [sic] Peburn. We are on video record.

Will the court reporter swear in the witness and counsel introduce themselves and their affiliations.

THE REPORTER: Could you raise your right hand, please.

Do you swear or affirm the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE REPORTER: Thank you.

MS. FITZGERALD: Trisha Fitzgerald from the Department of Justice on behalf of the United States.

MR. STEPHENS: Reed Stephens for Halifax Hospital Medical Center and Halifax Staffing.

And just to correct the record, the witness is Eric Peburn.

VIDEO TECHNICIAN: I apologize.

---

Page 8

MS. KEARBY: Amy Kearby on behalf of Halifax Hospital Medical Center and Halifax Staffing.

MR. SIEGEL: Steve Siegel on behalf of the defendant.

MS. HERNACKI: Katherine Hernacki on behalf of the Relator.

DIRECT EXAMINATION

BY MS. FITZGERALD:

Q    Good morning, Mr. Peburn. Have you ever been deposed before?

A    Yes.

Q    When?

A    About two years ago.

Q    Okay. Any other times?

A    No.

Q    Okay. What was the nature of that lawsuit that you were deposed in?

A    It was related to a business transaction.

Q    Okay. Well, there are some basic ground rules for a deposition. I'm sure your attorneys went over them with you. I'm going to go over them with you one more time now.

It's very important that we don't talk over each other so we get a clear record.

Do you understand that?

---

Page 9

A    I do.

Q    Also, if you don't understand a question, please let me know. If you don't ask for clarification, I'll assume that you understand the question.

Can you agree to that?

A    Okay.

Q    And if at any time you would like a break, please let me know. We'll be taking breaks periodically throughout the day, but anytime you want to take a break, just -- we'll be happy to accommodate.

The only thing I would ask is that if there's a question pending, could you please answer the question before taking a break unless you need to confer with your counsel about something related to the question. Okay?

A    Okay.

(Exhibit 22 was marked for identification.)

BY MS. FITZGERALD:

Q    Mr. Peburn, the court reporter has handed you what's been marked as Exhibit 1 [sic] to your deposition.

Have you ever seen this document before?

A    Yes.

Q    When?

A    Don't remember.



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 10..13

Page 10

1    Q    Okay.  Do you -- are you designated by Halifax
2 Hospital Medical Center to testify as to certain topics
3 in this notice?
4    A    Yes.
5    Q    Which topics?
6    A    You want me to point to them or --
7    Q    If you could read the numbers, that would be
8 great.  They're in Schedule A on page three.
9    A    Number one, number two, number three, number
10 14, 15, number 16, number 17, number 18, number 19,
11 number 20, 21, 22, 23.  I believe that's it.
12    Q    Okay.  I think so too.
13    A    All right.
14    Q    Did you do anything to prepare for today's
15 deposition?
16    A    I have.
17    Q    What did you do?
18    A    I reviewed the documents that we've
19 accumulated over the course of time that were requested
20 by the government.
21    Q    Did you review every document?
22    A    No.
23    Q    Okay.  Did you decide which documents to
24 review?
25    A    Yes.

Page 11

1    Q    Okay.  Did you decide on your own which
2 documents to review or did you talk about which
3 documents with someone else?
4    A    No, I worked with my counsel --
5    Q    Okay.
6    A    -- as it relates to these topics.
7    Q    When were you originally asked to provide a
8 30(b)(6) deposition in this case?
9    A    Probably several months ago.
10    Q    Okay.  Did you read the United States'
11 complaint in intervention in preparation for your
12 deposition testimony?
13    A    I did.
14    Q    Did you interview anyone in preparation for
15 your deposition testimony?
16    A    I did not.
17    Q    What about informal discussions with anyone
18 other than your attorneys, did you have any of those?
19    A    I asked questions for clarification if I
20 didn't understand the item in the report.
21    Q    Okay.  When you say item in the report, what
22 report are you referring to?
23    A    If it was a clarification question regarding
24 something that I'm not specifically involved in on a
25 day-to-day basis, I would ask the person that prepares

Page 12

1 it, you know, for clarification.
2    Q    When you say "report," do you mean documents
3 that were produced to the United States --
4    A    Yes.
5    Q    -- in this case?  Okay.  Who did you speak
6 with in terms of questions that you had about documents?
7    A    Tom Garthwaite and Lisa Tyler.
8    Q    Anyone else?
9    A    No.
10    Q    Did you read any deposition transcripts for
11 depositions that were taken in this case?
12    A    I did.
13    Q    Whose depositions did you read?
14    A    Andy Foster.
15    Q    Anyone else?
16    A    No.
17    Q    After you read Mr. Foster's deposition
18 transcript, did you -- you didn't meet with him about
19 anything in that deposition?
20    A    I did not.
21    Q    Okay.  None of it was confusing, then?  You
22 didn't have any points of clarification you needed?
23        MR. STEPHENS:  Objection as to form.
24 BY MS. FITZGERALD:
25    Q    You can answer.  The only time you don't

Page 13

1 answer is if your counsel instructs you not to answer.
2    A    Sure.  No, I understand.
3    Q    Okay.
4    A    Ask the question again.
5    Q    Sure.  When you read Mr. Foster's deposition
6 transcript, there wasn't anything that was confusing to
7 you that you wanted to talk about with him?
8    A    There was a statement in there that I didn't
9 agree with.
10    Q    What statement was that?
11    A    It was related to -- he stated that -- somehow
12 in there it was confusing as to whether or not inpatient
13 referrals were included in a bonus calculation, and that
14 was not correct.
15    Q    Mr. Foster prepared that bonus calculation,
16 though, did he not?
17    A    He assisted in it, yes.
18    Q    Okay.  When you say "he assisted," he was not
19 the individual who prepared that -- the roll-out
20 reports?
21    A    Multiple parties have to be involved to
22 prepare it, because the source data comes from multiple
23 systems.
24    Q    Okay.  Who was else was involved other than
25 Mr. Foster?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 14..17

Page 14

1    A    Lisa Tyler and Tom Garthwaite.
2    Q    What was Lisa Tyler's role in that --
3    A    She oversees the general ledger.
4    Q    What's the general ledger?
5    A    It's where the financial accounting
6  information is held.
7    Q    And Ms. Tyler gave information to Mr. Foster
8  or did somebody else compile information separate
9  from -- that was obtained separately from Ms. Tyler and
10  Mr. Foster?
11    A    Generally, Lisa Tyler creates or produces all
12  of the general ledger activity at a summary level.
13  Okay. And that information is then used by other
14  parties, including Andy Foster and Tom Garthwaite.
15    Q    So Lisa Tyler was involved in the bonus
16  calculations for the medical oncologists; is that right?
17    A    She would have been involved insofar as
18  producing that general ledger information, yes.
19    Q    Okay. Was she aware that she was producing
20  general ledger information related to the medical
21  oncologists?
22    A    That, I don't know.
23    Q    Okay. Does Halifax Hospital currently have
24  employment contracts and policies in place?
25    A    As it relates to?

Page 15

1    Q    Employment contracts.
2    A    We have certain employment contracts, yes.
3    Q    Policies and procedures related to those
4  employment contracts, are those -- do those exist?
5    A    Yes.
6    Q    Okay. Did they exist in the year 2000?
7    A    We've always had policies and procedures
8  related to our employees, yes.
9    Q    Okay. And those employment contract policies
10  would apply to contracts with all the physicians named
11  in the United States' complaint in intervention?
12    A    They would apply to any employee of the
13  hospital, yes.
14    Q    So that's a yes, they did apply to the --
15    A    They would apply to all employees.
16    Q    Okay. I'm going to ask you a series of
17  questions related to the contract policies and
18  procedures. If at any time your answers don't apply to
19  either the neurosurgeons or the medical oncologists, can
20  you let me know?
21    A    Okay.
22    Q    I'm trying to short-circuit this by not going
23  through each question and relating it to each physician.
24  We can do that if you need to.
25    A    Okay. Well, we may.

Page 16

1    Q    Yeah.
2         (Exhibit 23 was marked for identification.)
3  BY MS. FITZGERALD:
4    Q    This is Exhibit 23.
5         MR. STEPHENS:  I'm sorry, Exhibit 23?
6         MS. FITZGERALD:  Yeah, I was told that we were
7  going to be continuing the numbering of the
8  deposition exhibits for the 30(b)(6)s. We're not?
9  We're not doing that?
10         MS. HERNACKI:  That's fine.
11         We can change that to 2.
12         MR. STEPHENS:  That didn't happen last week.
13         MS. FITZGERALD:  Wasn't there only one
14  30(b)(6) last week?
15         MR. STEPHENS:  There were two. Oh, you're
16  right. That was just George. We continued from
17  the fact depositions.
18         MS. FITZGERALD:  Right.
19         MR. STEPHENS:  Okay. That might still work.
20         MS. HERNACKI:  It makes sense to do it that
21  way. Mine just might be not -- I might not have
22  the correlation if I mark something that's been
23  marked previously. It makes a lot of sense to do
24  it that way.
25         MS. FITZGERALD:  Well, we can -- I don't care

Page 17

1  which way we do it. I honestly don't, so we can
2  decide now how we're going to do this. We can
3  either mark this as 23 or we can mark it as --
4         MS. HERNACKI:  Why don't we just start at 23,
5  and then if there's overlap, there's overlap. It's
6  not --
7         MS. FITZGERALD:  Okay. And that was 22.
8         MS. HERNACKI:  Does that make sense?
9         MS. FITZGERALD:  Yeah, I'm fine with it, I
10  mean, if it's okay with you guys.
11         MR. STEPHENS:  Yeah, as long as we don't have
12  to change at midstream because of Katherine.
13         MS. FITZGERALD:  I mean -- at a break, we'll
14  just remark those as 1 and 2 and we'll keep that --
15         MS. HERNACKI:  Well, what we can do is if I
16  mark something that's been marked previously, I can
17  go ahead and just do it contiguously.
18         MS. FITZGERALD:  Yeah, just renumber it.
19         MS. HERNACKI:  And if 36 happens to be the
20  same as 3, it's not a big deal.
21         MS. FITZGERALD:  Right.
22         MS. HERNACKI:  Okay with everybody?
23         MR. STEPHENS:  Okay.
24  BY MS. FITZGERALD:
25    Q    Do you recognize Exhibit 23, Mr. Peburn?



Page 18

1     A    I do.
2     Q    What is Exhibit 23?
3     A    It's a policy statement.
4     Q    This policy statement has an effective date of
5  December 1991.  Do you see that?
6     A    I do.
7     Q    Has this policy statement been in effect since
8  December 1991?
9     A    This one has been revised as of January 2008.
10    Q    Is this statement currently in effect, the
11 document that's marked as Exhibit 23?
12    A    There's a revision on the next page as of
13 March 2010.
14    Q    Uh-huh.
15    A    And there may be an update based on if
16 positions have changed.
17    Q    Okay.  Now, when I flip through this document,
18 it appears to me that Exhibit 23 is actually a
19 collection of various separate documents that have
20 different headers on certain pages.  For example, page
21 one and page two have similar headers, as you noticed,
22 with different revision dates.
23    A    Yeah.
24    Q    Is this document stored as -- is Exhibit 23
25 stored as one document with separate parts or is -- is

Page 19

1  this all one document or are these a bunch of separate
2  documents?
3     A    The latest -- if you follow the years, this
4  one is 2008.
5     Q    Uh-huh.
6     A    So flip three pages back, that's 2009.
7     Q    Yeah.
8     A    So that's, what, two or three pages here.  I'm
9  sorry, that's a different policy.
10         There's an authorized signers policy and
11 there's a cash disbursements policy.
12    Q    Right, there's also --
13    A    These two are one and the same.  There should
14 be --
15    Q    Okay.  So pages one, two and three of
16 Exhibit 23 are one document?
17    A    No, this is the full document for authorized
18 signers right here, these two pages.
19    Q    Okay.  Page two and three.
20    A    Yes.
21    Q    Okay.  Do you know why this document was
22 produced to the United States -- Exhibit 23 was produced
23 to the United States as one complete document?
24    A    By reference.  I don't know, but by reference
25 is the only thing I can think of.

Page 20

1     Q    What do you mean "by reference"?
2     A    Well, there's a cash disbursements policy.
3     Q    Okay.
4     A    So within that, you have to know who the
5  authorized signers are.  That separate document changes
6  every year or two.
7     Q    Okay.
8     A    So this document gets updated; this one pretty
9  much stays the same.
10    Q    Okay.  So this document has been in existence
11 for several years, is that right, for a long time?
12    A    With the modifications.
13    Q    Right, with the modifications.
14    A    Yes.
15    Q    So do you know why it was only produced to the
16 United States last week?
17    A    I don't.
18    Q    Can you please turn to page two of Exhibit 23.
19         Do you see the policies statement at the top,
20 where it says, To define those individuals designated to
21 sign documentation as the authorized representative of
22 Halifax Health?
23    A    Yes.
24    Q    Are the individuals who are designated to sign
25 documents the same individuals who negotiate the terms

Page 21

1  of a contract?
2     A    Not necessarily.
3     Q    Okay.  Are the individuals who do negotiate
4  the terms of the contract, of an employment contract,
5  identified anywhere on that contract?
6     A    Yes.  There's a contract cover sheet.
7     Q    Okay.
8     A    And so usually the administrator -- or
9  currently we have a title called service line
10 administrator, and we also have titles of director or
11 manager.  So it would be someone with one of those
12 titles that enters into the negotiations with contracts.
13    Q    If a cover sheet is blank, if the contract
14 cover sheet doesn't have any individuals identified,
15 does that mean that no one negotiated the terms of the
16 contract?
17    A    I don't believe that would be true, no.
18    Q    Okay.  So if the contract cover sheet is
19 blank, how do you know who negotiated the terms of a
20 contract?
21    A    I'd have to see the contract to answer that
22 question.
23    Q    Okay.  Do the authorized representatives
24 discussed here in Exhibit 23 have any discussions with
25 the individuals who negotiate the terms of a contract?



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 22..25

Page 22

```
1      A   I'm sorry, repeat that question.
2      Q   So somebody signs the contract; is that right?
3      A   Sure.
4      Q   And it might be somebody different than the
5   person identified on the contract cover sheet?
6      A   If they sign the contract, they're supposed to
7   also sign the contract cover sheet.
8      Q   Okay.
9      A   In addition to the other parties that have to
10  sign.
11     Q   Okay.  And you said before that the authorized
12  representatives aren't necessarily the people who
13  negotiate the terms of the contract; isn't that right?
14     A   Correct.
15     Q   So when you have that instance, where the
16  authorized representative is not the same person who
17  negotiated the terms of the contract, does that
18  authorized representative who's binding Halifax have any
19  discussions with the person who negotiated the terms of
20  the contract?
21         MR. STEPHENS:  Objection as to form.  You can
22  answer.
23         THE WITNESS:  I don't know how to answer that
24  question.  They might or they might not.  I mean,
25  it's up to that person signing to ask the questions
```

Page 23

```
1   that they feel are important enough before they
2   sign and execute the contract.
3   BY MS. FITZGERALD:
4      Q   Does Halifax have a written policy explaining
5   when an authorized representative needs to have a
6   conversation with an individual who negotiated the terms
7   of the contract if they're not the same person?
8      A   A policy that requires a conversation?  I
9   don't believe a policy exists that requires a
10  conversation to occur.
11     Q   Is it just up to the discretion of the
12  authorized representative?
13     A   It's within their authority to execute the
14  contract based on the information they have and need to
15  have to be able to do that.
16     Q   Is there a list somewhere of the information
17  that an authorized representative needs to have in order
18  to sign contracts?
19     A   Yes.  The contract cover sheet stipulates who
20  has to sign what types of contracts.
21     Q   Okay.  But you said that it's not within the
22  authorized representative's discretion, right?
23         MR. STEPHENS:  Objection as to form.
24  BY MS. FITZGERALD:
25     Q   They have to know what -- they have to satisfy
```

Page 24

```
1   themselves; is that right?
2          MR. STEPHENS:  Objection as to form.
3          THE WITNESS:  There are certain people that
4   have to review the contract.
5   BY MS. FITZGERALD:
6      Q   Okay.
7      A   Legal has to review the contract, finance
8   reviews contracts, depending on the type of the contract
9   requires other parties as well, and so they would go
10  through the process of determining if those have been
11  done before they execute the contract.
12     Q   And is there a policy or something in place
13  that describes all of those reviews that have to occur?
14     A   In what way?
15     Q   Well, you described different reviews, right?
16     A   Uh-huh.
17     Q   Legal, the other people who are signing --
18  that are listed on the contract cover sheet.
19         Is there any document that exists that says
20  this is what an individual has to review before they
21  sign a contract cover sheet and the contract?
22     A   There are policies that require certain
23  review, and we have many policies that give guidance to
24  the different areas for review.
25     Q   Okay.  Were those policies produced to the
```

Page 25

```
1   United States in this litigation?
2      A   I don't know.
3          (Exhibit 24 was marked for identification.)
4   BY MS. FITZGERALD:
5      Q   Mr. Peburn, I've handed you what's been marked
6   as Exhibit 24.
7          Do you recognize this document?
8      A   I do.
9      Q   Is this document currently in effect?
10     A   I believe so.  I don't believe there's been --
11  I don't believe there's been a revision to this one.
12     Q   Okay.  Did this document supersede or replace
13  a prior contract management policies and procedures?
14     A   I'm not aware.
15     Q   When you say you're not aware --
16     A   This policy was an attempt to put in a single
17  policy all the different areas of expertise and bring it
18  together into a single policy.  So there would be other
19  policies that would identify different components of
20  this policy, but it wasn't in a single consolidated
21  policy, I don't believe.
22     Q   Who should I ask if I wanted to know the
23  answer to that question?
24         MR. STEPHENS:  Objection as to form.
25         THE WITNESS:  I guess we could ask some other
```



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 26..29

Page 26

1      folks in the organization that have been around for
2      a while.
3   BY MS. FITZGERALD:
4      Q    What other folks?
5      A    Our legal department, our compliance
6   department, our finance department. We each have --
7   each area has policy statements that guide their actions
8   and their activities. And so all those parties were
9   involved in the consolidation.
10     Q    Who was involved in the creation of
11  Exhibit 24?
12     A    I don't know all the parties. It would be
13  finance, legal, compliance. I'm sure other parties were
14  involved. I don't know.
15     Q    You said it would be legal, compliance and
16  finance?
17     A    That's how we would -- that's how the
18  organization would operate. In a consolidated policy
19  like this, we'd have those parties involved, but I
20  wasn't directly involved in the creation of the policy.
21  I did review the draft, so I don't know who else had
22  input into the policy.
23     Q    You are aware that you are speaking here on
24  behalf of Halifax; isn't that right?
25     A    Uh-huh.

Page 27

1      Q    So when you say you reviewed the draft, are
2   you talking about yourself as an individual, then,
3   reviewed the draft? I mean, because I'm asking from
4   Halifax who was involved in the creation of this
5   document.
6      A    Right.
7      Q    Not necessarily what you, Mr. Peburn, what
8   your role is, but --
9      A    I understand.
10     Q    Okay.
11     A    But I don't have a memory of exactly the list
12  of names of who was involved in creating this policy.
13     Q    Did you ever have a list -- did Halifax ever
14  create a list of names of who was involved in creating
15  Exhibit 24?
16     A    I don't think so, or I don't know, I should
17  say.
18     Q    And when you said it would be legal,
19  compliance, finance, did you use the phrase "would be,"
20  because you don't have a specific knowledge but that is
21  Halifax's general business practice?
22     A    Yes, correct.
23     Q    In the purpose section -- at the top of page
24  one, it talks about Halifax Hospital Medical Center and
25  its affiliated entities. Do you see that?

Page 28

1      A    I do.
2      Q    Is Halifax Staffing an affiliated entity?
3      A    Yes.
4      Q    A ways down the page there's -- under contract
5   management procedures, there's a subsection, legal
6   review procedure. Do you see that?
7      A    I do.
8      Q    And this section discusses the general counsel
9   office review. Do you see that?
10     A    I do.
11     Q    And it says, The general counsel's office
12  reviews contracts for, and then it has a certain -- has
13  a list of topics after that. Do you see that?
14     A    What specific sentence are you looking at?
15     Q    The second sentence. It starts, The general
16  counsel's office reviews.
17     A    Yes.
18     Q    So just read that sentence and let me know
19  when you're done.
20          MR. STEPHENS:  Do you want him to read it out
21  loud?
22          MS. FITZGERALD:  No, that's okay.
23          THE WITNESS:  Okay.
24  BY MS. FITZGERALD:
25     Q    Is that list exhaustive of the items that the

Page 29

1   general counsel's office reviews contracts for?
2      A    I don't think any review is exhaus- -- or any
3   description is exhaustive. I don't know that it would
4   capture everything. I don't know.
5      Q    Okay. So this -- what other issues does the
6   general counsel office review contracts for other than
7   the items listed here in Exhibit 24, the paragraph under
8   legal review procedure?
9      A    Any other types of risk associated with the
10  contract, including things like if there's a termination
11  clause that may need to be looked at and reconsidered;
12  whether or not the -- if there's arbitration clauses in
13  there that we may want to change; the business
14  associates' agreements, things like that, is it
15  acceptable, versus using our own. So those types of
16  things.
17     Q    Anything else other than --
18     A    I'm sure there's a long list, but I could not
19  list them off.
20     Q    Is there a list that exists anywhere at
21  Halifax of all the components of the general counsel
22  office contract review?
23     A    I don't know. I'm not aware of one.
24     Q    The next sentence begins, The manager or other
25  department representative submitting the contract for



Page 30

1   review.  Do you see that?
2       A   I do.
3       Q   So can we refer to this person as the
4   originating department representative?  Will you
5   understand what I mean when I say that?
6       A   Uh-huh.  It's in --
7       Q   Is it in there?
8       A   -- the parenthetical.
9       Q   So this person, it says, is responsible for
10  understanding and approving the business terms of the
11  contract.  Do you see that?
12      A   I do.
13      Q   What review does the originating department
14  representative do to understand and approve the business
15  terms of the contract?
16      A   This policy applies to all contracts.  And
17  earlier you made a statement that you want me to answer
18  the question as it relates specifically to physician
19  contracts?
20      Q   The neurosurgeons and the medical oncologists,
21  the physicians named in the United States' complaints in
22  intervention.
23      A   So I will focus in only on an answer that
24  would relate to the activities surrounding that type of
25  contract.

Page 31

1       Q   Thank you.
2       A   Is that helpful?
3       Q   That's good.  Thank you.
4       A   So there would also be a process by which
5   additional information would be needed beyond a normal
6   contract review.  So for the physicians that are in
7   question, the originating department would also gather
8   information as it relates to fair market value and
9   commercial reasonableness.
10      Q   Was that the policy prior to the effective
11  date of April 2009 for Exhibit 24 that --
12      A   That's -- that's always been the practice,
13  yes.
14      Q   Is that practice written down somewhere?
15      A   The only place that it would have been written
16  down prior to the consolidation would have been in our
17  compliance policies statements.
18      Q   And you say "would have been."  Was it, in
19  fact, included in those --
20      A   I don't know that, but that's where it would
21  be if -- I mean, that would be the guidance provided by
22  our internal folks.  So that's always been the practice.
23      Q   But you're not sure if it was written down
24  somewhere?
25      A   No, but everybody followed that practice.

Page 32

1       Q   Okay.  Is there an approval process?  It says,
2   Understanding and approving the business terms of the
3   contract.
4           Is there any sort of documentation associated
5   with the approval of the business terms?
6       MR. STEPHENS:  Objection as to form.
7       THE WITNESS:  Typically the process would
8       include finance and legal, and at some point the --
9       we have -- for these cases specifically that you're
10      referring to, would include recruiters and,
11      depending on the time period and whether or not we
12      were recruiting or renegotiating, could have
13      included or would -- did include fair market value
14      type reviews, which would include survey data
15      and -- as such and -- related to that specialty.
16          So yes, there would be other activities and
17      information that would be gathered to help
18      negotiate that contract.
19  BY MS. FITZGERALD:
20      Q   Well, not just to negotiate, but also to
21  approve the contract?
22      A   Sure, to approve it.
23      Q   It says the originating department
24  representative is also responsible for following other
25  applicable policies, including physician compensation.

Page 33

1           Do you see that?
2       MR. STEPHENS:  Objection as to form.
3       THE WITNESS:  I don't see it.
4   BY MS. FITZGERALD:
5       Q   Okay.  Could you read the last sentence of the
6   paragraph, legal review procedure, into the record?
7       A   Starting with, The manager?
8       Q   Yes, please.
9       A   The manager or other department representative
10  submitting the contract for review, parenthetically
11  originating department representative, is responsible
12  for understanding and approving the business terms of
13  the contract and for following all other applicable
14  policies in the administration and execution of the
15  contract; i.e., procedures related to bidding and
16  procurement, physician compensation, et cetera.
17      Q   What are the applicable policies with respect
18  to physician compensation that are referenced in
19  Exhibit 24?
20      A   Specifically related to compliance policies --
21      Q   Okay.
22      A   -- or standards -- and standards.
23      Q   Okay.  So there are compliance policies and
24  standards --
25      A   Yes.



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 11 of 143 PageID 14573

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 34..37

Page 34

1      Q    -- related to physician compensation?
2      A    There are.
3      Q    Anything else?
4      A    Not that I can think of.
5      Q    Well, if you think of anything else during the
6  course of today, just let me know.
7      A    Okay.
8      Q    So is the originating department
9  representative responsible for approving physician
10 compensation?
11          MR. STEPHENS:  Object as to form.
12          THE WITNESS:  I don't understand exactly
13     how -- the way you're using the word approving.
14 BY MS. FITZGERALD:
15     Q    Okay.  Sure.
16     Well, this document, Exhibit 24, talks about
17 the originating department representative, it says, is
18 responsible for understanding and approving the business
19 terms of the contract and for following all other
20 applicable policies in the administration and execution
21 of the contract.
22     So I'm wondering, does the approving the
23 business terms of the contract mean that the originating
24 department representative is also approving the
25 physician compensation as the term approving is used in

Page 35

1  Exhibit 24?
2      A    They wouldn't necessarily have the final
3  authorization, but they would definitely be making --
4  they would have to approve of the contract and the terms
5  prior to the party executing the contract.
6      Q    Who does have the final authorization?
7      A    There's -- you provided an exhibit of
8  authorized signers previously.  It would be that group
9  of folks, depending on the contract.
10     Q    So the individuals who are authorized to sign
11 for Halifax have the final authorization of physician
12 compensation?
13     A    They have final authorization of the entire
14 contract.
15     Q    Including physician compensation?
16     A    All contracts.
17     Q    To include physician compensation?
18     A    Yes, yes.
19     Q    And so it's the individuals who are signing
20 the actual contract who have the final approval of the
21 compensation outlined in a contract; is that right?
22     A    Yes.  And with all the other parties doing
23 their due diligence.  Signing the contract cover sheet
24 demonstrates that due diligence.  And the signer has
25 final authority to execute the agreement.

Page 36

1      Q    Okay.  Does the general counsel's office have
2  a role with respect to physician compensation?
3      A    In what sense?
4      Q    Any sense.
5      A    There's guidance there as it relates to if our
6  process in evaluation was sufficient.
7      Q    When you say whether process in evaluation was
8  sufficient, what does that mean?
9      A    Well, they don't actually perform the due
10 diligence as it relates to physician compensation and
11 fair market value, so they only can provide guidance as
12 to whether or not the documentation we provide is
13 sufficient.
14     Q    I see.  So the general counsel's office, is it
15 fair to say, doesn't actually do an analysis, they
16 review the documentation provided to see if that
17 documentation is sufficient?
18          MR. STEPHENS:  Objection as to form.
19          THE WITNESS:  They don't do the analysis.
20     They do review the contract and its terms.
21 BY MS. FITZGERALD:
22     Q    What does the review of the contract and its
23 terms -- what review does the general counsel's office
24 do for the contract and terms with respect to physician
25 compensation?

Page 37

1          MR. STEPHENS:  Object as to form.
2          THE WITNESS:  They review the entire contract
3     and can make any comments they'd like to, that they
4     feel appropriate, so it could be any comment.
5  BY MS. FITZGERALD:
6      Q    I'm asking specific about the compensation
7  provision.
8      A    Correct.
9      Q    Is there -- are there any special reviews that
10 the office of general counsel does for physician
11 compensation?
12          MR. STEPHENS:  Objection as to form.
13          THE WITNESS:  Only as to whether or not the
14     documentation and the process that was followed is
15     sufficient.
16 BY MS. FITZGERALD:
17     Q    Okay.  Is there a document that existed in
18 2009 that outlined the process for evaluating physician
19 compensation?
20     A    As part of this contract, I believe there's
21 some discussion.
22     Q    Okay.  This is -- has an effective date of
23 2009, so I'm asking about --
24     A    Oh, prior to.
25     Q    -- prior to 2009.  Was there anything that



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 38..41

Page 38

1  listed the process for determining physician
2  compensation, any documents?
3       A    No, I can tell you the process that we
4  followed.
5       Q    Okay.  Why don't you tell me the process that
6  you followed.
7       A    Okay.  So prior to 2009, for as long as I've
8  actually been with the hospital, I'm aware of -- and
9  this has been done by different departments over the
10  course of time, understand --
11       Q    Okay.
12       A    -- so -- but the process would be usually to
13  start with the recruiter information, because they have
14  the most -- they have the most current information and
15  they also know what it takes to recruit a physician into
16  certain markets.
17            But, you know, our goal is always to pay the
18  least, not the most.  Okay.  So we're a -- we're the
19  community provider, the charity provider of care, and so
20  we have to obtain services at a fair and reasonable
21  compensation to recruit somebody, but it still has to be
22  at the lower end, not the highest.
23            So we would also use survey data, such like
24  MGMA, Sullivan and Cotter, those types of data sources,
25  data points.  But certain circumstances -- and you're

Page 39

1  asking specifically related to these two groups of
2  physicians.  So in the neurosurgeons' case, we use more
3  than just that survey data and recruitment data.  We
4  also used other trauma center-specific information and
5  we would call around to other facilities outside of our
6  market, because there are no other trauma centers in our
7  market, to find out what they were paying to help us
8  negotiate the contract.
9            Obviously, the physician wants more and the
10  hospital wants to pay less, and so at least it gave us a
11  framework to build from.  And so that was what we've
12  always done.  We have had some trouble recruiting
13  neurosurgeons specifically over the course of time and
14  retaining them.  We've recruited some and lost some
15  because of our compensation levels.
16            And we currently only have three
17  neurosurgeons, so we have to still use locum tenens,
18  which is an outside, part-time, temporary type service,
19  and that's obviously the most expensive type of
20  physician coverage you can get.  But this coverage and
21  recruitment effort is solely for the purpose of covering
22  trauma call and provision of services to the
23  uncompensated or underfunded patients.
24       Q    The locum tenens, you mean?
25       A    Both.  You know, all of the neurosurgery

Page 40

1  coverage is basically --
2       Q    Okay.
3       A    Our employment practices from the beginning,
4  2000 or before, you can go back prior to 2000, our
5  intent was never to have to employ physicians.  So that
6  was our starting point actually.  It was just to get
7  them into town to join our medical staff and take call
8  coverage.  And so that was our intent.
9            And that worked for a while.  We had some in
10  town and they provided coverage.  And then, you know, we
11  lost a couple.  And so then we had to advance our
12  recruiting efforts to fully employ the whole group.
13       Q    You talked about starting with recruiter
14  information and -- did Halifax conduct this review on a
15  periodic basis or was it only when physicians were first
16  joining staff?
17       MR. STEPHENS:  Objection as to form.
18  BY MS. FITZGERALD:
19       Q    Well, wait, let's -- I'll address the
20  objection.
21            How frequently did this procedure occur?
22       A    Well, it would happen every, I would say, two
23  or three years.  Physician compensation, physician
24  competitiveness, competition in certain specialties,
25  specifically for oncology and neurosurgery, both of

Page 41

1  those groups' compensation over the course of the
2  twelve-year period or so that you're talking about has
3  been very competitive and continues to be so.  And so
4  it's -- every couple years we're having to renegotiate.
5  And sometimes we're effective at holding things flat and
6  sometimes we're not effective at holding things flat,
7  depending on what -- how strong the market conditions
8  are changing.
9       Q    Are there records of this review that exist
10  every two to three years?  Let's say specifically from
11  2000 through 2009, are there records that exist of this
12  analysis that you discussed starting with recruiting
13  information and going through survey data?  Is there any
14  record of that occurring?
15       A    You know, the parties that would have been
16  involved during that time would have been our
17  recruitment office, which was sometimes -- for a period
18  of time was included in our medical staff office and I
19  think partly in our human resource or marketing office,
20  so -- depending on where the recruiter was.  So they
21  would have, or would have had, documentation supporting
22  their data that they pulled.
23            And then as well as our administrator at the
24  time of the hospital who was primarily responsible for
25  making sure we had call coverage 24/7 365 for every



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 42..45

Page 42

1  specialty that was required for trauma call, which these
2  are.  He would have had, at some point, documentation.
3      Q   Okay.  You say "would have had" for both the
4  recruiter and the administrator.  Do those documents
5  actually exist?
6      A   I have not reviewed any.  I don't know if they
7  still exist.
8      Q   Were they ever destroyed?
9      A   I'm not aware of that, no.
10      Q   So you've never seen any documents, but your
11  understanding is that at some point they must have
12  existed because that's Halifax's practice?
13          MR. STEPHENS:  Objection as to form,
14      mischaracterizes his testimony.
15          THE WITNESS:  Those parties would have had
16      information that they used to go through that
17      process.  Whether they kept the documentation or
18      not, I don't know.
19  BY MS. FITZGERALD:
20      Q   Would it -- would they have been required by
21  Halifax to keep that documentation?
22          MR. STEPHENS:  Objection as to form, outside
23      the scope of the 30(b)(6).  The document retention
24      30(b)(6) witness was deposed last week.
25          THE WITNESS:  I don't know.

Page 43

1  BY MS. FITZGERALD:
2      Q   You can answer the question.
3      A   I honestly don't know.
4      Q   But you've never seen them?
5      A   I have not seen them.
6      Q   And when you listed the individuals that you
7  talked to in connection with your preparation for your
8  deposition here today, you did not list either the
9  hospital administrator or anyone in recruitment; isn't
10  that right?
11      A   Correct.  Those parties that I'm referring to
12  are no longer with Halifax.
13      Q   Are you saying you would have been unable to
14  speak to the recruitment and/or administrator if you
15  wanted to?
16          MR. STEPHENS:  Objection as to form.
17          THE WITNESS:  I didn't say that.
18  BY MS. FITZGERALD:
19      Q   Okay.  So you could have spoken with them?
20          MR. STEPHENS:  Objection as to form.
21          THE WITNESS:  But I did not.
22  BY MS. FITZGERALD:
23      Q   Why not?
24      A   I didn't think it was necessary.
25      Q   Well, so you've never seen documents about a

Page 44

1  fair market value analysis or any compensation analysis
2  from 2000 to 2009; isn't that right?
3          MR. STEPHENS:  Objection as to form,
4      mischaracterizes his testimony.
5          THE WITNESS:  I'm not saying I never saw it.
6  BY MS. FITZGERALD:
7      Q   Oh, when did you see them?
8      A   I don't know.  I don't remember.
9      Q   Was it in preparation for your deposition
10  testimony here today?
11          MR. STEPHENS:  Objection as to form, asked and
12      answered.
13          THE WITNESS:  I don't know how to answer that
14      question again.
15  BY MS. FITZGERALD:
16      Q   What?  So you said --
17      A   Ask the question again.
18      Q   Sure.
19          So did you see any of these documents related
20  to a physician compensation analysis from 2000 to 2009?
21  Did you see any of those in preparation for your
22  deposition testimony today?
23          MR. STEPHENS:  Objection as to form.
24          THE WITNESS:  I've seen lots of documents
25      related to fair market value and commercial

Page 45

1  reasonableness.
2  BY MS. FITZGERALD:
3      Q   Yeah.  I'm talking specific from 2000 to
4  2009 -- are you with me so far?
5          MR. STEPHENS:  Objection as to form.
6  BY MS. FITZGERALD:
7      Q   Yes?
8      A   I am with you.
9      Q   Okay.
10      A   But what I'm saying is, I don't remember
11  specifically the years they applied to.  I've seen lots
12  of fair market value, and I can tell you the process
13  that we followed.  I was not directly involved, but I
14  understood how Halifax operated.  And I've explained
15  that already, how we -- the process we went through.
16          And so I know the folks that did this process,
17  performed this process, they went through it, and I know
18  they got into this information, and I know they had to
19  renegotiate and discuss with the physicians every two or
20  three years because the pressures were -- from the
21  physician's side and the market, was to increase their
22  compensation, not decrease it.  And on our side the
23  pressure was to keep it the same or decrease it if we
24  could, and so I know that happened.  I remember
25  discussions and so forth happening.



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 14 of 143 PageID 14576

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                   Pages 46..49

Page 46

1    So I can describe Halifax's protocol or
2  process or standard practice, but as it relates to
3  specific documentation, unless I see it here, I can't
4  tell you exactly what period of time it related to.
5    Q    And I asked you whether there were documents
6  that existed, and you said there would have been
7  documents in the administrative office -- the
8  administrator's office and the recruitment office; isn't
9  that right?
10    A    They would be the parties that would have had
11  it, yes.
12    Q    And I asked whether those documents still
13  existed.
14    A    And I don't know.
15    Q    And the documents that you're thinking of that
16  would have existed in the administrator's office and the
17  physician recruitment office --
18    A    Uh-huh.
19    Q    -- have you ever seen those documents before?
20    MR. STEPHENS:  Objection as to form.
21    THE WITNESS:  I have seen MGMA data, Sullivan
22  & Cotter data, recruitment data, for the entire
23  time I've been with Halifax, which has been 17
24  years.  I've seen folks that have accumulated that
25  information, so I know they used that specifically

Page 47

1  for neurosurgery, medical oncology, the folks that
2  you're talking about, over that course of that
3  time, yes.  But I can't specifically tell you
4  here's the document and whether or not it still
5  exists.  I believe there's some documentation that
6  we've already provided to your office, which would
7  have included a lot of that documentation.
8  BY MS. FITZGERALD:
9    Q    So any existing documentation, your
10  understanding is, would have been provided to the
11  United States in connection with this case?
12    A    I would think so, yes.
13    Q    Can you turn to page two of Exhibit 24,
14  please.
15    Do you see at the top there's a continuation
16  of a list, three, four, five.  I'd like to direct your
17  attention to the paragraph after number five.
18    Do you see that?
19    A    Yes.
20    Q    Can you just take a moment and read that
21  paragraph and then the three paragraphs underneath it,
22  and let me know when you're done.
23    A    Out loud?
24    Q    No, you can just read it to yourself.  You can
25  save your voice.

Page 48

1    MR. STEPHENS:  Take as much time as you need.
2    MS. FITZGERALD:  Yes.
3    THE WITNESS:  Okay.
4  BY MS. FITZGERALD:
5    Q    This section that you just reviewed, it
6  discusses different avenues for what can occur after the
7  general counsel's office review; is that right?
8    MR. STEPHENS:  Objection as to form.  What
9  section are you referring to?
10    MS. FITZGERALD:  The part that you just read.
11    MR. STEPHENS:  I didn't read anything.
12    MS. FITZGERALD:  Well, I directed the witness
13  to read.  I'm asking the questions of the witness.
14    MR. STEPHENS:  Do you know what she's talking
15  about?
16    THE WITNESS:  Ask the question again, please.
17  BY MS. FITZGERALD:
18    Q    The section that you just read, it talks about
19  different avenues for what can occur after the general
20  counsel office review; is that right?
21    A    Different avenues?
22    Q    Well, it talks about a contract being
23  acceptable or not acceptable; is that right?
24    MR. STEPHENS:  Objection as to form.
25    THE WITNESS:  I think what the intent of this

Page 49

1  section is, is to more clearly identify, when legal
2  reviews a contract and they have certain concerns
3  or comments, that -- you know, does it have to be
4  changed or is it highly recommended or it's just a
5  suggestion.  I think that's really the nature of
6  the intent.
7  BY MS. FITZGERALD:
8    Q    Well, there's also an avenue for a contract
9  being acceptable; isn't that right?
10    MR. STEPHENS:  Objection as to form.
11  BY MS. FITZGERALD:
12    Q    The first sentence says, If the contract is
13  acceptable, the general counsel's office will forward
14  the contract to the appropriate party for execution.
15    A    Okay.  What's the question?
16    Q    Well, that's also an option, right?  It's not
17  that everything has to be changed; sometimes a contract
18  is just acceptable.
19    MR. STEPHENS:  Objection as to form.
20    THE WITNESS:  If they have no comments, they
21  will have no comments and say such.
22  BY MS. FITZGERALD:
23    Q    But the contract is acceptable?
24    A    Yes.
25    Q    So it says, If the contract is not acceptable,



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 50..53

Page 50

1 the reviewing attorney will prepare a memo to the
2 originating department representative.
3          Do you see that?
4     A    Yes.
5     Q    So if the originating department
6 representative does not receive a memo, is the
7 originating department representative to believe that
8 the contract is acceptable?
9          MR. STEPHENS:  Objection as to form.
10         THE WITNESS:  The legal counsel would initial
11    the contract and sign the contract cover sheet for
12    their -- identifying their review, and the memo
13    attached to it would also identify that there's no
14    issues.
15 BY MS. FITZGERALD:
16    Q    So every time there's a contract cover sheet,
17 there's also a memo from legal saying that there are no
18 issues --
19         MR. STEPHENS:  Objection as to form.
20 BY MS. FITZGERALD:
21    Q    -- or identifying issues that exist?
22    A    Most contracts I see have a memo with certain
23 suggestions, even if it includes changing the location
24 from an out-of-state to a Florida jurisdiction or other
25 terms.

Page 51

1     Q    Was that also Halifax's policy from 2000 to
2 2009?
3          MR. STEPHENS:  Objection as to form.  Policy
4     as to what?
5          THE WITNESS:  Specifically related to what?  I
6     mean --
7 BY MS. FITZGERALD:
8     Q    Well, you said that the contracts that you see
9 have a memo associated with them behind the contract
10 cover sheet.  And this policy talks about the reviewing
11 attorney preparing a memo?
12    A    Right.
13    Q    And my question is, was that the policy prior
14 to 2009 as well, from 2000 to 2009?
15    A    I don't know that every contract would have
16 had a memo, but it -- I do remember contracts having
17 notes on them from legal counsel to -- modifying the
18 contract, to make changes, as opposed to a memo format.
19 That's my memory of that.
20    Q    Did legal make any changes to any of the
21 neurosurgeon contracts from 2000 to 2009?
22         MR. STEPHENS:  Objection as to form, outside
23    the scope of the 30(b)(6).
24         THE WITNESS:  I don't know that.
25 BY MS. FITZGERALD:

Page 52

1     Q    Did legal make any changes to the medical
2 oncologists' contracts from 2000 to 2009?
3          MR. STEPHENS:  Objection as to form, outside
4     the scope of the 30(b)(6).
5          MS. FITZGERALD:  How is this outside the scope
6     of the 30(b)(6)?  We're talking about the --
7          MR. STEPHENS:  You're asking him for fact
8     testimony about these contracts.
9          MS. FITZGERALD:  The topic is the creation,
10    negotiation, and amendment of compensation
11    agreements.
12         MR. STEPHENS:  Uh-huh.
13         MS. FITZGERALD:  So how is a question about
14    what occurred during the creation, negotiation, and
15    amendment of compensation agreements outside the
16    scope of the 30(b)(6)?
17         MR. STEPHENS:  I stand on my objection.  I
18    didn't tell him not to answer.
19         MS. FITZGERALD:  No, I'm asking you a
20    question.  If there's a problem with the questions
21    that I'm asking that I agree with, I'd like to
22    correct the problem.
23         MR. STEPHENS:  I'll state my objections as
24    they come.  Go ahead.
25 BY MS. FITZGERALD:

Page 53

1     Q    Did legal undertake any review of the medical
2 oncologists' contracts from 2000 to 2009?  Did they make
3 any changes to the medical oncologists' contracts from
4 2000 to 2009?
5     A    I don't remember specific changes that were
6 made to the contracts.
7     Q    Have you ever seen any changes made by the --
8 by legal to the medical oncologists' contracts from 2000
9 to 2009?
10    A    I'm sure I did, but I don't remember
11 specifically what changes they would have made.
12         MR. STEPHENS:  Objection as to the form,
13    outside the scope of the 30(b)(6).
14 BY MS. FITZGERALD:
15    Q    Were there any written memos from legal that
16 were produced to the United States in this litigation
17 related to the general counsel office review of the
18 neurosurgeon contracts?
19         MR. STEPHENS:  Objection as to form.  And I'm
20    going instruct the witness not to answer to the
21    extent that it calls for disclosing any
22    attorney/client privileged information.  If it does
23    not, you can answer.
24         THE WITNESS:  I'm sorry, ask the question
25    again.



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 54..57

Page 54

1  BY MS. FITZGERALD:
2      Q    Right.  The question was, were there any
3  office of general counsel memos, written memos, that
4  were produced to the United States in connection with
5  this litigation related to the neurosurgeon contracts?
6      A    Memos from our attorney's office to the
7  United States?
8      Q    No, no, no.  Were any of the internal Halifax
9  office of general counsel memos contemplated here in
10  page two of Exhibit 24, were any of those produced to
11  the United States in this litigation?
12      A    I don't know.
13      Q    What about for the medical oncologists?
14      A    I don't know.  I didn't look at all the
15  documentation that was produced.
16      Q    Right.  How could you?
17      A    Okay.
18      Q    It's a lot of paper.
19          I'd like to turn your attention specifically
20  to the compliance revision section of -- that you just
21  looked at before on page two of Exhibit 24.
22      A    Okay.
23      Q    When it talks about legal questions to the
24  point that the legality of the contract is in question
25  and it says, Examples of this type of provision --

Page 55

1  revision or provisions that would violate any state or
2  federal law, rule or regulation, does that include the
3  Stark Law?  Is that one of the federal laws that's
4  included here?
5      A    It says "any," so I would assume yes.
6      Q    Okay.
7      A    It wasn't specifically contemplated here, but
8  it would appear that it would be, yes.
9      Q    Okay.  So was the general counsel's office
10  involved in evaluating the legality of the compensation
11  paid with respect to the Stark Law?  Were they reviewing
12  the physician compensation for compliance with the
13  Stark Law?
14      A    They would have, yes.
15      Q    Okay.  And that was from -- this document,
16  Exhibit 24, is dated 2009.  So prior to 2009, was the
17  legal department reviewing physician compensation
18  agreements for compliance with the Stark Law?
19      A    They would have, yes.
20      Q    You say they would have.  Did they?
21      A    Well, that's their job to do that.  Yes, they
22  would do that.
23      Q    They did do that?
24          MR. STEPHENS:  Objection as to form, outside
25      the scope of the 30(b)(6).

Page 56

1          He's not here to testify about his factual
2      knowledge of what compliance review has done on any
3      particular contract.  He testified about what the
4      policy was, and the policy was, as he testified,
5      for the legal department to perform Stark Law
6      review.
7  BY MS. FITZGERALD:
8      Q    Did the legal department actually perform a
9  Stark Law review of the neurosurgeon contracts from
10  2000 to 2009?
11          MR. STEPHENS:  Objection as to form.  Outside
12      the scope of the 30(b)(6) testimony.  You can
13      answer.
14          THE WITNESS:  They would have.
15  BY MS. FITZGERALD:
16      Q    But you don't know for a fact that they did?
17          MR. STEPHENS:  Objection as to form, outside
18      the scope of the 30(b)(6) testimony.
19          THE WITNESS:  I think I've answered the
20      question.
21  BY MS. FITZGERALD:
22      Q    No, you haven't.  My question is, did they
23  actually do a review, and you just said that they would
24  have.  And I'm asking whether you, in fact, know that
25  legal performed a review from 2000 to 2009 of the

Page 57

1  physician compensation for the neurosurgeons with
2  respect to the Stark Law.
3          MR. STEPHENS:  Objection as to form, outside
4      the scope of 30(b)(6) topic.
5          THE WITNESS:  My only knowledge -- the only
6      knowledge I can share with you is what they would
7      be doing as part of Halifax, a department of the
8      hospital.  They're the legal department.  They
9      would be the ones to review for that compliance.
10  BY MS. FITZGERALD:
11      Q    Okay.  So they would be.  Maybe they did;
12  maybe they didn't?
13      A    I'm not saying that.
14          MR. STEPHENS:  Objection as to form.
15  BY MS. FITZGERALD:
16      Q    What are you saying?
17      A    Exactly what I said.
18      Q    So you just don't have any knowledge about
19  whether they actually did a review?
20      A    I know they perform that function and they've
21  always performed that function.
22      Q    Okay.
23      A    Whether they did it specifically on an
24  individual contract, I can't answer that.  But if their
25  signature is on it, they would have done their review.



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER | VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013 | Pages 58..61

Page 58

1    Q    Was the policy that the legal department would
2    create any kind of documentation saying that they had
3    reviewed the physician compensation agreement for
4    compliance with the Stark Law?
5        A    I'm sorry, ask the question again.
6            MS. FITZGERALD:  Can you read it back, please.
7            (The question was read by the reporter as
8    follows:  "Was the policy that the legal department
9    would create any kind of documentation saying that they
10   had reviewed the physician compensation agreement for
11   compliance with the Stark Law?")
12           THE WITNESS:  Does the policy specifically
13   state they have to create documentation --
14   BY MS. FITZGERALD:
15       Q    Yes.
16       A    -- is the question?  Pre-2009?
17       Q    Sure.
18       A    Okay.  Or post or both?
19       Q    Let's start with pre-2009.  From 2000 to 2009.
20       A    They're required to sign off on the contract.
21       Q    Okay.
22       A    So that would have included that review, yes.
23       Q    Okay.  So it was -- but there was no separate
24   docu- -- there was no policy saying that there had to be
25   a separate documentation that the legal department had

Page 59

1    done a review of the compensation for compliance with
2    the Stark Law?
3            MR. STEPHENS:  Objection as to form.
4            THE WITNESS:  I'm trying to remember if there
5        was a specific statement -- or policy statement
6        that told them what -- physically what to do.
7    BY MS. FITZGERALD:
8        Q    Yeah.
9        A    I'm not aware, but that's what they would have
10   done.  They would have performed that review and then
11   signed off on the contract.  Their signature represents
12   their review.
13       Q    Okay.  Can you turn to page three of
14   Exhibit 24, please.
15           Do you see the section that says, Contract
16   renewals, slash, termination?
17       A    Yes.
18       Q    Can you read the first sentence into the
19   record, please.
20       A    Prior to a scheduled contract renewal
21   termination date, the general counsel's office will
22   forward a contract review notice to the originating
23   department representative.
24       Q    Was this also the policy before 2009?
25       A    I'm trying -- we implemented a contract

Page 60

1    management software system that aided in this at some
2    point, and I don't remember the date at which we did
3    that.  But that produced an electronic printout of
4    the -- based on the renewal dates.
5            However, prior to 2009, I do remember that the
6    legal department would send notifications, but I don't
7    know at what point that contract management software
8    automated it.
9        Q    What's the name of that contract management
10   software?
11       A    I don't know the name of it.
12       Q    Okay.
13       A    I call it the contract management software.
14       Q    Okay.  Turning to the very last part, it says,
15   Financial relationships with physicians and other
16   sources of referrals.
17           Do you see that?
18       A    Yes.
19       Q    Are physicians sources of referrals to
20   Halifax Hospital?
21           MR. STEPHENS:  Objection as to form, calls for
22       a legal conclusion.
23           THE WITNESS:  I don't understand the question.
24       What are you referring to?
25   BY MS. FITZGERALD:

Page 61

1        Q    Sure.  It says, Physicians and other sources
2    of referrals.  Does the "and other sources" mean that
3    physicians are sources of referrals to Halifax?
4            MR. STEPHENS:  Objection as to form, outside
5        the scope of the 30(b)(6) deposition and calls for
6        a legal conclusion.
7            THE WITNESS:  This represents any contract
8        that deals with physicians or referral sources.
9        Are you asking whether or not it's referencing the
10       hospital?
11   BY MS. FITZGERALD:
12       Q    No.  It says, Physicians and other sources of
13   referrals.  So my question is, are physicians sources of
14   referrals?
15           MR. STEPHENS:  Objection as to form, outside
16       the scope of the 30(b)(6) topics and calls for a
17       legal conclusion.
18           THE WITNESS:  I honestly don't understand the
19       question as to what you're asking.
20   BY MS. FITZGERALD:
21       Q    Okay.  I'll ask it one more time.  I'll see if
22   I can -- do you know what the phrase "other sources of
23   referrals" means?
24       A    Any referral to the organization, yes.
25       Q    So can physicians make referrals to Halifax?



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 62..65

Page 62

1     MR. STEPHENS:  Objection as to form, outside
2   the scope of the 30(b)(6) testimony, calls for a
3   legal conclusion.
4     THE WITNESS:  I'm not an attorney to -- I'm
5   not sure how to answer that question.
6   BY MS. FITZGERALD:
7     Q   Okay.  You don't have an answer?
8     A   Not really, no.  I don't know how to answer
9   it.  I don't know if the answer is yes or no, to be
10   honest.
11     Q   Okay.  And if I wanted to know whether the
12   answer was yes or no, who should I ask?
13     A   As to whether physicians are a source of
14   referrals?
15     Q   Yeah.
16     MR. STEPHENS:  Objection, outside the scope of
17   the 30(b)(6) testimony.
18     THE WITNESS:  I don't know.
19     MS. FITZGERALD:  Okay.
20     (Exhibit 25 was marked for identification.)
21   BY MS. FITZGERALD:
22     Q   Handing you what's been marked as Exhibit 25
23   to your deposition.  Have you ever seen Exhibit 25
24   before, Mr. Peburn?
25     MR. STEPHENS:  Why don't you take your time

Page 63

1   and look through the entire exhibit.
2     MS. FITZGERALD:  Well, you don't have to if
3   you know from looking at the front of it whether
4   you've seen it before.
5     MR. STEPHENS:  You can take your time and look
6   through the whole exhibit to confirm.
7     THE WITNESS:  I have.
8   BY MS. FITZGERALD:
9     Q   Is this one of the documents that you looked
10   at in connection with your preparation for your
11   deposition testimony here today?
12     A   I don't remember if I read this in preparation
13   for this deposition, to be honest.
14     Q   Okay.
15     A   I have read it, though.
16     Q   Is this a copy of the current financial
17   arrangements, legal review and approval process
18   compliance standard, the one that's currently in effect
19   today?
20     A   I believe so, but it's possible there's been
21   revisions by the compliance committee.
22     Q   Okay.
23     A   So I don't -- I can't answer it affirmatively,
24   but I believe so.
25     Q   Okay.  Well, if at any time you come to

Page 64

1   understand that there's a different one throughout the
2   course of the questioning that is more up to date, just
3   let me know.
4     This policy has an effective date of
5   November 1st, 2007.  Do you see that?
6     A   Yes.
7     Q   Did this compliance standard replace a
8   different compliance standard?
9     A   I don't know.
10     Q   Who would know?
11     A   Our compliance officer.
12     Q   Okay.  You didn't talk to your compliance
13   officer in preparation for your deposition testimony
14   here today?
15     A   Not about this.
16     Q   Okay.  Did you talk to the compliance officer
17   about anything in preparation for your deposition
18   testimony today?
19     A   We did have a conversation, not about any of
20   the technical information, just about, you know, the
21   interactions and so forth.
22     Q   Who is the current compliance officer?
23     A   George Rousis.
24     Q   Okay.  When did you speak with Mr. Rousis?
25     A   A week ago, I guess.

Page 65

1     Q   And you said it wasn't about any sort of this
2   technical stuff?
3     A   It wasn't about technical or any data or
4   reports or any information.  It was just about -- just
5   the format and so forth and the flow of the meeting and
6   so forth.
7     Q   Okay.  And Mr. Rousis had been deposed before,
8   correct?
9     A   Yes.  That's why I asked him those questions
10   of how it flows and so forth.
11     Q   What did he tell you?
12     MR. STEPHENS:  Objection, outside the scope of
13   the 30(b)(6) topic.
14     THE WITNESS:  He just gave me some pointers as
15   to be patient, listen carefully to the questions
16   and pause and respond.
17   BY MS. FITZGERALD:
18     Q   Did Mr. Rousis tell you anything else?
19     A   Not that I remember.
20     Q   Have you ever seen a compliance standard about
21   financial arrangements, legal review and approval
22   process that predated this one from November 2007?
23     MR. STEPHENS:  Objection as to form, outside
24   the scope of 30(b)(6).  The witness on this topic,
25   topic 24, testified already for seven hours last



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 66..69

Page 66

1    week.
2          THE WITNESS:  I don't know.
3    BY MS. FITZGERALD:
4          Q    So any --
5          A    I would not know that question -- the answer
6    to that question.
7          Q    So anything that related to the compliance
8    standards that were in effect for the medical
9    oncologists and neurosurgery contracts that you're here
10   to testify to, you're not sure if there was any policy
11   in effect prior to Exhibit 25?
12         A    I'm not specifically aware, but there may have
13   been, and George Rousis would have known that, the
14   compliance officer.
15         Q    But he wasn't testifying to the specific
16   contracts at issue, and I'm asking you about the
17   specific contracts at issue in this case.
18         A    You're asking about the policy statements
19   specifically surrounding.
20         Q    The creation, negotiation, and amendment of
21   the neurosurgery and medical oncology contracts?
22         A    Yes.  And I can tell you the practice that
23   surrounded that.
24         Q    Right.  So what was the practice prior to 2007
25   with respect the legal review and approval process?  Is

Page 67

1    that what we talked about before --
2          A    Correct.
3          Q    -- where you talked about the recruiter and
4    all that?
5          A    Correct.  And including the survey data, as
6    well as -- for the neurosurgeons specifically, that's
7    where we had to also use additional information which
8    included other trauma centers in the region, outside of
9    our service area.
10         Q    Can you please turn to page two of Exhibit 25.
11              Do you see section E, standards?
12         A    Yes.
13         Q    Okay.  And section 1a, can you read that into
14   the record?
15         A    This policy applies to any agreement or
16   financial relationship involving any referral source.
17         Q    Does this policy apply to the neurosurgeons
18   identified in the United States' complaint in
19   intervention?
20         A    This policy in total would apply to any
21   financial arrangements, legal review and approval
22   process for any contracts so, yes, it would apply to
23   all contracts.  It's a contract and it would apply.
24         Q    And to the medical oncologists as well?
25         A    It would apply to all contracts.

Page 68

1          Q    And Dr. Kelly Molpus?
2          A    This policy applies to all contracts.
3          Q    Including Dr. Molpus?
4          A    His -- he has a contract, yes, it would
5    include him.
6          Q    Section 2a?
7          A    E2a.
8          Q    E2a says, Legal review is required for any
9    financial arrangement with a referral source.
10              Do you see that?
11         A    I do.
12         Q    Can you please describe the legal review for
13   me?
14              MR. STEPHENS:  Objection as to form, asked and
15         answered.
16              THE WITNESS:  I'm sorry?
17              MR. STEPHENS:  I'm just stating my objection.
18         Go ahead.
19              THE WITNESS:  Oh, I didn't hear what you said.
20              Describe the legal review process?
21   BY MS. FITZGERALD:
22         Q    Uh-huh.  What is this policy as it relates to
23   the neurosurgeon and the medical oncology contracts?
24   Please describe the legal review process that's
25   articulated in E2a.

Page 69

1              MR. STEPHENS:  Objection as to form.
2              THE WITNESS:  The legal department would
3         review the contract for compliance with this
4         policy.
5    BY MS. FITZGERALD:
6          Q    Okay.  And that's the same review that you
7    talked about earlier?  I'm just asking, what did legal
8    do to review the neurosurgeon and medical oncology
9    contracts under this policy?
10              MR. STEPHENS:  Objection as to form, outside
11         the scope of the 30(b)(6) topic.
12              THE WITNESS:  They would review the contract,
13         all the terms of the contract, and determine
14         whether or not it was -- fit within the
15         requirements of the policies that we have.
16   BY MS. FITZGERALD:
17         Q    Was there any memorialization of that legal
18   review?
19              MR. STEPHENS:  Objection as to form, outside
20         the scope of the 30(b)(6) topic.
21              THE WITNESS:  The memorialization would have
22         been their signature.
23   BY MS. FITZGERALD:
24         Q    On the cover sheet?
25         A    And on the contract.



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 70..73

Page 70

1    Q    What if there's not a provision on the
2  contract for legal to sign?
3       A    They initial the contract.
4    Q    Okay.
5       A    There's never a spot for legal to sign.  It's
6  an initial.
7    Q    And this review also occurred prior to
8  Exhibit 25 being in existence, or it did not occur?
9            MR. STEPHENS:  Objection as to form.
10           THE WITNESS:  It -- it's always occurred.
11 BY MS. FITZGERALD:
12   Q    But you're not sure whether it was written
13 down before 2007?
14           MR. STEPHENS:  Objection as to form.
15           THE WITNESS:  Their signature is always on the
16 contract.
17 BY MS. FITZGERALD:
18   Q    Okay.  Which means that the review occurred
19 even if there wasn't a policy in place for it?
20      A    Correct.
21   Q    I'd like to turn your attention to page three.
22 Number six says, Use of outside counsel.
23           Do you see that section?
24      A    I do.
25   Q    It says, Outside counsel may be consulted for

Page 71

1  complex financial arrangements such as ownership and
2  investment interests and joint ventures.
3            Do you see that?
4       A    Yes.
5    Q    Were the contracts with the medical
6  oncologists complex financial arrangements such as
7  ownership and investments interest and joint ventures?
8       A    Were the medical oncologists a complex
9  financial arrangement -- there was no ownership and it
10 was not a joint venture, so it was not a joint venture
11 or ownership, no.  It was an employment arrangement.
12   Q    Okay.  So it's not a complex financial
13 arrangement as articulated here in number six?
14      A    I don't know that it would fit into that
15 bucket.
16   Q    Why was outside counsel consulted for the
17 medical oncologists' contracts?
18           MR. STEPHENS:  Objection as to form.  I'm
19           going to instruct the witness not to answer.  The
20           question calls for the disclosure of
21           attorney/client privileged information.
22 BY MS. FITZGERALD:
23   Q    Are you going to accept your attorney's
24 instructions?
25      A    I'm going to rely on my attorney's

Page 72

1  instructions.
2    Q    Was outside counsel consulted for any other
3  employment agreement other than the medical oncologists
4  from 2009 to the present?
5            MR. STEPHENS:  Objection as to form.  I'm
6            going to instruct the witness not to answer because
7            it calls for disclosure of attorney/client
8            privileged information.
9  BY MS. FITZGERALD:
10   Q    Are you going to accept your attorney's
11 instruction not to answer?
12      A    I'm going to accept his advice.
13           MR. STEPHENS:  I'm actually asserting the
14           objection on behalf of Halifax, not the witness.
15           MS. FITZGERALD:  Well, the witness is
16           testifying for Halifax.
17           MR. STEPHENS:  I understand.  I'm just
18           clarifying for the record.
19           MS. FITZGERALD:  Okay.  We've been going for
20           almost an hour and a half, so let's take a short
21           break.
22           VIDEO TECHNICIAN:  The time is approximately
23           10:59 a.m.  This concludes disk number one for the
24           deposition of Eric Peburn.  We are off video
25           record.

Page 73

1            (Short break from 10:59 a.m. to 11:15 a.m.)
2            VIDEO TECHNICIAN:  The time is approximately
3            11:15 a.m.  This is the beginning of disk number
4            two for the deposition of Eric Peburn -- excuse me,
5            Peburn.  We are back on video record.
6            (Exhibit 26 was marked for identification.)
7  BY MS. FITZGERALD:
8    Q    Mr. Peburn, I'm going to hand you what's been
9  marked as Exhibit 26.
10           Do you recognize Exhibit 26?
11      A    I do.
12   Q    Is this one of the documents that you reviewed
13 in preparation for your deposition testimony today?
14      A    I believe I read it.  I don't remember
15 specifically reading the document, but I recognize the
16 document.
17   Q    Is Deposition Exhibit 26 currently in effect?
18      A    I believe it's the latest version.  There
19 could be updated revisions.  I'm not familiar -- I don't
20 know for sure.
21   Q    Okay.  So Halifax isn't sure if this -- if
22 Exhibit 26 is the current version of LL-145?
23      A    I did not verify that before this meeting.
24   Q    Okay.  This Exhibit 26 has an effective date
25 of November 1, 2007.  Do you see that?



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 21 of 143 PageID 14583

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                              VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                   Pages 74..77

Page 74

1    A   I do.
2    Q   Did Exhibit 26 replace a previous compliance
3  standard or was it a new compliance standard in 2007?
4        MR. STEPHENS:  Objection, beyond the scope of
5    the 30(b)(6) topics.
6        THE WITNESS:  I don't know.  I don't remember.
7    I'd have to do research on that.
8  BY MS. FITZGERALD:
9    Q   What research would you have to do?
10   A   I'd have to go look at other -- if there's
11 other -- any policies to answer your question.
12   Q   Okay.  Can you please turn to page two,
13 section E.  Then there's subsection 2 entitled
14 Documentation.  Do you see that?
15   A   Yes.
16   Q   Can you read section E2a into the record,
17 please.
18   A   Fair market value determinations shall be
19 documented and submitted to the legal department at the
20 time a financial relationship is submitted for legal
21 department review.
22   Q   This review that's referenced, is that the
23 same review that we were talking about earlier that the
24 legal department would do for all contracts?
25   A   This is a subset of the discussion we had

Page 75

1  earlier.
2    Q   Okay.  This is a component of that legal
3  department review; is that fair?
4    A   Sure.
5    Q   Was this the policy prior to the
6  implementation of LL-145, Exhibit 26, in 2007, that fair
7  market value determination shall be documented and
8  submitted to the legal department?
9    A   I don't know specifically that it had to be
10 held in the legal department.  I don't believe it was
11 held -- I believe the individual departments held that
12 documentation.
13   Q   Was the documentation submitted to the legal
14 department prior to 2007 even if it wasn't retained in
15 the legal department?
16   A   The fair market value review, you're asking
17 whether or not that documentation was physically
18 submitted to the legal department during --
19   Q   Prior to 2007.
20   A   I don't know that answer.  The department
21 manager or the person entering into the negotiations
22 would have obtained that information from the various
23 sources we've discussed previously.  And then whether or
24 not it physically was submitted or a discussion took
25 place that, you know, their compensation is within the

Page 76

1  MGMA 50th percentile, you know, whether that's physical
2  or a discussion, I can't answer that question.  It would
3  have been combinations.  I'm not sure that the previous
4  practice would have been as specific as the way this
5  policy lays it out.
6    Q   Why was it changed to have this specific
7  policy laying out the fair market value determinations
8  in 2007?
9    A   Well, the general -- the general thought of
10 creating a consolidated group of processes into a single
11 process was that each department having that
12 documentation was somewhat more cumbersome than it would
13 be just to keep it all in our storage records in a
14 single spot.  So we had storage -- we would have had
15 storage in multiple locations.
16       So this basically attaches -- this policy,
17 what it did was it attached all the documentation to the
18 contract itself in a single point for future reference.
19   Q   Who was responsible for that decision to make
20 that change?
21   A   It would have been discussed between
22 compliance, legal, and administration.
23   Q   Okay.  But you're not aware of any specific
24 discussions that took place?
25       MR. STEPHENS:  Objection as to form.

Page 77

1        THE WITNESS:  There would have been
2    discussions that took place, because no one person
3    can take action usually in change -- or create a
4    policy on their own.  It takes input from the
5    different departments to create a full policy.
6  BY MS. FITZGERALD:
7    Q   Is there any record of those discussions?
8    A   This is the outcome of that discussion.
9    Q   Is there any record of the actual discussions?
10   A   I don't know.
11   Q   Returning to the section that you read
12 previously into the record, it says fair market value
13 determinations shall be documented and submitted to the
14 legal department.
15       Who is responsible for making the fair market
16 value determination?
17   A   Since this policy was created?
18   Q   Yes.
19   A   And you want to know pre or post?
20   Q   Since this -- like, under this policy,
21 Exhibit 26, who was responsible for making the fair
22 market value determination?
23   A   All fair market value documentation now is
24 funneled through a single point, which would be
25 Andy Foster in finance.  And then he would attach a memo



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 22 of 143 PageID 14584

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 78..81

Page 78

1  to that documentation after he's reviewed it, and/or it
2  could include external documentation that he didn't
3  produce.  And then that would be concluded in the legal
4  department.
5            That's how this is consol- -- that was the
6  consolidation of the information.  That was one of the
7  processes that changed.
8        Q    Right.  That didn't answer my question.
9            My question was, who is responsible for making
10  the fair market value determination?
11        A    Well, everybody along the chain there.  So
12  Andy Foster would have created the documentation to
13  support the fair market value.  But it -- certainly
14  there would have been negotiations, so then the manager
15  or administrator that was in the negotiations would have
16  had to be involved in that.  And then legal would review
17  it and the person signing it also has to understand
18  that.
19        Q    So there's no one person who makes the
20  determination of fair market value?
21        A    No -- a single person doesn't have to make
22  that determination on their own.  It would be a group of
23  people that were involved in the process.
24        Q    And they all make a fair market value
25  determination separate from each other?

Page 79

1        A    It would be based on the information gathered
2  by Andy Foster at this time.
3        Q    What about prior to 2007, who was responsible
4  for making a fair market value determination?
5        A    Prior to 2007, Andy Foster was not involved.
6  Finance department wasn't involved in the fair market
7  value specifically.  However, that would have been the
8  recruitment office in conjunction with the administrator
9  and the legal department.  I mean, those are the
10  discussions that would have taken place.
11            The fair market value, when you enter into
12  renegotiation, or negotiation of the initial contract,
13  but the -- it would start with the process that I
14  described earlier as it relates to if we're using a
15  recruiter, or if it's a renegotiation, we would use --
16  start with survey data.  So it would go through that
17  whole process again.
18        Q    Under Exhibit 26, is there a legal department
19  review of a fair market value determination?
20        A    The legal department would make sure that that
21  information was produced.  And in this case, in this
22  policy now, it requires them to store that data in a
23  single location, and they would make sure that that
24  information was sufficient to support the contract.
25        Q    Okay.  So are the people in the legal

Page 80

1  department actually making a fair market value
2  determination or are they reviewing the supporting
3  documentation to make sure that it's there?
4            MR. STEPHENS:  Objection as to form.
5            THE WITNESS:  I'm not sure you can
6       differentiate the two.  If they don't believe that
7       the documentation is sufficient, then I guess they
8       would be making a determination that it wasn't
9       enough to support it.
10            I'm not sure that they're saying it's not fair
11       market value, but they're certainly looking at the
12       documentation in this policy now to make sure it's
13       sufficient in form to file and support that
14       contract.
15  BY MS. FITZGERALD:
16        Q    So let's say Dr. Khanna wants to renegotiate
17  his contract where he has a base salary of $10 million,
18  and there's a fair market value analysis that's put
19  together by Andy Foster, and Andy Foster puts together a
20  memo that says, That's fair market value, base salary
21  $10 million, no incentive compensation.
22            Would legal do a separate review of that to
23  say, That's not right, or would legal just say, Well,
24  Andy Foster has the analysis, so it's okay, it's a go?
25            MR. STEPHENS:  Objection as to form, calls for

Page 81

1       speculation.
2            THE WITNESS:  There's a lot of questions in
3       that question.  And it also -- the question
4       included a $10 million contract, and so that
5       wouldn't go anywhere.
6  BY MS. FITZGERALD:
7        Q    Because you can't afford to pay it?
8        A    Well, we can't afford to pay it and it sounds
9  kind of ridiculous.
10        Q    Right.  So that's my question.
11        A    Okay.  So --
12        Q    So is legal doing an analysis of what -- under
13  Exhibit 26, is legal doing an analysis of the
14  determination that Andy Foster makes and puts together
15  or are they just looking at Andy Foster's determination
16  to make sure that everything seems like it's present
17  there?
18            MR. STEPHENS:  Objection as to form.
19            THE WITNESS:  There's a lot of conjecture
20       there.  So let me walk through your scenario of how
21       it would actually -- what would happen.
22  BY MS. FITZGERALD:
23        Q    Yes, please do.
24        A    This is what I would -- and this is
25  conjecture.  I'm guessing, because you're asking a very



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 23 of 143 PageID 14585

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 82..85

Page 82

1  specific question that hasn't happened, okay, so I'd
2  have to tell you how I would think our process would
3  work.
4      Q   Let's not do that.  Instead, why don't you
5  tell me what happens in the legal department when Andy
6  Foster submits a fair market value determination.
7          MR. STEPHENS:  Objection, asked and answered.
8          THE WITNESS:  I'll state my answer again.
9          He would review the documentation to make sure
10  that it's sufficient to support the contract.  And
11  so your previous question about $10 million, they'd
12  see that -- first of all, it would never get there,
13  because the person that's negotiating the contract
14  would never agree to that.
15         So -- but if it was within the fair market
16  value, MGMA supported it, the recruiters'
17  information that they provided supported it; good
18  faith negotiations went on, which usually take a
19  lot of back-and-forth discussions with the
20  physician; evaluating the risk of the physician
21  leaving town and we no longer have provision of
22  that service -- a lot goes into the discussions of
23  a negotiation and a renegotiation of every
24  contract, specifically the neurosurgeons, because
25  it's a very needed service.  It's the highest

Page 83

1  acuity service in our community.  And we can't
2  afford to not have the service.  The community
3  supports it, wants the service, and so we're
4  challenged and faced with having to recruit
5  those -- that talent, that service, into our
6  community.
7          And so there's a lot of negotiation that goes
8  on back and forth until we come up with a
9  reasonable and fair compensation structure, and we
10  focus on total compensation in that process.
11 BY MS. FITZGERALD:
12     Q   Okay.  So my question is, does legal do an
13  independent review to determine whether a financial
14  relationship meets fair market value or do they rely
15  only on the documentation that Andy Foster has provided
16  to them?
17         MR. STEPHENS:  Objection as to form.
18         THE WITNESS:  I'll answer the question.
19  It's -- in that case, they're going to review the
20  documentation.  If it's sufficient -- and I'll give
21  you some examples of sufficiency.
22         So if there's MGMA data and the compensation
23  is within our tolerance range and there is a review
24  of their workload, an understanding of the
25  onerousness of call coverage and an understanding

Page 84

1  that they're going to provide service to the
2  underinsured or uninsured patients, if that's all
3  included in the contract and it fits within the
4  market ranges, they're not going to go
5  independently and go seek out that same information
6  again from a third party.  They're going to rely on
7  the information that was produced from Andy Foster,
8  or prior to 2009 or '08, whenever he started, they
9  would rely on that data, that discussion with the
10  manager or the administrator as to, you know, does
11  it -- does it meet all those requirements.
12 BY MS. FITZGERALD:
13     Q   Earlier you said, I think, that the physicians
14  are very involved in the contract negotiation process;
15  is that right?
16         MR. STEPHENS:  Objection as to form.
17         THE WITNESS:  They're the counter-party, so,
18  yeah, they're going to be involved in the -- it's a
19  good faith negotiation between two parties.
20 BY MS. FITZGERALD:
21     Q   Does that include Dr. Durkin?
22     A   All doctors --
23         MR. STEPHENS:  Objection as to form, outside
24  the scope of the 30(b)(6) testimony.
25 BY MS. FITZGERALD:

Page 85

1      Q   Does that include Dr. Weiss?
2      A   It would include all doctors that --
3      Q   Does that include Dr. Sorathia?
4      A   -- have a contract.
5          MR. STEPHENS:  Objection as to form.  I think
6  the witness wasn't done answering.
7          THE WITNESS:  It would include --
8          (Knock on door.)
9          VIDEO TECHNICIAN:  The time is approximately
10  11:32 a.m.  We are off video record.
11         (Short break from 11:32 p.m. to 11:33 p.m.)
12         VIDEO TECHNICIAN:  Okay.  The time is
13  11:33 a.m.  We are back on video record.
14         THE WITNESS:  It would include all contracts
15  that we have with any party.
16 BY MS. FITZGERALD:
17     Q   Would it surprise you if Dr. Durkin,
18  Dr. Sorathia and Dr. Weiss all testified under oath that
19  they were not involved in their contract negotiation
20  processes?
21         MR. STEPHENS:  Objection as to form, outside
22  the scope of the 30(b)(6) testimony.
23         THE WITNESS:  They signed their contract.
24 BY MS. FITZGERALD:
25     Q   That doesn't answer my question.



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 24 of 143 PageID 14586

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 86..89

Page 86

1           My question is, would it surprise you if they
2    all testified under oath that they were not involved in
3    the negotiation process of their contracts?
4           MR. STEPHENS:  Objection as to form, outside
5    the scope of the 30(b)(6) topics.
6           THE WITNESS:  All parties to the contract
7    would be involved in the discussion and negotiation
8    of the contract and signing -- at the end have to
9    sign, so they would have to be involved.
10   BY MS. FITZGERALD:
11      Q    Even if they testified that they weren't?
12          MR. STEPHENS:  Objection as to form, outside
13   the scope of the 30(b)(6) topics.
14          THE WITNESS:  I can't answer for them.
15   BY MS. FITZGERALD:
16      Q    You can answer for the hospital.
17           Does the hospital contend that they were
18   involved in the negotiation of their contracts?
19          MR. STEPHENS:  Counsel, your question is was
20   the hospital surprised?  Is that what the testimony
21   was?
22          MS. FITZGERALD:  No.  My question was, does
23   the hospital contend that they were not involved --
24   that they were involved in the negotiation process.
25          MR. STEPHENS:  That's a different question.

Page 87

1           MS. FITZGERALD:  Well, that's the question
2    that I just asked.
3           THE WITNESS:  And my answer is a general
4    statement.  I don't know specifically to each
5    individual contract, but I can tell you when you
6    negotiate with any party, any counter-party, both
7    parties are involved in the negotiation.
8    BY MS. FITZGERALD:
9       Q    So the hospital -- the hospital does contend
10   that Dr. Durkin, Dr. Weiss and Dr. Sorathia were
11   involved in the negotiation of their contracts?
12      A    They were the counter-party.  They signed
13   their contract.  They would have to be involved in some
14   level.  Now, what -- their definition of involved in the
15   negotiation process, I can't answer that question.  But
16   I certainly can answer to the fact that they're the
17   counter-party to the contract, so we both -- both
18   parties were involved from that perspective.
19      Q    Are you done?
20      A    I'm done.
21          MS. FITZGERALD:  Okay.  Let's go off the
22   record.
23          VIDEO TECHNICIAN:  The time is 11:35 a.m.  We
24   are off video record.
25          (Lunch break from 11:35 a.m. to 12:15 p.m.)

Page 88

1           VIDEO TECHNICIAN:  The time is approximately
2    12:15 p.m.  We are back on video record.
3    BY MS. FITZGERALD:
4       Q    We were talking about Deposition Exhibit 26
5    before we took the lunch break.
6           Do you still have that in front of you,
7    Mr. Peburn?
8       A    I do.
9       Q    Okay.  And we were talking about the fair
10   market value determinations.  Do you remember that
11   testimony?
12      A    I do.
13      Q    Okay.  I'd like to turn your attention to page
14   three of the document, Exhibit 26, under the
15   implementation guidance, number 1e is Consideration of
16   facts and circumstances on page three.
17          Do you see that?
18      A    I do.
19      Q    Okay.  Can you take a minute to just read that
20   sentence to yourself and let me know when you're done.
21      A    I'm done.
22      Q    This has been Halifax's policy since 2007, is
23   that right, to consider the facts and circumstances?
24      A    This is the policy -- this policy statement
25   was effective in 2007.

Page 89

1       Q    And this policy applied to the fair market
2    value determinations of the medical oncologists?
3       A    Yes.  It applied to all contracts, yes.
4       Q    So for the medical oncologists, they were --
5    the fair market value determination was not just a
6    comparison to underlying data; is that right?
7           MR. STEPHENS:  Objection as to form.
8    BY MS. FITZGERALD:
9       Q    Or industry benchmark data, rather.
10          MR. STEPHENS:  Objection as to form.
11          THE WITNESS:  I actually don't know --
12   understand the question.  You said "just".
13   BY MS. FITZGERALD:
14      Q    Well, since Exhibit 26 contemplates a thorough
15   analysis of facts and circumstances, it says, Merely
16   comparing payments against objective benchmark measure
17   or industry practices does not guarantee that a payment
18   meets the standard.
19          So my question is, was this the policy that
20   was in effect for the medical oncologists, that
21   they're -- in order to make the fair market value
22   determination for the medical oncologists, facts and
23   circumstances were reviewed?  It was not -- their
24   compensation was not measured exclusively against
25   industry standards; is that right?



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 25 of 143 PageID 14587

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 90..93

Page 90

1     MR. STEPHENS:  Objection as to form.
2     THE WITNESS:  Well, I'll try to answer your
3  question.  It certainly was not just -- if you're
4  suggesting it was just the MGMA or data, if that's
5  what you're referring to -- I'm trying to get to
6  the answer of your question -- but if that's your
7  question, absolutely not, it was not just that
8  data.  It was also the provision of services that
9  they were going to provide.  And so it would
10  include all the other facts and circumstances
11  surrounding the transaction, which includes the
12  provision of services to the uncompensated patient,
13  call coverage, 24/7 365 of patients, if they need
14  attention.
15     So not -- you can't just look at survey data
16  standalone.  You have to look at the transaction in
17  total and what the expectations, and the service
18  expectations specifically, of the physician are to
19  determine whether or not it's meeting the
20  objectives and is reasonable compensation and a
21  reasonable contract and meets what we need.
22  BY MS. FITZGERALD:
23     Q     Is there any policy in place that requires
24  written documentation of the analysis of facts and
25  circumstances beyond comparison to the benchmark data?

Page 91

1     A     Well, this policy would intimate that we would
2  have to look at other factors.  You have to understand
3  the full transaction.
4     Q     That doesn't answer my question.
5     My question is, is there a written policy --
6  is there a policy that requires a written review of the
7  analysis of facts and circumstances beyond the benchmark
8  data?
9     MR. STEPHENS:  Objection as to form.
10     THE WITNESS:  I think all these policies
11  combined tell us that we're going to perform those
12  functions.  I don't know that it specifically
13  states how it has to be written out, in what form.
14  BY MS. FITZGERALD:
15     Q     Or whether it has to be written out, in fact?
16     MR. STEPHENS:  Objection as to form.
17     THE WITNESS:  I don't know that it
18  specifically says it has to be in written form.
19  You can interpret it that maybe it should be or
20  maybe it shouldn't be, but the facts are that it
21  has to be done.
22  BY MS. FITZGERALD:
23     Q     Okay.  Well, my question --
24     A     The function has to be performed.
25     Q     My question is for Halifax Hospital --

Page 92

1     A     Yes.
2     Q     -- for whom you are speaking.
3     A     Uh-huh.
4     Q     Halifax Hospital has no policy regarding
5  whether the analysis of the facts and circumstances of a
6  transaction have to be documented beyond a comparison to
7  the benchmark data?
8     A     I think this policy says that it should be.
9     Q     Documented?
10     A     I think it was back where -- and I might be
11  confusing this with the previous policy, but they go
12  together, and it says it has to be submitted to the
13  legal department.
14     Q     Are you referring to E2a --
15     A     I'm sorry.
16     Q     -- on page two?
17     A     That would be one part that would require
18  that, yes.
19     Q     So E2a requires that all valuations of a
20  thorough analysis of the facts and circumstances of the
21  underlying transaction are submitted to the legal
22  department?
23     A     You know, you specified all documentation, and
24  I would say that it would have to be sufficient
25  documentation.  So it's possible that there was other

Page 93

1  documentation in the process that didn't make it in as
2  an exhibit but would be in the memo from Andy Foster, so
3  I guess that's --
4     Q     Okay.
5     A     I don't -- when you said "all," that's pretty
6  broad, so I -- I don't want to say for sure.
7     Q     Right.  So is your testimony here today that
8  Halifax does require a written memo or memorandum
9  documenting the analysis of the facts and circumstances
10  of the underlying transaction?
11     A     This policy requires that a memo be submitted,
12  yes.
13     Q     Okay.  Were those memos prepared for the
14  medical oncologists in this case?
15     A     I believe so.  Post 2007, I believe it would
16  have been in some kind of format like that.
17     Q     Were they produced to the United States in
18  this litigation?
19     A     I believe so.  If they existed, they would
20  have been produced, or if they were available.
21     Q     Earlier today you talked about the use of
22  recruiters from 2000 to 2009 in compiling fair market
23  value analyses.  Do you recall that testimony?
24     A     Uh-huh.
25     Q     Were you referring to recruiters who are



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS  Document 281  Filed 05/29/13  Page 26 of 143 PageID 14588

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                        Pages 94..97

Page 94

1   employed by Halifax Staffing or were they outside
2   recruiters?
3        A    They would be external recruiters.  We do have
4   internal folks that are in charge of handling the
5   recruitment process, but they're not professional
6   recruiters in such -- in such a fashion that they would
7   have that data themselves, so the outside recruiter
8   would obtain or provide information.
9        Q    What outside recruiters provided information
10  on the neurosurgery contracts in 2000, the neurosurgery
11  data in 2000?
12       A    I don't remember that.
13       Q    Halifax doesn't know?
14       A    I don't have that information with me.
15       Q    Where is it?
16       A    If we have it, it will be in the files.
17       Q    Well, you said you don't have it with me.
18  What files are you referring to?  What are you talking
19  about?
20       A    You asked me a question as to the
21  documentation, and I don't have it.
22       Q    No, I didn't.  I asked you who was the
23  external recruiter who performed the documentation.
24       A    I don't know.
25       Q    Okay.  What about in 2000 -- who -- in 2001,

Page 95

1   who was the external recruiter who provided salary data
2   for the neurosurgeons?
3        A    I don't know that information.
4        Q    In 2002, who was the external recruiter?
5        A    I don't know that information for any period
6   of time.  We use lots of recruiters.
7        Q    For the neurosurgeons and the medical
8   oncologists?
9        A    We used lots of recruiters for all physicians.
10       Q    You don't know who the external recruiters
11  were that provided salary data for either the
12  neurosurgeons or the medical oncologists for any period
13  of time; is that your testimony?
14       A    I couldn't name you a recruiter for any
15  physician, but we have many.
16       Q    Okay.  So your testimony here today is that
17  Halifax doesn't know which external recruiters it used
18  to provide salary data information for the neurosurgeons
19  and the medical oncologists at any period of time?
20       A    I'm sure Halifax knows.  I don't have that
21  with me today to provide that information on behalf of
22  Halifax.
23       MR. STEPHENS:  Trisha, do you need help with
24    us identifying the documents we've produced on that
25    issue?

Page 96

1        MS. FITZGERALD:  Yes, please.
2        Yeah, I haven't seen any documents produced
3     for salary data information from 2000 to 2009.
4   BY MS. FITZGERALD:
5        Q    I'd like to turn your attention to page five
6   of Exhibit 26.
7        Do you see letter b?
8        A    Yes.
9        Q    Can you read that first sentence, please, out
10  loud?
11       A    If an independent third-party valuation is
12  deemed necessary, Halifax Health entities are encouraged
13  to contract with an expert preapproved by the legal
14  department.
15       Q    Who makes the determination to use an
16  independent third-party evaluation?
17       A    At the time the -- in conjunction with the
18  legal department and the administration, whoever was
19  involved in the negotiations, that would be determined.
20  It would be in conjunction.
21       Q    Why are there instances where a third-party
22  valua- -- in what instances would a third-party
23  valuation be deemed necessary?
24       A    If we don't have the information or the
25  necessary skills to provide a sufficient review.  There

Page 97

1   are circumstances in which the data is not sufficient in
2   the marketplace.  It's -- you had referenced earlier
3   joint ventures and other types of transactions that
4   aren't just a straight employment agreement.  In those
5   cases, we don't typically have the expertise, depending
6   on the transaction, so those would be some circumstances
7   or examples of when we would use a third party.
8        Q    Was an independent third party used to
9   evaluate the fair market value of the neurosurgeons'
10  employment contracts in 2009?
11       A    I believe so.  I don't remember the year, but
12  I know that one was done, so --
13       Q    Okay.  Well, it's in here somewhere.  We'll
14  get to it.  I'll ask these questions when we get there.
15       Is your testimony, sitting here today, that
16  Halifax did conduct -- perform a fair market value
17  analysis in the year 2001 for Dr. Khanna's employment
18  agreement?
19       MR. STEPHENS:  Objection as to form, outside
20    the scope of the 30(b)(6).
21       THE WITNESS:  I don't remember.  I mean, if we
22    submitted documentation about it, then I can look
23    at it, and I can speak to it.
24  BY MS. FITZGERALD:
25       Q    What about in the year -- well --



Page 98

1          (Exhibit 27 was marked for identification.)
2    BY MS. FITZGERALD:
3       Q    Handing you Exhibit 27 to your deposition.
4       Have you ever seen Exhibit 27 before?
5       A    I have.
6       Q    You have?
7       A    Yes.
8       Q    When?
9       A    Within the last couple of months, I would say.
10      Q    Was it in preparation for your deposition
11   testimony here today?
12      A    I don't know if it was specifically in
13   preparation, but it may have been.
14           MR. STEPHENS:  Object to the form.  It's
15      outside the scope of the 30(b)(6).
16           MS. FITZGERALD:  Whether he reviewed a
17      document in preparation for his testimony is
18      outside the scope of the 30(b)(6)?
19           MR. STEPHENS:  Actually, I'm objecting to the
20      exhibit and the questions relating to the
21      exhibit on that basis.
22           MS. FITZGERALD:  Okay.  Well, I want to
23      address that, because the 30(b)(6) deposition last
24      week, Reed, you objected that Mr. Rousis was not
25      able to testify as to the content of the

Page 99

1    interrogatory responses, that you had designated
2    someone else to testify to that content.
3           Is that not Mr. Peburn?
4           MR. STEPHENS:  Go ahead and ask the questions.
5    I --
6           MS. FITZGERALD:  Well, no, I want to address
7       your objection that it's outside the scope, because
8       you also objected last week that it was outside the
9       scope.
10          So who's designated to testify to the content
11      of the interrogatory responses?
12          MR. STEPHENS:  Well, ask your question and
13      then I'll be able to determine if I need to keep
14      objecting.  Maybe I won't.
15          MS. FITZGERALD:  Well, you made an objection
16      to the use of the entire document and questions
17      related to the document, so I'm asking what the
18      basis for it is.
19          MR. STEPHENS:  I didn't instruct him not to
20      answer.
21          MS. FITZGERALD:  I understand that, but if you
22      aren't designating Mr. Rousis to testify last week,
23      and Mr. Peburn you're going object to questions
24      about the use of this document, who's testifying to
25      the content of the interrogatory responses?

Page 100

1           MR. STEPHENS:  Well, why don't you ask the
2       questions and we'll see where it goes, and it may
3       be that it works out.
4           MS. FITZGERALD:  Okay.  Well, if it doesn't
5       work out, I want somebody designated today to
6       speak, and I want to schedule a deposition today to
7       go to the content of the interrogatory responses.
8           So you should be prepared to designate someone
9       today if you're going to continue to object to
10      these questions.
11          MR. STEPHENS:  I don't have that obligation.
12          MS. FITZGERALD:  Okay.  Well, you have an
13      obligation to provide someone to speak to all of
14      the topics.
15          MR. STEPHENS:  If you can ask him the
16      questions, we'll see how it goes.
17   BY MS. FITZGERALD:
18      Q    Could you please review Deposition Exhibit 27.
19   Specifically, let's start with interrogatory number
20   seven.  If you could review the interrogatory and
21   Halifax's response, please, and let me know when you've
22   finished that review.
23      A    Where did you want me to stop?
24      Q    The full answer to interrogatory number seven.
25      A    But not to eight?

Page 101

1       Q    Not yet to eight.
2       A    Okay.
3       Q    After reading interrogatory number seven and
4    the response, did Halifax conduct a fair market value
5    analysis of Dr. Khanna's employment agreement in 2000?
6       A    Did Halifax perform -- we would have -- yes,
7    we would have performed a valuation, a fair market value
8    analysis.
9       Q    Why is it not identified here in interrogatory
10   number seven?
11      A    The documentation may not be available in the
12   same format that this is available in.
13      Q    That --
14      A    These are examples of -- so you're asking
15   whether or not we did a fair market value of
16   Dr. Khanna's contract?
17      Q    A fair market value analysis of Dr. Khanna's
18   employment agreement in 2000, did that occur?
19      A    It would have occurred during the negotiation
20   process of his contract, and it would have occurred
21   periodically thereafter, yes.
22      Q    Why is no fair market value analysis
23   identified prior to 2009 for Dr. Khanna?
24      A    I can't answer that as to why a reference to
25   reviews in our process that we would have followed are



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 28 of 143 PageID 14590

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Pages 102..105

Page 102

1  not included in this.
2      Q    Is it because it didn't actually occur, there
3  was no fair market value analysis done?
4      MR. STEPHENS:  Objection as to form.
5      THE WITNESS:  I just said that it did occur,
6  so you're asking me now if it didn't occur, and I
7  already answered the question that it would have
8  occurred.
9  BY MS. FITZGERALD:
10     Q    Okay.  Well, can you tell me what
11 documentation supports the fact that it occurred or is
12 it just something in your head?
13     MR. STEPHENS:  Objection as to form.
14     THE WITNESS:  Our administrator would have
15 negotiated that contract with the information
16 provided by outside parties including survey data,
17 including recruitment data.  And whether it
18 happened in 2000 or 2001 or 2002, I can't
19 specifically tell you the year in which that
20 occurred.  I could look at the contract, determine
21 when it was done, and I could tell you
22 approximately when that would have occurred.
23     The negotiation included the fact that we
24 needed a neurosurgeon to cover 24 hours, seven days
25 a week, 365 days of call.  So those are -- these

Page 103

1  are some facts and circumstances that I know were
2  in existence at the time and continue today.  The
3  need is the same.
4      So the fair market value would have
5  incorporated the fact that he -- this one
6  neurosurgeon that you're referencing needed to take
7  call.  So call is very onerous for a neurosurgeon,
8  so it would have also included discussions with
9  other -- at some point other trauma centers to
10 understand the different mechanisms for which to
11 pay.
12     It would also include an analysis of our
13 uncompensated care.  So the amount of uncompensated
14 care that a neurosurgeon would have to have or take
15 a service call in our hospital is substantial.  So
16 that would have had to have been incorporated as
17 well.  I'm certain of this.
18 BY MS. FITZGERALD:
19     Q    Are you aware that last week Mr. Rousis
20 testified that, according to the interrogatory
21 responses, no fair market value analysis was conducted
22 prior to March of 2009?
23     MR. STEPHENS:  Objection as to form,
24 mischaracterizes the testimony.
25     THE WITNESS:  I can't speak for Mr. Rousis,

Page 104

1  but if he's referring to the format and form of
2  this fair market value study versus the format and
3  form previous to this 2009, it may have looked
4  differently, but the actions taken and the
5  discussions had and the information obtained to go
6  through the process functionally at the foundation
7  is no different.
8  BY MS. FITZGERALD:
9      Q    Okay.  This interrogatory says, identify
10 the -- all individuals who performed a fair market
11 analysis at any point between 2000 and 2011.
12     Do you see that?
13     A    I do.
14     Q    And there are no individuals identified prior
15 to 2009.  Do you see that?
16     A    I do.
17     Q    Who are the individuals who are not identified
18 in Halifax's interrogatory responses who did, in fact,
19 conduct a fair market value analysis at any point
20 between 2000 and 2009 for the physicians identified in
21 interrogatory number seven?
22     A    Excuse me.  It would have been partly the
23 recruitment office and our administrator, Dan Lang, at
24 the time obtaining that information.
25     Q    And is this the recruitment office that you

Page 105

1  previously said that you couldn't identify any
2  individuals in?
3      A    Well, those individuals, they're not all
4  necessarily here, employed at Halifax.
5      Q    Okay.  So I asked you to identify and you
6  said, once again, it would have been, but you couldn't
7  identify any individuals other than Dan Lang.
8      So are you saying to me that Dan Lang
9  performed a fair market value analysis between 2000 and
10 2009 for the physicians referenced in interrogatory
11 number seven?
12     A    Including our recruitment office.
13     Q    Who was in the recruitment office?
14     A    I'm trying to remember different folks.  I
15 don't know exact dates of who was doing what, but
16 Anne Martorano would have been involved in recruitment
17 of physicians.  Cheryl Owen would have been involved in
18 recruitment of physicians during that period of time.
19 There may have been other folks involved in that
20 process.
21     Q    Sitting here today, Halifax cannot provide a
22 list of all the individuals who were involved -- who
23 created fair market value analyses?
24     A    I'm certain those folks were involved.
25     Q    But you can't provide a complete list?



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 106..109

Page 106

1     A    We'd have to go through -- back through
2 employment records and determine if there were other
3 people involved.
4     Q    Well, previously no one was identified, so
5 it's news to me that anyone was involved.  I -- you
6 know, I want you to do that.  If you can't provide a
7 list sitting here now, that's your obligation under the
8 discovery rules.
9         MR. STEPHENS:  Why don't you provide us a
10 written request for different --
11        MS. FITZGERALD:  We already provided you with
12 a written request and we got this response which
13 identified no one.
14        MR. STEPHENS:  Okay.  Well, do you just want
15 to rely on the record or do you want to send us
16 some correspondence today or email?  How do you
17 want to handle it?
18        MS. FITZGERALD:  Well, you have a continuing
19 obligation under the Federal Rules of Civil
20 Procedure to update these interrogatory responses
21 as additional information becomes available to you.
22        MR. STEPHENS:  And discovery closes when?
23        MS. FITZGERALD:  April 11th.
24        MR. STEPHENS:  Okay.  So would you like a
25 response before then?

Page 107

1         MS. FITZGERALD:  I would appreciate a response
2 before then, but I can't make you do anything,
3 so --
4         MR. STEPHENS:  I'm asking you if you would
5 like to make a list of the information you want and
6 send it to me, at which point we can work on it, or
7 if you don't want to do that, then we'll just take
8 care of it in due course.
9         MS. FITZGERALD:  Okay.  Well, we'll send you a
10 list of the items identified today --
11        MR. STEPHENS:  Okay.  Good.
12        MS. FITZGERALD:  -- that are deficient.
13        MR. STEPHENS:  All right.
14        MS. FITZGERALD:  Okay.
15        (Exhibit 28 was marked for identification.)
16 BY MS. FITZGERALD:
17     Q    I'm handing you what's been marked as
18 Deposition Exhibit 28.  Do you recognize this document?
19     A    I do.
20     Q    Is this an earlier version of Deposition
21 Exhibit 26?
22     A    It appears so.
23     Q    Is it, in fact, an earlier version?
24     A    I believe so, yes.
25     Q    And it's no longer in effect today; is that

Page 108

1 right?
2     A    I believe this Exhibit Number 26 is in effect.
3     Q    Okay.  Does Halifax Hospital have a current
4 compliance standard for commercial reasonableness?
5     A    That's part of the process, yes.  I'd have to
6 reference whether or not it's in this policy
7 specifically.
8     Q    Sure.  Why don't you take your time.  And I'll
9 actually start by pointing you to a section of
10 Exhibit 28.  If you'll turn to page -- what says four of
11 43 at the top, number four on that page is commercially
12 reasonable standard.
13    A    Page four?
14    Q    Yeah, page four and continue on to page five.
15 And I was wondering if you could locate anything -- if
16 there was any current policy with respect to
17 commercially reasonable standard currently in effect.
18 And take your time and go through Exhibit 26 as long as
19 you need to identify anything comparable.
20    A    The reference in the Exhibit 26 is to
21 compliance with federal Stark Law, federal and state
22 anti-kickback statutes.
23    Q    So there's no separate commercially reasonable
24 policy in effect currently?  Nothing in this document,
25 Exhibit 26 references commercial reasonableness; isn't

Page 109

1 that right?
2     A    Well, I guess not specifically in this --
3 that's not specifically identified, but the fact that
4 this policy requires it to be -- to meet all the
5 requirements of the federal laws, then it would have to
6 be commercially reasonable.
7     Q    Who evaluates contracts or employment
8 agreements for commercial reasonableness at Halifax
9 today?
10    A    The same parties we discussed previously.  So
11 it would be the person negotiating the contract.  It
12 would start with that --
13    Q    Okay.
14    A    -- person.  And there's a -- a physician
15 contracting committee today that also oversees the
16 reasonableness of those terms.
17    Q    Who sits on the physician contracting
18 committee?
19    A    The legal department, the finance department,
20 the administration.  Those are the parties.
21    Q    Who -- who are the individuals that sit on the
22 physician contracting committee?
23    A    Myself; Ann Martorano; Arvin Lewis;
24 Bill Griffin; Dr. Don Stoner, he's our chief medical
25 officer; Dave Davidson; Andy Foster; Shelly Shiflet.  I



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 30 of 143 PageID 14592

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                         Pages 110..113

Page 110

1  believe that's everybody.
2      Q     When was the physician contracting committee
3  first formed?
4      A     The group was formalized within the last --
5  oh, gosh -- timing-wise, two to three years maybe.
6      Q     Okay.
7      A     It might be four.  I don't remember the
8  timing.
9      Q     I'd now like to turn your attention back to
10 Exhibit 27, the interrogatory responses.  And I'd now
11 like to direct your attention to interrogatory
12 number eight and the response to interrogatory
13 number eight.
14     A     Okay.
15     Q     What -- were there -- was a commercial
16 reasonableness analysis performed for any of the
17 physicians identified in interrogatory number eight in
18 the year 2000 to 2009?
19     A     Yes.
20     Q     Who performed that commercial reasonableness
21 analysis?
22     A     The parties identified before.  So in this
23 case specifically it would have been the administration
24 that was involved with those individual contracts.  So
25 it would have been Dan Lang, Laura Cason, along with any

Page 111

1  other party that was involved, which could have been the
2  recruitment office, and -- but it was driven based on
3  the need for the service.
4      So the first step in the whole process was
5  determining whether or not the -- the service and what
6  type of service and the specifics as it related to the
7  services.  Those were all identified in advance.  So you
8  had -- let's explain the neurosurgery component of this.
9      The neurosurgeons were necessary as a result
10 of our trauma status.  So the State requires certain
11 specialties to be available within 30 minutes, and
12 neurosurgery is one of those, so you have to have that
13 service.  And then you determine, you know, what level a
14 physician you need, and you need somebody that can
15 handle traumas and is going to be available 24 hours a
16 day.  So that was the first step in determining the
17 need, which goes into the commercial reasonableness
18 process.
19     I'll stop there.
20     Q     That's okay.  I want you to have a complete
21 answer.  I want you to be satisfied with your answer.
22     A     And so after that, then you would obtain data
23 related to the provision of that type of service.  So
24 you could look at just a -- if you looked at just fair
25 market value information as it relates to the general

Page 112

1  population of a particular provider, that wouldn't give
2  you the full picture.
3      What you have to do is understand the nature
4  of the service they're providing.  So in this case, it's
5  a -- the highest level of service, being a trauma
6  center.  And also the contract has to accommodate the
7  poor-payer mix, meaning if a physician's on their own in
8  our community they would probably -- a neurosurgeon
9  would probably choose to leave, which two did during the
10 time period you're talking about, because the payer mix
11 doesn't in and of itself support that level of service.
12     And so Halifax then would have to determine
13 how much it would take to keep a neurosurgeon here and
14 provide that level of service.  So that would be the
15 process we would -- we went through for the
16 neurosurgeons in particular.
17     Now, above and beyond that, we have not
18 recruited the fourth neurosurgeon, so we use the locum
19 tenens to support that.  And our goal is to always -- to
20 use the lowest cost balance of the group of physicians,
21 so if we hired a fourth neurosurgeon, we could provide
22 that 24/7 coverage instead of using locums, but that
23 would be a fourth full-time physician that we'd have to
24 pay for at full fair market value.  But instead, we --
25 it's cheaper to -- even though on a per-day basis it's

Page 113

1  more expensive, it's been cheaper to use that locum
2  tenens to fill in gaps as opposed to hiring a
3  full-fledged fourth neurosurgeon.
4      That all goes into the commercial
5  reasonableness of contracts.
6      Q     Was the commercial reasonableness analysis
7  documented in any way from 2000 through 2009 for the
8  physicians identified in interrogatory number eight?
9      A     I don't know that -- I don't know that the
10 compilation -- the compilation of the entire process I
11 just walked through was documented.  I don't believe it
12 was.
13     Q     You spoke in several of your answers about the
14 use of the recruitment office; isn't that right?
15     A     Yes.
16     Q     The recruitment department and external
17 recruiters?
18     A     Yes.
19     Q     Would external recruiters be used in a fair
20 market value analysis if it's not a new contract but
21 rather a renegotiation?
22     A     Sometimes, yes, because if -- in the past,
23 prior to 2009, you have to buy -- you have to buy all
24 that data, so we would have potentially used a
25 recruitment firm to get access to that data without



Page 114

1  having to buy all the different specialties, data, the
2  whole set of information.
3      Q    From 2000 to 2009 were external recruiters
4  used in conducting a fair market value analysis for the
5  neurosurgeons for contract renegotiations?
6          MR. STEPHENS:  Objection as to form.
7          THE WITNESS:  I believe so, and I believe
8      we've provided that information.
9  BY MS. FITZGERALD:
10     Q    In what format was it provided?
11     A    Might have been in the format of an email or a
12 photocopy of a document.  I don't know the -- you're
13 asking for the technical form, I --
14     Q    Was it -- did you see these documents that
15 you're referring to?
16     A    I believe so.
17     Q    In preparation for your deposition testimony
18 today?
19     A    I believe it was in preparation.
20     Q    Were external recruiters used for the contract
21 renegotiation for the medical oncologists in 2008?
22     A    2008.
23     Q    Or, I'm sorry, in 2010, were external
24 recruiters used?
25     A    I don't know that external recruiters were

Page 115

1  used in 2010 for the oncologists.
2      Q    What about at any point from 2000 to 2010,
3  were external recruiters used to conduct a fair market
4  value analysis of the medical oncologist contracts?
5      A    Let me clarify the use of external recruiter
6  information post recruitment.  So it would have been
7  their data being used, which is not necessarily a
8  product of that recruitment firm, but rather they have
9  access to the information.
10     Q    I see.
11     A    So they would have provided that information,
12 so it might say MGMA on it, or it might say Sullivan
13 Cotter.  It may have come from a recruitment firm or we
14 may have purchased it separately.  And so instead of
15 buying -- I'm certain of this -- during that time
16 period, from 2000 to maybe 2006 or -7, something like
17 that, we would have tried to leverage as much of that as
18 possible from some other source as opposed to us having
19 to buy it every year.
20     Q    Okay.
21     A    So that's when we would have used it.
22 Specifically what year we used it, we've
23 produced all that documentation so you would have it.
24 And whatever we have, we've produced and copied for you,
25 so -- and there's a lot of it, so there's different

Page 116

1  forms.  It might be an email that references the
2  recruiter or it might just be the document and it came
3  from the recruiter but wasn't identified as such.
4      Q    Okay.  You said every year -- purchase it
5  every year.  Does that mean that Halifax conducted a
6  fair market value analysis every year?
7      A    We would not perform a fair market value
8  analysis every single year for every contract.  It would
9  be every two or three years.  Unless -- there could have
10 been a period of time where it -- multiple years in a
11 row we had to do because of the physician wanting to
12 renegotiate their agreement and it came up for renewal,
13 so -- but I can't say that that was routine.  It was not
14 every year.
15     Q    When -- what does -- the data that you're
16 talking about, what does it look like?  Is it an
17 external report that you get?
18     A    Yeah, it would show -- there's several
19 different data points.  Typically they have categories
20 of specialties.  So it would have, like, hematology,
21 oncology, GYN oncology or a mixed bag, it would be
22 grouped different -- they group it different ways.  And
23 then they -- it would incorporate employment model
24 versus independent practice.  Sometimes they group it
25 that way.

Page 117

1          And then they would show typically -- a
2  typical format would be, like, the 25th percentile, the
3  50th percentile, the 75th percentile data points to use
4  as your negotiation starting points.
5      Q    Is there any kind of set policy that Halifax
6  will not pay more than a certain percentile compensation
7  to a physician?
8          MR. STEPHENS:  Objection as to form.
9          THE WITNESS:  The general practice has always
10     been that we try to strive for the 50th percentile,
11     and I'll explain where that comes from.
12     Our overall compensation strategy is the 50th
13     percentile for all employees, so we --
14 BY MS. FITZGERALD:
15     Q    Including you?
16     A    Including me, yes.
17     So for all employees that's our strategy.
18 Now, for some employees, whether it's doctors or
19 otherwise, if the recruit is difficult, we can move off
20 of that, and we do.  So there was a period of time where
21 pharmacists were in high demand because Walgreens and
22 CVS were expanding like crazy and we couldn't recruit a
23 pharmacist to work at the hospital and we had to go
24 above the 50th percentile and do a special program to
25 get them employed.  And so that would also apply to



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 32 of 143 PageID 14594

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 118..121

Page 118

1  doctors.
2          We've been successful many times with
3  specialties to bring them in within the 50th percentile,
4  but that has not been our experience with the
5  neurosurgeons, because it's very difficult to recruit
6  them, and the demand for the trauma center versus a
7  non-trauma center has been -- has been a challenge for
8  us for the entire time we've had the trauma program.
9          (Exhibit 29 was marked for identification.)
10 BY MS. FITZGERALD:
11     Q   I've handed you what's been marked as
12 Exhibit 29 to your deposition.
13         Do you recognize this document?
14     A   The signature says 2013, but it --
15     Q   2013?
16     A   It does.  It's actually 2003, I believe.
17     Q   I think that -- well, I mean, I'm not
18 Dan Lang, but I think that that might be an 03, although
19 I don't know.
20     A   I am familiar with the terms of this contract,
21 yes.
22     Q   Okay.  And so if you could turn to -- well,
23 okay, let's start with page -- the third page of the
24 exhibit.  There's Bates stamps on the bottom and it's
25 the one that ends in 38.

Page 119

1      A   Okay.
2      Q   Do you see number four, Term of Agreement?
3      A   Yes.
4      Q   And this says that the effective date of the
5  agreement shall be the 7th day of July, 2001.
6          Do you see that?
7      A   Yes.
8      Q   But then earlier you identified that the
9  contract wasn't signed until '03.  So was there a
10 contract in effect from '01 to '03 that wasn't signed?
11     A   I don't have that information with me.
12     Q   Okay.
13     A   I would suspect that there would be a
14 contract, but all these dates -- I'd have to do some
15 research.  There's a February 14th date and an
16 August 14th and -- or maybe that's a two, that's
17 February.
18     Q   You are aware that you are here and you
19 identified earlier that you are here today to testify on
20 the creation, negotiation, and amendment of compensation
21 agreements between Halifax Staffing, Inc., and
22 Dr. Rohit Khanna from 2000 to present?
23     A   Yes.
24     Q   And you are not prepared to testify here today
25 as to whether there was a signed contract in place from

Page 120

1  2000 to 2003?
2          MR. STEPHENS:  Objection, outside the scope of
3      the 30(b)(6) topic.
4          THE WITNESS:  I'm not aware of a contract
5      other than this one prior to this date, but if we
6      find one, we will produce it.
7  BY MS. FITZGERALD:
8      Q   Earlier today you testified that legal would
9  initial any contract; isn't that right?
10     A   Yes.
11     Q   Can you please look through Exhibit 29 and
12 show me where legal has initialed this contract
13 indicating their review?
14     A   I don't see one.
15     Q   Does that mean that legal did not review this
16 contract?
17     A   That does not mean that.
18     Q   Well, earlier you said that that's how you
19 know whether legal reviewed a contract; isn't that
20 right?
21         MR. STEPHENS:  Objection as to form.
22         THE WITNESS:  It doesn't -- just because the
23     signature is not there doesn't mean that the legal
24     department didn't review it considering that the
25     legal department drafts the contracts.

Page 121

1  BY MS. FITZGERALD:
2      Q   Okay.  Well, how do you know that that's what
3  occurred here?
4          MR. STEPHENS:  Objection as to form, outside
5      the scope of the 30(b)(6).
6          THE WITNESS:  Because legal drafts all the
7      contracts.
8  BY MS. FITZGERALD:
9      Q   Okay.  But earlier we talked a lot about
10 legal's review of a contract, and there's no information
11 here to indicate that legal did review Exhibit 29, is
12 there?
13     A   There's no indication in written form that
14 legal reviewed the contract, but I also know how the
15 hospital operates and -- and this is signed by Dan Lang
16 and Dan Lang doesn't actually draft the agreement.
17     Q   Well, Dan Lang also testified that he only
18 signs contracts after legal signs them, and I don't see
19 any legal signature here, so --
20     A   Right, that is our standard practice.
21     Q   It wasn't followed here, though?
22         MR. STEPHENS:  Objection as to form.
23         THE WITNESS:  The initial appears to be
24     missing.
25 BY MS. FITZGERALD:



Page 122

1    Q    So --
2    A    But it doesn't indicate that it wasn't
3  reviewed by legal.
4    Q    There also isn't a signature for legal on the
5  contract cover sheet, is there?
6    A    That's a true statement.
7    Q    I'd like to turn to page two of the contract,
8  or two of Exhibit 29, rather, the first page that's
9  titled Employment Agreement.  I notice that this
10  agreement is entered into by and between Halifax
11  Staffing, Inc., and Rohit Khanna.
12         Why is the contract between Halifax Staffing,
13  Inc., and Dr. Khanna and not another Halifax affiliate?
14    A    Well, Halifax Staffing, Inc., is a
15  instrumentality of the District.  I'm using that term
16  because that's the language we use as it relates to the
17  legal structure, not that I'm an attorney.
18         But it's an instrumentality of the District.
19  The District is Halifax Hospital Medical Center, and so
20  we treat it as one and the same.  Our employees, though,
21  including myself, are all employed by this -- this
22  corporation, Halifax Staffing, Inc.  But that -- the
23  sole purpose of that corporation was to employ us to
24  allow under state law to move our employees from the
25  Florida state retirement system into a self-funded

Page 123

1  retirement program.
2         So all employees are part of Halifax Staffing,
3  but Halifax Staffing and Halifax Hospital Medical Center
4  are viewed as basically the same entity for operations
5  purposes, clinical purposes, oversight purposes, and so
6  forth.
7    Q    Okay.  If you ever get confused at any point
8  today about whether I'm talking about Halifax Medical
9  Center, Halifax Staffing or Halifax, the umbrella
10  entity, just please ask and make sure -- you know, if
11  you want to clarify any parts of your answers to any
12  questions going forward with the contacts, just let me
13  know.
14    A    Well, specifically related to Halifax
15  Staffing, Inc., and Halifax Hospital Medical Center, we
16  view them as the same.
17    Q    Okay.
18    A    We don't differentiate.  When I say I'm
19  employed by Halifax Hospital Medical Center, it's one
20  and the same.  We don't differentiate.
21    Q    I'd like to turn your attention to section 3,
22  entitled Compensation.  Do you see that the first part
23  is -- or letter "a", rather, is an annual base salary of
24  $325,000?
25    A    Yes.

Page 124

1    Q    How was the amount of $325,000 determined?
2    A    Well, the -- at the time, the fair market
3  value was well in excess of 325,000, but that was
4  discussed with the physician as what would be a
5  reasonable base monthly -- or actually biweekly cash
6  flow stream for the individual.  And then typically on a
7  periodic basis -- and I'd have to look at this one
8  specifically as to what this was at the time, but I
9  think it was probably quarterly -- there would be an
10  additional payment based on their collections for their
11  professional services.
12    Q    Are you talking about provision 3b of the
13  Compensation?
14    A    Yes.
15    Q    Okay.  Great.  Well --
16    A    This one at the time looks like it was an
17  annual, but we do have quarterly and other periodic type
18  contracts.
19    Q    And this one, as you said, is all cash
20  collections in excess of $325,000; is that right?
21    A    Patient cash collections for -- for this
22  physician's work.
23    Q    And you said before there was an annual
24  incentive, but if you look to the second sentence, it
25  says payments will be made on a quarterly basis?

Page 125

1    A    Oh, there it is.  Thank you.
2         It is quarterly, then.
3    Q    For the fiscal year or is this a calendar
4  year?
5    A    No, this would have been on their contract
6  year, so --
7    Q    Oh, the contract year?
8    A    Yeah.
9    Q    When did this contract year start for
10  Dr. Khanna?
11    A    The contract states that it was -- began
12  July 7th, 2001.
13    Q    Okay.  Why was this incentive detailed in
14  provision 3b established?
15    A    Why was the payment of their cash collections
16  established?
17    Q    Yeah.
18    A    To pay them a reasonable compensation level
19  for their services provided.
20    Q    Who was involved in the decision to establish
21  this annual incentive in 3b?
22    A    Dan Lang would have been involved, based on
23  the need of having trauma surgeons -- neurosurgeons to
24  cover the trauma program.
25    Q    Anyone else other than Dan Lang involved?



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 126..129

Page 126

1      A    In 2001?
2      Q    Well, I don't know.  I can't tell when this
3  contract was -- I mean, you tell me when the contract
4  was negotiated and signed and came into effect.
5          MR. STEPHENS:  Objection as to form.
6  BY MS. FITZGERALD:
7      Q    I mean, I guess, let's go with -- it says 2003
8  on the back, so -- but it's effective 2001, and we don't
9  have any other contract, right, for 2001 to 2003?
10     A    Well, I don't --
11         MR. STEPHENS:  Objection as to form.
12         THE WITNESS:  I don't know that, but --
13  BY MS. FITZGERALD:
14     Q    Okay.  So let's say in 2001, anyone other than
15  Dan Lang involved in the creation of the annual
16  incentive in 3b?
17     A    Only to the extent of determining what would
18  be reasonable compensation, so fair market value and the
19  assessment of the need of the service.
20     Q    And who are those individuals?
21     A    It's the same people we've been talking
22  about --
23     Q    Please name them.
24     A    -- so at this time it probably would have
25  been -- I can't name the individual, because it could

Page 127

1  have been Anne Martorano at this time.  It could have
2  been Cheryl Owen in the recruitment office.  It could
3  have been obtained -- I mean, the documentation we
4  provided of the MGMA or whatever data related to this
5  compensation, wherever that came from, so it would have
6  been any of those parties.
7      Q    So sitting here --
8      A    But Dan Lang would have been the one to
9  compile that and negotiate the contract.
10     Q    So sitting here today you -- Halifax cannot
11  state who on an individual basis was involved in the
12  creation of the compensation detailed in 3b of
13  Exhibit 29?
14         MR. STEPHENS:  Objection at to form,
15     mischaracterizes his testimony.
16         THE WITNESS:  Beyond Dan Lang, specifically
17     the person that was involved at the time, I can't
18     identify, no.  But Dan would have accumulated that
19     information from those parties.
20  BY MS. FITZGERALD:
21     Q    This annual incentive amount established in
22  3b, was that a set fixed amount every year?
23     A    No.  It was based on their -- their services
24  performed.
25     Q    And wasn't it also based on the collections?

Page 128

1      A    Well, the collections would be tied to
2  services.
3      Q    So the more services that are performed, the
4  higher the incentive -- the annual incentive in 3b is
5  going to be; is that right?
6          MR. STEPHENS:  Objection as to form.
7          THE WITNESS:  Yes.
8  BY MS. FITZGERALD:
9      Q    So Dr. Khanna is paid a base salary and the
10  incentive compensation.  And the incentive compensation
11  is all of the collections for his services beyond the
12  amount of his base salary, correct?
13         MR. STEPHENS:  Objection as to form.
14         THE WITNESS:  I believe your statement was
15     correct based on if you just -- let me restate it
16     so that I make sure I understand you correctly.
17  BY MS. FITZGERALD:
18     Q    Sure.  There's a base salary, and then the
19  incentive bonus is -- the incentive compensation are all
20  the collections beyond that base salary amount?
21     A    Collections minus the base, yes.
22     Q    So Halifax isn't making any money from
23  Dr. Khanna's collections?
24         MR. STEPHENS:  Objection as to form.  Is that
25     a question?  Objection as to form.

Page 129

1          THE WITNESS:  Restate the question so it is a
2      question.
3  BY MS. FITZGERALD:
4      Q    It was a question.
5          So Halifax isn't making any money from
6  Dr. Khanna's collections --
7      A    That sounds like a statement to me.
8      Q    -- question -- is that right?
9      A    Halifax typically does not profit from
10  professional services provided by doctors.  That's
11  not -- that's not our goal, to profit from the
12  professional services of doctors.
13     Q    Dr. Khanna performs surgeries at
14  Halifax Hospital; isn't that right?
15     A    Yes.
16     Q    When Halifax bills Medicare for surgeries
17  performed by Dr. Khanna at the hospital, there's a
18  technical component associated with those surgeries,
19  right?
20     A    Yes.
21     Q    And the hospital keeps that technical
22  component, correct?
23     A    Yes.
24     Q    It's not part of Dr. Khanna's compensation?
25     A    No.



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 130..133

Page 130

1    Q   Did anyone from the legal department evaluate
2  the compensation being paid to Dr. Khanna under
3  Exhibit 29 for compliance with the Stark Law?
4        MR. STEPHENS:  Objection, outside the scope of
5     the 30(b)(6) testimony.
6        THE WITNESS:  It's our typical process that
7     the legal department would include in their review
8     to make sure that they understood the contract well
9     enough to -- that it was in compliance.
10  BY MS. FITZGERALD:
11   Q   Who at legal evaluated the compensation being
12  paid to Dr. Khanna under Exhibit 29 with compliance of
13  the Stark Law?
14       MR. STEPHENS:  Objection, outside the scope of
15     the 30(B)(6) topic.
16       THE WITNESS:  Whoever in legal.  At the time
17     we had, I believe, one person.
18  BY MS. FITZGERALD:
19   Q   Who was that one person?
20   A   Dave Davidson.
21   Q   Is it your testimony that Dave Davidson did
22  review the compensation paid to Dr. Khanna under
23  Exhibit 29?
24       MR. STEPHENS:  Objection, mischaracterizes the
25     testimony, outside the scope of the 30(b)(6) topic.

Page 131

1        THE WITNESS:  I have not confirmed with
2     Dave Davidson as to whether or not he reviewed
3     this.
4  BY MS. FITZGERALD:
5    Q   Did Halifax hire any outside person or company
6  to evaluate the compensation being paid to Dr. Khanna
7  for compliance with the Stark Law under Exhibit 29?
8    A   In 2001 -- you're referencing this contract
9  specifically -- I don't believe we contracted with any
10  outside party.
11       (Exhibit 30 was marked for identification.)
12  BY MS. FITZGERALD:
13   Q   Mr. Peburn, I'm handing you Exhibit 30 to your
14  deposition.
15       Do you recognize this document?
16   A   I am generally familiar with all the contracts
17  with the neurosurgeons.  Specifically this contract I
18  probably haven't read in several years, but we can walk
19  through it and I can answer questions.
20   Q   Is it fair to say, then, that you did not
21  specifically review all the contracts with all the
22  physicians prior to your testimony here today for
23  purposes of preparing for your deposition testimony?
24       MR. STEPHENS:  Objection as to form.
25       THE WITNESS:  I did not review and read every

Page 132

1     single contract prior to coming here today, no.
2  BY MS. FITZGERALD:
3    Q   What contract -- did you review any contracts
4  prior to coming here today?
5    A   I did.
6    Q   Which contracts did you review?
7    A   I reviewed many of them, but not every one of
8  them.
9    Q   Which ones did you review?
10   A   You want me to list them right now?
11   Q   Yes, please.
12   A   I cannot do that.
13   Q   Well, how about we do this?  If we come across
14  any contracts, you'll let me know whether you reviewed
15  them.  Will you agree to do that?
16   A   Sure.
17       MR. STEPHENS:  The witness actually stated
18     that he recalls this particular contract.
19       MS. FITZGERALD:  No, he said he didn't review
20     it in preparation for his deposition.
21       MR. STEPHENS:  But he also said he recalls the
22     contract.
23       MS. FITZGERALD:  I know, but my question was,
24     can you identify the ones that you reviewed in
25     preparation for your deposition testimony here

Page 133

1     today.  And he said no, he can't do it just sitting
2     here, but he would let me know if we came across
3     any of them.
4        MR. STEPHENS:  Are you going to ask him about
5     the contract?
6        MS. FITZGERALD:  Are you going to keep
7     interrupting?
8        MR. STEPHENS:  He said he's familiar with the
9     document, just ask him about the contract.
10       MS. FITZGERALD:  I'm going to, but I asked him
11     if he reviewed it in preparation for his deposition
12     and he said he hadn't.
13  BY MS. FITZGERALD:
14   Q   What are the effective dates of this contract,
15  Exhibit 30?
16   A   July 7th, 2004.
17   Q   Through when?
18   A   September 30th, 2007.
19   Q   When was Deposition Exhibit 30 executed?
20   A   The contract states November 9th, 2005.
21   Q   Was there a signed contract in effect for
22  Dr. Khanna from July 7th, 2004, through September 2005?
23  Or November 2005, I'm sorry.
24       MR. STEPHENS:  Objection, outside the scope of
25     the 30(b)(6) testimony.



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 134..137

Page 134

1    THE WITNESS:  I'm not aware.  We have one
2    contract here with effective dates that are
3    contiguous -- continuous.
4  BY MS. FITZGERALD:
5    Q    Right.  My question is, was there a signed
6  contract in effect from 2004 through 2005?
7    A    I don't know.
8    Q    Excuse me.  Did legal review this contract,
9  Exhibit 30?
10    MR. STEPHENS:  Objection, outside the scope of
11  the 30(b)(6) testimony.
12    THE WITNESS:  Legal prepares every contract,
13  so they would have -- they would have reviewed it
14  by the fact that they prepared it, but there's no
15  signature on the -- on the page.
16  BY MS. FITZGERALD:
17    Q    There's no signature on the cover page and
18  there are no initials anywhere else in the contract, are
19  there?
20    A    I don't see their initials.
21    Q    Is there a written policy that states that the
22  general counsel's office drafts the contracts?
23    A    I don't believe so.
24    Q    It's just Halifax's practice?
25    A    It's always been Halifax's practice that legal

Page 135

1  drafts the contracts.
2    Q    I'd like to turn your attention to section
3  three of Exhibit 30.
4    Would you agree that there's no change in
5  Dr. Khanna's compensation structure from Deposition
6  Exhibit 29 to Deposition Exhibit 30?
7    A    As it specifically relates to 3b or the entire
8  contract?
9    Q    3a, b and c, the provisions of the
10  compensation.
11    A    It appears that -- that there's no change.
12    Q    Who was involved in the decision not to change
13  Dr. Khanna's compensation structure?
14    A    To not change?
15    MR. STEPHENS:  Objection, beyond the scope of
16  the 30(b)(6) topic.
17    THE WITNESS:  Dan Lang negotiated this
18  contract, so he would have been in the position to
19  negotiate with Dr. Khanna as to if there were any
20  necessary changes.
21  BY MS. FITZGERALD:
22    Q    Anyone other than Dan Lang?
23    A    He would have used information that he had,
24  which would include all the facts and circumstances that
25  existed at the time he entered into this contract, which

Page 136

1  would have included the provision of services, which
2  includes uncompensated care levels, the call.  I don't
3  remember specifically at this time how many
4  neurosurgeons we had on locum tenens.  I'm sure at some
5  point around this period of time, we asked our
6  neurosurgeons to reduce the amount of the locum tenens
7  usage and to take on more responsibility for that
8  weekend coverage.  So that would have been a discussion
9  point here, but it wouldn't necessarily be in the
10  contract, it would have been, you know, just try to
11  reduce the -- the use of the locum tenens, because I
12  think at this point we started to pull back on that
13  expenditure.
14    Q    Earlier I asked you a series of questions
15  about the annual incentive compensation under Deposition
16  Exhibit 29.
17    If I asked you those same questions about
18  Exhibit 30, would your answers be the same?
19    MR. STEPHENS:  Objection as to form.
20    VIDEO TECHNICIAN:  Excuse me, there's one
21  minute left.
22    THE WITNESS:  Would they be exactly the same?
23  I'm sure they'd be similar.
24  BY MS. FITZGERALD:
25    Q    Okay.  Well, I'll just reask them.

Page 137

1    MS. FITZGERALD:  Let's take a break to change
2  the tape.
3    VIDEO TECHNICIAN:  The time is approximately
4  1:25 p.m.  This concludes disk number two for the
5  deposition of Eric Peburn.  We are off video
6  record.
7    (Short break from 1:25 p.m. to 1:34 p.m.)
8    VIDEO TECHNICIAN:  The time is approximately
9  1:34 p.m.  This is the beginning of disk number
10  three for the deposition of Eric Peburn.  We are
11  back on video record.
12  BY MS. FITZGERALD:
13    Q    For the annual incentive compensation
14  described in 3b and the annual base salary described in
15  3a of Exhibit -- Deposition Exhibit 30, I just want to
16  clarify that Dr. Khanna is paid a base salary and then
17  he also receives all cash collections in excess of that
18  base salary; is that right?
19    A    In excess, yes.
20    Q    So Halifax is not making any money from
21  Halifax -- from Dr. Khanna's collections; is that right?
22    A    Correct.  It's not Halifax's policy to make a
23  profit from the provision of services by the physician.
24    Q    But Dr. Khanna performs surgeries at
25  Halifax Hospital; is that right?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 37 of 143 PageID 14599

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Pages 138..141

Page 138

1     A    Correct.
2     Q    And Halifax bills Medicare for those
3  surgeries?
4     A    Correct.
5     Q    And Medicare reimburses Halifax for the
6  technical component of those surgeries; is that right?
7          MR. STEPHENS:  Objection, way outside the
8     scope of the 30(b)(6) topic.  There's no topic for
9     which he is designated to deal with billing and
10    reimbursement issues.
11  BY MS. FITZGERALD:
12    Q    Is that correct?
13         There's a question pending.  You can answer.
14         MR. STEPHENS:  You can answer.
15         THE WITNESS:  Correct.
16  BY MS. FITZGERALD:
17    Q    And the hospital keeps that technical
18  component; it's not paid to Dr. Khanna?
19         MR. STEPHENS:  Objection, outside the scope of
20    the 30(b)(6) topic.
21         THE WITNESS:  That's correct.
22  BY MS. FITZGERALD:
23    Q    It's not part of the annual incentive
24  compensation or the annual base salary; is that right?
25         MR. STEPHENS:  Objection.  Outside the scope

Page 139

1  of the 30(b)(6) topic.
2          Counsel, you know the --
3          MS. FITZGERALD:  It's not.
4          MR. STEPHENS:  -- physician is not paid the
5     fee -- the technical fee.
6          MS. FITZGERALD:  The calculation of the
7     bonuses -- the process by which Halifax Hospital
8     Medical Center calculates the bonuses paid by
9     staffing to Dr. Khanna is topic 18.
10         I'm asking him whether those technical
11    components are part of the bonus.  How is that
12    outside the scope?
13         MR. STEPHENS:  Are you asking if the fee is
14    actually paid to the physician?
15         MS. FITZGERALD:  I just -- those are the
16    questions I just asked him.
17         MR. STEPHENS:  That's not what you asked him.
18         MS. FITZGERALD:  Yes it is.  Read it back,
19    please.
20         (The question was read by the reporter as
21    follows:  "And the hospital keeps that technical
22    component; it's not paid to Dr. Khanna?")
23         MR. STEPHENS:  You can answer the question.
24         THE WITNESS:  I think -- did I already answer
25    or no?

Page 140

1  BY MS. FITZGERALD:
2     Q    Yeah, you had already answered, but please
3  answer again, now that there's no longer an objection
4  pending.
5     A    Okay.  It is not paid to Dr. Khanna, no.
6     Q    How does it make financial sense for Halifax
7  to pay Dr. Khanna in this way, where he makes all of his
8  collections --
9     A    There's a lot of reasons why you have to pay a
10 doctor --
11    Q    Well --
12    A    -- compensation.
13    Q    -- I don't want to hear all these reasons.  My
14 question was --
15    A    Specifically --
16    Q    -- how does it make financial sense for
17 Halifax?
18         MR. STEPHENS:  Objection.  The witness --
19         THE WITNESS:  I was answering your question.
20 BY MS. FITZGERALD:
21    Q    Okay.  Please go ahead.
22    A    Give me a chance before you stop me, and then
23 if I'm going down the wrong path, then please stop me
24 and I'll redirect my answer.
25         But there's a lot of reasons why you pay a

Page 141

1  doctor what you pay them.
2     Q    When you say "you," do you mean Halifax?
3     A    I mean Halifax, yeah.  While I was referring
4  to you as a party -- an entity that's paying a doctor.
5     Q    Okay.  Well, I'm asking exclusively about
6  Halifax.
7     A    I'm going to get there.
8     Q    Well, can you just start there, please.
9          MR. STEPHENS:  Objection.  The witness can
10    answer the question as he feels comfortable
11    answering it.  You're not to direct him on how he
12    should answer the question.
13         THE WITNESS:  To answer the question fully,
14    for you to understand completely how a hospital has
15    to compensate a neurosurgeon or any other
16    specialty, you have to understanding the facts and
17    circumstances surrounding it.  And in this case
18    you're specifically asking about a neurosurgeon, so
19    that you have to understand the facts and
20    circumstances surrounding the nature and service --
21    of the services provided by the neurosurgeon.
22         So in that case there is a lot of reasons, and
23    I'm going get to the reasons, but there's a lot of
24    reasons why you pay a neurosurgeon what you pay
25    them, why the fair market value, why the commercial



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 38 of 143 PageID 14600

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Pages 142..145

Page 142

1  reasonableness supports the compensation that
2  Dr. Khanna, specifically, or any other neurosurgeon
3  that we've ever paid, why they get what they get in
4  total.  Not just the compensation related to the
5  base, not just the compensation related to the
6  bonus, but their total compensation, including all
7  the other components that are in this agreement,
8  which I'm assuming you'll get to at some point.
9       But let me address them all together, because
10 the total compensation takes into account the level
11 of uncompensated care that they provide, the fact
12 that they have to be here at the hospital within 30
13 minutes, they have to cover 24 hours a day, seven
14 days a week, 365 days a year.  We do that with
15 three neurosurgeons plus some add-ins from external
16 folks.  So their compensation takes into account
17 all those activities.
18      And the neurosurgeon is at the highest end of
19 the chain as it relates to trauma centers.  Trauma
20 centers need a lot of different physician
21 specialties, but every -- almost every time a
22 general surgeon, an orthopedic surgeon, and a
23 neurosurgeon have to be involved in the severe
24 cases.
25      And so that neurosurgeon -- once the

Page 143

1  neurosurgeon gets involved, they're required to be
2  there -- sometimes a single surgery could be 14 or
3  more hours, a single surgery.  So they demand and
4  their compensation demand- -- or the market demands
5  for trauma centers that they are paid at a certain
6  level.
7       So all those factors go into determining why
8  is it reasonable to pay that bonus plus all the
9  other components to their compensation, benefits
10 and so forth, why it requires that much
11 compensation.
12      To a non-neurosurgeon, it may sound like a lot
13 of money, but to a neurosurgeon, it's expected
14 because of what they've had to go through in
15 training and what their current expectations are as
16 it relates to their current service at a trauma
17 center.  If they're not a trauma center, their
18 compensation is not going to be same.  If it was at
19 a normal regional hospital, it would be lower.
20 BY MS. FITZGERALD:
21    Q   Does Halifax make any money from Dr. Khanna?
22        MR. STEPHENS:  Objection as to form.
23        THE WITNESS:  No, not directly.
24        Dr. Khanna provides a service to our patients
25 in our emergency room and our -- and when they get

Page 144

1  admitted into surgery and so forth, Halifax doesn't
2  make money from Dr. Khanna.
3  BY MS. FITZGERALD:
4    Q   But you said not directly.  So does Halifax
5  make money from Dr. Khanna indirectly?
6        MR. STEPHENS:  Objection as to form.
7        THE WITNESS:  No.  Our patients come to us and
8  we need to have a surgeon qualified to perform the
9  surgery, whether it's Dr. Khanna or we buy a
10 locum tenens or we get some other help to provide
11 that service, Halifax is going to get the revenue
12 and incur the expense related to the provision of
13 the technical service, but Halifax can't provide
14 the -- on its own, the facility component, can't
15 provide on its own that service.  So you need to
16 have on staff a technical, like, professional that
17 can do that.  So Dr. Khanna is providing that
18 service.
19 BY MS. FITZGERALD:
20    Q   So Halifax does make money from the technical
21 component or the facility fee associated with the
22 services that Dr. Khanna performs?
23        MR. STEPHENS:  Objection as to form, vague.
24 What is make money?
25        THE WITNESS:  It's a very broad question.

Page 145

1  You're asking a question that -- really, actually,
2  we don't make money at the end of the day on many
3  of those cases.  And when you -- if you define
4  making money as revenues minus expenses, then
5  it's -- then the answer is no, actually.  Revenues
6  minus expenses are negative.
7  BY MS. FITZGERALD:
8    Q   Does Halifax derive any income from the
9  services that Dr. Khanna performs at the hospital?
10   A   Define income for me.
11   Q   Gross -- gross financial -- gross dollars.
12       MR. STEPHENS:  Objection as to form.
13       THE WITNESS:  Gross dollars in the healthcare
14 industries are charges?
15 BY MS. FITZGERALD:
16   Q   Yeah.
17   A   That is no correlation to collections.
18   Q   You're the one -- I didn't say anything about
19 collections.
20   A   No, you said gross charges.
21   Q   Right, gross dollars.
22   A   But gross dollars don't correlate to any --
23 any type of interpretation of income or margin or profit
24 or anything like that.
25       I mean, if I could, let me try to answer your



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 39 of 143 PageID 14601

USA vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                        Pages 146..149

Page 146

1  question --
2       Q    Sure.
3       A    -- in a --
4            MR. STEPHENS:  Well, why don't we have a
5       question that you can answer.
6            THE WITNESS:  Okay.
7  BY MS. FITZGERALD:
8       Q    Well, the question was, does Halifax generate
9  any gross income from the services that Dr. Khanna
10  performs, the surgeries that Dr. Khanna performs at the
11  hospital?
12           MR. STEPHENS:  Objection as to form.
13           THE WITNESS:  It's difficult to answer a
14      question when you say gross income in healthcare.
15      There is no gross income.
16           So let me tell you what Halifax does derive.
17      Halifax is the community provider of trauma
18      services.  The patients come to us.  Dr. Khanna
19      provides a service to support that -- care of that
20      patient.  Halifax derives revenues or cash
21      collections, let's define it as cash collections,
22      from billings related to those patients.  But that
23      doesn't mean it's profitable.
24  BY MS. FITZGERALD:
25      Q    Okay.

Page 147

1       A    And so earlier you were trying to say profit,
2  income, margin -- I'm not sure the words were you were
3  using, but none of those correlate to the answer I just
4  gave.
5            All I'm saying is yes, there's cash
6  collections derived from the billings related to the
7  technical component of the patients that come to Halifax
8  and are serviced by Dr. Khanna.
9            (Exhibit 31 was marked for identification.)
10 BY MS. FITZGERALD:
11      Q    I'm handing you Exhibit 31 to your deposition.
12      Have you seen Exhibit 31 before?
13      A    I believe so, yeah.
14      Q    Was this one of the contracts that you
15 reviewed in preparation for your deposition testimony
16 here today?
17      A    I've reviewed this contract in the past, but
18 not in direct preparation for this deposition.
19      Q    What --
20           MR. STEPHENS:  This is just an amendment to a
21      contract, isn't it?
22           THE WITNESS:  Yes.  It's just an amendment.
23           MS. FITZGERALD:  I'm sorry, did you have a
24      question for the witness?  You can wait until the
25      end if you did.

Page 148

1            MR. STEPHENS:  Objection, it's not a contract.
2       It's an amendment to a contract.
3  BY MS. FITZGERALD:
4       Q    What were the dates that were effective for
5  this amendment to the employment agreement?
6       A    Please ask the question again, because I'm not
7  sure if you're referring to the original agreement that
8  this is an amendment to or this actual amendment.
9       Q    Can you please describe what this amendment
10 is, Exhibit 31.
11      A    It's an amendment to the agreement that was
12 originally dated July 2004.
13      Q    Are all of the original terms of the agreement
14 dated 2004, is that Deposition Exhibit 29?
15           MR. STEPHENS:  Objection as to form.
16           THE WITNESS:  I believe it's Exhibit 30.
17 BY MS. FITZGERALD:
18      Q    And are there any changes other than those
19 listed in Exhibit 31 to Exhibit 30?
20      A    It was an extension of the agreement through
21 September 30th, 2010.
22      Q    What dates -- what are the effective dates for
23 this amendment to the employment agreement?
24      A    October 1st, 2007, through September 30th,
25 2010.

Page 149

1       Q    What dates was this amendment to employment
2  agreement signed?
3       A    By which party?
4       Q    All parties that are signatories.
5       A    So Dan Lang signed it November 7th, and
6  Dr. Khanna signed it October 18th.
7       Q    Both of them signed it in 2008; is that right?
8       A    It appears so, based on the signature and the
9  date in here.
10      Q    Was there a signed contract in effect from
11 October 1, 2007, through November 7th, 2008?
12      A    The existing contract would have continued.  I
13 don't -- I'm not aware of another contract beyond the
14 original contract.
15      Q    And that was Exhibit 30?
16      A    Yes.
17      Q    And what are the dates that Exhibit 30 is
18 effective?
19           MR. STEPHENS:  Objection, asked and answered.
20           THE WITNESS:  I'll reread the dates.
21 BY MS. FITZGERALD:
22      Q    Yes, please do.
23      A    I'm going to read it from the contract cover
24 sheet.  July 2004 through September 30th, 2007.
25      Q    Okay.  So was there a signed contract in



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 150..153

Page 150

1   effect from September 30 -- or from October 1, 2007,
2   through November 7th, 2008?
3        A    I'm not aware of another contract other than
4   the ones here.
5        Q    And none of the ones here were signed and in
6   effect from October 1, 2007, through November 7th, 2008;
7   is that right?
8        A    It was in effect, but not signed.
9        Q    Turning to Exhibit 31, it amends the terms of
10  the agreement; is that right? But -- it amends section
11  four, but there are no changes to section three, the
12  compensation section; is that correct?
13       A    Correct.
14       Q    Who was involved in the decision not to change
15  Dr. Khanna's compensation structure?
16            MR. STEPHENS:  Objection as to form, outside
17       the scope of the 30(b)(6) topic.
18            THE WITNESS:  In this case, Laura Cason and
19       Dan Lang would have been involved in that
20       discussion.
21  BY MS. FITZGERALD:
22       Q    Earlier I asked you a series of questions
23  about the annual incentive compensation and what the
24  components of that are.
25            Would your answers stay the same if I asked

Page 151

1   you those questions again?
2            MR. STEPHENS:  Objection as to form.
3            THE WITNESS:  I believe so.
4   BY MS. FITZGERALD:
5        Q    Mr. Davidson signed a contract cover sheet for
6   Deposition Exhibit 31; is that right?
7        A    Yes.
8        Q    And are those Mr. Davidson's initials on
9   page -- on page two of Deposition Exhibit 31?
10       A    They appear to be.
11       Q    Does this mean that Mr. Davidson conducted a
12  review of Deposition Exhibit 31?
13            MR. STEPHENS:  Objection as to form, outside
14       the scope of the 30(b)(6) topic.
15            THE WITNESS:  That would be the indication.
16  BY MS. FITZGERALD:
17       Q    Did that review, in fact, occur?
18       A    Yes.
19            MR. STEPHENS:  Objection as to form, outside
20       the scope.
21  BY MS. FITZGERALD:
22       Q    Did Mr. -- go ahead.
23       A    I was going to still answer the question.
24       Q    Oh, please go ahead.
25       A    Dave Davidson, or depending on the time,

Page 152

1   depending on what attorney -- attorneys we had in-house
2   but Dave has always been there, but other folks could
3   have reviewed it.
4            Legal, in this case it looks like Dave,
5   because he signed it, would have done the review, yes.
6   But, again, he also drafted the contract in all these
7   cases.
8        Q    Did Mr. Davidson evaluate the compensation
9   being paid to Dr. Khanna under Exhibit 30 and 31 for
10  compliance with the Stark Law?
11            MR. STEPHENS:  Objection, outside the scope of
12       the 30(b)(6) topic.
13            THE WITNESS:  Dan Lang would have been --
14       would have reviewed that as well, and Dave Davidson
15       would have been party to that.
16            And the total -- remember, the total
17       compensation provided in these contracts was based
18       and derived from their relative level of service.
19       So the more patients they saw and -- professionally
20       in their office, at the hospital, the compensation
21       would generate -- the service would generate
22       collections, and that would -- they would get the
23       benefit of that, yes.
24  BY MS. FITZGERALD:
25       Q    In 2008, did Halifax hire any outside person

Page 153

1   or company to evaluate the compensation being paid to
2   Dr. Khanna for compliance with the Stark Law?
3            MR. STEPHENS:  Objection, outside the scope of
4       the 30(b)(6) and instruct you not to answer to the
5       extent it calls for disclosing any attorney/client
6       privileged information.  To the extent it doesn't,
7       you can answer.
8            THE WITNESS:  No, I understand.
9            In, I think it was, 2009, there was an outside
10      party.
11  BY MS. FITZGERALD:
12       Q    Okay.  I was asking specifically about 2008.
13       A    Not that I'm aware of.
14            (Exhibit 32 was marked for identification.)
15  BY MS. FITZGERALD:
16       Q    I'm handing you Deposition Exhibit 32.  Do you
17  recognize this document?
18       A    Yes.
19       Q    Is Exhibit 32 Dr. Khanna's current contract?
20            MR. STEPHENS:  Objection as to form.
21            THE WITNESS:  This is an amendment and there
22       may be -- there may be another amendment.
23  BY MS. FITZGERALD:
24       Q    There may be or there is?
25       A    No, there may be.  I don't know.  I have not



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 41 of 143 PageID 14603

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                      Pages 154..157

Page 154

1  seen an amendment since this, but there may be.
2      Q.  Okay.  And when you said it's an amendment, is
3  there an original document that you've looked at that is
4  the rest of the contract that this Deposition Exhibit 32
5  amends?
6      A.  This is referencing the documents we just
7  reviewed.
8      Q.  Okay.  Can you identify for me by exhibit
9  number what is the original contract that's being
10 amended by Deposition Exhibit 32?
11     A.  This amendment would still be included.
12     Q.  When you say this amendment, you're referring
13 to --
14     A.  31.
15     Q.  -- Exhibit 31, okay.
16     A.  And Exhibit 30, so 30, 31, and 32.
17     Q.  Turning your attention to paragraph one of the
18 second amendment, it says section 3b is amended to read
19 as follows.
20         Is this different from the incentive
21 compensation that we saw in Exhibits 30 and 31?
22     A.  This is providing credit for services provided
23 to the District patients that are qualified for our
24 uncompensated care program.  This -- I believe -- this
25 date here is '09.  I believe this coincides with a

Page 155

1  change in our compensation for District patients,
2  charity patients, across the board.
3      Q.  Why was that change made to the compensation
4  structure in Exhibit 32?
5      A.  This was based on a review of the total
6  compensation to the physicians.  And when you include
7  the compensation for those patients that don't pay, it
8  was deemed to be fair compensation for the services
9  being provided.
10     Q.  Okay.
11     A.  There was also part of what -- the driver of
12 this is the economic conditions at the time increased
13 the level of the uninsured in our community.
14     Q.  And lots of other places too, I would imagine.
15     A.  So that's -- that was part of the reason why
16 it was brought up even as a concern, because the -- you
17 know, the level of service increased over that period of
18 time.
19     Q.  Dr. Khanna is still being compensated for all
20 of his collections above his base salary, is that right,
21 in excess of his base salary?
22     A.  Yes.
23     Q.  And earlier I asked you a series of questions
24 about the components of that incentive compensation.
25         If I asked you the same questions about

Page 156

1  Exhibit 32, would your answers stay the same?
2          MR. STEPHENS:  Objection as to form.
3          THE WITNESS:  Well, this -- this amendment
4      provides for a change to the net collections.  So,
5      you know, the answer specifically would be that the
6      net collections would be inclusive of a credit for
7      the charity patients.
8  BY MS. FITZGERALD:
9      Q.  Would your -- would the answers to my
10 questions about the technical component change?
11     A.  No.
12         MR. STEPHENS:  Objection as to form.
13 BY MS. FITZGERALD:
14     Q.  Did legal conduct a review of Exhibit 32?
15     A.  Yes, they would have conducted a review.
16     Q.  Did legal evaluate the compensation being paid
17 to Dr. Khanna under Deposition Exhibit 32 for compliance
18 with the Stark Law?
19         MR. STEPHENS:  Objection, asked and answered.
20         THE WITNESS:  Legal reviews all contracts for
21     compliance with the laws.
22 BY MS. FITZGERALD:
23     Q.  Including the Stark Law?
24     A.  Including the Stark Law.
25     Q.  Did anyone other than the legal department at

Page 157

1  Halifax evaluate -- did anyone at Halifax other than any
2  individuals within the legal department evaluate the
3  compensation being paid to Dr. Khanna under Deposition
4  Exhibit 32 for compliance with the Stark Law?
5          MR. STEPHENS:  Objection as to form.  And
6      objection to the extent that the question calls for
7      the disclosure of any attorney/client privileged
8      information.
9          THE WITNESS:  Well, the -- all the parties
10     that reviewed this contract would have been
11     included in that review, would have understood
12     the -- you know, whether or not there was any type
13     of inappropriate incentive.
14 BY MS. FITZGERALD:
15     Q.  Did Halifax hire any outside person or company
16 to evaluate the compensation being paid to Dr. Khanna
17 under Exhibit 32 for compliance with the Stark Law?
18         MR. STEPHENS:  Objection, asked and answered,
19     and I instruct the witness not to answer to the
20     extent that it requires disclosing any
21     attorney/client privileged information.
22         THE WITNESS:  I'm sorry.  Ask the question
23     again.
24 BY MS. FITZGERALD:
25     Q.  Did Halifax hire any outside person or company



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 42 of 143 PageID 14604

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                        Pages 158..161

Page 158

1  to evaluate the compensation being paid to Dr. Khanna
2  under Exhibit 32 for compliance with the Stark Law?
3          MR. STEPHENS:  I maintain my objection.
4          THE WITNESS:  I'm going to take the advice of
5     counsel -- my counsel to not answer the question as
6     it relates to any outside parties that --
7  BY MS. FITZGERALD:
8      Q    Am I to understand that you have no way of
9  answering the question without divulging any
10 attorney/client communications?
11     A    Your question is specific to the Stark Law --
12     Q    Yes.
13     A    -- evaluation of the Stark Law, not fair
14 market value?
15     Q    Evaluation of the compensation for compliance
16 with the Stark Law.
17         MR. STEPHENS:  And I maintain my objection.
18         THE WITNESS:  We did an evaluation -- I
19     believe we did an outside evaluation for the fair
20     market value assessment.
21 BY MS. FITZGERALD:
22     Q    Okay.  Other than that fair market value
23 assessment, did Halifax hire any outside person or party
24 to review the compensation being paid to Dr. Khanna
25 under Deposition Exhibit 32 for compliance with the

Page 159

1  Stark Law?
2          MR. STEPHENS:  Are you asking whether Halifax
3     retained any counsel to review the contracts?
4          MS. FITZGERALD:  Counsel or anyone else.  Did
5     they contract with some separate party to do a
6     review, any kind of compliance company, something
7     like that.
8          MR. STEPHENS:  So I'll maintain my objection
9     and instruct the witness not to answer to the
10    extent it requires disclosing any attorney/client
11    privileged information.  If there's not a
12    privilege -- things that happened, you can testify
13    to that.
14         THE WITNESS:  So we did do an outside review
15    of the structure, but I -- and that information has
16    been provided.
17 BY MS. FITZGERALD:
18     Q    Who conducted that outside review of the
19 structure?
20     A    Well, Andy Foster coordinated that for us, I
21 believe.
22     Q    With whom?
23     A    I don't remember the name of the firm.  We use
24 several firms to do these evaluations.
25     Q    And I had said before that I wanted you to

Page 160

1  answer separate from any fair market value analyses that
2  are done -- have been done.
3          Are you referring only to that outside fair
4  market value analysis or did you mean something else
5  other than a fair market value analysis?
6      A    I'm referring to the fair market value
7  analysis for the services -- it was an evaluation of the
8  services provided and assigning value to those services.
9  And so it was more than just a benchmark data.  It was a
10 review of their structure.
11     Q    Okay.
12     A    But I am referring to the document that I
13 believe we've provided and I think you have.
14     Q    So other than that fair market value analysis
15 and except for any attorney/client communications,
16 you're not aware of any other outside person or
17 individual hired by Halifax to evaluate the compensation
18 paid to Dr. Khanna under Exhibit 32?
19     A    I don't believe so.
20         (Exhibit 33 was marked for identification.)
21 BY MS. FITZGERALD:
22     Q    I'm handing you what's been marked as
23 Deposition Exhibit 33.  The documents got a little
24 messed up when I was preparing them.  They're stapled
25 separately.  I just didn't feel like ripping them all

Page 161

1  apart, but, I mean, you can go ahead or you can keep
2  them stapled separately.
3          MR. STEPHENS:  I'm sorry, Counsel.  It's two
4     separate exhibits?
5          MS. FITZGERALD:  No, no, it's one exhibit.
6  BY MS. FITZGERALD:
7      Q    Have you ever seen this collection of
8  spreadsheets that's Deposition Exhibit 33 before?
9      A    I've seen this information.  I don't know that
10 it was in exactly this format.  It seems to be blown up
11 or something or -- my recollection is also it's -- it's
12 this way and this horizontal format, so I put the
13 information -- in general, I understand what it's doing,
14 yes.
15     Q    The information is familiar to you but the
16 format may be different; is that what you're saying?
17     A    Yes.
18     Q    Do these spreadsheets, this collection of
19 spreadsheets that's Deposition Exhibit 33, accurately
20 reflect the incentive compensation paid to Dr. Khanna
21 for fiscal years 2000 through 2009?
22         MR. STEPHENS:  Objection as to form.
23         THE WITNESS:  You mean are all these numbers
24    on here what -- what actually occurred and tie back
25    to the ledgers that actually made the payments and



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 162..165

Page 162

1    all that?
2    BY MS. FITZGERALD:
3        Q    Yes.
4        A    There's a lot of information here for me to
5    verify that.
6        Q    Okay.
7        A    Is this something that -- well, I'm not sure I
8    could do that sitting here.
9        Q    Okay.  What would you need to --
10       A    It would require an auditor to go through that
11   process to evaluate whether or not this document -- like
12   I said, the format that I'm used to seeing this in is a
13   different format.
14       Q    Okay.
15       A    Was this -- did we provide this --
16       Q    Yes.
17       A    -- or is this, like, blown up and cut and
18   pasted?
19       Q    No, you did provide all of these.
20       A    Okay.
21            MR. STEPHENS:  In this format?
22            MS. FITZGERALD:  Well, yeah.  I mean, if you
23   look at the bottom, there's a Bates stamp.
24            MR. STEPHENS:  Are you confirming that Halifax
25   produced this document in this format to the

Page 163

1    United States?
2            MS. FITZGERALD:  Well, let's see, for the ones
3    that are Bates stamped the HAL-1, that's exactly
4    how it was produced.  I printed them from the
5    Concordance database that we use in that format.
6            THE WITNESS:  There's some pages that are
7    not --
8            MS. FITZGERALD:  This last two pages -- yeah,
9    these were also printed from the database like
10   that.  They just were produced without a Bates
11   stamp.
12           MR. STEPHENS:  You're talking about the front
13   document, which is four pages?
14           MS. FITZGERALD:  The 2000- -- well, the one
15   part, the 2007 through 2008, that should have the
16   Bates stamps on it.  Does it?
17           MR. STEPHENS:  I have two documents.  One is
18   four pages with no Bates stamps and another which
19   is --
20           MS. FITZGERALD:  Okay.  Well, they were all --
21           MR. STEPHENS:  -- seven pages, which has
22   HAL -- HAL-1 Bates numbers.
23           MS. FITZGERALD:  Right.  All of them were
24   produced or printed -- all of the Khanna documents
25   were printed just from the database.  I don't think

Page 164

1    any of these were produced as native files that I
2    printed.  Certainly the one with the Bates stamps
3    at the bottom were.
4            MR. STEPHENS:  So your representation is the
5    non-Bates stamped documents were produced from
6    Halifax's production to the United States?
7            MS. FITZGERALD:  Uh-huh.  All of the documents
8    that I've shown you here today have been produced
9    by Halifax to the United States, including these
10   ones.
11           THE WITNESS:  Okay.  To the extent that that's
12   accurate, then I -- then I would say that the
13   numbers are accurate, because we would have checked
14   them and produced them and made sure that it was
15   accurate.
16   BY MS. FITZGERALD:
17       Q    Who generated the spreadsheets in Deposition
18   Exhibit 33?
19           MR. STEPHENS:  Objection as to form.
20           THE WITNESS:  This would have been done at our
21   general accounting office.  I believe Lisa Tyler or
22   Tyna Rodriguez would have been the ones to actually
23   compile the information.
24   BY MS. FITZGERALD:
25       Q    Okay.  Were these spreadsheets generated

Page 165

1    pursuant to section 3b of Dr. Khanna's employment
2    agreements?
3        A    Yes.
4        Q    I'd like to turn your attention to the very
5    end, the -- for contract year 2008 through 2009.
6            MR. STEPHENS:  What are you on, Counsel?
7            MS. FITZGERALD:  It's not Bates stamped.
8            THE WITNESS:  Second to last page?
9    BY MS. FITZGERALD:
10       Q    Yeah.  This has not just collections, it also
11   has unposted collections, CHRDIS SPHCN, workers' comp,
12   and then a total.
13            Why is this spreadsheet different from the
14   other spreadsheets?
15           MR. STEPHENS:  Objection as to form.
16           THE WITNESS:  The --
17           MR. STEPHENS:  Objection.  I also object to
18   outside the scope of the 30(b)(6) testimony.
19           MS. FITZGERALD:  It goes to the calculation of
20   the bonus.
21           THE WITNESS:  The -- there's credit being
22   provided for charity patients.
23   BY MS. FITZGERALD:
24       Q    Is that pursuant to the amendment to the
25   employment agreement in Deposition Exhibit 32?



Page 166

1      A    It appears as though that the credit applies
2  to the charity patients that was outlined in the -- or
3  more specifically outlined in the second amendment to
4  the employment agreement, yes.
5      Q    And you're referring to Deposition Exhibit 32?
6      A    I am, yes.
7      Q    I'd like to turn your attention to the
8  first page, starting at Exhibit 33.  It says, Less
9  minimum required collections per contract, and next to
10 that has $350,000.
11          Do you see that?
12     A    I do.
13     Q    What is that referring to?
14     A    It's referring to the $325,000 in the
15 contract.
16     Q    Why does this say $350,000?
17     A    It appears as if we owe him -- the doctor some
18 money.
19     Q    Did you ever pay the doctor that money?
20     A    I'm not aware that we have, and I'm not sure
21 we've identified that that is an issue, to be honest.
22     Q    Until you today?
23     A    Until you just pointed out that we owe the
24 doctor some money.
25     Q    Okay.

Page 167

1      A    That's not good.
2      Q    You have some lawyers who I'm sure will be
3  happy to assist you.
4          We're going to turn to Dr. Kuhn at this time.
5      A    Okay.
6          (Exhibit 34 was marked for identification.)
7  BY MS. FITZGERALD:
8      Q    I'm handing you what's been marked as
9  Deposition Exhibit 34.
10         Do you recognize Deposition Exhibit 34?
11     A    I am familiar with the contract.  There's an
12 attachment, and I was trying to remember if this is part
13 of the contract by reference.  Okay.  Yes.
14     Q    Is this one of the contracts that you reviewed
15 in preparation for your deposition testimony today?
16     A    Again, all the contracts -- I'm familiar with
17 all these contracts related to the neurosurgeons and the
18 oncologists.  Specifically did I read this contract in
19 advance?  I believe, actually, this might be one of the
20 ones I did read.  Although -- no, not 2004.  It would
21 have been newer.  So probably not, not 2004.
22     Q    Okay.  I'd like to turn your attention to
23 section three, the compensation section.
24         Turning to section 3b, the wording is slightly
25 different for Dr. Kuhn's contract than it was for

Page 168

1  Dr. Khanna's contract; would you agree?
2          MR. STEPHENS:  Object as to form.
3          THE WITNESS:  It doesn't specify the quarterly
4      basis.
5  BY MS. FITZGERALD:
6      Q    But earlier -- sorry, go ahead.
7      A    And it doesn't specify that it's above and
8  beyond the base specifically.
9      Q    It does say which exceed the annual base
10 salary, right?
11     A    But it previously listed the amount out, and
12 it doesn't list the amount out here, so those are the
13 differences I see.
14     Q    But is the effect the same --
15     A    It should be.
16     Q    -- that Dr. Kuhn is compensated in the same
17 manner that Dr. Khanna is, even though there are slight
18 language differences to the contract?
19         MR. STEPHENS:  Objection as to form.
20         THE WITNESS:  I believe the intent is
21     relatively the same.
22 BY MS. FITZGERALD:
23     Q    So I asked you a series of questions about the
24 components of Dr. Khanna's incentive compensation.  If I
25 were to ask you those same questions for Dr. Kuhn's

Page 169

1  incentive compensation, would your answers stay the
2  same?
3          MR. STEPHENS:  Objection as to the form.
4          THE WITNESS:  I believe so.
5  BY MS. FITZGERALD:
6      Q    Do you want me to go through and ask the
7  questions again just to make sure?
8      A    If that would make it more certain, then go
9  ahead.
10     Q    We talked about -- so the hospital isn't
11 making any money off of Dr. Kuhn's personally performed
12 services; is that right?
13         MR. STEPHENS:  Objection as to the form.
14         THE WITNESS:  The hospital doesn't make money
15     off of the professional services of the physician.
16 BY MS. FITZGERALD:
17     Q    But the hospital does retain the technical
18 component associated with the surgeries performed at
19 Halifax; is that right?
20         MR. STEPHENS:  Objection as to form, outside
21     the scope of the 30(b)(6) topic.
22         THE WITNESS:  The hospital is in business to
23     provide technical services.
24 BY MS. FITZGERALD:
25     Q    The hospital does not pay that technical



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 170..173

Page 170

1   component back to Dr. Kuhn, does it?
2           MR. STEPHENS:  Objection as to form.
3           THE WITNESS:  It does not.
4   BY MS. FITZGERALD:
5       Q   Did the legal department evaluate the
6   compensation being paid to Dr. Kuhn under Deposition
7   Exhibit 34 for compliance with the Stark Law?
8           MR. STEPHENS:  Objection as to form and I'll
9       instruct the witness not to answer to the extent
10      the answer would disclose attorney/client
11      privileged communications.
12          THE WITNESS:  The legal department would
13      perform a full review of the contract, which
14      includes all aspects of that contract.
15  BY MS. FITZGERALD:
16      Q   Including the Stark Law?
17      A   Including the Stark Law.
18      Q   Did anyone else at Halifax other than
19  individuals in the legal department evaluate the
20  compensation being paid to Dr. Kuhn under Exhibit 34 for
21  compliance with the Stark Law?
22          MR. STEPHENS:  Objection as to the form.
23          THE WITNESS:  Since the compensation
24      arrangement and structure is similar in nature to
25      Dr. Khanna's, the same -- and the expectations

Page 171

1       within the contract for the services provided are
2       similar in nature, the -- the reviews done would
3       apply to all three neurosurgeons.
4   BY MS. FITZGERALD:
5       Q   Okay.  So your answers would be the same if I
6   asked you the same questions about Dr. Vinas as well?
7           MR. STEPHENS:  Objection as to form.
8           THE WITNESS:  You know, there's a very
9       specific question that you asked related to
10      Dr. Khanna of specific people that may have
11      reviewed the contract in detail and done --
12      performed certain due diligence.  A separate set of
13      due diligence would -- may not be deemed necessary
14      so that that work done would -- could apply to all
15      three if it's substantially the same.  And in this
16      case, it's substantially the same.
17  BY MS. FITZGERALD:
18      Q   So that work was not re-performed for
19  Dr. Kuhn's contract; is that right?
20          MR. STEPHENS:  Objection as to the form.
21          THE WITNESS:  It wouldn't necessarily have to
22      be re-performed.
23  BY MS. FITZGERALD:
24      Q   Was it re-performed?
25          MR. STEPHENS:  Objection as to the form.

Page 172

1           THE WITNESS:  The same thought process would
2       have been followed using that same information.
3   BY MS. FITZGERALD:
4       Q   So there was a separate analysis done in
5   Dr. Kuhn's contract?
6       A   It may not have been done in the same format
7   and form.
8       Q   What -- what format and form was it performed
9   in?
10      A   I don't remember which surgeons were included
11  in that outside review.
12      Q   When did this outside review occur?
13      A   Well -- well, I'm sorry, that was for 2009.
14  You're specifically referring to what period of time?
15      Q   This contract, Exhibit 34.
16      A   The date of which is 2004.  Okay.  So that
17  outside review doesn't apply to this.  It would have
18  been the internal review of the -- and that would go
19  back to the whole process that I went through of
20  evaluating the services needed and then tying back
21  compensation to those services and the need for
22  neurosurgery as it relates to the trauma center and
23  coverage for our uninsured patients as well as our
24  trauma patients.
25      Q   What specific individuals conducted a fair

Page 173

1   market value analysis of Deposition Exhibit 34?
2       A   In this case, it would have been Dan Lang.
3       Q   Anyone else?
4       A   The parties that would have assisted him in
5   gathering information would have been the same parties
6   as I discussed before, so depending on the time, at this
7   time it probably was Cheryl Owen and not Ann Martorano
8   anymore in 2004.  That would have been my -- I'm trying
9   to tie the dates correctly.
10      Q   Anyone other than Cheryl Owen and Dan Lang?
11      A   Not to my recollection.
12      Q   Can you please identify all individuals who
13  performed a commercial reasonableness analysis of
14  Deposition Exhibit 34?
15      A   Again, that would be Dan Lang.
16      Q   Anyone else?
17      A   Other than providing support as to the
18  services needed within the emergency room, meaning
19  understanding the process and the demands on their
20  schedule and so forth, not directly, no.
21      Q   Okay.  I am asking you to identify all
22  individuals.  So if Halifax is identifying -- has
23  individuals that worked on the commercial reasonableness
24  analysis, who performed a commercial reasonableness
25  analysis of Deposition Exhibit 34, I'm asking you to



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 174..177

Page 174

1  identify them sitting here today.  And you identified
2  Dan Lang.
3           Is there anyone else?
4       A   I can't recall.  I'm not aware of any other
5  parties.
6           (Exhibit 35 was marked for identification.)
7  BY MS. FITZGERALD:
8       Q   I'm handing you -- I'm handing you two pages
9  which have been marked as Deposition Exhibit 35.
10          Do you recognize Deposition Exhibit 35?
11      A   Yes.
12      Q   Who is Sally Beninati?
13      A   These are employees that Dr. Kuhn wanted to
14  add to his practice.
15      Q   So that would be Sally Beninati,
16  Meredith Hunter, Patricia Lepley and Nicole Tolhurst?
17      A   Yeah.
18      Q   Those are all Dr. Kuhn's employees?
19      A   Well, they're --
20          MR. STEPHENS:  Objection as to form.
21          THE WITNESS:  No, they're Halifax employees,
22          but they're -- that he wanted to add inside his
23          practice, and Halifax was in disagreement that he
24          needed this additional staff.
25  BY MS. FITZGERALD:

Page 175

1       Q   Why?
2       A   Because --
3           MR. STEPHENS:  Objection as to form.
4           THE WITNESS:  -- it was in addition to what
5       the other parties were utilizing.
6  BY MS. FITZGERALD:
7       Q   Why was Dr. Kuhn being -- why was Dr. Kuhn
8  receiving an incentive compensation equal to all net
9  collection -- I'm sorry, why was Dr. Kuhn receiving an
10  incentive compensation for 125 percent of the amount
11  paid by Halifax Staffing to the four individuals listed?
12          MR. STEPHENS:  Objection.  That's not what the
13      exhibit says.
14          THE WITNESS:  That's correct.
15          MS. FITZGERALD:  What does it say?
16          MR. STEPHENS:  It says the company.
17  BY MS. FITZGERALD:
18      Q   Who is the company?
19          MR. STEPHENS:  You can answer.
20          THE WITNESS:  Let me explain this provision.
21  BY MS. FITZGERALD:
22      Q   Sure.
23      A   He wanted -- Dr. Kuhn wanted to add these
24  individuals to his practice.  We weren't willing to pay
25  for it.  So what we did was we added those individuals

Page 176

1  to his practice, but now his incentive threshold had to
2  be above and beyond the cost related to those
3  individuals.  So he, effectively, is taking less money
4  but getting more staff.
5       Q   But, okay, so as the company -- there was an
6  objection that that's not what it says.
7           The company is Halifax Staffing, Inc.,
8  correct?
9       A   Paid by Halifax.
10      Q   But -- I'm sorry, let's go step by step.
11          The company is Halifax Staffing, Inc., right?
12      A   Well, Halifax Staffing or Halifax --
13  Halifax -- yes, Halifax Staffing employs them, yes.
14      Q   Well, it says at the top, Halifax Staffing,
15  Inc., hereinafter referred to as the company.
16          Do you see that?
17      A   Correct.
18      Q   And so it says, now turning to 3b, an
19  incentive compensation equal to all net collections for
20  employee's services which exceed the sum of the
21  employee's annual base salary plus 125 percent of the
22  amount paid by the company in wages to those four
23  individuals.
24      A   Uh-huh.
25      Q   Did I read that right?

Page 177

1       A   Uh-huh.
2       Q   So are you explaining to me that it's the base
3  salary plus 125 percent of those wages that staffing
4  pays, that's the amount that Dr. Kuhn has to exceed in
5  order to obtain an incentive compensation?
6       A   Correct.
7       Q   How long was that provision in effect?
8           I'll just give you Deposition Exhibit 36 and
9  we'll go there.
10          (Exhibit 36 was marked for identification.)
11  BY MS. FITZGERALD:
12      Q   Do you recognize this document?
13      A   I do.
14      Q   And does this amend Dr. Kuhn's -- does
15  Deposition Exhibit 36 amend Dr. Kuhn's prior employment
16  agreement so that it no longer considers the additional
17  staff?
18      A   It does with an additional modification.
19      Q   What is the additional modification?
20      A   That the -- there's revenue associated with
21  the physician assistants that accrues to the hospital.
22      Q   Are these the same physician assistants that
23  were identified in Deposition Exhibit 35 --
24      A   Those are not --
25      Q   -- or are they different people?



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 178..181

Page 178

1    MR. STEPHENS:  Objection as to form.
2    THE WITNESS:  I don't know that they're the
3  same people.  Give me a moment here.  I don't know
4  that they're the same people.
5  BY MS. FITZGERALD:
6    Q    Please identify all individuals employed by
7  Halifax who performed a fair market value analysis for
8  the compensation paid to Dr. Kuhn under Deposition
9  Exhibit 36.
10    A    Dan Lang absolutely would have performed that
11  review.
12    Q    Anyone else?
13    A    Only to the extent of providing information,
14  and it would be the same parties that I described
15  before.
16    Q    Please identify them.
17    A    In 2007, would have been other parties --
18    THE WITNESS:  I'm sorry, is that feedback?
19    VIDEO TECHNICIAN:  Yeah.
20    THE WITNESS:  Would have been other parties
21  other than, I believe, Cheryl -- well, no,
22  Cheryl Owen might have been still there in 2007.
23  BY MS. FITZGERALD:
24    Q    Anyone else?
25    A    She would have provided input.  Not to my

Page 179

1  knowledge, no.
2    Q    Please identify all individuals working on
3  behalf of Halifax who performed a fair market value
4  analysis for the compensation paid to Dr. Kuhn under
5  Deposition Exhibit 36.
6    A    Would have been Dan Lang as well with the same
7  information.
8    Q    Please identify all individuals employed at or
9  working on behalf of Halifax who provided a commercial
10  reasonableness analysis of the compensation paid to
11  Dr. Kuhn under Deposition Exhibit 36.
12    A    Would have been Dan Lang as well.
13    Q    Anyone else?
14    A    Only to the extent to provide him information
15  for him to fully understand the services that needed to
16  be provided and the demands of that service.
17    Q    Please identify those individuals.
18    A    Would have been -- Dan would have been
19  discussing the demands of his services with departments
20  like the emergency room and department of surgery as it
21  relates to trauma call.
22    (Exhibit 37 was marked for identification.)
23  BY MS. FITZGERALD:
24    Q    Handing you what's been marked as Exhibit 37
25  to your deposition.  Is Deposition Exhibit 37 executed?

Page 180

1    MR. STEPHENS:  Objection as to form.
2    THE WITNESS:  This copy is not executed.
3  BY MS. FITZGERALD:
4    Q    Does an executed third amendment to employment
5  agreement between Halifax Staffing and Dr. Kuhn exist?
6    A    I'm not aware.
7    Q    You don't know?
8    A    I don't know on behalf of Halifax.
9    Q    Are the terms listed in Exhibit 37 currently
10  in force?
11    A    The contract that is executed would be
12  enforced.
13    Q    Does that mean that Dr. Kuhn is not being paid
14  under the terms identified in Exhibit 37?
15    A    I don't know.
16    (Exhibit 38 was marked for identification.)
17  BY MS. FITZGERALD:
18    Q    I'm going to hand you what's been marked as
19  Exhibit 38 to your deposition.  It's a collection of
20  spreadsheets that Halifax produced to the United States
21  in connection with this litigation.
22    Do the spreadsheets collected in Exhibit 38
23  accurately reflect the compensation paid to
24  Dr. Khanna -- I'm sorry, to Dr. Kuhn for fiscal years
25  2003 and 2006 through 2010?

Page 181

1    MR. STEPHENS:  Objection as to form.  The
2  witness can review all these six spreadsheets.
3    THE WITNESS:  You've stated these all came
4  from Halifax; we've produced it?
5  BY MS. FITZGERALD:
6    Q    Yes.
7    A    Then I would say that they were accurate.
8    Q    I'd like to turn your attention to the first
9  page of Deposition Exhibit 38.  It has a collection of
10  payments, and then it says required collections, and
11  then it says $325,000.
12    Do you see that?
13    A    Uh-huh.
14    Q    Does that take into account the additional --
15  the additional employee salaries that were identified in
16  Deposition Exhibit 35?
17    MR. STEPHENS:  Objection as to form.
18    THE WITNESS:  This is not the pay app to
19  actually pay the physician.
20  BY MS. FITZGERALD:
21    Q    Okay.
22    A    This is an accrual for general ledger purposes
23  only.  There might be something else in here.  I can
24  flip through, unless it's not for the same year.
25    Q    No, they're all for different years.  It's for



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 48 of 143 PageID 14610

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                      Pages 182..185

Page 182

1   fiscal year 2003 and 2006 through 2010.
2          So is there another spreadsheet that reflects
3   the bonus that was actually paid to Dr. Kuhn?
4       A   Well, we'd have to tie that back to the actual
5   check paid, payroll check, and then walk back through
6   that documentation.
7       Q   Okay.
8       A   So I don't -- it doesn't tie directly to this.
9       Q   Does that documentation exist?
10      A   Yeah, check copies.
11      Q   No, no, no, a spreadsheet detailing the
12  incentive compensation paid to Dr. Kuhn.
13      A   A spreadsheet detailing comp- -- there would
14  be something supporting that payment to Dr. Kuhn.
15      Q   Was that -- what form would that something be
16  in?
17      A   Well, it would start with a -- the attachment
18  to the payroll authorization.
19      Q   Was that produced to the United States in
20  connection with this litigation?
21      A   I don't know.
22          (Exhibit 39 was marked for identification.)
23  BY MS. FITZGERALD:
24      Q   Handing you what's been marked as Exhibit 39
25  to your deposition.

Page 183

1          Why was Dr. Vinas paid $250,000, which is
2   $75,000 less than what Dr. Kuhn and Dr. Khanna were
3   paid?
4          MR. STEPHENS:  Objection as to the form.
5          THE WITNESS:  I actually answered this
6       question earlier as to why that amount -- why
7       those -- or how those amounts get established, and
8       that's based on something substantially less than
9       what they're expected compensation to be, but
10      enough where they are comfortable receiving that
11      stream of payment.
12  BY MS. FITZGERALD:
13      Q   So Dr. Vinas was comfortable receiving --
14          MR. STEPHENS:  Counsel, he wasn't done
15      answering your question.
16  BY MS. FITZGERALD:
17      Q   Oh, I'm sorry.
18      A   So he wanted $250,000 as the base and --
19  knowing that a neurosurgeon is going to make a multiple
20  of that over the course of time, so there would be a
21  reconciliation done on a quarterly basis to make up the
22  difference.
23      Q   Did Dr. Vinas know that he was being
24  compensated less than Dr. Kuhn and Dr. Khanna at a base
25  level?

Page 184

1       A   I don't know that.
2       Q   In order for Dr. Vinas to make more money than
3   Dr. Khanna or Dr. Kuhn, he would have to have a higher
4   number of collections; isn't that right?
5          MR. STEPHENS:  Objection as to form.
6          THE WITNESS: He would have to provide more
7       relative value service, so part of that --
8   BY MS. FITZGERALD:
9       Q   What is --
10      A   Part of that -- well, meaning the types of
11  services he's providing.  He could make more money by
12  taking more trauma call days.  I mean, there's --
13  there's more components than just that bonus.
14      Q   I see.  Earlier I asked you a series of
15  questions about the technical component being part of
16  the incentive compensation.
17          Would your answers be the same if I asked you
18  those same questions again for Dr. Vinas?
19          MR. STEPHENS:  Objection as to form to the
20      extent you asked questions about billing that have
21      nothing to do with compensation.
22          THE WITNESS:  If you're referring to the
23      questions as to whether or not Dr. Vinas received
24      any technical share of the hospital service, the
25      answer would be the same.

Page 185

1   BY MS. FITZGERALD:
2       Q   Please identify for me all individuals either
3   employed by Halifax Staffing or working on behalf of
4   Halifax Staffing who performed a fair market value
5   analysis for Deposition Exhibit 39.
6       A   The same parties, so mostly Dan Lang.
7       Q   Anyone else?
8       A   Only to the extent that he needed additional
9   information to form his opinion of the fair market
10  value.
11      Q   And who were those individuals?
12      A   The same folks that I've mentioned before,
13  anyone that would help him understand the nature of his
14  duties and services and obtaining -- and the ability to
15  obtain comparable data.
16      Q   Please identify them by name.
17      A   I'll refer to my previous answers as it's the
18  same process for the organization at this time.
19      Q   Please identify all individuals by name who
20  performed a commercial reasonable analysis of Deposition
21  Exhibit 39 who either worked at or on behalf of Halifax.
22      A   Dan Lang would have been primarily responsible
23  for performing commercial reasonableness based on his --
24  the gaining of his knowledge or his gaining of knowledge
25  as it relates to the services necessary to cover the



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 49 of 143 PageID 14611

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                            Pages 186..189

Page 186

1   trauma call and provision of services for the trauma
2   program as it related to neurosurgery.
3        Q    Anyone else?
4        A    Other than input from those other parties from
5   the departments.
6        Q    Would you like to incorporate by reference
7   your previous testimony on this issue?
8        A    Yes, it's the same answer.
9             (Exhibit 40 was marked for identification.)
10  BY MS. FITZGERALD:
11       Q    I'm handing you what's been marked as
12  Exhibit 40 to your deposition.
13            Is this the current contract that's in
14  effect -- is Deposition Exhibit 40 the current contract
15  in effect for Dr. Vinas?
16            MR. STEPHENS:  Objection as to form.
17            THE WITNESS:  There may be a new contract as
18       of today, but I -- I'm not aware of what that is.
19       I believe this is -- this is most likely the
20       latest, but there could be a newer one.
21  BY MS. FITZGERALD:
22       Q    Sitting here today as Halifax's designee to
23  testify to the creation, negotiation, and amendment of
24  compensation agreements for Dr. Vinas from 2000 to the
25  present, you are not able to tell me whether this is the

Page 187

1   current contract?
2        A    I believe it is.  I believe it's the latest.
3        Q    But you are not positive?
4        A    I'm not 100 percent.
5        Q    Under Deposition Exhibit 40, is Dr. Vinas paid
6   any portion of the technical component that Halifax
7   receives from Medicare for services provided at
8   Halifax Hospital?
9        A    No.
10       Q    Please identify for me all individuals, either
11  employed by Halifax -- actually withdrawn.
12       A    I'm sorry?
13       Q    No question pending right now.
14            Did legal evaluate Deposition Exhibit 40 for
15  compliance with the Stark Law?
16            MR. STEPHENS:  Objection.  To the extent that
17       the question calls for the witness to disclose any
18       attorney/client privileged information, I'll
19       instruct him not to answer.
20            THE WITNESS:  Legal would have performed that
21       review, as well as Dan Lang.
22  BY MS. FITZGERALD:
23       Q    Anyone else?
24       A    All parties that signed this agreement
25  probably had that in their review process, understanding

Page 188

1   the terms and the conditions of the contract.
2             (Exhibit 41 was marked for identification.)
3   BY MS. FITZGERALD:
4        Q    I'm handing you Deposition Exhibit 41, a
5   collection of spreadsheets produced by Halifax to the
6   United States in connection with this litigation.
7             Do these spreadsheets on -- at Exhibit 41
8   accurately reflect the bonuses paid to -- or the
9   incentive compensation, rather, paid to Dr. Vinas for
10  July 2003 through June 2004 and July 2006 through
11  June 2010?
12            MR. STEPHENS:  Objection as to form.  Take
13       your time to review the exhibit.
14            THE WITNESS:  I'm sorry.  Repeat the question
15       or at least the last part of the question.
16  BY MS. FITZGERALD:
17       Q    Sure.  Do these spreadsheets accurately
18  reflect the bonuses -- I'm sorry, do these spreadsheets
19  accurately reflect the incentive compensation paid to
20  Dr. Vinas for July 2003 through June 2004 and July 2006
21  through June 2010?
22            MR. STEPHENS:  I'm sorry.  Counsel, this is a
23       document that was produced to the plaintiffs by
24       Halifax?
25            MS. FITZGERALD:  Yes, without Bates stamps.

Page 189

1             MR. STEPHENS:  It was produced without Bates
2        stamps?
3             MS. FITZGERALD:  In native format without
4        Bates stamps.
5             MR. STEPHENS:  Sorry.  If you need to ask the
6        question again --
7             THE WITNESS:  No, I understand the question
8        now.
9             It would appear to be correct, yes.
10  BY MS. FITZGERALD:
11       Q    Were these spreadsheets generated pursuant to
12  section 3b of Dr. Vinas's employment agreements dealing
13  with the incentive compensation?
14       A    Are you specifically referring to this or
15  every one of them?
16       Q    Is there any other provision under Dr. Vinas's
17  contract that these spreadsheets were created pursuant
18  to?
19       A    Here it is.  Okay.  Yes, they are.
20            (Exhibit 42 was marked for identification.)
21  BY MS. FITZGERALD:
22       Q    I'm now going to hand you two deposition
23  exhibits at the same time.  Here's Deposition
24  Exhibit 42.
25            (Exhibit 43 was marked for identification.)



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 190..193

Page 190

1  BY MS. FITZGERALD:
2       Q   And this is Deposition Exhibit 43.
3           Earlier we talked about independent
4  third-party evaluations.  Are these the independent
5  third-party evaluations that you referred to?
6       A   I'm only familiar with that we had one.  I'm
7  not sure why there's two documents here.
8       Q   Okay.  Is there one of these documents that
9  you haven't seen before?
10      A   They're very similar.  There's a couple of
11 differences, so I'm not -- to be honest, I'm not sure
12 which one I've seen before.  I've only seen -- to my
13 knowledge, I've only seen or remember one document.
14      Q   Who made the determination to use an
15 independent third party for this fair market value
16 survey analysis of the neurosurgeons?
17          MR. STEPHENS: Objection as to form.  Which
18 one are you talking about, Exhibit 42 or 43?
19          MS. FITZGERALD:  There's a question pending.
20 He can answer if he understands the question.
21          MR. STEPHENS:  You've handed him two exhibits
22 and you've asked him one question about two
23 documents that have the exact same title.
24          MS. FITZGERALD:  Right.
25          MR. STEPHENS:  Are you going to clarify for

Page 191

1  him which exhibit you're referring to?
2          MS. FITZGERALD:  If the witness needs me to
3  clarify, he can ask.
4          MR. STEPHENS:  I'm going to instruct the
5  witness not to answer until counsel identifies
6  which exhibit she's referring to.
7          MS. FITZGERALD:  There's a question pending.
8  BY MS. FITZGERALD:
9       Q   Who made the determination to use an
10 independent third parity to do the fair market value
11 survey analysis of the neurosurgeons?
12          MR. STEPHENS:  So you're not referring to one
13 of the exhibits before him?
14 BY MS. FITZGERALD:
15      Q   There was a decision made, was there not, by
16 Halifax to use an independent third-party evaluation for
17 the neurosurgeons?  Is that right?
18          MR. STEPHENS:  You can answer that question.
19          THE WITNESS:  Yes.
20 BY MS. FITZGERALD:
21      Q   Who made that decision?
22      A   I don't remember that.
23      Q   You don't know sitting here today?  Halifax
24 doesn't know who made that decision?
25          MR. STEPHENS:  Objection as to form.

Page 192

1          THE WITNESS:  You're asking for the person
2    that initially identified that we want to have a
3    third-party review?
4  BY MS. FITZGERALD:
5       Q   Yeah.  Who made that decision?
6       A   And I'm telling you that I'm not sure that we
7  can identify an individual that decided that.
8       Q   Which third party -- was there more than one
9  third party used for the neurosurgery analysis or just
10 one?
11      A   I believe there was just one.  Again, I
12 believe there was only one report too, so I'm not
13 exactly sure what the differences are between the two
14 reports.
15      Q   What was the name of the third party that was
16 used?
17      A   It's identified on this report.  Healthcare
18 Strategy Group.
19      Q   I'd like to direct your attention to
20 Deposition Exhibit 42, page ten.
21          Can you please read the first two sentences on
22 page ten of Exhibit 42?
23      A   Dr. Khanna's compensation is outside of fair
24 market value standards.  Dr. Khanna is earning almost as
25 much as Dr. Vinas while performing nearly half the work

Page 193

1  volume.
2       Q   What steps did Halifax take when it received
3  this report saying that Dr. Khanna's compensation was
4  outside of fair market value?
5          I'm sorry.  Are you still reviewing the
6  document, Deposition Exhibit 42?
7       A   I am, because I'm not sure -- excuse me -- I'm
8  familiar with this document here.  That's why I'm --
9       Q   Are you denying that Halifax received this
10 document?
11      A   I didn't say that.  We produced it, did we
12 not?  You said we produced this?
13      Q   You did.
14      A   Okay.  So I'm not saying Halifax didn't, but
15 I'm not knowledgeable about this document and what it
16 says.
17      Q   Okay.  So are you not prepared to testify
18 about what steps Halifax took when it received this
19 report that Dr. Khanna's compensation is outside of fair
20 market value?
21          MR. STEPHENS:  Objection as to form.
22          THE WITNESS:  It appears as if this report --
23    this initial report was produced using a certain
24    methodology and it didn't account for the relative
25    value of charges, meaning -- charges are



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 51 of 143 PageID 14613

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Pages 194..197

Page 194

1    relative -- another relative value unit. And
2    the -- I guess this is -- I don't know -- they're
3    both missing a page, it looks like, of -- the
4    signature or the cover page or the letter attached
5    to it, or something. They usually have --
6    BY MS. FITZGERALD:
7       Q    These are what were produced to me by Halifax.
8       A    Okay. There's usually an accompanying
9    signature attached to it.
10         And so the only conclusion I can come to by
11   looking at these reports is that this first report
12   didn't accommodate the proper relative value unit using
13   his charge information, which would be the indication of
14   relative values. And so in the second review -- or I'm
15   assuming it's the second, you gave me 42 and then 43 in
16   this order -- that the -- on this report it shows
17   charges and percentage of collections of charges
18   somewhere -- oh, here, page six on 43. And when you
19   look at it that way, he's actually compensated at a
20   lower level. So there's lots of ways to look at
21   compensation.
22      Q    Okay. I'd like to stop you there.
23         MR. STEPHENS: Counsel, the witness has not
24   finished answering your question.
25         MS. FITZGERALD: Well, he hasn't actually

Page 195

1    answered the question, which was, what steps did
2    Halifax take upon receiving this report? He's
3    still not identified any steps.
4         MR. STEPHENS: When counsel is done, finish
5    answering your question as you planned to.
6         THE WITNESS: I don't have the information
7    with me about what steps or even whether or not
8    this was an accurate document, final document, that
9    was produced.
10         It appears as if there was some calculations
11   done without full information. And this other
12   report shows compensation percentage charges which
13   is a clarification of the relative value of the
14   services provided. And when you look at it that
15   way, he's actually being compensated at the lowest
16   level.
17         And so there's -- again, you're suggesting
18   that steps needed to be taken to rectify his
19   compensation, and this report says -- this
20   Exhibit 43 says that we don't have to change.
21   BY MS. FITZGERALD:
22      Q    You must have misunderstood my question. I
23   wasn't suggesting in any way that any steps needed to be
24   taken. I was just asking whether Halifax took any
25   steps. And to me your answer was, you could not

Page 196

1    identify any sitting here today; is that accurate?
2         MR. STEPHENS: Objection as to form,
3    mischaracterizes his testimony.
4         THE WITNESS: I'm actually saying that, based
5    on this report, I'm not sure that any steps are
6    needed other than to verify this report.
7    BY MS. FITZGERALD:
8       Q    Right.
9       A    And so somebody would go through and verify
10   this report and get a final report based on the facts
11   and circumstances surrounding the -- the information
12   provided.
13      Q    After Halifax received Deposition Exhibit 42,
14   did it have any conversations with anyone at Healthcare
15   Strategy Group, LLC?
16      A    I'm sure, yes.
17      Q    You don't know?
18      A    Well, I didn't have the conversations, but
19   Halifax would have.
20      Q    But you're speaking on behalf of Halifax.
21      A    I understand. And so the parties involved in
22   this process would have to have conversations. The
23   compensation review can't be done without all relevant
24   information, so there would be questions and answers
25   related to accumulating that information. And it

Page 197

1    appears that all the information wasn't accurate. And
2    so when they produced this information, it got revised
3    based on that information, and it tells a different
4    story.
5       Q    But you have no information sitting here today
6    about specific conversations that were had?
7       A    No. But my knowledge of the activities
8    surrounding this review was that a -- an appropriate
9    review was done with an outside firm, all relevant
10   information has been disclosed and their compensation
11   was within fair market value.
12         (Exhibit 44 was marked for identification.)
13   BY MS. FITZGERALD:
14      Q    I'm handing you Deposition Exhibit 44. Oh,
15   actually, I might --
16         VIDEO TECHNICIAN: Is this a good time to
17   change the disk?
18         MS. FITZGERALD: Yes, this is fine.
19         VIDEO TECHNICIAN: The time is approximately
20   3:06 p.m. This concludes disk number three for the
21   deposition of Eric Peburn. We are off video
22   record.
23         (Short break from 3:06 p.m. to 3:21 p.m.)
24         VIDEO TECHNICIAN: The time is approximately
25   3:20 p.m. This is the beginning of disk number



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 52 of 143 PageID 14614

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 198..201

Page 198

1   four for the deposition of Eric Peburn.  We are
2   back on video record.
3   BY MS. FITZGERALD:
4       Q   Mr. Peburn, I've handed you what's been marked
5   as Deposition Exhibit 44.
6       A   Yes.
7       Q   Does Deposition Exhibit 44 accurately reflect
8   amendments made to the medical oncologists' contracts in
9   2006?
10      A   Yes.
11      Q   And these amendments are to begin -- rather
12  section 3c is amended for the fiscal year beginning
13  September 30th, 2005; is that right?
14      A   Yes.
15      Q   Who made the decision to change the incentive
16  compensation pool of the medical oncologists' contracts?
17          MR. STEPHENS:  Objection, asked -- objection
18  as to the form.
19          THE WITNESS:  The decision to begin
20  negotiations about the compensation arrangement
21  with the oncologists began through a request to
22  review the current fair market value of the
23  compensation pool.  They had a fixed pool of
24  dollars plus a small base that they received.  And
25  the compensation was paid out based on RVUs, like a

Page 199

1   relative value unit measurement, and the total
2   compensation was viewed as lower than the market
3   value.
4       So we went through a process of evaluating the
5   market value of our physicians.  And this all came
6   about because three out of the seven oncologists
7   left because they wanted to make more money.  And
8   the reason they make less money at Halifax is
9   because of the -- that they provide a lot of
10  uninsured care, so oncology services to the
11  uninsured.
12      So three left.  We had to start the
13  recruitment process to bring in three more.  And we
14  did that.  And so to retain the physicians that
15  we're now recruiting again, we wanted to make sure
16  we're paying fairly.
17      And so it was determined that there was an
18  amount, it was, like, approximately $300,000 more
19  in total compensation that we needed to add.  And
20  so we didn't want to just guarantee $300,000 to
21  them.  So -- although it's still going to be
22  divvied up, the same mechanism, they're going to be
23  paid based on their personally performed work,
24  their -- relative value of their personally
25  performed work, that's how they're going to get

Page 200

1   paid.  They only get paid if there's enough funds
2   available to pay them.
3       And so as such, a compensation structure was
4   developed such that there would be a funding
5   mechanism that would be determined each year to pay
6   that additional amount, and it was determined to be
7   15 percent of the oncology clinic's operating
8   margin as defined by their internal reports.
9   BY MS. FITZGERALD:
10      Q   That was a very long nonanswer to my question.
11          Please identify by name the individual or
12  individuals who made the decision to change the
13  incentive compensation pool.  Identify by name is the
14  question.
15          MR. STEPHENS:  Objection as to form.
16          THE WITNESS:  It's hard to know exactly who
17  asked the first question.  I don't know that
18  anybody knows who asked the first question as to,
19  hey, we should look at this, but it was the
20  consensus of all parties involved to do a review
21  based on the facts and circumstances that I just
22  laid out in front of you.
23  BY MS. FITZGERALD:
24      Q   Sitting here today Halifax does not know who
25  made the decision to change the incentive compensation

Page 201

1   pool of the medical oncologists in 2006?
2           MR. STEPHENS:  Objection as to the form.
3           THE WITNESS:  Well, the parties that would
4   have been involved at the time would have been
5   Laura Cason, Dan Lang, the medical oncologists.  It
6   would have all been discussions based on the
7   concern that we've lost three medical oncologists
8   that stayed in the community but left Halifax for
9   more compensation.
10      So it would have been a group decision to
11  relook at the contract such that they would be able
12  to maintain fair compensation, and it's not the
13  highest, and it's still not equal to what the
14  surrounding oncologists are paid, however, the
15  remaining folks balanced their compensation with
16  the fact that they're providing community service.
17  BY MS. FITZGERALD:
18      Q   Please define for me the term "operating
19  margin" as it's used in Deposition Exhibit 44.
20      A   That is collections of the clinic, oncology
21  clinic, minus expenses of the oncology clinic.
22      Q   Did anyone at the legal department evaluate
23  the incentive compensation being paid to the medical
24  oncologists as described in Exhibit 44 for compliance
25  with the Stark Law in 2006?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS Document 281 Filed 05/29/13 Page 53 of 143 PageID 14615

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 202..205

Page 202

1    A    The legal department would have reviewed this
2  contract.
3    Q    And they found that the incentive compensation
4  did comply with the Stark Law?
5        MR. STEPHENS:  Objection.  I'm going to
6    instruct the witness not to answer because the
7    question calls for disclosure of attorney/client
8    privileged information.
9        THE WITNESS:  I'm going to take the advice of
10   my attorney.
11 BY MS. FITZGERALD:
12   Q    Okay.  Please identify by name the individuals
13 either employed by Halifax or working on behalf of
14 Halifax who performed a fair market value analysis of
15 the incentive compensation -- or the compensation paid
16 to the medical oncologists in 2006.
17   A    The parties that would have been involved in
18 that evaluation would have been at the time Laura Cason,
19 who in the process prior to finalization and execution
20 of the contract did retire; Dan Lang; myself would have
21 been involved, I came in at the end, but did review the
22 information and spoke with all the individuals that did
23 the work; and Tom Garthwaite.
24   Q    When was that analysis performed?
25   A    My understanding at the time, it would have

Page 204

1  period of time.  This is '05, '06, '07.  Three years.  I
2  don't know for certain.
3    Q    This bonus provision is not set, is it?  It's
4  not fixed the way the earlier incentive compensation
5  was?
6        MR. STEPHENS:  Objection as to form.
7        THE WITNESS:  Fixed in a dollar amount?
8  BY MS. FITZGERALD:
9    Q    Right.
10   A    It's a percentage to make sure that there's
11 enough funds to be able to pay the bonus.
12   Q    And as you testified, the amount that each
13 physician would get under that bonus provision would
14 depend on the amount of work that that physician
15 performed?
16   A    Yeah.  The distribution of the funds and the
17 availability of the funds are separate.  So there has to
18 be funds available to pay.  You can't pay out of a zero
19 bank account.
20   Q    I wish you could.
21   A    So the distribution was based on their
22 professional services performed.  So it was added to
23 their base pool and distributed the same -- in the same
24 manner.  And so when that all added together, that's the
25 fair market value assessment that has to be done to

Page 203

1  been within the six months -- six to nine months leading
2  up to the final execution.
3    Q    Was any fair market value analysis of
4  Deposition Exhibit 44 -- withdrawn.
5        Was any fair market value analysis performed
6  by anyone at Halifax Staffing of the compensation paid
7  to the medical oncologists under this operating margin
8  incentive compensation from 2006 through 2009?
9        MR. STEPHENS:  Objection as to form.
10       THE WITNESS:  That was a very long question.
11   I'm trying to piece all those parts together to
12   make sure I answer the question.
13 BY MS. FITZGERALD:
14   Q    Let me help.  Let me withdraw that.
15       So you identified certain individuals who
16 performed a fair market value analysis for the six to
17 nine months leading up to the execution of this
18 contract; isn't that right?
19   A    Correct.
20   Q    Was there any fair market value analysis that
21 was performed after this contract was executed?
22   A    Since this contract has been executed?
23   Q    While this contract was in effect, was there
24 any fair market value analysis that was performed?
25   A    I believe so.  I'm trying to remember the

Page 205

1  determine whether or not their total compensation was
2  still, you know, reasonable, commercially reasonable and
3  within fair market value.
4    Q    Right.  And so you performed -- I'm sorry.
5        So you performed that analysis prior to the
6  execution of that contract.  So because of these
7  variables that you just mentioned, how could you know
8  what each physician was going to be paid and, therefore,
9  whether their compensation was fair market value?
10       MR. STEPHENS:  Objection as to the form, calls
11   for a legal conclusion.
12       THE WITNESS:  Because we knew at the time it
13   was approximately $300,000.  We know how much their
14   total payment is.  And that gets reviewed.  So it's
15   not that it doesn't get looked at again.  It
16   doesn't automatically get paid.  There's a review
17   of total compensation that they're getting paid
18   every year.
19 BY MS. FITZGERALD:
20   Q    Oh, I just asked you if there was any fair
21 market value analysis that was performed after this
22 medical oncology --
23   A    I understand.
24   Q    -- was in place.
25   A    Maybe not to the same extent, but using the



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 54 of 143 PageID 14616

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 206..209

Page 206

1  same bases, the same information -- I'm not aware of
2  specific new MGMA data that was gathered.  That's what I
3  was answering before.
4      Q   Okay.  Please describe for me the review that
5  you are referencing.  How often did that take place?
6      A   It would happen -- which review are you
7  talking about now?
8      Q   Whatever -- this review that didn't involve
9  any MGMA data that you referred to.
10     A   I didn't say it didn't involve any MGMA data.
11 I said it didn't involve new --
12     Q   Oh, new data.  You're were using old data?
13         MR. STEPHENS:  Counsel --
14         THE WITNESS:  It wasn't old.  It was still
15     relevant.
16         MS. FITZGERALD:  Okay.
17         MR. STEPHENS:  You two need to not talk over
18     each other, so that you can have a clean record.
19         THE WITNESS:  Ask the question again so I can
20     answer the question.
21         MS. FITZGERALD:  Let's move on.
22         MR. STEPHENS:  Were you done answering the
23     question, Mr. Peburn?
24         THE WITNESS:  I am.
25         MS. FITZGERALD:  Well, he asked me to reask

Page 207

1      the question.  I don't have another question to
2      ask, so --
3  BY MS. FITZGERALD:
4      Q   Were the medical oncologists paid bonuses
5  pursuant to Deposition Exhibit 44?
6      A   I believe so.
7         (Exhibit 45 was marked for identification.)
8  BY MS. FITZGERALD:
9      Q   I'm handing you what's been marked for your
10 deposition as Exhibit 45.
11         Do you recognize this document?
12     A   I do.
13     Q   What is it?
14     A   It's a compilation of the oncology clinic
15 revenues and expenses.
16     Q   Was this the report prepared by the finance
17 department to reflect the operating margin as referenced
18 in Exhibit 44?
19     A   It is.
20     Q   Who was responsible for preparing this report?
21     A   This would have been in conjunction with
22 Tom Garthwaite and accounting, which would have
23 included -- at different periods of time, Lisa Tyler
24 would have been overseeing that.
25     Q   Please identify for me what parts of

Page 208

1  Exhibit 44 were prepared by Mr. Foster -- I mean, I'm
2  sorry.
3         Please identify in Exhibit 45 what parts were
4  prepared by Mr. Foster.
5      A   The format that it's in would have been a
6  compilation that Mr. Foster probably compiled, but the
7  source data for this is general ledger, so it's coming
8  from Lisa Tyler.
9      Q   I would like to direct your attention to page
10 Bates stamped 325451 at the bottom.
11     A   I don't have a 451, do I?
12     Q   451 at the bottom?
13     A   I have 325344, -345.  It goes all the way to
14 -364.
15     Q   Oh, I might have given you the wrong -- what
16 fiscal year is that?
17     A   2006.
18         (Exhibit 46 was marked for identification.)
19 BY MS. FITZGERALD:
20     Q   Okay.  I'm going to hand you what's been
21 marked as Deposition 46.
22     A   Do you want me to give this back to you or --
23     Q   No, you can just hold on to that.  It's no big
24 deal.
25     A   Are we starting on 46?

Page 209

1      Q   Yes, we are.
2      A   Okay.
3      Q   Is this also a report that was prepared by the
4  finance department to reflect the operating margin of
5  the medical oncology department?
6      A   Again, it's a general ledger data -- the
7  source data would have been coming from Lisa Tyler's
8  department, and most of this, I believe, Andy Foster
9  would have put into this format.
10     Q   For purposes of calculating the incentive
11 compensation for the medical oncologists as referenced
12 in Deposition Exhibit 44?
13     A   This doesn't appear to be -- this doesn't
14 appear to have a calculation to support that.
15     Q   What do you mean?
16     A   You're referencing the -- with the incentive
17 pool, a 15 percent?
18     Q   Uh-huh.
19     A   I'm not seeing that on here, on my report
20 here.
21     Q   Okay.  Was there a different report generated
22 for fiscal year 2005 that Halifax used to calculate the
23 operating margin in the incentive compensation for the
24 medical oncologists?
25         MR. STEPHENS:  Objection as to form.



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 55 of 143 PageID 14617

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                   Pages 210..213

Page 210

1    THE WITNESS:  This is all supporting this
2    front page.
3         There would have to be some other document
4    that supports the 15 percent, or at least a
5    calculation to support the actual distribution.
6  BY MS. FITZGERALD:
7    Q    Does this report, Deposition Exhibit 46,
8  represent the operating margin that would have been used
9  to calculate --
10   A    Yes.
11   Q    -- the 15 percent bonus?
12   A    Yes.
13   Q    Okay.  So are you comfortable answering
14 questions about --
15   A    Yes.
16   Q    -- Deposition Exhibit 46 to relate to the
17 operating margin of the medical oncology program?
18   A    Yes.
19   Q    Now I would like to turn your attention to
20 325451, please.
21   A    Okay.
22   Q    I think you might not be on the right page
23 because mine is going the other way.  325451.
24   A    Okay.
25   Q    Okay.  Do you see at the top it says, Medical

Page 211

1  Oncology, Practice Analysis, Summary of Revenue and
2  Expense?
3    A    Uh-huh.
4    Q    Does this page relate back to the
5  fourth column for medical oncology physicians on page
6  one of Deposition Exhibit 46?
7    A    It does.
8    Q    Okay.  Under gross revenue, do you see it says
9  inpatient revenue, outpatient revenue, and total?
10   A    Uh-huh.
11   Q    Is that a yes?
12   A    I do see that, yes.
13   Q    Is inpatient revenue included in the medical
14 oncology physicians' calculations on page one of
15 Exhibit 46?
16   A    If they see a patient on the inpatient
17 setting, their professional services for that
18 inpatient -- those billings are included in here, yes.
19   Q    I'd like to now turn your attention to page
20 325440.  Okay.  It says kind of at the top, Halifax
21 Medical Center, Daytona Medical Oncology Profitability,
22 and then there's a number, 762000.
23         Do you see that?
24   A    I do.
25   Q    What is that number?

Page 212

1    MR. STEPHENS:  I'm sorry, what page are we on?
2  BY MS. FITZGERALD:
3    Q    Are you confused about what page we're on?
4    MR. STEPHENS:  No, I'm asking what page are we
5  on?
6    MS. FITZGERALD:  Oh, you couldn't keep up.
7  It's 325440.
8    MR. STEPHENS:  That's clever, Counsel.
9  BY MS. FITZGERALD:
10   Q    Do you see that number, 762000?
11   A    I do.
12   Q    What is that number?
13   A    It's a cost center number.
14   Q    Okay.  And what is that cost center?
15   A    That is the cost center of the outpatient
16 oncology clinic.
17   Q    Outpatient only?
18   A    Outpatient only.
19   Q    Okay.  Now, if you could flip to page 32 --
20 hold that page with your finger, if you don't mind -- or
21 I can give you a sticky note.
22   A    I've got it.
23   Q    -- to page 325453.
24   A    Okay.
25   Q    Okay.  At the very bottom of the page, do you

Page 213

1  see that same -- that number again, 762000?
2    A    I do.
3    Q    Is that the same cost center?
4    A    It is.
5    Q    Okay.  Beneath that it has revenues.  Do you
6  see that?
7    A    I do.
8    Q    And then it has INP revenue?
9    A    I do.
10   Q    What does INP revenue stand for?
11   A    It's stands for inpatient.
12   Q    And below that, it says OUT revenue.  Do you
13 see that?
14   A    Yes.
15   Q    What is OUT revenue?
16   A    Outpatient.
17   Q    Okay.  I am going to give you a piece of paper
18 that we're going to mark as Deposition Exhibit 47 so we
19 can do some addition work -- actually, you can do some
20 addition work.
21   A    If you're asking whether or not this inpatient
22 revenue stated here is included in the report, it is --
23   Q    Okay.  We're going --
24   A    -- but it's not inpatient revenue.
25   Q    We're going to get there.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 214..217

Page 214

1      A    Okay.
2      Q    Well, what is it, then?
3      A    It's an outpatient account that was miscoded
4  on the general ledger and accounted for as inpatient on
5  the general ledger.  That's what this is.  This is a
6  general ledger activity.
7           It was still an outpatient -- in an outpatient
8  setting in the outpatient oncology center, but the
9  reason -- that's why there's such small amounts.  Those
10  are errors in the classification on the general ledger
11  related to that patient.  But if you go back and look at
12  these patients, they were all outpatients.
13      Q    Did you go back and look at those patients?
14      A    No, our staff has.
15      Q    Why is the report -- the report is wrong for
16  every fiscal year, then?
17      A    It's always going to be --
18      Q    Is it still wrong?
19      A    And it's always going to be wrong, because
20  there's always a mis- -- there's hundreds of thousands
21  of patients that go through our system.  And if there's
22  a misclassification at any point in time, it hits the
23  general ledger, and the general ledger actually doesn't
24  get fixed.  The patient record does get fixed and the
25  billing does get fixed.

Page 215

1      Q    Is there a separate accounting somewhere of
2  correct numbers?
3      A    No.  Because this is an outpatient cost
4  center.
5      Q    Okay.
6      A    So we already know that it's accumulated in an
7  outpatient cost center.  And that applies to any
8  other -- that's not the same as I answered before as it
9  related to the physician billing component, because they
10  do bill for the physician component on the inpatient and
11  they do get credit for their professional services.
12      Q    Just in the medical oncology professional
13  component?
14      A    Just in that cost center, yes.
15      Q    So this cost center is outpatient only, you
16  said?
17      A    Yes.
18      Q    And so why is this --
19      A    All of these are.
20      Q    Why is there even an inpatient revenue section
21  of an outpatient-only cost center?
22      A    When you close the books for financial
23  statement purposes, you have to have everything mapped
24  somewhere.  It maps the inpatient.  It has to go
25  somewhere, so it has to flow through.  And then we close

Page 216

1  the books and it stays there for general ledger
2  purposes.  There's no benefit of moving those dollars
3  from that -- from the one category to the other.
4  There's no financial benefit of review of the cost
5  center or anything like that, so there's no reason to go
6  back and do journal entries to fix that.
7           So you have to have everything mapped.
8  There's millions of transactions that go through and
9  they all map somewhere.
10      Q    Were the medical oncologists paid on the wrong
11  information, then?
12      A    No.  The core information, the source
13  information, is accurate.  It's an outpatient clinic,
14  and it's specifically an outpatient clinic.  It doesn't
15  include any other ancillary services.  It doesn't
16  include lab, doesn't include imaging, doesn't include
17  other hospital services.  And it's -- they're not paid
18  based on this dollar either.  That's not how they're
19  being paid.  This is just to create an available pool.
20  And then --
21      Q    Well, they sort of are.
22      A    No, they're not.
23      Q    Well, they're paid based on the pool?
24      A    No.  The pool is created.  They're paid based
25  on their personally performed work.  That's it.

Page 217

1      Q    Well, they're paid based on their RVUs?
2      A    Their personally performed RVUs.
3      Q    Right.
4      A    Professional services only.  And so the
5  tot- -- you could base it on the -- you know, the -- if
6  they have to sit around and be call inside the
7  office, you could pay them more for that service,
8  because they have to physically be there.  And that
9  would be generating an RVU, but it's personally
10  performed work.  Where the dollars come from is not
11  directly paying them for that activity.
12      Q    I'd like to turn your attention to page
13  325452.
14      A    That was the page we were just on?
15      Q    Is it?  325 --
16      A    That's the one I'm on.
17      Q    -- 452.  Okay.
18           At the top, what is the cost center, 715100?
19      A    That is the outpatient oncology drug, so the
20  infusion clinic, drugs.
21      Q    And, once again, there's inpatient revenue
22  listed?
23      A    Same exact answer.  That's what -- if this
24  were inpatient, it would be millions of dollars.  Not
25  $3,000.  That's one drug for one patient one time, so --



USA vs. HALIFAX HOSPITAL MEDICAL CENTER     VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013     Pages 218..221

Page 218

1     Q    Yeah, I'm aware of how expensive the drugs
2 are.
3     A    Okay.
4     Q    Yeah, sadly.
5      How -- did you talk to -- and you did not talk
6 to Andy Foster after his deposition?
7     MR. STEPHENS: Objection as to form.
8     THE WITNESS: I did not talk to Andy Foster.
9 BY MS. FITZGERALD:
10     Q    Why does Andy Fos- -- do you know why
11 Andy Foster believes that inpatient revenue was
12 included?
13     MR. STEPHENS: Objection as to form, outside
14    the scope of the 30(b)(6) topic.
15     MS. FITZGERALD: Well, it clearly goes to the
16    bonus calculation, which is one of the topics he's
17    testifying to.
18     MR. STEPHENS: Mr. Foster's mistake is not
19    within the scope of 30(b)(6) topic.
20     MS. HERNACKI: The colloquy has got to stop.
21    You are not here to testify. Okay. I've been
22    listening to it all day long, you've been coaching
23    and testifying. Let's just move on.
24     THE WITNESS: I'll answer the question.
25 BY MS. FITZGERALD:

Page 219

1     Q    Thank you.
2     A    He was confused. I read the whole transcript,
3 that part anyway. I didn't read the whole thing, but I
4 did read the section. And it's clear that he was being
5 asked a lot of questions and he was confused as to the
6 question. That's what it appears to me. It's
7 conjecture, but he was absolutely wrong.
8     And I've done some investigation on that
9 specifically, and it's not the case.
10     Q    Please describe for me the investigation that
11 you undertook.
12     A    The finance department -- or actually in this
13 case the accounting department, looked at these records
14 specifically and determined that they were outpatients
15 in the clinic -- at the respective clinics, so --
16 depending on which cost center it was -- so Ormond
17 Oncology or the Daytona Oncology or the Port Orange
18 Oncology. And the drugs related to those are in those
19 related cost centers.
20     Q    Did the accounting department prepare a report
21 for you of these charges?
22     A    They did not, no.
23     Q    Did they just inform you verbally or was it by
24 email or some other way?
25     MR. STEPHENS: Objection as to the form.

Page 220

1     THE WITNESS: It was verbally.
2 BY MS. FITZGERALD:
3     Q    Whom did you -- with whom did you meet in the
4 accounting department?
5     A    Lisa Tyler.
6     Q    Anyone else?
7     A    No.
8     Q    Did Lisa Tyler have any role in the medical
9 oncology compensation -- incentive compensation?
10     MR. STEPHENS: Objection as to form.
11     THE WITNESS: Did she have any role in -- in
12    processing?
13 BY MS. FITZGERALD:
14     Q    Did Lisa Tyler have any role in calculating
15 the operating margin of the -- for the 15 percent
16 incentive compensation?
17     A    She would have been -- she would have worked
18 with Tom Garthwaite and Andy Foster to produce the
19 necessary information to be able to do the calculation.
20 It all comes from the general ledger.
21     Q    In addition to -- in front of you is also
22 Deposition Exhibit 45, which is the fiscal year 2006
23 oncology report.
24     If I asked you the same questions about what
25 was included in this report, would your answers be the

Page 221

1 same?
2     A    Yes.
3     MR. STEPHENS: Objection as to form.
4     THE WITNESS: Yes.
5 BY MS. FITZGERALD:
6     Q    Is there any inpatient information included --
7 inpatient billing data that's included in the fiscal
8 year 2006 report?
9     A    There's identification of inpatient services
10 with small dollars that are also outpatients related to
11 the activity in the clinics.
12     Q    And are all the cost centers identified in
13 Deposition Exhibit 45 outpatient cost centers?
14     A    Yes. With one exclusion, which includes the
15 inpatient physician billing related to the physician
16 services. When they see a patient in the inpatient,
17 they bill for that. It's not paid on part A, but
18 it's -- you understand? Okay. It's a physician
19 billing.
20     Q    I believe I understand that. If you think
21 that you would like to further clarify your answer --
22     A    No, that's okay.
23     Q    -- please go ahead.
24     A    It's okay.
25     Q    Okay. For fiscal year 2007 --



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 58 of 143 PageID 14620

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                         Pages 222..225

Page 222

1     A    Which exhibit?  I apologize.
2     Q    I haven't given you an exhibit.  I'm happy to
3  mark it as an exhibit.  I'm going to ask you the same
4  questions, but I can mark it as an exhibit if you need
5  it as reference.
6     A    Is it the same document you're referencing?
7     Q    Yeah.
8     A    Okay.
9     Q    For fiscal year 2007, were only outpatient
10 cost centers used?
11    A    Yes.
12    Q    Were the only inpatient calculations that were
13 included the personally performed services by the
14 medical oncologists?
15    A    The physicians, when they see the patient on
16 the inpatient setting, the physician component, yes.
17    Q    Okay.  Are your answers the same for fiscal
18 year 2008?
19    A    It would be, but I don't believe -- it was
20 2008 or 2009, the last year that this incentive -- I
21 don't remember which year it was.
22    Q    Well, you're Halifax --
23    A    I know.
24    Q    -- so you --
25    A    I'd have to see the report.

Page 223

1     Q    Okay.
2          (Exhibit 47 was marked for identification.)
3  BY MS. FITZGERALD:
4     Q    We'll mark --
5          And this was through 2007, so --
6          We'll mark this as 47.
7          Does Deposition Exhibit 47 refresh your
8  recollection as to whether a 15 percent of operating
9  margin incentive compensation was paid?
10    A    No, I'd have to see the contract, to be
11 honest.
12    Q    Okay.
13    A    There's a contract related -- because this is
14 now -- there's an agreement.  I don't think I have it.
15         (Exhibit 48 was marked for identification.)
16 BY MS. FITZGERALD:
17    Q    I'm handing you what's been marked as
18 Deposition Exhibit 48.
19         MR. STEPHENS:  Are we done with 47?
20         MS. FITZGERALD:  I've handed him 48.
21         THE WITNESS:  I think you have a question on
22 47, and you're helping me with this.
23 BY MS. FITZGERALD:
24    Q    Right.  You said that that document did not
25 refresh your recollection as to whether an incentive

Page 224

1  compensation was paid for fiscal year 2008.
2     A    Correct.
3     Q    You requested to see the contract that was
4  amended.  I have now handed you Deposition Exhibit 48.
5     A    Yes, but I'm going to keep this out.
6     Q    Sure.  Does Deposition Exhibit -- is
7  Deposition Exhibit 48 the current contract for
8  Dr. Boon Chew?
9          MR. STEPHENS:  Take your time reviewing the
10 document so that you know what it is.
11         THE WITNESS:  Yeah, this is when the amount
12 was fixed as opposed to a percentage.
13 BY MS. FITZGERALD:
14    Q    And does this -- reviewing Deposition
15 Exhibit 48 refresh your recollection as to whether a
16 15 percent of operating margin incentive compensation
17 was paid in fiscal year 2008 to the medical oncologists?
18    A    Based on the contract, it should have been
19 paid.  I didn't verify that a check actually was made,
20 but it should be paid based on the contract.
21    Q    Are you aware of whether there was any
22 internal confusion at Halifax as to whether the bonus
23 should be paid for a fiscal year 2008 to medical
24 oncologists?
25         MR. STEPHENS:  Objection as to form.  I'll

Page 225

1  instruct the witness not to answer to the extent
2  that any answer would divulge attorney/client
3  privileged information.
4          MS. FITZGERALD:  Except for that which was
5  vitiated by the court in the crime fraud exception.
6          THE WITNESS:  There was some question as to
7  whether or not there was a full understanding of
8  that agreement, and so we reexamined the agreement.
9  BY MS. FITZGERALD:
10    Q    But the bonus provision was paid, the
11 incentive compensation was paid?
12    A    Remember, I said it should be paid based on
13 the contract.  I don't know that a check was actually
14 cut for 2008.
15    Q    Sitting here today, Halifax is not aware of
16 whether --
17    A    I don't -- I didn't verify that before I came.
18    Q    Okay.  And you are testifying on behalf of
19 Halifax?
20    A    Yes.
21    Q    Deposition Exhibit 48 is the current contract
22 of Dr. Boon Chew; is that right?
23    A    I believe so.
24    Q    Are the contracts the same for all other
25 members of the medical oncology practice at Halifax?



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 226..229

Page 226

1       MR. STEPHENS:  Objection as to form.
2  BY MS. FITZGERALD:
3       Q    I'd like to direct your attention to --
4       A    I believe so.
5       Q    -- page three of the contract, the three at
6  the bottom, letter "e" at the top, says, The company
7  agrees to offer a contract identical in terms to this
8  agreement to all physicians who become members of the
9  practice group.
10      Do you see that?
11      A    I do.
12      Q    And is the company, in fact, following this
13 provision?
14      A    I believe so, yes.
15      Q    Were the medical oncologists unhappy with the
16 incentive compensation that we saw in Deposition
17 Exhibit 44?
18      MR. STEPHENS:  Objection as to form, outside
19      the scope of 30(b)(6) testimony.
20      THE WITNESS:  I don't know their happiness.
21 BY MS. FITZGERALD:
22      Q    If they weren't unhappy, why would you change
23 the compensation structure?
24      MR. STEPHENS:  Objection as to form,
25      mischaracterizes his testimony.

Page 227

1       THE WITNESS:  There were several factors
2  happening -- occurring at this point in time.  We
3  qualified for 340B drug pricing, which
4  substantially lowered the price and which would
5  have increased the margin, which we're not going to
6  share the savings related to that in some kind of
7  pool that would then be distributed based on their
8  personally performed work.  It -- it could have
9  been -- it potentially would have brought it to a
10 point where it was outside of fair market value.
11      When we initially entered into this
12 arrangement, the number was approximately $300,000,
13 the target of additional compensation that we
14 needed to distribute across the group based on our
15 views to get them closer to -- I won't say fair
16 market value for our community, because they're
17 still the lowest paid oncologists in our community,
18 but, in general, it got them closer to fair market
19 value.  And they agreed to fix the amount to 275-,
20 approximately $300,000.
21      And then we also wanted certain -- we wanted
22 certain additional commitments from them, service
23 commitments and participation in certain activities
24 within the clinic.
25 BY MS. FITZGERALD:

Page 228

1       Q    I'd like to turn back to that 15 percent of
2  operating margin bonus pool.
3       A    Yes.
4       Q    You said that the pool was distributed based
5  on personally performed work, right?  It was based --
6  distributed based on their work RVUs?
7       A    Yes.
8       Q    And then you said just now that there was a
9  drug component to the pool, isn't that right?  There
10 were drug pieces?
11      A    The infusion clinic --
12      MR. STEPHENS:  Objection as to the form.
13      THE WITNESS:  The infusion clinic includes
14      drugs, yeah.  340B only applies to outpatient drugs
15      in the clinic.
16 BY MS. FITZGERALD:
17      Q    Okay.  And so the drug fee, that was part of
18 the pool, wasn't it?
19      A    It went into the calculation that determined
20 the pool, yes.
21      Q    It went into that overall operating margin,
22 the drug component, right?
23      A    The expense, yeah.
24      Q    The drug expense.  So that wasn't personally
25 performed, the actual expense of the drugs?

Page 229

1       A    The -- to administer that drug, the doctor has
2  to be there.
3       Q    Okay.  But I'm just saying that -- there's a
4  fee associated with that that's not just the doctor's
5  personally performed services; isn't that right?
6       A    Yes.  The drug in and of itself, the clinic in
7  and of itself, is not necessarily the doctor's fees.
8  However, that was to create the pool to be distributed
9  based on their personally performed work.  And in total,
10 when you add that in, they were within fair market
11 value.
12      Q    Turning to -- okay, you're there.
13      Exhibit 48 was not produced to us with Bates
14 stamps on it.  Three pages from the end --
15      A    Where is it?
16      Q    -- is a memo from Andy Foster to
17 Tom Garthwaite.  Are you there?
18      A    Yes.
19      Q    And -- when Mr. Fos-- did Mr. Foster create
20 the template for developing the fair market value
21 analysis determination that he was doing?
22      A    Did he create it on his own?  My understanding
23 is that he used other analyses that we've received from
24 outside parties and incorporated some of that process
25 into his review.  So when we did it internally, he was



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 230..233

Page 230

1    able to do it without having to buy that service every
2    time.
3        Q    Please identify for me the outside fair market
4    value analyses that Mr. Foster used to create the
5    process.
6        A    The firms we've historically used.
7        Q    Was that only for the MGMA data or are you
8    talking about firms that performed a fair market value
9    analysis?
10        MR. STEPHENS:  Objection as to form.
11        THE WITNESS:  No.  Firms that have performed a
12    fair market -- the fair market value analysis from
13    outside firms includes an understanding of relative
14    value units based on different metrics.  So there's
15    different components.  So sometimes you would use a
16    driver -- a charge -- charges as the driver or some
17    other Medicare equivalent, because Medicare
18    typically is an industry standard as well, to
19    determine that value.
20        So he used -- he incorporated that information
21    and that knowledge base into his analyses.  And
22    he's actually added to that over time to -- you
23    know, to better support the -- true nature of
24    the arrangement.
25    BY MS. FITZGERALD:

Page 231

1        Q    Please identify for me by name all outside
2    firms that Halifax used to create fair market value
3    analyses from 2000 through 2009.
4        MR. STEPHENS:  Objection, asked and answered.
5        THE WITNESS:  I can't remember all the firms.
6    I couldn't list them off.  Andy probably could.  He
7    uses them.  He interacts with those folks.
8    BY MS. FITZGERALD:
9        Q    Did those firms provide reports to Halifax for
10    the neurosurgeons' fair market value from 2000 to 2009?
11        A    We have lots of reports, and I don't remember
12    the specific dates.  We reviewed some today.  I don't
13    remember the dates of those and we just reviewed them.
14        Q    That's because they weren't dated probably.
15        Did those outside companies prepare any fair
16    market value analyses for the medical oncology group
17    from 2000 to 2009?
18        A    If they did, we provided it, so I don't know.
19        Q    For the neurosurgeons from 2000 to 2009, how
20    many different outside companies performed fair market
21    value analyses of their compensation?
22        A    I don't know that answer.  You're asking very
23    specific questions related to dates, and without
24    documents in front of me --
25        Q    That's because I don't have any documents.

Page 232

1        Was it more than two companies?
2        A    I don't know.
3        Q    More than five?
4        A    I don't know.  We would probably use -- based
5    on our history, we wouldn't necessarily use a bunch of
6    different ones for the same review.
7        Q    Can you remember any of the names of the
8    outside companies that were -- that performed fair
9    market value analyses other than Healthcare
10    Strategies --
11        A    No.
12        Q    -- from 2000 to 2009?
13        A    I believe Healthcare Appraisers.  Kaufman Hall
14    would be involved.
15        Q    And they performed fair market value analyses?
16        A    I believe so.
17        Q    What was the first --
18        A    What year -- what year -- I think it's
19    Healthcare Appraisers.
20        Q    From 2000 --
21        A    I don't know the dates.  You're asking me a
22    date, and I don't know.
23        Q    Okay.  Any others other than those two?
24        A    I don't know.
25        Q    Okay.

Page 233

1        A    I'm sure there were, but I don't know, and I
2    couldn't name them.
3        Q    Who was involved in the renegotiation of the
4    medical oncology contract that -- Dr. Boon Chew's,
5    Exhibit 48?
6        MR. STEPHENS:  Objection as to form.
7        THE WITNESS:  Multiple parties, but mostly led
8    by Tom Garthwaite.
9    BY MS. FITZGERALD:
10        Q    Was Audrey Pike involved?
11        A    I don't know the date which she was still here
12    as an employee.  She left employment at some point in
13    the last few years, and I don't remember the date.
14        (Exhibit 49 was marked for identification.)
15    BY MS. FITZGERALD:
16        Q    I'm handing you what's been marked as
17    Exhibit 49 to your deposition.
18        Does Exhibit 49 refresh your recollection as
19    to who was involved in the renegotiation of the medical
20    oncologists' contracts?
21        A    Okay.
22        Q    Does Deposition Exhibit 49 refresh your
23    recollection?
24        A    What it tells me is Tom Garthwaite negotiated
25    the terms.  It's pretty clear.  It says, I met with the



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 61 of 143 PageID 14623

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                           Pages 234..237

Page 234

1    medical oncologists last Friday and we came to agreement
2    on all the contractor terms.
3       Q    Does that mean that Tom Garthwaite drafted the
4    contract?
5       A    Physically?
6       Q    Yeah.
7       A    No, not physically.  Somebody has to draft the
8    contract, and that's always legal, as I said before.
9       Q    So does that mean that legal was then involved
10   in the negotiation of the contract in any way?
11           MR. STEPHENS:  Objection as to form.
12           THE WITNESS:  You said negotiation.
13   BY MS. FITZGERALD:
14      Q    Uh-huh.
15      A    So you're clarifying the question of
16   involvement and you're specifying it to be negotiation?
17      Q    Right.
18      A    So this tells me that Tom Garthwaite
19   negotiated the contract with the medical oncologists.
20      Q    And no one else?
21      A    He would have been the person negotiating.
22      Q    Okay.
23           (Exhibit 50 was marked for identification.)
24   BY MS. FITZGERALD:
25      Q    I'm handing you what's been marked as

Page 235

1    Exhibit 50 to your deposition.
2            Do you recognize Deposition Exhibit 50?
3       A    I do not.
4       Q    Did you review this document in preparation
5    for your deposition testimony here today?
6       A    I did not.
7       Q    Does Deposition Exhibit 50 accurately reflect
8    the medical oncology contractor review that was
9    undertaken in August 2009?
10           MR. STEPHENS:  Objection, vague, no foundation
11   for this document.
12           MS. FITZGERALD:  He's the 30(b)(6) witness
13   testifying to negotiation of the contracts.
14           MR. STEPHENS:  He just told you he's never
15   seen the document before.
16           MS. FITZGERALD:  He's here to speak on behalf
17   of the entire company.  If he hasn't seen the
18   document before --
19           MR. STEPHENS:  Go ahead.
20           MS. FITZGERALD:  -- you know, that's possibly
21   a problem for his preparation.
22           MR. STEPHENS:  All right.
23           THE WITNESS:  I can't answer the question.
24   I've not seen the document before.
25   BY MS. FITZGERALD:

Page 236

1       Q    Why was the addendum for profitability
2    deleted?
3            MR. STEPHENS:  Objection as to form, lack of
4    foundation.
5            THE WITNESS:  I believe I answered that
6    question already.  I went through the whole process
7    of why we moved away from that profitability and
8    into the new contract.
9    BY MS. FITZGERALD:
10      Q    And so is your deposition testimony that the
11   addendum for profitability, 3e, relates to that
12   15 percent of operating margin incentive compensation?
13           MR. STEPHENS:  Objection as to form.
14           THE WITNESS:  Yes.  But I still don't know who
15   wrote this, so I don't know the intent behind the
16   parties' documentation.
17   BY MS. FITZGERALD:
18      Q    Well, you're still testifying here on behalf
19   of Halifax --
20      A    I understand.
21           MR. STEPHENS:  Objection as to form.  This is
22   beyond the scope of 30(b)(6) testimony.
23           MS. FITZGERALD:  Oh, no, it's not.
24   Okay.  Let's take a short break.
25           VIDEO TECHNICIAN:  The time is approximately

Page 237

1    4:10 p.m.  We are off video record.
2            (Short break from 4:10 p.m. to 4:13 p.m.)
3            VIDEO TECHNICIAN:  The time is approximately
4    4:13 p.m.  We are back on video record.
5                CROSS-EXAMINATION
6    BY MS. HERNACKI:
7       Q    Thank you.  Mr. Peburn, I'm Katherine
8    Hernacki.  We met, I think, briefly earlier.  I've got
9    some questions for you.
10           You understand that you are here to testify on
11   behalf of Halifax Hospital in regard to Halifax Hospital
12   Medical Center's organization and structure, including
13   its relationships with all subsidiaries, affiliates,
14   partnerships and joint ventures from 2000 to the
15   present, do you not?
16      A    I do.
17      Q    Starting with Halifax Hospital Medical Center,
18   can you -- my understanding is that is a special tasking
19   district; is that correct?
20      A    It is.
21      Q    Okay.  Can you describe that to me, what that
22   means.
23      A    Sure.  Halifax Hospital Medical Center was
24   established as a political subdivision of the State of
25   Florida to carry out its mission of providing access to



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 62 of 143 PageID 14624

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                          Pages 238..241

Page 238

1  healthcare for the community.  In that, it's allowed to
2  create certain subsidiaries or affiliates, whatever term
3  you want to use.  They're affiliated through control.
4          Specifically, Halifax Staffing, that we've
5  been talking about today, was established as one of
6  those affiliates.  The board of commissioners of both
7  organizations are the same.  And the board of
8  commissioners of the District, going back to the
9  District, are appointed by the governor of the state of
10  Florida.
11      Q    Does the board -- does the governor appoint
12  the board of commissioners for Halifax Staffing, Inc.?
13      A    They do by default, because the board is a
14  mirror board, meaning when a board member changes, it
15  automatically changes for both organizations.
16      Q    Are you talking about board of commissioners
17  or board of directors?  They are two separate things,
18  right?
19      A    The board of commissioners of the hospital,
20  and I think they're called the board of directors for
21  Halifax Staffing, but they are the same people.
22      Q    Okay.  Now, Halifax Hospital Medical Center is
23  not a corporation; is that right?
24      A    It's a government.
25      Q    It's a special district, a governmental

Page 239

1  entity, right?
2      A    Uh-huh.
3      Q    Halifax Staffing, Inc., is a not-for-profit
4  corporation, correct?
5      A    It's also considered a governmental entity.
6      Q    It's a 501(c)(3) corporation?
7      A    It is.  It's an instrumentality of the
8  District.
9      Q    It has a separate employee identification
10  number, Halifax Staffing, Inc., does?
11      A    It does.
12      Q    Halifax Hospital also has a separate employee
13  identification number?
14      A    It does, with no employees.
15      Q    That was my next question.  How many employees
16  does Halifax Hospital Medical Center have?
17      A    Zero.
18      Q    How many -- and I think this -- I think I know
19  the answer to this question.  How many employees does
20  Halifax Hospital Medical Center report via W-2 to the
21  IRS?
22      A    Halifax Hospital Medical Center?
23      Q    Yes.
24      A    None.
25      Q    Halifax Hospital Medical Center, how many

Page 240

1  W-2 --
2      A    Zero.
3      Q    Zero.  Who is on the board of commissioners
4  for Halifax Hospital Medical Center?
5      A    Would you like me to list them by name?
6      Q    Yes, please.
7      A    Dr. John Johnson, Glenn Ritchey, Karen Jans,
8  Art Giles, Dan Francoti, Susan Schandel and
9  Harold Goodemote.
10      Q    Okay.  Anybody else?
11      A    That's seven, right?
12      Q    I think I got Ritchey -- well, we can read it
13  back.  John Johnson, Glenn Ritchey, Karen --
14      A    Jans.
15      Q    Jans.
16      A    Art Giles.
17      Q    Art Giles?
18      A    Dan Francoti.  I've lost track of how many --
19  where we are.
20          THE REPORTER:  Susan Schandel?
21          THE WITNESS:  Susan Schandel.
22          THE REPORTER:  Harold Good-something.
23          THE WITNESS:  Goodemote, G-o-o-d-e-m-o-t-e.
24  BY MS. HERNACKI:
25      Q    So that's, you think, all of them?

Page 241

1      A    There's seven appointed -- this enabling act
2  cre- -- seven positions.
3      Q    Okay.  Halifax Health Medical Center is a
4  fictitious name; is that right?
5      A    It's a doing-business-as, yes.
6      Q    And why -- why was that registered as a
7  fictitious name?
8      A    Because we felt that it was -- the community
9  could more recognize and understand the entirety of the
10  hospital's operations as it relates to all the different
11  services we provide.  And it was mostly for image.
12  Halifax Health is more simple, straightforward.
13      Q    Brand recognition?
14      A    Brand recognition, yeah.
15      Q    Who -- at Halifax Hospital Medical Center, who
16  comprises the audit committee of the board of
17  commissioners?
18      A    There are two board members.  That includes
19  Dan Francoti and Susan Schandel.  Susan Shandel is the
20  treasurer, and then there's other community members,
21  expert members.
22      Q    There are other community members?
23      A    Yeah, there's other members appointed by the
24  board of commissioners.
25      Q    And those are -- I'm sorry.



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Pages 242..245

Page 242

1    A    They're experts in the field of audit or
2  finance so that they add more value on the audit
3  committee.
4    Q    And can you name those individuals for me, the
5  community -- the expert community members, please?
6    A    Sure.  Ted Surbousek, Dan Houser,
7  Nellie Kargar.  That's three.  I'm trying to think,
8  based on how they sit.  I mentioned the two board
9  members already, right?  You have Susan Schandel and
10  Dan Francoti.  And I'm missing one.  I think there's six
11  members.  I'm sorry.
12         Can you read back the five names and then I
13  can get to the sixth one?
14    Q    Let's see.  We've got Dan Francoti, I believe,
15  Susanne Shandel, and then we have for the expert
16  members, Ted Surbousek, Dan Houser, Nellie Kargar.
17    A    Yes.
18    Q    And --
19    A    And Decker Youngman.
20    Q    Decker Youngman?
21    A    Decker Youngman.
22    Q    And you said those are --
23    A    There should be six names.  Did you write
24  six --
25    Q    One, two, three -- six total?

Page 243

1    A    Oh, yes.
2    Q    Including the --
3    A    The two board members.
4    Q    -- the two board members?
5    A    Correct.
6    Q    And these expert members are appointed by the
7  board --
8    A    Yes.
9    Q    -- of commissioners?
10    A    Are -- other than being on the audit
11  committee, being appointed to the audit committee, do
12  these expert community members have any other -- do they
13  have any financial interest in Halifax Hospital?
14    A    No.
15    Q    Do they have any other position with respect
16  to the hospital, whether paid or unpaid?
17    A    Well, the board members may be on another
18  subcommittee of the board, but not the non-board
19  members.  There's several committees of the board, and
20  there's a representative -- you know, one person that
21  would fill in for those.  So I'm trying to think.  There
22  maybe another committee that I don't remember.
23    Q    How often does the audit committee for Halifax
24  Hospital Medical Center meet?
25    A    The audit committee meets monthly.

Page 244

1    Q    Monthly?  And how -- how long has that been
2  the case?
3    A    With this current structure of six, it's been
4  three to five years.  It was a smaller committee -- it's
5  currently an audit and finance committee.  Prior to
6  that, it was just an audit committee and there was a
7  separate -- the finance committee was just the full
8  board.  And so when it was an audit committee, there was
9  a -- the treasurer of the board was on it, plus two
10  audit experts, financial audit experts, and those two
11  are no longer on the committee.  They rolled off and new
12  members were added.
13         So that was several years prior to that.  So
14  probably back seven, eight years at least, I would say.
15    Q    The previous -- so we've got the current
16  six-member formation, which is audit and finance?
17    A    Yes.
18    Q    And you said that's about three to five years?
19    A    Yeah.  I want to say five -- probably closer
20  to five years.  I'd have to get the exact date of the
21  membership.
22    Q    Roughly 2008 to the present, if my math is
23  correct?
24    A    Yeah, somewhere -- '07, '08, '09, somewhere in
25  there.

Page 245

1    Q    And with the previous version, that was simply
2  the audit ---
3    A    It was just an audit committee.
4    Q    Yes, just the audit committee, how often did
5  that committee meet?
6    A    At least quarterly.  I don't believe they met
7  monthly, because it -- the audit committee even meets
8  monthly, but they have quarterly reports, so there was
9  updates monthly, but then the full report is really --
10  there's quarterly full reports.
11    Q    Where is Ted Surbousek employed?
12    A    He's employed and part owner of an automotive
13  dealership.
14    Q    What about Dan Houser?
15    A    International Speedway Corporation.
16    Q    Nellie Kargar?
17    A    Kargar?
18    Q    Kargar.
19    A    She works for ICI Homes.
20    Q    And Decker Young- --
21    A    Youngman.
22    Q    Youngman?  Where does he work?
23    A    He works at Brown and Brown Insurance.
24    Q    Does Brown and Brown provide any insurance
25  coverage to any of the Halifax Hospital organization



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 246..249

Page 246

1  affiliates?
2      A   They are our insurance consultant, but he's
3  not involved in the account.
4      Q   Insurance consultant.  Does Brown and Brown
5  act as a broker or a seller of policies to the hospital?
6      A   They do, non-commission based.  We're required
7  to have an insurance consultant as it relates to our
8  taxes and debt, and so they provide that oversight.
9      Q   Which policies of insurance does Brown and
10  Brown sell to the hospital?
11      A   Automobile and general business insurance.
12      Q   I have a couple of questions about -- my
13  understanding is that Patient Business and Financial
14  Services, Incorporated, is a separate affiliate, or
15  whatever you might call it, of Halifax; is that correct?
16      A   Uh-huh.
17      Q   What is the purpose of or function of Patient
18  Business and Financial Services, Incorporated?
19      A   The -- that is our billing function, and the
20  reason we established a separate company was to
21  establish delineation in benefits when we -- that was an
22  outsourced function previously to Health Task, a company
23  called Health Task.  It didn't work out.  We brought all
24  those employees back in under the employment of Halifax.
25          But we didn't want to give -- provide the same

Page 247

1  level of benefits.  We wanted to transition folks,
2  excuse me, away from the defined benefit plan.  And so
3  we established a separate corporation to employ them in,
4  but they're basically working for Halifax.
5      Q   Does that organization -- if we can, I'll
6  refer to Patient Business and Financial Services,
7  Incorporated as PBFS.
8      A   Sure.
9      Q   Does PBFS handle the -- anything with regard
10  to Medicare and Medicaid billing?
11      A   They do all the billing.
12      Q   So they submit -- do they submit requests for
13  payment to Medicare and Medicaid?
14      A   PBFS is just the staffing organization that
15  provides a service to the hospital, just like
16  Halifax Staffing.  The hospital is doing the billing, so
17  they're providing people, bodies, and -- but the actual
18  billings are all done on the hospital systems for the
19  hospital direct -- you know, Halifax Hospital Medical
20  Center is doing the billing.  They're performing the
21  personnel's function, I guess.
22      Q   How many employees does PBFS have?
23      A   Approximately 300 FTEs.  I actually don't know
24  the employee count, 300 -- between 300, 350 FTEs.
25      Q   Are those, the employees of Patient Business

Page 248

1  and Financial Services, exempt from the Florida
2  retirement plan as well?
3      A   Yes.  They're not in the Florida retirement
4  plan or the Halifax pension plan.  They're in the
5  defined contribution plan, which actually all new
6  employees now are in the same defined contribution plan,
7  so the need for these separate corporations is really
8  not there anymore.
9      Q   Getting back to the audit committee current --
10  the current audit committee.
11      A   The six members?
12      Q   Yes, which is the audit and finance committee
13  that meets monthly?
14      A   (Nods head.)
15      Q   What types of reports do they hear from --
16  from the hospital?  What types of information do they
17  review on a monthly basis or a quarterly basis?
18      A   They review audit reports.  They receive
19  financial statement updates, performance.  They receive
20  operational statistical information updates.  They
21  receive investment performance updates for all the
22  different organizations, the different components of our
23  investment portfolios, and anything related to those
24  activities.
25      Q   Are the members of the audit committee, either

Page 249

1  the board members or the community members, are they
2  compensated for their role in the audit committee?
3      A   No.  It's all volunteer.
4      Q   Do they receive updates as to anything
5  regarding this -- this lawsuit that brings us here
6  today?
7      A   The board does, yes, the board of
8  commissioners.
9      Q   I'm sorry, I'm talking about the audit
10  committee.
11      A   I don't believe so.
12      Q   Has the audit committee been made aware of any
13  allegations of fraud with respect to the hospital?
14          MR. STEPHENS:  Objection as to form, outside
15      the scope of the 30(b)(6).
16          MS. HERNACKI:  It goes to the organization.
17          THE WITNESS:  Well, two of the members on the
18      audit and finance committee are board members, so
19      they would be fully apprised.
20          They're aware that there's an investigation
21      that was in the newspaper, and we discuss it at a
22      very high level, but not to the same extent that
23      the board has been updated.
24  BY MS. HERNACKI:
25      Q   So with res- -- and I understand that two of



Page 250

1  the members, Mr. Francoti and Ms. Schandel, are on the
2  board of commissioners and might have a -- be privy to
3  more disclosure with regard to this lawsuit, but I want
4  to talk specifically with the audit committee.
5          Other than perhaps reading newspaper articles
6  about this lawsuit, has the audit committee, all six
7  members of the audit committee, been made aware of the
8  allegations of fraud in this lawsuit?
9      A   I believe they understand the allegations.
10     Q   My question was, have they been made aware by
11 formal report from the hospital?
12         MR. STEPHENS:  Objection as to form.
13         THE WITNESS:  I'm not aware that they have
14     been by formal report other than a verbal update as
15     to a response to the newspaper articles.
16 BY MS. HERNACKI:
17     Q   Who -- who made that verbal report or verbal
18 response?
19     A   Any discussion would be done through our
20 counsel.
21     Q   Okay.  So that would be inside counsel or
22 outside counsel?
23     A   For the audit committee, it would be inside
24 counsel.  And I'm not privy to that discussion.
25     Q   Have you, as -- and I'm talking about as --

Page 251

1  well, let me ask you this.
2          Has the chief -- you are the chief financial
3  officer, correct?
4      A   Correct.
5      Q   Has the chief financial officer made any
6  disclosures to the audit committee with regard to the
7  allegations of fraud in this lawsuit?
8          MR. STEPHENS:  Objection as to form, outside
9      the scope of the 30(b)(6).
10         THE WITNESS:  Nothing specific.
11 BY MS. HERNACKI:
12     Q   Has the chief financial officer of Halifax
13 made any disclosures with regard to the federal
14 magistrate's finding of -- findings -- factual findings
15 with respect to fraud on the part of Halifax Hospital in
16 this case?
17         MR. STEPHENS:  Objection as to form.
18         THE WITNESS:  No.
19 BY MS. HERNACKI:
20     Q   The audit committee --
21     A   If I could clarify, because of our status as
22 an organization, the communications, I can't be party
23 to.  It's between legal counsel and the board.  I can --
24 by statute, I can't be involved in that.  Otherwise,
25 it's a public meeting.

Page 252

1      Q   Now, the audit committee -- can you describe
2  to me the audit committee's role with respect to bonds
3  issued by the hospital?
4      A   The audit committee's role is a recommendation
5  body only.  They make recommendations.  They review
6  information and make recommendations to the board, but
7  the board is responsible for all actions and activities
8  of the organization.
9          So when we issued bonds in the past, they were
10 involved.  They reviewed information.  They would make a
11 recommendation, but we would still have to present full
12 presentation to the full board as well, because the full
13 board is the appointed body.
14     Q   What type of recommendations do they make,
15 does the audit committee make, with respect to hospital
16 bonds?
17     A   As to whether or not those -- the transaction
18 is necessary, the scope; whether or not the organization
19 has the ability to pay it back if we're entering into
20 it; and the terms of the agreement, the terms of the
21 bond issue.
22     Q   And would that include recommendations with
23 respect to the risk that the hospital faces, financial
24 risks that might affect the ability of the hospital to
25 make good on those bonds?

Page 253

1          MR. STEPHENS:  Objection as to form, outside
2      the scope of the 30(b)(6) topics.
3          THE WITNESS:  They would assess the ability to
4      pay those bonds back based on a financial forecast
5      and the validity of that -- whether they agree with
6      that financial forecast.  That's the process we
7      would go through.
8  BY MS. HERNACKI:
9      Q   And just for purposes of that organization's
10 understanding of the financial forecast, that would
11 include any perceived risk that the hospital was facing?
12         MR. STEPHENS:  Objection as to form, outside
13     the scope of the 30(b)(6) topics.
14         THE WITNESS:  Yes.
15         (Exhibit 51 was marked for identification.)
16 BY MS. HERNACKI:
17     Q   Mr. Peburn, have you had a chance to review
18 what's been marked as Exhibit 51?
19     A   I have.
20     Q   And do you recognize this document?
21     A   I do.
22     Q   Is that your signature at the bottom?
23     A   It is.
24     Q   If you -- if I could draw your attention to
25 item -- well, tell me first, what is this document?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 66 of 143 PageID 14628

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                         Pages 254..257

Page 254

1     A    This is a quarterly disclosure, I think.  This
2  might be the annual.  No, this doesn't include the
3  audit, so this doesn't -- this is the annual disclosure,
4  but it's really the quarterly disclosure, and then
5  there's an annual disclosure in addition to this that
6  would have been submitted recently in accordance with
7  our bond documents.
8     Q    And to whom is this disclosure made?
9     A    It's posted out publicly on a -- on a NRMSIR
10  replacement.
11     Q    I'm sorry.  What is NRMSIR replacement?
12     A    NRMSIR is an acronym for the required -- you
13  have to disclose your quarterly findings out on -- a
14  government website, but instead of the government
15  website, you can use a third-party, mostly because the
16  information doesn't ever get publicized unless you use
17  that third-party service.  And so we use a third-party
18  service.
19     Q    The DAC Bond, is that --
20     A    Yes.
21     Q    So DAC Bond is a third-party service.  So you
22  use DAC Bond --
23     A    And then they post it on the NRMSIR.
24     Q    So this DAC Bond reports, then, this
25  information to the government?

Page 255

1     A    It's -- yeah, they report it to the NRMSIR.
2  And whether that gets posted on the NRMSIR is another
3  question.  I can't answer that.  I don't follow that.
4     Q    Is that the State of Florida government?
5     A    That's federal.
6     Q    Federal government.  Okay.
7        If I can draw your attention to four, item
8  four on that first page, it states, I have disclosed to
9  the external auditors and audit committee of the board
10  of commissioners, item "a" talks about different things.
11  Item "b" talks about any fraud, whether or not material,
12  that involves management or other employees who have a
13  significant role in internal controls.
14        Did I read that correctly?
15     A    Yes.
16     Q    What I want to know is what information has
17  been disclosed to the audit committee with respect to
18  the finding of Judge Smith in this case with regard to
19  the Relator showing that Halifax was engaged or about to
20  engage in fraudulent conduct at the time of certain
21  communications reviewed by the court?  Has that been
22  disclosed to the audit committee?
23        MR. STEPHENS:  Objection as to form.
24        THE WITNESS:  The disclosure, it's not listed
25  here, but it is listed in our audited financial

Page 256

1     statements.  And I don't know if you have those,
2     but that disclosure is also out on DAC.
3  BY MS. HERNACKI:
4     Q    My question was, has this disclosure -- I read
5  the court's findings -- has that been disclosed to the
6  audit committee?
7        MR. STEPHENS:  Objection as to form.
8        THE WITNESS:  I don't know that that specific
9     language that you just read was disclosed.  In
10     fact, I wouldn't have been party to it, because,
11     again, like I said, I can't be in the room when
12     those disclosures are made.
13        However, the disclosure that we do make is
14     included in our audited financial statements.  It
15     is disclosed to every party that uses those
16     financial statements, which includes our rating
17     agencies as well as bond holders, mostly
18     institutional bond holders.
19        MS. HERNACKI:  I'm going to move to strike his
20     answer as nonresponsive.
21  BY MS. HERNACKI:
22     Q    Sir, my question is, you signed here, this is
23  a certification, is it not --
24     A    It is.
25     Q    -- that you have disclosed to the external

Page 257

1  auditors and the audit committee of the board of
2  commissioners as chief financial officer of the hospital
3  any fraud, whether or not material, that involves
4  management or other employees who have a significant
5  role in internal controls.
6        You signed this statement.  Maybe this is
7  easier, what did you disclose to the audit committee as
8  of November 13th, 2012, with respect to fraud, if
9  anything?
10        MR. STEPHENS:  Objection, asked and answered.
11        MS. HERNACKI:  He hasn't answered it.  You can
12     answer it now.
13        THE WITNESS:  I believe I have answered the
14     question.
15  BY MS. HERNACKI:
16     Q    You have not answered the question, sir.
17     A    I'll answer it again.  I'm going to answer it
18  the same way.
19     Q    Well, let me --
20        MR. STEPHENS:  Objection.
21        MS. HERNACKI:  No, no, no.
22        MR. STEPHENS:  Let the witness finish
23     answering his question -- your question.
24        MS. HERNACKI:  He says he's going to repeat
25     his testimony.



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 67 of 143 PageID 14629

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                         Pages 258..261

Page 258

1     MR. STEPHENS:  Then let him repeat his
2     testimony.
3         MS. HERNACKI:  I'll strike my question.
4  BY MS. HERNACKI:
5     Q   What has the chief financial officer of
6  Halifax disclosed to the audit committee?  Not -- I'm
7  not interested in what has been disclosed to the
8  external auditors.  What I want to know is what has the
9  chief financial officer of Halifax disclosed to the
10  audit committee as of -- or what did he disclose as of
11  November 13th with respect to fraud at the hospital?
12  Simple question.
13     MR. STEPHENS:  Objection as to form and
14     objection, asked and answered.
15     THE WITNESS:  The same information that was
16     explained earlier.  It's the same information that
17     was disclosed to the external auditors, the same
18     information that was disclosed to rating agencies
19     and bond holders.  It's all the same information.
20  BY MS. HERNACKI:
21     Q   I thought you told me earlier that you, as
22  chief financial officer, had not disclosed anything with
23  respect to fraud to the audit committee itself?
24     (Mr. Siegel and Ms. Kearby leave the
25  deposition.)

Page 259

1     A   You asked me about the investigation.
2     Q   No, I asked about fraud, sir.
3     A   Oh.  There is no fraud.
4     Q   The finding of Judge Smith in this case that a
5  prima facie case of fraud had been established.
6     MR. STEPHENS:  Objection as to form.
7  BY MS. HERNACKI:
8     Q   That's what I'm talking about.  I'm talking
9  about the federal judge's finding here.
10     MR. STEPHENS:  Objection as to form.
11  BY MS. HERNACKI:
12     Q   The answer is nothing, right?
13     A   No fraud has been --
14     Q   Disclosed to the audit committee?
15     A   -- committed.
16     MR. STEPHENS:  Objection as to form.
17  BY MS. HERNACKI:
18     Q   You testified earlier on behalf of the
19  hospital that Halifax Staffing, Inc., was established in
20  order to provide staffing to the hospital; is that
21  correct?
22     A   No.
23     Q   Okay.  Tell me why it was established.
24     A   The State of Florida specifically allowed
25  governmental entities to move their employees into a

Page 260

1  fully controlled 501(c)(3) organization.  In fact, I
2  think it was the Attorney General that authorized us to
3  do this, and other governments did as well, to be able
4  to pull employees out from underneath the FRS, Florida
5  Retirement System, and establish a lookalike plan for
6  the benefit of those employees.  That was the sole
7  purpose, remained the sole purpose for several years.
8     Since that time, the State of Florida actually
9  allows you to accomplish the same end goal without
10  moving your employees into a separate 501(c)(3)
11  organization.  And as such there is no net reason
12  anymore to have Halifax Staffing.
13     But administratively, we've chosen not to move
14  the employees back and resign all new documents and
15  change the employer identification number.
16     Q   Just so the record is clear, the 3- -- how
17  many?  Did we say 3-?  How many employees of Halifax
18  Staffing, Inc., are there?
19     A   Probably 4,000.
20     Q   4,000.  So the roughly 4,000 employees of
21  Halifax Staffing, Inc., you're one of them, correct?
22     A   Yes.
23     Q   Those employees are still employees of Halifax
24  Staffing, Inc.?
25     A   Correct.  There are no employees of Halifax

Page 261

1  Hospital Medical Center.
2     Q   Who are the most -- who are the most highly
3  compensated employees of Halifax Staffing, Inc.?
4     A   Our neurosurgeons, our CEO, our physicians,
5  many physicians, that include emergency room physicians,
6  oncologists, neurologists, our senior executive team.
7  I'm not sure how you define highly compensated for this
8  purpose.
9     Q   I just asked for the -- highest paid
10  employees.
11     A   So that would included the highest paid, that
12  group of folks.
13     (Exhibit 52 was marked for identification.)
14  BY MS. HERNACKI:
15     Q   I'm going to hand you, Mr. Peburn, what's been
16  marked as Exhibit 52.  You can have your attorney take a
17  look at it first if you'd like.
18     Take a look at this exhibit.  Do you recognize
19  this as a Form 990 which is submitted by Halifax
20  Staffing, Inc., to the Internal Revenue Service?
21     A   I do.
22     Q   Flipping to -- I had it marked, but it might
23  have -- whatever the first dog-eared --
24     A   I see it.
25     Q   It talks about -- I just want to get this


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 68 of 143 PageID 14630

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 262..265

Page 262

1    clear for the record.  This is 2006, or tax year 2006.
2              The five highest paid employees for Halifax
3    staffing in that year were Dr. Khanna, Dr. Vinas,
4    Dr. Kuhn, Dr. Molpus and Dr. Weiss; is that correct?
5         A    That's what this states.  I'm trying to figure
6    out the year that this relates to.  This is 2006.  Okay.
7    That might be the case.
8         Q    Is that --
9         A    If it was current, and those were the
10   salaries, then our CEO would be higher than the 433-,
11   but not in 2007.
12        Q    Well, I think --
13        A    Oh, other than officers, directors and
14   trustees.  There you go.
15        Q    So are those not the highest compensated?
16        A    They are.
17        Q    They are?
18        A    I didn't realize it was qualified for other
19   than officers.  Our directors are paid zero and trustees
20   are paid zero.
21        Q    So are you telling me that the CEO made more
22   than these physicians?
23        A    Would have made more than Kelly Molpus and
24   Richard Weiss.
25        Q    And Dr. Weiss.  Okay.

Page 263

1              But Dr. Khanna, Dr. Vinas and Dr. Kuhn still
2    for that year were in the -- they were number one,
3    number two and number three in terms of highest paid
4    employees of Halifax Staffing, Inc.?
5         A    Yes.  So your question was the highest paid,
6    but maybe you were asking excluding officers?
7         Q    I just wanted to make sure that this was
8    accurate, and I understand the -- and I thank you for
9    the clarification with respect to the carve-out of the
10   officers that come in to the statement -- I guess the
11   number four and number five spot.
12        A    Just the number four.
13        Q    Just number four?
14        A    (Nods head.)
15        Q    Oh, okay, just one.  Okay.  Got you.
16             If you turn to page three of that, just to --
17   I asked you a question earlier about providing
18   staffing --
19        A    Yes.
20        Q    -- for the hospital.  The statement there in
21   regards to the purpose of Halifax Staffing, Inc., to
22   provide payroll and staffing for the supported
23   organization, Halifax Hospital Medical Center, is that
24   inaccurate?
25             MR. STEPHENS:  Objection as to form.

Page 264

1              THE WITNESS:  No, that's correct.
2    BY MS. HERNACKI:
3         Q    That's correct?
4         A    But the purpose -- the purpose of establishing
5    the company in the first place was solely for the
6    pension plan.  Otherwise, there's no other purpose to do
7    it.
8         Q    Sure, because if the employees -- if the
9    individuals who are now currently employed by Halifax
10   Staffing, Incorporated, were indeed employees of Halifax
11   Hospital, they would be subject to the Florida
12   retirement plan, correct?
13        A    They would.  But today, we actually can do --
14   accomplish the same goal, but the State changed the rule
15   such that you don't have to move the employees into that
16   corporation.  You can keep them where they are.  So the
17   need to actually have Halifax Staffing no longer exists.
18        Q    When was that change put in place by the
19   State?
20        A    I believe it's within the last five or six
21   years, something like that.
22             MS. HERNACKI:  Actually, we can stop here.
23   You can change the tape.
24             VIDEO TECHNICIAN:  The time is approximately
25   4:52 p.m.  This concludes disk number four for the

Page 265

1    deposition of Eric Peburn.  We are off video
2    record.
3              (Short break from 4:53 p.m. to 4:58 p.m.)
4              VIDEO TECHNICIAN:  The time is approximately
5    4:58 p.m.  This is the beginning of disk number
6    five for the deposition of Eric Peburn.  We are
7    back on video record.
8              (Exhibit 53 was marked for identification.)
9    BY MS. HERNACKI:
10        Q    Mr. Peburn, the court reporter has just -- or
11   Ms. Fitzgerald has just handed you what's been marked as
12   Exhibit 53, and I just have a few questions about this
13   contract, which I'll represent to you is the contract of
14   employment for Dr. Abdul Sorathia.
15             Do you recognize this document?
16        A    I do.
17        Q    Is this the current document -- the current
18   contract of employment for Dr. Sorathia with Halifax
19   Staffing, Inc.?
20        A    I believe it's the latest one I've seen, yes.
21        Q    So the contract end date here, 9/30/2012,
22   you're not aware -- Halifax is not aware of any
23   additional contracts that are in place currently with
24   Dr. Sorathia?
25        A    I'm not aware of one, but if this is a hard



USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 266..269

Page 266

1  stop -- let's see here.  Okay.
2       Q    The cover sheet, it states that the contract
3  end date is September 30th, 2012.
4       Is Halifax aware of any amendments that would
5  change that date or bring it current to the present
6  time?
7       A    I don't know.
8       Q    Halifax --
9       A    There may be.  Halifax may have one.  I'm not
10 aware of it.
11      Q    Okay.  We understand that you, today, sir, are
12 the voice of Halifax.
13      A    I am.
14      Q    So speaking on behalf of Halifax, is it your
15 testimony that Halifax does not know if there's a
16 contract current?
17      A    I can't answer the question, because I'm not
18 knowledgeable about it, about the current contract.
19      Q    Have you signed one for -- a new contract for
20 Dr. Sorathia?
21      MR. STEPHENS:  Counsel, in terms of the
22 numbering of the exhibits, are we sure we're at 52
23 and not 53?
24      MS. HERNACKI:  This is 53.
25      MR. STEPHENS:  Oh, I'm sorry.

Page 267

1  BY MS. HERNACKI:
2       Q    So are you -- are you telling me, Mr. Peburn,
3  that you are not prepared to address the topic of
4  whether or not there has been a new contract for
5  Dr. Sorathia's employment with the hospital since
6  September 30th, 2012?
7       A    I don't remember if I signed the contract
8  updating this.
9       Q    The question was -- I believe my question was,
10 is it your testimony that you are not prepared as a
11 designee of Halifax to testify as to whether or not
12 Dr. Sorathia is currently under a contract that has been
13 effective after September 30th of 2012?
14      A    For that period of time, I did not review
15 documents subsequent to this to determine whether or not
16 a new contract was signed.  I may have signed one.  And
17 I don't remember signing it.  And I don't have one to
18 prepare or produce for you today.
19      Q    Has Halifax made monthly payments to
20 Dr. Sorathia since September 30th, 2012, for a bonus
21 compensation or any compensation at all?
22      MR. STEPHENS:  Objection as to form.
23      THE WITNESS:  He is still employed by Halifax.
24 BY MS. HERNACKI:
25      Q    Has he received compensation since

Page 268

1  September 30th of 2012?
2       A    He would have received compensation, so I'd
3  assume that there's a contract, but I have not reviewed
4  it recently to remember exactly where that stands.
5       Q    Has Dr. Sorathia since September 30th received
6  any portion of his monthly bonus allocation?
7       A    I did not review the last few months of
8  activity in preparation for this.
9       Q    My question was not with respect to what you
10 have reviewed.  I'm just asking, has Halifax Hospital
11 paid any portion of Dr. Sorathia's monthly bonus
12 compensation since September 30th of 2012?  Is the
13 answer that you don't know?
14      MR. STEPHENS:  Objection as to form.
15      THE WITNESS:  You're asking questions related
16 to the last few months, and I have not reviewed
17 that activity in preparation for this.  I have
18 reviewed this contract in front of me, and if you'd
19 like to ask questions about this, I can answer
20 them.
21 BY MS. HERNACKI:
22      Q    Well, you were designated by Halifax Hospital
23 to testify with regard to the creation, negotiation, and
24 amendment of compensation agreements between Halifax
25 Staffing, Inc., and the oncologists, including

Page 269

1  Dr. Abdul Sorathia, from 2000 to the present.
2       Is it your testimony that you are not prepared
3  to discuss the time frame from September 30th, 2012, to
4  the present with respect to this agreement?
5       A    Related to these contracts, everything we're
6  discussing today, all the points that I'm here to talk
7  about, there are hundreds of actions and activities
8  surrounding those on a daily basis, monthly basis, or
9  whatever.  So there's been a lot of activity.  I did not
10 review the last few months of activity in preparation
11 for this.  I'm current -- I did review this contract
12 through 2012.
13      Q    I'm going to move to strike that answer as
14 nonresponsive.
15      Sir, are you prepared to discuss the creation,
16 negotiation or amendment to compensation agreements
17 between Halifax Staffing and Dr. Sorathia or any of the
18 oncologists from September 30th of 2012 to the present?
19 It's a yes or no question.
20      MR. STEPHENS:  Objection as to form.
21      THE WITNESS:  I've answered that question.
22 BY MS. HERNACKI:
23      Q    You have not, sir.  It's a yes or no question.
24      Are you prepared to discuss the amendment or
25 creation or negotiation of any contracts for



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 70 of 143 PageID 14632

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 270..273

Page 270

1    compensation with regard to Dr. Abdul Sorathia from
2    September 30th -- let's make it October 1st, 2012, to
3    the present?
4            MR. STEPHENS:  Objection as to form.
5            THE WITNESS:  I've answered that question.  I
6        said I have not reviewed any documentation, so I'm
7        not able to testify on behalf of Halifax as it
8        relates to the most recent activity surrounding a
9        specific contract.
10   BY MS. HERNACKI:
11       Q    And is that the same answer with respect to
12   each of the medical oncologists, Dr. -- Dr. Chew,
13   Dr. Deveras, Dr. Durkin, Dr. Favis, Dr. Weiss?
14           MR. STEPHENS:  Objection as to form.
15   BY MS. HERNACKI:
16       Q    Is that the same answer?
17       A    It would be the same answer.
18       Q    Going back to the contract that you did
19   review, you signed this, correct --
20       A    I did.
21       Q    -- as administrator --
22       A    Uh-huh.
23       Q    -- on July 8th 2010; is that right?
24       A    I did.
25       Q    The contract start date, though, however, is

Page 271

1    March 1st of 2009; is that right?
2        A    Correct.
3        Q    And did Dr. Sorathia receive payments in the
4    interim between March 1st, 2009, and the time that you
5    actually signed this agreement on July 8th of 2010?
6            MR. STEPHENS:  Objection as to the form.
7            THE WITNESS:  Yes.
8    BY MS. HERNACKI:
9        Q    Turning to the second page of the exhibit,
10   which is actually the first page of the medical oncology
11   employment agreement, you see at the top there, Halifax
12   Staffing, Inc., is defined as the company throughout the
13   document?
14       A    I do.
15       Q    And under section one, Duties of employee, the
16   employee is employed by the company.
17           Accurate to say that that is stating that
18   Dr. Sorathia is an employee of Halifax Staffing, Inc.,
19   correct?
20       A    He is.  And Halifax Staffing, Inc., is -- we
21   believe is one and the same with Halifax Hospital
22   Medical Center.
23       Q    The hospital likes to think it's one and the
24   same, correct?
25       A    We don't like to think.  We believe that is

Page 272

1    based on an IRS determination letter establishing it as
2    an instrumentality, based on the fact that none of the
3    activities -- there are no activities inside of Halifax
4    Staffing, Inc.  There is no corporate oversight.  The
5    oversight is provided by the District directly.
6            The entity doesn't have any net assets.  It's
7    a pass-through company with zero assets.  It's a single
8    bank account that's a sub bank account of Halifax
9    Medical Center, the District, Halifax Hospital Medical
10   Center, the District.  Halifax Hospital transfers money
11   the day of payroll to cut checks out of that account and
12   all the money sweeps back to Halifax Hospital Medical
13   Center.
14           So there is no real activity.  The medical
15   staff is monitored by and reviewed by the board of
16   directors of the hospital, Halifax Hospital Medical
17   Center.  The practices are managed by Halifax Hospital
18   Medical Center.  There is no activity inside of Halifax
19   Staffing.
20           So the fact is, Halifax Staffing and Halifax
21   Hospital Medical Center are one and the same, and that's
22   why it's designated as a governmental entity even though
23   it has a 501(c)(3) status.  It's a governmental body.
24   It falls under governmental accounting standards.  The
25   IRS views it that way.  The courts have viewed it that

Page 273

1    way in litigation.  And every employee of Staffing is an
2    agent of the District and, as such, sovereign immunity
3    applies.  So as such, it's one and the same.
4        Q    Thank you for that explanation.
5            Do I take your answer there to be all of the
6    reasons -- well, strike that.  I'll get to that.
7            Does Halifax Hospital contend that it has a
8    direct compensation agreement with Dr. Sorathia or any
9    other medical oncologists?
10           MR. STEPHENS:  Objection as to form, calls for
11       a legal conclusion.
12           THE WITNESS:  I'm not an attorney.
13   BY MS. HERNACKI:
14       Q    I didn't ask you if you were an attorney, sir.
15   I asked you if Halifax -- you are the voice of Halifax
16   today.  Does Halifax contend that it has a direct
17   compensation agreement with Dr. Sorathia?
18           MR. STEPHENS:  Objection, it's outside the
19       scope of 30(b)(6) topics and calls for a legal
20       conclusion.
21   BY MS. HERNACKI:
22       Q    You can answer the question, sir.
23           MR. STEPHENS:  The witness isn't designated to
24       answer any question like that.
25           MS. HERNACKI:  You can't instruct him not to



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 71 of 143 PageID 14633

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                     VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Pages 274..277

Page 274

```
 1        answer.  You just can't --
 2             MR. STEPHENS:  I didn't instruct him not to
 3        answer.
 4             MS. HERNACKI:  Well, then let's move on
 5        because you're taking up time on the record.
 6   BY MS. HERNACKI:
 7        Q    What's the answer, sir?
 8        A    I can't answer the question.  I'm not an
 9   attorney.  But I did explain to you our take on and our
10   position as to why the two entities are really one
11   entity.
12        Q    If the two entities are one entity, is that
13   what Halifax reports to the IRS?
14             MR. STEPHENS:  Objection as to form.
15             THE WITNESS:  That is the process we went
16        through to get an IRS determination letter for
17        instrumentality status.
18   BY MS. HERNACKI:
19        Q    Is that a letter that has been produced to any
20   of the parties in this lawsuit?
21        A    I believe the government has all those
22   documents.
23        Q    When was that letter -- you said that's a
24   letter received from the IRS?
25        A    It's an IRS determination letter.
```

Page 275

```
 1        Q    And when was that received from the hospital?
 2        A    Years ago.
 3        Q    Are you --
 4        A    Like 2000- --
 5        Q    I'm sorry.  Go ahead.
 6        A    Late -- early to mid '90s, somewhere in there,
 7   is my guess.
 8        Q    And that was a letter of determination from
 9   the IRS stating that the employees were one and the same
10   between Halifax and Halifax Staffing, Inc.?
11        A    That's my non- --
12             MR. STEPHENS:  Objection as to form.
13             THE WITNESS:  That's my nonlegal review or
14        interpretation.
15   BY MS. HERNACKI:
16        Q    Well, is that Halifax Hospital's
17   interpretation?
18        A    It is.
19        Q    You're aware that the Florida Attorney General
20   advised Halifax of its ability to start a -- and develop
21   a new, separate not-for-profit for purposes of providing
22   employees to the hospital which is a government entity?
23             MR. STEPHENS:  Objection as to form.
24             THE WITNESS:  The State of Florida did allow
25        us to do that.
```

Page 276

```
 1   BY MS. HERNACKI:
 2        Q    And so are you telling me that there's a
 3   separate letter from the IRS relating to the 501(c)(3)
 4   status of Halifax Staffing, Inc.?
 5        A    As it relates to instrumentality status, yes.
 6        Q    How -- what about as it relates to the
 7   employee status of Halifax Staffing, Inc., employees,
 8   those employees that are listed on W-2 forms and
 9   provided to the Internal Revenue Service?
10             MR. STEPHENS:  Objection as to the form.
11             THE WITNESS:  I don't understand the
12        difference between that question and the fact that
13        we have an IRS determination letter for the
14        corporation.  It's also applying to the employees.
15   BY MS. HERNACKI:
16        Q    Well, does that -- I've never seen this
17   letter, so what I'm asking is --
18        A    I think that --
19        Q    Excuse me.  What I'm asking is, is does that
20   letter say, Dear Halifax, your -- Halifax Staffing,
21   Inc., employees are also employees of Halifax Hospital?
22             MR. STEPHENS:  Objection as to the form.
23             THE WITNESS:  It's a long opinion letter.
24        It's a letter that we requested.  You go through a
25        process, you submit a lot of documentation to
```

Page 277

```
 1        support that.  Based on the facts and
 2        circumstances, the government opines specifically
 3        for this case, not -- it's not a general statement.
 4        It's specific to Halifax Staffing, Inc.
 5             And so yes, they're basically saying that,
 6        that -- and that's why it's a -- the pension plan
 7        of Halifax Staffing is a governmental plan.  It
 8        follows the government.  It does not -- it's not
 9        subject to ERISA because of that, because it's
10        considered a governmental plan, so it is the
11        government.
12   BY MS. HERNACKI:
13        Q    Okay.  I want to get back to the
14   compensation -- the employment agreement with
15   Dr. Sorathia that expired on September the 30th of 2012.
16        A    Exhibit 53?
17        Q    Yes.  You do recognize that the company, with
18   a capital C as defined in this agreement, is defined
19   only as Halifax Staffing, Inc., correct?
20             MR. STEPHENS:  Objection as to form.
21   BY MS. HERNACKI:
22        Q    Those are the plain words of the contract?
23        A    Which is an affiliate and considered a
24   governmental entity by its nature and relationship to --
25        Q    Sir, I move to strike, nonresponsive.
```



Page 278

1      All I'm asking you --
2          MR. STEPHENS:  Counsel, don't interrupt the
3      witness when he's answering your questions.
4  BY MS. HERNACKI:
5      Q   Excuse me.  All I'm asking is, have I read
6  this correct -- correctly, that this agreement -- this
7  is on the first page of this, This agreement is entered
8  into by and between Halifax Staffing Inc., which is
9  herein referred to as the company.  Correct?
10     A   By -- the contract references Halifax Hospital
11 Medical Center as well.
12     Q   All I'm asking you is about have I read that
13 first statement correct?
14     A   Well, yes, you've read the words correctly.
15     Q   Okay.  Can you turn to page seven, and if you
16 could look at item 13d.  It's correct -- The company,
17 which is defined as Halifax Staffing, Inc., may
18 terminate this agreement at any time, and then it gives
19 a certain number of reasons that Halifax Staffing, Inc.,
20 may terminate the employee's agreement at any time; is
21 that accurate?
22         MR. STEPHENS:  Objection as to form.
23         THE WITNESS:  It's qualified with everything
24     after "if".
25 BY MS. HERNACKI:

Page 279

1      Q   Sure.  There are a certain number of felonies,
2  drug arrests, inability to do their job, but it --
3  Halifax Staffing, Inc., may terminate the employee's
4  agreement, correct?
5      A   Yes.
6      Q   Okay.  Who -- if Dr. Sorathia were to be
7  terminated for any of the reasons listed in item 13d,
8  who is Dr. Sorathia's supervisor for those purposes?
9          MR. STEPHENS:  Objection as to form.
10         THE WITNESS:  The -- this -- a termination of
11     a physician would include a review by the medical
12     staff process, so the medical staff of the hospital
13     would actually review his performance as it relates
14     to these items.
15 BY MS. HERNACKI:
16     Q   And then who would make the ultimate decision?
17 Would they vote or would it be an individual who
18 would --
19     A   There's a process that you have to follow for
20 physicians and removing them from the medical staff.
21     Q   And those would be physicians who are employed
22 by Halifax Staffing, Inc.?
23     A   No.
24     Q   Who --
25     A   It would be physicians of Halifax Hospital

Page 280

1  Medical Center.
2      Q   Which has no employees, correct?
3      A   These are independent physicians and/or
4  employed physicians of Halifax Hospital, so it's not
5  going to be only -- review of physician is not just
6  controlled by an employer or a supervisor, per se.
7  That's not how you monitor physicians' activity.  It has
8  to be monitored within the protocols of a medical staff
9  for appropriate care, level of care and so forth.  And
10 so it would go up through that process, which would be
11 the subsection, the department chair, the chairman -- or
12 the chief of staff and so forth.
13         All actions of the medical staff then have to
14 be approved by the board of commissioners of the
15 hospital.  And that is the oversight.  So the board of
16 commissioners of the hospital, the ones appointed by the
17 governor, take actions monthly on medical staff
18 privileges, regardless of whether they're employed or
19 not employed, whether it's staffing or whatever.  And so
20 that's the control and oversight.
21     Q   And is it accurate to say that none of the
22 individuals, the numerous individuals that you just
23 listed by reference, are reported as employees by
24 Halifax Hospital?  Correct?
25         MR. STEPHENS:  Objection as to form.

Page 281

1          THE WITNESS:  They may be employees, but they
2      may not be employees.  I mean, there's employees
3      and nonemployees on the medical staff.
4  BY MS. HERNACKI:
5      Q   My question is, you told me earlier on behalf
6  of the hospital that Halifax Hospital Medical Center
7  does not have any employees that it reports to the
8  Internal Revenue Service.
9          So my question is, is it fair to say that none
10 of the individuals that would be involved in terminating
11 the physician in this case are employed by Halifax
12 Hospital Medical Center?
13     A   I guess ultimately it would be the board of
14 commissioners of the hospital.
15     Q   Who is not -- they're not employees --
16     A   They're not employees.
17     Q   -- of the hospital, correct?
18     A   They're not employees, no, but they are the
19 board of commissioners at the hospital, ultimate
20 authority.
21     Q   This agreement was -- you testified earlier
22 there were some changes made to the -- from the former
23 agreement that was in place.
24         If you'll turn to page 13.  Who -- within the
25 organization, who comprises the oncology utilization



USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 282..285

Page 282

1  committee?
2      A   I believe it's the physicians.
3      Q   The medical oncologists?
4      A   I believe so.
5      Q   And that would be Dr. Chew, Dr. Deveras,
6  Dr. Durkin, Dr. Sorathia, all of them, or is it just
7  some of them?
8      A   I don't know if it's the entire group.  They
9  each -- many times they all work on projects together,
10 but sometimes they designate folks.
11     Q   Well, who -- this is separate than the
12 utilization review committee of the hospital, correct?
13 This is a separate committee, the oncology?
14     A   Yes.
15     Q   Yes?
16     A   Yes.
17     Q   And what I want to know is, is that a -- is
18 that a committee that -- is that a committee that
19 regularly meets?
20     A   I believe so.  Tom Garthwaite would manage the
21 operational aspects of these committees and coordinate
22 their activities with the physicians.
23     Q   And is it Halifax's testimony that that
24 oncology utilization committee is comprised of each of
25 the medical oncologists?

Page 283

1      A   It's my understanding that it's comprised of
2  it's comprised of the medical oncologists.  I don't know
3  if it's all or some.
4      Q   Well, thank you, but what I want to know is,
5  what does -- what is Halifax's understanding of who is
6  on this committee, this oncology utilization committee?
7          MR. STEPHENS:  Objection as to form, asked and
8      answered.
9          THE WITNESS:  I have no further answer to --
10 BY MS. HERNACKI:
11     Q   Halifax has no further answer?
12     A   Halifax does not.
13     Q   Okay.  So this committee that may or may not
14 be comprised of each of the medical oncologists, am I
15 reading this correctly that this committee is in charge
16 of determining 60 percent of the allocation of the bonus
17 pool pursuant to this contract?
18         MR. STEPHENS:  Objection as to form.
19         THE WITNESS:  60 percent of the $275,000 is
20     attributable to this activity.  And if they meet
21     certain criteria, benchmarks, as established below,
22     they would get a portion of that 60 percent.  So if
23     they only got 70 percent of the recommendations
24     completed, they would only get 50 percent of the
25     60 percent of the 275-.

Page 284

1  BY MS. HERNACKI:
2      Q   And the committee recommendations are the
3  recommendations made by the oncology utilization
4  committee?
5      A   Yes.  But it requires changes throughout the
6  organization to accomplish that activity.
7      Q   But if -- so just so I'm clear, under this new
8  agreement, the one -- the -- that was in place between
9  March 1st of 2009 and September 30th of 2012, the
10 oncologists themselves were in charge of determining
11 what they themselves needed to do or accomplish in order
12 to obtain 60 percent of the $275,000 bonus pool?
13         MR. STEPHENS:  Objection as to form,
14     mischaracterizes his testimony.
15         THE WITNESS:  They participated in the
16     activities to improve utilization.
17 BY MS. HERNACKI:
18     Q   And they participate in activities which they
19 recommend, the committee themselves recommend; is that
20 right?
21     A   I don't know those details.
22     Q   Well, I'm just asking you what this means.  It
23 says 100 percent payable if all physicians follow
24 through with more than 90 percent of the committee
25 recommendations.

Page 285

1          Is it correct that the committee refers to the
2  oncology utilization committee?
3      A   Yes.
4      Q   So the oncology utilization committee,
5  comprised of each of those oncologists, is in charge of
6  determining or making recommendations and then
7  determining if they have lived up to those
8  recommendations in order to get 60 percent of that
9  $275,000; is that correct?
10         MR. STEPHENS:  Objection as to form.
11         THE WITNESS:  I don't know if that's correct.
12 BY MS. HERNACKI:
13     Q   You don't know or does Halifax not know?
14     A   Tom Garthwaite would know.  He manages the
15 process related to this activity.  He would know the
16 details, the operational details of the activities
17 related to all these components.  The total
18 compensation, if 100 percent of this is paid, is still
19 fair market value without them performing any of these
20 services.
21         However, again, we don't like to just have
22 compensation without getting more value and more action
23 and activity from the doctors, and we want the doctors
24 to focus on certain activities.  That's Halifax's
25 position.  Halifax asked for certain benchmarks to be



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 74 of 143 PageID 14636

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Pages 286..289

Page 286

1   established, such that the activities would be enhanced
2   of those physicians.  And it would, in turn, enhance the
3   program and make it better.
4        Whether this goes to fair market value is what
5   I'm hearing from you.  I don't think that's -- it
6   changes anything; however, we want to receive additional
7   services from the doctors.
8        Q.  Sir, I never mentioned fair market value.  All
9   I asked was what was -- if Halifax's understanding of
10  this -- what was Halifax Hospital's understanding of the
11  meaning of this provision that allocates 60 percent of
12  the $275,000.  And your answer was that you do not know,
13  that Tom Garthwaite would know; is that correct?
14       A.  No, I gave you an answer.
15            MR. STEPHENS:  Objection as to form,
16  mischaracterizes his answer.
17            THE WITNESS:  I gave you an answer.  I don't
18  know some of the specifics of the questions that
19  you're asking relating to the operationalization of
20  the components of this section.
21            However, the intent -- I do know the intent
22  and the direction that Halifax gave to create this
23  section.  And it was to establish certain
24  activities and benchmarks that we wanted to
25  accomplish that would improve and enhance the

Page 287

1        program.  And as such, these are the metrics that
2        came out from that process.
3   BY MS. HERNACKI:
4        Q.  The question was not what the purpose was or
5   the intent.  My question was, so the oncology
6   utilization committee comprised of each of those
7   oncologists is in charge of determining or making
8   recommendations and then determining if they have lived
9   up to those recommendations in order to get 60 percent
10  of that $275,000; is that correct?
11       A.  I don't know that answer, because that's an
12  operational detailed question.  The goal is, is to make
13  improvements.  And if they all live up to the
14  improvements that they recommend, the group -- the folks
15  that are involved in this recommend, then that improves
16  the program and we're willing to allow them to have
17  their full compensation.
18       Q.  Let's talk about some of those improvements.
19  Exhibit 50, you have in front of you.
20            Mr. Peburn, do you have Exhibit 50 in front of
21  you?
22       A.  I do.
23       Q.  I just have a few -- I know you testified you
24  don't know who prepared this document; is that correct?
25       A.  That is correct.

Page 288

1        Q.  With item three, Equitable portion of
2   professional collections, that was deleted from the
3   previous agreement with the medical oncologists; is that
4   correct?
5            MR. STEPHENS:  Objection as to form.
6   BY MS. HERNACKI:
7        Q.  Well, let me ask you this.  This will probably
8   cut through the chase a little bit.
9            The agreement that was the predecessor of the
10  agreement that was in place at least until
11  September 30th of 2012, this past year, the previous
12  agreement was amended and changed in certain ways,
13  correct?
14       A.  Yes.
15       Q.  Okay.  And what I want to know is, just
16  looking at this document here where there are certain
17  strike-through provisions -- of certain provisions, are
18  those -- those provisions were some of the things that
19  were taken out of the previous agreement; is that right?
20            MR. STEPHENS:  Objection as to form.
21            THE WITNESS:  Actually, I'm reading this here
22  now, but count 3c is stricken through.  It says,
23  Equitable portion of professional collections over
24  base and pool.  That was never included before.
25  It's never been -- it was probably something that

Page 289

1   was thought of as an idea and maybe that would work
2   as something that one would like -- they would like
3   to be included in the contract.  And it looks like
4   they decided that that wouldn't be the case.
5        If you look at the exhibit, the collections
6   are less than their compensation, and that's
7   because of uncompensated care and call coverage and
8   the services they provide.  So they probably
9   determined that that would not meet their needs as
10  a group.  It wouldn't provide compensation as it
11  relates to commercial reasonableness, it wouldn't
12  provide compensation as it relates to fair market
13  value, and it wouldn't provide the results and the
14  actions we're looking for from the physicians as it
15  relates to the doctors.
16        However, I didn't write that.  I don't know
17  who wrote it, and I don't know who striked -- the
18  strike through it, so I -- but that was never
19  included previously.  I mean --
20  BY MS. HERNACKI:
21       Q.  Okay.
22       A.  So some of these may be -- have been.  I don't
23  know that the five years and majority vote was
24  previously included.
25       Q.  The addendum for profitability was indeed



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 75 of 143 PageID 14637

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                          Pages 290..293

Page 290

1   deleted; is that right?
2       A    I don't know exactly what this profitability
3   relates to, but I'm assuming, based on it's referencing
4   an addendum, that that's what they're referencing, but I
5   don't know that.
6       Q    Has Halifax Hospital placed any of its
7   insurance carriers on notice for errors and omissions of
8   officers and directors in regards to the allegations in
9   this lawsuit?
10      A    I don't believe so.
11      Q    Are those insurance policies that would be
12  covered -- would cover errors and omissions that was
13  sold by Mr. -- is it Decker with Brown and Brown to the
14  hospital?
15      A    I don't believe so.  The employees of
16  Halifax Staffing are agents of the District and, as
17  such, are covered under those regulations.
18      Q    What regulations are those, the sovereign
19  immunity regulations?
20      A    I'm not a lawyer, so I can't specifically
21  identify, but I don't believe we have errors and
22  omissions coverage out of -- like a separate policy
23  statement.  We may, but I'm not aware of one.
24          (Exhibit 54 was marked for identification.)
25  BY MS. HERNACKI:

Page 291

1       Q    Just briefly show you Exhibit -- that's been
2   marked as Exhibit 54.
3           Do you recognize this document?
4       A    I recognize the form of this document, yes.
5       Q    And this appears to be a policy of insurance
6   issued by Brown and Brown Insurance Agency --
7       A    Okay.
8       Q    -- on the cover?
9       A    Yes.
10      Q    And that's the same Brown and Brown Insurance
11  Agency that Mr. Younger-- is it Youngman?
12      A    Decker Youngman.
13      Q    Decker Youngman, he's involved with that
14  agency, the same Mr. Youngman that's on the audit
15  committee?
16      A    He is.
17          MR. STEPHENS:  Objection as to form.  This is
18  outside the scope of the 30(b)(6) topics.
19          MS. HERNACKI:  I'm asking him about the
20  company -- the organizational coverage insurance,
21  and now it relates to a member of the audit
22  committee, which is part of the organization of the
23  hospital.
24          MR. STEPHENS:  Objection as to form.  It's
25  outside the scope of 30(b)(6) topics for this

Page 292

1       witness.
2   BY MS. HERNACKI:
3       Q    On page eight of this policy, do you see where
4   it says, Employee dishonesty?
5       A    Okay.
6       Q    Has Halifax made any -- placed its insurance
7   carrier on notice with respect to any employee
8   dishonesty related to the allegations made in the
9   lawsuit that brings us here today?
10          MR. STEPHENS:  Objection as to form.  Outside
11      the scope of the 30(b)(6) topics.  No foundation on
12      this document.
13  BY MS. HERNACKI:
14      Q    You can answer, sir.
15      A    I don't believe so.
16      Q    If you'll turn to page ten, does that refresh
17  your -- well, let me ask you this, directors' and
18  officers' liability, has Halifax made any -- placed this
19  insurance company on notice or any insurance company for
20  any potential liability exposure of its directors and
21  officers related in any way to the allegations forming
22  the basis of the lawsuit that brings us here today?
23          MR. STEPHENS:  Objection as to form.  Outside
24      the scope of the 30(b)(6) topics.
25          THE WITNESS:  These are $5,000 public official

Page 293

1       bonds.  And the second paragraph stipulates that
2   Halifax Medical Center counsel believes the
3   hospital and board members are provided certain
4   sovereign immunity protections in state and federal
5   jurisdictions.
6   BY MS. HERNACKI:
7       Q    Is the answer yes or no?
8           MR. STEPHENS:  Objection as to form.
9           THE WITNESS:  What's your question?
10  BY MS. HERNACKI:
11      Q    The question is whether the hospital has
12  placed this insurance carrier or any other insurance
13  carrier on notice of potential claims or liability
14  exposure of its officers and directors related in any
15  way to the allegations forming the basis of the lawsuit
16  that brings us here today.
17          MR. STEPHENS:  Objection as to form, outside
18      the scope of the 30(b)(6) topics.
19          THE WITNESS:  They are aware of the same
20      disclosure that I discussed earlier that's been
21      discussed and disclosed in the audited financial
22      statements and as well as in the DAC disclosures.
23      And beyond that, there's no need to notify any
24      party as to exposure at this time.
25  BY MS. HERNACKI:



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 76 of 143 PageID 14638

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 294..297

Page 294

1    Q   Well, just so you know -- or just so I know,
2  sorry, when you say they are aware of the same -- is
3  that they're aware of -- you talked about a newspaper
4  article?
5    A   They have our financial statements, audited
6  financial statements.
7    Q   Those are provided to your insurance carrier?
8    A   They have that same disclosure, yes.
9    Q   They have not been specifically made aware of
10 any of the findings of Judge Smith in this case?
11       MR. STEPHENS:  Objection as to form, outside
12   the scope of the 30(b)(6) topics.
13       THE WITNESS:  I've answered the question fully
14   from the knowledge that I have.
15 BY MS. HERNACKI:
16   Q   You were designated to testify as to all facts
17 and information Halifax Hospital Medical Center relied
18 upon in the support of the physician -- the physicians
19 maintaining employment agreements with Halifax Staffing,
20 Inc., are actually employees of Halifax Hospital Medical
21 Center for purposes of the Stark Law.
22       You testified earlier, sir, about a number of
23 surgeons with regard to the structure of Halifax
24 Staffing Inc. and so forth.
25       Are those -- well, I guess let me ask you,

Page 295

1  what facts and information is the hospital relying upon
2  to make that argument with respect to the Stark Law?
3    A   That the --
4        MR. STEPHENS:  Objection, outside the scope of
5    30(b)(6) testimony.  You can answer.
6        MS. HERNACKI:  Excuse me.  I just read he's
7    been designated to testify as to all facts and
8    information Halifax Hospital Medical Center relied
9    upon or intends to rely upon in support of its
10   position that physicians maintaining employment
11   agreements with Halifax Staffing, Inc., are
12   employees of Halifax Hospital Medical Center for
13   purposes of the Stark Law.
14       Am I incorrect that he -- that Mr. Peburn is
15   the designee to testify on behalf of the hospital
16   as to those -- as to that topic?
17       MR. STEPHENS:  I didn't instruct him not to
18   answer.
19       MS. HERNACKI:  No, I just want to make sure
20   that I'm right.
21       MR. STEPHENS:  I'm not testifying here, as
22   you've pointed out often.  You can answer the
23   question.
24       MS. HERNACKI:  Well -- let's go off the
25   record.

Page 296

1        VIDEO TECHNICIAN:  The time is approximately
2    5:39 p.m.  We are off video record.
3        (Short break from 5:39 p.m. to 5:40 p.m.)
4        VIDEO TECHNICIAN:  The time is 5:40 p.m.  We
5    are back on video record.
6  BY MS. HERNACKI:
7    Q   Mr. Peburn, are you the corporate designee of
8  Halifax Hospital for topic number three for the 30(b)(6)
9  deposition?
10   A   Topic number three?  Do I have a document --
11   Q   Yes.  I believe it was the first exhibit that
12 was marked.
13   A   I believe so.
14   Q   Okay.  Can you tell me what facts
15 Halifax Hospital relies upon to support the -- the
16 position that the physicians maintaining employment
17 agreements with Halifax Staffing, Inc., are employees of
18 Halifax Hospital Medical Center for purposes of the
19 Stark Law?
20   A   Sure.
21   Q   Okay.
22   A   The -- the facts and circumstances, I've laid
23 out many.  But in addition to that, the employees of,
24 you're referencing, Staffing, Inc., are agents of the
25 hospital, direct agents of the hospital.  And they

Page 297

1  are -- the staffing corporation is -- I say one and the
2  same.  You can describe it as an alter ego, as such.
3        There's no control exerted by Halifax
4  Staffing, Inc.  The control is exerted exclusively by
5  the board of commissioners, whether that's through the
6  medical staff for clinical oversight, whether that's
7  operationally, or whether or not that's for the
8  employment of.  And so the District and the board of
9  commissioners of the District exert all that authority.
10   Q   Okay.  And anything else?
11   A   Well, I have previously listed off many items.
12 I mean, I can go through that whole dissertation again.
13   Q   No, I was -- I was sort of doing it somewhat
14 inarticulately.  I was trying to ask if all the things
15 that you told me earlier were part of that answer.
16   A   There was a lot of facts and circumstances,
17 including the IRS documentation, the court
18 documentation -- or the court results as it relates to
19 the fact that they are deemed to be agents of the
20 hospital and sovereign immunity applies.
21       And so all those different aspects would be
22 included in how the treatment would apply for those
23 employees and whether or not they're employees of the
24 District.
25   Q   What -- the court decisions regarding



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                        Pages 298..301

Page 298

1  sovereign immunity.  What court decisions are those?
2       A   Any malpractice lawsuits.
3       Q   The court finding has been that -- repeatedly
4  that sovereign immunity does not apply to the hospital;
5  isn't that right?
6           MR. STEPHENS:  Objection as to form.
7           THE WITNESS:  That's not correct, if I
8       understood the question correctly.
9  BY MS. HERNACKI:
10      Q   When was the last fair market value analysis
11  on the medical oncologists performed?
12          MR. STEPHENS:  Objection as to form, asked and
13      answered.
14          THE WITNESS:  I'm drawing a blank at the
15      moment.  I believe it's been within -- I'm trying
16      to remember, but I believe it's been within the
17      last five months or four months.
18  BY MS. HERNACKI:
19      Q   And that would be -- I'm sorry.
20      A   I'm guessing.  Just from memory, I believe it
21  was within the last four or five, six months, something
22  like that.
23      Q   Has that been -- that fair market value
24  analysis been provided to the United States in this
25  lawsuit?

Page 299

1       A   I don't know.  I would assume, yes.
2           MS. HERNACKI:  We'll go off for just a
3  second and I'll look over my notes.
4           VIDEO TECHNICIAN:  The time is approximately
5  5:45 p.m.  We are off video record.
6           (Short break from 5:45 p.m. to 5:46 p.m.)
7           VIDEO TECHNICIAN:  The time is 5:46 p.m.  We
8  are back on video record.
9           MS. HERNACKI:  I have no further questions at
10  this time.
11          REDIRECT EXAMINATION
12  BY MS. FITZGERALD:
13      Q   I have just a couple of questions.
14          We talked about fair market value analyses --
15  we talked about fair market value analyses that were
16  conducted of the neurosurgeons' payment from 2000 to
17  2009; is that right?  Do you recall that?
18      A   I do.
19      Q   Were any of those fair market value analyses
20  sort of retroactive in the sense that they looked at
21  payments that the doctors had received to determine
22  whether those -- that compensation was within fair
23  market value?
24      A   Well, we would have used historical
25  information to assess their expected future

Page 300

1  compensation, because it would be -- you need some basis
2  to use -- so once they were employed, you're saying, and
3  years later?
4       Q   Yes.
5       A   Okay.  I guess you would use the historical
6  information to compare, but I don't know that it's --
7  I'm not sure what you mean by retroactive.  Like
8  implementation of it?
9       Q   Right.
10      A   I don't understand that.
11      Q   Sorry.  That was confusing.
12          Okay.  So you would look at prior payments of
13  what the neurosurgeons received under their contracts in
14  order to project whether their future payments would be
15  within fair market value; is that right?
16      A   That's the assumption.  When you're doing a
17  fair market value, you either -- if you're starting from
18  scratch, you would estimate.  And if you have history,
19  you'd use history to evaluate, so -- and then if there's
20  any substantial changes, obviously you'd have to adjust
21  for that, but that's the data you would use.
22      Q   And we talked before about the physician
23  compensation varying with the amount of their
24  collections, the work that they perform.  Do you
25  remember that?

Page 301

1       A   Uh-huh.
2       Q   And so how would you account for doctors
3  having a lot more billings and collections in a year
4  when conducting a fair market value analysis?
5           MR. STEPHENS:  Objection as to form.
6           THE WITNESS:  I don't quite get the question.
7  The --
8           MR. STEPHENS:  Do you need the question
9  clarified?
10          THE WITNESS:  Yeah, I --
11          MS. FITZGERALD:  Well, he was ready to start
12  answering, and as you've said all day, let's let
13  the witness answer the question.
14          THE WITNESS:  I'll state a position of the
15  hospital as to -- as it relates to the compensation
16  and the variability of that compensation,
17  meaning -- because it's based on their personally
18  performed work and their cash collections -- now,
19  not all their compensation is based that way.  They
20  have other compen- -- call pay and so forth, which
21  is fixed.
22          But when they see a patient and they have
23  collections related to that patient, a professional
24  fee, if they saw an extra patient that day, they
25  would get the collections for that day -- the extra



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 78 of 143 PageID 14640

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                        Pages 302..305

Page 302

1  patient that day.  So if somebody only saw two
2  patients, but somebody else saw ten patients, they
3  would get -- one would get two equivalents and one
4  would get ten equivalents.  So I'm not exactly
5  understanding your question, but that's how
6  mathematically it works.
7          And from a fair market value perspective, it's
8  not just a fair market value of an MGMA data point.
9  It includes an RVU, which these are -- when you're
10 doing it that way, when you're paying a doctor
11 based on their collections, it's, by default, RVU
12 based.
13         Medical oncologists in comparison is RVU based
14 because we don't attribute collections to an
15 individual physician.
16 BY MS. FITZGERALD:
17     Q      Instead you create a pool?
18     A      It's a pool, and it's divvied up based on
19 their -- an assigned relative value, so everything is
20 normalized to, like, a Medicare-adjusted type RVU basis
21 and then it gets divvied up.
22         In the neurosurgery instance, it's different.
23 It was negotiated differently.  And so the individual
24 doctor would get the benefit of their collection and
25 their payer mix and so forth benefit.

Page 303

1     Q      Did the neurosurgeons ever request to have a
2  bonus pool similar to the medical oncologists?
3          MR. STEPHENS:  Objection as to form.
4          THE WITNESS:  I don't know that they ever did,
5  no.
6  BY MS. FITZGERALD:
7     Q      When -- how much -- how many years of
8  historical data would be used for the neurosurgeons in
9  terms of evaluating the fair market value analysis from
10 2000 to 2009?
11     A      At the time they were doing it, it would
12 probably be one or two years.  It wouldn't go beyond --
13 typically beyond that.
14     Q      And this was the fair market value analysis
15 that Dan Lang was performing or are you referring to the
16 fair market value analysis for those external companies
17 that you identified earlier?
18     A      It would be both --
19         MR. STEPHENS:  Objection as to form.
20         THE WITNESS:  It would be both parties, both
21 scenarios, because you would evaluate compensation
22 and since compensation for the neurosurgeons is
23 based on personally performed work and direct
24 collections of their practice, it automatically
25 fits into fair market value, because it includes

Page 304

1  their Medicare and Medicaid and BlueCross and those
2  payments related specifically to their work.
3          In the oncology setting it's RVU adjusted for
4  across the spectrum, meaning each physician is
5  going to get paid equivalently -- equivalent for
6  the level of service versus payer mix.  You see the
7  difference there?
8  BY MS. FITZGERALD:
9     Q      Did Gerry Neff ever conduct any fair market
10 value analyses of the neurosurgeons at any time from
11 2000 to the present -- or I guess from 2000 until he
12 left the employment of Halifax?
13     A      I don't remember if Gerry Neff personally
14 performed any fair market value.  If it was during the
15 period of time when Andy Foster took over from, you
16 know, the administrative office and the medical staff or
17 recruitment office internal, then Gerry Neff may have
18 been involved in helping establish some processes
19 related to fair market value, but I don't know
20 specifically if he signed off on fair market value
21 assessments.
22         There were several contracts that he did
23 review and, in that process, you know, he would have
24 been in that -- that discussion about fair market value.
25         MS. FITZGERALD:  I have no further questions.

Page 305

1          VIDEO TECHNICIAN:  Follow-ups?
2          The time is approximately 5:53 p.m.  This
3  concludes disk number five and today's deposition
4  of Eric Peburn.  We are off video record.
5          (Off-the-record discussion whereby witness
6  does not waive reading and signing of the deposition.)
7          (Witness excused.)
8          (Whereupon, at 5:53 p.m. the taking of the
9  deposition was concluded.)
10                         -   -   -
11
12
13
14
15



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Pages 306..309

---

Page 306

```
1              CERTIFICATE OF OATH

2

3   STATE OF FLORIDA )

4   COUNTY OF ORANGE )

5

6          I, the undersigned authority, certify that

7   ERIC PEBURN personally appeared before me on

8   February 26, 2013, and was duly sworn.

9

10          WITNESS my hand and official seal this 7th day

11  of March 2013.

12

13

14

15          Georgeanne Rodriguez, RPR,
            Notary Public - State of Florida

16          Georgeanne Rodriguez, RPR,
            Notary Public - State of Florida
            My Commission No. DD998567

17          Expires:  June 27, 2014

18

19

20

21

22

23

24

25
```

Page 307

```
1              REPORTER'S DEPOSITION CERTIFICATE

2

3   STATE OF FLORIDA  )

4   COUNTY OF ORANGE  )

5          I, Georgeanne Rodriguez, Registered
    Professional Reporter, certify that I was authorized to
6   and did stenographically report the deposition of
    ERIC PEBURN; that a review of the transcript was
7   requested; and that the transcript is a true and
    complete record of my stenographic notes.

8

9          I further certify that I am not a relative,
    employee, attorney, or counsel of any of the parties,
10  nor am I a relative or employee of any of the parties'
    attorney or counsel connected with the action, nor am I
    financially interested in the action.

11

12         I further certify the original deposition will
    be delivered to PATRICIA M. FITZGERALD, Esquire,
13  attorney for United States, for filing with the court or
    its safekeeping.

14

15         The foregoing certification of this transcript
    does not apply to any reproduction of the same by any
16  means unless under the direct control and/or direction
    of the certifying reporter.

17

18         Dated this 7th day of March 2013.

19

20

21         Georgeanne Rodriguez, RPR,
           Notary Public - State of Florida

22         Georgeanne Rodriguez, RPR

23

24

25
```

---

Page 308

```
1          DEPOSITION ERRATA SHEET

2   Assignment No.  6347

3   Case Caption:  UNITED STATES OF AMERICA ex. rel.

4   vs.  HALIFAX HOSPITAL MEDICAL CENTER, et al.

5   Witness: ERIC PEBURN - February 26, 2013

6

7       DECLARATION UNDER PENALTY OF PERJURY

8          I declare under penalty of perjury

9   that I have read the entire transcript of

10  my Deposition taken in the captioned matter

11  or the same has been read to me, and

12  the same is true and accurate, save and

13  except for changes and/or corrections, if

14  any, as indicated by me on the DEPOSITION
    ERRATA SHEET hereof, with the understanding
15  that I offer these changes as if still under
    oath.

16         Signed on the _____ day of

17  _____, 20___.

18  _____
           ERIC PEBURN

19  Sworn to and subscribed before me this _____ day

20  of _____, 20___.

21  _____

22  Notary Public

23

24  My commission expires_____

25
```

Page 309

```
1          DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to:_____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to:_____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to:_____

9   _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25         ERIC PEBURN
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Page 310

```
                                              Page 310
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25              ERIC PEBURN
```



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 81 of 143 PageID 14643

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013
VIDEOTAPED DEPOSITION OF
Index: $10..2012

---

**$**

**$10** 80:17,21 81:4 82:11

**$250,000** 183:1, 18

**$275,000** 283:19 284:12 285:9 286:12 287:10

**$3,000** 217:25

**$300,000** 199:18,20 205:13 227:12, 20

**$325,000** 123:24 124:1, 20 166:14 181:11

**$350,000** 166:10,16

**$5,000** 292:25

**$75,000** 183:2

---

**-**

**-345** 208:13

**-364** 208:14

**-7** 115:16

---

**0**

**01** 119:10

**03** 118:18 119:9,10

**05** 204:1

**06** 204:1

**07** 204:1 244:24

**08** 84:8 244:24

**09** 154:25 244:24

---

**1**

**1** 9:20 17:14 73:25 149:11 150:1,6

**100** 187:4 284:23 285:18

**10:59** 72:23 73:1

**11:15** 73:1,3

**11:32** 85:10,11

**11:33** 85:11,13

**11:35** 87:23,25

**11th** 106:23

**125** 175:10 176:21 177:3

**12:15** 87:25 88:2

**13** 281:24

**13d** 278:16 279:7

**13th** 257:8 258:11

**14** 10:10 143:2

**14th** 119:15,16

**15** 10:10 200:7 209:17 210:4, 11 220:15 223:8 224:16 228:1 236:12

**16** 10:10

**17** 10:10 46:23

**18** 10:10 139:9

**18th** 149:6

**19** 10:10

**1991** 18:5,8

**1:25** 137:4,7

**1:34** 137:7,9

**1a** 67:13

**1e** 88:15

**1st** 64:5 148:24 270:2 271:1,4 284:9

---

**2**

**2** 16:11 17:14 74:13

**20** 10:11

**2000** 15:6 40:4 41:11 44:2,20 45:3 51:1,14, 21 53:2,4,8 56:10,25 58:19 93:22 94:10, 11,25 96:3 101:5, 102:18 104:11,20 105:9 110:18 113:7 114:3 115:2,16 119:22 120:1 161:21 186:24 231:3,10,17,19 232:12,20 237:14 269:1 299:16 303:10 304:11

**2000-** 163:14 275:4

**2001** 94:25 97:17 102:18 119:5 125:12 126:1,8,9,14 131:8

**2002** 95:4 102:18

**2003** 118:16 120:1 126:7,9 180:25 182:1 188:10,20

**2004** 133:16,22 134:6 148:12, 14 149:24 167:20,21 172:16 173:8 188:10,20

**2005** 133:20, 22,23 134:6 198:13 209:22

**2006** 115:16 180:25 182:1 188:10,20 198:9 201:1,25 202:16 203:8 208:17 220:22 221:8 262:1,6

**2007** 64:5 65:22 66:24 70:13 73:25 74:3 75:6,14, 19 76:8 79:3,5 88:22,25 93:15 133:18 148:24 149:11,24 150:1,6 163:15 178:17,22 221:25 222:9 223:5 262:11

**2008** 18:9 19:4 114:21,22 149:7,11 150:2,6 152:25 153:12 163:15 165:5 222:18, 20 224:1,17,23 225:14 244:22

**2009** 19:6 31:11 37:18, 23,25 38:7 41:11 44:2,20 45:4 51:2,14, 21 53:2,4,9 55:16 56:10,25 58:19 59:24 60:5 72:4 84:8 93:22 96:3 97:10 101:23 103:22 104:3, 15,20 105:10 110:18 113:7, 23 114:3 153:9 161:21 165:5 172:13 203:8 222:20 231:3, 10,17,19 232:12 235:9 271:1,4 284:9 299:17 303:10

**2010** 18:13 114:23 115:1,2 148:21, 180:25 182:1 188:11, 21 270:23 271:5

**2011** 104:11

**2012** 257:8 266:3 267:6, 13,20 268:1,12 269:3,12,18 270:2 277:15 284:9 288:11

---



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 82 of 143 PageID 14644

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: 2013..49

**2013** 7:2
118:14,15

**21** 10:11

**22** 9:17 10:11
17:7

**23** 10:11 16:2,
4,5 17:3,4,25
18:2,11,18,24
19:16,22 20:18
21:24

**24** 25:3,6 26:11
27:15 29:7
31:11 33:19
34:16 35:1
47:13 54:10,21
55:16 59:14
65:25 102:24
111:15 142:13

**24/7** 41:25
90:13 112:22

**25** 62:20,22,23
66:11 67:10
70:8

**25th** 117:2

**26** 7:2 73:6,9,
10,17,22,24
74:2 75:6
77:21 79:18
81:13 88:4,
89:14 96:6
107:21 108:2,
18,20,25

**27** 98:1,3,4
100:18 110:10

**275-** 227:19
283:25

**28** 107:15,18
108:10

**29** 118:9,12

121:11 122:8
127:13 130:3,
12,23 131:7
135:6 136:16
148:14

**2a** 68:6

---

**3**

**3** 17:20 123:21

**3-** 260:16,17

**30** 131:11,13
133:15,19
134:9 135:3,6
136:18 137:15
142:12 148:16,
19 149:15,17
150:1 152:9
154:16,21

**30(b)(6)** 7:1
11:8 16:14
42:23,24 51:23
52:4,6,16
53:13 55:25
56:12,18 57:4
61:5,16 62:2,
17 65:13,24
69:11,20 74:5
84:24 85:22
86:5,13 97:20
98:15,18,23
120:3 130:5,
15, 133:25
134:11 135:16
138:8,20 139:1
150:17 151:14
152:12 153:4
165:18 169:21
218:14, 226:19
235:12 236:22
249:15 251:9
253:2,13
273:19 291:18,

25 292:11,24
293:18 294:12
295:5 296:8

**30(b)(6)s**
16:8

**300** 247:23,24

**30th** 133:18
148:21, 149:24
198:13 266:3
267:6,13,20
268:1,5,12
269:3,18 270:2
277:15 284:9
288:11

**31** 147:9,11,12
148:10,19
150:9 151:6,9,
12 152:9
154:14,15,16,
21

**32** 153:14,16,
19 154:4,10,16
155:4 156:1,
14,17 157:4,17
158:2,25
160:18 165:25
166:5 212:19

**325** 217:15

**325,000** 124:3

**325344** 208:13

**325440** 211:20
212:7

**325451** 208:10
210:20,23

**325452** 217:13

**325453** 212:23

**33** 160:20,23
161:8,19
164:18 166:8

**34** 167:6,9,10
170:7,20
172:15 173:1,
14,25

**340B** 227:3
228:14

**35** 174:6,9,10
177:23 181:16

**350** 247:24

**36** 17:19 177:8,
10,15 178:9
179:5,11

**365** 41:25
90:13 102:25
142:14

**37** 179:22,24,
25 180:9,14

**38** 118:25
180:16,19,22
181:9

**39** 182:22,24
185:5,21

**3:06** 197:20,23

**3:20** 197:25

**3:21** 197:23

**3a** 135:9
137:15

**3b** 124:12
125:14,21
126:16 127:12,
22 128:4 135:7
137:14 154:18
165:1 167:24
176:18 189:12

**3c** 198:12
288:22

**3e** 236:11

---

**4**

**4,000** 260:19,
20

**40** 186:9,12,14
187:5,14

**41** 188:2,4,7

**42** 189:20,24
190:18 192:20,
22 193:6
194:15 196:13

**43** 108:11
189:25 190:2,
18 194:15,18
195:20

**433-** 262:10

**44** 197:12,14
198:5,7
201:19,24
203:4 207:5,18
208:1 209:12
226:17

**45** 207:7,10
208:3 220:22
221:13

**451** 208:11,12

**452** 217:17

**46** 208:18,21,
25 210:7,16
211:6,15

**47** 213:18
223:2,6,7,19,
22

**48** 223:15,18,
20 224:4,7,15
225:21 229:13
233:5

**49** 233:14,17,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

**Nationwide Coverage**

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 83 of 143 PageID 14645

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: 4:10..add

18,22

**4:10** 237:1,2

**4:13** 237:2,4

**4:52** 264:25

**4:53** 265:3

**4:58** 265:3,5

_____

**5**

**50** 234:23
235:1,2,7
283:24 287:19,
20

**501(c)(3)**
239:6 260:1,10
272:23 276:3

**50th** 76:1
117:3,10,12,24
118:3

**51** 253:15,18

**52** 261:13,16
266:22

**53** 265:8,12
266:23,24
277:16

**54** 290:24
291:2

**5:39** 296:2,3

**5:40** 296:3,4

**5:45** 299:5,6

**5:46** 299:6,7

**5:53** 305:2,8

_____

**6**

**60** 283:16,19,
22,25 284:12

285:8 286:11
287:9

_____

**7**

**70** 283:23

**715100** 217:18

**75th** 117:3

**762000** 211:22
212:10 213:1

**7th** 119:5
125:12 133:16,
22 149:5,11
150:2,6

_____

**8**

**8th** 270:23
271:5

_____

**9**

**9/30/2012**
265:21

**90** 284:24

**90s** 275:6

**990** 261:19

**9:36** 7:5

**9th** 133:20

_____

**A**

**a.m.** 7:5 72:23
73:1,3 85:10,
13 87:23,25

**Abdul** 265:14
270:1

**ability** 185:14
252:19,24

253:3 275:20

**able** 23:15
98:25 99:13
186:25 204:11
220:19 230:1
260:3 270:7

**above** 112:17
117:24 155:20
168:7 176:2

**absolutely** 90:7
178:10 219:7

**accept** 71:23
72:10,12

**acceptable**
29:15 48:23
49:9,13,18,23,
25 50:8

**access** 113:25
115:9 237:25

**accommodate**
9:10 112:6
194:12

**accompanying**
194:8

**accomplish**
260:9 264:14
284:6,11
286:25

**accordance**
254:6

**according**
103:20

**account**
142:10,16
181:14 193:24
204:19 246:3
272:8,11 301:2

**accounted**
214:4

**accounting**
14:5 164:21
207:22 215:1
219:13,20
220:4 272:24

**accrual** 181:22

**accrues** 177:21

**accumulated**
10:19 46:24
127:18 215:6

**accumulating**
196:25

**accurate**
164:12,13,15
181:7 195:8
197:1 216:13
263:8 271:17
280:21

**accurately**
161:19 180:23
188:8,17,19
235:7

**acronym**
254:12

**across** 132:13
155:2 227:14
304:4

**act** 241:1 246:5

**action** 77:3
285:22

**actions** 26:7
104:4 269:7
280:13,17
289:14

**activities** 26:8
30:24 32:16
142:17 197:7
227:23 248:24
269:7 272:3

282:22 284:16,
18 285:16,24
286:1,24

**activity** 14:12
214:6 221:11
268:8,17
269:9,10 270:8
272:14,18
280:7 283:20
284:6 285:15,
23

**actual** 35:20
77:9 148:8
182:4 210:5
228:25 247:17

**actually** 18:18
36:9,15 38:8
40:6 42:5 56:8,
23 57:19 72:13
80:1 81:21
89:11 98:19
102:2 108:9
121:16 124:5
132:17 139:14
145:1,5
161:24,25
164:22 181:19
182:3 183:5
187:11 194:19,
25 195:15
196:4 197:15
213:19 214:23
219:12 224:19
225:13 230:22
247:23 248:5
260:8 264:13,
17,22 271:5,10
279:13 288:21
294:20

**acuity** 83:1

**add** 174:14,22
175:23 199:19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 84 of 143 PageID 14646

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                                    Index: add-ins..all

229:10 242:2

add-ins 142:15

added 175:25
204:22,24
230:22 244:12

addendum
236:1,11
289:25 290:4

addition 22:9
175:4 213:19,
20 220:21
254:5 296:23

additional 31:5
67:7 106:21
124:10 174:24
177:16,18,19
181:14,15
185:8 200:6
227:13,22
265:23 286:6

address 40:19
98:23 99:6
142:9 267:3

adjust 300:20

adjusted 304:3

administer
229:1

administration
33:14 34:20
76:22 96:18
109:20 110:23

administrative
46:7 304:16

administratively
260:13

administrator
21:8,10 41:23
42:4 43:9,14
78:15 79:8

84:10 102:14
104:23 270:21

administrator's
46:8,16

admitted 144:1

advance 40:11
111:7 167:19

advice 72:12
158:4 202:9

advised 275:20

affect 252:24

affiliate 122:13
246:14 277:23

affiliated 27:25
28:2 238:3

affiliates
237:13 238:2,6
246:1

affiliations 7:10

affirm 7:13

affirmatively
63:23

afford 81:7,8
83:2

after 12:17
28:13 47:17
48:6,19 78:1
101:3 111:22
121:18 196:13
205:21 218:6
267:13 278:24

again 13:4
44:14,17 48:16
53:25 58:5
79:17 82:8
105:6 140:3
148:6 151:1
152:6 157:23

167:16 169:7
173:15 184:18
189:6 192:11
195:17 205:15
206:19 209:6
213:1 217:21
256:11 257:17
285:21 297:12

against 89:16,
24

agencies
256:17 258:18

agency 291:6,
11,14

agent 273:2

agents 290:16
296:24,25
297:19

ago 8:13 11:9
64:25 275:2

agree 9:5 13:9
52:21 82:14
132:15 135:4
168:1 253:5

agreed 227:19

agreement
35:25 58:3,10
67:15 72:3
97:4,18 101:5,
18 116:12
119:2,5 121:16
122:9,10 142:7
148:5,7,11,13,
20,23 149:2
150:10 165:25
166:4 177:16
180:5 187:24
223:14 226:8
234:1 252:20
269:4 271:5,11
273:8,17

277:14,18
278:6,7,18,20
279:4 281:21,
23 284:8
288:3,9,10,12,
19

agreements
29:14 52:11,15
55:18 109:8
119:21 165:2
186:24 189:12
268:24 269:16
294:19 295:11
296:17

agrees 226:7

ahead 17:17
52:24 68:18
99:4 140:21
151:22,24
161:1 168:6
169:9 221:23
235:19 275:5

aided 60:1

all 10:13 14:11
15:10,15 19:1
24:13 25:17
26:8,12 29:21
30:16 33:13
34:19 35:16,22
39:25 54:14
67:4,23,25
68:2 69:13
74:24 76:13,17
77:23 78:24
82:12 84:2,22
85:2,14,18
86:2,6 89:3
91:10 92:19,23
93:5 95:9
100:13 104:10
105:3,22
107:13 111:7

113:4,23 114:1
115:23 117:13,
17 119:14
121:6 122:21
123:2 124:19
128:11,19
131:16,21
135:24 137:17
140:7,13
142:6,9,17
143:7,8 147:5
148:13 149:4
152:6 155:19
156:20 157:9
160:25 161:23
162:1,19
163:20,23,24
164:7 167:16,
17 170:14
171:3,14
173:12,21
174:18 175:8
176:19 178:6
179:2,8 181:2,
3,25 185:2,19
187:10,24
196:23 197:1,9
199:5 200:20
201:6 202:22
203:11 204:24
208:13 210:1
214:12 215:19
216:9 218:22
220:20 221:12
225:24 226:8
231:1,5 234:2
235:22 237:13
240:25 241:10
246:23 247:11,
18 248:5,21
249:3 250:6
252:7 258:19
260:14 267:21
269:6 272:12
273:5 274:21


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 85 of 143 PageID 14647

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: allegations..answer

278:1,5,12 280:13 282:6,9 283:3 284:23 285:17 286:8 287:13 294:16 295:7 297:9, 14,21 301:12, 19

**allegations** 249:13 250:8,9 251:7 292:8,21 293:15

**allocates** 286:11

**allocation** 268:6 283:16

**allow** 275:24 287:16

**allowed** 238:1 259:24

**allows** 260:9

**almost** 72:20 142:21 192:24

**along** 78:11 110:25

**already** 45:15 47:6 65:25 102:7 106:11 139:24 140:2 236:6 242:9

**also** 9:2 19:12 21:10 22:7 31:4,7 32:20, 34:24 38:15,23 39:4 49:8,16 50:13,17 51:1 59:24 70:7 78:17 81:3 103:8,12 109:15 112:6

117:25 121:14, 17 122:4 127:25 132:21 137:17 152:6 161:11 163:9 165:10,17 209:3 220:21 221:10 227:21 239:5,12 256:2 276:14,21

**alter** 297:2

**although** 118:18 167:20 199:21

**always** 15:7 31:12,22 38:17 39:12 57:21 70:10,15 112:19 117:9 134:25 152:2 214:17,19,20 234:8

**am** 45:8 118:20 131:16 158:8 160:12 166:6 167:11 193:7 206:24 213:17 266:13 295:14

**amend** 177:14, 15

**amended** 154:10,18 198:12 224:4 288:12

**amendment** 52:10,15 147:20,22 148:2,5,8,9,11, 23 149:1 153:21,22 154:1,2,11,12, 18 156:3

165:24 166:3 180:4 186:23 268:24 269:16, 24

**amendments** 198:8,11 266:4

**amends** 150:9, 10 154:5

**amount** 103:13 124:1 127:21, 22 128:12,20 136:6 168:11, 12 175:10 176:22 177:4 183:6 199:18 200:6 204:7, 12,14 224:11 227:19 300:23

**amounts** 183:7 214:9

**Amy** 8:1

**analyses** 105:23 160:1 229:23 230:4, 21 231:3,16,21 232:9,15 299:14,15,19 304:10

**analysis** 36:15, 19 41:12 44:1, 20 80:18,24 81:12,13 89:15 90:24 91:7 92:5,20 93:9 97:17 101:5,8, 17,22 102:3 103:12,21 104:11,19 105:9 110:16, 21 113:6,20 115:4 116:6,8 160:4,5,7,14

172:4 173:1, 13,24,25 178:7 179:4,10 185:5,20 190:16 191:11 192:9 202:14, 24 203:3,5,16, 20,24 205:5,21 211:1 229:21 230:9,12 298:10,24 301:4 303:9, 14,16

**ancillary** 216:15

**and/or** 43:14 78:1 280:3

**Andy** 14:14 77:25 78:12 79:2,5 80:19, 24 81:14,15 82:5 83:15 84:7 93:2 109:25 159:20 209:8 218:6,8, 10,11 220:18 229:16 231:6 304:15

**Ann** 109:23 173:7

**Anne** 105:16 127:1

**annual** 123:23 124:17,23 125:21 126:15 127:21 128:4 136:15 137:13, 14 138:23,24 150:23 168:9 176:21 254:2, 3,5

**another** 149:13 150:3 153:22 163:18 182:2 207:1 243:17, 22 255:2

**answer** 9:12 12:25 13:1 21:21 22:22, 25:23 30:17,23 43:2 44:13 52:18 53:20,23 56:13 57:24 62:5,7,8,9,12 63:23 66:5 71:19 72:6, 74:11 75:20 76:2 82:8 83:18 85:25 86:14,16 87:3, 15,16 90:2,6 91:4 99:20 101:24 111:21 131:19 138:13, 14 139:23,24 140:3,24 141:10,12,13 145:5,25 146:5,13 147:3 151:23 153:4,7 156:5 157:19 158:5 159:9 160:1 170:9,10 175:19 184:25 186:8 187:19 190:20 191:5, 18 195:25 202:6 203:12 206:20 217:23 218:24 221:21 225:1,2 231:22 235:23 239:19 255:3 256:20 257:12,17 259:12 266:17



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 86 of 143 PageID 14648

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: answered..asked

268:13,19
269:13 270:11,
16,17 273:5,
22,24 274:1,3,
7,8 283:9,11
286:12,14,16,
17 287:11
292:14 293:7
295:5,18,22
297:15 301:13

**answered**
44:12 56:19
68:15 102:7
140:2 156:19
157:18 183:5
195:1 215:8
231:4 236:5
257:10,11,13,
16 258:14
269:21 270:5
283:8 298:13

**answering** 85:6
140:19 141:11
158:9 183:15
194:24 195:5
206:3,22
210:13 257:23
278:3 301:12

**answers** 15:18
113:13 123:11
136:18 150:25
156:1,9 169:1
171:5 185:17
196:24 220:25
222:17

**anti-kickback**
108:22

**anybody**
200:18 240:10

**anymore** 248:8
260:12

**anyone** 11:14,
17 12:8,15
43:9 106:5
125:25 126:14
130:1 135:22
156:25 157:1
159:4 170:18
173:3,10,16
174:3 178:12,
24 179:13
185:7,13 186:3
187:23 196:14
201:22 220:6

**anything** 10:14
12:19 13:6
29:17 34:3,5
37:25 48:11
64:17 65:18
66:7 107:2
108:15,19
145:18,24
216:5 247:9
248:23 249:4
257:9 258:22
286:6 297:10

**anytime** 9:9

**anyway** 219:3

**anywhere** 21:5
29:20 81:5
134:18

**apart** 161:1

**apologize** 7:25
222:1

**app** 181:18

**appear** 55:8
151:10 189:9
209:13,14

**appears** 18:18
107:22 121:23
135:11 149:8
166:1,17

193:22 195:10
197:1 219:6
291:5

**applicable**
32:25 33:13,17
34:20

**applied** 45:11
89:1,3

**applies** 30:16
67:15 68:2
166:1 215:7
228:14 273:3
297:20

**apply** 15:10,12,
14,15,18
67:17,20,22,
23, 117:25
171:3,14
172:17 297:22
298:4

**applying**
276:14

**appoint** 238:11

**appointed**
238:9 241:1,23
243:6,11
252:13 280:16

**Appraisers**
232:13,19

**appreciate**
107:1

**apprised**
249:19

**appropriate**
37:4 49:14
197:8 280:9

**approval** 32:1,5
35:20 63:17
65:21 66:25

67:21

**approve** 30:14
32:21,22 35:4

**approved**
280:14

**approving**
30:10 32:2
33:12 34:9,13,
18,22,24,25

**approximately**
7:4 72:22 73:2
85:9 88:1
102:22 137:3,8
197:19,24
199:18 205:13
227:12,20
236:25 237:3
247:23 264:24
265:4 296:1
299:4 305:2

**April** 31:11
106:23

**arbitration**
29:12

**area** 26:7 67:9

**areas** 24:24
25:17

**aren't** 22:12
97:4 99:22

**argument** 295:2

**around** 26:1
136:5 217:6

**arrangement**
71:9,11,13
170:24 198:20
227:12 230:24

**arrangements**
63:17 67:21
71:1,6

**arrests** 279:2

**Art** 240:8,16,17

**article** 294:4

**articles** 250:5,
15

**articulated**
68:25 71:13

**Arvin** 109:23

**ask** 9:3,11
11:25 13:4
15:16 22:25
25:22,25 44:17
48:16 53:24
58:5 61:21
62:12 97:14
99:4,12 100:1,
15 123:10
133:4,9 148:6
157:22 168:25
169:6 189:5
191:3 206:19
207:2 222:3
251:1 268:19
273:14 288:7
292:17 294:25
297:14

**asked** 11:7,19
44:11 46:5,12
65:9 68:14
82:7 87:2
94:20,22 105:5
133:10 136:5,
14,17 139:16,
17 149:19
150:22,25
155:23,25
156:19 157:18
168:23 171:6,9
184:14,17,20
190:22 200:17,
18 205:20
206:25 219:5



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 87 of 143 PageID 14649

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: asking..back-and-forth

220:24 231:4 257:10 258:14 259:1,2 261:9 263:17 273:15 283:7 285:25 286:9 298:12

**asking** 27:3 37:6,23 39:1 48:13 52:7,19, 21 56:24 61:9, 19 66:16,18 69:7 75:16 81:25 99:17 101:14 102:6 107:4 114:13 139:10,13 141:5,18 145:1 153:12 159:2 173:21,25 192:1 195:24 212:4 213:21 231:22 232:21 263:6 268:10, 15 276:17,19 278:1,5,12 284:22 291:19

**aspects** 170:14 297:21

**asserting** 72:13

**assess** 253:3 299:25

**assessment** 126:19 158:20, 23 204:25

**assessments** 304:21

**assets** 272:6,7

**assigned** 302:19

**assigning** 160:8

**assist** 167:3

**assistants** 177:21,22

**assisted** 13:17, 18 173:4

**associated** 29:9 32:4 51:9 129:18 144:21 169:18 177:20 229:4

**associates'** 29:14

**assume** 9:4 55:5 268:3 299:1

**assuming** 142:8 194:15 290:3

**assumption** 300:16

**attach** 77:25

**attached** 50:13 76:17 194:4,9

**attaches** 76:16

**attachment** 167:12 182:17

**attempt** 25:16

**attention** 47:17 54:19 70:21 88:13 90:14 96:5 110:9,11 123:21 135:2 154:17 165:4 166:7 167:22 181:8 192:19 208:9 211:19 217:12 226:3 253:24 255:7

**attorney** 50:1 51:11 62:4 122:17 152:1 202:10 260:2 261:16 273:12, 14 274:9 275:19

**attorney's** 54:6 71:23,25 72:10

**attorney/client** 53:22 71:21 72:7 153:5 157:7,21 159:10 160:15 170:10 187:18 202:7 225:2

**attorneys** 8:20 11:18 152:1

**attributable** 283:20

**attribute** 302:14

**audit** 241:16 242:1,2 243:10,11,23, 25 244:5,6,8, 10,16 245:2,3, 4,7 248:9,10, 12,18,25 249:2,9,12,18 250:4,6,7,23 251:6,20 252:1,2,4,15 254:3 255:9, 17,22 256:6 257:1,7 258:6, 10,23 291:14, 21

**audited** 255:25 256:14 293:21 294:5

**auditor** 162:10

**auditors** 255:9 257:1 258:8,17

**Audrey** 233:10

**August** 119:16 235:9

**authority** 23:13 35:25 281:20 297:9

**authorization** 35:3,6,11,13 182:18

**authorized** 19:10,17 20:5, 21 21:23 22:11,16,18 23:5,12,17,22 35:8,10 260:2

**automated** 60:8

**automatically** 205:16 238:15 303:24

**Automobile** 246:11

**automotive** 245:12

**availability** 204:17

**available** 93:20 101:11,12 106:21 111:11, 15 200:2 204:18 216:19

**avenue** 49:8

**avenues** 48:6, 19,21

**aware** 14:19 25:14,15 29:23

38:8 59:9 66:12 76:23 103:19 119:18 120:4 134:1 149:13 150:3 153:13 160:16 166:20 174:4 180:6 186:18 218:1 224:21 225:15 249:12, 20 250:7,10,13 265:22,25 266:4,10 275:19 290:23 293:19 294:2, 3,9

**away** 236:7 247:2

_____

**B**

**back** 19:6 40:4 58:6 73:5 83:8 85:13 88:2 92:10 106:1 110:9 126:8 136:12 137:11 139:18 161:24 170:1 172:19, 20 182:4,5 198:2 208:22 211:4 214:11, 13 216:6 228:1 237:4 238:8 240:13 242:12 244:14 246:24 248:9 252:19 253:4 260:14 265:7 270:18 272:12 277:13 296:5 299:8

**back-and-forth** 82:19



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 88 of 143 PageID 14650

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: bag..billing

**bag** 116:21

**balance** 112:20

**balanced** 201:15

**bank** 204:19 272:8

**base** 80:17,20 123:23 124:5 128:9,12,18, 20,21 137:14, 16,18 138:24 142:5 155:20, 21 168:8,9 176:21 177:2 183:18, 198:24 204:23 217:5 230:21 288:24

**based** 18:15 23:14 60:4 79:1 111:2 124:10 125:22 127:23,25 128:15 149:8 152:17 155:5 183:8 185:23 196:4,10 197:3 198:25 199:23 200:21 201:6 204:21 216:18, 23,24 217:1 224:18,20 225:12 227:7, 14 228:4,5,6 229:9 230:14 232:4 242:8 246:6 253:4 272:1,2 277:1 290:3 301:17, 19 302:11,12, 13,18 303:23

**bases** 206:1

**basic** 8:19

**basically** 40:1 76:16 247:4 277:5

**basis** 11:25 40:15 98:21 99:18 112:25 124:7,25 127:11 168:4 183:21 248:17 269:8 292:22 293:15 300:1 302:20

**Bates** 118:24 162:23 163:3, 10,16,18,22 164:2 165:7 188:25 189:1,4 208:10 229:13

**become** 226:8

**becomes** 106:21

**before** 8:10 9:13,22 22:11 23:1 24:11,20 40:4 46:19 54:21 62:24 63:4 65:7 67:1 70:13 73:23 88:5 98:4 106:25 107:2 110:22 124:23 140:22 147:12 159:25 161:8 173:6 178:15 185:12 190:9, 12 191:13 206:3 215:8 225:17 234:8 235:15,18, 288:24 300:22

**began** 125:11 198:21

**begin** 198:11, 19

**beginning** 7:5 73:3 137:9 197:25 198:12 265:5

**begins** 29:24

**behalf** 7:19 8:1, 3,5 26:24 72:14 95:21 179:3,9 180:8 185:3,21 196:20 202:13 225:18 235:16 236:18 237:11 259:18 266:14 270:7 281:5 295:15

**behind** 51:9 236:15

**being** 48:22 49:9 70:8 112:5 115:7 130:2,11 131:6 152:9 153:1 155:9,19 156:16 157:3, 16 158:1,24 165:21 170:6, 20 175:7 180:13 183:23 195:15 201:23 216:19 219:4 243:10,11

**believe** 10:11 21:17 23:9 25:10,11,21 37:20 47:5 50:7 63:20,24 73:14,18

75:10,11 80:6 93:15,19 97:11 107:24 108:2 110:1 113:11 114:7,16,19 118:16 128:14 130:17 131:9 134:23 147:13 148:16 151:3 154:24,25 158:19 159:21 160:13,19 164:21 167:19 168:20 169:4 178:21 186:19 187:2 192:11, 12 203:25 207:6 209:8 221:20 222:19 225:23 226:4, 14 232:13,16 236:5 242:14 245:6 249:11 250:9 257:13 265:20 267:9 271:21,25 274:21 282:2, 4,20 290:10, 15,21 292:15 296:11,13 298:15,16,20

**believes** 218:11 293:2

**below** 213:12 283:21

**benchmark** 89:9,16 90:25 92:7 160:9

**benchmarks** 283:21 285:25 286:24

**Beneath** 213:5

**benefit** 152:23 216:2,4 247:2 260:6 302:24, 25

**benefits** 143:9 246:21 247:1

**Beninati** 174:12,15

**better** 230:23 286:3

**between** 76:21 84:19 104:11, 20 105:9 119:21 122:10, 12 180:5 192:13 247:24 251:23 268:24 269:17 271:4 275:10 276:12 284:8

**beyond** 31:5 74:4 90:25 91:7 92:6 112:17 127:16 128:11,20 135:15 149:13 168:8 176:2 236:22 293:23 303:12,13

**bidding** 33:15

**big** 17:20 208:23

**bill** 109:24 215:10 221:17

**billing** 138:9 184:20 214:25 215:9 221:7, 15, 246:19 247:10,11,16, 20



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS Document 281 Filed 05/29/13 Page 89 of 143 PageID 14651

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: billings..case

**billings** 146:22
147:6 247:18
301:3

**bills** 129:16
138:2

**binding** 22:18

**bit** 288:8

**biweekly** 124:5

**blank** 21:13,19
298:14

**blown** 161:10
162:17

**Bluecross**
304:1

**board** 155:2
238:6,7,11,12,
13,14,16,17,
19,20 240:3
241:16,18,24
242:8 243:3,4,
7,17,18,19
244:8,9 249:1,
7,18,23 250:2
251:23 252:6,
7,12,13 255:9
257:1 272:15
280:14,15
281:13,19
293:3 297:5,8

**bodies** 247:17

**body** 252:5,13
272:23

**bond** 252:21
254:7,19,21,
22,24 256:17,
18 258:19

**bonds** 252:2,9,
16,25 253:4
293:1

**bonus** 13:13,
14:15 128:19
139:11 142:6
143:8 165:20
182:3 184:13
204:3,11,13
210:11 218:16
224:22 225:10
228:2 267:20
268:6,11
283:16 284:12
303:2

**bonuses** 139:7,
188:8,18 207:4

**books** 215:22
216:1

**Boon** 224:8
225:22 233:4

**both** 40:25
42:3 58:18
87:6,17 149:7
194:3 238:6,15
303:18,20

**bottom** 118:24
162:23 164:3
208:10,12
212:25 226:6
253:22 263:10

**Brand** 241:13,
14

**break** 9:7,10,
17:13 72:21
73:1 85:11
87:25 88:5
137:1,7 197:23
236:24 237:2
296:3 299:6

**breaks** 9:8

**briefly** 237:8
291:1

**bring** 25:17
118:3 199:13
266:5

**brings** 249:5
292:9,22
293:16

**broad** 93:6
144:25

**broker** 246:5

**brought** 155:16
227:9 246:23

**Brown** 245:23,
24 246:4,9,10
290:13 291:6,
10

**bucket** 71:15

**build** 39:11

**bunch** 19:1
232:5

**business** 8:18
27:21 29:13
30:10,14 32:2,
5 33:12 34:18,
23 169:22
246:11,13,18
247:6,25

**buy** 113:23
114:1 115:19
144:9 230:1

**buying** 115:15

_____

**C**

**calculate**
209:22 210:9

**calculates**
139:8

**calculating**
209:10 220:14

**calculation**
13:13,15 139:6
165:19 209:14
210:5 218:16
228:19

**calculations**
14:16 195:10
211:14 222:12

**calendar** 125:3

**call** 39:5,22
40:7 41:25
42:1 60:13
83:25 90:13
102:25 103:7,
15 136:2
179:21 184:12
186:1 217:6
246:15 289:7
301:20

**called** 21:9
238:20 246:23

**calls** 60:21
61:5,16 62:2
71:20 72:7
80:25 153:5
157:6 187:17
202:7 273:10,
19

**came** 116:2,12
126:4 127:5
133:2 181:3
199:5 202:21
225:17 234:1
287:2

**can't** 47:3
57:24 63:23
76:2 81:7,8
83:1 86:14
90:15 101:24
102:18 105:25
106:6 107:2
116:13 126:2,

25 127:17
133:1 144:13,
14 174:4
196:23 204:18
231:5 235:23
251:22,24
255:3 256:11
266:17 273:25
274:1,8 290:20

**cannot** 105:21
127:10 132:12

**capital** 277:18

**capture** 29:4

**care** 16:25
38:19 103:13,
14 107:8 136:2
142:11 146:19
154:24 199:10
280:9 289:7

**carefully** 65:15

**carrier** 292:7
293:12,13
294:7

**carriers** 290:7

**carry** 237:25

**carve-out** 263:9

**case** 11:8 12:5,
11 39:2 47:11
66:17 79:21
83:19 93:14
110:23 112:4
141:17,22
150:18 152:4
171:16 173:2
219:9,13 244:2
251:16 255:18
259:4,5 262:7
277:3 281:11
289:4 294:10



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 90 of 143 PageID 14652

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: cases..closes

cases 32:9
97:5 142:24
145:3 152:7

cash 19:11
20:2 124:5,19,
21 125:15
137:17 146:20,
21 147:5
301:18

Cason 110:25
150:18 201:5
202:18

categories
116:19

category 216:3

center 7:22
10:2 27:24
118:6,7 122:19
123:3,9,15,19
139:8 143:17
172:22 211:21
212:13,14,15
213:3 214:8
215:4,7,14,15,
21 216:5
217:18 219:16
237:17,23
238:22 239:16,
20,22,25 240:4
241:3,15
243:24 247:20
261:1 263:23
271:22 272:9,
10,13,17,18,21
278:11 280:1
281:6,12 293:2
294:17,21
295:8,12
296:18

Center's
237:12

center-specific
39:4

centers 39:6
67:8 103:9
142:19,20
143:5 219:19
221:12,13
222:10

CEO 261:4
262:10,21

certain 15:2
18:20 24:3,22
28:12 38:16,25
40:24 49:2
50:22 103:17
105:24 111:10
115:15 117:6
143:5 169:8
171:12 193:23
203:15 204:2
227:21,22,23
238:2 255:20
278:19 279:1
283:21 285:24,
25 286:23
288:12,16,17
293:3

certainly 78:13
80:11 87:16
90:3 164:2

certification
256:23

cetera 33:16

chain 78:11
142:19

chair 280:11

chairman
280:11

challenge
118:7

challenged
83:4

chance 140:22
253:17

change 16:11
17:12 29:13
76:20 77:3
135:4,11,12,14
137:1 150:14
155:1,3 156:4,
10 195:20
197:17 198:15
200:12,25
226:22 260:15
264:18,23
266:5

changed 18:16
49:4,17 76:6
78:7 264:14
288:12

changes 20:5
51:18,20 52:1
53:3,5,7,11
135:20 148:18
150:11 238:14,
15 281:22
284:5 286:6
300:20

changing 41:8
50:23

charge 94:4
194:13 230:16
283:15 284:10
285:5 287:7

charges
145:14,20
193:25 194:17
195:12 219:21
230:16

charity 38:19
155:2 156:7

165:22 166:2

chase 288:8

cheaper 112:25
113:1

check 182:5,10
224:19 225:13

checked
164:13

checks 272:11

Cheryl 105:17
127:2 173:7,10
178:21,22

Chew 224:8
225:22 270:12
282:5

Chew's 233:4

chief 109:24
251:2,5,12
257:2 258:5,9,
22 280:12

choose 112:9

chosen 260:13

CHRDIS 165:11

circumstances
38:25 88:16,23
89:15,23
90:10,25 91:7
92:5,20 93:9
97:1,6 103:1
135:24 141:17,
20 196:11
200:21 277:2
296:22 297:16

Civil 106:19

claims 293:13

clarification 9:3
11:19,23 12:1,
22 195:13

263:9

clarified 301:9

clarify 115:5
123:11 137:16
190:25 191:3
251:21

clarifying 72:18
234:15

classification
214:10

clause 29:11

clauses 29:12

clean 206:18

clear 8:24
219:4 233:25
260:16 262:1
284:7

clearly 49:1
218:15

clever 212:8

clinic 201:20,
21 207:14
212:16 216:13,
14 217:20
219:15 227:24
228:11,13,15
229:6

clinic's 200:7

clinical 123:5
297:6

clinics 219:15
221:11

close 215:22,
25

closer 227:15,
18 244:19

closes 106:22



Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 91 of 143 PageID 14653

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                       Index: coaching..compensation

**coaching**
218:22

**coincides**
154:25

**collected**
180:22

**collection**
18:19 161:7,18
175:9 180:19
181:9 188:5
302:24

**collections**
124:10,20,21
125:15 127:25
128:1,11,20,
21,23 129:6
137:17,21
140:8 145:17,
19 146:21
147:6 152:22
155:20 156:4,6
165:10,11
166:9 176:19
181:10 184:4
194:17 201:20
288:2,23 289:5
300:24 301:3,
18,23,25
302:11,14
303:24

**colloquy**
218:20

**column**  211:5

**combinations**
76:3

**combined**
91:11

**come**  52:24
63:25 83:8
132:13 144:7
146:18 147:7

263:10

**comes**  13:22
117:11 220:20

**comfortable**
183:10, 210:13

**coming**  132:1,4
209:7

**comment**  37:4

**comments**
49:3,20,21

**commercial**
31:9 44:25
108:4,25 109:8
110:15,20
111:17 113:4,6
141:25 173:13,
23,24 179:9
185:20,23
289:11

**commercially**
108:11,17,23
109:6 205:2

**commissioners**
238:6,8,12,16,
19 240:3
241:17,24
243:9 249:8
250:2 255:10
257:2 280:14,
16 281:14,19
297:5,9

**commitments**
227:22,23

**committed**
259:15

**committee**
63:21 109:15,
18,22 110:2
241:16 242:3
243:11,22,23,

25 244:4,5,6,7,
8,11 245:3,4,5,
7 248:9,10,12,
25 249:2,10,
12,18 250:4,6,
7,23 251:6,20
252:1,15
255:9,17,22
256:6 257:1,7
258:6,10,23
259:14 282:1,
12,13,18,24
283:6,13,15
284:2,4,19,24
285:1,2,4
287:6 291:15,
22

**committee's**
252:2,4

**committees**
243:19 282:21

**communications**
158:10 160:15
170:11 251:22
255:21

**community**
38:19 83:1,2,6
112:8 146:17
155:13 201:8,
227:16,17
238:1 241:8,
20,22 242:5
243:12 249:1

**comp**  165:11

**comp-**  182:13

**companies**
231:15,20
232:1,8 303:16

**company**  131:5
153:1 157:15,
25 159:6

175:16,18
176:5,7,11,15,
22 226:6,12
235:17 246:20,
22 264:5
271:12,16
272:7 277:17
278:9,16
291:20 292:19

**comparable**
108:19 185:15

**compare**  300:6

**comparing**
89:16

**comparison**
89:6 90:25
92:6 302:13

**compen-**
301:20

**compensate**
141:15

**compensated**
155:19 168:16
183:24 194:19
195:15 249:2
261:3,7 262:15

**compensation**
32:25 33:16,18
34:1,10,25
35:12,15,17,21
36:2,10,25
37:6,11,19
38:2,21 39:15
40:23 44:1,20
45:22 52:10,15
55:10,12,17
57:1 58:3,10
59:1 75:25
80:21 83:9,10,
22 89:24 90:20
117:6,12

119:20 123:22
124:13 126:18
127:5,12
128:10,19
129:24 130:2,
11,22 131:6
135:5,10,13
136:15 137:13
138:24 140:12
142:1,4,5,6,10,
16 143:4,9,11,
23 150:12,15,
23 152:8,17,20
153:1 154:21
155:1,3,6,7,8,
24 156:16
157:3,16
158:1,15,24
160:17 161:20
167:23 168:24
169:1 170:6,
20,23 172:21
175:8,10
176:19 177:5
178:8 179:4,10
180:23 182:12
183:9 184:16,
21 186:24
188:9,19
189:13 192:23
193:3,19
194:21 195:12,
19 196:23
197:10 198:16,
20,23,25
199:2,19
200:3,13,25
201:9,12,15,23
202:3,15
203:6,8 204:4
205:1,9,17
209:11,23
220:9,16 223:9
224:1,16
225:11 226:16,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
**Nationwide Coverage**

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 92 of 143 PageID 14654

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: competition..contract

23 227:13
231:21 236:12
267:21,25
268:2,12,24
269:16 270:1
273:8,17
277:14 285:18,
22 287:17
289:6,10,12
299:22 300:1,
23 301:15,16,
19 303:21,22

competition
40:24

competitive
41:3

competitiveness
40:24

compilation
113:10 207:14
208:6

compile  14:8
127:9 164:23

compiled  208:6

compiling
93:22

complaint
15:11 67:18

complaints
30:21

complete  19:23
105:25 111:20

completed
283:24

completely
141:14

complex  71:1,
6,8,12

compliance
26:5,13,15
27:19 31:17
33:20,23 54:20
55:12,18 56:2
57:9 58:4,11
59:1 63:18,21
64:7,8,11,12,
16,22 65:20
66:7,14 69:3
74:2,3 76:22
108:4,21
130:3,9,12
131:7 152:10
153:2 156:17,
21 157:4,17
158:2,15,25
159:6 170:7,21
187:15 201:24

comply  202:4

component
75:2 111:8
129:18,22
138:6,18
139:22 144:14,
21 147:7
156:10 169:18
170:1 184:15
187:6 215:9,
10,13 222:16
228:9,22

components
25:19 29:21
139:11 142:7
143:9 168:24
184:13 230:15
248:22 285:17
286:20

comprised
282:24 283:1,
2,14 285:5
287:6

comprises
241:16 281:25

concern  155:16
201:7

concerns  49:2

concluded  78:3
305:9

concludes
72:23 137:4
197:20 264:25
305:3

conclusion
60:22 61:6,17
62:3 194:10
273:11,20

Concordance
163:5

conditions  41:7
155:12 188:1

conduct  40:14
97:16 101:4
104:19 115:3
156:14 255:20
304:9

conducted
103:21 116:5
151:11 156:15
159:18 172:25
299:16

conducting
301:4

confer  9:13

confirm  63:6

confirmed
131:1

confirming
162:24

confused  123:7

212:3 219:2,5

confusing
12:21 13:6,12
300:11

confusion
224:22

conjecture
81:19,25 219:7

conjunction
79:8 96:17,20
207:21

connection
43:7 47:11
54:4 63:10
180:21 182:20
188:6

consensus
200:20

consider  88:23

Consideration
88:15

considered
239:5 277:10,
23

considering
120:24

considers
177:16

consol-  78:5

consolidated
25:20 26:18
76:10

consolidation
26:9 31:16
78:6

consultant
246:2,4,7

consulted
70:25 71:16
72:2

contacts
123:12

contemplated
54:9 55:7

contemplates
89:14

contend  86:17,
23 87:9 273:7,
16

content  98:25
99:2,10,25
100:7

contiguous
134:3

contiguously
17:17

continuation
47:15

continue  100:9
103:2 108:14

continued
16:16 149:12

continues  41:3

continuing  16:7
106:18

continuous
134:3

contract  15:9,
17 21:1,4,5,6,
13,16,18,20,
21,25 22:2,5,6,
7,13,17,20
23:2,7,14,19
24:4,7,8,11,18,
21 25:13 28:4



Case 6:09-cv-01002-GAP-TBS    Document 281    Filed 05/29/13    Page 93 of 143 PageID 14655

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: contracted..could

29:10,22,25
30:11,15,25
31:6 32:3,18,
21 33:10,13,15
34:19,21,23
35:4,5,9,14,20,
21,23 36:20,
22,24 37:2,20
39:8 48:22
49:2,8,12,14,
17,23,25 50:8,
11,16 51:9,15,
18 54:24 56:3
57:24 58:20
59:11,15,20,
22,25 60:7,9,
13 61:7 67:23
68:4 69:3,12,
13,25 70:2,3,
16 76:18
79:12,24
80:14,17 81:4
82:10,13,24
84:3,14 85:4,
19,23 86:6,8
87:5,13,17
90:21 96:13
101:16,20
102:15,20
109:11 112:6
113:20 114:5,
20 116:8
118:20 119:9,
10,14,25
120:4,9,12,16,
19 121:10,14
122:5,7,12
125:5,7,9,11
126:3, 127:9
131:8,17
132:1,3,18,22
133:5,9,14,20,
21 134:2,6,8,
12,18 135:8,
18,25 136:10

147:17,21
148:1,2
149:10,12,13,
14,23,25 150:3
151:5 152:6
153:19 154:4,9
157:10 165:5
166:9,15
167:11,13,18,
25 168:1,18
170:13,14
171:1,11,19
172:5,15
180:11 186:13,
14,17 188:1
189:17 201:11
202:2,20
203:18,21,22,
23 205:6
223:10,13
224:3,7,18,20
225:13,21
226:5,7 234:4,
8,10,19 236:8
265:13,18,21
266:2,16,18,19
267:4,7,12,16
268:3,18
269:11 270:9,
18,25 277:22
278:10 283:17
289:3

**contracted**
131:9

**contracting**
109:15,17,22
110:2

**contractor**
234:2 235:8

**contracts** 14:24
15:1,2,4,10
21:12 23:18,20
24:8 28:12

29:1,6 30:16,
19 35:16 50:22
51:8,16,21
52:2,8 53:2,3,
6,8,18 54:5
66:9,16,17,21
67:22,23,25
68:2,23 69:9
71:5,17 74:24
85:14 86:3,18
87:11 89:3
97:10 109:7
110:24 113:5
115:4 120:25
121:7, 124:18
131:16,21
132:3,6,14
134:22 135:1
147:14 152:17
156:20 159:3
167:14,16,17
198:8,16
225:24 233:20
235:13 265:23
269:5,25
300:13 304:22

**contribution**
248:5,6

**control** 238:3
280:20 297:3,4

**controlled**
260:1 280:6

**controls** 255:13
257:5

**conversation**
23:6,8,10
64:19

**conversations**
196:14,18,22
197:6

**coordinate**
282:21

**coordinated**
159:20

**copied** 115:24

**copies** 182:10

**copy** 63:16
180:2

**core** 216:12

**corporate**
272:4 296:7

**corporation**
122:22, 238:23
239:4,6 245:15
247:3 264:16
276:14 297:1

**corporations**
248:7

**correct** 7:23
22:14 27:22
37:8 43:11
52:22 65:8
67:2,5 70:20
128:12,15
137:22 138:1,
4,12,15,21
150:12,13
175:14 176:8,
17 177:6 189:9
203:19 224:2
237:19 239:4
243:5 244:23
246:15 251:3,4
260:21,25
262:4 264:1,3,
12 270:19
271:2,19,24
277:19 278:6,
9,13,16 279:4
280:2,24
281:17 282:12
285:1,9,11
286:13 287:10,

24,25 288:4,13
298:7

**correctly**
128:16 173:9
255:14 278:6,
14 283:15
298:8

**correlate**
145:22 147:3

**correlation**
16:22 145:17

**correspondence**
106:16

**cost** 112:20
176:2 212:13,
14,15 215:3,7,
14,15,21 216:4
217:18 219:16,
19 221:12,13
222:10

**Cotter** 38:24
46:22 115:13

**could** 7:11 9:12
10:7 25:25
29:18 32:12
33:5 37:4
43:19 45:24
54:16 73:19
78:2 100:18,
102:20,21
108:15 111:1,
24 112:21
116:9 118:22
126:25 127:1,
143:2 145:25
152:2 162:8
171:14 184:11
186:20 195:25
204:20 205:7
212:19 217:5,7
227:8 231:6
241:9 251:21



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 94 of 143 PageID 14656

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: couldn't..days

253:24 278:16

couldn't  95:14
105:1,6 117:22
231:6 233:2

counsel  7:9
9:14 11:4 13:1
28:8 29:6,21
37:10 48:20
50:10 53:17
54:3,9 70:22,
25 71:16 72:2
86:19 139:2
158:5 159:3,4
161:3 165:6
183:14 188:22
191:5 194:23
195:4 206:13
212:8 250:20,
21,22,24
251:23 266:21
293:2

counsel's
28:11,16 36:1,
14,23 48:7
49:13 55:9
59:21 134:22

count  247:24
288:22

counter-party
84:17 87:6,12,
17

couple  40:11
41:4 98:9
190:10 246:12
299:13

course  10:19
34:6 38:10
39:13 41:1
64:2 107:8
183:20

court  7:8 9:19

225:5 255:21
265:10 297:17,
18,25 298:1,3

court's  256:5

courts  272:25

cover  21:6,13,
14,18 22:5,7
23:19 24:18,21
35:23 50:11,16
51:10 102:24
122:5 125:24
134:17 142:13
149:23 151:5
185:25 194:4
266:2 290:12
291:8

coverage  39:20
40:1,8,10
83:25 90:13
112:22 136:8
172:23 245:25
289:7 290:22
291:20

covered
290:12,17

covering  39:21

crazy  117:22

cre-  241:2

create  27:14
58:2,9,13 77:3,
5 216:19
229:8,19,22
230:4 238:2
286:22 302:17

created  77:17
78:12 105:23
189:17 216:24

creates  14:11

creating  27:12,

14 76:10

creation  26:10,
20 27:4 52:9,
14 119:20
126:15 127:12
268:23 269:15,
25

credit  154:22
156:6 165:21
166:1 215:11

crime  225:5

criteria  283:21

CROSS-EXAMINATION
237:5

cumbersome
76:12

current  38:14
63:16 73:22
108:3,16
143:15,16
153:19 186:13,
14 187:1
198:22 224:7
225:21 244:3,
15 248:9,10
262:9 265:17
266:5,16,18
269:11

currently  14:23
18:10 25:9
39:16 63:18
108:17,24
180:9 244:5
264:9 265:23
267:12

cut  162:17
225:14 272:11
288:8

CVS  117:22

—— D ——

DAC  254:19,
21,22,24 256:2
293:22

daily  269:8

Dan  104:23
105:7,8 110:25
118:18 121:15,
16,17 125:22,
25 126:15
127:8,16,18
135:17,22
149:5 150:19
152:13 173:2,
10,15 174:2
178:10 179:6,
12,18 185:6,22
187:21 201:5
202:20 240:8,
18 241:19
242:6,10,14,16
245:14 303:15

data  13:22
32:14 38:23,
24,25 39:3
41:13,22
46:21,22 65:3
67:5 79:16,
83:22 84:9
89:6,9 90:4,8,
15,25 91:8
94:7,11 95:1,
11,18 96:3
97:1 102:16,17
111:22 113:24,
25 114:1 115:7
116:15,19
117:3 127:4
160:9 185:15
206:2,9,10,12
208:7 209:6,
230:7 300:21

303:8

database
163:5,9,25

date  18:4 31:11
37:22 59:21
64:2,4 73:24
119:4,15 120:5
149:9 154:25
172:16 232:22
233:11,13
244:20 265:21
266:3,5 270:25

dated  55:16
148:12, 231:14

dates  18:22
60:4 105:15
133:14 134:2
148:4,22
149:1,17,20
173:9 231:12,
13,23 232:21

Dave  109:25
130:20,21
131:2 151:25
152:2,4,14

Davidson
109:25 130:20,
21 131:2
151:5,11,25
152:8,14

Davidson's
151:8

day  9:9 111:16
119:5 142:13
145:2 218:22
272:11 301:12,
24,25 302:1

day-to-day
11:25

days  102:24,25



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 95 of 143 PageID 14657

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                      Index: Daytona..determination

142:14 184:12

**Daytona** 211:21
219:17

**deal** 17:20
138:9 208:24

**dealership**
245:13

**dealing** 189:12

**deals** 61:8

**Dear** 276:20

**debt** 246:8

**December** 18:5,
8

**decide** 10:23
11:1 17:2

**decided** 192:7
289:4

**decision** 76:19
125:20 135:12
150:14 191:15,
21,24 192:5
198:15,19
200:12,25
201:10 279:16

**decisions**
297:25 298:1

**Decker** 242:19,
20,21 245:20
290:13 291:12,
13

**decrease**
45:22,23

**deemed** 96:12,
23 155:8
171:13 297:19

**default** 238:13
302:11

**defendant** 8:4

**deficient**
107:12

**define** 20:20
145:3,10
146:21 201:18
261:7

**defined** 200:8
247:2 248:5,6
271:12 277:18
278:17

**definitely** 35:3

**definition** 87:14

**deleted** 288:2
290:1

**delineation**
246:21

**demand** 117:21
118:6 143:3

**demand-** 143:4

**demands** 143:4
173:19 179:16,
19

**demonstrates**
35:24

**denying** 193:9

**department**
7:19 26:5,6
29:25 30:4,13
31:7 32:23
33:9,11 34:8,
17,24 50:2,5,7
55:17 56:5,8
57:7,8 58:1,8,
25 59:23 60:6
69:2 74:19,21,
24 75:3,8,10,
14,15,18,20
76:11 77:14

78:4 79:6,9,18,
20 80:1 82:5
92:13,22
96:14,18
109:19 113:16
120:24,25
130:1,7 156:25
157:2 170:5,
12,19 179:20
201:22 202:1
207:17 209:4,
5,8 219:12,13,
20 220:4
280:11

**departments**
38:9 75:11
77:5 179:19
186:5

**depend** 204:14

**depending** 24:8
32:11 35:9
41:7,20 97:5
151:25 152:1
173:6 219:16

**deposed** 8:10,
17 42:24 65:7

**deposition** 7:1,
6 8:20 9:21
10:15 11:8,12,
15 12:10,17,19
13:5 43:8 44:9,
22 61:5 62:23
63:11, 64:13,
17 72:24 73:4,
13,17 88:4
98:3,10,23
100:6, 107:18,
20 114:17
118:12 131:14,
23 132:20,25
133:11,19
135:5,6 136:15

137:5,10,15
147:11,15,18
148:14 151:6,
9,12 153:16
154:4,10
156:17 157:3
158:25 160:23
161:8,19
164:17 165:25
166:5 167:9,
10,15 170:6
173:1,14,25
174:9,10
177:8,15,23
178:8 179:5,
11,25 180:19
181:9,16
182:25 185:5,
20 186:12,14
187:5,14 188:4
189:22,23
190:2 192:20
193:6 196:13
197:14,21
198:1,5,7
201:19 203:4
207:5,10
208:21 209:12
210:7,16 211:6
213:18 218:6
220:22 221:13
223:7,18
224:4,6,7,14
225:21 226:16
233:17,22
235:1,2,5,7
236:10 258:25
265:1,6 296:9
305:3,6,9

**depositions**
12:11,13 16:17

**derive** 145:8
146:16

**derived** 147:6
152:18

**derives** 146:20

**describe** 46:1
68:12,20,24
148:9 206:4
219:10 237:21
252:1 297:2

**described**
24:15 178:14
201:24

**describes**
24:13

**description**
29:3

**designate**
100:8 282:10

**designated**
10:1 20:20,24
99:1,10 100:5
138:9 272:22
273:23 294:16
295:7

**designating**
99:22

**designee**
186:22 267:11
295:15 296:7

**destroyed** 42:8

**detail** 171:11

**detailed** 125:13
287:12

**detailing**
182:11,13

**details** 284:21
285:16

**determination**
75:7 77:16,22



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: determinations..doctor

78:10,20,22,25
79:4,19 80:2,8
81:14,15 82:6
89:5,22 96:15
190:14 191:9
229:21 272:1
274:16,25
275:8 276:13

**determinations**
74:18 76:7
77:13 88:10
89:2

**determine**
83:13 90:19
99:13 102:20
106:2 111:13
112:12 205:1
230:19 267:15
299:21

**determined**
96:19 124:1
199:17 200:5,6
219:14 228:19
289:9

**determining**
24:10 38:1
111:5,16
126:17 143:7
283:16 284:10
285:6, 287:7,8

**develop** 275:20

**developed**
200:4

**developing**
229:20

**Deveras** 270:13
282:5

**didn't** 11:20
12:18,22 13:8
16:12 43:17,24
48:11 52:18

54:14 64:12
68:19 78:2,8
93:1 94:22
99:19 102:6
120:24 132:19
145:18 160:25
193:11,14,24
194:12 196:18
199:20 206:8,
10,11 219:3
224:19 225:17
246:23,25
262:18 273:14
274:2 289:16
295:17

**difference**
183:22 276:12
304:7

**differences**
168:13,18
190:11 192:13

**different** 18:20,
22 19:9 22:4
24:15,24
25:17,19 38:9
48:6,19,21
64:1,8 77:5
86:25 103:10
104:7 105:14
106:10 114:1
115:25 116:19,
22 154:20
161:16 165:13
181:25 197:3
207:23 209:21
230:14,15
231:20 232:6
241:10 248:22
255:10 297:21
302:22

**differentiate**
80:6 123:18,20

**differently**
104:4 302:23

**difficult** 117:19
118:5 146:13

**diligence**
35:23,24 36:10
171:12,13

**direct** 8:7 47:16
141:11 147:18
192:19 208:9
226:3 247:19
273:8,16
296:25 303:23

**directed** 48:12

**direction**
286:22

**directly** 26:20
45:13 143:23
144:4 173:20
182:8 217:11
272:5

**director** 21:10

**directors**
238:17,20
262:13,19
272:16 290:8
292:20 293:14

**directors'**
292:17

**disagreement**
174:23

**disbursements**
19:11 20:2

**disclose**
170:10 187:17
254:13 257:7
258:10

**disclosed**
197:10 255:8,

17,22 256:5,9,
15,25 258:6,7,
9,17,18,22
259:14 293:21

**disclosing**
53:21 153:5
157:20 159:10

**disclosure**
71:20 202:7
250:3 254:1,3,
4,5,8 255:24
256:2,4,13
293:20 294:8

**disclosures**
251:6,13
256:12 293:22

**discovery**
106:8,22

**discretion**
23:11,22

**discuss** 45:19
249:21 269:3,
15,24

**discussed**
21:24 41:12
75:23 76:21
109:10 124:4
173:6 293:20,
21

**discusses** 28:8
48:6

**discussing**
179:19 269:6

**discussion**
37:21 74:25
75:24 76:2
77:8 84:9 86:7
136:8 150:20
250:19, 304:24
305:5

**discussions**
11:17 21:24
22:19 45:25
76:24 77:2,7,9
79:10 82:19,22
103:8 104:5
201:6

**dishonesty**
292:4,8

**disk** 7:5 72:23
73:3 137:4,9
197:17,20,
264:25 265:5
305:3

**dissertation**
297:12

**distribute**
227:14

**distributed**
204:23 227:7
228:4,6 229:8

**distribution**
204:16,21
210:5

**district** 122:15,
18,19 154:23
155:1 237:19
238:8,9,25
239:8 272:5,9,
10 273:2
290:16 297:8,
9,24

**divulge** 225:2

**divulging** 158:9

**divvied** 199:22
302:18,21

**doctor** 140:10
141:1,4
166:17,19,24
229:1 302:10,



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 97 of 143 PageID 14659

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: doctor's..Dr

24

**doctor's** 229:4, 7

**doctors** 84:22 85:2 117:18 118:1 129:10, 12 285:23 286:7 289:15 299:21 301:2

**docu-** 58:24

**document** 9:22 10:21 18:11, 17,24,25 19:1, 16,17,21,23 20:5,8,10 24:19 25:7,9, 12 27:5 34:16 37:17 42:23 47:4 73:15,16 88:14 98:17 99:16,17,24 107:18 108:24 114:12 116:2 118:13 131:15 133:9 153:17 154:3 160:12 162:11,25 163:13 177:12 188:23 190:13 193:6,8,10,15 195:8 207:11 210:3 222:6 223:24 224:10 235:4,11,15, 18,24 253:20, 25 265:15,17 271:13 287:24 288:16 291:3,4 292:12 296:10

**documentation** 20:21 32:4 36:12,16,17

37:14 41:21 42:2,17,21 46:3 47:5,7,9 54:15 58:2,9, 13,25 74:14 75:12,13,17 76:12,17 77:23 78:1,2,12 80:3, 7,12 82:9 83:15,20 90:24 92:23,25 93:1 94:21,23 97:22 102:11 115:23 127:3 182:6,9 236:16 270:6 276:25 297:17, 18

**documented** 74:19 75:7 77:13 92:6,9 113:7,11

**documenting** 93:9

**documents** 10:18,23 11:2, 3 12:2,6 18:19 19:2 20:25 38:2 42:4,10 43:25 44:19,24 46:5,7,12,15, 19 63:9 73:12 95:24 96:2 114:14 154:6 160:23 163:17, 24 164:5, 190:7,8,23 231:24,25 254:7 260:14 267:15 274:22

**does** 14:23 17:8 21:15 22:17 23:4 29:5 30:13

34:22 35:6 36:1,8,22,23 37:10 49:3 50:6 53:22 55:2 58:12 61:2 67:17 83:12 84:10, 11,21 85:1,3 86:17,22 87:9 89:17 93:8 108:3 116:5, 15, 118:16 120:15,17 129:9 140:6,16 143:21 144:4, 20 146:8,16 151:11 166:16 168:9 169:17, 25 170:1,3 175:15 177:14, 18 180:4,13 181:14 182:9 198:7 200:24 210:7 211:4,7 213:10 214:24, 25 218:10 223:7 224:6,14 233:18,22 234:3,9 235:7 238:11 239:10, 11,14,16,19 243:23 245:22, 24 246:4,9 247:5,9,22 249:7 266:15 273:7, 276:16, 19 277:8 281:7 283:5,12 285:13 292:16 298:4 305:6

**doesn't** 21:14 36:15 78:21 85:25 91:4 94:13 95:17

100:4 112:11 120:22,23 121:16 122:2 144:1 146:23 153:6 168:3,7, 12 169:14 172:17 182:8 191:24 205:15, 16 209:13 214:23 216:14, 15,16 254:2,3, 16 272:6

**dog-eared** 261:23

**doing** 16:9 35:22 57:7 81:12,13 105:15 161:13 229:21 247:16, 20 297:13 300:16 302:10 303:11

**doing-business-as** 241:5

**dollar** 204:7 216:18

**dollars** 145:11, 13,21,22 198:24 216:2 217:10,24 221:10

**Don** 109:24

**done** 24:11 28:19 38:9 39:12 47:22 56:2 57:25 59:1,10 85:6 87:19, 88:20, 91:21 97:12 102:3,21 152:5 160:2 164:20 171:2,11,14

172:4,6 183:14,21 195:4,11 196:23 197:9 204:25 206:22 219:8 223:19 247:18 250:19

**door** 85:8

**down** 28:4 31:14,16,23 70:13 140:23

**Dr** 68:1,3 80:16 84:21 85:1,3, 17,18 87:10 97:17 101:5, 16,17,23 109:24 119:22 122:13 125:10 128:9,23 129:6,13,17,24 130:2,12,22 131:6 133:22 135:5,13,19 137:16,21,24 138:18 139:9, 22 140:5,7 142:2 143:21, 24 144:2,5,9, 17,22 146:9, 10,18 147:8 149:6 150:15 152:9 153:2, 155:19 156:17 157:3,16 158:1,24 160:18 161:20 165:1 167:4,25 168:1,16,17, 24,25 169:11 170:1,6,20,25 176:6,10,19 172:5 174:13, 18 175:7,9,23



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS  Document 281  Filed 05/29/13  Page 98 of 143 PageID 14660

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: draft..employment

177:4,14,15
178:8 179:4,11
180:5,13,24
182:3,12,14
183:1,2,13,23,
24 184:2,3,18,
23 186:15,24
187:5 188:9,20
189:12,16
192:23,24,25
193:3,19 224:8
225:22 233:4
240:7 262:3,4,
25 263:1
265:14,18,24
266:20 267:5,
12,20 268:5,11
269:1,17
270:1,12,13
271:3,18
273:8,17
277:15 279:6,8
282:5,6

**draft** 26:21
27:1,3 121:16
234:7

**drafted** 152:6
234:3

**drafts** 120:25
121:6 134:22
135:1

**draw** 253:24
255:7

**drawing** 298:14

**driven** 111:2

**driver** 155:11
230:16

**drug** 217:19,25
227:3 228:9,
10,17,22,24
229:1,6 279:2

**drugs** 217:20
218:1 219:18
228:14,25

**due** 35:23,24
36:9 107:8
171:12,13

**during** 34:5
41:16 52:14
75:18 101:19
105:18 112:9
115:15 304:14

**Durkin** 84:21
85:17 87:10
270:13 282:6

**duties** 185:14
271:15

---

**E**

**E2a** 68:7,8,25
74:16 92:14,19

**each** 8:24
15:23 26:6,7
76:11 78:25
87:4 200:5
204:12 205:8
206:18 270:12
282:9,24
283:14 285:5
287:6 304:4

**earlier** 30:17
69:7 74:23
75:1 79:14
84:13 93:21
97:2 107:20,23
119:8,19
120:8,18 121:9
136:14 147:1
150:22 155:23
183:6 184:14
190:3 204:4
237:8 258:16,

21 259:18
263:17 281:5,
21 293:20
294:22 297:15
303:17

**early** 275:6

**earning** 192:24

**easier** 257:7

**economic**
155:12

**effect** 18:7,10
25:9 63:18
66:8,11 73:17
89:20 107:25
108:2,17,24
119:10 126:4
133:21 134:6
149:10 150:1,
6,8 168:14
177:7 186:14,
15 203:23

**effective** 18:4
31:10 37:22
41:5,6 64:4
73:24 88:25
119:4 126:8
133:14 134:2
148:4,22
149:18 267:13

**effectively**
176:3

**effort** 39:21

**efforts** 40:12
12

**ego** 297:2

**eight** 100:25
101:1 110:12,
13,17 113:8
244:14 292:3

**either** 15:19

17:3 43:8
95:11 185:2,21
187:10 202:13
216:18 248:25
300:17

**electronic** 60:3

**else** 11:3 12:8,
15 13:24 14:8
26:21 29:17
34:3,5 65:18
99:2 125:25
134:18 160:4
170:18 173:3,
16 174:3
178:12,24
179:13 181:23
185:7 186:3
187:23 220:6
234:20 297:10
302:2

**email** 106:16
114:11 116:1
219:24

**emergency**
143:25 173:18
179:20 261:5

**employ** 40:5,12
122:23 247:3

**employed** 94:1
105:4 117:25
122:21 123:19
178:6 179:8
185:3 187:11
202:13 245:11,
12 264:9
267:23 271:16
279:21 280:4,
18,19 281:11
300:2

**employee**
15:12 181:15
233:12 239:9,

12 247:24
271:15,16,18
273:1 276:7
292:4,7

**employee's**
176:20,21
278:20 279:3

**employees**
15:8,15
117:13,17,18
122:20,24
123:2 174:13,
18,21 239:14,
15,19 246:24
247:22,25
248:6 255:12
257:4 259:25
260:4,6,10,14,
17,20,23,25
261:3,10 262:2
263:4 264:8,
10,15 275:9,22
276:7,8,14,21
280:2,23
281:1,2,7,15,
16,18 290:15
294:20 295:12
296:17, 297:23

**employer**
260:15 280:6

**employment**
14:24 15:1,2,4,
9 21:4 40:3
71:11 72:3
97:4,10,17
101:5,18 106:2
109:7 116:23
122:9 148:5,23
165:1,25 166:4
177:15 180:4
233:12 246:24
265:14,18
267:5 271:11



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 99 of 143 PageID 14661

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: employs..exert

277:14 294:19 295:10 296:16 297:8 304:12

**employs** 176:13

**enabling** 241:1

**encouraged** 96:12

**end** 38:22 86:8 142:18 145:2 147:25 165:5 202:21 229:14 260:9 265:21 266:3

**ends** 118:25

**enforced** 180:12

**engage** 255:20

**engaged** 255:19

**enhance** 286:2, 25

**enhanced** 286:1

**enough** 23:1 130:9 183:10 200:1 204:11

**enter** 79:11

**entered** 122:10 135:25 227:11 278:7

**entering** 75:21 252:19

**enters** 21:12

**entire** 35:13 37:2 46:22 63:1 99:16 113:10 118:8

135:7 235:17 282:8

**entirety** 241:9

**entities** 27:25 96:12 259:25 274:10,12

**entitled** 74:13 123:22

**entity** 28:2 123:4,10 141:4 239:1,5 272:6, 22 274:11,12 275:22 277:24

**entries** 216:6

**equal** 175:8 176:19 201:13

**Equitable** 288:1,23

**equivalent** 230:17 304:5

**equivalently** 304:5

**equivalents** 302:3,4

**Eric** 7:1, 72:24 73:4 137:5,10 197:21 265:1,6 305:4

**ERISA** 277:9

**errors** 214:10 290:7,12,21

**establish** 125:20 246:21 260:5 286:23 304:18

**established** 125:14,16 127:21 183:7

237:24 238:5 246:20 247:3 259:5,19,23 283:21 286:1

**establishing** 264:4 272:1

**estimate** 300:18

**et** 33:16

**evaluate** 97:9 130:1 131:6 152:8 153:1 156:16 157:1, 2,16 158:1 160:17 162:11 170:5,19 187:14 201:22 300:19 303:21

**evaluated** 130:11

**evaluates** 109:7

**evaluating** 37:18 55:10 172:20 199:4 303:9

**evaluation** 36:6,7 96:16 158:13,15,18, 19 160:7 191:16 202:18

**evaluations** 159:24 190:4,5

**even** 50:23 70:19 75:14 86:11 112:25 155:16 168:17 195:7 215:20 245:7 272:22

**ever** 8:9 9:22 27:13 42:8

46:19 53:7 62:23 65:20 98:4 123:7 142:3 161:7 166:19 254:16 303:1,4 304:9

**every** 10:21 20:6 40:22 41:4,10,25 45:19 50:16 51:15 82:23 115:19 116:4, 5,6,8,9,14 127:22 131:25 132:7 134:12 142:21 189:15 205:18 214:16 230:1 256:15 273:1

**everybody** 17:22 31:25 78:11 110:1

**everything** 29:4 49:17 81:16 215:23 216:7 269:5 278:23 302:19

**exact** 105:15 217:23 244:20

**exactly** 27:11 34:12 46:4 57:17 136:22 161:10 163:3 192:13 200:16 268:4 290:2 302:4

**EXAMINATION** 8:7 299:11

**example** 18:20

**examples** 54:25 83:21 97:7

101:14

**exceed** 168:9 176:20 177:4

**except** 160:15 225:4

**exception** 225:5

**excess** 124:3, 20 137:17,19 155:21

**excluding** 263:6

**exclusion** 221:14

**exclusively** 89:24 141:5 297:4

**excuse** 73:4 104:22 134:8 136:20 193:7 247:2 276:19 278:5 295:6

**excused** 305:7

**execute** 23:2, 13 24:11 35:25

**executed** 133:19 179:25 180:2,4,11 203:21,22

**executing** 35:5

**execution** 33:14 34:20 49:14 202:19 203:2,17 205:6

**executive** 261:6

**exempt** 248:1

**exert** 297:9



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 100 of 143 PageID 14662

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: exerted..facts

**exerted** 297:3,4

**exhaus-** 29:2

**exhaustive** 28:25 29:3

**exhibit** 9:17,20 16:2,4,5 17:25 18:2,11,18,24 19:16,22 20:18 21:24 25:3,6 26:11 27:15 29:7 31:11 33:19 34:16 35:1,7 47:13 54:10,21 55:16 59:14 62:20, 22,23 63:1,6 66:11 67:10 70:8 73:6,9,10, 17,22,24 74:2 75:6 77:21 79:18 81:13 88:4, 89:14 93:2 96:6 98:1, 3,4,20,21 100:18 107:15, 18,21 108:2, 10,18,20,25 110:10 118:9, 12,24 121:11 122:8 127:13 130:3,12,23 131:7,11,13 133:15,19 134:9 135:3,6 136:16,18 137:15 147:9, 11,12 148:10, 14,16,19 149:15,17 150:9 151:6,9, 12 152:9 153:14,16,19 154:4,8,10,15,

16 155:4 156:1,14,17 157:4,17 158:2,25 160:18,20,23 161:5,8,19 164:18 165:25 166:5,8 167:6, 9,10 170:7,20 172:15 173:1, 14,25 174:6,9, 10 175:13 177:8,10,15,23 178:9 179:5, 11,22,24,25 180:9,14,16, 19,22 181:9,16 182:22,24 185:5,21 186:9,12,14 187:5,14 188:2,4,7,13 189:20,24,25 190:2,18 191:1,6 192:20,22 193:6 195:20 196:13 197:12, 14 198:5,7 201:19,24 203:4 207:5,7, 10,18 208:1,3, 18 209:12 210:7,16 211:6,15 213:18 220:22 221:13 222:1, 2,3,4 223:2,7, 15,18 224:4,6, 7,15 225:21 226:17 229:13 233:5,14,17, 18,22 234:23 235:1,2,7 253:15,18

261:13,16,18 265:8,12 271:9 277:16 287:19, 20 289:5 290:24 291:1,2 296:11

**exhibits** 16:8 154:21 161:4 189:23 190:21 191:13 266:22

**exist** 15:4,6 41:9,11 42:5,7 50:21 180:5 182:9

**existed** 37:17 42:12 46:6,13, 16 93:19 135:25

**existence** 20:10 70:8 103:2

**existing** 47:9 149:12

**exists** 23:9 24:19 29:20 47:5 264:17

**expanding** 117:22

**expectations** 90:17,18 143:15 170:25

**expected** 143:13 183:9 299:25

**expenditure** 136:13

**expense** 144:12 211:2 228:23,24,25

**expenses**

145:4,6 201:21 207:15

**expensive** 39:19 218:1

**experience** 118:4

**expert** 96:13 241:21 242:5, 15 243:6,12

**expertise** 25:17 97:5

**experts** 242:1 244:10

**expired** 277:15

**explain** 111:8 117:11 175:20 274:9

**explained** 45:14 258:16

**explaining** 23:4 177:2

**explanation** 273:4

**exposure** 292:20 293:14, 24

**extension** 148:20

**extent** 53:21 126:17 153:5, 157:6,20 159:10 164:11 170:9 178:13 179:14 184:20 185:8 187:16 205:25 225:1 249:22

**external** 78:2

94:3,23 95:1,4, 10,17 113:16, 19 114:3,20, 23,25 115:3,5 116:17 142:15 255:9 256:25 258:8,17 303:16

**extra** 301:24,25

---

**F**

**faced** 83:4

**faces** 252:23

**facie** 259:5

**facilities** 39:5

**facility** 144:14, 21

**facing** 253:11

**fact** 16:17 31:19 52:7 56:16,24 87:16 91:15 102:11, 23 103:5 104:18 107:23 109:3 134:14 142:11 151:17 201:16 226:12 256:10 260:1 272:2,20 276:12 297:19

**factors** 91:2 143:7 227:1

**facts** 88:16,23 89:15,22 90:10,24 91:7, 20 92:5,20 93:9 103:1 135:24 141:16, 19 196:10 200:21 277:1



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 101 of 143 PageID 14663

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: factual..Fitzgerald

294:16 295:1,7
296:14,22
297:16

**factual** 56:1
251:14

**fair** 31:8 32:13
36:11,15 38:20
44:1,25 45:12
74:18 75:3,6,
16 76:7 77:12,
15,21,23
78:10,13,20,24
79:4,6,11,19
80:1,10,18,20
82:6,15 83:9,
14 88:9 89:1,5,
21 93:22 97:9,
16 101:4,7,15,
17,22 102:3
103:4,21
104:2,10,19
105:9,23
112:24 113:19
114:4 115:3
116:6,7 124:2
126:18 131:20
141:25 155:8
158:13,19,22
160:1,3,5,6,14
172:25 178:7
179:3 185:4,9
190:15 191:10
192:23 193:4,
19 197:11
198:22 201:12
202:14 203:3,
5,16,20,24
204:25 205:3,
9,20 227:10,
15,18 229:10,
20 230:3,8,12
231:2,10,15,20
232:8,15 281:9
285:19 286:4,8

289:12 298:10,
23 299:14,15,
19,22 300:15,
17 301:4
302:7,8 303:9,
14,16,25
304:9,14,19,
20,24

**fairly** 199:16

**faith** 82:18
84:19

**falls** 272:24

**familiar** 73:19
118:20 131:16
133:8 161:15
167:11,16
190:6 193:8

**far** 45:4

**fashion** 94:6

**Favis** 270:13

**February** 7:2
119:15,17

**federal** 55:2,3
106:19 108:21
109:5 251:13
255:5,6 259:9
293:4

**fee** 139:5,13
144:21 228:17
229:4 301:24

**feedback**
178:18

**feel** 23:1 37:4
160:25

**feels** 141:10

**fees** 229:7

**felonies** 279:1

**felt** 241:8

**few** 233:13
265:12 268:7,
16 269:10
287:23

**fictitious** 241:4,
7

**field** 242:1

**figure** 262:5

**file** 80:13

**files** 94:16,18
164:1

**fill** 113:2
243:21

**final** 35:2,6,11,
13,20,25 195:8
196:10 203:2

**finalization**
202:19

**finance** 24:7
26:6,13,16
27:19 32:8
77:25 79:6
109:19 207:16
209:4 219:12
242:2 244:5,7,
16 248:12
249:18

**financial** 14:5
60:15 63:16
65:21 67:16,21
68:9 71:1,6,9,
12 74:20 83:13
140:6,16
145:11 215:22
216:4 243:13
244:10 246:13,
18 247:6
248:1,19
251:2,5,12

252:23 253:4,
6,10 255:25
256:14,16
257:2 258:5,9,
22 293:21
294:5,6

**find** 39:7 120:6

**finding** 251:14
255:18 259:4,9
298:3

**findings** 251:14
254:13 256:5
294:10

**fine** 16:10 17:9
197:18

**finger** 212:20

**finish** 195:4
257:22

**finished** 100:22
194:24

**firm** 113:25
115:8,13
159:23 197:9

**firms** 159:24
230:6,8,11,13
231:2,5,9

**first** 40:15
49:12 59:18
82:12 96:9
110:3 111:4,16
122:8 123:22
181:8 192:21
194:11 200:17,
18 232:17
253:25 255:8
261:17,23
264:5 271:10
278:7,13
296:11

**fiscal** 125:3
161:21 180:24
182:1 198:12
208:16 209:22
214:16 220:22
221:7,25
222:9,17
224:1,17,23

**fit** 71:14

**fits** 84:3 303:25

**Fitzgerald** 7:18
8:8 9:18 12:24
16:3,6,13,18,
25 17:7,9,13,
18,21,24 23:3,
24 24:5 25:4
26:3 28:22,24
32:19 33:4
34:14 36:21
37:5,16 40:18
42:19 43:1,18,
22 44:6,15
45:2,6 47:8
48:2,4,10,12,
17 49:7,11,22
50:15,20 51:7,
25 52:5,9,13,
19,25 53:14
54:1 56:7,15,
21 57:10,15
58:6,14 59:7
60:25 61:11,20
62:6,19,21
63:2,8 65:17
66:3 68:21
69:5,16,23
70:11,17 71:22
72:9,15,19
73:7 74:8 77:6
80:15 81:6,22
83:11 84:12,
20,25 85:16,24
86:10,15,22



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
*Nationwide Coverage*

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 102 of 143 PageID 14664

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: five..form

87:1,8,21 88:3
89:8,13 90:22
91:14,22 96:1,
4 97:24 98:2,
16,22 99:6,15,
21 100:4,12,17
102:9 103:18
104:8 106:11,
18,23 107:1,9,
12,14,16 114:9
117:14 118:10
120:7 121:1,8,
25 126:6,13
127:20 128:8,
17 129:3
130:10,18
131:4,12
132:2,19,23
133:6,10,13
134:4,16
135:21 136:24
137:1,12
138:11,16,22
139:3,6,15,18
140:1, 143:20
144:3,19
145:7,15
146:7,24
147:10,23
148:3,17
150:21 151:4,
16,21 152:24
153:11,15,23
156:8,13,22
157:14,24
158:7,21
159:4,17
160:21 161:5,6
162:2,22
163:2,8,14,20,
23 164:7,16,24
165:7,9,19,23
167:7 168:5,22
169:5,16,24
170:4,15

171:4,17,23
172:3 174:7,25
175:6,15,17,21
177:11 178:5,
179:23 180:3,
17 181:5,20
182:23 183:12,
16 184:8 185:1
186:10,21
187:22 188:3,
16,25 189:3,
10,21 190:1,
19,24 191:2,7,
8,14,20 192:4
194:6,25
195:21 196:7
197:13,18
198:3 200:9,23
201:17 202:11
203:13 204:8
205:19 206:16,
21,25 207:3,8
208:19 210:6
212:2,6, 218:9,
15,25 220:2,13
221:5 223:3,
16,20,23
224:13 225:4,9
226:2,21
227:25 228:16
230:25 231:8
233:9,15
234:13,24
235:12,16,20,
25 236:9,17,23
265:11 299:12
301:11 302:16
303:6 304:8,25

**five** 47:16,17
96:5 108:14
232:3 242:12
244:4,18,19,20
262:2 263:11
264:20 265:6

289:23 298:17,
21 305:3

**fix** 216:6
227:19

**fixed** 127:22
198:23 204:4,7
214:24,25
224:12 301:21

**flat** 41:5,6

**flip** 18:17 19:6
181:24 212:19

**Flipping** 261:22

**Florida** 50:24
237:25 238:10
248:1,3 255:4
259:24 260:4,8
264:11 275:19,
24

**flow** 65:5 124:6
215:25

**flows** 65:10

**focus** 30:23
83:10 285:24

**folks** 26:1,4
31:22 35:9
45:16 46:24
47:1 94:4
105:14,19,24
142:16 152:2
185:12 201:15
231:7 247:1
261:12 282:10
287:14

**follow** 255:3
279:19 284:23

**Follow-ups**
305:1

**followed** 31:25
37:14 38:4,6

45:13 101:25
121:21 172:2

**following** 32:24
33:13 34:19
226:12

**follows** 58:8
139:21 154:19
277:8

**force** 180:10

**forecast** 253:4,
6,10

**form** 12:23
22:21 23:23
24:2 25:24
32:6 33:2
34:11 36:18
37:1,12 40:17
42:13,22
43:16,20 44:3,
11,23 45:5
46:20 48:8,24
49:10,19 50:9,
19 51:3,22
52:3 53:12,19
55:24 56:11,17
57:3,14 59:3
60:21 61:4,15
62:1 65:23
68:14 69:1,10,
19 70:9,14
71:18 72:5
76:25 80:4,13,
25 81:18 83:17
84:16,23 85:5,
21 86:4,12
89:7,10 90:1
91:9,13,16,18
97:19 98:14
102:4,13
103:23 104:1,3
114:6,13 117:8
120:21 121:4,

13,22 126:5,11
127:14 128:6,
13,24,25
131:24 136:19
143:22 144:6,
23 146:12
148:15 150:16
151:2,13,19
153:20 156:2,
12 157:5
161:22 164:19
165:15 168:2,
19 169:3,13,20
170:2,8,22
171:7,20,25
172:7,8 174:20
175:3 181:1,17
182:15 183:4
184:5,19 185:9
186:16 188:12
190:17 191:25
193:21 196:2
198:18 200:15
201:2 203:9
204:6 205:10
209:25 218:7,
13 219:25
220:10 221:3
224:25 226:1,
18,24 228:12
230:10 233:6
234:11 236:3,
13,21 249:14
250:12 251:8,
17 253:1,12
255:23 256:7
258:13 259:6,
10,16 261:19
263:25 267:22
268:14 269:20
270:4,14 271:6
273:10 274:14
275:12,23
276:10,22
277:20 278:22



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 103 of 143 PageID 14665

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: formal..give

279:9 280:25 283:7,18 284:13 285:10 286:15 288:5, 20 291:4,17,24 292:10,23 293:8,17 294:11 298:6, 12 301:5 303:3,19

**formal** 250:11, 14

**formalized** 110:4

**format** 51:18 65:5 93:16 101:12 104:1,2 114:10,11 117:2 161:10, 12,16 162:12, 13,21,25 163:5 172:6,8 189:3 208:5 209:9

**formation** 244:16

**formed** 110:3

**former** 281:22

**forming** 292:21 293:15

**forms** 116:1 276:8

**forth** 45:25 64:21 65:5,6, 10 83:8 123:6 143:10 144:1 173:20 280:9, 12 294:24 301:20 302:25

**forward** 49:13 59:22 123:12

**Fos-** 218:10 229:19

**Foster** 12:14 13:15,25 14:7, 10,14 77:25 78:12 79:2,5 80:19,24 81:14 82:6 83:15 84:7 93:2 109:25 159:20 208:1,4,6 209:8 218:6,8, 11 220:18 229:16,19 230:4 304:15

**Foster's** 12:17 13:5 81:15 218:18

**found** 202:3

**foundation** 104:6 235:10 236:4 292:11

**four** 47:16 108:10,11,13, 14 110:7 119:2 150:11 163:13, 18 175:11 176:22 198:1 255:7,8 263:11,12,13 264:25 298:17, 21

**fourth** 112:18, 21,23 113:3 211:5

**frame** 269:3

**framework** 39:11

**Francoti** 240:8, 18 241:19 242:10,14

250:1

**fraud** 225:5 249:13 250:8 251:7,15 255:11 257:3,8 258:11,23 259:2,3,5,13

**fraudulent** 255:20

**frequently** 40:21

**Friday** 234:1

**front** 63:3 88:6 163:12 200:22 210:2 220:21 231:24 268:18 287:19,20

**FRS** 260:4

**FTES** 247:23, 24

**full** 19:17 77:5 91:3 100:24 112:2,24 170:13 195:11 244:7 245:9,10 252:11,12 287:17

**full-fledged** 113:3

**full-time** 112:23

**fully** 40:12 141:13 179:15 249:19 260:1 294:13

**function** 57:20, 21 91:24 246:17,19,22 247:21

**functionally** 104:6

**functions** 91:12

**funding** 200:4

**funds** 200:1 204:11,16,17, 18

**funneled** 77:24

**further** 221:21 283:9,11 299:9 304:25

**future** 76:18 299:25 300:14

──────────

**G**

**G-o-o-d-e-m-o-t-e** 240:23

**gaining** 185:24

**gaps** 113:2

**Garthwaite** 12:7 14:1,14 202:23 207:22 220:18 229:17 233:8, 24 234:3,18 282:20 285:14 286:13

**gather** 31:7

**gathered** 32:17 79:1 206:2

**gathering** 173:5

**gave** 14:7 39:10 65:14 147:4 194:15 286:14,17,22

**general** 14:3,4, 12,18,20 27:21 28:8,11,15

29:1,6,21 36:1, 14,23 37:10 48:7,19 49:13 53:17 54:3, 55:9 59:21 76:9 87:3 111:25 117:9 142:22 161:13 164:21 181:22 208:7 209:6 214:4,5,6,10, 23 216:1 220:20 227:18 246:11 260:2 275:19 277:3

**generally** 14:11 131:16

**generate** 146:8 152:21

**generated** 164:17,25 189:11 209:21

**generating** 217:9

**George** 16:16 64:23 66:13

**Gerry** 304:9,13, 17

**gets** 20:8 143:1 205:14 255:2 302:21

**getting** 176:4 205:17 248:9 285:22

**Giles** 240:8,16, 17

**give** 7:14 24:23 83:20 112:1 140:22 177:8 178:3 208:22



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 104 of 143 PageID 14666

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: given..hand

212:21 213:17
246:25

**given** 208:15
222:2

**gives** 278:18

**Glenn** 240:7,13

**goal** 38:17
112:19 129:11
260:9 264:14
287:12

**goes** 82:22
83:7 100:2,16
111:17 113:4
165:19 208:13
218:15 249:16
286:4

**good** 8:9 31:3
82:17 84:19
107:11 167:1
197:16 252:25

**Good-something**
240:22

**Goodemote**
240:9,23

**gosh** 110:5

**got** 45:18
106:12 160:23
197:2 212:22
218:20 227:18
237:8 240:12
242:14 263:15
283:23

**government**
10:20 238:24
254:14,25
255:4,6 274:21
275:22 277:2,
8,11

**governmental**

238:25 239:5
259:25 272:22,
23,24 277:7,
10,24

**governments**
260:3

**governor**
238:9,11
280:17

**great** 10:8
124:15

**Griffin** 109:24

**gross** 145:11,
13,20,21,22
146:9,14,15
211:8

**ground** 8:19

**group** 35:8
40:12 76:10
78:22 110:4
112:20 116:22,
24 192:18
196:15 201:10
226:9 227:14
231:16 261:12
282:8 287:14
289:10

**grouped**
116:22

**groups** 39:1

**groups'** 41:1

**guarantee**
89:17 199:20

**guess** 64:25
80:7 93:3
109:2 126:7
194:2 247:21
263:10 275:7
281:13 294:25

300:5 304:11

**guessing** 81:25
298:20

**guidance** 24:23
31:21 36:5,11
88:15

**guide** 26:7

**guys** 17:10

**GYN** 116:21

_____

**H**

_____

**hadn't** 133:12

**HAL** 163:22

**HAL-1** 163:3,22

**half** 72:20
192:25

**Halifax** 7:21,22
8:1,2 10:1
14:23 20:22
22:18 23:4
26:24 27:4,13,
24 28:2 29:21
35:11 40:14
42:21 43:12
45:14 46:23
54:8 57:7
60:20 61:3,25
72:14,16 73:21
91:25 92:4
93:8 94:1,13
95:17,20,22
96:12 97:16
101:4,6 105:4,
21 108:3 109:8
112:12 117:5
119:21 122:10,
12,13,14,19,22
123:2,3,8,9,14,
15,19 127:10
128:22 129:5,

9,14,16 131:5
137:20,21,25
138:2,5 139:7
140:6,17
141:2,3,6
143:21 144:1,
4,11,13,20
146:8,16,17,20
147:7 152:25
157:1,15,25
158:23 159:2
160:17 162:24
164:9 169:19
170:18 173:22
174:21,23
175:11 176:7,
9,11,12,13,14
178:7 179:3,9
180:5,8,20
181:4 185:3,4,
21 187:6,8,11
188:5,24
191:16,23
193:2,9,14,18
194:7 195:2,24
196:13,19,20
199:8 200:24
201:8 202:13,
14 203:6
209:22 211:20
224:22 225:15,
19,25 231:2,9
236:19 237:11,
17,23 238:4,
12,21,22
239:3,10,12,
16,20,22,25
240:4 241:3,
12,15 243:13,
23 245:25
246:15,24
247:4,16,19
248:4 251:12,
15 255:19
258:6,9 259:19

260:12,17,21,
23,25 261:3,19
262:2 263:4,
21,23 264:9,
10,17 265:18,
22 266:4,8,9,
12,14,15
267:11,19,23
268:10,22,24
269:17 270:7
271:11,18,20,
21 272:3,8,9,
10,12,16,17,
18,20 273:7,
15,16 274:13
275:10,16,20
276:4,7,20,21
277:4,7,19
278:8,10,17,19
279:3,22,25
280:4,24
281:6, 283:11,
12 285:13,25
286:10,22
290:6,16
292:6,18 293:2
294:17,19,20,
23 295:8,11,12
296:8,15,17,18
297:3 304:12

**Halifax's** 27:21
42:12 51:1
88:22 100:21
104:18 134:24,
25 137:22
164:6 186:22
282:23 283:5
285:24 286:9

**Hall** 232:13

**hand** 7:12 73:8
180:18 189:22
208:20 261:15



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 105 of 143 PageID 14667

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: handed..horizontal

**handed** 9:19
25:5 118:11
190:21 198:4
223:20 224:4
265:11

**handing** 62:22
98:3 107:17
131:13 147:11
153:16 160:22
174:8 182:24
186:11 188:4
197:14 207:9
223:17 233:16
234:25

**handle** 106:17
111:15 247:9

**handling** 94:4

**happen** 16:12
40:22 81:21
206:6

**happened**
45:24 82:1
102:18 159:12

**happening**
45:25 227:2

**happens** 17:19
82:5

**happiness**
226:20

**happy** 9:10
167:3 222:2

**hard** 200:16
265:25

**Harold** 240:9,
22

**hasn't** 82:1
194:25 235:17
257:11

**haven't** 56:22
96:2 131:18
190:9 222:2

**having** 41:4
51:16 76:11
83:4 114:1
115:18 125:23
230:1 301:3

**he's** 104:1
109:24 133:8
184:11 194:19
195:2,15
218:16 230:22
235:12,14,16
245:12 246:2
257:24 278:3
291:13 295:6

**head** 102:12
263:14

**headers** 18:20,
21

**Health** 20:22
96:12 241:3,12
246:22,23

**healthcare**
145:13 146:14
192:17 196:14
232:9,13,19
238:1

**hear** 68:19
140:13 248:15

**hearing** 286:5

**held** 14:6
75:10,11

**help** 32:17 39:7
95:23 144:10
185:13 203:14

**helpful** 31:2

**helping** 223:22

304:18

**hematology**
116:20

**here** 19:8,18
21:24 26:23
29:7 43:8
44:10 46:3
54:9 55:4,7
56:1 63:11
64:14 66:9
71:13 93:7
95:16 97:13,15
98:11 101:9
105:4,21 106:7
112:13 119:18,
19,24 121:3,
11,19,21
127:7,10
131:22 132:1,
4,25 134:2
136:9 142:12
147:16 149:9
150:4,5 154:25
161:24 162:4,
164:8 168:12
174:1 178:3
181:23 186:22
189:19 190:7
191:23 193:8
194:18 196:1
197:5 200:24
209:19,20
211:18 213:22
218:21 225:15
233:11 235:5,
16 236:18
237:10 249:5
255:25 256:22
259:9 264:22
265:21 266:1
269:6 288:16,
21 292:9,22
293:16 295:21

**here's** 47:4
189:23

**herein** 278:9

**hereinafter**
176:15

**Hernacki** 8:5
16:10,20 17:4,
8,15,19,22
218:20 237:6,8
240:24 249:16,
24 250:16
251:11,19
253:8,16
256:3,19,21
257:11,15,21,
24 258:3,4,20
259:7,11,17
261:14 264:2,
22 265:9
266:24 267:1,
24 268:21
269:22 270:10,
15 271:8
273:13,21,25
274:4,6,18
275:15 276:1,
15 277:12,21
278:4,25
279:15 281:4
283:10 284:1,
17 285:12
287:3 288:6
289:20 290:25
291:19 292:2,
13 293:6,10,25
294:15 295:6,
19,24 296:6
298:9,18
299:2,9

**hey** 200:19

**high** 117:21
249:22

**higher** 128:4
184:3 262:10

**highest** 38:22
82:25 112:5
142:18 201:13
261:9,11
262:2,15
263:3,5

**highly** 49:4
261:2,7

**hire** 131:5
152:25 157:15,
25 158:23

**hired** 112:21
160:17

**hiring** 113:2

**historical**
299:24 300:5
303:8

**historically**
230:6

**history** 232:5
300:18,19

**hits** 214:22

**hold** 208:23
212:20

**holders** 256:17,
18 258:19

**holding** 41:5,6

**Homes** 245:19

**honest** 62:10
63:13 166:21
223:11

**honestly** 17:1
43:3 61:18

**horizontal**
161:12



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 106 of 143 PageID 14668

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: hospital..I'm

**hospital** 7:22 10:2 14:23 15:13 27:24 38:8 39:10 41:24 43:9 57:8 60:20 61:10 86:16, 17,20,23 87:9 91:25 92:4 103:15 108:3 117:23 121:15 122:19 123:3, 15,19 129:14, 17,21 137:25 138:17 139:7, 21 141:14 142:12 143:19 145:9 146:11 152:20 169:10, 14,17,22,25 177:21 184:24 187:8 216:17 237:11,17,23 238:19,22 239:12,16,20, 22,25 240:4 241:15 243:13, 16,24 245:25 246:5,10 247:15,16,18, 19 248:16 249:13 250:11 251:15 252:3, 15,23,24 253:11 257:2 258:11 259:19, 20 261:1 263:20,23 264:11 267:5 268:10,22 271:21,23 272:9,10,12, 16,17,21 273:7 275:1,22 276:21 278:10

279:12,25 280:4,15,16,24 281:6,12,14, 17,19 282:12 290:6,14 291:23 293:3, 11 294:17,20 295:1,8,12,15 296:8,15,18,25 297:20 298:4 301:15

**hospital's** 241:10 275:16 286:10

**hour** 72:20

**hours** 65:25 102:24 111:15 142:13 143:3

**Houser** 242:6, 16 245:14

**how** 17:2 21:19 22:23 26:17 34:13 40:21 41:7 44:13 45:14,15 52:5, 13 54:16 62:5, 8 65:10 78:5 81:20 82:2 91:13 106:16 112:13 120:18 121:2,14 124:1 132:13 136:3 139:11 140:6, 16 141:11,14 163:4 183:7 199:25 205:7, 13 206:5 216:18 218:1,5 231:19 239:15, 18,19,25 240:18 242:8 243:23 244:1

245:4 247:22 260:16,17 261:7 276:6 280:7 297:22 301:2 302:5 303:7

**however** 60:5 79:7 201:14 229:8 256:13 270:25 285:21 286:6,21 289:16

**human** 41:19

**hundreds** 214:20 269:7

**Hunter** 174:16

---

**I**

**I'd** 21:21 47:16 52:21 54:19 70:21 74:7,10 82:1 88:13 108:5 110:9,10 119:14 122:7 123:21 124:7 135:2 165:4 166:7 167:22 181:8 192:19 194:22 211:19 217:12 222:25 223:10 226:3 228:1 244:20 268:2

**I'll** 9:4 40:19 52:23 61:21 82:8 83:18,20 90:2 97:14 99:13 108:8 111:19 117:11 136:25 140:24 149:20 177:8

185:17 187:18 218:24 224:25 247:5 257:17 258:3 265:13 273:6 299:3 301:14

**I'm** 8:20,21 11:24 15:16,22 16:5 17:9 19:8 22:1 25:14 26:13 27:3 29:18,23 34:22 37:6,23 38:8 42:9 43:11 44:5 45:3,10 48:13 52:19,21 53:10,19, 56:24 57:13 58:5 59:4,9,25 62:4 66:12, 68:16,17 69:7 71:18,25 72:5, 12,13,17 73:8, 19 76:3 80:5, 10 81:25 87:20 88:21 90:5 92:15 95:20 98:19 103:17 105:14,24 107:4,17 114:23 115:15 118:17 120:4 122:15,17 123:8,18 131:13 133:10, 23 134:1 136:4,23 139:10 140:23 141:5,7,23 142:8 147:2,5, 11,23 148:6 149:13,23 150:3 153:13, 16 157:22

158:4 160:6,22 161:3 162:7,12 166:20 167:2, 8,16 172:13 173:8,25 174:4,8 175:9 176:10 178:18 180:6,18,24 183:17 186:11, 18 187:4,12 188:4,14,18, 189:22 190:6, 11 191:4 192:6,12 193:5,7,8,14, 15 194:14 196:4,5,16 197:14 202:5,9 203:11,25 205:4 206:1 207:9 208:1,20 209:19 212:1,4 217:16 218:1 222:2,3 223:17 224:5 229:3 233:1,16 234:25 237:7 241:25 242:7, 10,11 243:21 249:9 250:13, 24,25 254:11 256:19 257:17 258:6 259:8 261:7,15 262:5 265:25 266:9, 17,25 268:10 269:6,11,13 270:6 273:12 274:8 275:5 276:17,19 278:1,5,12 284:7,22 286:5 288:21 290:3, 20,23 291:19 295:20,21



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS    Document 281    Filed 05/29/13    Page 107 of 143 PageID 14669

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: I've..independent

298:14,15,19,
20 300:7 302:4

I've  25:5 38:7
44:24 45:11,14
46:23,24 56:19
118:11 147:17
161:9 164:8
190:12,13
198:4 212:22
218:21 219:8
223:20 235:24
237:8 240:18
265:20 269:21
270:5 276:16
294:13 296:22

i.e.  33:15

ICI  245:19

idea  289:1

identical  226:7

identification
9:17 16:2 25:3
62:20 73:6
98:1 107:15
118:9 131:11
147:9 153:14
160:20 174:6
177:10 179:22
180:16 182:22
186:9 188:2
189:20,25
197:12 207:7
208:18 221:9
223:2,15
233:14 234:23
239:9,13
260:15 261:13
265:8 290:24

identified  21:5,
14 22:5 67:18
101:9,23
104:14,17,20
106:4,13

107:10 109:3
110:17,22
111:7 113:8
116:3 119:8,19
166:21 174:1
177:23 180:14
181:15 192:2,
17 195:3
203:15 221:12
303:17

identifies  191:5

identify  25:19
49:1 50:13
104:9 105:1,5,
7 108:19
127:18 132:24
154:8 173:12,
21 174:1
178:6,16
179:2,8,17
185:2,16,19
187:10 192:7
196:1 200:11,
13 202:12
207:25 230:3
231:1 290:21

identifying
50:12,21 95:24
173:22

image  241:11

imagine  155:14

imaging  216:16

immunity  273:2
290:19 293:4
297:20 298:1,4

implementation
75:6 88:15
300:8

implemented
59:25

important  8:23
23:1

improve  284:16
286:25

improvements
287:13,14,18

improves
287:15

in-house  152:1

inability  279:2

inaccurate
263:24

inappropriate
157:13

inarticulately
297:14

Inc  119:21
122:11,13,14,
22 123:15
176:7,11,15
238:12 239:3,
10 259:19
260:18,21,24
261:3,20
263:4,21
265:19 268:25
271:12,18,20
272:4 275:10
276:4,7,21
277:4,19
278:8,17,19
279:3,22
294:20,24
295:11 296:17,
24 297:4

incentive  80:21
124:24 125:13,
21 126:16
127:21 128:4,
10,19 136:15

137:13 150:23
154:20 155:24
157:13 161:20
168:24 169:1
175:8,10
176:1,19 177:5
182:12 184:16
188:9,19
189:13 198:15
200:13,25
201:23 202:3,
15 203:8 204:4
209:10,16,23
220:9,16
222:20 223:9,
25 224:16
225:11 226:16
236:12

include  32:8,
10,13,14 35:17
55:2 68:5 78:2
84:21 85:1,2,3,
7,14 90:10
103:12 130:7
135:24 155:6
216:15,16
252:22 253:11
254:2 261:5
279:11

included  13:13
31:19 32:13
41:18 47:7
55:4 58:22
67:8 81:4 84:3
102:1,23 103:8
136:1 157:11
172:10 207:23
211:13,18
213:22 218:12
220:25 221:6,7
222:13 256:14
261:11 288:20
289:3,19,24
297:22

includes  50:23
90:11 136:2
221:14 230:13
241:18 256:16
302:9 303:25

including  14:14
29:10 32:25
35:15 67:5
68:3 102:16,17
105:12 117:15,
16 122:21
142:6 156:23,
24 164:9
170:16,17
237:12 243:2
268:25 297:17

inclusive  156:6

income  145:8,
10,23 146:9,
14,15 147:2

incorporate
116:23 186:6

incorporated
103:5,16
229:24 230:20
246:14,18
247:7 264:10

incorrect
295:14

increase  45:21

increased
155:12,17
227:5

incur  144:12

indeed  264:10
289:25

independent
83:13 96:11,16
97:8 116:24
190:3,4,15



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS    Document 281    Filed 05/29/13    Page 108 of 143 PageID 14670

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                  VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                        Index: independently..into

191:10,16
280:3

**independently**
84:5

**indicate** 121:11
122:2

**indicating**
120:13

**indication**
121:13 151:15
194:13

**indirectly** 144:5

**individual**
13:19 23:6
24:20 27:2
57:24 75:11
87:5 110:24
124:6 126:25
127:11 160:17
192:7 200:11
279:17 302:15,
23

**individuals**
20:20,24,25
21:3,14,25
35:10,19 43:6
104:10,14,17
105:2,3,7,22
109:21 126:20
157:2 170:19
172:25 173:12,
22,23 175:11,
24,25 176:3,23
178:6 179:2,8,
17 185:2,11,19
187:10 202:12,
22 203:15
242:4 264:9
280:22 281:10

**industries**
145:14

**industry** 89:9,
17,25 230:18

**inform** 219:23

**informal** 11:17

**information**
14:6,7,8,13,18,
20 23:14,16
31:5,8 32:17
38:13,14 39:4
40:14 41:13
42:16 45:18
46:25 53:22
64:20 65:4
67:7 71:21
72:8 75:22
78:6 79:1,21,
24 82:17 84:5,
7 94:8,9,14
95:3,5,18,21
96:3,24 102:15
104:5,24
106:21 107:5
111:25 114:2,8
115:6,9,
119:11 121:10
127:19 135:23
153:6 157:8,21
159:11,15
161:9,13,15
162:4 164:23
172:2 173:5
178:13 179:7,
14 185:9
187:18 194:13
195:6, 196:11,
24,25 197:1,2,
3,5,10 202:8,
22 206:1
216:11,12,13
220:19 221:6
225:3 230:20
248:16,20
252:6,10

254:16,25
255:16 258:15,
16,18,19
294:17 295:1,8
299:25 300:6

**infusion** 217:20
228:11,13

**initial** 50:10
70:3,6 79:12
120:9 193:23

**initialed** 120:12

**initially** 192:2
227:11

**initials** 134:18,
20 151:8

**INP** 213:8,10

**inpatient** 13:12
211:9,13,16,18
213:11,21,24
214:4 215:10,
20,24 217:21,
24 218:11
221:6,7,9,15,
16 222:12,16

**input** 26:22
77:4 178:25
186:4

**inside** 174:22
217:6 250:21,
23 272:3,18

**insofar** 14:17

**instance** 22:15
302:22

**instances**
96:21,22

**instead** 82:4
112:22,24
254:14 302:17

**institutional**
256:18

**instruct** 53:20
71:19 72:6
99:19 153:4
157:19 170:9
187:19 191:4
202:6 225:1
273:25 274:2
295:17

**instruction**
72:11

**instructions**
71:24 72:1

**instructs** 13:1

**instrumentality**
122:15,18
239:7 272:2
274:17 276:5

**insurance**
245:23,24
246:2,4,7,9,11
290:7,11
291:5,6,10,20
292:6,19
293:12 294:7

**intends** 295:9

**intent** 40:5,8
48:25 49:6
168:20 236:15
286:21 287:5

**interactions**
64:21

**interacts** 231:7

**interest** 71:7
243:13

**interested**
258:7

**interests** 71:2

**interim** 271:4

**internal** 31:22
54:8 94:4
172:18 200:8
224:22 255:13
257:5 261:20
276:9 281:8
304:17

**internally**
229:25

**International**
245:15

**interpret** 91:19

**interpretation**
145:23 275:14,
17

**interrogatory**
99:1,11,25
100:7,19,20,24
101:3,9 103:20
104:9,18,21
105:10 106:20
110:10,11,12,
17 113:8

**interrupt** 278:2

**interrupting**
133:7

**intervention**
15:11 30:22
67:19

**interview** 11:14

**intimate** 91:1

**into** 21:12
25:18 26:22
33:6 38:15
40:7 59:18
67:13 71:14
74:16 75:21



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 109 of 143 PageID 14671

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: introduce..just

76:10 77:12
79:11 82:22
83:5 111:17
113:4 122:10,
25 126:4
135:25 142:10,
16 143:7 144:1
181:14 209:9
227:11 228:19,
21 229:25
230:21 236:8
252:19 259:25
260:10 264:15
278:8 303:25

introduce 7:9

investigation
219:8,10
249:20 259:1

investment
71:2 248:21,23

investments
71:7

involve 206:8,
10,11

involved 11:24
13:21,24
14:15,17 26:9,
10,14,19,20
27:4,12,14
41:16 45:13
55:10 78:16,23
79:5,6 84:14,
18 85:19 86:2,
7,9,18,23,24
87:7,11,13,14,
18 96:19
105:16,17,19,
22,24 106:3,5
110:24 111:1
125:20,22,25
126:15 127:11,
17 135:12

142:23 143:1
150:14,19
196:21 200:20
201:4 202:17,
21 232:14
233:3,10,19
234:9 246:3
251:24 281:10
287:15 291:13
304:18

involvement
234:16

involves
255:12 257:3

involving 67:16

IRS 239:21
272:1,25
274:13,16,24,
25 275:9
276:3,13
297:17

isn't 22:13
26:24 43:9
44:2 46:8 49:9
73:21 108:25
113:14 120:9,
19 122:4
128:22 129:5,
14 147:21
169:10 184:4
203:18 228:9
229:5 273:23
298:5

issue 66:16,17
95:25 166:21
186:7 252:21

issued 252:3,9
291:6

issues 29:5
50:14,18,21
138:10

it's 8:23 17:5,
10,20 18:3
22:25 23:13,21
30:6 35:19
49:4,16 54:18
61:9 63:20
67:23 70:5,10
71:12 73:18
79:15 80:3,10,
12,24 81:16
82:10,25
83:19,20 84:18
90:19 92:25
97:2,13 98:14
99:7 106:5
107:25 108:6
112:4,25
113:1,20
117:18 118:5,
16,24 122:18
123:19 126:8,
21 129:24
130:6 134:24,
25 137:22
138:18,23
139:3,22
143:13 144:9,
25 145:5
146:13,23
147:22 148:1,
2,11,16 154:2
161:3,5,11,13
165:7 166:14
168:7 171:15,
16 177:2
180:19 181:24,
25 185:17
186:8 187:2
192:17 194:15
199:21 200:16
201:12,13,19
204:3,10
207:14 208:5,
7,23 209:6
212:7,13

213:11,24
214:3,17,19
215:6 216:13,
14,17 217:9
219:4,6,9
221:17,18,24
232:18 233:25
236:23 238:1,
24,25 239:5,6,
7 241:5 244:3,
4 249:3
251:23,25
254:4,9 255:1,
24 258:16,19
265:20 269:19,
271:23 272:6,
7,22,23 273:3,
18 274:25
276:14,23,24
277:3,4,6,8,9
278:16,23
280:4,19
282:2,8 283:1,
2,3 288:25
290:3 291:24
298:15,16
300:6 301:17
302:7,11,18,22
304:3

item 11:20,21
253:25 255:7,
10,11 278:16
279:7 288:1

items 28:25
29:7 107:10
279:14 297:11

its 27:25 36:20,
22 144:14,15
237:13,25
275:20 277:24
292:6,20
293:14 295:9

itself 76:18
112:11 229:6,7
258:23

_____

J

Jans 240:7,14,
15

January 18:9

job 55:21 279:2

John 240:7,13

Johnson 240:7,
13

join 40:7

joining 40:16

joint 71:2,7,10
97:3 237:14

journal 216:6

Judge 255:18
259:4 294:10

judge's 259:9

July 119:5
125:12 133:16,
22 148:12
149:24 188:10,
20 270:23
271:5

June 188:10,
11,20,21

jurisdiction
50:24

jurisdictions
293:5

just 7:23 9:10
16:16,21 17:4,
14,17,18 23:11
28:18 32:20
34:6 39:3 40:6



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: Justice..laying

47:20,24 48:5,
10,18 49:4,18
54:20 56:23
57:18 64:2,20
65:4,14 68:17
69:7 72:17
76:13 80:23
81:15 87:2
88:19 89:5,12
90:3,4,7,15
97:4 102:5,12
106:14 107:7
111:24 113:11
116:2 120:22
123:10,12
128:15 133:1,9
134:24 136:10,
25 139:15,16
141:8 142:4,5
147:3,20,22
154:6 160:9,25
163:10,25
165:10 166:23
169:7 177:8
184:13 192:9,
11 195:24
199:20 200:21
205:7,20
208:23 215:12,
14 216:19
217:14 219:23
228:8 229:3,4
231:13 235:14
244:6,7 245:3,
4 247:14,15
256:9 260:16
261:9,25
263:7,12,13,
15,16 265:10,
11,12 268:10
274:1 280:5,22
282:6 284:7,22
285:21 287:23
288:15 294:1
295:6,19

298:20 299:2,
13 302:8

**Justice** 7:19

_____

**K**

**Karen** 240:7,13

**Kargar** 242:7,
245:16,17,18

**Katherine** 8:5
17:12 237:7

**Kaufman**
232:13

**Kearby** 8:1
258:24

**keep** 17:14
42:21 45:23
112:13 133:6
161:1 212:6
224:5 264:16

**keeps** 129:21
138:17 139:21

**Kelly** 68:1
262:23

**kept** 42:17

**Khanna** 80:16
101:23 119:22
122:11,13
125:10 128:9
129:13,17
130:2,12,22
131:6 133:22
135:19 137:16,
24 138:18
139:9,22
140:5,7 142:2
143:21,24
144:2,5,9,17,
22 146:9,10,18
147:8 149:6

152:9 153:2
155:19 156:17
157:3,16
158:1,24
160:18 161:20
163:24 168:17
171:10 180:24
183:2,24 184:3
192:24 262:3
263:1

**Khanna's** 97:17
101:5,16,17
128:23 129:6,
24 135:5,13
137:21 150:15
153:19 168:1,
24 170:25
192:23 193:3,
19

**kind** 58:2, 81:9
93:16 117:5
159:6 211:20
227:6

**knew** 205:12

**knock** 85:8

**knowing**
183:19

**knowledge**
27:20 56:2
57:5,6,18
179:1 185:24
190:13 197:7
230:21 294:14

**knowledgeable**
193:15 266:18

**known** 66:13

**knows** 95:20
200:18

**Kuhn** 167:4
168:16 170:1,

6,20 174:13
175:7,9,23
177:4 178:8
179:4,11
180:5,13,24
182:3,12,14
183:2,24 184:3
262:4 263:1

**Kuhn's** 168:25
169:11 171:19
172:5 174:18
177:14,15

_____

**L**

**lab** 216:16

**lack** 236:3

**laid** 296:22

**Lang** 104:23
105:7,8 110:25
118:18 121:15,
16,17 125:22,
25 126:15
127:8,16
135:17,22
149:5 150:19
152:13 173:2,
10,15 174:2
178:10 179:6,
12 185:6,22
187:21 201:5
202:20 303:15

**language**
122:16 168:18
256:9

**last** 16:12,14
20:16 33:5
42:24 60:14
65:25 98:9,23
99:8,22 103:19
110:4 165:8
188:15 222:20

233:13 234:1
264:20 268:7,
16 298:10,17,
21

**Late** 275:6

**later** 300:3

**latest** 19:3
73:18 186:20
187:2 265:20

**Laura** 110:25
150:18 201:5
202:18

**law** 55:2,3,11,
13,18 56:5,9
57:2 58:4,11
59:2 108:21
122:24 130:3,
13 131:7
152:10 153:2
156:18,23,24
157:4,17
158:2,11,13,16
159:1 170:7,
16,17,21
187:15 201:25
202:4 294:21
295:2,13
296:19

**laws** 55:3
109:5 156:21

**lawsuit** 8:16
249:5 250:3,6,
8 251:7 274:20
292:9,22
293:15 298:25

**lawsuits** 298:2

**lawyer** 290:20

**lawyers** 167:2

**laying** 76:7



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

**Nationwide Coverage**

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 111 of 143 PageID 14673

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: lays..long

**lays** 76:5

**leading** 203:1, 17

**least** 38:18 39:10 188:15 210:4 244:14 245:6 288:10

**leave** 112:9 258:24

**leaving** 82:21

**led** 233:7

**ledger** 14:3,4, 12,18,20 181:22 208:7 209:6 214:4,5, 6,10,23 216:1 220:20

**ledgers** 161:25

**left** 136:21 199:7,12 201:8 304:12

**legal** 24:7,17 26:5,13,15 27:18 28:5 32:8 33:6 49:1 50:10, 51:17, 20 53:1,8,15 54:23 55:17 56:5,8,25 57:8 58:1,8,25 60:6, 22 61:6,17 62:3 63:17 65:21 66:25 67:21 68:8,12, 20,24 69:2,7, 17 70:2,5 74:19,20,24 75:2,8,10,13, 15,18 76:22 77:14 78:3,16 79:9,18,20,25

80:22,23 81:12,13 82:5 83:12 92:13,21 96:13,18 109:19 120:8, 12,15,19,23,25 121:6,11,14, 18,19 122:3,4, 17 130:1,7,11, 16 134:8,12,25 152:4 156:14, 16,20,25 157:2 170:5,12,19 187:14,20 201:22 202:1 205:11 234:8,9 251:23 273:11, 19

**legal's** 121:10

**legality** 54:24 55:10

**Lepley** 174:16

**less** 39:10 166:8 176:3 183:2,8,24 199:8 289:6

**let** 9:3,8 15:20 28:18 34:6 47:22 64:3 88:20 100:21 115:5 123:12 128:15 132:14 133:2 142:9 145:25 146:16 175:20 203:14 251:1 257:19, 22 258:1 288:7 292:17 294:25 301:12

**let's** 40:19 41:10 58:19 72:20 80:16

82:4 87:21 100:19 111:8 118:23 126:7, 14 137:1 146:21 163:2 176:10 206:21 218:23 236:24 242:14 266:1 270:2 274:4 287:18 295:24 301:12

**letter** 96:7 123:23 194:4 226:6 272:1 274:16,19,23, 24,25 275:8 276:3,13,17, 20,23,24

**level** 14:12 87:14 111:13 112:5,11,14 125:18 142:10 143:6 152:18 155:13,17 183:25 194:20 195:16 247:1 249:22 280:9 304:6

**levels** 39:15 136:2

**leverage** 115:17

**Lewis** 109:23

**liability** 292:18, 20 293:13

**like** 9:7 26:19 29:10,14 37:3 38:23 47:16 52:21 54:19 70:21 77:20 81:16 88:13 93:16 96:5

106:24 107:5 110:9,11 116:16,20 117:2,22 122:7 123:21 124:16 129:7 135:2 143:12 144:16 145:24 152:4 159:7 160:25 162:11,17 163:9 165:4 166:7 167:22 179:20 181:8 186:6 192:19 194:3,22 198:25 199:18 208:9 211:19 216:5 217:12 221:21 226:3 228:1 240:5 247:15 256:11 261:17 264:21 268:19 271:25 273:24 275:4 285:21 289:2,3 298:22 300:7 302:20

**likely** 186:19

**likes** 271:23

**line** 21:9

**Lisa** 12:7 14:1, 2,11,15 164:21 207:23 208:8 209:7 220:5,8, 14

**list** 23:16 27:11,13,14 28:13,25 29:18,19,20 43:8 47:16 105:22,25 106:7 107:5,

132:10 168:12 231:6 240:5

**listed** 24:18 29:7 38:1 43:6 148:19 175:11 180:9 217:22 255:24,25 276:8 279:7 280:23 297:11

**listen** 65:15

**listening** 218:22

**litigation** 25:1 53:16 54:5,11 93:18 180:21 182:20 188:6 273:1

**little** 160:23 288:8

**live** 287:13

**lived** 285:7 287:8

**LL-145** 73:22 75:6

**LLC** 196:15

**locate** 108:15

**location** 79:23

**locations** 76:15

**locum** 39:17,24 112:18 113:1 136:4,6,11 144:10

**locums** 112:22

**long** 20:11 29:18 38:7 108:18 177:7 203:10 218:22 244:1 276:23



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 112 of 143 PageID 14674

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: longer..market

**longer** 43:12
82:21 107:25
140:3 177:16
244:11 264:17

**look** 54:14
63:1,5 74:10
90:15,16 91:2
97:22 102:20
111:24 116:16
120:11 124:7,
24 162:23
194:19,20
195:14 200:19
214:11,13
261:17,18
278:16 289:5
299:3 300:12

**lookalike** 260:5

**looked** 29:11
54:21 63:9
104:3 111:24
154:3 205:15
219:13 299:20

**looking** 28:14
63:3 80:11
81:15 194:11
288:16 289:14

**looks** 124:16
152:4 289:3

**lost** 39:14
40:11 201:7
240:18

**lot** 16:23 47:7
54:18 81:2,
82:19,22 83:7
115:25 140:9,
25 141:22,23
142:20 143:12
162:4 199:9
219:5 269:9
276:25 297:16
301:3

**lots** 44:24
45:11 95:6,9
155:14 194:20
231:11

**loud** 28:21
47:23 96:10

**lower** 38:22
143:19 194:20
199:2

**lowered** 227:4

**lowest** 112:20
195:15 227:17

**lunch** 87:25
88:5

___

**M**

**made** 30:17
53:6,7,11
99:15 124:25
155:3 161:25
190:14 191:9,
15,21,24 192:5
198:8,15
200:12,25
224:19 249:12
250:7,10,17
251:5,13 254:8
256:12 262:21,
23 267:19
281:22 284:3
292:6,8,18
294:9

**magistrate's**
251:14

**maintain** 158:3,
17 159:8
201:12

**maintaining**
294:19 295:10
296:16

**majority** 289:23

**make** 17:8 37:3
51:18,20 52:1
53:2 61:25
76:19 78:21,24
79:20,23 80:3,
12 81:16 82:9
89:21 93:1
107:2,5 123:10
128:16 130:8
137:22 140:6,
16 143:21
144:2,5,20,24
145:2 169:7,8,
14 183:19,21
184:2,11
199:7,8,15
203:12 204:10
252:5,6,10,14,
15,25 256:13
263:7 270:2
279:16 286:3
287:12 295:2,
19

**makes** 16:20,
23 78:19 81:14
96:15 140:7

**making** 35:3
41:25 77:15,21
78:9 79:4 80:1,
8 128:22 129:5
137:20 145:4
169:11 285:6
287:7

**malpractice**
298:2

**manage** 282:20

**managed**
272:17

**management**
25:13 28:5
60:1,7,9,13

**255:12 257:4**

**manager** 21:11
29:24 33:7,9
75:21 78:14
84:10

**manages**
285:14

**manner** 168:17
204:24

**many** 24:23
95:15 118:2
132:7 136:3
145:2 231:20
239:15,18,19,
25 240:18
247:22 260:17
261:5 282:9
296:23 297:11
303:7

**map** 216:9

**mapped** 215:23
216:7

**maps** 215:24

**March** 18:13
103:22 271:1,4
284:9

**margin** 145:23
147:2 200:8
201:19 203:7
207:17 209:4,
23 210:8,17
220:15 223:9
224:16 227:5
228:2,21
236:12

**mark** 16:22
17:3,16 213:18
222:3, 223:4,6

**marked** 9:17,20
16:2,23 17:16

**18**:11 25:3,5
62:20,22 73:6,
9 98:1 107:15,
17 118:9,
131:11 147:9
153:14 160:20,
22 167:6,8
174:6,9 177:10
179:22,24
180:16,18
182:22,24
186:9,11 188:2
189:20,25
197:12 198:4
207:7,9
208:18,21
223:2,15,17
233:14,16
234:23,25
253:15,18
261:13,16,22
265:8,11
290:24 291:2
296:12

**market** 31:8
32:13 36:11
39:6, 41:7
44:1,25 45:12,
21 74:18 75:7,
16 76:7 77:12,
15,22,23
78:10,13,20,24
79:4,6,11,19
80:1,11,18,20
82:6,15 83:14
84:4 88:10
89:1,5,21
93:22 97:9,16
101:4,7,15,17,
22 102:3
103:4,21
104:2,10,19
105:9,23
111:25 112:24



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

113:20 114:4 115:3 116:6,7 124:2 126:18 141:25 143:4 158:14,20,22 160:1,4,5,6,14 173:1 178:7 179:3 185:4,9 190:15 191:10 192:24 193:4, 20 197:11 198:22 199:2,5 202:14 203:3, 5,16,20,24 204:25 205:3, 9,21 227:10, 16,18 229:10, 20 230:3,8,12 231:2,10,16,20 232:9,15 285:19 286:4,8 289:12 298:10, 23 299:14,15, 19,23 300:15, 17 301:4 302:7,8 303:9, 14,16,25 304:9,14,19, 20,24

**marketing** 41:19

**marketplace** 97:2

**markets** 38:16

**Martorano** 105:16 109:23 127:1 173:7

**material** 255:11 257:3

**math** 244:22

**mathematically** 302:6

**may** 15:25 18:15 29:11,13 66:12 70:25 98:13 100:2 101:11 104:3 105:19 115:13, 14 143:12 153:22,24,25 154:1 161:16 171:10,13 172:6 243:17 266:9 267:16 278:17,20 279:3 281:1,2 283:13 289:22 290:23 304:17

**maybe** 57:11, 12 91:19,20 99:14 110:5 119:16 205:25 243:22 263:6 289:1

**MBMA** 206:10

**mean** 12:2 17:10,13 20:1 21:15 22:24 27:3 30:5 31:21 34:23 36:8 39:24 51:6 61:2 79:9 97:21 116:5 118:17 120:15, 17,23 126:3,7 127:3 141:2,3 145:25 146:23 151:11 160:4 161:1,23 162:22 180:13 184:12 208:1 209:15 234:3,9 281:2 289:19 297:12 300:7

**meaning** 112:7 173:18 184:10 193:25 238:14 286:11 301:17 304:4

**means** 61:23 70:18 284:22

**measure** 89:16

**measured** 89:24

**measurement** 199:1

**mechanism** 199:22 200:5

**mechanisms** 103:10

**Medicaid** 247:10,13 304:1

**medical** 7:22 10:2 14:16,20 15:19 27:24 30:20 40:7 41:18 53:1,3,8 54:13 66:8,21 67:24 68:23 69:8 71:5,8,17 72:3 89:2,4,20, 22 93:14 95:7, 12,19 109:24 114:21 115:4 122:19 123:3, 8,15,19 198:8, 16 201:1,5,7, 23 202:16 203:7 205:22 207:4 209:5, 11,24 210:17, 25 211:5,13,21 215:12 216:10 220:8 222:14 224:17,23 225:25 226:15 231:16 233:4, 19 234:1,19 235:8 237:12, 17,23 238:22 239:16,20,22, 25 240:4 241:3,15 243:24 247:19 261:1 263:23 270:12 271:10, 22 272:9,12, 14,16,18,21 273:9 279:11, 12,20 280:1,8, 13,17 281:3,6, 12 282:3,25 283:2,14 288:3 293:2 294:17, 20 295:8,12 296:18 297:6 298:11 302:13 303:2 304:16

**Medicare** 129:16 138:2,5 187:7 230:17 247:10,13 304:1

**Medicare-adjusted** 302:20

**meet** 12:18 220:3 243:24 245:5 283:20 289:9

**meet all** 84:11 109:4

**meeting** 65:5 73:23 90:19 251:25

**meets** 83:14 89:18 90:21 243:25 245:7 248:13 282:19

**member** 238:14 291:21

**members** 225:25 226:8 241:18,20,21, 22,23 242:5,9, 11,16 243:3,4, 6,12,17,19 244:12 248:11, 25 249:1,17,18 250:1,7 293:3

**membership** 244:21

**memo** 50:1,6, 12,17,22 51:9, 11,16,18 77:25 80:20 93:2,8, 11 229:16

**memorandum** 93:8

**memorialization** 69:17,21

**memory** 27:11 51:19 298:20

**memos** 53:15 54:3,6,9 93:13

**mentioned** 185:12 205:7 286:8

**Meredith** 174:16

**Merely** 89:15

**messed** 160:24

**met** 233:25 237:8 245:6

**methodology**

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 114 of 143 PageID 14676

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: metrics..mr

193:24

metrics 230:14 287:1

MGMA 38:24 46:21 76:1 82:16 83:22 90:4 115:12 127:4 206:2,9 230:7 302:8

mid 275:6

midstream 17:12

might 16:19,21 22:4,24 92:10 110:7 114:11 115:12 116:1,2 118:18 167:19 178:22 181:23 208:15 210:22 246:15 250:2 252:24 254:2 261:22 262:7

million 80:17, 21 81:4 82:11

millions 216:8 217:24

mind 212:20

mine 16:21 210:23

minimum 166:9

minus 128:21 145:4,6 201:21

minute 88:19 136:21

minutes 111:11 142:13

mirror 238:14

mis- 214:20

mischaracterizes 42:14 44:4 103:24 127:15 130:24 196:3 226:25 284:14 286:16

misclassification 214:22

miscoded 214:3

missing 121:24 194:3 242:10

mission 237:25

mistake 218:18

misunderstood 195:22

mix 112:7,10 302:25 304:6

mixed 116:21

model 116:23

modification 177:18,19

modifications 20:12,13

modifying 51:17

Molpus 68:1,3 262:4,23

moment 47:20 178:3 298:15

money 128:22 129:5 137:20 143:13,21 144:2,5,20,24 145:2,4 166:18,19,24 169:11,14 176:3 184:2,11

199:7,8 272:10,12

monitor 280:7

monitored 272:15 280:8

monthly 124:5 243:25 244:1 245:7,8,9 248:13,17 267:19 268:6, 11 269:8 280:17

months 98:9 203:1,17 268:7,16 269:10 298:17, 21

more 8:22 39:2,9 49:1 61:21 64:2 76:12 113:1 117:6 128:3 136:7 143:3 152:19 160:9 166:3 169:8 176:4 184:2,6, 11,12,13 192:8 199:7,13,18 201:9 217:7 232:1,3 241:9, 12 242:2 250:3 262:21,23 284:24 285:22 301:3

morning 8:9

most 38:14,18 39:19 50:22 186:19 209:8 261:2 270:8

mostly 185:6 233:7 241:11

254:15 256:17

move 117:19 122:24 206:21 218:23 256:19 259:25 260:13 264:15 269:13 274:4 277:25

moved 236:7

moving 216:2 260:10

mr 7:21 8:3,9 9:19 12:17,23 13:5,15,25 14:7,10 16:5, 12,15,19 17:11,23,25 22:21 23:23 24:2 25:5,24 27:7 28:20 32:6 33:2 34:11 36:18 37:1,12 40:17 42:13,22 43:16,20 44:3, 11,23 45:5 46:20 48:1,8, 11,14,24 49:10,19 50:9, 19 51:3,22 52:3,7,12,17, 23 53:12,19 55:24 56:11,17 57:3,14 59:3 60:21 61:4,15 62:1,16,24,25 63:5 64:24 65:7,12,18,23 68:14,17 69:1, 10,19 70:9,14 71:18 72:5,13, 17 73:8 74:4 76:25 80:4,25 81:18 82:7

83:17 84:16,23 85:5,21 86:4, 12,19,25 89:7, 10 90:1 91:9, 16 95:23 97:19 98:14,19,24 99:3,4,12,19, 22,23 100:1, 11,15 102:4,13 103:19,23,25 106:9,14,22,24 107:4,11,13 114:6 117:8 120:2,21 121:4,22 126:5,11 127:14 128:6, 13,24 130:4, 14,24 131:13, 24 132:17,21 133:4,8,24 134:10 135:15 136:19 138:7, 14,19,25 139:4,13,17,23 140:18 141:9 143:22 144:6, 23 145:12 146:4,12 147:20 148:1, 15 149:19 150:16 151:2, 5,8,11,13,19, 22 152:8,11 153:3,20 156:2,12,19 157:5,18 158:3,17 159:2,8 161:3, 22 162:21,24 163:12,17,21 164:4,19 165:6,15,17 168:2,19 169:3,13,20



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 115 of 143 PageID 14677

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: Ms..myself

170:2,8,22
171:7,20,25
174:20 175:3,
12,16,19
181:1,17
183:4,14
184:5,19
187:16 188:12,
22 189:1,5
190:17,21,25
191:4,12,18,25
193:21 194:23
195:4 196:2
198:4,17
200:15 201:2
202:5 203:9
204:6 205:10
206:13,17,22,
23 208:1,4,6
209:25 212:1,
4,8 218:7,13,
18 219:25
220:10 221:3
223:19 224:9,
25 226:1,18,24
228:12 229:19
230:4,10 231:4
233:6 234:11
235:10,14,19,
22 236:3,13,21
237:7 249:14
250:1,12
251:8,17
253:1,12,17
255:23 256:7
257:10,20,22
258:1,13,24
259:6,10,16
261:15 263:25
265:10 266:21,
25 267:2,22
268:14 269:20
270:4,14 271:6
273:10,18,23
274:2,14

275:12,23
276:10,22
277:20 278:2,
22 279:9
280:25 283:7,
18 284:13
285:10 286:15
287:20 288:5,
20 290:13
291:11,14,17,
24 292:10,23
293:8,17
294:11 295:4,
14,17,21 296:7
298:6,12
301:5,8 303:3,
19

**Ms** 7:18 8:1,5,8
9:18 12:24
14:7,9 16:3,6,
10,13,18,20,25
17:4,7,8,9,13,
15,18,19,21,
22,24 23:3,24
24:5 25:4 26:3
28:22,24 32:19
33:4 34:14
36:21 37:5,16
40:18 42:19
43:1,18,22
44:6,15 45:2,6
47:8 48:2,4,10,
12,17 49:7,11,
22 50:15,20
51:7,25 52:5,9,
13,19,25 53:14
54:1 56:7,15,
21 57:10,15
58:6,14 59:7
60:25 61:11,20
62:6,19,21
63:2,8 65:17
66:3 68:21
69:5,16,23

70:11,17 71:22
72:9,15,19
73:7 74:8 77:6
80:15 81:6,22
83:11 84:12,
20,25 85:16,24
86:10,15,22
87:1,8,21 88:3
89:8,13 90:22
91:14,22 96:1,
4 97:24 98:2,
16,22 99:6,15,
21 100:4,12,17
102:9 103:18
104:8 106:11,
18,23 107:1,9,
12,14,16 114:9
117:14 118:10
120:7 121:1,8,
25 126:6,13
127:20 128:8,
17 129:3
130:10,18
131:4,12
132:2,19,23
133:6,10,13
134:4,16
135:21 136:24
137:1,12
138:11,16,22
139:3,6,15,18
140:1, 143:20
144:3,19
145:7,15
146:7,24
147:10,23
148:3,17
150:21 151:4,
16,21 152:24
153:11,15,23
156:8,13,22
157:14,24
158:7,21
159:4,17
160:21 161:5,6

162:2,22
163:2,8,14,20,
23 164:7,16,24
165:7,9,19,23
167:7 168:5,22
169:5,16,24
170:4,15
171:4,17,23
172:3 174:7,25
175:6,15,17,21
177:11 178:5,
179:23 180:3,
17 181:5,20
182:23 183:12,
16 184:8 185:1
186:10,21
187:22 188:3,
16,25 189:3,
10,21 190:1,
19,24 191:2,7,
8,14,20 192:4
194:6,25
195:21 196:7
197:13,18
198:3 200:9,23
201:17 202:11
203:13 204:8
205:19 206:16,
21,25 207:3,8
208:19 210:6
212:2,6, 218:9,
15,20,25
220:2,13 221:5
223:3,16,20,23
224:13 225:4,9
226:2,21
227:25 228:16
230:25 231:8
233:9,15
234:13,24
235:12,16,20,
25 236:9,17,23
237:6 240:24
249:16,24
250:1,16

251:11,19
253:8,16
256:3,19,21
257:11,15,21,
24 258:3,4,20,
24 259:7,11,17
261:14 264:2,
22 265:9,11
266:24 267:1,
24 268:21
269:22 270:10,
15 271:8
273:13,21,25
274:4,6,18
275:15 276:1,
15 277:12,21
278:4,25
279:15 281:4
283:10 284:1,
17 285:12
287:3 288:6
289:20 290:25
291:19 292:2,
13 293:6,10,25
294:15 295:6,
19,24 296:6
298:9,18
299:2,9,12
301:11 302:16
303:6 304:8,25

**much** 20:9 48:1
112:13 115:17
143:10 192:25
205:13 303:7

**multiple** 13:21,
22 76:15
116:10 183:19
233:7

**must** 42:11
195:22

**myself** 109:23
122:21 202:20



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 116 of 143 PageID 14678

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013               Index: name..notice

## N

name 60:9,11
95:14 126:23,
25 159:23
185:16,19
192:15 200:11,
13 202:12
231:1 233:2
240:5 241:4,7
242:4

named 15:10
30:21

names 27:12,
14 232:7
242:12,23

native 164:1
189:3

nature 8:16
49:5 112:3
141:20 170:24
171:2 185:13
230:23 277:24

nearly 192:25

necessarily
21:2 22:12
27:7 35:2
105:4 115:7
136:9 171:21
229:7 232:5

necessary
43:24 96:12,
23,25 111:9
135:20 171:13
185:25 220:19
252:18

need 9:13
15:24 23:14
29:11 48:1
90:13,21 95:23

99:13 103:3
108:19 111:3,
14,17 125:23
126:19 142:20
144:8,15 162:9
172:21 189:5
206:17 222:4
248:7 264:17
293:23 300:1
301:8

needed 12:22
31:5 82:25
102:24 103:6
172:20 173:18
174:24 179:15
185:8 195:18,
23 196:6
199:19 227:14
284:11

needs 23:5,17
191:2 289:9

Neff 304:9,13,
17

negative 145:6

negotiate 20:25
21:3,25 22:13
32:18,20 39:8
87:6 127:9
135:19

negotiated
21:15,19
22:17,19 23:6
102:15 126:4
135:17 233:24
234:19 302:23

negotiating
82:13 109:11
234:21

negotiation
52:10,14 66:20
79:12 82:23

83:7 84:14,
85:19 86:3,7,
18,24 87:7,11,
15 101:19
102:23 117:4
119:20 186:23
234:10,12,16
235:13 268:23
269:16,25

negotiations
21:12 75:21
78:14,15 82:18
96:19 198:20

Nellie 242:7,
245:16

net 156:4,6
175:8 176:19
260:11 272:6

neurologists
261:6

neurosurgeon
51:21 53:18
54:5 56:9
68:23 69:8
102:24 103:6,
7,14 112:8,13,
18,21 113:3
141:15,18,21,
24 142:2,18,
23,25 143:1,13
183:19

neurosurgeons
15:19 30:20
39:13,17 57:1
67:6,17 82:24
95:2,7,12,18
111:9 112:16
118:5 125:23
131:17 136:4,6
142:15 167:17
171:3 190:16
191:11,17

231:19 261:4
300:13 303:1,
8,22 304:10

neurosurgeons'
39:2 97:9
231:10 299:16

neurosurgery
40:25 47:1
66:9,21 94:10
111:8,12
172:22 186:2
192:9 302:22

never 40:5
42:10 43:4,25
70:5 82:12,
235:14 276:16
286:8 288:24,
25 289:18

new 74:3
113:20 186:17
206:2,11,12
236:8 244:11
248:5 260:14
266:19 267:4,
16 275:21
284:7

newer 167:21
186:20

news 106:5

newspaper
249:21 250:5,
15 294:3

next 18:12
29:24 166:9
239:15

Nicole 174:16

nine 203:1,17

nods 263:14

non- 275:11

non-bates
164:5

non-board
243:18

non-commission
246:6

non-neurosurgeon
143:12

non-trauma
118:7

nonanswer
200:10

none 12:21
147:3 150:5
239:24 272:2
280:21 281:9

nonemployees
281:3

nonlegal
275:13

nonresponsive
256:20 269:14
277:25

normal 31:5
143:19

normalized
302:20

not-for-profit
239:3 275:21

note 212:21

notes 51:17
299:3

nothing 7:15
108:24 184:21
251:10 259:12

notice 10:3
59:22 122:9
292:7,19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 117 of 143 PageID 14679

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: noticed..off

293:13

**noticed**  18:21

**notifications**
60:6

**notify**  293:23

**November**  64:5
65:22 73:25
133:20,23
149:5,11
150:2,6 257:8
258:11

**now**  8:22 17:2
18:17 77:23
79:22 80:12
87:14 102:6
106:7 110:9,10
112:17 117:18
132:10 140:3
176:1,18
187:13 189:8,
22 199:15
206:7 212:19
223:14 224:4
228:8 238:22
248:6 252:1
257:12 264:9
288:22 291:21
301:18

**NRMSIR**  254:9,
11,12,23
255:1,2

**number**  7:5
10:9,10,11
47:17 70:22
71:13 72:23
73:3 88:15
100:19,24
101:3,10
104:21 105:11
108:2,11
110:12,13,17
113:8 119:2

137:4, 154:9
184:4 197:20,
25 211:22,25
212:10,12,13
213:1 227:12
239:10,13
260:15 263:2,
3,11,12,13
264:25 265:5
278:19 279:1
294:22 296:8,
10 305:3

**numbering**  16:7
266:22

**numbers**  10:7
161:23 163:22
164:13 215:2

**numerous**
280:22

———————

**O**

**oath**  85:18 86:2

**object**  34:11
37:1 98:14
99:23 100:9
165:17 168:2

**objected**  98:24
99:8

**objecting**  98:19
99:14

**objection**  12:23
22:21 23:23
24:2 25:24
32:6 33:2
36:18 37:12
40:17,20
42:13,22
43:16,20 44:3,
11,23 45:5
46:20 48:8,24

49:10,19 50:9,
19 51:3,22
52:3,17 53:12,
19 55:24
56:11,17 57:3,
14 59:3 60:21
61:4,15 62:1,
16 65:12,23
68:14,17 69:1,
10,19 70:9,14
71:18 72:5,14
74:4 76:25
80:4,25 81:18
82:7 83:17
84:16,23 85:5,
21 86:4,12
89:7,10 90:1
91:9,16 97:19
99:7,15 102:4,
13 103:23
114:6 117:8
120:2,21
121:4,22
126:5,11
127:14 128:6,
13,24,25
130:4,14,
133:24 134:10
135:15 136:19
138:7,19,25
140:3,18 141:9
143:22 144:6,
23 146:12
148:1,15
149:19 150:16
151:2,13,19
152:11 153:3,
20 156:2,12,19
157:5,6,18
158:3,17 159:8
161:22 164:19
165:15,17
168:19 169:3,
13,20 170:2,8,
22 171:7,20,25

174:20 175:3,
12 176:6
181:1,17 183:4
184:5,19
187:16 188:12
190:17 191:25
193:21 196:2
198:17 200:15
201:2 202:5
203:9 204:6
205:10 209:25
218:7,13
219:25 220:10
221:3 224:25
226:1,18,24
228:12 230:10
231:4 233:6
234:11 235:10
236:3,13,21
249:14 250:12
251:8,17
253:1,12
255:23 256:7
257:10,20
258:13,14
259:6,10,16
263:25 267:22
268:14 269:20
270:4,14 271:6
273:10,18
274:14 275:12,
23 276:10,22
277:20 278:22
279:9 280:25
283:7,18
284:13 285:10
286:15 288:5,
20 291:17,24
292:10,23
293:8,17
294:11 295:4
298:6,12 301:5
303:3,19

**objections**

52:23

**objective**  89:16

**objectives**
90:20

**obligation**
100:11,13
106:7,19

**obtain**  38:20
94:8 111:22
177:5 185:15
284:12

**obtained**  14:9
75:22 104:5
127:3

**obtaining**
104:24 185:14

**obviously**  39:9,
19 300:20

**occur**  23:10
24:13 40:21
48:6,19 70:8
101:18 102:2,
5,6 151:17
172:12

**occurred**  52:14
70:7,10,18
101:19,20
102:8,11,20,22
121:3 161:24

**occurring**
41:14 227:2

**October**  148:24
149:6,11
150:1,6 270:2

**off**  29:19 58:20
59:11 72:24
85:10 87:21,24
117:19 137:5
169:11,15



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 118 of 143 PageID 14680

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                               Index: off-the-record..one

197:21 231:6
237:1 244:11
265:1 295:24
296:2 297:11
299:2,5 304:20
305:4

**off-the-record**
305:5

**offer** 226:7

**office** 28:9,11,
16 29:1,6,22
36:1,14,23
37:10 41:17,
18,19 46:7,8,
16,17 47:6
48:7,20 49:13
53:17 54:3,6,
55:9 59:21
79:8 104:23,25
105:12,13
111:2 113:14
127:2 134:22
152:20 164:21
217:7 304:16,
17

**officer** 64:11,
13,16,22 66:14
109:25 251:3,
5,12 257:2
258:5,9,22

**officers** 262:13,
19 263:6,10
290:8 292:21
293:14

**officers'** 292:18

**official** 292:25

**often** 206:5
243:23 245:4
295:22

**oh** 16:15 37:24
44:7 68:19

110:5 125:1,7
151:24 183:17
194:18 197:14
205:20 206:12
208:15 212:6
236:23 243:1
259:3 262:13
263:15 266:25

**okay** 8:14,16,
19 9:6,15,16
10:1,12,23
11:1,5,10,21
12:5,21 13:3,
18,24 14:13,
19,23 15:6,9,
16,21,25 16:19
17:7,10,22,23
18:17 19:15,
19,21 20:3,7,
10 21:3,7,18,
23 22:8,11
23:21 24:6,25
25:12 27:10
28:22,23 29:5
32:1 33:5,21,
23 34:7,15
36:1 37:17,22
38:5,7,11,18
40:2 42:3
43:19 45:9
48:3 49:15
54:17,22 55:6,
9,15 57:11,22
58:18,21,23
59:13 60:12,14
61:21 62:7,11,
19 63:14,22,25
64:12,16,24
65:7 67:13
69:6 70:4,18
71:12 72:19
73:21,24 74:12
75:2 76:23
79:25 80:24

81:11 82:1
85:12 87:21
88:9,13,19
91:23 93:4,13
94:25 95:16
97:13 98:22
100:4,12 101:2
102:10 104:9
105:5 106:14,
24 107:9,11,14
108:3 109:13
110:6,14
115:20 116:4
118:22,23
119:1,12
121:2,9 123:7,
17 124:15
125:13 126:14
136:25 140:5,
21 141:5
146:6, 149:25
153:12 154:2,
8,15 155:10
158:22 160:11
162:6,9,14,
163:20 164:11,
166:25 167:5,
13,22 171:5
172:16 173:21
176:5 181:21
182:7 189:19
190:8 193:14,
17 194:8,22
202:12 206:4,
16 208:20
209:2,21
210:13,21,24,
25 211:8,20
212:14,19,24,
25 213:5,17,23
214:1 215:5
217:17 218:3,
21 221:18,22,
24,25 222:8,17
223:1,12

225:18 228:17
229:3,12
232:23,25
233:21 234:22
236:24 237:21
238:22 240:10
241:3 250:21
255:6 259:23
262:6,25
263:15 266:1,
11 277:13
278:15 279:6
283:13 288:15
289:21 291:7
292:5 296:14,
21 297:10
300:5,12

**old** 206:12,14

**omissions**
290:7,12,22

**once** 105:6
142:25 217:21
300:2

**oncologist**
115:4

**oncologists**
14:16,21 15:19
30:20 54:13
66:9 67:24
71:6,8 72:3
89:2,4,20,22
93:14 95:8,12,
19 114:21
115:1 167:18
198:21 199:6
201:1,5,7,14,
24 202:16
203:7 207:4
209:11,24
216:10 222:14
224:17,24
226:15 227:17

234:1,19 261:6
268:25 269:18
270:12 273:9
282:3,25
283:2,14
284:10 285:5
287:7 288:3
298:11 302:13
303:2

**oncologists'**
53:2,3,8 71:17
198:8,16
233:20

**oncology** 40:25
47:1 66:21
68:23 69:8
116:21 199:10
200:7 201:20,
21 205:22
207:14 209:5
210:17 211:1,
5,14,21 212:16
214:8 215:12
217:19 219:17,
18 220:9,23
225:25 231:16
233:4 235:8
271:10 281:25
282:13,24
283:6 284:3
285:2,4 287:5
304:3

**one** 7:5 8:21
10:9 16:13
18:9,21,25
19:1,4,13,15,
16,23 20:8
21:11,15 25:11
27:24 29:23
55:3 61:21
63:9,18 64:1
65:22 72:25
73:12 77:2



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 119 of 143 PageID 14681

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: onerous..out

78:6,19 92:17
97:12 103:5
106:4,13
111:12 118:25
120:5,6,14
122:20 123:19
124:7,16,19
127:8 130:17,
19 132:7 134:1
136:20 145:18
147:14 154:17
161:5 163:14,
17 164:2
167:14,19
186:20 189:15
190:6,8,12,13,
18,22 191:12
192:8,10,11,12
211:6,14 216:3
217:16,25
218:16 221:14
234:20 238:5
242:10,13,25
243:20 260:21
263:2,15
265:20,25
266:9,19
267:16,17
271:15,21,23
272:21 273:3
274:10,12
275:9 284:8
289:2 290:23
297:1 302:3
303:12

**onerous** 103:7

**onerousness**
83:25

**ones** 132:9,24
150:4,5 163:2
164:10,22
167:20 232:6
280:16

**only** 9:11 12:25
16:13 19:25
20:15 30:23
31:15 36:11
37:13 39:16
40:15 57:5
83:15 126:17
160:3 178:13
179:14 181:23
185:8 190:6,
12,13 192:12
194:10 200:1
212:17,18
215:15 217:4
222:9,12
228:14 230:7
252:5 277:19
280:5 283:23,
24 302:1

**operate** 26:18

**operated** 45:14

**operates**
121:15

**operating** 200:7
201:18 203:7
207:17 209:4,
23 210:8,17
220:15 223:8
224:16 228:2,
21 236:12

**operational**
248:20 282:21
285:16 287:12

**operationalization**
286:19

**operationally**
297:7

**operations**
123:4 241:10

**opines** 277:2

**opinion** 185:9
276:23

**opposed** 51:18
113:2 115:18
224:12

**option** 49:16

**Orange** 219:17

**order** 23:17
89:21 177:5
184:2 194:16
259:20 284:11
285:8 287:9
300:14

**organization**
26:1,18 61:24
185:18 237:12
245:25 247:5,
14 249:16
251:22 252:8,
18 260:1,11
263:23 281:25
284:6 291:22

**organization's**
253:9

**organizational**
291:20

**organizations**
238:7,15
248:22

**original** 148:7,
13 149:14
154:3,9

**originally** 11:7
148:12

**originating**
30:4,13 31:7
32:23 33:11
34:8,17,23
50:2,5,7 59:22

**Ormond** 219:16

**orthopedic**
142:22

**other** 8:14,24
11:18 13:24
14:13 24:9,17
25:18,25 26:4,
13 29:5,6,9,17,
24 32:16,24
33:9,13 34:19
35:22 39:4,5,6
50:24 60:15
61:1,2,12,22
67:8 72:2,3
74:10,11 78:25
90:10 91:2
92:25 97:3
103:9 105:7,19
106:2 111:1
115:18 120:5
124:17 125:25
126:9,14
135:22 141:15
142:2,7 143:9
144:10 148:18
150:3 152:2
155:14 156:25
157:1 158:22
160:5,14,16
165:14 170:18
173:10,17
174:4 175:5
178:17,20,21
186:4 189:16
195:11 196:6
206:18 210:3,
23 215:8
216:3,15,17
225:24 229:23
230:17 232:9,
23 241:20,22,
23 243:10,12,
15 250:5,14
255:12 257:4

260:3 262:13,
18 264:6 273:9
293:12 301:20

**others** 232:23

**otherwise**
117:19 251:24
264:6

**our** 15:8 26:5,6
29:15 31:16,22
36:5 38:17
39:5,6,15 40:3,
4,6,7,8,11
41:16,18,19,23
45:22 54:6
64:11 67:9
76:13 82:2
83:1,5,23
101:25 102:14
103:12,15
104:23 105:12
109:24 111:10
112:8,19
117:12,17
118:4 122:20,
24 129:11
130:6 136:5
143:24,25
144:7 154:23
155:1,13
164:20 172:23
199:5 214:14,
21 227:14,16,
17 232:5
246:2,7,19
248:22 250:19
251:21 254:7
255:25 256:14,
16 261:4,6
262:10,19
274:9 294:5

**out** 28:20 39:7
47:23 76:5,7
84:5 91:13,15



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: out-of-state..participation

96:9 100:3,5
166:23 168:11,
12 198:25
199:6 200:22
204:18 213:12,
15 224:5
237:25 246:23
254:9,13 256:2
260:4 262:6
272:11 287:2
288:19 295:22
296:23

**out-of-state**
50:24

**outcome** 77:8

**outlined** 35:21
37:18 166:2,3

**outpatient**
211:9 212:15,
17,18 213:16
214:3,7,8
215:3,7,15
216:13,14
217:19 221:13
222:9 228:14

**outpatient-only**
215:21

**outpatients**
214:12 219:14
221:10

**outside** 39:5,18
51:22 52:3,5,
15 53:13 55:24
56:11,17 57:3
61:4,15 62:1,
16 65:12,23
67:8 69:10,19
70:22,25 71:16
72:2 84:23
85:21 86:4,12
94:1,7,9 97:19
98:15,18 99:7,

8 102:16 120:2
130:4,14,25
131:5,10
133:24 134:10
138:7,19,25
139:12 150:16
151:13,19
152:11,25
153:3,9
157:15,25
158:6,19,23
159:14,18
160:3,16
165:18 169:20
172:11,12,17
192:23 193:4,
19 197:9
218:13 226:18
227:10 229:24
230:3,13
231:1,15,20
232:8 249:14
250:22 251:8
253:1,12
291:18,25
292:10,23
293:17 294:11
295:4

**outsourced**
246:22

**over** 8:20,21,23
10:19 38:9
39:13 41:1
47:2 155:17
183:20 206:17
230:22 288:23
299:3 304:15

**overall** 117:12
228:21

**overlap** 17:5

**overseeing**
207:24

**oversees** 14:3
109:15

**oversight** 123:5
246:8 272:4,5
280:15,20
297:6

**owe** 166:17,23

**Owen** 105:17
127:2 173:7,10
178:22

**own** 11:1 29:15
77:4 78:22
112:7 144:14,
15 229:22

**owner** 245:12

**ownership**
71:1,7,9,11

---

**P**

**p.m.** 85:11
87:25 88:2
137:4,7,9
197:20,23,25
237:1,2,4
264:25 265:3,5
296:2,3,4
299:5,6,7
305:2,8

**page** 10:8
18:12,20,21
19:19 20:18
27:23 28:4
47:13 54:10,21
59:13 67:10
70:21 74:12
88:13, 92:16
96:5 108:10,
11,13,14
118:23 122:7,8
134:15,17

151:9 165:6,
166:8 181:9
192:20,22
194:3,4,18
208:9 210:2,22
211:4,5,14,19
212:1,3,4,19,
20,23,25
217:12,14
226:5 255:8
263:16 271:9,
10 278:7,15
281:24 292:3,
16

**pages** 18:20
19:6,8,15,18
163:6,8,13,18,
21 174:8
229:14

**paid** 55:11
128:9 130:2,
12,22 131:6
137:16 138:18
139:4,8,14,22
140:5 142:3
143:5 152:9
153:1 156:16
157:3,16
158:1,24
160:18 161:20
170:6,20
175:11 176:9,
22 178:8
179:4,10
180:13,23
182:3,5,12
183:1,3 187:5
188:8,9,19
198:25 199:23
200:1 201:14,
23 202:15
203:6 205:8,
16,17 207:4
216:10,17,19,

23,24 217:1
221:17 223:9
224:1,17,19,
20,23 225:10,
11,12 227:17
243:16 261:9,
11 262:2,19,20
263:3,5 268:11
285:18 304:5

**paper** 54:18
213:17

**paragraph** 29:7
33:6 47:17,21
154:17 293:1

**paragraphs**
47:21

**parenthetical**
30:8

**parenthetically**
33:10

**parity** 191:10

**part** 37:20
48:10 57:7
60:14 92:17
108:5 123:2,22
129:24 138:23
155:11, 163:15
167:12 184:7,
10, 188:15
219:3 228:17
245:12 251:15
291:22 297:15

**part-time** 39:18

**participate**
284:18

**participated**
284:15

**participation**
227:23



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations

Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 121 of 143 PageID 14683

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: particular..period

**particular** 56:3
112:1,16
132:18

**parties** 13:21
14:14 24:9
26:8,12,13,19
35:22 42:15
43:11 46:10
84:19 86:6
87:7,18 102:16
109:10,20
110:22 127:6,
19 149:4 157:9
158:6 173:4,
175:5 178:14,
17,20 185:6
186:4 187:24
196:21 200:20
201:3 202:17
229:24 233:7
303:20

**parties'** 236:16

**partly** 41:19
104:22

**partnerships**
237:14

**parts** 18:25
203:11 207:25
208:3

**party** 35:5
49:14 84:6
85:15 87:6
97:7,8 111:1
131:10 141:4
149:3 152:15
153:10 158:23
159:5 190:15
192:8,9,15
251:22 256:10,
15 293:24

**pass-through**
272:7

**past** 113:22
147:17 252:9
288:11

**pasted** 162:18

**path** 140:23

**patient** 65:15
90:12 124:21
146:20 211:16
214:11,24
217:25 221:16
222:15 246:13,
17 247:6,25
301:22,23,24
302:1

**patients** 39:23
84:2 90:13
143:24 144:7
146:18,22
147:7 152:19
154:23 155:1,
2, 156:7
165:22 166:2
172:23,24
214:12,13,21
302:2

**Patricia** 174:16

**pause** 65:16

**pay** 38:17
39:10 81:7,8
103:11 112:24
117:6 125:18
140:7,9,25
141:1,24 143:8
155:7 166:19
169:25 175:24
181:18,19
200:2,5
204:11,18
217:7 252:19
253:4 301:20

**payable** 284:23

**payer** 112:10
302:25 304:6

**paying** 39:7
141:4 199:16
217:11 302:10

**payment** 89:17
124:10 125:15
182:14 183:11
205:14 247:13
299:16

**payments**
89:16 161:25
181:10 267:19
271:3 299:21
300:12,14
304:2

**payroll** 182:5,
18 263:22
272:11

**pays** 177:4

**PBFS** 247:7,9,
14,22

**Peburn** 7:1,6,
24 8:9 9:19
17:25 25:5
27:7 72:24
73:4,5,8 88:7
99:3,23 131:13
137:5,10
197:21 198:1,4
206:23 237:7
253:17 261:15
265:1,6,10
267:2 287:20
295:14 296:7
305:4

**pending** 9:12
138:13 140:4
187:13 190:19
191:7

**pension** 248:4
277:6

**people** 22:12
24:3,17 78:23
79:25 106:3
126:21 171:10
177:25 178:3,4
238:21 247:17

**per** 166:9
280:6

**per-day** 112:25

**perceived**
253:11

**percent** 175:10
176:21 177:3
187:4 200:7
209:17 210:4,
11 220:15
223:8 224:16
228:1 236:12
283:16,19,22,
23,24,25
284:12,23,24
285:8,18
286:11 287:9

**percentage**
194:17 195:12
204:10 224:12

**percentile** 76:1
117:2,3,6,10,
13,24 118:3

**perform** 36:9
56:5,8 57:20
91:11 97:16
101:6 116:7
144:8 170:13
300:24

**performance**
248:19,21
279:13

**performed**
45:17 56:25
57:21 59:10
91:24 94:23
101:7 104:10
105:9 110:16,
20 127:24
128:3 129:17
169:11,18
171:12 172:8
173:13,24
178:7,10 179:3
185:4, 187:20
199:23,25
202:14,24
203:5,16,21,24
204:15,22
205:4,5,21
216:25 217:2,
10 222:13
227:8 228:5,25
229:5,9 230:8,
11 231:20
232:8,15
298:11 301:18
303:23 304:14

**performing**
185:23 192:25
247:20 285:19
303:15

**performs**
129:13 137:24
144:22 145:9
146:10

**perhaps** 250:5

**period** 32:11
41:2,17 46:4
95:5,12,19
105:18 112:10
115:16 116:10
117:20 136:5
155:17 172:14
204:1 267:14



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 122 of 143 PageID 14684

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: periodic..pool

304:15

**periodic** 40:15
124:7,17

**periodically** 9:8
101:21

**periods** 207:23

**person** 11:25
22:5,16,19,25
23:7 30:3,9
75:21 77:2
78:17,19,21
82:13 109:11,
14 130:17,19
131:5 152:25
157:15,25
158:23 160:16
192:1 234:21
243:20

**personally**
169:11 199:23,
24 216:25
217:2,9 222:13
227:8 228:5,24
229:5,9 301:17
303:23 304:13

**personnel's**
247:21

**perspective**
87:18 302:7

**pharmacist**
117:23

**pharmacists**
117:21

**photocopy**
114:12

**phrase** 27:19
61:22

**physical** 76:1

**physically** 59:6
75:17,24 217:8
234:5,7

**physician**
15:23 30:18
32:25 33:16,18
34:1,9,25
35:11,15,17
36:2,10,24
37:10,18 38:1,
15 39:9,20
40:23 44:20
46:17 55:12,17
57:1 58:3,10
82:20 90:18
95:15 109:14,
17,22 110:2
111:14 112:23
116:11 117:7
124:4 137:23
139:4,14
142:20 169:15
177:21,22
181:19 204:13,
14 205:8
215:9,10
221:15,18
222:16 279:11
280:5 281:11
294:18 300:22
302:15 304:4

**physician's**
45:21 112:7
124:22

**physicians**
15:10 30:21
31:6 39:2 40:5,
15 45:19
60:15,19 61:1,
3,8,12,13,25
84:13 95:9
104:20 105:10,
17,18 110:17

112:20 113:8
131:22 155:6
199:5,14 211:5
222:15 226:8
261:4,5 262:22
279:20,21,25
280:3,4 282:2,
22 284:23
286:2 289:14
294:18 295:10
296:16

**physicians'**
211:14 280:7

**picture** 112:2

**piece** 203:11
213:17

**pieces** 228:10

**Pike** 233:10

**place** 14:24
24:12 31:15
70:19 75:25
76:24 77:2
79:10 90:23
119:25 205:24
264:5,18
281:23 284:8
288:10

**placed** 292:6,
18 293:12

**places** 155:14

**plain** 277:22

**plaintiffs**
188:23

**plan** 248:2,4,5,
6 260:5 264:6,
12 277:6,7,10

**planned** 195:5

**please** 7:12
9:3,8,12 20:18

33:8 47:14
48:16 58:6
59:14,19 67:10
68:12,24
74:12,17 81:23
96:1,9 100:18,
21 120:11
123:10 126:23
132:11 139:19
140:2,21,23
141:8 148:6,9
149:22 151:24
173:12 178:6,
16 179:2,8,17
185:2,16,19
187:10 192:21
200:11 201:18
202:12 206:4
207:25 208:3
210:20 219:10
221:23 230:3
231:1 240:6
242:5

**plus** 142:15
143:8 176:21
177:3 198:24
244:9

**point** 10:6 32:8
40:6 42:2,11
54:24 60:2,7
76:18 77:24
103:9 104:11,
19 107:6 115:2
123:7 136:5,9,
12 142:8
214:22 227:2,
10 233:12
302:8

**pointed** 166:23
295:22

**pointers** 65:14

**pointing** 108:9

**points** 12:22
38:25 116:19
117:3,4 269:6

**policies** 14:24
15:3,7,9,17
20:19 24:22,
23,25 25:13,19
31:17 32:25
33:14,17,20,23
34:20 69:15
74:11 91:10
246:5,9 290:11

**policy** 18:3,4,7
19:9,10,11
20:2 23:4,8,9
24:12 25:16,
17,18,20,21
26:7,18,20,22
27:12 30:16
31:10 51:1,3,
10,13 56:4
58:1,8,12,24
59:5,24 64:4
66:10,18
67:15,17,20
68:2,22 69:4,9
70:19 76:5,7,
16 77:4,5,17,
20 79:22 80:12
88:22,24 89:1,
19 90:23 91:1,
5,6 92:4,8,
93:11 108:6,
16,24 109:4
117:5 134:21
290:22 291:5
292:3

**political** 237:24

**pool** 198:16,23
200:13 201:1
204:23 209:17
216:19,23,24
227:7 228:2,4,



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 123 of 143 PageID 14685

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                    Index: poor-payer..produce

9,18,20 229:8 283:17 284:12 288:24 302:17, 18 303:2

poor-payer 112:7

population 112:1

Port 219:17

portfolios 248:23

portion 268:6, 11 283:22 288:1,23

position 135:18 243:15 274:10 285:25 295:10 296:16 301:14

positions 18:16 241:2

positive 187:3

possible 63:20 92:25 115:18

possibly 235:20

post 58:18 77:19 93:15 115:6 254:23

posted 254:9 255:2

potential 292:20 293:13

potentially 113:24 227:9

practice 27:21 31:12,14,22,25 42:12 46:2 66:22,24 76:4

116:24 117:9 121:20 134:24, 25 174:14,23 175:24 211:1 225:25 226:9 303:24

practices 40:3 272:17

pre 77:19

pre-2009 58:16, 19

preapproved 96:13

predated 65:22

predecessor 288:9

preparation 11:11,14 43:7 44:9,21 63:10, 12 64:13,17 73:13 98:10, 13, 114:17,19 132:20,25 133:11 147:15, 18 167:15 235:4,21 268:8,17 269:10

prepare 10:14 13:22 50:1 219:20 231:15 267:18

prepared 13:15,19 93:13 100:8 119:24 134:14 193:17 207:16 208:1,4 267:3,10 269:2,15, 287:24

prepares 11:25 134:12

preparing 51:11 131:23 160:24 207:20

present 72:4 81:16 119:22 186:25 237:15 244:22 252:11 266:5 269:1,4, 18 270:3 304:11

presentation 252:12

pressure 45:23

pressures 45:20

pretty 20:8 93:5 233:25

previous 74:2 76:3 92:11 104:3 185:17 186:7 244:15 245:1 288:3, 11,19

previously 16:23 17:16 35:8 75:23 77:12 105:1 106:4 109:10 168:11 246:22 289:19,24 297:11

price 227:4

pricing 227:3

prima 259:5

primarily 41:24 185:22

printed 163:4, 9,24,25 164:2

printout 60:3

prior 25:13 31:10,16 35:5 37:24,25 38:7 40:4 51:13 55:16 59:20 60:5 66:11,24 70:7 75:5,14, 19 79:3,5 84:8 101:23 103:22 104:14 113:23 120:5 131:22 132:1,4 177:15 202:19 244:5, 13 300:12

privilege 159:12

privileged 53:22 71:21 72:8 153:6 157:7,21 170:11 187:18 202:8 225:3

privileges 280:18

privy 250:2,24

probably 11:9 112:8, 124:9 126:24 131:18 167:21 173:7 187:25 231:6, 14 232:4 244:14, 260:19 288:7,25 289:8 303:12

problem 52:20, 22 235:21

procedure 28:6 29:8 33:6

40:21 106:20

procedures 15:3,7,18 25:13 28:5 33:15

process 24:10 31:4 32:1,7 36:6,7 37:14, 18 38:1,3,5,12 42:17 45:12, 15,16,17 46:2 63:17 65:22 66:25 67:22 68:20,24 76:11 78:23 79:13,17 82:2 83:10 84:14 86:3,24 87:15 93:1 94:5 101:20,25 104:6 105:20 108:5 111:4,18 112:15 113:10 130:6 139:7 162:11 172:1, 173:19 185:18 187:25 196:22 199:4,13 202:19 229:24 230:5 253:6 274:15 276:25 279:12,19 280:10 285:15 287:2 304:23

processes 76:10 78:7 85:20 304:18

processing 220:12

procurement 33:16

produce 78:3 120:6 267:18



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 124 of 143 PageID 14686

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: produced..question

**produced** 12:3
19:22 20:15
24:25 53:16
54:4,10,15
60:3 79:21
84:7 93:17,20
95:24 96:2
115:23,24
162:25 163:4,
10,24 164:1,5,
8,14 180:20
181:4 182:19
188:5,23 189:1
193:11,12,23
194:7 195:9
197:22 229:13
274:19

**produces** 14:11

**producing**
14:18,19

**product** 115:8

**production**
164:6

**professional**
94:5 124:11
129:10,12
144:16 169:15
204:22 211:17
215:11,12
217:4 288:2,
301:23

**professionally**
152:19

**profit** 129:9,11
145:23 147:1

**profitability**
211:21 236:1,
7,11 289:25
290:2

**profitable**
146:23

**program**
117:24 118:8
123:1 154:24
186:2 210:17
286:3 287:1,16

**project** 300:14

**projects** 282:9

**proper** 194:12

**protections**
293:4

**protocol** 46:1

**protocols** 280:8

**provide** 11:7
36:11,12 84:1
90:9 94:8
95:18,21 96:25
100:13 105:21,
25 106:6,9
112:14,21
142:11 144:10,
13, 162:15,19
169:23 179:14
184:6 231:9
241:11 245:24
246:8,25
259:20 263:22
289:8,10,12,13

**provided** 31:21
35:7 36:16
40:10 47:6,10
82:17 83:15
94:9 95:1,11
102:16 106:11
114:8,10
115:11 125:19
127:4 129:10
141:21 152:17
154:22 155:9
159:16 160:8,
13 165:22
171:1 178:25

179:9,16 187:7
195:14 196:12
231:18 272:5
276:9 293:3
294:7 298:24

**provider** 38:19
112:1 146:17

**provides**
143:24 146:19
156:4 247:15

**providing** 112:4
144:17 154:22
173:17 178:13
184:11 201:16
237:25 263:17
275:21

**provision** 37:7
39:22 54:25
70:1 82:21
90:8,12 111:23
124:12 125:14
136:1 137:23
144:12 175:20
177:7 186:1
189:16 204:3,
13 225:10
226:13 286:11

**provisions** 55:1
135:9 288:17,
18

**public** 292:25

**publicized**
254:16

**publicly** 254:9

**pull** 136:12
260:4

**pulled** 41:22

**purchase** 116:4

**purchased**

115:14

**purpose** 27:23
39:21 122:23
246:17 260:7
261:8 263:21
264:4,6 287:4

**purposes** 123:5
131:23 181:22
209:10 215:23
216:2 253:9
275:21 279:8
294:21 295:13
296:18

**pursuant** 165:1,
24 189:11,17
207:5 283:17

**put** 25:16
80:18 161:12
209:9 264:18

**puts** 80:19
81:14

---

**Q**

**qualified** 144:8
154:23 227:3
262:18 278:23

**quarterly**
124:9,17,25
125:2 168:3
183:21 245:6,
8,10 248:17
254:1,4,13

**question** 9:2,4,
12,14 11:23
13:4 15:23
21:22 22:1,24
25:23 30:18
31:7 43:2
44:14,17 48:16
49:15 52:13,20

53:24 54:2,24
56:20,22 58:5,
7,16 60:23
61:13,19 66:5,
6 71:20 74:11
76:2 78:8,9
81:3,10 82:1,
11 83:12,18
85:25 86:1,19,
22,25 87:1,15
89:12,19 90:3,
6,7 91:4,5,23,
25 94:20 99:12
102:7 128:25
129:1,2,4,8
132:23 134:5
138:13 139:20,
23 140:14,19
141:10,12,13
144:25 146:1,
5,8,14 147:24
148:6 151:23
157:6,22
158:5,9,11
171:9 183:6,15
187:13,17
188:14,15
189:6,7
190:19,20,22
191:7,18
194:24 195:1,
5,22 200:10,
14,17,18 202:7
203:10,12
206:19,20,23
207:1 218:24
219:6 223:21
225:6 234:15
235:23 236:6
239:15,19
250:10 255:3
256:4,22
257:14,16,23
258:3,12
263:5, 266:17



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 125 of 143 PageID 14687

USA vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: questioning..recruitment

268:9 269:19,
21,23 270:5
273:22,24
274:8 276:12
281:5,9 287:4,
5,12 293:9,11
294:13 295:23
298:8 301:6,8,
13 302:5

**questioning**
64:2

**questions**
11:19 12:6
15:17 22:25
48:13 52:20
54:23 65:9,15
81:2 97:14
98:20 99:4,16,
23 100:2,10,16
123:12 131:19
136:14,17
139:16 150:22
151:1 155:23,
25 156:10
168:23,25
169:7 171:6
184:15,18,20,
23 196:24
210:14 219:5
220:24 222:4
231:23 237:9
265:12 268:15,
19 278:3
286:18 299:9,
13 304:25

**quite** 301:6

_____

**R**

_____

**raise** 7:11

**range** 83:23

**ranges** 84:4

**rather** 89:9
113:21 122:8
123:23 188:9
198:11

**rating** 256:16
258:18

**re-performed**
171:18,22,24

**read** 10:7
12:10,13,17
13:5 28:18,20
33:5 47:20,24
48:10,11,13,18
58:6,7 59:18
63:12,15 67:13
73:14 74:16
77:11 88:19
96:9 131:18,25
139:18,20
149:23 167:18,
20 176:25
192:21 219:2,
3,4 242:12
255:14 256:4,9
278:5,12,14
295:6

**reading** 73:15
101:3 250:5
283:15 288:21
305:6

**ready** 301:11

**real** 272:14

**realize** 262:18

**really** 49:5 62:8
145:1 245:9
248:7 254:4
274:10

**reask** 206:25

**reason** 155:15
199:8 214:9

216:5 246:20
260:11

**reasonable**
38:20 83:9
90:20,21
108:12,17,23
109:6 124:5
126:18 143:8
185:20 205:2

**reasonableness**
31:9 45:1
108:4,25
109:8, 110:16,
20 111:17
113:5,6 142:1
173:13,23,24
179:10 185:23
289:11

**reasons** 140:9,
13,25 141:22,
23,24 273:6
278:19 279:7

**recall** 93:23
174:4 299:17

**recalls** 132:18,
21

**receive** 50:6
248:18,19,21
249:4 271:3
286:6

**received**
184:23 193:2,
9,18 196:13
198:24 229:23
267:25 268:2,5
274:24 275:1
299:21 300:13

**receives**
137:17 187:7

**receiving**
175:8,9

183:10,13
195:2

**recent** 270:8

**recently** 254:6
268:4

**recognition**
241:13,14

**recognize**
17:25 25:7
73:10,15
107:18 118:13
131:15 153:17
174:10 177:12
207:11 235:2
241:9 253:20
261:18 265:15
277:17 291:3,4

**recollection**
173:11 223:8,
25 224:15
233:18,23

**recommend**
284:19 287:14,
15

**recommendation**
252:4,11

**recommendations**
252:5,6,14,22
283:23 284:2,
3,25 285:6,
287:8,9

**recommended**
49:4

**reconciliation**
183:21

**reconsidered**
29:11

**record** 7:7,23
8:24 33:6

41:14 59:19
67:14 72:18,25
73:5 74:16
77:7,9,12
85:10,13
87:22,24 88:2
106:15 137:6,
11 197:22
198:2 206:18
214:24 237:1,4
260:16 262:1
265:2,7 274:5
295:25 296:2,
299:5,8 305:4

**records** 41:9,
11 76:13 106:2
219:13

**recruit** 38:15,
21 83:4
117:19,22
118:5

**recruited** 39:14
112:18

**recruiter** 40:13
41:20 42:4
67:3 79:15
94:7,23 95:1,4,
14 115:5
116:2,3

**recruiters**
32:10 93:22,25
94:2,3,6,9
95:6,9,10,
113:17,19
114:3,20,24,25
115:3

**recruiters'**
82:16

**recruiting**
41:12 199:15

**recruitment**



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 126 of 143 PageID 14688

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: rectify..renegotiation

39:3,21 41:17
43:9,14 46:8,
17,22 79:8
94:5 102:17
104:23,25
105:12,13,16,
18 111:2
113:14,16,25
115:6,8,13
127:2 199:13
304:17

**rectify** 195:18

**redirect** 140:24
299:11

**reduce** 136:6,
11

**Reed** 7:21
98:24

**reexamined**
225:8

**refer** 30:3
185:17 247:6

**reference** 19:24
20:1 76:18
101:24 108:6,
20 167:13
186:6 222:5
280:23

**referenced**
33:18 74:22
97:2 105:10
207:17 209:11

**references**
108:25 116:1
278:10

**referencing**
61:9 103:6
131:8 154:6
206:5 209:16
222:6 290:3,4

296:24

**referral** 61:8,24
67:16 68:9

**referrals** 13:13
60:16,19 61:2,
3,13,14,23,25
62:14

**referred** 176:15
190:5 278:9

**referring** 11:22
32:10 43:11
48:9 60:24
90:5 92:14
93:25 94:18
104:1 114:15
141:3 148:7
154:12 160:3,
6,12 166:5,13,
172:14 184:22
189:14 191:1,
6,12 303:15

**refers** 285:1

**reflect** 161:20
180:23 188:8,
18,19 198:7
207:17 209:4
235:7

**reflects** 182:2

**refresh** 223:7,
25 224:15
233:18,22
292:16

**regard** 237:11
247:9 250:3
251:6 255:18
268:23 270:1
294:23

**regarding**
11:23 92:4
249:5 297:25

**regardless**
280:18

**regards** 263:21
290:8

**region** 67:8

**regional** 143:19

**registered**
241:6

**regularly**
282:19

**regulation** 55:2

**regulations**
290:17,18,19

**reimbursement**
138:10

**reimburses**
138:5

**relate** 30:24
210:16 211:4

**related** 8:18
9:14 13:11
14:20 15:3,8,
17 33:15,20
39:1 44:19,25
46:4 51:5
53:17 54:5
66:7 99:17
111:6,23
123:14 142:4,5
144:12 146:22
147:6 167:17
171:9 186:2
196:25 214:11
215:9 219:18,
19 221:10,15
223:13 227:6
248:23 268:15
269:5 285:15,
17 292:8,21
293:14 301:23

304:2,19

**relates** 11:6
14:25 30:18
31:8 36:5,10
46:2 68:22
79:14 111:25
122:16 135:7
142:19 143:16
158:6 172:22
179:21 185:25
236:11 241:10
246:7 262:6
270:8 276:5,6
279:13 289:11,
12,15 290:3
291:21 297:18
301:15

**relating** 15:23
98:20 276:3
286:19

**relationship**
67:16 74:20
83:14 277:24

**relationships**
60:15 237:13

**relative** 152:18
184:7 193:24
194:1,12,14
195:13 199:1,
24 230:13
302:19

**relatively**
168:21

**Relator** 8:6
255:19

**relevant** 196:23
197:9 206:15

**relied** 294:17
295:8

**relies** 296:15

**relook** 201:11

**rely** 71:25
83:14 84:6,9
106:15 295:9

**relying** 295:1

**remained** 260:7

**remaining**
201:15

**remark** 17:14

**remember** 9:25
44:8 45:10,24
51:16 53:5,10
59:4 60:2,5
63:12 65:19
73:14 74:6
88:10 94:12
97:11,21
105:14 110:7
136:3 152:16
159:23 167:12
172:10 190:13
191:22 203:25
222:21 225:12
231:5,11,13
232:7 233:13
243:22 267:7,
17 268:4
298:16 300:25
304:13

**removing**
279:20

**renegotiate**
41:4 45:19
80:16 116:12

**renegotiating**
32:12

**renegotiation**
79:12,15 82:23
114:21 233:3,
19



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 127 of 143 PageID 14689

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: renegotiations..review

**renegotiations** 114:5

**renewal** 59:20 60:4 116:12

**renewals** 59:16

**renumber** 17:18

**repeat** 22:1 188:14 257:24 258:1

**repeatedly** 298:3

**replace** 25:12 64:7 74:2

**replacement** 254:10,11

**report** 11:20, 21,22 12:2 116:17 192:12, 17 193:3,19, 22,23 194:11, 16 195:2,12,19 196:5,6,10 207:16,20 209:3,19,21 210:7 213:22 214:15 219:20 220:23,25 221:8 222:25 239:20 245:9 250:11,14,17 255:1

**reported** 280:23

**reporter** 7:8,11, 17 9:19 58:7 240:20,22 265:10

**reports** 13:20 65:4 192:14

194:11 200:8 231:9,11 245:8,10 248:15,18 254:24 274:13 281:7

**represent** 210:8 265:13

**representation** 164:4

**representative** 20:21 22:16,18 23:5,12,17 29:25 30:4,14 32:24 33:9,11 34:9,17,24 50:2,6,7 59:23 243:20

**representative's** 23:22

**representatives** 21:23 22:12

**represents** 59:11 61:7

**request** 106:10, 12 198:21 303:1

**requested** 10:19 224:3 276:24

**requests** 247:12

**require** 24:22 92:17 93:8 162:10

**required** 42:1, 58:20 68:8 143:1 166:9 181:10 246:6 254:12

**requirements** 69:15 84:11 109:5

**requires** 23:8, 24:9 79:22 90:23 91:6 92:19 93:11 109:4 143:10 157:20 159:10 284:5

**reread** 149:20

**res-** 249:25

**research** 74:7,9 119:15

**resign** 260:14

**resource** 41:19

**respect** 33:17 36:2,24 55:11 57:2 66:25 108:16 243:15 251:13,15 252:2,15,23 255:17 257:8 258:11,23 268:9 269:4 270:11 292:7 295:2

**respective** 219:15

**respond** 65:16

**response** 100:21 101:4 106:12,25 107:1 110:12 250:15,18

**responses** 99:1,11,25 100:7 103:21 104:18 106:20 110:10

**responsibility** 136:7

**responsible** 30:9 32:24 33:11 34:9,18 41:24 76:19 77:15,21 78:9 79:3 185:22 207:20 252:7

**rest** 154:4

**restate** 128:15 129:1

**result** 111:9

**results** 289:13 297:18

**retain** 169:17 199:14

**retained** 75:14 159:3

**retaining** 39:14

**retention** 42:23

**retire** 202:20

**retirement** 122:25 123:1 248:2,3 260:5 264:12

**retroactive** 299:20 300:7

**Returning** 77:11

**revenue** 144:11 177:20 211:1, 8,9,13 213:8, 10,12,15,22,24 215:20 217:21 218:11 261:20 276:9 281:8

**revenues**

145:4,5 146:20 207:15 213:5

**review** 10:21, 24 11:2 24:4,7, 20,23,24 26:21 28:6,9 29:2,6, 8,22 30:1,13 33:6,10 36:16, 20,22,23 37:2 40:14 41:9 48:7,20 50:12 53:1,17 56:2,6, 9,23,25 57:9, 19,25 58:22 59:1,10,12,22 63:17 65:21 66:25 67:21 68:8,12,20,24 69:3,6,8,12,18 70:7,18 74:21, 22,23 75:3, 78:16 79:19 80:22 82:9 83:13,19,23 91:6 96:25 100:18,20,22 120:13,15,24 121:10,11 130:7,22 131:21,25 132:3,6,9,19 134:8 151:12, 17 155:5 156:14,15 157:11 158:24 159:3,6,14,18 160:10 170:13 172:11,12,17, 18 178:11 181:2 187:21, 25 188:13 192:3 194:14 196:23 197:8,9 198:22 200:20



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
**Nationwide Coverage**

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 128 of 143 PageID 14690

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                Index: reviewed..satisfy

202:21 205:16 206:4,6,8 216:4 229:25 232:6 235:4,8 248:17,18 252:5 253:17 267:14 268:7 269:10,11 270:19 275:13 279:11,13 280:5 282:12 304:23

**reviewed** 10:18 27:1,3 42:6 48:5 58:3,10 73:12 78:1 89:23 98:16 120:19 121:14 122:3 131:2 132:7,14,24 133:11 134:13 147:15,17 152:3,14 154:7 157:10 167:14 171:11 202:1 205:14 231:12, 13 252:10 255:21 268:3, 10,16,18 270:6 272:15

**reviewing** 50:1 51:10 55:11,17 80:2 193:5 224:9,14

**reviews** 24:8, 13,15 28:12,16 29:1 32:14 37:9 49:2 101:25 156:20 171:2

**revised** 18:9 197:2

**revision** 18:12, 22 25:11 54:20 55:1

**revisions** 63:21 73:19

**Richard** 262:24

**ridiculous** 81:9

**right** 7:11 10:13 16:16,18 17:21 19:12,18 20:11,13 22:2, 13 23:22 24:1, 15 26:24 27:6 35:21 43:10 44:2 46:9 48:7, 20,23 49:9,16 51:12 54:2,16 66:24 78:8 80:23 81:10 84:15 88:23 89:6,25 93:7 107:13 109:1 113:14 120:9, 124:20 126:9 128:5 129:8, 14,19 132:10 134:5 137:18, 21,25 138:6,24 145:21 150:7, 10 151:6 155:20 163:23 168:10 169:12, 171:19 176:11, 25 184:4 187:13 190:24 191:17 196:8 198:13 203:18 204:9 205:4 210:22 217:3 223:24 225:22 228:5,9,22 229:5 234:17 235:22 238:18,

23 239:1 240:11 241:4 242:9 259:12 270:23 271:1 284:20 288:19 290:1 295:20 298:5 299:17 300:9,15

**ripping** 160:25

**risk** 29:9 82:20 252:23 253:11

**risks** 252:24

**Ritchey** 240:7, 12,13

**Rodriguez** 164:22

**Rohit** 119:22 122:11

**role** 14:2 27:8 36:2 220:8,11, 14 252:2,4 255:13 257:5

**roll-out** 13:19

**rolled** 244:11

**room** 143:25 173:18 179:20 256:11 261:5

**roughly** 244:22 260:20

**Rousis** 64:23, 24 65:7,18 66:13 98:24 99:22 103:19, 25

**routine** 116:13

**row** 116:11

**rule** 55:2 264:14

**rules** 8:19 106:8,19

**RVU** 302:9,11, 13,20 304:3

**RVUS** 198:25 217:1,2 228:6

_____

**S**

**sadly** 218:4

**said** 22:11 23:21 26:15 27:18 44:16 46:6 51:8 56:23 57:17 65:1 68:19 84:13 89:12 93:5 94:17 102:5 105:1,6 116:4 120:18 124:19,23 132:19,21 133:1,8,12 144:4 145:20 154:2 159:25 193:12 206:11 215:16 223:24 225:12 228:4, 234:8,12 242:22 244:18 256:11 270:6 274:23 301:12

**salaries** 181:15 262:10

**salary** 80:17,20 95:1,11,18 96:3 123:23 128:9,12,18,20 137:14,16,18 138:24 155:20, 21 168:10 176:21 177:3

**Sally** 174:12,15

**same** 17:20 19:13 20:9,25 22:16 23:7 45:23 69:6 74:23 84:5 101:12 103:3 109:10 122:20 123:4,16,20 126:21 136:17, 18,22 143:18 155:25 156:1 168:14,16,21, 25 169:2 170:25 171:5, 6,15,16 172:1, 2,6 173:5 177:22 178:3, 4,14 179:6 181:24 184:17, 18,25 185:6, 12,18 186:8 190:23 199:22 204:23 205:25 213:1,3 215:8 217:23 220:24 221:1 222:3,6, 17 225:24 232:6 238:7,21 246:25 248:6 249:22 257:18 258:15,16,17, 19 260:9 264:14 270:11, 16,17 271:21, 24 272:21 273:3 275:9 291:10,14 293:19 294:2,8 297:2

**satisfied** 111:21

**satisfy** 23:25



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 129 of 143 PageID 14691

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: save..service

**save** 47:25

**savings** 227:6

**saw** 44:5
152:19 154:21
226:16 301:24
302:1,2

**saying** 43:13
44:5 45:10
50:17 57:13,16
58:2,9,24
80:10 105:8
147:5 161:16
193:3,14 196:4
229:3 277:5
300:2

**says** 20:20
24:19 28:11
30:9 32:1,23
34:17 49:12,
54:25 55:5
59:15 60:14
61:1,12 68:8
70:22,25 77:12
80:20 89:15
91:18 92:8,12
104:9 108:10
118:14 119:4
124:25 126:7
154:18 166:8
175:13,16
176:6,14,18
181:10,11
193:16 195:19,
20 210:25
211:8,20
213:12 226:6
233:25 257:24
284:23 288:22
292:4

**scenario** 81:20

**scenarios**
303:21

**Schandel**
240:8,20,21
241:19 242:9
250:1

**schedule** 10:8
100:6 173:20

**scheduled**
59:20

**scope** 51:23
52:4,5,16
53:13 55:25
56:12,18 57:4
61:5,16 62:2,
16 65:12,24
69:11,20 74:4
84:24 85:22
86:5,13 97:20
98:15,18 99:7,
9 120:2 121:5
130:4,14,25
133:24 134:10
135:15 138:8,
19,25 139:12
150:17 151:14,
20 152:11
153:3 165:18
169:21 218:14,
226:19 236:22
249:15 251:9
252:18 253:2,
13 273:19
291:18,25
292:11,24
293:18 294:12
295:4

**scratch** 300:18

**se** 280:6

**second** 28:15
124:24 154:18
165:8 166:3
194:14,15
271:9 293:1

299:3

**section** 27:23
28:8 48:5,9,18
49:1 54:20
59:15 67:11,13
68:6 70:23
74:13,16 77:11
108:9 123:21
135:2 150:10,
11,12 154:18
165:1 167:23,
24 198:12
215:20 219:4
271:15 286:20,
23

**see** 18:5 20:19
21:21 27:25
28:6,9,13 30:1,
11 33:1,3
36:14,16 44:7,
19,21 46:3
47:15,18 50:3,
22 51:8 59:15
60:17 61:21
64:5 67:11
68:10 70:23
71:3 73:25
74:14 82:12
88:17 96:7
100:2,16
104:12,15
114:14 115:10
119:2,6 120:14
121:18 123:22
134:20 163:2
166:11 168:13
176:16 181:12
184:14 210:25
211:8,12,16,23
212:10 213:1,
6,13 221:16
222:15,25
223:10 224:3
226:10 242:14

261:24 266:1
271:11 292:3
301:22 304:6

**seeing** 162:12
209:19

**seek** 84:5

**seems** 81:16
161:10

**seen** 9:22
42:10 43:4,5,
25 44:24 45:11
46:19,21,24
53:7 62:23
63:4 65:20
96:2 98:4
147:12 154:1
161:7, 190:9,
12,13 235:15,
17,24 265:20
276:16

**self-funded**
122:25

**sell** 246:10

**seller** 246:5

**send** 60:6
106:15 107:6,9

**senior** 261:6

**sense** 16:20,23
17:8 36:3,4
140:6,16
299:20

**sentence**
28:14,15,18
29:24 33:5
49:12 59:18
88:20 96:9
124:24

**sentences**
192:21

**separate** 14:8
18:19,25 19:1
20:5 58:23,
78:25 80:22
108:23 159:5
160:1 161:4
171:12 172:4
204:17 215:1
238:17 239:9,
12 244:7
246:14,20
247:3 248:7
260:10 275:21
276:3 282:11,
13 290:22

**separately** 14:9
115:14 160:25
161:2

**September**
133:18,22
148:21, 149:24
150:1 198:13
266:3 267:6,
13,20 268:1,5,
12 269:3,18
270:2 277:15
284:9 288:11

**series** 15:16
136:14 150:22
168:23 184:14

**service** 21:9
39:18 67:9
82:22,25 83:1,
2,3,5 84:1
90:17 103:15
111:3,5,6,13,
23 112:4,5,11,
14 126:19
141:20 143:16,
24 144:11,13,
15,18 146:19
152:18,21
155:17 179:16



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 130 of 143 PageID 14692

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: serviced..sold

184:7,24
201:16 217:7
227:22 230:1
247:15 254:17,
18,21 261:20
276:9 281:8
304:6

**serviced** 147:8

**services** 38:20
39:22 90:8,12
111:7 124:11
125:19 127:23
128:2,3,11
129:10,12
136:1 137:23
141:21 144:22
146:9,18
154:22 155:8
160:7,8
169:12,15,23
171:1 172:20,
21 173:18
176:20 179:15,
19 184:11
185:14,25
186:1 187:7
195:14 199:10
204:22 211:17
215:11 216:15,
17 217:4
221:9,16
222:13 229:5
241:11 246:14,
18 247:6 248:1
285:20 286:7
289:8

**set** 114:2 117:5
127:22 171:12
204:3

**setting** 211:17
214:8 222:16
304:3

**seven** 65:25
100:20,24
101:3,10
102:24 104:21
105:11 142:13
163:21 199:6
240:11 241:1,2
244:14 278:15

**several** 11:9
20:11 113:13
131:18 159:24
227:1 243:19
244:13 260:7
304:22

**severe** 142:23

**shall** 74:18
75:7 77:13
119:5

**Shandel** 241:19
242:15

**share** 57:6
184:24 227:6

**she's** 48:14
191:6

**sheet** 21:6,13,
14,18 22:5,7
23:19 24:18,21
35:23 50:11,16
51:10 69:24
122:5 149:24
151:5 266:2

**Shelly** 109:25

**Shiflet** 109:25

**short** 72:20
73:1 85:11
137:7 197:23
236:24 237:2
296:3 299:6

**short-circuit**
15:22

**should** 19:13
25:22 27:16
62:12 91:19
100:8 141:12
168:15 200:19
224:18,20,23
225:12 242:23

**shouldn't** 91:20

**show** 116:18
117:1 120:12
291:1

**showing**
255:19

**shown** 164:8

**shows** 194:16
195:12

**sic** 7:6 9:20

**side** 45:21,22

**Siegel** 8:3
258:24

**sign** 20:21,24
22:6,7,10 23:2,
18,20 24:21
35:10 50:11
58:20 70:2,5
86:9

**signatories**
149:4

**signature** 57:25
59:11 69:22
70:15 118:14
120:23 121:19
122:4 134:15,
17 149:8
194:4,9 253:22

**signed** 59:11
85:23 87:12
119:9,10,25
121:15 126:4

133:21 134:5
149:2,5,6,7,10,
25 150:5,8
152:5 187:24
256:22 257:6
266:19 267:7,
16 270:19
271:5 304:20

**signer** 35:24

**signers** 19:10,
18 20:5 35:8

**significant**
255:13 257:4

**signing** 22:25
24:17 35:19,23
78:17 86:8
267:17 305:6

**signs** 22:2
121:18

**similar** 18:21
136:23 170:24
171:2 190:10
303:2

**simple** 258:12

**simply** 245:1

**since** 18:7
77:17,20 88:22
89:14 154:1
170:23 203:22
260:8 267:5,
20,25 268:5,12
303:22

**single** 25:16,
18,20 76:10,
14,18 77:24
78:21 79:23
116:8 132:1
143:2,3 272:7

**sir** 256:22
257:16 259:2

266:11 269:15,
23 273:14,22
274:7 277:25
286:8 292:14
294:22

**sit** 109:21
217:6 242:8

**sits** 109:17

**sitting** 97:15
105:21 127:7,
10 133:1 162:8
174:1 186:22
191:23 196:1
197:5 200:24
225:15

**six** 70:22 71:13
181:2 194:18
203:1,16
242:10,23,24,
25 244:3
248:11 250:6
264:20 298:21

**six-member**
244:16

**sixth** 242:13

**skills** 96:25

**slash** 59:16

**slight** 168:17

**slightly** 167:24

**small** 198:24
214:9 221:10

**smaller** 244:4

**Smith** 255:18
259:4 294:10

**software** 60:1,
7,10,13

**sold** 290:13



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS  Document 281  Filed 05/29/13  Page 131 of 143 PageID 14693

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: sole..staffing

**sole** 122:23
260:6,7

**solely** 39:21
264:5

**some** 8:19
25:25 32:8
37:21 39:12,14
40:9 42:2,11
47:5 60:1
65:14 83:21
87:13 93:16
97:6 103:1,9
106:16 117:18
119:14 136:4
142:8,15
144:10 159:5
163:6 166:17,
24 167:2
195:10 210:3
213:19 219:8,
24 227:6
229:24 230:16
233:12 237:9
281:22 282:7
283:3 288:18
289:22 300:1
304:18

**somebody** 14:8
22:2,4 38:21
100:5 111:14
196:9 234:7
302:1,2

**somehow**
13:11

**someone** 11:3
21:11 99:2
100:8,13

**something** 9:14
11:24 16:22
17:16 102:12
115:16 159:6
160:4 161:11

162:7 181:23
182:14,15
183:8 194:5
264:21 288:25
289:2 298:21

**sometimes**
41:5,6, 49:17
113:22 116:24
143:2 230:15
282:10

**somewhat**
76:12 297:13

**somewhere**
23:16 31:14,24
97:13 194:18
215:1,24,25
216:9 244:24
275:6

**Sorathia** 85:3,
18 87:10
265:14,18,24
266:20 267:12,
20 268:5
269:1,17 270:1
271:3,18
273:8,17
277:15 282:6

**Sorathia's**
267:5 268:11
279:8

**sorry** 16:5 19:9
22:1 53:24
58:5 68:16
92:15 147:23
157:22 161:3
168:6 172:13
175:9 176:10
178:18 180:24
183:17 187:12
188:14,18,22
193:5 205:4
208:2 212:1

241:25 242:11
249:9 254:11
266:25 275:5
294:2 298:19
300:11

**sort** 32:4 65:1
216:21 297:13
299:20

**sound** 143:12

**sounds** 81:8
129:7

**source** 13:22
62:13 67:16
68:9 115:18
209:7 216:12

**sources** 38:24
60:16,19 61:1,
2,3,8,12,13,22
75:23

**sovereign**
273:2 290:18
293:4 297:20
298:1,4

**speak** 12:5
43:14 64:24
97:23 100:6,13
103:25 235:16

**speaking** 26:23
92:2 196:20
266:14

**special** 37:9
117:24 237:18
238:25

**specialties**
40:24 111:11
114:1 116:20
118:3 142:21

**specialty** 32:15
42:1 141:16

**specific** 27:20
28:14 37:6
46:3 59:5
66:15,17 76:4,
6,23 82:1
158:11 171:9,
10 172:25
197:6 206:2
231:12,23
251:10 256:8
270:9 277:4

**specifically**
11:24 30:18
32:9 33:20
39:1,13 40:25
41:10 45:11
46:25 47:3
51:5 53:11
54:19 55:7
57:23 66:12,19
67:6 73:15
75:9 79:7
82:24 87:4
90:18 91:12,18
98:12 102:19
108:7 109:2,3
110:23 115:22
123:14 124:8
127:16 131:9,
17,21 135:7
136:3 140:15
141:18 142:2
153:12 156:5
166:3 167:18
168:8 216:14
219:9,14 250:4
259:24 277:2
290:20 294:9
304:2,20

**specifics** 111:6
286:18

**specified** 92:23

**specify** 168:3,7

**specifying**
234:16

**spectrum** 304:4

**speculation**
81:1

**Speedway**
245:15

**SPHCN** 165:11

**spoke** 113:13
202:22

**spoken** 43:19

**spot** 70:5 76:14
263:11

**spreadsheet**
165:13 182:2,
11,13

**spreadsheets**
161:8,18,19
164:17,25
165:14 180:20,
22 181:2
188:5,7,17,18
189:11,17

**staff** 40:7,16
41:18 144:16
174:24 176:4
177:17 214:14
272:15 279:12,
20 280:8,12,
13,17 281:3
297:6 304:16

**staffing** 7:22
28:2 94:1
119:21 122:11,
12,14,22
123:2,3,9,15
139:9 175:11
176:7,11,12,



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 132 of 143 PageID 14694

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                Index: stamp..Stephens

13,14 177:3
180:5 185:3,4
203:6 238:4,
12,21 239:3,10
247:14,16
259:19,20
260:12,18,21,
24 261:3,20
262:3 263:4,
18,21,22
264:10,17
265:19 268:25
269:17 271:12,
18,20 272:4,
19,20 273:1
275:10 276:4,
7,20 277:4,7,
19 278:8,17,19
279:3,22
280:19 290:16
294:19,24
295:11 296:17,
24 297:1,4

stamp 162:23
163:11

stamped 163:3
164:5 165:7
208:10

stamps 118:24
163:16,18
164:2 188:25
189:2,4 229:14

stand 52:17
213:10

standalone
90:16

standard 46:2
63:18 64:7,8
65:20 74:3
89:18 108:4,
12,17 121:20
230:18

standards
33:22,24 66:8
67:11 89:25
272:24

stands 213:11
268:4

stapled 160:24
161:2

Stark 55:3,11,
13,18 56:5,9
57:2 58:4,11
59:2 108:21
130:3,13 131:7
152:10 153:2
156:18,23,24
157:4,17
158:2,11,13,16
159:1 170:7,
16,17,21
187:15 201:25
202:4 294:21
295:2,13
296:19

start 17:4
38:13 58:19
79:13,16
100:19 108:9
109:12 118:23
125:9 141:8
182:17 199:12
270:25 275:20
301:11

started 84:8
136:12

starting 33:7
40:6,13 41:12
117:4 166:8
208:25 300:17

starts 28:15

state 52:23
55:1 58:13

82:8 108:21
111:10 122:24,
25 127:11
237:24 238:9
255:4 259:24
260:8 264:14,
19 275:24
293:4 301:14

stated 13:11
132:17 181:3
213:22

statement 13:8,
10 18:3,4,7,10
20:19 30:17
59:5 87:4
88:24 122:6
128:14 129:7
215:23 248:19
257:6 263:20
277:3 278:13
290:23

statements
26:7 31:17
66:18 256:1,
14,16 293:22
294:5,6

states 7:20
12:3 19:22,23
20:16 25:1
47:11 53:16
54:4,7,11
91:13 93:17
125:11 133:20
134:21 163:1
164:6,9 180:20
182:19 188:6
255:8 262:5
266:2 298:24

States' 11:10
15:11 30:21
67:18

stating 271:17

275:9

statistical
248:20

status 111:10
251:21 272:23
274:17 276:4,
5,7

statute 251:24

statutes 108:22

stay 150:25
169:1

stayed 201:8

stays 20:9
216:1

step 111:4,16
176:10

Stephens 7:21
12:23 16:5,12,
15,19 17:11,23
22:21 23:23
24:2 25:24
28:20 32:6
33:2 34:11
36:18 37:1,12
40:17 42:13,22
43:16,20 44:3,
11,23 45:5
46:20 48:1,8,
11,14,24
49:10,19 50:9,
19 51:3,22
52:3,7,12,17,
23 53:12,19
55:24 56:11,17
57:3,14 59:3
60:21 61:4,15
62:1,16,25
63:5 65:12,23
68:14,17 69:1,
10,19 70:9,14
71:18 72:5,13,

17 74:4 76:25
80:4,25 81:18
82:7 83:17
84:16,23 85:5,
21 86:4,12,19,
25 89:7,10
90:1 91:9,16
95:23 97:19
98:14,19 99:4,
12,19 100:1,
11,15 102:4,13
103:23 106:9,
14,22,24
107:4,11,13
114:6 117:8
120:2,21
121:4,22
126:5,11
127:14 128:6,
13,24 130:4,
14, 131:24
132:17,21
133:4,8,24
134:10 135:15
136:19 138:7,
14,19,25
139:4,13,17,23
140:18 141:9
143:22 144:6,
23 145:12
146:4,12
147:20 148:1,
15 149:19
150:16 151:2,
13,19 152:11
153:3,20
156:2,12,19
157:5,18
158:3,17
159:2,8 161:3,
22 162:21,24
163:12,17,21
164:4,19
165:6,15,17
168:2,19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 133 of 143 PageID 14695

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                    VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: steps..supporting

169:3,13,20
170:2,8,22
171:7,20,25
174:20 175:3,
12,16,19
181:1,17
183:4,14
184:5,19
187:16 188:12,
22 189:1,5
190:17,21,25
191:4,12,18,25
193:21 194:23
195:4 196:2
198:17 200:15
201:2 202:5
203:9 204:6
205:10 206:13,
17,22 209:25
212:1,4,8
218:7,13,18
219:25 220:10
221:3 223:19
224:9,25
226:1,18,24
228:12 230:10
231:4 233:6
234:11 235:10,
14,19,22
236:3,13,21
249:14 250:12
251:8,17
253:1,12
255:23 256:7
257:10,20,22
258:1,13
259:6,10,16
263:25 266:21,
25 267:22
268:14 269:20
270:4,14 271:6
273:10,18,23
274:2,14
275:12,23
276:10,22

277:20 278:2,
22 279:9
280:25 283:7,
18 284:13
285:10 286:15
288:5,20
291:17,24
292:10,23
293:8,17
294:11 295:4,
17,21 298:6,12
301:5,8 303:3,
19

**steps** 193:2,18
195:1,3,7,18,
23,25 196:5

**Steve** 8:3

**sticky** 212:21

**still** 16:19
38:21 39:17
42:7 46:12
47:4 88:6
151:23 154:11
155:19 178:22
193:5 195:3
199:21 201:13
205:2 206:14
214:7,18
227:17 233:11
236:14,18
252:11 260:23
263:1 267:23
285:18

**stipulates**
23:19 293:1

**Stoner** 109:24

**stop** 100:23
111:19 140:22,
23 194:22
218:20 264:22
266:1

**storage** 76:13,
14,15

**store** 79:22

**stored** 18:24,
25

**story** 197:4

**straight** 97:4

**straightforward**
241:12

**Strategies**
232:10

**strategy**
117:12,17
192:18 196:15

**stream** 124:6
183:11

**stricken** 288:22

**strike** 256:19
258:3 269:13
273:6 277:25
289:18

**strike-through**
288:17

**striked** 289:17

**strive** 117:10

**strong** 41:7

**structure** 83:9
122:17 135:5,
13 150:15
155:4 159:15,
19 160:10
170:24 200:3
226:23 237:12
244:3 294:23

**study** 104:2

**stuff** 65:2

**sub** 272:8

**subcommittee**
243:18

**subdivision**
237:24

**subject** 264:11
277:9

**submit** 247:12
276:25

**submits** 82:6

**submitted**
74:19,20 75:8,
13,18,24 77:13
92:12,21 93:11
97:22 254:6
261:19

**submitting**
29:25 33:10

**subsection**
28:5 74:13
280:11

**subsequent**
267:15

**subset** 74:25

**subsidiaries**
237:13 238:2

**substantial**
103:15 300:20

**substantially**
171:15,16
183:8 227:4

**successful**
118:2

**such** 32:15
38:23 49:21
71:1, 94:6
200:3,4 201:11
214:9 260:11

264:15 273:2,3
287:1 290:17
297:2

**sufficiency**
83:21

**sufficient** 36:6,
8,13,17 37:15
79:24 80:7,13
82:10 83:20
92:24 96:25
97:1

**suggesting**
90:4 195:17,23

**suggestion**
49:5

**suggestions**
50:23

**Sullivan** 38:24
46:21 115:12

**sum** 176:20

**summary** 14:12
211:1

**supersede**
25:12

**supervisor**
279:8 280:6

**support** 78:13
79:24 80:9,13
82:10 112:11,
146:19 173:17
209:14 210:5
230:23 277:1
294:18 295:9
296:15

**supported**
82:16,17
263:22

**supporting**
41:21 80:2



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 134 of 143 PageID 14696

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013
VIDEOTAPED DEPOSITION OF
Index: supports..termination

182:14 210:1

**supports** 83:3
102:11 142:1
210:4

**supposed** 22:6

**Surbousek**
242:6,16
245:11

**sure** 8:20 13:2,
5 22:3 26:13
29:18 31:23
32:22 34:15
41:25 44:18
53:10 58:17
61:1 62:5
66:10 70:12
73:20,21 75:4
76:3 79:20,23
80:3,5,10,12
81:16 82:9
93:6 95:20
108:8 123:10
128:16,18
130:8 132:16
136:4,23 147:2
162:7 164:14
166:20 167:2
169:7 175:22
188:17 190:7,
11 192:6,13
193:7 196:5,16
199:15 203:12
204:10 224:6
233:1 237:23
242:6 247:8
263:7 264:8
266:22 279:1
295:19 296:20
300:7

**surgeon** 142:22
144:8

**surgeons**

125:23 172:10
294:23

**surgeries**
129:13,16,18
137:24 138:3,6
146:10 169:18

**surgery** 143:2,
3 144:1,9
179:20

**surprise** 85:17
86:1

**surprised** 86:20

**surrounded**
66:23

**surrounding**
30:24 66:19
90:11 141:17,
20 196:11
197:8 201:14
270:8

**survey** 32:14
38:23 39:3
41:13 67:5
79:16 90:15
190:16 191:11

**Susan** 240:8,
20,21 241:19
242:9

**Susanne**
242:15

**suspect** 119:13

**swear** 7:8,13

**sweeps** 272:12

**system** 60:1
122:25 214:21
260:5

**systems** 13:23
247:18

—————
**T**
—————

**take** 9:9 40:7
47:20 48:1
62:25 63:5
72:20 77:3
82:18 88:19
103:6,14 107:7
108:8,18
112:13 136:7
137:1 158:4
181:14 188:12
195:2 202:9
206:5 224:9
236:24 261:16,
18 273:5 274:9
280:17

**taken** 12:11
79:10 104:4
195:18,24
288:19

**takes** 38:15
77:4 142:10,16

**taking** 9:8,13
176:3 184:12
274:5 305:8

**talent** 83:5

**talk** 8:23 11:2
13:7 64:12,16
206:17 218:5,8
250:4 269:6
287:18

**talked** 40:13
43:7 67:1,3
69:7 93:21
121:9 169:10
294:3 299:14,
15 300:22

**talking** 41:2
45:3 47:2
48:14 52:6

74:23 88:4,9
94:18 112:10
116:16 123:8
124:12 126:21
163:12 190:18
206:7 230:8
238:5,16 249:9
250:25 259:8

**talks** 27:24
34:16 48:18,22
51:10 54:23
255:10,11
261:25

**tape** 137:2
264:23

**target** 227:13

**Task** 246:22,23

**tasking** 237:18

**tax** 262:1

**taxes** 246:8

**team** 261:6

**technical** 64:20
65:2,3 114:13
129:18,21
138:6,17
139:5,10,21
144:13,16,20
147:7 156:10
169:17,23,25
184:15,24
187:6

**TECHNICIAN**
7:4,25 72:22
73:2 85:9,12
87:23 88:1
136:20 137:3,8
178:19 197:16,
19,24 236:25
237:3 264:24
265:4 296:1,

299:4,7 305:1

**Ted** 242:6,16
245:11

**tell** 38:3,5
45:12 46:4
47:3 52:18
65:11,18 66:22
82:2, 87:5
91:11 102:10,
19,21 126:2,3
146:16 253:25
259:23 296:14

**telling** 192:6
262:21 276:2

**tells** 197:3
233:24 234:18

**template**
229:20

**temporary**
39:18

**ten** 192:20,22
292:16 302:2,4

**tenens** 39:17,
24 112:19
113:2 136:4,6,
11 144:10

**term** 34:25
119:2 122:15
201:18 238:2

**terminate**
278:18,20
279:3

**terminated**
279:7

**terminating**
281:10

**termination**
29:10 59:16,21
279:10



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 135 of 143 PageID 14697

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: terms..there's

terms 12:6
20:25 21:4,15,
19,25 22:13,
17,19 23:6
30:10,15 32:2,
5 33:12 34:19,
23 35:4 36:20,
23,24 50:25
69:13 109:16
118:20 148:13
180:9,14 188:1
226:7 233:25
234:2 252:20
263:3 266:21
303:9

testified 56:3,4
65:25 85:18
86:2,11 103:20
120:8 121:17
204:12 259:18
281:21 287:23
294:22

testify 10:2
56:1 66:10
98:25 99:2,10,
22 119:19,24
159:12 186:23
193:17 218:21
237:10 267:11
268:23 270:7
294:16 295:7,
15

testifying 66:15
72:16 99:24
218:17,23
225:18 235:13
236:18 295:21

testimony 7:13
11:12,15 42:14
44:4,10,22
52:8 56:12,18
62:2,17 63:11
64:13,18 73:13

84:24 85:22
86:20 88:11
93:7,23 95:13,
16 97:15
98:11,17
103:24 114:17
127:15 130:5,
21,25 131:22,
23 133:25
134:11 147:15
165:18 167:15
186:7 196:3
226:19,25
235:5 236:10,
22 257:25
258:2 266:15
267:10 269:2
282:23 284:14
295:5

than 11:18
13:24 22:4
29:6,17 72:3
76:12 105:7
117:6 120:5
125:25 126:14
135:22 148:18
150:3 156:25
157:1 158:22
160:5,9,14
167:25 170:18
173:10,17
178:21 183:2,
8,24 184:2,13
186:4 192:8
196:6 199:2
232:1,3,9,23
243:10 250:5,
14 262:10,13,
19,22,23
282:11 284:24
289:6

thank 7:17
31:1,3 219:1
237:7 263:8

283:4

that's 10:11
15:14 16:10,22
17:16 18:11
19:6,8,9 26:17
28:22 31:3,12,
20,22 39:19
42:12 49:5,16
51:19 55:3,21
59:9 63:18
65:9 67:6
68:24 69:6
74:22 76:1
78:5 80:18,20,
23 81:10 82:13
84:2 86:25
87:1 90:4,6
93:3,5 106:7
108:5 109:3
110:1 111:20
115:21 117:17
119:16 120:18
121:2 122:6,8,
16 129:10,11
138:21 139:17
141:4 154:9
155:15 161:8,
19 163:3
164:11 167:1
175:12,14
176:6 177:4
183:8 186:13
193:8 199:25
204:24 206:2
212:8 214:5,9
215:8 216:18,
25 217:16,23,
25 219:6
221:7,22 229:4
231:14,25
234:8 235:20
240:11,25
242:7 244:18
253:6 255:5

259:8 262:5
264:1,3 272:8,
21 274:23
275:11,13
277:6 280:7,20
285:11,24
286:5 287:11
289:6 290:4
291:1,10,14
293:20 297:5,
6, 298:7
300:16,21
302:5

their 7:9 23:13
26:7,8 35:23
41:22 45:21
50:12 55:21
57:24,25
59:11,12 69:22
70:15 75:25
77:4 78:22
83:24 85:19,23
86:3,18 87:11,
13,14 89:23
115:7 116:12
120:13 124:10
125:5,15,19
127:23 130:7
134:20 142:6,
16 143:4,9,15,
16,17 152:18,
20 160:10
173:19 187:25
197:10 199:23,
24 200:8
201:15 204:21,
23 205:1,9,13
211:17 215:11
216:25 217:1,2
226:20 227:7
228:6 229:9
231:21 249:2
259:25 279:2
282:22 287:17

289:6,9 299:25
300:13,14,23
301:17,18,19
302:11,19,24,
25 303:24
304:1,2

themselves 7:9
24:1 94:7
284:10,11,19

there's 9:11
17:5 18:12
19:10,11,12
20:2 21:6
25:10,11 28:4,
5 29:10,12,18
35:7 36:5
37:20 47:5,15
49:8 50:13,16,
17 63:20 70:1,
5 74:10,13
78:19 80:18
81:2,19 83:7,
22 108:23
109:14 115:25
116:18 118:24
119:15 121:10,
13 128:18
129:17 134:14,
17 135:4,11
136:20 138:8,
13 140:3,9,25
141:23 147:5
159:11 162:4,
23 163:6
165:21 167:11
171:8 177:20
184:12,13
190:7,10,19
191:7 194:8,20
195:17 200:1
204:10 205:16
211:22 214:9,
20,21 216:2,4,
5,8 217:21



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 136 of 143 PageID 14698

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: thereafter..through

221:9 223:13,
14 229:3
230:14 241:1,
20,23 242:10
243:19,20
245:10 249:20
254:5 264:6
266:15 268:3
269:9 276:2
279:19 281:2
293:23 297:3
300:19

**thereafter**
101:21

**therefore** 205:8

**these** 11:6
19:1,13,18
32:9 42:1
44:19 52:8
91:10 97:14
100:10 101:14
102:25 106:20
119:14 140:13
152:6,17
159:24 161:18,
23 162:19
163:9 164:1,9,
25 167:17
174:13 175:23
177:22 181:2,3
188:7,17,18
189:11,17
190:4,8 194:7,
198:11 205:6
214:12 215:19
219:13,21
243:6,12 248:7
262:22 269:5
279:14 280:3
282:21 285:17,
19 287:1
289:22 292:25
302:9

**they'd** 37:3
82:11 136:23

**they're** 10:8
22:6 23:7 57:8
58:20 80:10,11
83:19 84:1,4,6,
17,18 87:16
89:21 94:5
105:3 112:4
143:1,17
160:24 174:19,
21,22 178:2,4
181:25 183:9
190:10 194:2
199:22,25
201:16 216:17,
18,22,23,24
217:1 227:16
238:3,20 242:1
247:4,17,20
248:3,4 249:20
277:5 280:18
281:15,16,18
290:4 294:3
297:23

**they've** 57:20
143:14

**thing** 9:11
19:25 219:3

**things** 29:10,
14,16 41:5,6
159:12 238:17
255:10 288:18
297:14

**think** 10:12
19:25 27:16
29:2 34:4,5
41:19 43:24
47:12 48:25
49:5 56:19
82:2 84:13
85:5 91:10

92:8,10
118:17,18
124:9 136:12
139:24 153:9
160:13 163:25
210:22 221:20
223:14,21
232:18 237:8
238:20 239:18
240:12,25
242:7,10
243:21 254:1
260:2 262:12
271:23,25
276:18 286:5

**thinking** 46:15

**third** 84:6 97:7,
8 118:23 180:4
190:15 191:10
192:8,9,15

**third-party**
96:11,16,21,22
190:4,5 191:16
192:3 254:15,
17,21

**thorough** 89:14
92:20

**those** 11:18
15:3,4,9 17:14
20:20 21:11
24:10,13,25
26:8,19 29:15
31:19 38:24
41:1 42:4,15
43:11 44:21
46:12,19 54:10
65:9 77:7 79:9
83:5 91:11
93:13 97:4,6
102:25 105:3,
24 109:16,20
110:24 111:7,

12 126:20
127:6,19
129:18 136:17
138:2,6
139:10,15
142:17 143:7
145:3 146:22
147:3 148:18
151:1,8 155:7
160:8 168:12,
25 172:21
174:18 175:25
176:2,22
177:3,24
179:17 183:7
184:18 185:11
186:4 203:11
211:18 214:9,
13 216:2
219:18 231:7,
9,13,15 232:23
238:6 241:25
242:4,22
243:21 244:10
246:24 247:25
248:23 252:17,
25 253:4
256:1,12,15
260:6,23
262:9,15 269:8
274:21 276:8
277:22 279:8,
284:21 285:5,7
286:2 287:6,9,
288:18 290:11,
17,18 294:7,25
295:16 297:21,
22 298:1
299:19,22
303:16 304:1

**though** 13:16
63:15 112:25
121:21 122:20
166:1 168:17

270:25 272:22

**thought** 76:9
172:1 258:21
289:1

**thousands**
214:20

**three** 10:8,9
19:6,8,15,19
39:16 40:23
41:10 45:20
47:16,21 59:13
70:21 88:14,16
110:5 116:9
135:3 137:10
142:15 150:11
167:23 171:3,
15 197:20
199:6,12,13
201:7 204:1
226:5 229:14
242:7,25
244:4,18
263:3,16 288:1
296:8,10

**threshold** 176:1

**through** 15:23
18:17 24:10
41:11,13 42:16
45:15,17 63:1,
6 77:24 79:16
81:20 104:6
106:1 108:18
112:15 113:7,
120:11 131:19
133:17,22
134:6 143:14
148:20,24
149:11,24
150:2,6 161:21
162:10 163:15
165:5 169:6
172:19 180:25



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 137 of 143 PageID 14699

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                          Index: throughout..truth

181:24 182:1,5
188:10,20,21
196:9 198:21
199:4 203:8
214:21 215:25
216:8 223:5
231:3 236:6
238:3 250:19
253:7 269:12
274:16 276:24
280:10 284:24
288:8,22
289:18 297:5,
12

**throughout** 9:9
64:1 271:12
284:5

**tie** 161:24
173:9 182:4,8

**tied** 128:1

**time** 7:4 8:22
9:7 10:19
12:25 15:18
32:11 38:10
39:13 41:16,
18,24 46:4,23
47:3 48:1
50:16 61:21
62:25 63:5,25
72:22 73:2
74:20 79:2
85:9,12 87:23
88:1 95:6,13,
19 96:17 103:2
104:24 105:18
108:8,18
112:10 115:15
116:10 117:20
118:8 124:2,8,
16 126:24
127:1,17
130:16 135:25
136:3,5 137:3,

8 142:21
151:25 155:12,
18 167:4
172:14 173:6,7
183:20 185:18
188:13 189:23
197:16,19,24
201:4 202:18,
25 204:1
205:12 207:23
214:22 217:25
224:9 230:2,22
236:25 237:3
255:20 260:8
264:24 265:4
266:6 267:14
269:3 271:4
274:5 278:18,
20 293:24
296:1, 299:4,7,
10 303:11
304:10,15
305:2

**times** 8:14
118:2 282:9

**timing** 110:8

**timing-wise**
110:5

**title** 21:9
190:23

**titled** 122:9

**titles** 21:10,12

**today** 34:6 43:8
44:10,22
63:11,19
64:14,18 73:13
93:7,21 95:16,
21 97:15 98:11
100:5,6,9
103:2 105:21
106:16 107:10,
25 109:9,15

114:18 119:19,
24 123:8
127:10 131:22
132:1,4 133:1
147:16 164:8
166:22 167:15
174:1 186:18,
22 191:23
196:1 197:5
200:24 225:15
231:12 238:5
249:6 264:13
266:11 267:18
269:6 273:16
292:9,22
293:16

**today's** 10:14
305:3

**together** 25:18
80:19 81:14
92:12 142:9
203:11 204:24
282:9

**told** 59:6
235:14 258:21
281:5 297:15

**tolerance** 83:23

**Tolhurst**
174:16

**Tom** 7:6 12:7
14:1,14 202:23
207:22 220:18
229:17 233:8,
24 234:3,18
282:20 285:14
286:13

**too** 10:12
155:14 192:12

**took** 76:24 77:2
88:5 193:18
195:24 304:15

**top** 20:19
27:23 47:15
108:11 176:14
210:25 211:20
217:18 226:6
271:11

**topic** 52:9 57:4
65:13,24,25
69:11,20 120:3
130:15,25
135:16 138:8,
20 139:1,9
150:17 151:14
152:12 169:21
218:14,19
267:3 295:16
296:8,10

**topics** 10:2,5
11:6 28:13
61:16 86:5,13
100:14 218:16
253:2,13
273:19 291:18,
25 292:11,24
293:18 294:12

**tot-** 217:5

**total** 67:20
83:10 90:17
142:4,6,10
152:16 155:5
165:12 199:1,
19 205:1,14,17
229:9 242:25
285:17

**town** 40:7,10
82:21

**track** 240:18

**training** 143:15

**transaction**
8:18 90:11,16
91:3 92:6,21

93:10 97:6
252:17

**transactions**
97:3 216:8

**transcript**
12:18 13:6
219:2

**transcripts**
12:10

**transfers**
272:10

**transition** 247:1

**trauma** 39:4,6,
22 42:1 67:8
103:9 111:10
112:5 118:6,8
125:23,24
142:19 143:5,
16, 146:17
172:22,24
179:21 184:12
186:1

**traumas** 111:15

**treasurer**
241:20 244:9

**treat** 122:20

**treatment**
297:22

**tried** 115:17

**Trisha** 7:18
95:23

**trouble** 39:12

**true** 21:17
122:6 230:23

**trustees**
262:14,19

**truth** 7:14,15



Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 138 of 143 PageID 14700

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: try..until

**try** 90:2 136:10
145:25

**trying** 15:22
59:4,25 90:5
105:14 147:1
167:12 173:8
203:11,25
242:7 243:21
262:5 297:14
298:15

**turn** 20:18
47:13 54:19
59:13 67:10
70:21 74:12
88:13 96:5
108:10 110:9
118:22 122:7
123:21 135:2
165:4 166:7
167:4,22 181:8
211:19 217:12
228:1 263:16
278:15 281:24
286:2 292:16

**turning** 60:14
150:9 154:17
167:24 176:18
229:12 271:9

**twelve-year**
41:2

**two** 8:13 10:9
16:15 18:21
19:8,13,15,18,
19 20:6,18
39:1 40:22
41:10 45:19
47:13 54:10,21
67:10 73:4
74:12 80:6
84:19 92:16
110:5 116:9
119:16 122:7,8

137:4 151:9
161:3 163:8,17
174:8 189:22
190:7,21,22
192:13,21
206:17 232:1,
23 238:17
241:18 242:8,
25 243:3,4
244:9,10
249:17,25
263:3 274:10,
12 302:1,3
303:12

**tying** 172:20

**Tyler** 12:7 14:1,
7,9,11,15
164:21 207:23
208:8 220:5,8,
14

**Tyler's** 14:2
209:7

**Tyna** 164:22

**type** 24:8 30:24
32:14 39:18,19
54:25 111:6,23
124:17 145:23
157:12 252:14
302:20

**types** 23:20
29:9,15 38:24
97:3 184:10
248:15,16

**typical** 117:2
130:6

**typically** 32:7
97:5 116:19
117:1 124:6
129:9 230:18
303:13

---

**U**

**Uh-huh** 18:14
19:5 24:16
26:25 30:6
46:18 52:12
68:22 92:3
93:24 164:7
176:24 177:1
181:13 209:18
211:3,10
234:14 239:2
246:16 270:22
301:1

**ultimate** 279:16
281:19

**ultimately**
281:13

**umbrella** 123:9

**unable** 43:13

**uncompensated**
39:23 90:12
103:13 136:2
142:11 154:24
289:7

**under** 28:4
29:7 69:9
77:20 79:18
81:12 85:18
86:2 88:14
106:7,19
122:24 130:2,
12,22 131:7
136:15 152:9
156:17 157:3,
17 158:2,25
160:18 170:6,
20 178:8
179:4,11
180:14 187:5
189:16 203:7

204:13 211:8
246:24 267:12
271:15 272:24
284:7 290:17
300:13

**underfunded**
39:23

**underinsured**
84:2

**underlying** 89:6
92:21 93:10

**underneath**
47:21 260:4

**understand**
8:25 9:2,4
11:20 13:2
27:9 30:5,14
34:12 38:10
60:23 61:18
64:1 78:17
89:12 91:2
99:21 103:10
112:3 128:16
141:14,19
158:8 161:13
179:15 185:13
189:7 196:21
205:23 221:18,
236:20 237:10
241:9 249:25
250:9 263:8
276:11 300:10

**understanding**
30:10 32:2
33:12 34:18
42:11 47:10
83:24,25
141:16 173:19
202:25 225:7
229:22 230:13
237:18 246:13
253:10 283:1,5

286:9,10 302:5

**understands**
190:20

**understood**
45:14 130:8
157:11 298:8

**undertake** 53:1

**undertaken**
235:9

**undertook**
219:11

**unhappy**
226:15,22

**uninsured** 84:2
155:13 172:23
199:10,11

**unit** 194:1,12
199:1

**United** 7:20
11:10 12:3
15:11 19:22,23
20:16 25:1
30:21 47:11
53:16 54:4,7,
11 67:18 93:17
163:1 164:6,9
180:20 182:19
188:6 298:24

**units** 230:14

**unless** 9:13
46:3 116:9
181:24 254:16

**unpaid** 243:16

**unposted**
165:11

**until** 83:8 119:9
147:24 166:22,
23 191:5



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 139 of 143 PageID 14701

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                           Index: up..Vinas's

288:10 304:11

**up**  22:25 23:11
64:2 83:8
116:12 155:16
160:24 161:10
162:17 183:21
199:22 203:2,
17 212:6 274:5
280:10 285:7
287:9,13
302:18,21

**update**  18:15
106:20 250:14

**updated**  20:8
73:19 249:23

**updates**  245:9
248:19,20,21
249:4

**updating**  267:8

**upon**  195:2
294:18 295:1,9
296:15

**us**  39:7,10
91:11 95:24
106:9,15
115:18 118:8
122:23 144:7
146:18 159:20
229:13 249:5
260:2 275:25
292:9,22
293:16

**usage**  136:7

**use**  27:19
38:23 39:2,17
67:7 70:22
79:15 93:21
95:6 96:15
97:7 99:16,24
112:18,20
113:1,14 115:5

117:3 122:16
136:11 159:23
163:5 190:14
191:9,16
230:15 232:4,5
238:3 254:15,
16,17,22
300:2,5,19,21

**used**  14:13
34:25 39:4
42:16 46:25
95:9,17 97:8
113:19,24
114:4,20,24
115:1,3,7,21,
22 135:23
162:12 192:9,
16 201:19
209:22 210:8
222:10 229:23
230:4,6,20
231:2 299:24
303:8

**uses**  231:7
256:15

**using**  29:15
34:13 79:14
112:22 122:15
147:3 172:2
193:23 194:12
205:25 206:12

**usually**  21:8
38:12 77:3
82:18 194:5,8

**utilization**
281:25 282:12,
24 283:6
284:3,16
285:2,4 287:6

**utilizing**  175:5

---

**V**

**vague**  144:23
235:10

**validity**  253:5

**valua-**  96:22

**valuation**
96:11,23 101:7

**valuations**
92:19

**value**  31:8
32:13 36:11
44:1,25 45:12
74:18 75:7,16
76:7 77:12,16,
22,23 78:10,
13,20,24 79:4,
7,11,19 80:1,
11,18,20 82:6,
16 83:14 88:10
89:2,5,21
93:23 97:9,16
101:4,7,15,17,
22 102:3
103:4,21
104:2,19
105:9,23
111:25 112:24
113:20 115:4
116:6,7 124:3
126:18 141:25
158:14,20,22
160:1,4,5,6,8,
14 173:1 178:7
179:3 184:7
185:4,10
190:15 191:10
192:24 193:4,
20,25 194:1,12
195:13 197:11
198:22 199:1,
3,5,24 202:14

203:3,5,16,20,
24 204:25
205:3,9,21
227:10,16,19
229:11,20
230:4,8,12,14,
19 231:2,10,
16,21 232:9,15
242:2 285:19,
22 286:4,8
289:13 298:10,
23 299:14,15,
19,23 300:15,
17 301:4
302:7,8,19
303:9,14,16,25
304:10,14,19,
20,24

**values**  194:14

**variability**
301:16

**variables**  205:7

**various**  18:19
75:22

**varying**  300:23

**venture**  71:10

**ventures**  71:2,7
97:3 237:14

**verbal**  250:14,
17

**verbally**  219:23
220:1

**verify**  73:23
162:5 196:6,9
224:19 225:17

**version**  73:18,
22 107:20,23
245:1

**versus**  29:15

104:2 116:24
304:6

**very**  8:23 41:3
60:14 82:25
84:14 103:7
118:5 144:25
165:4 171:8
203:10 212:25
249:22

**via**  239:20

**video**  7:4,7,25
72:22,24 73:2,
5 85:9,10,12,
13 87:23,24
88:1,2 136:20
137:3,5,8,11
178:19 197:16,
19,21,24 198:2
236:25 237:1,
3,4 264:24
265:1,4,7
296:1,2,4,5
299:4,5,7,8
305:1,4

**VIDEOTAPED**
7:1

**view**  123:16

**viewed**  123:4
199:2 272:25

**views**  227:15
272:25

**Vinas**  171:6
183:1,13,23
184:2,18,23
186:15,24
187:5 188:9,20
192:25 262:3
263:1

**Vinas's**  189:12,
16



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 140 of 143 PageID 14702

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: violate..whatever

violate 55:1

vitiated 225:5

voice 47:25
266:12 273:15

volume 193:1

volunteer 249:3

vote 279:17
289:23

---

**W**

W-2 239:20
240:1 276:8

wages 176:22
177:3

wait 40:19
147:24

waive 305:6

Walgreens
117:21

walk 81:20
131:18 182:5

walked 113:11

want 9:9 10:6
28:20 29:13
30:17 77:19
93:6 98:22
99:6 100:5,6,
23 106:6,14,
15,17 107:5,7
111:20,21
123:11 132:10
137:15 140:13
169:6 192:2
199:20 208:22
238:3 244:19
246:25 250:3
255:16 258:8
261:25 277:13

282:17 283:4
285:23 286:6
288:15 295:19

wanted 13:7
25:22 43:15
62:11 159:25
174:13,22
175:23 183:18
199:7,15
227:21 247:1
263:7 286:24

wanting 116:11

wants 39:9,10
80:16 83:3

wasn't 13:6
16:13 26:20
55:7 65:1,3
66:15 70:19
75:14 79:6
80:8 85:6
116:3 119:9,10
121:21 122:2
127:25 183:14
195:23 197:1
206:14 228:18,
24

way 16:21,24
17:1 24:14
34:13 76:4
113:7 116:25
140:7 158:8
161:12 194:19
195:15,23
204:4 208:13
210:23 219:24
234:10 257:18
272:25 273:1
292:21 293:15
301:19 302:10

ways 28:4
116:22 194:20
288:12

we'd 26:19
106:1 112:23
182:4

we'll 9:8,10
17:13,14 97:13
100:2,16
107:7, 177:9
223:4,6 299:2

we're 16:8,9
17:2 38:18
41:4,5, 52:6
79:14 83:3
91:11 167:4
199:15,16
212:3 213:18,
23,25 227:5
246:6 252:19
266:22 269:5
287:16 289:14

we've 10:18
15:7 39:11,14
47:6 72:19
75:23 95:24
114:8 115:22,
24 118:2,8
126:21 142:3
160:13 166:21
181:4 201:7
229:23 230:6
238:4 242:14
244:15 260:13

website
254:14,15

week 16:12,14
20:16 42:24
64:25 66:1
98:24 99:8,22
102:25 103:19
142:14

weekend 136:8

Weiss 85:1,18
87:10 262:4,

24,25 270:13

well 8:19 16:25
17:15 20:2
24:9,15 32:20
34:5,16 36:9
40:19,22 41:23
43:25 48:12,22
49:8,16 51:8,
14 55:21 63:2,
25 67:6,24
72:15 76:9
78:11 80:23
81:8 87:1
89:14 90:2
91:1,23 94:17
97:13,25 98:22
99:6,12,15
100:1,4,12
102:10 103:17
105:3 106:4,
14,18 107:9
109:2 118:17,
22 120:18
121:2,17
123:14 124:2,
3,15 126:2,10
128:1 130:8
132:13 136:25
140:11 141:5,8
146:4,8 152:14
156:3 157:9
159:20 162:7,
22 163:2,14,20
171:6 172:13,
23 174:19
176:12,14
178:21 179:6,
12 182:4,17
184:10 187:21
194:25 196:18
201:3 206:25
214:2 216:21,
23 217:1
218:15 222:22

236:18 240:12
243:17 248:2
249:17 251:1
252:12 253:25
256:17 257:19
260:3 262:12
268:22 273:6
274:4 276:16
278:11,14
282:11 283:4
284:22 288:7
292:17 293:22
294:1,25
295:24 297:11
299:24 301:11

went 8:20
45:15,17 82:18
112:15 172:19
199:4 228:19,
21 236:6
274:15

weren't 86:11
175:24 226:22
231:14

what's 9:20
14:4 25:5
49:15 60:9
62:22 73:8
107:17 118:11
160:22 167:8
179:24 180:18
182:24 186:11
198:4 207:9
208:20 223:17
233:16 234:25
253:18 261:15
265:11 274:7
293:9

whatever
115:24 127:4
206:8 238:2
246:15 261:23
269:9 280:19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 141 of 143 PageID 14703

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER          VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                    Index: whenever..witness

whenever 84:8

where 14:5
20:20 22:15
41:20 67:3,7
80:17 92:10
94:15 96:21
100:2,23
116:10 117:11,
20 120:12
140:7 227:10
229:15 240:19
245:11,22
264:16 268:4
288:16 292:3

whereby 305:5

whereupon
305:8

wherever 127:5

whether 29:12
32:11 36:7,12
37:13 42:17
46:5,12 47:4
56:24 57:19,23
61:9 62:11,13
63:3 69:14
70:12 75:17,23
76:1 83:13
90:19 91:15
92:5 98:16
101:15 102:17
108:6 111:5
117:18 119:25
120:19 123:8
131:2 132:14
139:10 144:9
157:12 159:2
162:11 184:23
186:25 195:7,
24 205:1,9
213:21 223:8,
25 224:15,21,
22 225:7,

243:16 252:17,
18 253:5
255:2,11 257:3
267:4,11,15
280:18,19
286:4 293:11
297:5,6,7,23
299:22 300:14

which 10:5,23
11:1,2 17:1
31:4 32:14
39:18 41:17
42:1 46:23
47:6 60:2 67:7
70:18 77:24
82:18 90:11
95:17 97:1
102:19 103:10
106:12 107:6
111:1,17 112:9
115:7 132:6,9
135:24,25
136:1 138:9
139:7 142:8
149:3 163:13,
18,21 168:9
170:13 172:10,
16 174:9
176:20 183:1
190:12,17
191:1,6 192:8
194:13 195:1,
12 206:6
207:22 219:16
220:22 221:14
222:1,21 225:4
227:3,4,5
233:11 244:16
246:9 248:5,12
256:16 261:19
265:13 271:10
275:22 277:23
278:8,17
280:2,10

284:18 291:22
301:20 302:9

while 26:2 40:9
141:3 192:25
203:23

who 12:5
13:19,24 20:4,
24,25 21:3,19,
25 22:12,16,19
23:6,19 24:17
25:22 26:10,21
27:4,12,14
35:6,10,19,20
41:24 62:12
64:10,22 76:19
77:15,21 78:9,
19 79:3 93:25
94:22,23,25
95:1,4,10
96:15 104:10,
17,18 105:13,
15,22 109:7,
17,21 126:20
130:11,19
135:12 150:14
159:18 164:17
167:2 173:12,
24 174:12
175:18 178:7
179:3,9 185:4,
11,19,21
190:14 191:9,
21,24 192:5
198:15 200:12,
16,18,24
202:14,19
203:15 207:20
226:8 233:3,19
236:14 240:3
241:15 250:17
255:12 257:4
261:2 264:9
279:6,8,16,17,
21,24 281:15,

24,25 282:11
283:5 287:24
289:17

who's 22:18
99:10,24

whoever 96:18
130:16

whole 7:14
40:12 63:6
79:17 111:4
114:2 172:19
219:2,3 236:6
297:12

whom 92:2
159:22 220:3
254:8

Whose 12:13

why 17:4 19:21
20:15 38:5
43:23 62:25
65:9 71:16
76:6 82:4
96:21 100:1
101:9,22,24
106:9 108:8
122:12 125:13,
15 140:9,25
141:24,25
142:3 143:7,10
146:4 155:3,15
165:13 166:16
175:1,7,9
183:1,6 190:7
193:8 214:9,15
215:18,20
218:10 226:22
236:1,7 241:6
259:23 272:22
274:10 277:6

will 7:8,14
30:4,23 49:13,
21 50:1 59:21

94:16 120:6
124:25 132:15
167:2 288:7

willing 175:24
287:16

wish 204:20

withdraw
203:14

withdrawn
187:11 203:4

within 20:4
23:13,21 69:14
75:25 82:15
83:23 84:3
98:9 110:4
111:11 118:3
142:12 157:2
171:1 173:18
197:11 203:1
205:3 218:19
227:24 229:10
264:20 280:8
281:24 298:15,
16,21 299:22
300:15

without 113:25
158:9 163:10
188:25 189:1,3
195:11 196:23
230:1 231:23
260:9 285:19,
22

witness 7:8,16,
22:23 24:3
25:25 28:23
32:7 33:3
34:12 36:19
37:2,13 42:15,
24,25 43:17,21
44:5,13,24
46:21 48:3,12,
13,16,25 49:20



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 142 of 143 PageID 14704

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER                VIDEOTAPED DEPOSITION OF
30(B)(6) ERIC PEBURN on 02/26/2013                              Index: won't..you'll

50:10 51:5,24
53:20,24
56:14,19 57:5
58:12 59:4
60:23 61:7,18
62:4,18 63:7
65:14,24 66:2
68:16,19 69:2,
12,21 70:10,15
71:19 72:6,14,
15 74:6 77:1
80:5 81:2,19
82:8 83:18
84:17 85:6,7,
14,23 86:6,14
87:3 89:11
90:2 91:10,17
97:21 102:5,14
103:25 114:7
117:9 120:4,22
121:6,23
126:12 127:16
128:7,14 129:1
130:6,16
131:1,25
132:17 134:1,
12 135:17
136:22 138:15,
21 139:24
140:18,19
141:9,13
143:23 144:7,
25 145:13
146:6,13
147:22,24
148:16 149:20
150:18 151:3,
15 152:13
153:8,21
156:3,20
157:9,19,22
158:4,18
159:9,14
161:23 163:6
164:11,20

165:8,16,21
168:3,20
169:4,14,22
170:3,9,12,23
171:8,21 172:1
174:21 175:4,
14,20 178:2,
18,20 181:2,3,
18 183:5
184:6,22
187:17,20
188:14 189:7
191:2,5,19
192:1 193:22
194:23 195:6
196:4 198:19
200:16 201:3
202:6,9 203:10
204:7 205:12
206:14,19,24
210:1 218:8,24
220:1,11 221:4
223:21 224:11
225:1,6 226:20
227:1 228:13
230:11 231:5
233:7 235:12,
23 236:5,14
240:21,23
249:17 250:13
251:10,18
253:3,14
255:24 256:8
257:13,22
258:15 264:1
267:23 268:15
269:21 270:5
271:7 273:12,
23 274:15
275:13,24
276:11,23
278:3,23
279:10 281:1
283:9,19
284:15 285:11

286:17 288:21
292:1,25
293:9,19
294:13 298:7,
14 301:6,10,
13,14 303:4,20
305:5,7

**won't**  99:14
227:15

**wondering**
34:22 108:15

**word**  34:13

**wording**  167:24

**words**  147:2
277:22 278:14

**work**  16:19
82:3 100:5
107:6 117:23
124:22 171:14,
18 192:25
199:23,25
202:23 204:14
213:19,20
216:25 217:10
227:8 228:5,6
229:9 245:22
246:23 282:9
289:1 300:24
301:18 303:23
304:2

**worked**  11:4
40:9 173:23
185:21 220:17

**workers'**
165:11

**working**  179:2,
9 185:3 202:13
247:4

**workload**  83:24

**works**  100:3
245:19,23
302:6

**wouldn't**  35:2
81:5 112:1
136:9 171:21
232:5 256:10
289:4,10,11,13
303:12

**write**  242:23
289:16

**written**  23:4
31:14,15,23
53:15 54:3
70:12 90:24
91:5,6,13,15,
18 93:8
106:10,12
121:13 134:21

**wrong**  140:23
214:15,18,19
216:10 219:7

**wrote**  236:15
289:17

---
**Y**
---

**yeah**  16:1,6
17:9,11,18
18:23 19:7
45:3 59:8
62:15 84:18
96:2 108:14
116:18 125:8,
17 140:2 141:3
145:16 147:13
162:22 163:8
165:10 174:17
178:19 182:10
192:5 204:16
218:1,4 222:7
224:11 228:14,

23 234:6
241:14,23
244:19,24
255:1 301:10

**year**  20:6
97:11,17,25
102:19 110:18
115:19,22
116:4,5,6,8,14
125:3,4,6,7,9
127:22 142:14
165:5 181:24
182:1 198:12
200:5 205:18
208:16 209:22
214:16 220:22
221:8,25
222:9,18,20,21
224:1,17,23
232:18 262:1,
3,6 263:2
288:11 301:3

**years**  8:13 19:3
20:11 40:23
41:4,10 45:11,
20 46:24 110:5
116:9,10
131:18 161:21
180:24 181:25
204:1 233:13
244:4,13,14,
18,20 260:7
264:21 275:2
289:23 300:3
303:7,12

**yet**  101:1

**you'd**  261:17
268:18 300:19,
20

**you'll**  108:10
132:14 142:8
281:24 292:16



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com

Case 6:09-cv-01002-GAP-TBS   Document 281   Filed 05/29/13   Page 143 of 143 PageID 14705

USA  vs. HALIFAX HOSPITAL MEDICAL CENTER
30(B)(6) ERIC PEBURN on 02/26/2013

VIDEOTAPED DEPOSITION OF
Index: you're..zero

**you're** 25:15
28:19 31:23
32:9 34:13
38:25 41:2
46:15 47:2,22
52:7 61:19
66:9,10,18
70:12 75:16
76:23 81:25
88:20 90:3,5
99:23 100:9
101:14 103:6
112:10 114:12,
116:15 131:8
141:11,18
145:1,18 148:7
154:12 161:16
163:12 166:5
172:14 184:22
191:1,12 192:1
195:17 196:20
206:12 209:16
213:21 222:6,
223:22 229:12
231:22 232:21
234:15,16
236:18 260:21
265:22 268:15
274:5 286:19
296:24 300:2,
16,17 302:9,10

**you've** 42:10
43:4,25 63:4
100:21 181:3
190:21, 218:22
278:14 295:22
301:12

**Young-** 245:20

**Younger-**
291:11

**Youngman**
242:19,20,
245:21,22

291:11,12,13,
14

**yourself** 27:2
47:24 88:20

———————————

**Z**

———————————

**zero** 204:18
239:17 240:2,3
262:19,20
272:7



37 North Orange Avenue
Suite 500
Orlando, Florida 32801
321.710.2150
www.DiscoveryLit.com