## HALIFAX HEALTH CONTRACT COVER SHEET    EXHIBIT 48

Instructions:  This form should be completed in its entirety, and the original should be attached as the cover page for the original contract during routing for signatures. The Manager/Administrator responsible for the contract shall complete the information prior to forwarding the contract. The reverse side contains a listing of various types of contracts and the signatures required for each. If the particular type of contract is not listed, find the most similar type and forward as noted. No payment will be made prior to completion of this form and its receipt/processing by Accounting. **Once all signatures have been obtained, the original of this form should be sent with the original contract to the Legal Department for filing, with a copy (cover sheet only) to Accounting.**

Name of company, firm, individual, etc.: Boon Chew, M.D

Halifax Affiliate (HHMC, Hospice, Healthy Families, etc.): HHMC

Service provided: Medical Oncologist  *Employment Agreement*    *Revised*

Contract start date: 03-01-2009    Contract end date: 9/30/2012

Renewal/cancellation date: 2 years notice for cancel - HHMC    Cost Center/Subacct: 01.765000
(The date by which notice of renewal/cancellation must be given)

Revenue or Expense? Exp    Expense, will Company invoice? Payroll

Budgeted Item?    ☒ Yes    ☐ No  Accts Payable Notice Sent? (Expense Only)  ☐ Yes  ☐ No

Start Payment Date: Ongoing    Last Payment Date: Last pay-period of 2/11

Amount of First Payment: Payroll    Amount of Subsequent Payments: Payroll
                                    (if different from first payment)

When are payments due? Provide details (e.g. 15 days after end of month): Payroll sched

Remittance address: On file

Required documentation for payment: NA
(i.e. time sheets, receipts, itemization of work, etc.)

Insurance requirements (include contract section reference): Section 6

HIPAA Business Associate Agreement required?  ☐ Yes    ☒ No

False Claims Act communication per Deficit Reduction Act required?  ☐ Yes  ☒ No (refer to Contract Management Policy)

Other comments (including any changes to prior contracts): NA

Person to contact for questions: Tom Garthwaite    Person to receive renewal reminder: Tom Garthwaite

| SIGNATURES (see instructions on reverse) | Date |
|---|---|
| Manager: | 4-16-10 |
| Legal: | 6/11/10, 4/27/10 |
| Other signatures required (see reverse) | |
| Administrator: | 7/8/10 |
| CIO: | |
| Operations: | |
| Nursing: | |
| Materials Mgr: | |
| Finance: | 5/5/10 |
| Dir. Physician Svcs[1]: Elin B. Kunz | 4-28-10 |
| VP, PBFS[2]: | |

[1] Required for all contracts involving physician services (initial review should occur prior to offering contract to physician)
[2] Required for all hospital/physician contracts which include clinical services billable through PBFS

**Do not split page – all signatures must be contained on page 1**

Ariba Internal Control
Number: cw 1964 903
Master

## MEDICAL ONCOLOGY EMPLOYMENT AGREEMENT

THIS AGREEMENT is entered into by and between HALIFAX STAFFING, INC., hereinafter referred to as the "Company", and BOON CHEW, M.D., hereinafter referred to as "Employee".

### WITNESSETH

In consideration of the covenants and agreements herein contained and the moneys to be paid hereunder, the Company agrees to hire Employee and Employee agrees to work for the Company upon the following terms and conditions:

1.      **Duties of Employee.**  Employee is employed by the Company to render professional services as a medical oncology physician and to provide medical supervision of non-physician employees of the Company on a full-time basis on behalf of Halifax Hospital Medical Center, a special taxing district (the "Hospital") in the Hospital's Medical Oncology Program (the "Program"), pursuant to the Company's agreement with the district.  All duties shall be carried out with that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers.   The Employee's duties shall also include:   keeping and maintaining appropriate records relating to all professional services rendered by Employee under this agreement in the manner required by law and the Hospital's accreditation agencies; preparing in connection with such services all reports, claims and correspondence necessary and appropriate under the circumstances; and taking reasonable steps to maintain and improve his/her professional skills. The Company shall not participate in or interfere with the exercise of medical judgment by the Employee or in the care or treatment of patients by the Employee; provided, however, that the medical care rendered by the Employee at all times meets the standards of performance called for under this Agreement and by the Hospital. The Employee may continue to provide services pursuant to any existing directorship, faculty, or similar agreement, but the Employee hereby assigns all income from any such agreement to the Company.  This Agreement is intended to replace the Employee's existing Medical Oncology Employment Agreement with the Company, and said existing agreement shall be terminated immediately upon execution of this Agreement.

2.      **Devotion of Time to Practice of Medicine.**  Employee shall not engage in, carry on, or be employed by, directly or indirectly, any other business or profession in which the Employee is practicing medicine, without the express written consent of the Company and the Hospital. The Employee's practice shall be limited to those facilities serviced or approved by the Company and the Hospital.  The Employee shall be entitled to fees, payments and/or honorariums generated by the activities of the Employee which are outside of the scope of this

1

6/9/2010

Agreement so long as said activities are approved in advance by the Company and do not interfere with the Employee's duties and responsibilities under this Agreement.

      3.     **Compensation.**  The Company shall pay to Employee as compensation for services the following:

      a.     An Annual Base Salary of $135,000.00. Payments shall be made on a bi-weekly basis.

      b.     For the time period October 1, 2009 through September 30, 2012, an annual equitable portion of a Compensation Pool to be established by the Company in an amount equal to One Million Five Hundred and Nine Thousand Six Hundred Dollars ($1,509,600.00). The portion paid to the Employee shall be determined by the Medical Oncology Practice Management Group, as defined herein, based upon the Employee's relative contribution to the Hospital's services. Notwithstanding the foregoing, no such payment shall be made for two consecutive bi-weekly periods if the total number of face-to-face billable patient visits to all locations at which oncologists employed by the Company provide services falls below 1,500 during a one-month period and new appointments for patients cannot be scheduled for sooner than ten (10) working days for at least sixteen (16) days of that month. The Compensation Pool and the minimum number of patient visits required for Compensation Pool distribution shall be adjusted in the event the number of oncologists employed by the Company and working on behalf of the Hospital increases or decreases. As new oncologists are added to the Program, the Compensation Pool will not be adjusted for the first six (6) months. The Hospital will review the Program's financials and adjust the Compensation Pool by the percentage of growth in volume not to exceed an equal portion of the Compensation Pool per employed oncologist. If adjustment in the pool and practice volume is not at one hundred percent (100%) of the equitable portion of the pool per physician, the six (6) month review process will continue through the term of this Agreement.

      c.     The Hospital will create an incentive bonus pool (the "Incentive Bonus Pool") for each one (1) year period during the term of this Agreement (the "Measurement Period"). The Incentive Compensation Pool shall be Two Hundred Seventy Five Thousand Dollars ($275,000.00) per one (1) year period. All or a portion of the Incentive Bonus Pool will be payable to Employee, based on the extent to which the Program achieves the Reach Targets during each Measurement Period as set forth in Exhibit A hereof. The portion paid to the Employee shall be determined by the Medical Oncology Practice Management Group, based upon the Employee's relative contribution to achievement of the Reach Targets. Incentive Bonus Compensation owed hereunder will be payable within ninety (90) days after the end of the Measurement Period to which it relates.

      d.     Any other reasonable compensation as determined by the Company and the Hospital from time to time.

2

6/9/2010

The compensation paid pursuant to Sections 3.a, 3.b, 3.c, and 3.d above is consistent with fair market value. The parties acknowledge that the compensation is in no way dependent upon the volume or value of patient referrals. There shall be no obligation or agreement, implied or otherwise, for the Company, the Hospital or the Physician to refer any patients between them. The Employee's compensation under this Agreement in the best judgment of the Company and the Hospital is, and must at all times be, consistent with the principles under which the Company and the Hospital are obligated to conduct their affairs, including federal and state laws, rules, regulations and guidelines regarding Medicare, and including the rules and regulations of the Internal Revenue Service and the Florida Department of Revenue that are applicable to tax exempt organizations.

  e.  The Company agrees to offer a contract identical in its terms to this Agreement to all physicians who become members of the Practice Group.

  4.  **Term of Agreement**. This Agreement shall be effective the 1st day of March, 2009 through the 30th day of September, 2012. The continuing benefit of this Agreement may be evaluated at any time by request of either party, and the parties agree to meet to negotiate compensation adjustments upon the expiration of the initial term, and every two years thereafter.

  5.  **Expenses**. The Company and/or the Hospital shall pay the following expenses relating to Employee's services for the Company in accordance with Company and/or Hospital policies in effect at the time the expenses are anticipated:

  a.  Professional office space, as well as expenses for appropriate furnishing and maintenance of said office space, and appropriate general premises liability insurance coverage in accordance with Company and Hospital policies.

  b.  License fees and reasonable subscriptions to professional journals and professional medical textbooks, not to exceed Two Thousand Dollars ($2,000.00) per year.

  c.  Membership dues in the following professional associations: AMA, ASCO, FLASCO, VCMS, and ASH.

  d.  Reasonable expenses for employment-related travel, medical meetings, conventions, continuing medical education, business entertainment expenses, and medically-related equipment shall be paid for by the Company in accordance with Company policy, with an annual limit of $7,500.00 for the Employee. The Employee shall provide appropriate receipts and documentation for all such expenses. Unused funds remaining from this annual allowance will not roll over year to year.

3

e. Reasonable fees for cellular phone service, beeper service, advertising and marketing.

f. The Company shall, after considering the recommendations of the Employee and the Hospital, employ, terminate, and when it deems appropriate, reinstate such non-physician personnel as the Company and the Hospital deem appropriate for the proper operation of the Company and the Hospital and the proper performance by the Employee of the Employee's duties under this Agreement. The Employee shall also have the right to request to not work with any specific non-physician employees of the Company and the Company, in consultation with the Hospital, shall not unreasonably deny such a request.

6. **Sovereign Immunity**. In all respects pursuant to this Agreement, the Employee shall be acting on behalf of the Hospital by providing appropriate care to patients needing treatment, including those patients who are unable to pay for the use of the Hospital's facilities or for the services rendered. As such, the Employee is entitled to sovereign immunity, pursuant to this Agreement, Florida Statutes §768.28 and all other applicable law, and shall be provided legal defense and protection against awards by the Hospital's self-insurance program for alleged acts or omissions of the Employee occurring in the fulfillment of his/her duties pursuant to this Agreement. It shall be the Employee's responsibility to obtain liability coverage for any actions taken beyond the scope of this Agreement.

7. **Fees**. The Company and the Hospital shall have the exclusive authority to determine reasonable fees, or a procedure for establishing reasonable fees, to be charged patients or customers of the Hospital, even though such patients may be treated by Employee in the course of Employee's employment by the Company. Employee agrees to assign to the Company or the Hospital all revenues relating to patients treated by him. No fees shall be set at rates which are less than 85% of the Medicare Fee Schedule for hospital-based oncologists without the consent of the Medical Oncology Practice Management Group. Employee shall not do any separate billing for patients treated by the Employee. All sums paid by any patient or customer of the Hospital in the way of fees, salary or otherwise, for medical services rendered by Employee shall be and remain the property of the Hospital and shall be included in the Hospital' income. All fees or other income and accounts receivables attributable to the Employee's professional medical services, administrative directorships, teaching services or clinical services conducted on behalf of the Company and/or the Hospital shall belong to the Company. Where necessary, the Employee agrees to assign such monies and accounts to the Company in writing. The ownership and right of control of all case records, charts, case histories, x-ray films, reports, records and supporting documents concerning all patients prepared by or under the Employee's supervision or prepared in connection with the operation of the Company shall vest exclusively in and remain with the Company, subject to applicable state or federal laws, rules or regulations. After termination or expiration of this Agreement, the Employee may inspect during regular business hours any patient records of any patient which Employee treated during the term of this Agreement or its predecessors, subject to the

4

rights of such patients with respect to said records.   Access to such records shall not be unreasonably denied, and shall be provided in accordance with Florida law.

8.      **Meeting Community Needs**.  In order to meet community needs in the area of oncology services, Employee in the discharge of Employee's duties to the Hospital, will also:

a.      Provide access to care by accepting Medicare and Medicaid patients, as appropriate.

b.      Assist the Hospital in improving service, outcome and cost within the patient care environments it services.

c.      Embrace the principles of total quality management within the facilities serviced by the Hospital.

d.      Assist with recruiting additional medical oncology physicians as required to meet patient needs.

e.      Provide input as to additional medical oncology services which are needed in the community.

f.      Assist the Hospital in the design and delivery of managed care initiatives aimed at meeting the needs of the community.

g.      Assist the Hospital in the design and implementation of quality assurance and utilization management initiatives aimed at meeting the needs of the community. Participate in a utilization management initiative concerning inpatient care by admitting patients to the Hospital for chemotherapy regimens only when, in the Employee's independent professional judgment, there is no clinically equivalent outpatient regimen that can reasonably be given.

h.      Assist the Hospital and the community in designing initiatives to address the delivery of health care services to the medically needy and indigent of the community. Participate in a service call rotation for inpatients and outpatient new patient consultations and referrals and, through this mechanism, accept an equivalent proportion of indigent, Medicaid, and uninsured patients.   In addition, the Employee will make reasonable efforts to see outpatients within ten (10) days.

9.      **Professional Policies and Procedures**.   The Medical Oncology Practice Management Group shall have the authority from time to time to establish the professional policies and procedures to be followed by Employee in the handling of each individual patient of the Company.  Employee agrees to comply with the policies and procedures of the Company

5

6/9/2010

so long as they are reasonable and do not violate any law or professional ethics and do not impede the Employee from exercising his or her own medical professional judgment. No policy shall prohibit the Employee from displaying his or her name at the Employee's practice location. The Employee may not relocate his or her practice without the consent of both parties, unless this Agreement is terminated.

Employee shall notify the Company as follows, in writing, after any of the following events:

(i)     a malpractice claim or any similar legal proceeding against the Employee is threatened or is actually filed, within three (3) days of the event;

(ii)     an event occurs or an illness or other situation develops that substantially interrupts all or a portion of the Employee's professional practice or that will in all likelihood within the next ninety (90) days materially adversely affect the Employee's ability to perform his/her duties under this Agreement, within three (3) days of the event; or

(iii)     the occurrence of an incident which the Employee knows or should know is likely to give rise to a malpractice claim if all the facts were known to the patient or patient's family, within three days of the event.

The Employee shall comply with those provisions of law that affect reimbursement for professional services rendered by the Employee.   Furthermore, the Employee will not, either by action or inaction, do or cause anything that would adversely affect reimbursement payment to the Company or the Hospital or which would adversely affect the Medicare provider status of the Company or the Hospital.

10.     **Paid Time Off and Benefits**. Employee shall be entitled to up to five (5) weeks Paid Time Off, in lieu of Personal Leave, each year of this Agreement, to be taken at a time approved by the Medical Oncology Practice Management Group.  Unused Paid Time Off will not roll over year to year. The Company shall maintain a life insurance policy for the Employee in the amount of Employee's annual salary and Compensation Pool distribution. The Company shall make available a health plan for the Employee and his/her dependents for medical and dental expenses.  Such coverage shall be in accordance with similar policies available to all Company employees. The Employee shall be entitled to all other standard benefits not addressed in this Agreement as are available to other Company employees as set forth in the Company's Employee Handbook.

11.     **Physician Disability**.  In the event the Employee is unable to work for a continuous aggregate time period of three (3) months during the term of this Agreement by reason of illness, mental or physical disability, the Company shall make disability payments to the Employee in an amount equal to One Hundred Twenty Thousand Dollars ($120,000.00) per

6/9/2010

Full (6|18|10)   Tal 6-18-10

year. Said payments shall continue for as long as the disability remains, or until such time as the Employee reaches the age of Social Security eligibility, whichever occurs first. It is agreed that the above described disability coverage may be provided by the Company through the purchase of a policy of insurance.

12.    **Time Off**. Employee shall be entitled to such time off as is approved by the Medical Oncology Practice Management Group from time to time. Employee shall be entitled to attend approved seminars for Continuing Medical Education each year. Time spent in CME activity may not exceed two (2) weeks per year, without prior written consent of the Medical Oncology Practice Management Group.

13.    **Termination of Agreement**.

a.    The Company may voluntarily elect to terminate this Agreement at any time upon written notice of such intention to terminate not less than two (2) years prior to the date upon which termination is desired. In the event such notice is delivered less than two (2) years prior to expiration of any term of this Agreement, said term shall automatically be extended to a date two (2) years from the date said notice was delivered.

b.    The Employee may voluntarily elect to terminate this Agreement at any time upon written notice of such intention to terminate not less than six (6) months prior to the date upon which termination is desired.

c.    In the event the parties are unable to reach a mutually agreeable compensation formula as more fully set forth in Section 24.d below, it shall be the Employee's option to terminate the Agreement upon six (6) months written notice or to continue the Agreement at the current compensation rate for one (1) additional year.

d.    The Company may terminate this Agreement at any time if Employee becomes unfit to properly practice medicine because of any good and sufficient cause, including but not limited to commission of any felony or misdemeanor involving moral turpitude, failure to take call or provide timely coverage, neglect of patients, behavior which discredits the Company or the Hospital, abuse of alcohol or drugs, or any violation of the Medical Practice Act; or if Employee becomes legally disqualified to render professional services as a physician within the State of Florida; or is no longer on the staff at Halifax Medical Center, with Active or Associate Staff privileges in medical oncology. Such termination shall be effective upon the delivery of written notice thereof to Employee or at such later time as may be designated in said notice.

e.    All terms and conditions of Employee's employment with the Company are provided in this Agreement. Employee's fair hearing rights under the Bylaws of any hospital medical staff of which he/she is a member continue to apply to Employee's medical

7

6/9/2010

staff and clinical privileges at said facility but are not applicable to the termination or renewal of this Agreement. Any dispute arising from this Agreement shall be handled by a court of competent jurisdiction.

f.    This Agreement shall terminate upon the death of the Employee. Notwithstanding termination as a result of such death, however, the Company shall continue to carry out any provisions under this Agreement which contemplate performance subsequent to such termination. Furthermore, such termination shall not affect any liability or other obligation of any party hereto which accrued prior to such termination. In the event of death of the Employee resulting in termination of this Agreement, patients then under the care of the Employee shall be cared for by other physician employees of the Company, if such patients so elect.

g.    In the event of termination for reasons other than death, the Employee may purchase the charts of the Employee's active patients for the cost of copying the medical records, including materials and labor. Said charts shall be provided in the manner in which they are maintained by the Company.

h.    The Employee acknowledges the exclusive and closed nature of the Medical Oncology staff at the Hospital. Therefore, in the event of termination of the Employee's employment under this Agreement, the Employee will immediately resign from the Hospital's Medical Oncology staff. This provision will prohibit the Employee from rendering services in the field of medical oncology and hematology at the Hospital following his termination, but it will not prevent him from retaining privileges on the Hospital's medical staff in the fields of internal medicine, primary care medicine, or any other medical specialty not involving oncology/hematology services.

14.    **Limitations of Authority**.    Without the express written consent from the Company, Employee shall have no apparent or implied authority to:

a.    Pledge the credit of the Company, the Hospital, or any of its other employees;

b.    Bind the Company or the Hospital under any contract, agreement, note, mortgage or otherwise;

c.    Subject to policies adopted by the Company, release or discharge any debt due the Company unless the Company has received the full amount thereof;

d.    Sell, mortgage, transfer or otherwise dispose of any assets of the Company or the Hospital.

8

15.    **Invalid Provisions**. The invalidity or unenforceability of a particular provision of this Agreement shall not affect the other provisions hereof, and the Agreement shall be construed in all respects as if such invalid or unenforceable provisions were omitted.

16.    **Modification**. No change or modification of this Agreement shall be valid unless the same be in writing and signed by the parties hereto. Notwithstanding any other provisions of this Agreement, if the governmental agencies which administer or enforce Medicare or Medicaid or if any other federal or state regulatory body or agency passes, issues, interprets or promulgates any law, rule, regulation, standard, guideline or interpretation while this Agreement is in effect which prohibits, restricts, limits or in any way materially adversely affects the rights or obligations hereunder of either the Company, the Employee, or the Hospital, then either party may give the other party notice of intent to amend this Agreement to the satisfaction of the noticing party, to compensate or adjust for such prohibition, restriction, limitation, or materially adverse effect; provided, however, that the reduction in Medicare or Medicaid reimbursement rates instituted by the agencies administering such programs shall not give the Company the right to send any such notice of intent to amend.

If the parties are unable to mutually agree to amend this Agreement in writing within thirty (30) days after such a notice is given, then either party may terminate this Agreement without further liability. However, if the implementation of any law, rules, regulation, standard, guideline or interpretation which gave rise to the perceived need to amend this Agreement is stayed on account of any administrative appeal or any suit filed in a court of competent jurisdiction, then the right to amend or terminate as set in this section above shall also be stayed during the period of such administrative or court ordered stay.

17.    **Applicable Law and Binding Effect**. This Agreement shall be construed and regulated under and by the laws of the State of Florida, and shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns. Venue shall be with the appropriate court having jurisdiction in Volusia County, Florida.

18.    **Proprietary Information**. The parties agree to keep in secrecy and confidence any and all information they may assimilate or to which they have access during the term of this Agreement and which has not been publicly disclosed and is not a matter of common knowledge in the areas of practice in which the Company is engaged. The parties agree that both during and after the terms of Employee's employment by the Company they will not, without prior written consent by the other party, disclose any such confidential information to any third person, partnership, joint venture, company, corporation or other organization, except as required by law.

19.    **Specific Performance**. The parties agree that damages at law will be an insufficient remedy in the event that a party violates the terms of paragraph 18 of this

6/9/2010

Agreement and that the aggrieved party shall be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief to enforce the provisions of such paragraph, which injunctive relief shall be in addition to any other rights or remedies available to the parties.

20.     **Attorneys' Fees**. In the event any litigation is brought to enforce the terms of this Agreement, the prevailing party in such action shall recover from the non-prevailing party all the prevailing party's reasonable costs and attorneys' fees incurred in such action.

21.     **Confidentiality**. The parties agree that the terms of this contract are to be kept confidential and may not be disclosed to any third party without the prior written consent of both parties, except as required by law. This paragraph shall survive the termination of this Agreement.

22.     **Notices**. All notices provided for in this Agreement shall be made by certified mail, return receipt requested to the Employee at his/her primary place of business, and to the Company at Post Office Box 2830, Daytona Beach, Florida 32120-2830, or such other address as requested in writing by the parties.

23. **Physician Employment**. No new physicians shall be employed by the Company without a two-thirds consent of the Medical Oncology Practice Management Group.

24.     **Medical Oncology Practice Management Group**.    The Medical Oncology Practice Management Group (hereinafter "Management Group") shall consist of six members, three of whom shall be selected by the Hospital, and three of whom shall be selected by the medical oncology physicians employed by the Company. Members of the Management Group shall serve for two years. The Management Group shall meet quarterly to discuss management of the Program and related areas of importance. These meetings will be open to the Employee, even if Employee is not a member of the Management Group. The Management Group shall meet more frequently upon the request of the Company, the Hospital, or any member of the Management Group. The Management Group shall also:

a.     Appoint a Director of Medical Oncology to carry out the day-to-day implementation of the policies adopted by the Management Group at all locations serviced by the medical oncology employees of the Company on behalf of the Hospital.

b.     Receive and review quarterly financial information concerning the Program, and distribute a quarterly Profit and Loss Statement to all medical oncology physicians employed by the Company. The Profit and Loss Statement shall be as accurate and true as possible at the time it is presented. However, the Company reserves the right to make subsequent adjustments to the Statement, as necessary.

6/9/2010

c.      Recommend policy and budget considerations concerning medical oncology to the Hospital.

d.      Meet annually with the Hospital, Program administrators, and the Company to review and adjust medical oncology physician employee compensation, in light of the Profit and Loss Statements and other relevant factors.

25.     **Non-Competition.**

a.      Except as otherwise stated in Section 25.b below, as long as this Agreement is in effect, and for a period of two (2) years following the Employee's termination of employment with the Company, the Employee will not provide oncology/hematology services (including medical oncology, hematology, radiation oncology, laboratory and imaging) at any facility within the geographical boundaries of the Halifax Hospital Medical Center special tax district, or the Southeast Volusia Hospital District (as described on Exhibit "B" attached to this Agreement), without the prior approval of the Company.

b.      Notwithstanding anything to the contrary contained herein, it is agreed that the restrictive covenant (non-competition provision) contained in Section 25.a above will not apply to the Employee in either of the following events:

i.      If the Hospital declines to renew this Agreement upon the expiration of its term, the Employee will have no restrictions on his future practice.

ii.     Upon the Employee's termination of employment with the Company, if a majority of full-time medical oncologists who have similar employment contracts with the Company, and who have been members of the Medical Staff at the Hospital for at least five (5) years, decide by majority vote to waive the application of the restrictive covenant (non-competition provision) as to the Employee - in which decision the Employee will not be entitled to vote - then the Employee may practice following his termination of employment without restriction.

iii.    The restrictive covenant contained herein will apply only as long as the Hospital has a closed staff in medical oncology/hematology.

26.     **Binding Upon Successors.** This Agreement shall be binding upon any and all successors in interest to the Hospital or its operations, regardless of whether such successor assumes control through sale, merger, reorganization, or any other restructuring of the Hospital.

11

6/9/2010

27.  **Master List.**  This Agreement and any other agreements between the Company/District and the Employee shall be included in a central Master List maintained by the District's Legal Department.

IN WITNESS WHEREOF, the undersigned have hereunto caused this Agreement to be executed the day and year first above written.

HALIFAX STAFFING, INC.                          BOON CHEW, M.D.


By: _____                  _____

Title: _____C.F.O._____

Date: _____7/8/10_____                Date: _____6/18/2010_____

Witness: _____              Witness: _____


12

6/9/2010

Exhibit A

Benchmarks

The Hospital and Employee will work together to meet the following targets. The targets provided below are applicable to the first year of the initial term. The parties will meet and negotiate in good faith beginning 180 days prior to the end of the year to review and revise the targets for the next year of the term (the process will repeat for each subsequent year).

The actual pay-out depends on the percentage allocation (or weight) assigned to each quality indicator and deliverable, and the extent to which each quality indicator and deliverable is met.

Percentage Allocation (or Weighting)

Patient Satisfaction – Thirty percent (30%) of the Incentive Bonus Pool
> 0% payable for Baseline, 75% payable for Floor Targets, 100% payable for Reach Targets
> Equal weight allocated to each measure

| Measures | Floor Target | Reach Target | Baseline |
|---|---|---|---|
| Time physician spends with you | 85% per quarter | 90+% per quarter | 80% |
| Physician addresses your concerns | 85% per quarter | 90+% per quarter | 80% |
| Dr answered questions understandably-8646 | 85% per quarter | 90+% per quarter | 80% |
| Friendliness/courtesy of physician | 85% per quarter | 90+% per quarter | 80% |
| Confidence/trust in Drs-8178 | 85% per quarter | 90+% per quarter | 80% |

Oncology Utilization Committee – Sixty percent (60%) of the Bonus Pool
> 100% payable if all physicians follow through with more than 90% of the committee recommendations.
> 75% payable if all physicians follow through with 80% of the committee recommendations
> 50% payable if all physicians follow through with 70% of the committee recommendations.

13

> 0% payable if all physicians follow through with less than 70% of the committee recommendations

**Third Party Recognition** – Ten percent (10%) of Bonus Pool
> 100% payable if recognition received/maintained
> equal weight (5 percent) of the Incentive Bonus Pool allocated to each
>> 1. ASCO Certification for Practice
>> 2. ACOS – COC accreditation survey
>> 3. Achieve Joint Commission Disease Specific Certification
>> 4. If the above accreditations are not available or Hospital fails to apply for the accreditation, at the time of the Incentive Pool Bonus calculation and payout the ten percent (10%) of the Incentive Bonus Pool will be allocated to the calculation for the Oncology Utilization Committee portion of the agreement

14

6/9/2010

**Exhibit B**

[Attach Geographical Boundaries Map]

15

Exhibit "B"



Volusia County Taxing and Tax Code Districts

NORTH

100 County - Westside
200 County - Northeast
600 County - Southeast
650 County - Silver Sands
204 Daytona Beach
214 Daytona Beach
885 Daytona Beach
405 Daytona Beach Shores
015 DeBary
012 DeLand
016 Deltona
604 Edgewater
205 Flagler Beach
206 Holly Hill
018 Lake Helen
601 New Smyrna Beach
606 Oak Hill
014 Orange City
201 Ormond Beach
011 Pierson
405 Ponce Inlet
402 Port Orange - N of Spruce Creek
602 Port Orange - S of Spruce Creek
401 South Daytona

MORGAN B. GILREATH, JR.
Property Appraiser
Volusia County, FL

August 19, 2002

# Memo

**To:** Tom Garthwaite
**From:** Andy Foster
**CC:** Audrey Pike, Gerry Neff
**Date:** March 24, 2009
**Re:** Fair Market Value Analysis – Dr. Chew

---

This memo will be retained in the legal department, documenting the compensation paid to Dr. Chew.

The chart below compares the proposed compensation to MGMA survey data. Amounts which lie below the 25th or above the 75th percentile require additional documentation and explanation. The MGMA survey data has been recast in 2009 dollars using a 3% inflation factor. Please see below for more information.

| X | The proposed compensation lies within acceptable tolerances with regard to FMV. Please proceed with compensating physicians of this type and experience at this rate. |

| | The proposed compensation lies outside acceptable tolerances. Please coordinate with Audrey Pike, legal department. A memo which includes extenuating circumstances will be required to justify this level of compensation. Reasons may include (but are not limited to): acuity of patients, volume of patients, specific recruitment challenges, etc. |

I can be reached at extension 4564 with questions.



*The opinions reflected within this document relate only to fair market value assessment and are not intended as an affirmation of fiscal responsibility. This document does not represent the opinion of an independent 3rd party.*

## Contract Renewal

**Halifax Health**
**Information Needed for FMV Calculations**

*Please complete the following and forward to Andy Foster, Finance Dept., ext 4564*
*You may also fax to 226-4575, attn: Andy Foster*

1. Manager Name: **Tom Garthwaite**

2. Manager Department: **Center for Oncology**

3. Phone number: **4056**

4. Physician Name: **Boon Chew, MD**

5. Physician Specialty: **Medical Oncology**

6. How many years practicing in this specialty? **5 years**

7. Which best describes the physician? (check one)

   Full Time; greater than 0.8 FTEs    [x]

   Part Time; between 0.4 and 0.6 FTEs    [ ]

8. Which best describes the proposed compensation arrangement? (check one)

   Straight Salary    [ ]

   Salary plus incentive (incentive at risk)    [ ]

   Salary plus incentive (incentive share of pool)    [x]

   Productivity based    [ ]

   Amount per unit of time or activity (specify below)    [ ]

   Per (circle one): Hour   Day   Year   Procedure/reading    (Monthly)

9. Have compensation specifics already been discussed with the physician?   Yes   No

10. Please specify. If amounts have not been discussed, specify what you are proposing.

    Amount: $ **Base $135,000 + share of pool**

    Per (circle one): Hour   Day   Year   Procedure/reading    (Month)

    Incentive type and amount: **Annual pool of $1,509,600 split by 6 physicians**

11. Estimated time this physician will provide medical services to patients: **95** %

    Estimated time this physician will provide non-medical services to Halifax Health: **5** %

    Note: A + B must equal 100%

    Describe the non-patient services **Medical Director oncology reimbursement**

**Oncology Physicians**

| Physician | Yrs Exp | Base | 2008 Incentive | 2009 Incentive | 2009 Proj Incnt | 2009 Projected | Contract Yr End | Incentive Data thru | Incentive Type | Clinical Time | non-Clin Time | Nature of non-Clinical Services |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Radiation Oncology** | | | | | | | | | | | | |
| Hechtman | 2 | 250,000 | 66,587 | 116,768 | 280,243 | 530,243 | Sep | Feb | Risk | 100% | 0% | |
| Battle | 20 | 250,000 | 292,529 | 144,135 | 157,238 | 407,238 | Mar | Feb | Risk | 100% | 0% | |
| Factor | 5 | 250,000 | 312,432 | 169,459 | 290,501 | 540,501 | Jul | Feb | Risk | 100% | 0% | |
| | | | | | | | | | | | | |
| **Medical Oncology** | | | | | | | | | | | | |
| Weiss | 20 | 135,000 | | | 307,631 | 442,631 | | | Pool | 95% | 5% | Med Dir Hospice |
| Chew | 5 | 135,000 | | | 355,875 | 490,875 | | | Pool | 95% | 5% | Med Dir Oncology Reimbursement |
| Deveras | 4 | 135,000 | | | 174,021 | 309,021 | | | Pool | 95% | 5% | Med Dir Role - Clinical Trials |
| Durkin | 25 | 135,000 | | | 275,768 | 410,768 | | | Pool | 90% | 10% | Hospice physician + Med Dir - Oncology |
| Favis | 25 | 135,000 | | | 202,669 | 337,669 | | | Pool | 90% | 10% | Hospice physician + Med Dir - Oncology |
| Sorathia | 17 | 135,000 | | | 448,818 | 583,818 | | | Pool | 95% | 5% | Clinical trials physician |

Total amount in pool      1,509,600

| | FY09 Pool Share | Pool Comp | Incent Comp | Total |
|---|---|---|---|---|
| Weiss | 17.80% | 268,709 | 38,922 | 307,631 |
| Chew | 20.47% | 309,015 | 46,860 | 355,875 |
| Deveras | 9.47% | 142,959 | 31,062 | 174,021 |
| Durkin | 15.44% | 233,082 | 42,686 | 275,768 |
| Favis | 11.43% | 172,547 | 30,122 | 202,669 |
| Sorathia | 25.39% | 383,287 | 65,331 | 448,818 |
| Total | 100.00% | 1,509,599 | 254,983 | 1,764,582 |

**Notes**

Radiation uses their base plus a figure equal to their annualized year to date productivity bonus payments.

Medical uses their base plus a figure equal to their FYTD09 pool share % X the total pool plus their FY08 incentive payments (15% of margin calc).

3/24/2009             Oncology matrix.xls - Sheet1