**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, and ELIN BAKLID-KUNZ, Relator, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) CASE NO.: 6:09-CV-1002-ORL-31TBS ) |
| | ) JUDGE GREGORY A. PRESNELL |
| HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC., | ) ) [FALSE CLAIMS ACT – QUI TAM] ) ) DISPOSITIVE MOTION ) ) ORAL ARGUMENT REQUESTED |
| Defendants. | ) ) |

**DEFENDANTS HALIFAX HOSPITAL MEDICAL CENTER AND HALIFAX**
**STAFFING, INC.'S**
**MOTION FOR SUMMARY JUDGMENT ON RELATOR'S NON-INTERVENED**
**CAUSES OF ACTION IN COUNTS I, II, III AND IV**

## TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF MATERIAL FACTS AND ALLEGATIONS ...................................2

   A.  Introduction To Halifax ................................................................................2

   B.  The Non-Intervened Causes Of Action ........................................................3

      1.  Count I – False Claims Act Allegations Involving Medical Necessity Of Short Stay Admissions.............................................................................................................3

      2.  Count IV – Anti-Kickback Statute Allegations Involving Halifax Employed Physicians 5

      3.  Count III – Stark Law Allegations Involving Halifax Psychiatrists And Medical Directors...............................................................................................................6

      4.  Counts I And II – Derivative False Claims Act Causes Of Action Based On Alleged Violations Of The Stark Law and Anti-Kickback Statute....................................................7

III.  SUMMARY JUDGMENT LEGAL STANDARDS ...............................................8

IV.  LEGAL FRAMEWORK...................................................................................9

   A.  The False Claims Act .....................................................................................9

   B.  The Anti-Kickback Statute Does Not Apply Due To The Employment Exception .........11

   C.  The Stark Law ..............................................................................................12

      1.  The Stark Law Does Not Prohibit All Referrals .......................................................15

V.   LEGAL ARGUMENT REGARDING FCA COUNT I ALLEGED LACK OF MEDICAL NECESSITY FOR SHORT STAY MEDICARE ADMISSIONS.....................16

VI.  LEGAL ARGUMENT ON ANTI-KICKBACK STATUTE (COUNT IV) ...................24

   A.  Relator's Anti-Kickback Statute Allegations Fail As A Matter Of Law..........................24

   B.  Relator Has Not Offered Any Evidence To Establish Anti-Kickback Statute Violations With Respect To Any Of The Physicians At Issue ................................................................25

      1.  Anti-Kickback Statute Elements Of Proof................................................................25

   C.  Relator Has No Evidence Rebutting Halifax's Factual Showing That No Kickbacks Were Offered By Halifax Or Solicited By Any Halifax Physician ...................................................26

VII. LEGAL ARGUMENT ON STARK LAW (COUNT III)............................................27

   A.  Relator Has Not Offered Any Evidence To Establish Stark Law Violations With Respect To The Psychiatrists And Medical Directors.........................................................................27

   B.  Halifax Used A Reasonable Method Of Its Own Creation To Arrive At FMV Compensation ...............................................................................................................29

      1.  Halifax's Method For Determining FMV Was Reasonable As Set Forth By Fact And Expert Evidence .......................................................................................................29

      2.  Halifax's Physician Compensation Was FMV........................................................30

   C.  Halifax's Evidence That Its Psychiatric And Medical Director Arrangements Were Commercially Reasonable Is Undisputed By Relator................................................................31

   D.  Relator Offers No Credible Evidence That Halifax Physicians Made Prohibited Referrals, Therefore, Summary Judgment Is Warranted For Halifax .........................................................32

VIII.      LEGAL ARGUMENT ON COUNT II FALSE CLAIMS ACT ALLEGATIONS DEPENDENT ON ALLEGED VIOLATIONS OF THE STARK LAW (COUNT III) AND ANTI-KICKBACK STATUTE (COUNT IV) ......................................34

   A.  Plaintiffs' Non-Intervened FCA Causes Of Action In Count II Fail As A Matter Of Law And Fact ......................................................................................................................34

## <u>TABLE OF CONTENTS</u>

1.    Relator Cannot Show That Any Claims Related To Count III Are False Because There Were No Stark Law Violations..........................................................................................34

2.    Relator's Count I And II FCA Claims Based On The AKS Should Be Dismissed For Lack Of Evidence That Any AKS Violations Occurred ....................................................36

3.    Plaintiffs Cannot Establish The Requisite Scienter As To Any Count I Or II Claims..36

**IX.  CONCLUSION**............................................................................................................38

## I.     INTRODUCTION

Halifax's Motion for Summary Judgment on all Counts of Relator's Second Amended Complaint reflects the reality that these counts were meritless from the outset. The United States must have concurred with this assessment, electing not to intervene on the majority of the allegations made in Relator's Second Amended Complaint ("non-intervened causes of action"). Relator cannot point to any facts uncovered during the discovery process that should change this assessment. Specifically, the United States did not intervene on Relator's allegations regarding (1) the lack of medical necessity for certain Medicare short stay admissions in violation of 31 U.S.C. §§ 3729 *et seq.*, (the False Claims Act or "FCA"); (2) alleged violations of the 42 U.S.C. § 1395nn (the "Stark Law") involving Halifax psychiatrists; (3) alleged Stark Law violations involving Halifax medical directorship positions; (4) alleged 42 U.S.C. § 1320a-7b(b) (Anti-Kickback Statute or AKS) violations involving Halifax medical oncology agreements; (5) alleged AKS violations involving Halifax neurosurgeons; and (6) alleged AKS violations involving Halifax psychiatrists. Since the United States made that election in November 2011, Relator has abandoned these claims, failing at every turn to adduce evidence through discovery to substantiate *any* of the non-intervened causes of action for which she seeks tens of millions of dollars of damages.

Relator's lack of diligence is expressed by (1) her short stay admission expert's deficient report that only concludes further review is necessary; (2) her failure to submit any expert reports in support of Stark Law Count III or AKS Count IV; (3) failure to acknowledge that the *Bona Fide* Employment Exception to the AKS bars her Count IV; and (4) her failure to depose any of the Halifax psychiatrists or medical directors implicated in

Counts III and IV. Halifax has, by contrast, submitted substantial expert reports and testimony concluding that it has acted in compliance with the law with respect to each of Relator's allegations. Halifax should be granted summary judgment as to all of the non-intervened causes of action reflected in Count I, Count II, Count III, and Count IV of Relator's Complaint. *See* Relator's Second Amended Complaint (Dkt. No. 29) at 66-70 ("Complaint").

## II.     STATEMENT OF MATERIAL FACTS AND ALLEGATIONS

### A.     Introduction To Halifax

Halifax was created by a special act of the Florida Legislature in 1927 and operates as a special taxing district with health care facilities in Volusia County, Florida, including Halifax Hospital Medical Center in Daytona Beach, Florida. Complaint at ¶ 5.[1] With 764 beds on three campuses, Halifax is the regional Level II Trauma Center and principal charity care provider serving Volusia and Flagler Counties. *Id.* As one of only 14 member hospitals in Florida's Safety Net Hospital Alliance, Halifax treats all patients who come to its Emergency Department regardless of their ability to pay.[2] In 2009, for example, Halifax provided $76.8 million in community benefits, including uninsured, Medicaid, trauma services, and neonatal and pediatrics. *See* Ex. 1.[3] Halifax carries the burden of care in the

---

[1] *See also* Halifax Health Medical Center of Daytona Beach, publicly available at:
http://www.halifaxhealth.org/locations/medicalcenterofdaytonabeach.aspx.
[2] *See* Safety Net Hospital Alliance of Florida – Member Hospitals, publicly available at:
http://safetynetsflorida.org/member-hospitals.
[3] Halifax Health Community Benefits Factsheet, publicly available at:
http://extranet.acsysweb.com/vsitemanager/Halifax/Public/Upload/SubmittedDocuments/0309-
0679%20Community%20Benefits%202012.pdf.

region, accounting for over 23,000 admissions in 2011, representing over one-third of all 2011 admissions in Volusia County, Florida. *See* Ex 2.

      B.     The Non-Intervened Causes Of Action

      The non-intervened causes of action substantively break down into four categories: (1) Count I, allegations of medically unnecessary Medicare patient admissions in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G) );[4] (2) Count II, alleged conspiracy to violate the FCA, 31 U.S.C. § 3729(a)(1)(C), through the payment of "excessive compensation" and "illegal incentives" to physicians in violation of the Stark Law and AKS, 42 U.S.C. § 1320a-7b(b); (3) Count III, allegations that certain Halifax physician services agreements violated the Stark Law; and (4) Count IV, allegations that certain physician services agreements included kickbacks and other illegal remuneration to physicians, including employed Halifax physicians, in violation of the AKS.

      1.     Count I – False Claims Act Allegations Involving Medical Necessity Of Short Stay Admissions

      Relator lacks the necessary clinical evidence to survive summary judgment on her allegation that Halifax fraudulently admitted "short stay" patients as inpatients. A "short stay" admission is a hospital stay that typically lasts for less than two days. *See, e.g.*, Ex. 3, Duvall Dep. (June 28, 2012), at 30:15-21. Such short-stay admissions are common. The Medicare Program, administered by the Centers for Medicaid and Medicare Services ("CMS"), is responsible for providing statutory and regulatory guidance to providers on how to determine whether a patient should be admitted and treated as an inpatient or treated in a

---

[4] Relator's Count II alleges conspiracy and violation of the False Claims Act under 31 U.S.C. § 3729(a)(1)(C), so it is derivative of the substantive allegations in Count I.

potentially less expensive outpatient setting. CMS' guidance is that the decision to admit a patient can only be made by the physician. *See id.*, at 72:5-73:9.[5] Second-guessing the physician's decision to admit can only be done through a clinical medical necessity review by a qualified medical professional. Ex. 4, Duvall Dep. (June 28, 2012) at 58:19-62:7. Relator's expert report is fatally deficient because it is statistically invalid, and provides this Court with no basis to assess the unsubstantiated conclusions therein.

Relator's expert report on the short stay admissions does not establish a genuine dispute of material fact regarding the medical necessity of those admissions. Relator's expert, Jessica Schmor, used a statistically invalid sample of 35 patient records that cannot be relied upon in support of Relator's broader short stay admission allegations. *See* Ex. 5, Expert Rep. of Mathew Mercurio ("Mercurio Rep."), at 3-8. Relator's counsel admitted in Court that the other 200-plus patient records obtained in discovery could not be used as a statistically valid random sample for any further clinical medical necessity reviews. Ex. 6, Hr'g Tr. 84, May 7, 2013; Ex. 7, Expert Rep. of Jessica Schmor ("Schmor Rep."), at 4, 9-13, 20. The absence of expert evidence is fatal to Relator's non-intervened causes of action. *See United States of America ex rel. Samuel L. Armfield, III, and Patricia Armfield v. James P. Gills, et al.*, Case No. 8:07-cv-2374-T-27TBM, 2012 U.S. Dist. LEXIS 154749, at *23-26 (M.D. Fla. Oct. 29, 2012) (denying Relator's motion for summary judgment because of failure to provide expert report; defendants opposed Relator's motion but did not move for summary judgment).

---

[5] *See also* Medicare Benefits Policy Manual Ch. 1 § 10, entitled "*Covered Inpatient Hospital Services Covered Under Part A*," discussed *infra* at 18.

2.    Count IV – Anti-Kickback Statute Allegations Involving Halifax
      Employed Physicians

Relator's AKS allegations in Count IV fail as a matter of law because the *Bona Fide*
Employment Exception to the AKS exempts employed physicians from the scope of the
prohibition. *See* 42 U.S.C. § 1320a-7b(b)(3)(B) (2006) (the AKS does not apply to "any
amount paid by an employer to an employee (who has a *bona fide* employment relationship
with such employer) for employment in the provision of covered items and services").

Even in the absence of this blanket exception, Relator has no credible evidence
creating a genuine dispute of material fact as to whether Halifax physicians were offered or
solicited offers of illegal remuneration for the purpose of steering patient referrals to Halifax
or any of its affiliated entities. Every physician identified in Count II has testified that (1) all
of his or her compensation is for services provided during the course of his or her
employment with Halifax; (2) his or her compensation was based on Fair Market Value
("FMV") considerations at all times; (3) a significant proportion of the patients that the
physicians treated were charity care patients who would not otherwise be able to receive
adequate treatment locally; and (4) no physician tracked any referrals related to patients
under his or her care. Ex. 8, Khanna Decl.; Ex. 9, Kuhn Decl.; Ex. 10, Vinas Decl.; Ex. 11,
Chew Decl.; Ex. 12, Deveras Decl.; Ex. 13, Durkin Decl.; Ex. 14, Favis Decl.; Ex. 15,
Sorathia Decl.; and Ex. 16, Weiss Decl. Moreover, Relator fails to provide any expert report
in support of Count IV. *See Armfield*, 2012 U.S. Dist. LEXIS 154749, at *23-26.

3.      Count III – Stark Law Allegations Involving Halifax Psychiatrists And Medical Directors

With respect to her non-intervened Stark Law causes of action in Count III, the undisputed evidence shows Halifax's arrangements with its psychiatrists were direct compensation arrangements that meet the criteria for the *Bona Fide* Employment Exception to the Stark Law, as these arrangements were commercially reasonable and based on FMV. 42 U.S.C. § 1395nn(e)(2) (hereinafter the "*Bona Fide* Employment Exception"). Relator has not deposed any of the psychiatrists or medical directors at issue. Moreover, Relator has not offered any expert report on this Count and, therefore, cannot establish a material dispute of the fact as to whether Halifax's employment arrangements with its psychiatrists and medical directors were based on FMV and were commercially reasonable.

Halifax's undisputed evidence shows the compensation paid to the physicians at issue was reasonably related to what competitors in the relevant market were paying and offering to psychiatrists and medical directors. Ex. 34A, Expert Rep. of Ronald Vance ("Vance Rep."), at 11-20. As the United States' 30(b)(6) witness testified, any reasonable methodology for determining FMV is acceptable. Ex. 17, Barsky Dep., at 65:17-69:8. Relator has offered no evidence disputing the reasonableness of the method used by Halifax or that the psychiatrist agreements and medical director agreements were commercially reasonable.

Relator offered no evidence identifying any actual referrals prohibited by the Stark Law by any of the physicians identified in her non-intervened causes of action. *See* Complaint at 37-58. Without identifying any specific referrals, Relator cannot prove that Halifax submitted or presented any potentially false claims. Without identified claims, there can be no FCA violation. 31 U.S.C. § 3729(a)(2). Relator even failed to take the superficial

-6-

steps taken by the United States for its intervened causes of action: obtaining an "expert" report from a database vendor who summarized various Halifax Medicare claims as purported evidence. Relator has made no discovery effort whatsoever to identify *any* referrals or false claims. This is fatal to Count III. *See Armfield*, 2012 U.S. Dist. LEXIS 154749, at *23-26.

Halifax, by contrast, has established through its undisputed expert reports and testimony, and through the 30(b)(6) testimony of the United States' witnesses, that—even if Relator had collected and summarized Halifax's Medicare claim forms that constitute the United States' sole evidence of purported referrals—this evidence is not probative, reliable evidence to prove whether referrals were made or which physicians made them for purposes of the Stark Law. *See, e.g.*, Ex. 18, Expert Rep. of Donald Moran ("Moran Rep."), at 13-16; Ex. 47, Sandlin Dep., at 85:2-12. The patient medical records are the only reliable evidence of whether a specific physician made a referral. Ex. 47, Sandlin Dep., at 153:19-24. Relator has not offered any evidence that it has reviewed a single Halifax patient medical record for the purpose of establishing damages for Count III.

Summary judgment is, therefore, appropriate on the non-intervened causes of action in Count III.

        4.       <u>Counts I And II – Derivative False Claims Act Causes Of Action Based On Alleged Violations Of The Stark Law and Anti-Kickback Statute</u>

Relator also alleges FCA violations in Counts I and II that are derivative of the Stark Law and AKS allegations in Counts III and IV. Because the United States intervened only on the FCA causes of action relating to the Stark Law allegations for the Halifax neurosurgeons

and medical oncologists, Relator is left to pursue only her orphan FCA claims derived from (1) the alleged Stark Law violations of the psychiatrists and medical directors (Count III); and (2) alleged AKS violations for the neurosurgeon, medical oncologist, and psychiatry agreements (Count IV). As with the other Counts, Relator has made no pretense of undertaking discovery to support her Count II FCA claims. The failure of Relator's underlying Counts III and IV, discussed *infra*, requires that Halifax be granted summary judgment on her FCA Count II. The absence of evidence establishing any of the required elements of the FCA, *i.e.*, the (1) knowing (2) submission or presentment of (3) false claims; and (4) damages, is an independent basis for summary judgment.

## III.  SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). "Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 836–37 (11th Cir. 2006); *see also*, *United States ex rel. Kaimowitz v. Ansley*, 250 Fed. Appx. 912, 914 (11th Cir. 2007) (internal citations omitted). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "must look at the record as a whole, reviewing all of the evidence in the record." *Kaimowitz*, 250 Fed. Appx. at 914 (citing *Reeves*

*v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151 (2000)). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Id.* (citing *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005)).

The moving party bears the burden of showing that no genuine issue of material fact exists. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324–25 (internal quotations and citation omitted). Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324–25; *see also Shurick v. Boeing Co.*, No. 6:07–cv–1974–Orl–31GJK, 2010 WL 258788, at *1-2 (M.D. Fla. Jan. 20, 2010), *aff'd*, 623 F.3d 1114 (11th Cir. 2010).

## IV.   LEGAL FRAMEWORK

### A.   The False Claims Act

To establish a cause of action under the FCA, Relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. *Kaimowitz,* 250 Fed. Appx. at 915 (citing *United States v. R&F Properties of Lake Cnty., Inc.,* 433 F.3d 1349, 1355 (11th Cir. 2005)). However, the FCA was not designed to reach "every kind of fraud practiced on the Government." *United States ex rel.*

*Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir. 1977) (quoting *United States v. McNinch*, 356 U.S. 595, 599 (1958)); *see also Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001).

Relator contends that Halifax violated Sections 3729(a)(1) and (2) of the FCA. To establish a violation of Section 3729(a)(1), Relator must prove that: (1) Halifax presented or caused to be presented to the government a claim for payment; (2) the claim was false or fraudulent; and (3) Halifax knew they were presenting a false or fraudulent claim for payment. *See United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601, 618-19 (S.D. Tex. 2001); *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247, 1258-59 (S.D. Fla. 1989); *United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *13-16 (E.D. Pa. Feb. 11, 2003). Section 3729(a)(2) requires proof that: (1) Halifax made or caused to be made a record or statement to get a claim against the United States paid; (2) the record or the statement and the claim were false or fraudulent; and (3) Halifax knew the record or statement and the claim were false or fraudulent. *See Stinson*, 721 F. Supp. at 1259; *United States v. Warning*, No. 93-4541, 1994 U.S. Dist. LEXIS 10402, at *10-11 (E.D. Pa. July 26, 1994). "Knew" means that a person with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b) (1994).

Imprecise statements or differences in interpretation growing out of a disputed legal question, by law, are not false under the FCA. *See, e.g., United States ex rel. Parato v.*

*Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1339 (M.D. Ga. 2011) (under the FCA "innocent mistakes or negligence are not actionable, nor are imprecise statements arising from a disputed legal question."); *see also United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971, 986 (E.D. Wis. 1998) ("Imprecise statements or differences in interpretation growing out of a disputed legal question are not false under the FCA.").

      B.      <u>The Anti-Kickback Statute Does Not Apply Due To The Employment Exception</u>

      The AKS prohibits the knowing and willful offer, payment, or acceptance of "remuneration" to induce Medicare or Medicaid patient referrals. 42 U.S.C. §§ 1320a-7b(b)(1)-(2) (2006). The AKS does not apply to Halifax's agreements with employed physicians. Specifically, the Employment Exception states the AKS does not apply to "any amount paid by an employer to an employee (who has a *bona fide* employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B) (2006); *see also* 42 C.F.R. § 1001.952(i) (2012) (internal quotation marks omitted) ("remuneration does not include any amount paid by an employer to an employee, who has a *Bona Fide* employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs."). The Employment Exception applies equally to employees and independent contractors.[6]

---

[6] To identify a *Bona Fide* employment relationship, the AKS requires reference to the definition of "employee" under 26 U.S.C. § 3121(d)(2). *See* 42 C.F.R. § 1001.952(i). Section 3121(d)(2) defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." The Eleventh Circuit has embraced two common-law tests to assess such relationship: the "agency" test and the "hybrid" test. *See Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1266 (11th Cir. 1997) (noting that court has "relied on both the hybrid and agency

(continued…)

C.    The Stark Law

The Stark Law contains a two-part prohibition on referrals: (1) a physician may not

make a referral to an "entity" for the furnishing of designated health services ("DHS") if the

physician (or an immediate family member of the physician) has a financial relationship with

the entity; and (2) an entity may not submit a claim to Medicare or bill any party for certain

DHS furnished as a result of a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(A)-(B). The

legislative history reveals Congressional concern that financial relationships between

physicians and entities create two risks: (1) physicians may not refer to a facility that

provides the best care; and (2) overutilization of services would increase Medicare Program

costs. *Hearing on Ethics in Patient Referrals Act of 1989*, 101st Cong. 27 (1989). The

ultimate implementation of the Stark Law has taken decades and encompassed many

modifications and much regulatory guidance.

The initial Stark Law, also known as "Stark I," was passed in 1989 and addressed

concerns regarding physician self-referrals, *i.e.*, the referral of patients to medical facilities in

which the referring physician have a financial interest, which posed a conflict-of-interest

since the physician was in a position to benefit financially from their own referrals. *See, e.g.*,

U.S. Department of Health and Human Services, Office of the Inspector General, *Financial*

*Arrangements Between Physicians and Health Care Businesses*, OAI-12-88-01410 (1989).

Specifically, Stark I banned Medicare reimbursement for physician referrals for clinical lab

services where the referring physician has a financial relationship with the lab, unless the

---

tests"). Both tests turn upon the "degree of control" and derive a non-exhaustive set of factors from the
Restatement (Second) of Agency, rendering them "largely indistinguishable." *Folkerson v. Circus Circus Ent.*,
No. 93-17158, 1995 WL 608432, at *3 (9th Cir. 1995) (noting agreement with Second and Eighth Circuits).

terms of certain statutory or regulatory exceptions are met. Omnibus Budget Reconciliation

Act of 1989, Pub. L. No. 101-239, § 6204, 103 Stat. 2106, 2236 (1989). Stark I also required

entities to self report various ownership and referral arrangements. *Id.* § 6204(a)(f), 103 Stat.

at 2239. Stark I and its implementing regulations established, however, several exceptions

that protect specific types of arrangements between physicians and entities from enforcement

action. *See, e.g.*, § 1395nn(e); 42 C.F.R. § 411.357. Where an exception applies, the

arrangement between the referring physician and the entity does not constitute a "financial

relationship" under the Stark Law, and neither the referral nor billing prohibitions apply. The

Omnibus Budget Reconciliation Act of 1990 included technical amendments to Stark I. *See*

Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 4207(e), 104 Stat. 1388,

1388-121 (1990).

Enforcement of Stark I became effective three years after its passage, on January 1,

1992. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6204(c)(1), 103

Stat. 2106, 2242. Three years after that, on August 14, 1995, HHS published final regulations

implementing Stark I as of September 13, 1995. Medicare Program; Physician Financial

Relationships With, and Referrals to, Health Care Entities That Furnish Clinical Laboratory

Services and Financial Relationship Reporting Requirements, Final Rule, 60 Fed. Reg. 41914,

41978 (Aug. 14, 1995) (amending 42 C.F.R. §§ 411.1, 411.350–411.361).

During this same period, Congress passed "Stark II" in 1993, which extended the

restriction on physician self-referrals under both Medicare and Medicaid to certain additional

categories of DHS beyond clinical lab services.[7] Physician evaluation and management (E&M) services are not DHS. *See* 42 C.F.R. § 411.351; Ex. 18, Moran Rep., at 15; Ex. 45, Stone Dep., at 37:4-6.

The Stark Law is a complex yet vaguely written law. Stark II has been implemented in three phases of regulations, each providing some guidance to health care providers. In 2001, the Health Care Financing Administration ("HCFA") issued Phase I of the final Stark II regulations. Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships, Final Rule, 66 Fed. Reg. 856, 856 (Jan. 4, 2001) (amending 42 C.F.R. §§ 411.1, 411.350–411.357). Phase I, "the first step of a two-part rulemaking process," implemented Stark I as amended by Stark II. *Id.* The final regulations implemented by Phase I became effective a year later, on January 4, 2002. *Id.* CMS issued regulations implementing Phase II in 2004. Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase II), Interim Final Rule, 69 Fed. Reg. 16054, 16054 (Mar. 26, 2004) (amending 42 C.F.R. §§ 411.1, 411.350–411.357). Phase III of the final regulations were published September 5, 2007, which became effective December 4, 2007. Medicare Program; Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase III), Final

---

[7] Additional DHS includes: (1) physical therapy services; (2) occupational therapy services; (3) radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services; (4) radiation therapy services and supplies; (5) durable medical equipment and supplies; (6) parenteral and enteral nutrients, equipment, and supplies; (7) prosthetics, orthotics, and prosthetic devices and supplies; (8) home health services; (9) outpatient prescription drugs; (10) inpatient and outpatient hospital services; and (11) outpatient speech-language pathology services. 42 U.S.C. § 1395(nn)(h)(6); *see also* Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, §§ 13562, 13624, 107 Stat. 312, 596, 636 (1993).

Rule, 72 Fed. Reg. 51012, 51012 (Sept. 5, 2007) (amending 42 C.F.R. §§ 411.350–411.357, 411.361, 411.370).

1.   <u>The Stark Law Does Not Prohibit All Referrals</u>

The Stark Law does not apply to all physician referrals. It only applies when a physician has (1) made a "referral," which is defined by the Stark Law, subject to additional limitations, as the request by a physician for, the ordering of, or the certifying or recertifying of the need for (2) any DHS – or establishing a plan of care that includes the provision of DHS – including the request for a consultation with another physician and any test or procedure ordered by or to be performed by (or under the supervision of) that other physician from (3) an entity to which he or she (or an immediate family member) has a direct or indirect financial relationship (and ownership/investment interest or compensation arrangement). 42 U.S.C. § 1395nn(h)(5)(A); 42 C.F.R. § 411.351.

There are further limitations on the reach of the Stark Law. The Stark Law only applies to referrals involving DHS, a term which is defined to include a limited set of items and/or services. 42 U.S.C. § 1395nn(h)(6); 42 C.F.R. § 411.351.[8] Also, an order for DHS that was either personally performed or provided by the referring physician is not a "referral." *Id.* Billing for such orders is, therefore, not prohibited by the Stark Law.

The Stark Law also grants the Secretary of the Department of Health and Human Services the authority to create regulatory exceptions for financial relationships that pose no

---

[8] DHS are limited to: (i) clinical laboratory services; (ii) physical therapy, occupational therapy, and outpatient speech-language pathology services; (iii) radiology and certain other imaging services; (iv) Radiation therapy services and supplies; (v) durable medical equipment and supplies; (vi) parenteral and enteral nutrients, equipment, and supplies; (vii) prosthetics, orthotics, and prosthetic devices and supplies; (viii) home health services; (ix) outpatient prescription drugs; and (x) inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6); 42 C.F.R. § 411.351.

risk of program or patient abuse. *Id*. at § 1395nn(b)(4); *see also* 42 C.F.R. § 411.355-411.357 (governing exceptions to the referral prohibition related to ownership or investment interests, compensation arrangements). These exceptions are relevant to the instant case.

Stark Law liability is also restricted to referrals made "to the entity." 42 U.S.C. § 1395nn(a)(1)(A)-(B). Under the Stark Law, an "entity" is defined as "[a] physician's sole practice or a practice of multiple physicians or any other person, sole proprietorship, public or private agency or trust, corporation, partnership, limited liability company, foundation, nonprofit corporation, or unincorporated association that furnishes DHS." 42 C.F.R. § 411.351. Therefore, Plaintiff must show that a physician made a referral to an "entity."

Because the Stark Law's definition of "referral" (42 C.F.R. § 411.351) expressly excludes services personally performed by the physician, a bonus based on a percentage of collections for personally performed services is, by definition, not a bonus based on "referrals." *See accord* 69 Fed. Reg. at 16067 ("we defined 'referral' under the statute to include only DHS referrals and to *exclude* personally performed DHS. In short, personally performed work—DHS or otherwise—is not considered a 'referral' under section 1877 of the Act. […] Thus, a productivity bonus based on personally performed work would not be based on the volume or value of 'referrals.'") (emphasis in original).

## V.     LEGAL ARGUMENT REGARDING FCA COUNT I ALLEGED LACK OF MEDICAL NECESSITY FOR SHORT STAY MEDICARE ADMISSIONS

Halifax's short stay admissions were medically necessary in all respects. "Short stay" admissions are commonplace and are defined as a hospital stay that typically lasts for less than two days. *See, e.g.*, Ex. 3, Duvall Dep. (June 28, 2012), at 30:15-21. The Medicare Program, through CMS, is responsible for providing statutory and regulatory guidance to

providers on how to determine whether a patient should be admitted to a hospital for treatment or treated in another setting such as an outpatient clinic. CMS's guidance is that the decision to admit a patient must be made by the physician. *See, e.g.*, Ex. 4, Duvall Dep. (June 28, 2012) at 58:19-62:7. Second-guessing of the physician's decision to admit can only be done through a clinical medical necessity review by a qualified medical professional. *Id.* Relator's clinical evidence in support of Count I boils down to a deficient expert review of 35 patient records that cannot be replicated or verified independently and that relied on non-statistically valid data for its conclusions.

Relator's allegations that Halifax fraudulently admitted "short stay" patients have been shown by discovery to lack the necessary clinical evidentiary basis to justify allowing this Count to survive summary judgment. Relator's expert report cannot establish a genuine dispute of material fact regarding the medical necessity of the short stay admissions. *See* Ex. 7, Schmor Rep. Relator's methodology was unacceptably flawed and cannot be extrapolated to a broader set of claims which she not reviewed. *See id.*; Ex.5, Mercurio Rep., at 8.

Relator has not, to date, conducted any medical necessity reviews of statistically-valid random samples of patient records that could be extrapolated over the universe of claims at issue. *See* Ex.6, Hr'g Tr. 84, May 7, 2013; Ex. 7, Schmor Rep., at 4, 9-13, 20. Relator's sole proof for Count I relies on one patient chart review that was not even a clinical medical necessity review but rather an internal compliance audit. Ex. 7, at 4. Ms. Schmor's sole basis for identifying this sample as randomly selected is a statement on Halifax's own audit document indicating that the cases were "randomly selected" – she did nothing to verify, validate, or replicate the sample to ensure that it was, in fact, random. *Id.* at 4-5. Relator's

remaining short stay allegations mischaracterize the results of non-clinical internal reviews conducted as part of a CMS-sponsored quality improvement review conducted by Florida Medical Quality Assurance, Inc. ("FMQAI").[9] *See* Complaint at ¶¶ 74-97; Ex. 19, Baklid-Kunz Dep. (August 20, 2012), at 252:14-254:23; *contra See* Ex. 20, Lewis Dep. (November 1, 2012), at 188:5-189:18 (stating that the FMQAI reviews were quality reviews not medical necessity reviews). Relator is masquerading the FMQAI review results as clinical medical necessity "error rates" when the FMQAI review does not purport to be a medical necessity review. *See* Complaint at ¶¶ 74-97. Without the support of an expert clinical medical necessity review that can be verified, replicated, or assessed for sufficiency, Relator cannot generate a dispute of material fact as to the appropriateness of any Halifax admission patient admissions and the absence of expert evidence is fatal to Relator's non-intervened causes of action. *See Armfield*, 2012 U.S. Dist. LEXIS 154749, at *23-26.

The Medicare law and the testimony of the United States' 30(b)(6) witness on the medical necessity for patient admissions are consistent with Halifax's position. Medicare requires that inpatient hospital services be provided on a medically necessary basis. *See generally* 42 U.S.C. § 1395y(a)(1)(A) (2008). The Medicare program's clinical guidance is clear that the "medical necessity" of a patient admission is a complex clinical determination that relies on the medical judgment of the admitting physician, not the staff of the hospital at which the patient presents. Medicare Benefit Policy Manual ("MBPM") Ch. 1 § 10, entitled

---

[9] The sample was drawn from a "PEPPER Report" which is used "as a guide for auditing and monitoring efforts," and not to "identify the presence of payment errors." *See* Short-term Acute Care Program for Evaluating Payment Patterns Electronic Report User Guide 3 (12th ed. 2012), *available at*: http://www.pepperresources.org/LinkClick.aspx?fileticket=XrRCA-tNZ_M%3d&tabid=39.

"*Covered Inpatient Hospital Services Covered Under Part A*"[10]; Ex. 3, Duvall Dep. (June 28, 2012), at 72:5-73:11. The retrospective review of the medical necessity of an admission decision requires the review of the patient medical record by a qualified medical professional. Ex. 4, Duvall Dep. (June 28, 2012), at 58:19-62:7.

Halifax's expert on clinical medical necessity, Dr. Walter Baigelman, produced a report stating that the admitting physician is in the best position to incorporate all the factors necessary to make a decision regarding the medical necessity of acute inpatient care, and noting that this view was consistent with CMS' definition of Inpatient Services. Ex. 21, Expert Report of Walter Baigelman, M.D. ("Baigelman Rep."), at 2. Dr. Baigelman further noted that, at the higher level of medical necessity review, "physician knowledge and judgment must supersede generalized, non-individualized guidelines," and that physician intent also defines the appropriateness of ordering a patient to be placed at inpatient hospital level of care. Ex. 21, Baigelman Rep., at 3. A retrospective Medicare overpayment review of a physician's decision-making must be at least as rigorous.

Halifax's statistical expert, Matthew G. Mercurio, Ph.D., provided a detailed report concluding that Relator's expert report is unreliable and invalid because it does not document her statistical methodology by *any* acceptable standard and relies instead upon inappropriate and grossly overbroad assumptions. Ex. 5, Mercurio Rep., at 3-8. Mr. Mercurio determined that Ms. Schmor's conclusions "cannot be relied upon for any purpose relevant" to the allegations in this litigation regarding short stay admissions. *Id.*, at 8.

---

[10] The MBPM states "[t]he decision to admit a patient is a complex medical judgment which can be made only after the physician has considered a number of factors, including the patient's medical history and current medical needs, the types of facilities available to inpatients and to outpatients, the hospital's by-laws and admissions policies, and the relative appropriateness of treatment in each setting"

Relator ignores the law and CMS guidance in relying on Halifax's non-clinical FMQAI quality review audits of small, non-statistically valid samples of short stay admissions as proof of Medicare overpayments. These samples were not clinical medical necessity reviews and were not objective as admitted by Relator who testified that she was involved in the creation of certain of the samples reviewed. Ex. 22, Baklid-Kunz Dep. (April 4, 2013), at 36, 69-77. Relator nonetheless mischaracterized the FMQAI review at every turn during discovery, pointing to the FMQAI "chest pain reviews" and describing claims as "fail[ing] to meet the Medicare medical necessity criteria" using InterQual,[11] while providing no explanation of how a review conducted by a non-clinician constitutes a clinical medical necessity review. *See* Ex. 23, Sept. 10, 2012 Decl. of M. Norvick, at ¶ 10 (Dkt. 160-1). The FMQAI quality reviews conducted at Halifax cannot be substituted for the clinical medical necessity review necessary to establish a potential Medicare overpayment. Relator's witness Pat Aramayo agreed that a quality review, alone, would not be sufficient to establish a "known overpayment." Ex. 24, Aramayo Dep., at 151:14-152:2.

Relator could have used the discovery process to support her Count I allegations with an expert report that relied on credible methodologies but has not done so. Halifax produced the patient medical records for 272 short stay admissions identified in her Complaint, but her expert Ms. Schmor's medical necessity conclusions were limited to a review of 35 patient records which she did verify were randomly selected. Ex. 7, Schmor Rep. at 9. To the extent Ms. Schmor reached any conclusions regarding the 35 records she did review, the "Financial

---

[11] InterQual is a decision-support tool used by hospitals, including Halifax, to support treatment decisions made by a patient's physician based on his/her medical judgment.

Damages" findings included in her report were not her own work. *Id.*, at 14-15. Rather,

"[t]his section of the opinion report was prepared with information and assistance from

Douglas Lee Steinley Ph.D." *Id.* With absolutely no experience in statistical analysis, *see id.*

at 21-24, Ms. Schmor admits that Dr. Steinley was solely responsible for conducting the

statistical analysis and "extrapolation methodology" that is included in her report. Dr.

Steinley also makes certain "assumptions" that conflate the error rate of one-day and two-day

short stays. *Id.* at 15. Ms. Schmor's report does not reflect a verifiable methodology and is

not even entirely her own work. Because Dr. Steinley was not identified by Relator as a

witness or an expert in this case, his opinion and contributions to Ms. Schmor's report should

be disregarded entirely by the Court. *See Abrams v. Ciba Specialty Chems. Corp.*, 2010 U.S.

Dist. LEXIS 19155, at *25 (S.D. Ala. Mar. 2, 2010) (finding that "bootstrapping of an

undisclosed expert witness's opinions into the reports and testimony of another is plainly

improper, where the disclosed expert is treating those opinions as his own"); *Lillibridge*

*Health Care Servs. v. Hunton Brady Architects, P.A.*, 2010 U.S. Dist. LEXIS 17847, at *6

(M.D. Fla. Feb. 8, 2010) (granting motion in limine to exclude undisclosed expert

testimony); *see also In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) (excluding expert

testimony when expert did not "assess the validity of the opinions of the experts he relied

upon," rendering his methodology fatally flawed); *Beck's Office Furniture & Supplies v.*

*Haworth*, 1996 U.S. App. LEXIS 20608, at *21 (10th Cir. Aug. 16, 1996) ("Experts . . . may

not merely parrot the opinions of other experts whose conclusions are not themselves in the

record.").

    Ultimately, Ms. Schmor only concluded that she could not reach any broad findings

on the medical necessity of Halifax's short stay admissions without doing much more work including her recommendation for "further identification of the appropriate universe for additional years with sampling to establish an annual error and trending of the patterns found." Ex. 7, Schmor Rep., at 20. The time for such expert work has passed.

With respect to the additional 200-plus patient records Halifax produced in discovery, Relator's counsel conceded at the May 7, 2013 hearing that Ms. Schmor "had 200 records that [Halifax] did produce in December [2012] that she hasn't had time to look at, she hasn't looked at those, Your Honor, *because those weren't randomly selected* and *could not provide a proper sample to perform an extrapolation off of.*" Ex. 6, Hr'g Tr. 84, May 7, 2013 (emphasis added). Further review of these patient medical records would be futile. Relator sought leave of the Court to fill in the gaping hole in her Count I evidence but was denied by the Court in its May 8, 2013 Order denying her Motion for Protective Order (Dkt. 266). As the Court made clear in its May 8, 2013 Order, Relator is limited to using Ms. Schmor's December 21, 2012 report.

Halifax did not delay in refunding any known Medicare overpayments. Relator's assertion to the contrary is not evidence that short stay admissions were not medically necessary. Complaint at ¶¶ 130, 152. The evidence, including witness testimony regarding Halifax's overpayment refund policy, clearly demonstrates that Halifax refunded or rebilled all "known overpayments." Ex. 25, Lewis Dep. (March 5, 2013), at 153:5-13; 256:10-258:2; 260:10-264:11; 298:12-301:8.

Pursuant to Halifax policy, services billed that were found to not meet medical necessity on the basis of clinical necessity medical review were refunded. Ex. 26, Lewis Dep.

(November 1, 2012), at 166:8-167:7; 187:24-195:15. Halifax made these determinations based upon an evaluation of a procedure's *medical necessity*. Ex. 27, Lewis Dep. (Nov. 1, 2012), at 167:2-7. Halifax's methodology of determining medical necessity is consistent with CMS's which relies on a physician's evaluation of the patient's clinical presentation. Ex. 28, Lewis Dep. (Nov. 1, 2012), at 157:22-158:6; Ex. 29, Lewis Dep. (Mar. 5, 2013), at 268:19-269:9; 272:9-16.

Neither Relator nor her supporting witnesses have the clinical background to have performed medical necessity reviews, and none did so. Ex. 30, Lewis Dep. (Nov. 1, 2012), at 152:7-17; Ex. 23, Sept. 10, 2012 Decl. of M. Norvick (Dkt. No. 160-1), at ¶ 4 (noting her employment in Case Management Department of Patient Business & Financial Services); Ex. 31, Baklid-Kunz Dep. (August 20, 2012) at 27:24-30:15 (identifying all positions she has held at Halifax, all of which are non-physician positions); Ex. 33, Aramayo Dep. (December 12, 2012), at 11:20-12:7 (identifying all positions she held at Halifax, all of which are non-physician positions). Rather, Relator and other lay Halifax employees simply conducted "quality" reviews, which could not identify "known overpayments." Ex. 32, Lewis Dep. (Nov. 1, 2012), at 198:3-10; Ex. 24, Aramayo Dep., at 151:14-152:8 (admitting that quality review would not be enough to identify known overpayment).

Relator also alleges that Halifax engaged in "fraudulent" activities through its alleged "[f]ailure to implement or enforce the utilization review protocols required by Medicare as a condition of participation." Complaint at 24. However, "[t]he [FCA] is not a vehicle to police technical compliance with complex federal regulations." *U.S. ex rel. Williams v. Renal Care Group, et al.*, 696 F.3d 518, 532 (6th Cir. 2012) (violations of conditions of participation

does not render claims to be materially false and are not subject to FCA liability); *Connor v. Salina Regional Health Center, Inc.*, 543 F.3d 1211 (10th Cir. 2008) (allowing FCA liability for violations of conditions of participation would improperly interfere with the government's carefully crafted administrative enforcement mechanism for such violations); *United States ex rel. Mikes v. Strauss*, 274 F.3d 687 (2d Cir. 2001) (finding there was no "expressly false" claims submitted because the payment form only required that the service be medically necessary and personally performed, not that the service meet certain "quality of care" requirements as a condition of participation to Medicare). Relator's allegations that an alleged failure to meet a condition of participation in the Medicare program supports FCA liability fail as a matter of law.

No material dispute of fact exists as to whether or not Halifax's short stay Medicare admissions were medically necessary and, accordingly, summary judgment is warranted for Halifax on Relator's Count I.

## VI.   LEGAL ARGUMENT ON ANTI-KICKBACK STATUTE (COUNT IV)

### A.   Relator's Anti-Kickback Statute Allegations Fail As A Matter Of Law

As a threshold matter, noted *supra*, Relator's Count IV allegations fail as a matter of law because the AKS does not apply to compensation arrangements for employed or contracted physicians. *See* 42 U.S.C. § 1320a-7b(b)(3)(B) (2006). Relator's AKS allegations also fail as a matter of law because there is no private right of enforcement. *See, e.g., United States ex rel. Villafane v. Solinger*, 543 F.Supp.2d 678, 700 (W.D. Ky. 2008) ("As discussed in the Court's prior opinion, neither the [AKS] nor the Stark law provides for a private right of enforcement"). Standing alone, Relator's AKS allegations also fail because the *qui tam*

statute – which allows private persons to bring civil claims for violation of the FCA – does not authorize private persons to bring civil claims for violations of the AKS outside the context of the FCA. 31 U.S.C. 3730(b). Furthermore, the United States chose not to intervene on Relator's AKS allegations as to any physician arrangement identified in her Complaint. The United States did not even need discovery to conclude that there was no AKS case to be pursued against Halifax. After years of opportunity for discovery, Relator has no evidence supporting Count IV and has made no effort to obtain discovery in support of her baseless allegations. For the reasons set forth below, summary judgment is warranted as there is no genuine dispute of material fact that Halifax did not commit any AKS violations alleged in Count IV.

> B.   Relator Has Not Offered Any Evidence To Establish Anti-Kickback Statute Violations With Respect To Any Of The Physicians At Issue

Throughout the discovery phase of this litigation, Relator has ignored her obligation to adduce evidence supporting her non-intervened AKS causes of action. Now she must face the consequences of this neglect. The AKS is an enforcement statute meant to address intentional, criminal conduct involving bribery and kickbacks. Relator bears the burden of proving that the alleged AKS violations occurred.

> 1.   Anti-Kickback Statute Elements Of Proof

Proving a federal AKS violation requires proof of all of the following elements: (1) a knowing and willful; (2) offer or payment of any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person; (3) to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part

under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. 42 U.S.C. § 1320a-7b; *see also United States v. Waters*, No. 11-00012-KD, 2012 U.S. Dist. LEXIS 62067, at *17-18 (D. Ala. 2012) (noting that AKS plaintiff "must prove that (1) the Defendant knowingly and willfully offered, paid, solicited, or received remuneration; (2) the remuneration was offered, paid, solicited, or received, at least in part, to induce or in exchange for the referral of a patient insured by a federal healthcare program; and (3) the patient's services were covered, in whole or in part, by a federal healthcare program."). *See United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F. Supp. 2d 153, 160 (D.D.C. 2008). Mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion. *United States ex rel. Kaimowitz v. Ansley*, 250 Fed. Appx. 912, 914 (11th Cir. 2007).

C.     Relator Has No Evidence Rebutting Halifax's Factual Showing That No Kickbacks Were Offered By Halifax Or Solicited By Any Halifax Physician

Relator has failed to offer any evidence rebutting Halifax's extensive factual showing that no kickbacks were offered by Halifax, or solicited by any Halifax physician. Numerous declarations from Halifax employees and the relevant physicians state no such kickbacks were offered or solicited. Ex. 42, Caliendo Decl.; and Ex. 43, Flavio Decl. One of Halifax's medical directors has also offered a declaration indicating no kickbacks were offered or solicited in his experience at Halifax. Ex. 44, Moore Decl. Relator has no credible evidence contradicting these assertions.

Similarly, each of Halifax's employed neurosurgeons and medical oncologists has offered a sworn declaration clearly stating that he or she was never offered or received kickbacks by Halifax, nor did any solicit any kickbacks. Ex. 8, Khanna Decl.; Ex. 9, Kuhn Decl.; Ex. 10, Vinas Decl.; Ex. 11, Chew Decl.; Ex. 12, Deveras Decl.; Ex. 13, Durkin Decl.; Ex. 14, Favis Decl.; Ex. 15, Sorathia Decl.; and Ex. 16, Weiss Decl.[12] Relator has no contradictory evidence here either.

Relator has had every opportunity to pursue her legally and factually meritless allegations, but no credible evidence is presented supporting the necessary elements of her AKS allegations. Relator's Count IV cannot survive summary judgment and must be dismissed.

## VII.   LEGAL ARGUMENT ON STARK LAW (COUNT III)

A.   Relator Has Not Offered Any Evidence To Establish Stark Law Violations With Respect To The Psychiatrists And Medical Directors

There is no material dispute of fact that that Relator has failed to produce any evidence supporting her non-intervened Stark Law allegations against the physician compensation agreements of Dr. Caliendo, Dr. Frick, or the medical director agreements identified in Count III. Moreover, like her AKS allegations, Relator's Stark Law allegations also fail as a matter of law because there is no private right of enforcement, *see, e.g.*, *Solinger*, 543 F.Supp.2d at 700, and the *qui tam* statute does not authorize private persons to bring civil claims for violations of the Stark Law outside the context of the FCA. 31 U.S.C. 3730(b). In addition to failing to present any expert testimony regarding either the FMV or

---

[12] Dr. Kelly Molpus, a gynecological oncologist, was added to the case in the United States' Complaint-in-Intervention but is not named in Relator's Second Amended Complaint. *See, generally* Complaint. Accordingly, Halifax assumes that Relator has voluntarily dismissed him from her case.

commercial reasonableness of their compensation, Relator made no efforts to pursue these

non-intervened causes of action in any way during discovery. Halifax has, however, obtained

substantial, uncontroverted evidence demonstrating these agreements' compliance with the

Stark Law.

Each of Halifax's physician employment arrangements satisfies the *Bona Fide*

Employment Exception to the Stark Law because the compensation was consistent with

FMV, did not take into account the value or volume of referrals, and was commercially

reasonable. *See* 42 U.S.C. § 1395nn(e)(2).

> *Bona fide* employment relationships. Any amount paid by an employer to a
> physician (or an immediate family member of such physician) who has a bona
> fide employment relationship with the employer for the provision of services
> if—
>
> (A)     the employment is for identifiable services,
>
> (B)     the amount of the remuneration under the employment—
>
>    (i) is consistent with the fair market value of the services, and
>
>    (ii) is not determined in a manner that takes into account (directly or
>    indirectly) the volume or value of any referrals by the referring physician,
>
> (C) the remuneration is provided pursuant to an agreement which would be
> commercially reasonable even if no referrals were made to the employer, and
>
> (D) the employment meets such other requirements as the Secretary may
> impose by regulation as needed to protect against program or patient abuse.
>
> Subparagraph (B)(ii) shall not prohibit the payment of remuneration in the
> form of a productivity bonus based on services performed personally by the
> physician (or an immediate family member of such physician).

42 U.S.C. § 1395nn(e)(2).

B.  Halifax Used A Reasonable Method Of Its Own Creation To Arrive At FMV Compensation

The United States' own 30(b)(6) expert, Troy Barsky, testified that "[i]t's up to the entity to determine, based on the CMS guidance, as to whether their conduct is commercially reasonable" and may use "any reasonable method" in making FMV determinations under the Stark Law. Ex. 17, Barsky Dep., at 65:17-69:8.

1.  Halifax's Method For Determining FMV Was Reasonable As Set Forth By Fact And Expert Evidence

Halifax's fact witnesses, 30(b)(6) designees, and expert witnesses have testified regarding Halifax's process for identifying and retaining qualified physicians. Each of these witnesses have supported the fact that Halifax had a reasonable process in place at all times that reasonably considered FMV and commercial reasonableness information to ensure that Halifax's employment agreements were consistent with the Stark Law. Dan Lang, Halifax's retired Administrator, testified that Halifax would regularly consult health care publications to determine whether compensation offered to Halifax was consistent with that of other physicians in similar hospitals in similar geographic areas. Ex. 46, Lang Dep., at 18:19-20:5. Arvin Lewis, Halifax's Chief Revenue Office, testified that Halifax considered what similar hospitals were paying for specialty physicians in the neighboring markets of Orlando and Jacksonville and the "national norm" for salaries for those specialties. Ex. 36, Lewis Dep. (Nov. 1, 2012), at 55:19-57:21. Eric Peburn, Halifax's Chief Financial Officer and one of its 30(b)(6) corporate designees, testified that Halifax regularly consulted with recruiters when recruiting or renegotiating contracts with employed physicians. Ex. 37, Peburn Dep., at 32:7-18. He further testified that it is Halifax's policy that department managers are responsible

for understanding and approving the business terms of the contract before submitting the contracts to Halifax's Legal Department for review. *Id.* at 33:9-16; *see* Exs. 38-40, Halifax Contract Management Policies LL-101, LL-103, and LL-145. Halifax's reasonable process is consistent with the undisputed testimony of the United States' 30(b)(6) expert, Troy Barsky, that a hospital may use "any reasonable method" to determine FMV determinations in relation to Stark Law compliance. Ex. 17, Barsky Dep., at 65:17-69:8.

Without an FMV expert of her own, Relator cannot credibly contradict Halifax's FMV methodology evidence or create a material dispute of fact on this issue. *See, e.g., U.S. ex rel. Jamison v. McKesson*, Civ. No. 2:08cv214-SA-JMV, 2012 U.S. Dist. LEXIS 17856 (N.D. Miss. Feb. 14, 2012) (finding numerous factual issues existed relating to an accurate determination of fair market value where the Plaintiff utilized an expert who proffered a fair market value methodology at odds with that of the Defendant).

### 2.    Halifax's Physician Compensation Was FMV

Halifax's expert, Ronald Vance, evaluated the employment arrangements between Halifax and the psychiatrists and medical directors. Mr. Vance confirmed that the compensation for both groups was FMV and commercially reasonable. Ex. 34A, Vance Rep., at 11-21. Specifically, Mr. Vance determined that the 2009 compensation levels for Dr. Frick and Dr. Caliendo—$257,804 and $153,335, respectively—were slightly above the 90th percentile and substantially below the 25th percentile, respectively. *Id.*, at 13-17. The United States 30(b)(6) witness on FMV, CMS employee Troy Barsky, testified that third party comparative salary survey "percentiles" are irrelevant to FMV, and that CMS assigns no

weight to whether compensation falls into the 50th, 75th, or 90th percentile of any third party comparative survey. Ex. 41, Barsky Dep., at 82:4-86:22.

In analyzing Dr. Moore's medical directorship, Mr. Vance determined that Halifax's compensation for medical directorships—which require 24/7 coverage 365 days a year—was FMV and commercially reasonable. Ex. 34A, Vance Rep., at 17-20. Relator has no evidence to contradict Mr. Vance's expert opinion. Based upon his "market approach" analysis, Mr. Vance concluded that the compensation paid by Halifax to its psychiatrists and medical directors represents FMV and is commercially reasonable. *Id.*, at 12-13.[13] Therefore, Halifax's incentive compensation complies with the *Bona Fide* Employment Exception (which requires compensation that is consistent with FMV and commercially reasonable for each psychiatrist).

C.    Halifax's Evidence That Its Psychiatric And Medical Director Arrangements Were Commercially Reasonable Is Undisputed By Relator

As noted *supra*, the United States' 30(b)(6) witness testified that CMS has no specific criteria for the determination of commercial reasonableness. Ex. 41, Barsky Dep., at 38:12-40:17. The evidence establishes that Halifax structured its compensation plans to pay the physicians a low base salary with a reasonable personal productivity bonus. There is no credible evidence on the record that the Halifax methodology is not commercially reasonable, and Relator has not presented an expert on this subject.

---

[13] The Market Approach is a valuation approach in which market data is analyzed to determine what is actually being paid in the marketplace for comparable services. Ex. 34A, Vance Rep., at 12. The data is gathered and analyzed and a comparison is made between the facts of the subject being valued and the facts of the particular market from which the information is obtained. *Id.* at 12.

D.    Relator Offers No Credible Evidence That Halifax Physicians Made
      Prohibited Referrals, Therefore, Summary Judgment Is Warranted For Halifax

Relator has failed to offer any evidence whatsoever identifying prohibited referrals

made by any psychiatrist or medical director identified in her non-intervened causes of action.

Relator bears the burden of establishing that a referral was made to an entity. *United States*

*ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009) ("Once the plaintiff or

the government has established proof of each element of a violation under the [Stark] Act,

the burden shifts to the defendant to establish that the conduct was protected by an

exception."). Halifax, in contrast, provides undisputed evidence as to why patient medical

records are the only relevant evidentiary basis for establishing whether a prohibited referral

was made and which physician made it.

The Stark Law does not make it illegal for hospitals to accept referrals from

physicians. The Stark Law only makes it illegal to seek reimbursement from Medicare for

services arising out of referrals for DHS from physicians with whom the hospital has a non-

excepted financial relationship. *See* 42 U.S.C. § 1395nn(a)(1)(A)-(B). Indeed, if a hospital

has a financial relationship with a physician that satisfies a Stark Law exception, the hospital

may lawfully require the physician to refer his or her patients to the hospital and may bill the

Government for services arising from those referrals.

Evidence of referrals alone is not evidence of a prohibited referral. *See, e.g.*, 42 U.S.C.

§ 1395nn(a)(1)(A) (prohibiting referrals to the entity if the physician has a financial

relationship with that entity); 66 Fed. Reg. 873 ("[T]he relevant inquiry is whether the

physician has made a referral, directly or indirectly, to the entity furnishing DHS, in other

words, whether he or she is referring 'to' that entity."). Identification of a prohibited referral

requires the review of the patient medical records to determine who made the referral and for what type of services. Ex. 18, Moran Rep., at 16.

Relator has done nothing to identify any referrals and has not even bothered to obtain any Medicare claim forms that Halifax used to obtain payment for providing services to patients. Even if she had, these Medicare claim forms are insufficient for identifying who made the referral, as these forms utilize distinct definitions of "attending" or "referring" providers which bear no substantive connection to the Stark Law's definition of "referring physician." *Compare* 42 U.S.C. § 1395nn(h)(5) (defining a "referral" by a "referring physician") *with* Medicare Intermediary Manual, § 3604 (instructing hospitals to list in the "attending/referring physician" field on the UB-92 the physician "primarily responsible for the care of the patient from the beginning of the hospital episode.") *and* Medicare Claims Processing Manual, chpt. 25, § 75.5 (instructing hospitals to list in the "attending provider" field of the UB-04 the individual with "overall responsibility for the patient's medical care and treatment" and in the "operating provider" field the individual with "primary responsibility for performing the surgical procedure(s).").

Halifax also has offered rebutting evidence from its own expert witness and, tellingly, the United States' own 30(b)(6) witnesses support Halifax's theory that the patient medical record is the only reliable evidence for identifying actual referrals under the Stark Law. Ex. 47, Sandlin Dep., 153:19-24.

VIII.   **LEGAL ARGUMENT ON COUNT II FALSE CLAIMS ACT ALLEGATIONS DEPENDENT ON ALLEGED VIOLATIONS OF THE STARK LAW (COUNT III) AND ANTI-KICKBACK STATUTE (COUNT IV)**

A.      Plaintiffs' Non-Intervened FCA Causes Of Action In Count II Fail As A Matter Of Law And Fact

Relator alleges in Counts I and II that Halifax violated Sections 3729(a)(1), (2), (3), and (7) of the FCA with respect to alleged facts related to the non-intervened Stark Law and AKS cause of action. Relator's FCA allegations with respect to Count II are dependent on her first proving her Count III Stark Law and Count IV AKS claims, and further establishing that the violations also meet the proof requirements of the FCA. Relator cannot prove the necessary elements to establish FCA liability as to any of the non-intervened causes of action. Relator has failed to offer more than speculative allegations and, therefore, her FCA allegations related to Counts III and IV cannot survive summary judgment. *See Kaimowitz*, 250 Fed. Appx. at 915. Courts have held that the "penal nature of the [FCA] statute requires careful scrutiny to see if the alleged misconduct violates the statute." *Weinberger*, 557 F.2d at 460 (citation omitted); *see also Vermont Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 784-85 (2000) (holding that civil FCA actions for treble damages and penalties are "punitive"). Relator's allegations do not hold up under careful scrutiny.

1.      Relator Cannot Show That Any Claims Related To Count III Are False Because There Were No Stark Law Violations

There is no FCA liability for the non-intervened causes of action because no Stark Law violations occurred. *See United States ex rel. Osheroff v. Tenet HealthCare Corp.*, No. 09-22253-CIV-Huck/O'Sullivan, 2013 U.S. Dist. LEXIS 44235, at *5 (S.D. Fla. Mar. 27, 2013) (noting that "because neither the Anti-Kickback Statute nor Stark arms Relator with a

private right of action," such causes of action must be asserted through a derivative FCA claim dependent upon these underlying statutory violations); *cf. United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, 565 F. Supp. 2d 153, 170 (D.D.C. 2008) (finding that because "no reasonable jury could find that the evidence supports a finding that hospitals acted with requisite knowledge pursuant to the Stark Law," summary judgment is appropriate for all derivative FCA claims).

Relator engaged in minimal discovery regarding the non-intervened Stark Law causes of action in Count III and has not identified any alleged false claims associated with any of the Count III physician arrangements. As noted previously the submission of a false claim is the *sine qua non* of a FCA violation, and without the presentment of a claim there is simply not actionable damage. *Kaimowitz*, 250 Fed. Appx. at 915. Furthermore, Relator has not even provided a purported summary of claims as the United States attempted to do on the intervened causes of action. Nor has Relator offered any expert testimony regarding FMV or commercial reasonableness in support of her Stark Law allegations in Count III. Without this evidence, there can be no material dispute of Halifax's evidence in defense of the substance of its physician agreements. As such, Relator's Count III cannot survive summary judgment and must be dismissed with prejudice.

      a.      <u>Because Relator Failed To Identify Prohibited Referrals She Has Not Identified FCA Damages For Count III</u>

As set forth above in Halifax's Stark Law motion for summary judgment, *supra* at Section VII, Relator has failed to identify any alleged Medicare claims that reflect referrals of DHS that are prohibited by the Stark Law. In ignoring her responsibility to identify credible evidence of referrals, Relator has also failed to identify any false claims or damages

suffered by the United States. As Halifax's claims processing expert Donald Moran concluded, there is no evidence showing that any particular physician at issue actually caused patients to be served by Halifax specifically (*i.e.*, a referral as that term is defined for Stark Law purposes). Ex. 18, Moran Rep., at 3. Halifax is accordingly entitled to summary judgment on Count III, as there is no genuine disputed issue of material fact as to whether the United States suffered any damages.

      2.      <u>Relator's Count I And II FCA Claims Based On The AKS Should Be Dismissed For Lack Of Evidence That Any AKS Violations Occurred</u>

Halifax is entitled to summary judgment on Relator's FCA Counts related to the non-intervened AKS causes of action. As described above, *supra* at Section VI, the Employment Exception to the AKS shields all of the relevant physician compensation. Relator, moreover, has failed to offer any evidence establishing any AKS violations with respect to any of the physicians at issue, while Halifax has presented a large volume of evidence asserting that there have been no kickbacks solicited, offered or received. *See supra* at Section VI. In the face of Halifax's uncontroverted evidence, Relator's Counts I and II based upon the AKS must be dismissed with prejudice as there is no genuine disputed issue of material fact.

      3.      <u>Plaintiffs Cannot Establish The Requisite Scienter As To Any Count I Or II Claims</u>

Because the physician agreements identified in Count III were commercially reasonable and based on FMV, Relator cannot establish that Halifax knowingly submitted any false claims. *See, e.g.*, Ex. 34B, Expert Rep. of Kevin O'Brien, at 11-35. There is no genuine dispute of material fact, therefore, that Relator cannot prove by a preponderance of the evidence that Halifax "knowingly" violated the FCA. *See Brooks v. United States*, 64

F.3d 251, 255 (7th Cir. 1995) (noting that the Government bears the burden of proving the violation by a preponderance of the evidence); *see also United States ex rel. Watson v. Connecticut Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *16 (E.D. Pa. Feb. 11, 2003). The scienter requirement is "critical to the operation of the False Claims Act," and, ultimately, to the resolution of this case. *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998). Without a showing of the necessary scienter, Claims I and II must be dismissed.

The FCA defines "knowing" or "knowingly" to mean that "a person, with respect to information—(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b) (1994). The "reckless disregard" standard for FCA liability has been held to require at least a showing of an aggravated form of gross negligence, or, "gross negligence-plus." *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997).

Innocent mistake and mere negligence may *not* form the basis for False Claims Act liability. *See Hochman*, 145 F.3d at 1074; *United States v. Taber Extrusions, LP*, 341 F.3d 843, 845 (8th Cir. 2003); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 681 (5th Cir. 2003) (Jones, J., concurring); *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544 (7th Cir. 1999); *Hindo v. Univ. of Health Sciences*, 65 F.3d 608, 613-14 (7th Cir. 1995); *United States v. Medica-Rents Co.*, 285 F. Supp. 2d 742, 771 (N.D. Tex. Sept. 23, 2003), *aff'd in part, rev'd in part*, 2008 U.S. App. LEXIS 17946 (5th. Cir. Aug. 19, 2008) ("Merely submitting a false claim does not show the necessary scienter for fraud."); *Watson*, 2003 U.S.

-37-

Dist. LEXIS 2054, at *16. The requisite scienter for a FCA violation is the "knowing

presentation of what is known to be false." *Hochman*, 145 F.3d at 1073. More specifically,

"'known to be false' does not mean scientifically untrue; it means a lie." *Id.* (quoting *United*

*States ex rel. Anderson v. N. Telecom., Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995) (quotations

omitted)) (emphasis added); *see also Taber Extrusions*, 341 F.3d at 845. Numerous courts

have held that mere non-compliance with a statute, regulation or contractual provision,

without more, cannot constitute a "knowing" FCA violation. *See Southland Mgmt.*, 326 F.3d

at 681-82; *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 12 (D.D.C. 2003)

("[M]ere disagreement over scientific opinion, methodology, and judgments do not amount

to claims under the FCA.") (citing *Wang v. FMC Corp.*, 975 F.2d 1412, 1420-21 (9th Cir.

1992)).

Absent an expert report contradicting Halifax's FMV and commercial reasonableness

expert, Relator cannot establish that any claims were false, much less that Halifax knowingly

submitted false claims. This is true with respect to the AKS allegations directed at the

neurosurgeons, medical oncologists, and psychiatrists and Stark Law allegations for the

psychiatrists agreements, the medical directorships.

## IX.    CONCLUSION

Once the United States intervened on a small portion of the allegations in her

Complaint, Relator ostensibly abandoned her responsibility to engage in discovery necessary

to develop the non-intervened allegations. She deliberately did not do so as shown by the

state of the evidence on summary judgment. In the absence of any credible evidence

supporting the allegations of Counts I, II, III and IV, Relator's non-intervened causes of

action should all be dismissed on summary judgment.

Dated: May 28, 2013                          Respectfully submitted,
*Amended: May 29, 2013*

                                             s/ Amandeep S. Sidhu
                                             Anthony N. Upshaw
T. Reed Stephens (admitted *pro hac vice*)   Fla. Bar. No. 0861091
David O. Crump (admitted *pro hac vice*)     MCDERMOTT WILL & EMERY LLP
Amy H. Kearbey (admitted *pro hac vice*)     333 Avenue of the Americas
Amandeep S. Sidhu (admitted *pro hac vice*)  Suite 4500
Emre N. Ilter (admitted *pro hac vice*)      Miami, FL 33131
Brandon H. Barnes (admitted *pro hac vice*)  Tel: (305) 358-3500
MCDERMOTT WILL & EMERY LLP                   Fax: (305) 347-6500
The McDermott Building                       Email: aupshaw@mwe.com
500 North Capitol Street NW
Washington, DC 20001
Tel: (202) 756-8000
Fax: (202) 756-8087
Email: trstephens@mwe.com

*Counsel to Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Florida using the CM/ECF system on May 29, 2013. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Amandeep S. Sidhu
Amandeep S. Sidhu