UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex. rel.* ELIN BAKLID-KUNZ, | |
| Relator, | CIVIL ACTION FILE NO. 6:09-cv-1002-Orl-31DAB |
| vs. | |
| HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC., | Judge Gregory A. Presnell [FALSE CLAIMS ACT – QUI TAM] |
| Defendants. | |

**RELATOR ELIN BAKLID-KUNZ'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUPPORTING LEGAL MEMORANDUM**

Pursuant to Federal Rule of Civil Procedure 56, Relator Elin Baklid-Kunz ("Relator") files this motion for partial summary judgment against Defendant Halifax Hospital Medical Center d/b/a Halifax Health a/k/a Halifax Community Health System a/k/a Halifax Medical Center ("Halifax Hospital") and Defendant Halifax Staffing, Inc. ("Halifax Staffing") (Halifax Hospital and Halifax Staffing are sometimes collectively referred to as "Defendants").

Relator requests that summary judgment be entered against Defendants as to liability for their violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, arising out of the payment of prohibited remuneration to medical oncologists in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b).   Relator also requests that the Court rule that the proper measure of damages for which Defendants would be liable is the entire amount paid by Medicare for each of the false claims (specifically described below) submitted by Defendants.

1

Finally, Relator requests that the Court enter summary judgment in her favor as to all affirmative defenses raised by Defendants as to all claims asserted by Relator in this case.

In support of this motion, Relator relies upon her supporting legal memorandum and all material and evidence filed of record.

## MEMORANDUM OF LAW

### I.     SUMMARY OF THE ARGUMENT.

The undisputed evidence shows that Defendants knowingly and illegally incentivized physicians to induce referrals to Halifax Hospital, in violation of the "Stark Statute," 42 U.S.C. § 1395nn, and the AKS.[1]

Defendants knowingly and willfully offered and paid hundreds of thousands of dollars to six medical oncologists to induce those physicians to refer patients to Halifax Hospital's Regional Oncology Centers for items and services reimbursed in whole or in part under a Federal health care program in violation of the AKS.   Furthermore, Defendants knowingly (including deliberate ignorance and reckless disregard) presented false claims to the United States for reimbursement for such items and services in violation of FCA.

### II.     PROCEDURAL HISTORY.

Relator filed this *qui tam* action on behalf of the United States of America against Defendants pursuant to the FCA.   In her Second Amended Complaint, Relator alleged, *inter alia*, that Defendants participated in improper financial arrangements with and paid excessive

---

[1]     The United States has filed a motion for summary judgment which focuses on Defendants' violations of the Stark Statute, while this motion focuses on Defendants' violations of the AKS.

2

compensation to physicians in violation of the AKS and the Stark Statute, which violations resulted in the presentation of and payment of false or fraudulent claims to the United States. (Dkt. 29.)   Defendants filed a Motion to Dismiss Relator's Second Amended Complaint on March 15, 2011 (Dkt. 34), which the Court denied by Order dated June 6, 2011.   (Dkt. 46.)

On September 9, 2011, the United States moved to partially intervene (Dkt. 58), and the Court granted such motion on September 27, 2011.   (Dkt. 64.)   The United States filed its Complaint in Intervention on November 4, 2011, (Dkt. 73) in which it alleged Defendants' improper financial relationships with three neurosurgeons and seven medical oncologists violated the Stark Statute and resulted in Defendants' presentation of false claims to the United States in violation of the FCA.   The United States also sought relief under the common law theories of unjust enrichment and payment by mistake.   Defendants filed a Motion to Dismiss the United States' Complaint in Intervention on November 29, 2011 (Dkt. 77), which the Court denied in all respects except as to Count VI (Disgorgement, Constructive Trust, and Accounting) by Order dated March 19, 2012.   (Dkt. 109.)

## III.   STATEMENT OF UNDISPUTED FACTS.

### A.   *History of Halifax Hospital's Regional Oncology Center.*

Halifax Hospital owns and operates hospitals and medical facilities in Volusia County, Florida and surrounding counties.   (Dkt. 47, ¶5.)   Halifax Hospital was created by Florida statute as a special taxing district.   (Dkt. 47, ¶5.)   Halifax Staffing is an affiliate of Halifax Hospital.   (Dkt. 47, ¶6.)   Halifax Staffing is a not-for-profit Florida Corporation, which provides staffing personnel for Halifax Hospital.   (Dkt. 47, ¶6.)   Halifax Hospital has zero employees.   (*See* Ex. 1, Peburn Dep. at 239:15-17.)

3

Halifax Hospital's Regional Oncology Center opened in 1984 and provides the full gamut of cancer care and services. (*See* Ex. 2.) The physician employment agreements that were established in 1994 for those physicians practicing at the oncology center tied the future success of the physician practices and the oncology program together. (*Id*.)

**B.**     ***Three Oncologists Left Halifax in 2003 to Form a Private Practice.***

In 2003, three of the medical oncologists practicing at Halifax Hospital's oncology center (Dr. Alexander, Dr. Dodd and Dr. Doughney) felt they could make more money working in private practice than they were making at Halifax Hospital.[2] (*See* Ex. 3, Garthwaite May 1 Dep. at 43:12-20.) These three medical oncologists resigned from Halifax Staffing effective November 25, 2003 in order to form their own private practice. (*See* Ex. 2.) A fourth oncology physician retired a couple of months before the other three left. (*See* Ex. 3, Garthwaite May 1 Dep. at 43:12-20.) As a result, the number of oncologists staffing Halifax Hospital's oncology center declined from eight to four. (*See* Ex. 3, Garthwaite May 1 Dep. at 43:21-24.) With fewer physicians referring patients to Halifax Hospital oncology centers, the number of patient visits to these oncology centers declined from 32,236 in fiscal year 2003 to 24,184 in fiscal year 2004, a 25% decline. (*See* Ex. 5 (redacted).) The net outpatient revenue impact of this change was $4 million, which translated into a $1 million reduction to Halifax Hospital's bottom line after netting expenses. (*See* Ex. 2.)

**C.**     ***Halifax Staffing Employed the Remaining Oncologists.***

---

[2]     Because of the way the United States reimburses medical oncology programs, the emphasis for the reimbursement is on the drugs. Physicians in private practice may lawfully bill both for physician services and outpatient oncology services (including drugs) which are ancillary to their physician office practices. (*See* Ex. 3, Garthwaite May 1 Dep. at 144:4-19.)

The four physicians remaining at Halifax Hospital's oncology center after November 2003 were Drs. Walter Durkin, Gregory Favis, Abdul Sorathia, and Richard Weiss.   Halifax Staffing hired Dr. Boon Chew to start on August 21, 2004.   (*See* Ex. 3, Garthwaite May 1 Dep. at 59:16-25; *see also* Ex. 6A.)   Halifax Staffing hired Dr. Ruby Deveras to start on December 1, 2005.   (*See* Ex. 6B.)

Prior to January 2006, Halifax Staffing had entered into written employment agreements (including amendments thereto) with Drs. Boon Chew, Ruby Deveras, Walter Durkin, Gregory Favis, Abdul Sorathia, and Richard Weiss (the "Oncologists").   (*See* Ex. 3, Garthwaite May 1 Dep. at 47:21-48:15; *see also* Ex. 6, contracts of Dr. Chew (Ex. 6A); Dr. Deveras (Ex. 6B); Dr. Durkin (Ex. 6C); Dr. Favis (Ex. 6); Dr. Sorathia (Ex. 6E), and Dr. Weiss (Ex. 6F).)   These employment agreements each provided for an annual base salary (section 3.a), plus a fixed pool of money that was divided up monthly by the Oncologists based on the work they performed (section 3.b).   (*Id.; see* Ex. 3, Garthwaite May 1 Dep. at 50:13-51:23.)

### D.   *15% Operating Margin Incentive Bonus.*

Concerned about the reduced patient volumes at its oncology centers, Halifax Staffing amended the medical oncology employment agreements in January 2006 to provide additional remuneration to the Oncologists over and above the annual base salary (section 3.a) and the fixed bonus pool (section 3.b).   (*See* Ex. 7, amendments of Dr. Chew (Ex. 7A); Dr. Deveras (Ex. 7B); Dr. Durkin (Ex. 7C); Dr. Favis (Ex. 7D); Dr. Sorathia (Ex. 7E), and Dr. Weiss (Ex. 7F).)   It is this amendment that Relator asserts provides for illegal kickbacks and is the gravamen of Relator's AKS and FCA claims at issue in this Motion.

As so amended, section 3.c of the employment agreements provided an incentive

bonus (the "Incentive Bonus") as follows:

> *Beginning with the fiscal year ending September 30, 2005, **an equitable portion of an Incentive Compensation pool which is equal to 15% of the operating margin for the Medical Oncology program as defined by the financial statements produced by the Finance Department on a quarterly basis**. The amount of the incentive compensation distributed to the Employee shall be determined by the Medical Oncology Practice Management Group. This compensation shall be paid annually according to the operating margin for the fiscal year. Payment will be made on or before March 15 of the following year in order to provide a 90-day period of collections. The Company shall make best efforts to achieve a reasonable collection rate in light of community needs, patient mix, and relevant health care reform efforts.*

(*See* Ex. 3, Garthwaite May 1 Dep. at 63:12-64:4; *see also* Ex. 4A emphasis supplied. )

E.       *The Admitted Purpose of the 15% Operating Margin Incentive Bonus Paid to the Oncologists Was to Induce Referrals to Halifax Hospital.*

The admitted purpose of the contract amendments and the additional remuneration (the Incentive Bonus) was to make the medical oncology practice in the hospital-based setting more equivalent to a medical oncology practice in private practice, so that the physicians would continue to refer their patients to Halifax Hospital oncology centers, instead of opening a competing private practice as Drs. Alexander, Dodd and Doughney did in November 2003. (*See* Ex. 3, Garthwaite May 1 Dep. at 61:5-13; *see also* Ex. 8, Durkin Dep. at 148:4-149:15; and Ex. 9, Weiss Dep. at 37:15-38:23.)

Tom Garthwaite, Halifax Hospital's manager of the Oncologists, wrote on the cover sheets for such contract amendments that the Incentive Bonuses would "var[y] based on net margin." (*See* Ex. 3, Garthwaite May 1 Dep. at 91:19-94-13; *see also* Ex. 4B.)   The bonus money used for the Incentive Bonus and available in the 15% Operating Margin pool did, in fact, vary with the volume and value of each Oncologist's referrals to Halifax Hospital.   (*See*

6

Ex. 10, Pike May 20 Dep. Rough at 58:7-14.)   By its very definition, the 15% Operating

Margin bonus pool from which the Incentive Bonus was paid took into account patient referrals

by the Oncologists to Halifax Hospital oncology centers. (*See* Ex. 10, Pike May 20 Dep. Rough

at 127:18-128:24.)

      **F.**     *The 15% Operating Margin Incentive Bonus Remunerates the Oncologists*
                 *For Referrals, Not Personal Services.*

The operating margin of Halifax Hospital's Medical Oncology program on which the

Incentive Bonus was calculated (the "Operating Margin") included medical oncologist

professional fees, medical oncology administration fees and medical oncology

pharmaceuticals.   (*See* Ex. 3, Garthwaite May 1 Dep. at 67:3-10.)   This Operating Margin

included inpatient and outpatient services.   (*See* Ex. 3, Garthwaite May 1 Dep. at 67:11-16.)

It also included hospital facility fees.   (*See* Ex. 3, Garthwaite May 1 Dep. at 67:17-24.)

To calculate the Operating Margin, the finance department of Halifax Hospital

prepared spreadsheets to roll up the revenues and expenses of every cost center in the Medical

Oncology program.   (*See* Ex. 3, Garthwaite May 1 Dep. at 146:21-148:23.)   The spreadsheets

included revenues from all outpatient oncology programs at Halifax Hospital and all outpatient

oncology pharmacy revenue and revenue generated from Halifax Hospital's joint venture with

Bert Fish Medical Center.   (*See* Ex. 3, Garthwaite May 1 Dep. at 147:5-16.)   Defendants

prepared annualized spreadsheets to compute the Operating Margin for each of the fiscal years

2005-2008.   (*See* Ex. 11: FY 2005 (Ex. 11A); FY 2006 (Ex. 11B); FY 2007 (Ex. 11C); FY

2008 (Ex. 11D.)   These spreadsheets clearly show how the 15% Operating Margin Incentive

Bonus varied with the "volume and value" of the referrals from the Oncologists to Halifax

Hospital for outpatient services (including prescription drugs and hospital facility fees).

**G.** ***Defendants Knowingly Paid the 15% Operating Margin Incentive Bonuses to the Oncologists for Fiscal Years 2005-2008.***

Defendants paid the Oncologists, and the Oncologists received and accepted, this 15% Operating Margin Incentive Bonus for fiscal years 2005 through 2008 as follows:

| Fiscal Year Ended Sept. 30 | Total 15% Operating Margin Incentive |
|:---:|:---:|
| 2005 | $ 231,234.60 |
| 2006 | $ 290,252.25 |
| 2007 | $ 223,940.07 |
| 2008 | $ 254,982.90 |

(*See* Ex. 3, Garthwaite May 1 Dep. at 145:23-146:7; 159:14-160:14; 162:6-165:17; 166:9-168:11; *see also* Ex. 4C; Ex. 4D; Ex. 4E; Ex. 4F; Ex. 4G.) (*See* Ex. 8, Durkin Dep. at 183:17-187:15; *see also* Ex. 8A.) (*See* Ex. 12, Sorathia Dep. at 73:20-75:10.) (*See* Ex. 9, Weiss Dep. at 74:11-75:20, *see also* Ex. 9A.)

Defendants admit paying the 15% Operating Margin Incentive Bonuses to each of the Oncologists for each of the fiscal years 2005-2008.  (*See* Ex. 13, RFA Responses 175-198.) Defendants also admit paying bonuses to each of the Oncologists for each of the fiscal years 2009-2012.  (*See* Ex. 14, RFA Responses 53-76.)

As shown by Halifax Hospital's own documents, once the 15% Operating Margin Incentive Bonus was implemented, the number of patient visits to the Halifax oncology centers jumped from 26,105 in fiscal year 2005 to 29,571 in fiscal year 2006, to 30,898 in fiscal year 2007, and to 29,667 in fiscal year 2008.  (*See* Ex. 5 (redacted).)

**H.** *Relator Reported That The Incentive Bonus Was Improper, But Defendants Continued to Pay It.*

When Relator assumed the role of Director of Physician Services at Halifax Hospital in June 2008, she was asked to review physician contracts.   (*See* Ex. 15, Baklid-Kunz Aug. 20 Dep. at 62:3-11.)   She reviewed the employment contracts with the Oncologists and quickly realized these contracts "had major issues."   (*See* Ex. 15, Baklid-Kunz Aug. 20 Dep. at 63:5-9.)   Relator sent an email on October 28, 2008 at 11:36 A.M. to Audrey Pike (Defendants' Associate General Counsel) and George Rousis (Defendants' Chief Compliance Officer) to express her concerns about the contracts with the Oncologists.   (*See* Ex. 15, Baklid-Kunz Aug. 20 Dep., at 63:10-20; *see also* Ex. 16: Ex. 16A (redacted)); Ex. 16B (redacted); Ex. 16C (redacted).)

Halifax Hospital's Associate General Counsel Audrey Pike reviewed the question of whether the Incentive Bonus violated the Stark Law.   She then wrote a comprehensive memorandum to Halifax Hospital's General Counsel, David Davidson, dated November 10, 2008, regarding the legality of the Incentive Bonus.   (*See* Ex. 10, Pike May 20 Dep. Rough at 9:17-10:5.)   This memorandum clearly and unequivocally concluded that "**the arrangement [was] not permitted under Stark**."   (*See* Ex. 10A (redacted) (the same document is located at Dkt. 272-9 (Ex. 28 to USA's Partial Motion for Summary Judgment, HAL-1 0691036-0691038) (emphasis supplied).)   Ms. Pike, in this same memorandum recommended "that payment through the amendment [15% Operating Margin incentive] **stop immediately**, and that the amendment be terminated for each employed physician."   (*Id.* at page 3 (emphasis supplied).)

9

Tom Garthwaite, who was the manager of the Oncologists for Defendants and had to approve all of their employment contracts, was told by David Davidson (Defendants' General Counsel) that Defendants "have had a technical violation with their medical oncology contract regarding Stark." (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 333:2-334:4.)

Despite Ms. Pike's determination that the Incentive Bonus "was not permitted under Stark" and despite her expressly recommending that the payment of such Incentive Bonus "stop immediately," Defendants **still** paid the Oncologists the 15% Operating Margin Incentive Bonus for Fiscal Year 2008 on or about March 4, 2009. (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 226:6-231:9; 233:10-234:3; *see also* Ex. 18A and 18B; *see also* Ex. 19, Pike Feb. 25 Dep. at 63:19-65:12; *see also* Ex. 19A.)

## I.  *Defendants Altered The 15% Operating Margin Incentive Bonus by Naming It a "Quality" Incentive in July 2010.*

After paying the 15% Operating Margin Incentive Bonus to the Oncologists in March 2009, Defendants prepared a document entitled "Medical Oncology Contract Review" dated August 2009 which outlined Halifax Staffing's plans to modify the Oncologists' contracts. (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 339:1-19; *see also* Ex. 18D.) Halifax Staffing planned to replace the 15% Operating Margin Incentive Bonus and substitute a financial incentive pool purportedly related to "quality" measures. (*Id.*, at 340:13-342:20.)

Mr. Garthwaite met with the Oncologists on January 22, 2010 to discuss modifying their contracts to remove the Incentive Bonus structure. (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 338:10-17; *see also* Ex. 18C.) These modified contracts with the Oncologists were not fully executed by Halifax Staffing until July 8, 2010, well over a year and a half after Halifax

Hospital was undeniably aware of the illegality of the 15% Operating Margin Incentive Bonus contained in the prior contracts.   (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 345:3-12; *see* Ex. 18E; *see also* Ex. 20: Dr. Chew (Ex. 20A); Dr. Deveras (Ex. 20B); Dr. Durkin (Ex. 20C); Dr. Favis (Ex. 20D); Dr. Sorathia (Ex. 20E); and Dr. Weiss (Ex. 20F).)

The modified contracts signed in July 2010 had a retroactive start date of March 1, 2009.   (*Id*.)   The modified contracts included a fixed bonus pool of $275,000 for certain "quality" goals.   This "fixed pool" was within the range of the 15% Operating Margin Incentive Bonuses paid for fiscal years 2005-2008 ($223,940.07 to $290,252.25 respectively). (*Id*.)   The modified contracts signed in 2010 were used to determine the bonuses paid to the Oncologists for fiscal year 2009.   (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 345:13-14.)

**J.     *Defendants Assert No AKS Safe Harbor or Advice of Counsel Defense.***

Defendants have not pled as an affirmative defense or provided any evidence in discovery that their actions meet all of the requirements of any statutory or regulatory safe harbor to the AKS.   (*See* Ex. 21, Rousis Feb. 20 30(b)(6) Dep. at 231:14-233:2.)   Defendants have confirmed they will not assert an advice of counsel defense to any of Relator's non-intervened claims, including those which are the subject of this motion.   (*See* Ex. 22.)

**K.     *Defendants Certified Compliance with the Federal Anti-Kickback Statute.***

Defendants submitted Medicare Enrollment Agreements (Form 855-A) in which Defendants expressly certified:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

11

(*See* Ex. 23A and Ex. 23B (Redacted)).

Each of Halifax Hospital's claims to Medicare on Form UB-04 is subject to the following certification of the reverse side of Form UB-04: "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." (*See* Ex. 24, Lewis Mar. 5 30(b)(6) Dep. at 48:3-25; 82:19-84:8.) The Form UB-92, which preceded Form UB-04, contained similar language that the information needs to be true and accurate. (*Id.* at 84:9-20).

**L.** ***Defendants Submitted Thousands of Claims to the United States during the Time in which They Paid Referral-Based Remuneration to the Oncologists.***

Defendants' own damages expert, Donald Moran, prepared a report that includes data on the number of outpatient claims filed by Halifax Hospital on referrals from the Oncologists who received the Incentive Bonus and then the "quality" incentive bonus. (*See* Ex. 25, Moran Dep. at 12:13-22; *see also* Dkt. 272-5, 6, and 7 (report of Donald Moran filed by USA in support of its motion for partial summary judgment).) Using Defendants' expert's own report, and limiting the claims count to the number of outpatient claims **after** reductions made by Defendant's expert, Halifax Hospital submitted not less than 31,894 claims for the period beginning October 1, 2004 (first day of fiscal year 2005 for which the 15% Operating Margin Bonus Incentive was effective) until June 30, 2010 (end of the last calendar month before the cosmetically modified employment agreements were executed by Halifax Staffing). (*See* Ex. 26, Withrow Declaration). Each of these 31,894 claims were for healthcare services referred by the Oncologists who were receiving the Incentive Bonus, and then the "quality" incentive

bonus.

## IV.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   An issue of fact is genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).   When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."   *Id.* at 324–25 (internal quotations and citations omitted).   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.   *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985).

To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine factual dispute exists only if "a reasonable jury could return a verdict for the non-moving

party." *Damon v. Fleming Supermarkets, Inc.,* 196 F.3d 1354, 1358 (11th Cir.1999) (internal quotation marks and citation omitted). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *S.E.C. v. Asset Recovery & Mgmt. Trust, S.A.*, 2:02-CV-1372-WKW, 2008 WL 4831738 (M.D. Ala. Nov. 3, 2008).

## V.    ARGUMENT.

### A.    Defendants Paid The Oncologists Remuneration For Referrals In Violation Of The Anti-Kickback Statute.

#### 1.    The Anti-Kickback Statute.

The AKS makes it a crime to knowingly and willfully offer, pay, solicit or receive any **remuneration** to **induce** a person:

> (1) to refer an individual to a person for the furnishing of any item or service covered under a federal health care program; or

> (2) to purchase, lease, order, arrange for or recommend any good, facility, service, or item covered under a federal health care program.

42 U.S.C. § 1320a-7b(b)(1)-(2).   The term "any remuneration" encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind. 42 U.S.C. § 1320a-7b(b)(1).

Originally enacted in 1972, the AKS was revised in 1977 (in Public Law 95-142) to read largely as it does today. The AKS "address[es] Congress' concern that health care decision-making can be unduly influenced by a profit motive."   Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With Which They Have Financial

14

Relationships, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).   Compliance with the AKS is a

condition of payment for the Medicare program. *United States ex rel. Freedman v. Suarez-*

*Hoyos*, 781 F. Supp. 2d 1270, 1279 (M.D. Fla. 2011); *see also McNutt ex rel. U.S. v. Haleyville*

*Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005).

       2.     *Interplay Between the AKS and Stark.*

This Motion for Partial Summary Judgment addresses Relator's claims for AKS

violations and kickback-tainted false claims under the FCA.   The interplay between the AKS

and the Stark Statute has been summarized as follows:

> Both the anti-kickback statute and [Stark] address Congress' concern that health
> care decisionmaking can be unduly influenced by a profit motive. When
> physicians have a financial incentive to refer, this incentive can affect
> utilization, patient choice, and competition. Physicians can overutilize by
> ordering items and services for patients that, absent a profit motive, they would
> not have ordered. A patient's choice can be affected when physicians steer
> patients to less convenient, lower quality, or more expensive providers of health
> care, just because the physicians are sharing profits with, or receiving
> remuneration from, the providers. And lastly, where referrals are controlled by
> those sharing profits or receiving remuneration, the medical marketplace suffers
> since new competitors can no longer win business with superior quality, service,
> or price. Although the purposes behind the anti-kickback statute and [Stark] are
> similar, it is important to analyze them separately. In other words, to operate
> lawfully under Medicare and Medicaid, one must comply with both statutes.

*Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities With*

*Which They Have Financial Relationships*, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998).

       *3.*     *AKS Intent Requirement.*

Knowing and willful conduct is a necessary element under the AKS.   42 U.S.C. §

1320a-7b(b)(1).   An act is willful if "the act was committed voluntarily and purposely, with

the specific intent to do something the law forbids, that is with a bad purpose, either to disobey

or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-8 (11th Cir. 1998).

In the Eleventh Circuit, in order to demonstrate a violation of the AKS, the Relator need only show that Defendants knew their conduct was illegal, not that they specifically intended to violate the AKS. *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998). In *Starks*, a criminal case, the court found that the AKS "is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct," and pointed out that "the giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal[.]" *Id*. at 838.[3] The *Starks* court further found that evidence of defendants' attempt to cloak the true nature of the kickback arrangement was sufficient to support an inference that defendants knowingly violated the law. *Id*. at 839.

Although it is Relator's burden to show such intent, such burden can be carried at the summary judgment stage by the demonstration of knowledge from the admissions and circumstantial evidence of record. *Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, 6:09-CV-1999, 2011 WL 653524 (M.D. Fla. Feb. 14, 2011) ("[T]he fact that an affiant's statements would be best tested by a jury, in and of itself, will not preclude [awarding summary judgment] unless the evidence presented casts sufficient doubt on the affiant's credibility to create a genuine issue of material fact."); *U.S. S.E.C. v. Lyttle*, 538 F.3d 601, 604 (7th Cir. 2008) ("In the absence of contrary evidence, and there was none as we are about to see, the brief summary that we have given would have left a reasonable jury with no alternative to inferring scienter."); *U.S. Commodity Futures Trading Comm'n v. Driver*, 877 F. Supp. 2d 968,

---

[3]     This would seem to be particularly true when the persons at issue are sophisticated health care professionals, including Defendants' in house legal counsel.

976 (C.D. Cal. 2012) ("A genuine issue of material fact must be more than a scintilla of evidence, or evidence that is merely colorable or not significantly probative.").

In proving intent, circumstantial evidence may be used because "in common experience circumstantial evidence is most likely to be the only evidence of a subjective state of mind." *United States v. Tobin*, 676 F.3d 1264, 1286-87 (11th Cir. 2012), *reh'g denied* (July 13, 2012), *cert. denied*, 133 S. Ct. 647, 184 L. Ed. 2d 458 (U.S. 2012) and *cert. denied*, 133 S. Ct. 648, 184 L. Ed. 2d 458 (U.S. 2012) and *cert. denied*, 133 S. Ct. 658, 184 L. Ed. 2d 458 (U.S. 2012) and *cert. denied*, 133 S. Ct. 666, 184 L. Ed. 2d 458 (U.S. 2012) and *cert. denied*, 133 S. Ct. 885, 184 L. Ed. 2d 689 (U.S. 2013) (citing *United States v. Smith,* 548 F.2d 545, 549–50 (5th Cir. 1977)).

Relator need only establish the elements of her FCA case, including the elements of an AKS violation, by a preponderance of the evidence.   *See* 31 U.S.C**.** § 3731(c); *see also United States v. Rogan*, 459 F.Supp.2d 692, 716 (N.D. Ill. 2006) (holding that the statutory language of the FCA governs and that the plaintiff must prove the essential elements of an AKS violation by a preponderance of the evidence).

### 4.        *AKS Is Violated If One Purpose Is To Induce Referrals.*

The AKS has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *U.S. ex rel. Osheroff v. Tenet Healthcare Corp.*, 09-22253-CIV, 2013 WL 1289260 at *9 (S.D. Fla. Mar. 27, 2013); *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985); *United States v. McClatchey*, 217 F.3d 823, 835 (10th Cir. 2000); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir.

17

1998).   "Each circuit to actually reach the issue has rejected the primary-motivation theory" that defendants in AKS cases have advocated.   *United States v. Borrasi*, 639 F.3d 774, 782 (7th Cir. 2011).   The AKS is "violated, even if the payments were also intended to compensate for professional services."   *Id.* (quoting *United States v. Greber*, 760 F.2d 68, 72 (3d Cir. 1985)).

Remuneration for past or future referrals violates the AKS. *Id.*   Under the AKS, it makes no difference whether the illegal remuneration was offered to start a new relationship or to maintain an existing one.

> 5.    *Defendants Paid the Oncologists an Illegal 15% Operating Margin Incentive Bonus.*

Defendants admit to paying the 15% Operating Margin Incentive Bonus for the fiscal years 2005-2008.   (*See* Section III.G *Supra.*)   The calculation of the Operating Margin (from which the Incentive Bonus was calculated) included medical oncology administration fees, medical oncology pharmaceuticals, and hospital facility fees received by Defendants from referrals from the Oncologists.   (*See* Section III.F *Supra.*)   By its very definition, the 15% Operating Margin bonus pool from which the Incentive Bonus was paid, took into account patient referrals by the Oncologists to Halifax Hospital oncology centers.   (*See* Ex. 10, Pike May 20 Rough Dep. at 127:18-128:24; *see also* Section III.E *Supra.*)

There is no genuine issue of material fact that Defendants paid the 15% Operating Margin Incentive Bonus to the Oncologists, nor is there a material fact that can dispute or obviate the direct tie between the calculation of the 15% Operating Margin Incentive Bonus and referrals by the Oncologists to Halifax Hospital.

6. *There Is No Disputing That One Purpose Why Defendants Paid the 15% Operating Margin Incentive Bonus to the Oncologists Was to Induce Referrals to Halifax Hospital.*

Defendants have admitted that one purpose (possibly, the primary purpose) for the 15% Operating Margin Incentive Bonus was to induce referrals to Halifax Hospital.   Tom Garthwaite, manager of the Halifax Hospital oncology program, testified:   "The goal, according to the oncologists, was to make the medical oncology practice in the hospital-based setting more equivalent to a medical oncology practice in private practice."   (*See* Ex. 3, Garthwaite May 1 Dep. at 61:10-13.)   Because of the way the United States reimburses medical oncology programs, the emphasis for the reimbursement is on the drugs.   Physicians in private practice may lawfully bill both for physician services and outpatient oncology services (including drugs) which are ancillary to their physician office practices.   (*See* Ex. 3, Garthwaite May 1 Dep. at 144:4-19.)   Such clinics operated by physicians in private practice would not only increase the revenue to those oncologists because of their ability to bill for drugs, but such clinics would also compete with the oncology outpatient services offered by Halifax Hospital.

Dr. Walter Durkin, one of the Oncologists, testified:   "My understanding of it was that it's 15 percent of the amounts of money we would have made if we were in private practice." (*See* Ex. 8, Durkin Dep. at 148:25-149:2.)   Dr. Richard Weiss, one of the Oncologists, testified:   "And when we lost three medical oncologists they went to private practice to make more money, and they did. . . . So we said, is there something that we can do?   Help us out." (*See* Ex. 9, Weiss Dep. at 38:8-19.)

Three of Defendants' witnesses have testified under oath that at least one purpose of

the 15% Operating Margin Incentive Bonus was to make the medical oncology practice in the

hospital-based setting more equivalent to a medical oncology practice in private practice, so

that the physicians would continue to refer their patients to Halifax Hospital oncology centers,

instead of opening a competing private practice as Drs. Alexander, Dodd and Doughney did in

November 2003.   (*See* Section III.E *Supra*.)   Defendants have offered no other explanation.

Defendants cannot overcome the compelling evidence in the record that at least one purpose

in creating and paying the 15% Operating Margin Incentive Bonus was to induce referrals to

Halifax Hospital rather than having the Oncologists as competitors.   This illicit purpose of

controlling referrals is precisely what the AKS sought to address.[4]

### B.      Defendants Knowingly and Willfully Violated the AKS.

Defendants knew these contracts with the Oncologists, as amended in January 2006,

violated the AKS.   Tom Garthwaite, Halifax Hospital's manager of the Oncologists, wrote on

the cover sheets for such contract amendments that the Incentive Bonuses would "var[y] based

on net margin."   (*See* Ex. 3, Garthwaite May 1 Dep. at 91:19-94-13; *see also* Ex 4B.)   The

money available in the 15% Operating Margin pool did, in fact, vary with the volume and value

of each Oncologist's referrals to Halifax Hospital.   (*See* Ex. 10, Pike May 20 Dep. Rough at

58:7-14.)   By its very definition, the 15% Operating Margin bonus pool from which the 15%

Incentive Bonus was paid, took into account patient referrals by the Oncologists to Halifax

---

[4]      *See* Section V.A.1. *Supra*; *see also Medicare and Medicaid Programs; Physicians'
Referrals to Health Care Entities With Which They Have Financial Relationships*, 63 Fed. Reg.
1659, 1662 (Jan. 9, 1998) ("[W]here referrals are controlled by those sharing profits or
receiving remuneration, the medical marketplace suffers since new competitors can no longer
win business with superior quality, service, or price.").

Hospital oncology centers, (*see* Ex. 10, Pike May 20 Dep. Rough at 127:18-128:24), in direct violation of the AKS' prohibition on paying remuneration to induce a person to "refer [a patient] to [Halifax Hospital] for the furnishing of any item or service covered under a federal health care program."  42 U.S.C**.** § 1320a-7b(b)(1).

Not only do the circumstances of establishing the 15% Operating Margin Incentive Bonus and the spreadsheets used to actually pay this Incentive Bonus show Defendants acted knowingly and willfully, Defendants have admitted knowing the 15% Operating Margin Incentive Bonus was unlawful.  (*See* Section III.H *Supra*.)  Halifax Hospital's associate general counsel Audrey Pike told the General Counsel of Defendants, in writing, that "**the arrangement [was] not permitted under Stark**."  (*See* Ex. 10A (redacted); *see also* Dkt. 272-9, Ex. 28 to USA's Motion for Partial Summary Judgment.)  Although no further evidence of Defendants knowledge of illegality is necessary, Tom Garthwaite testified that he was told by David Davidson (Defendants' General Counsel) that Defendants "have had a technical violation with their medical oncology contract regarding Stark."  (*See* Ex. 18, Garthwaite Feb. 19 Dep. at 333:2-334:4.)[5]

In order to demonstrate a violation of the AKS, Relator need only show that Defendants knew their conduct was illegal, not that they specifically intended to violate the AKS.  *United States v. Starks*, *supra*, 157 F.3d at 837-8.   Defendants were certainly aware of the illegality of these contracts when Ms. Audrey Pike, Associate General Counsel for Halifax Hospital, explicitly informed them in her memorandum dated November 10, 2008, that "**the**

_____

[5]     Defendants tried to have this fatal admission stricken from the record (Dkt. 217), but failed.   (Dkt. 266 at 2.)

**arrangement [was] not permitted under Stark**."  (*See* Ex. 10A (redacted); *see also* Dkt. 272-9, Ex. 28 to USA's Motion for Partial Summary Judgment.)

The evidentiary record in this case, including both circumstantial evidence and Defendants' multiple admissions of illegality, is more than sufficient to carry Relator's burden of proving knowing and willful intent in support of a motion for summary judgment.  *See Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, *supra*; *United States v. Tobin*, *supra*.

### C.   Defendants Have Not Asserted Their Actions Fall Within an Applicable AKS Safe Harbor, and They Do Not.

Defendants have not pled or asserted any safe harbor affirmative defense in response to Relator's claims against them under the AKS.   (Dkt. 47; *see also* Ex. 21, Rousis Feb. 20 30(b)(6) Dep. at 231:14-233:2.)   Defendants are not asserting any form of an "advice of counsel" defense in an attempt to shield their violations.   (*See* Ex. 22.)

Even if Defendants belatedly attempt to assert their arrangements with the Oncologists fall within a safe harbor, the remuneration paid by Halifax Hospital indirectly through Halifax Staffing to the Oncologists in the form of the Incentive Bonus payments would not qualify for the statutory exclusion or regulatory safe harbor from the kickback referral prohibition for amounts paid to an employee, because the Oncologists were not employees of Halifax Hospital.   42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. § 1001.952(i); s*ee also* Ex. 1, Peburn Feb. 26 30(b)(6) Dep. at 239:15-17.   The burden is on the party seeking protection under a safe harbor provision to demonstrate strict compliance with each and every element of the safe harbor.  *U.S. ex rel. Armfield v. Gills*, 8:07-CV-2374-T-27TBM, 2012 WL 5340131 at *5 (M.D. Fla. Oct. 29, 2012).   Defendants have utterly failed to assert a viable defense to their

violations of the AKS and Relator should be awarded summary judgment.

**D.**   **Defendants Violated the False Claims Act, Because All Claims Presented Relating to the Oncologists Are Tainted by Their Violations of the Anti-Kickback Statute.**

The FCA is designed to discourage fraud against the federal government.   Under the FCA, "any person who...knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval...is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 ...plus 3 times the amount of damages which the Government sustains because of the act of that person."   31 U.S.C. § 3729(a)(1).

"To establish a cause of action under the FCA, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false."   *United States v. R&F Properties of Lake Cnty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).

A Medicare provider's failure to comply with the AKS results in violation of the FCA, as such claims are "legally false."   *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) ("There are two categories of false claims under the FCA: a factually false claim[6] and a legally false claim."); *see also U.S. ex rel. Spay v. CVS Caremark Corp.*, 2012 WL 6645537 (E.D. Pa. Dec. 20, 2012) (two theories are "(1) a legally false claim under the false certification theory and (2) a worthless services theory").   "A legally false FCA claim

---

[6]     Relator does not move in this motion on the "worthless services/factually false" theory, as such theory is more pertinent to her other claims, which are matters for trial.

is based on a 'false certification' theory of liability."   *Id.*   "[C]ourts have recognized that there are two types of false certifications, express and implied."   *Id.* (citations omitted).

>    1.    *Defendants Expressly Falsely Certified Compliance with the AKS, Rendering Them Liable under the FCA.*

"Under the 'express false certification' theory, an entity is liable under the FCA for falsely certifying that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds."   *Id.* (citations omitted); *see also U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1224 (11th Cir. 2012).

Defendants falsely certified compliance with the AKS when they submitted Medicare Enrollment Agreements (Form 855-A) in which they expressly certified:

> I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

(*See* Ex. 23A (redacted) and Ex. 23B (redacted).)

Each of Halifax Hospital's claims to Medicare on Form UB-04 is subject to the following certification of the reverse side of Form UB-04:   "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete.   That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."   (*See* Ex. 24, Lewis Mar. 5 Dep. at 48:3-25 and 82:19-84:8.)   The Form UB-92, which preceded Form UB-04, contained similar language that the information needs to be true and accurate.   (*Id.* at 84:9-20.)

2.   *Defendants Impliedly Falsely Certified Compliance with the AKS, Rendering Them Liable under the FCA.*

Under the "implied false certification" theory, an FCA violation occurs "when a claimant seeks and makes a claim for payment from the Government without disclosing that it violated regulations that affected its eligibility for payment." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 305 (3d Cir. 2011). Implied false certification "is premised on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Id.* (citation and internal punctuation omitted).

In other words as this Court has previously ruled, "a violator of government regulations is ineligible to participate in a government program and when that violator presents claims for payment that the violator knows the government does not owe, the FCA makes that violator liable for its submission of those false claims." *U.S. ex rel. Mastej v. Health Mgmt. Associates, Inc.*, 869 F. Supp. 2d 1336, 1343 (M.D. Fla. 2012), *reconsideration denied* (July 13, 2012) (citing *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.,* 423 F.3d 1256 (11th Cir.2005)). In *Mastej*, this Court reasoned: "'[W]here the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.'" *Id.* (quoting *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.,* 251 F. Supp. 2d 28, 33 (D.D.C. 2003).)

25

It is a settled matter in this Circuit and this Court that claims submitted to Medicare in violation of the AKS are false under the FCA.   As this Court has previously held, compliance with the AKS is a condition of payment for the Medicare program. *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1279 (M.D. Fla. 2011); *see also McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1260 (11th Cir. 2005) ("[C]ompliance with the [AKS] is necessary for reimbursement under the Medicare program."); *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 313-14 (3d Cir. 2011) ("Compliance with the AKS is clearly a condition of payment under Parts C and D of Medicare."); and *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 159 (D.D.C. 2008) (noting the "absurdity" of a defendant's argument that compliance with the Anti–Kickback Statute is not a precondition of payment as it "would put the government in the position of funding illegal kickbacks after the act.").

Pursuant to the foregoing, every claim that Defendants submitted to the Medicare program pursuant to the illegal kickback arrangement between the Defendants and the Oncologists from the start of fiscal year 2005 (October 1, 2004) until at least July 8, 2010, the date Halifax Staffing executed the cosmetically modified contracts with the Oncologists to cloak the illegal remuneration that had been paid them for years and years.

### E.      Defendants Presented and Caused to Be Presented Not Less than 31,894 False Claims in Violation of the False Claims Act.

There is no dispute that Defendants presented tens of thousands of "claims" relating to the Oncologists alone between October 1, 2004 and June 30, 2010.   In fact, by Defendants'

own expert's calculations, Halifax Hospital has submitted 31,894 kickback-tainted false claims relating to the Oncologists.

Defendants' own damages expert, Donald Moran, prepared a report that includes data on the number of outpatient claims filed by Halifax Hospital on referrals from the Oncologists. (*See* Ex. 25, Moran Dep. at 12:13-22; *see also* Dkt. 272-5, 6, and 7 (report of Donald Moran filed by USA in support of its motion for partial summary judgment).)   Using Defendants' expert's own report, and limiting the claims count to the number of outpatient claims **after** reductions made by Defendant's expert, Halifax Hospital submitted not less than 31,894 claims for the period beginning October 1, 2004 (first day of fiscal year 2005 for which the 15% Operating Margin Incentive Bonus was effective) until June 30, 2010 (last month before the replacement employment agreements were executed by Halifax Staffing).   (*See* Ex. 26, Withrow Declaration.)   Each of these 31,894 claims were false because Defendants paid illegal remuneration to the Oncologists to induce referrals in violation of the AKS for these periods, Defendants falsely certified that it was not in violation of the AKS, and the United States would not have paid such claims had it known of the violations.

Therefore, Relator is entitled to summary judgment that the number of false claims presented by Defendants relating to the Oncologists is not less than 31,894.

Defendants presented each of the 31,894 false claims relating to the Oncologists "with the knowledge that the claim was false."   *R&F Properties of Lake Cnty., Inc.*, *supra*, 433 F.3d at 1355.   Under the FCA, the term "knowingly" means "that a person, with respect to information...(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of

the information."   31 U.S.C. § 3729(b)(1).   The statute specifically provides that "no proof of specific intent to defraud" is required to show knowledge.   31 U.S.C. § 3729(b)(1)(B).

The direct and circumstantial evidence in the record more than establishes Defendants' knowledge that these claims were false or, at the very least, that Defendants acted with deliberate indifference or reckless disregard of the truth or falsity of the claims.   *See United States v. Rogan*, 459 F. Supp. 2d 692, 726 (N.D. Ill. 2006) *aff'd*, 517 F.3d 449 (7th Cir. 2008). Compliance with the AKS is a condition of payment for the Medicare program.   *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1279 (M.D. Fla. 2011).   Defendants knew one purpose of the 15% Operating Margin Incentive Bonus was to induce referrals, and Defendants knew the incentive was illegal.   Defendants did not comply with the AKS, so the claims are false.   The "knowledge" component of the FCA is satisfied, and Relator is entitled to summary judgment.

**F.     The Proper Measure of Damages under the FCA Is the Full Value of All False Claims.**

Although Relator does not seek a determination of the exact damages and civil monetary penalties in this motion for partial summary judgment for liability only, Relator does ask this Court to confirm the proper measure of damages on kickback-tainted false claims. This Court has held that because Medicare would not have paid claims tainted by Defendants' kickback arrangement with the Oncologists if Medicare had known of such arrangement, the proper measure of damages for Defendants' violations is the entire amount that Medicare paid on such tainted claims.   *See U.S. ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199 at *4 (M.D. Fla. Sept. 21, 2012) (concluding that the "amount of the Government's damages

28

resulting from the payment of claims tainted by a kickback arrangement equals the full amount that Medicare paid on such claims").

In addition to this Court's decision in *Freedman*, this issue has been decided consistent with Relator's request in this motion by the court in *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008). In *Rogan*, as here, the government brought an FCA case based upon defendant's violations of the Stark law and the AKS. As the *Rogan* court explained:

> [It is not] important that most of the patients for which claims were submitted received some medical care-perhaps all the care reflected in the claim forms.... Edgewater [the medical center] did not furnish any medical service to the United States. The government offers a subsidy (from the patient's perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due. **Thus the entire amount that [defendant] received of these . . . claims must be paid back.**

*Id.* at 453(emphasis supplied).

Therefore, Relator requests that the Court enter judgment that the proper measure of damages for *all* of Defendants' FCA violations (when proven by Relator, to the extent not shown or argued in this motion) is the entire amount that Medicare paid on such tainted claims.

**G.    Relator Is Entitled to Summary Judgment as to All Affirmative Defenses which Defendants Have Asserted or May Have Had as to All Claims Asserted By Relator.**

Defendants have asserted nine specific affirmative defenses as to Relator's claims in this case and have purported to "reserve" the right to raise other affirmative defenses. (Dkt. 47, pp. 20-21.) Defendants have produced no evidence or information to support any of their nine specific affirmative defenses, so Relator is entitled to summary judgment on those specific affirmative defenses. As discovery is now closed (except as to discovery relating to Defendants' eleventh hour "advice of counsel" affirmative defense raised regarding the

Government's claims) – and, particularly, as Defendants have always had all information relevant to their affirmative defenses in this matter – Relator also requests entry of an order that Defendants may not raise any additional affirmative defenses.

       1.    *Standard of Review for Summary Judgment on Affirmative Defenses.*

"Partial summary judgment may properly be granted on affirmative defenses." *Tingley Sys., Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209, 1218 (M.D. Fla. 2007) (citing *Int'l Ship Repair and Marine Servs., Inc. v. St. Paul Fire and Marine Ins. Co.,* 944 F. Supp. 886, 891 (M.D. Fla. 1996)).

It is well established that the party asserting an affirmative defense has the burden of proving it. *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim,' in order to discharge [its] 'initial responsibility.'" *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (quoting *Celotex,* 477 U.S. at 323) (emphasis in original). "Instead, the moving party simply may show – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (quoting *Celotex,* 477 U.S. at 324; internal punctuation omitted). "Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id*. (quoting *Celotex,* 477 U.S. at 331 (Brennan, J., dissenting)). "If the moving party shows the absence of a triable issue of fact by either method, the burden on summary

judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial."

*Id.* (citations omitted).

> 2.  *Relator Is Entitled to Summary Judgment as to Each of the Nine Enumerated Affirmative Defenses Raised by Defendants.*

> a.  Affirmative Defense 1: Failure to State a Claim.

In support of this affirmative defense, Defendants assert only that "Relator has failed to state claim upon which relief may be granted."   (Dkt. 47.)   Defendants argued this affirmative defense in their Motion to Dismiss, which the Court denied in its Order Denying Defendants' Motion to Dismiss.   (Dkt. 46.)   Relator is aware of no other basis for Affirmative Defense #1.   Thus, Relator requests that the Court enter summary judgment in her favor on Defendants' Affirmative Defense 1.

> b.  Affirmative Defense 2: Estoppel.

In support of this affirmative defense, Defendants assert that "[t]he doctrine of estoppel bars any relief on Relator's claim."   (Dkt. 47.)   This Court has previously held that, as a matter of law, the affirmative defense of estoppel is not available to a defendant in an FCA case.   *U.S. ex rel. Freedman v. Suarez-Hoyos*, 2012 WL 4344199 (M.D. Fla. Sept. 21, 2012) (holding equitable estoppel not an available affirmative defense in FCA case).   The Supreme Court "has never upheld an assertion of estoppel against the Government by a claimant seeking public funds." *Office of Personnel Management v. Richmond,* 496 U.S. 414, 434 (1990). Relying on the Appropriations Clause of the Constitution, the Supreme Court held that "the payment of money from the Treasury must be authorized by statute," and therefore, "judicial use of an equitable doctrine of estoppel cannot grant ... a money remedy that Congress has not

authorized." *Id.* at 426. "The principle applies equally where a party seeks to use the doctrine of estoppel to prevent the Government from recovering public funds that have already been paid." *United States v. Manhattan-Westchester Med. Servs., P.C.*, 2008 WL 241079 (S.D.N.Y. Jan. 28, 2008) (striking affirmative defense of estoppels in FCA case); *see also United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 768-70 (N.D. Tex. 2002) (striking affirmative defense of estoppel in case involving FCA claims). Since Relator's FCA claims involve the recovery of public funds, Defendants' estoppel affirmative defense fails as a matter of law.

Even if the defense were not barred by law, Defendants have neither alleged nor produced evidence that they could meet all elements of an estoppel affirmative defense. Therefore, Relator is entitled to summary judgment as to Defendants' estoppel defense.

c.      Affirmative Defense 3: Waiver.

In support of this affirmative defense, Defendants assert "[t]he doctrine of waiver bars any relief on Relator's claims." (Dkt. 47.) Absent Defendants' presentment of evidence that the Attorney General waived one or more of the claims asserted against Defendants in this case, the affirmative defense of waiver fails as a matter of law. *U.S. ex rel. Spay v. CVS Caremark Corp.*, 2013 WL 1755214 at *12 (E.D. Pa. Apr. 24, 2013) ("[V]iolations of the FCA may only be waived by the Department of Justice."); *see also United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 771 (N.D. Tex. 2002) (striking affirmative defense of waiver as unavailable to defendant in FCA case). Even if Defendants were able to present evidence showing that Relator "purposefully and unreasonably delayed or knew of Defendants' alleged misconduct" long before bringing this case (which would be patently

untrue), such conduct would be "irrelevant," and the waiver defense would still fail by law.
*Spay*, 2013 WL 1755214 at *12.   Therefore, Relator is entitled to summary judgment as to
Defendants' waiver defense.

d.      Affirmative Defense 4: Good Faith.

In support of this affirmative defense, Defendants assert that "Relator's claims for relief
are barred because any actions taken by Halifax with respect to the subject matters alleged in
the Complaint were undertaken in good faith and constitute lawful, proper, justified and/or
privileged conduct."   (Dkt. 47.)   Defendants' factual support for this affirmative defense is
that Defendants purportedly "followed [their] contract management policy."   (*See* Ex. 21,
Rousis Dep. 30(b)(6) at 168:24-169:1.[7])   Mr. Rousis testified further that Defendants "view
the contract process – the purpose of having that process is to – is to give the legal department
an opportunity to advise the manager regarding the legality of any contract that they're
presenting for execution."   (*See* Ex. 21, Rousis Dep. 30(b)(6) at 169:6-11.)   Other than
following its contract management policy, one component of which was purportedly to have
the legal department review contracts for legality, Mr. Rousis testified there is no other basis
for Defendants' good faith affirmative defense.   (*See* Ex. 21, Rousis Dep. 30(b)(6) at 169:19-
170:6.)

Courts have recognized a good-faith defense to claims pursued under the AKS and
FCA.   *See U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am.*, 565 F. Supp. 2d 153, 167
(D.D.C. 2008) (citing *United States v. Jain*, 93 F.3d 436, 440 (8th Cir. 1996)).   In *Jain*, the

---

[7]      Defendants designated George Rousis as their 30(b)(6) witness to testify regarding all
affirmative defenses.   (*See* Ex. 21, Rousis Dep. 30(b)(6) at 12:11-13.)

trial court recognized a "good faith" defense, "explaining that Dr. Jain acted in good faith if he believed he was being paid for promoting North Hills, not for referring patients." *Jain*, 93 F.3d at 440.   In this case, Dr. Durkin and Dr. Weiss have already admitted the 15% Operating Margin Incentive Bonus was paid to induce them to refer to Halifax Hospital rather than start a competitive private practice.   Moreover, the good faith defense fails as a matter of law in light of the admissions by Mr. Garthwaite and Ms. Pike that the 15% Operating Margin Incentive Bonus was illegal.   *See* Section III.H *Supra*.

Following internal policy is not a valid basis of a good faith defense.   At a minimum, to establish a good faith affirmative defense, Defendants would have to show they acted in: (1) reliance on; and (2) conformity with a CMS regulation, opinion letter, or CMS interpretative guidelines; and (3) in good faith.   *See, e.g., Swigart v. Fifth Third Bank*, 870 F. Supp. 2d 500, 509 (S.D. Ohio 2012).   Defendants have advanced no such argument, let alone evidence to support it.   Following internal policy created by the organization is no defense to that organization's breach of the AKS.   Ignorance of the law is no defense.   *United States v. Jain*, *supra,* 93 F.3d at 441.   Therefore, Relator is entitled to summary judgment as to Defendants' affirmative defense of "good faith."

e.    Affirmative Defense 5: Limitation on Damages.

In support of this affirmative defense, Defendants assert that "Relator is precluded from recovering treble damages and civil penalties under applicable provisions of law."   (Dkt. 47.) This affirmative defense appears to be entirely without basis.   The FCA specifically provides that violators are "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation

Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person."  31 U.S.C. § 3729(a)(1).  If Relator proves Defendants violated the FCA on one or more occasions, then Defendants would be liable for treble damages and civil penalties for each false claim presented or obligation avoided by Defendants.

To the extent Defendants are referring to the provisions of 31 U.S.C. § 3729(a)(2) and are asserting that the damages should be reduced, Defendants do not qualify for such reduction. Defendants did not self-report any violation, did not cooperate in the Government's investigation into these violations, and did not furnish any information to the Government prior to the filing of this case on June 16, 2009 or prior to the Government's issuance of the first subpoena regarding the violations asserted in this case in December 2009.  Therefore, Defendants' Affirmative Defense 5 fails as a matter of law.

f.     Affirmative Defense 6: Attorney's Fees.

In support of this affirmative defense, Defendants assert that "Relator is precluded from recovering attorneys' fees under applicable provisions of law."  (Dkt. 47.)  Defendants have advanced no theory, facts, or evidence in support of what they have labeled an "affirmative defense."  This seems not to be an affirmative defense at all and is, instead, merely a denial of the claims asserted by Relator.  Such defense is contradicted by 31 U.S.C. § 3730, which specifically provides that Relator would be entitled to recovery from Defendants of her "reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."  31 U.S.C. § 3730(d)(1)-(2).  Therefore, this "affirmative defense"

should likely simply be striken, but Relator also requests entry of summary judgment in her favor on such affirmative defense.

g.      Affirmative Defense 7: Fraud with Particularity.

In support of this affirmative defense, Defendants assert that "[i]nsofar as any of Relator's causes of action in the Complaint sounds in fraud, the Complaint fails to plead fraud with particularity."  (Dkt. 47.)   Defendants argued this affirmative defense in their Motion to Dismiss, which the Court denied in its Order Denying Defendants' Motion to Dismiss.   (Dkt. 46.)   For the reasons set forth in such order, Relator requests that the Court enter summary judgment in her favor on Defendants' Affirmative Defense 7.

h.      Affirmative Defense 8: Unclean Hands.

In support of this affirmative defense, Defendants assert that "Relator's unclean hands bar her claims."  (Dkt. 47.)   However, as with estoppel and waiver, the affirmative defense of unclean hands is also unavailable to Defendants in this case as a matter of law.   *See, e.g., SEC v. Follick*, 2002 WL 31833868, at *8 (S.D.N.Y. Dec. 18, 2002) ("[T]he doctrine of unclean hands may not be invoked against a government agency which is attempting to enforce a congressional mandate in the public interest."); *see also United States v. Manhattan-Westchester Med. Servs., P.C.*, 2008 WL 241079 (S.D.N.Y. Jan. 28, 2008) (striking affirmative defense of unclean hands in FCA case).   In another FCA case, a court struck the defendant's unclean hands affirmative defense on the grounds that, because "the FCA is designed to protect the public from fraud and to deter fraud against the government," the defense was insufficient as a matter of law.   *United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 774 (N.D. Tex. 2002).   Ultimately, "the defense (of unclean hands) may never be asserted against

36

the government or private parties in suits to vindicate the public interest." *Hernandez, Kroone & Associates, Inc. v. United States*, 95 Fed. Cl. 395 (Fed. Cl. 2010) (agreeing with government's position and striking unclean hands defense in FCA case). Therefore, Relator is entitled to summary judgment as to Defendants' affirmative defense of unclean hands.

        i.      Affirmative Defense 9: Public Disclosure.

In support of this affirmative defense, Defendants assert "[t]he court lacks jurisdiction over the allegations under the False Claims Act pursuant to 31 U.S.C. § 3730(e)(4)(A) because (1) the claims, allegations, and transactions described in the Complaint were publicly disclosed prior to the filing and partially unsealing of the lawsuit; and (2) Relator is not an original source of the information as defined by 31 U.S.C. § 3730(e)(4)(B)." (Dkt. 47.) Defendants argued this affirmative defense in their Motion to Dismiss, which the Court denied in its Order Denying Defendants' Motion to Dismiss. (Dkt. 46.) For the reasons set forth in such order, Relator requests that the Court enter summary judgment in her favor on Defendants' Affirmative Defense 9.

        *3.*      *Relator Requests that the Court Enter an Order Barring Defendants from Asserting Any Additional Affirmative Defenses.*

In Affirmative Defense 10, Defendants assert they are "reserve[ing] the right to assert all affirmative defenses under Fed. R. Civ. P. 8(c) and any other defenses available at law or equity that may be available now or may become available based on discovery or other factual investigations." (Dkt. 47.) Such statement "is a nullity and surplusage," and it "has no efficacy." *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.*, 2005 WL 975773 at *12 (S.D. Fla. Mar. 4, 2005) (striking a defendant's reservation of right to assert

additional affirmative defenses in the future).   Furthermore, Defendants' 30(b)(6) designee testified just three months ago that Defendants were aware of no additional affirmative defenses and had no factual basis for any additional affirmative defenses.   (Ex. 21, Rousis Dep. 30(b)(6) at 263:24-265:8.)   Just days ago, Defendants clarified they were not raising the advice of counsel defense to any of Relator's claims.   (Ex. 22.)   Therefore, Relator requests an order stating that Defendants may not raise any additional affirmative defenses, as the same would be prejudicial to Relator and would delay the case.

## VI.    CONCLUSION.

WHEREFORE, Relator respectfully requests that the Court GRANT Relator's Motion for Partial Summary Judgment and ORDER, ADJUDGE and DECREE as follows:

(1)    that Defendants' financial relationships with the Oncologists, as memorialized in the 2006 amendments to their employment agreements, constituted improper remuneration paid in exchange for referrals in violation of the AKS;

(2)    that Defendants' 31,894 kickback-tainted claims presented from October 1, 2004 to June 30, 2010 relating to the Oncologists constitute false claims under the FCA;

(3)    that the proper measure of damages under the FCA is the full value of all false claimed presented by Defendants;

(4)    that the Court set a hearing to determine the exact amount of damages and civil monetary penalties to which the Government is entitled arising out of Defendants' FCA violations arising out of the kickback-tainted referrals made by the Oncologists;

(5)    that all affirmative defenses which Defendants have asserted or may have had as to

all claims asserted by Relator are insufficient as a matter of law;

(6)     that Defendants are barred from asserting any other or additional affirmative

defenses to any of Relator's claims;

(7)     for all such other and further relief as the Court finds appropriate.

The forgoing motion was originally submitted on May 28, 2013. This "corrected"

motion (corrected solely for the purpose of attaching formerly redacted exhibits) is submitted

this 12th day of June, 2013.

| | |
|---|---|
| s/ L. Lin Wood | s/ Marlan B. Wilbanks |
| L. Lin Wood (admitted *pro hac vice*) | Marlan B. Wilbanks (admitted *pro hac vice*) |
| Katherine V. Hernacki (*pro hac vice*) | Susan S. Gouinlock (admitted *pro hac vice*) |
| Amy M. Stewart (admitted *pro hac vice*) | WILBANKS & BRIDGES, LLP |
| WOOD, HERNACKI & EVANS, LLC | 3414 Peachtree Road N.E. |
| 1180 West Peachtree Street N.W. | Suite 1075 |
| Suite 2400 | Atlanta, GA 30326 |
| Atlanta, GA 30309 | Tel.: (404) 842-1075 |
| Tel.: (404) 891-1402 | Fax: (404) 842-0559 |
| Fax: (404) 506-9111 | Email: mbw@wilbanks-bridges.com |
| Email: lwood@whetriallaw.com | Email: ssg@wilbanks-bridgeslaw.com |
| Email: khernacki@whetriallaw.com | |
| Email: astewart@whetriallaw.com | |
| | |
| s/ Terrence McQuade | s/ Christopher C. Casper |
| Scott C. Withrow (admitted *pro hac vice*) | Christopher C. Casper |
| Terrence McQuade (admitted *pro hac vice*) | Florida Bar No. 048320 |
| Jeffrey T. Holm (admitted *pro hac vice*) | JAMES, HOYER, NEWCOMER, SMILJANICH & |
| WITHROW, MCQUADE & OLSEN, LLP | YANCHUNIS, P.A |
| 3379 Peachtree Road N.E. | One Urban Centre |
| Suite 970 | Suite 550 |
| Atlanta, GA 30326 | 4830 West Kennedy Blvd. |
| Tel.: (404) 814-0200 | Tampa, FL 33609-2589 |
| Fax: (404) 814-0009 | Tel.: (813) 286-4109 |
| Email: swithrow@wmolaw.com | Fax: (813) 286-4174 |
| Email: tmquade@wmolaw.com | E-mail: ccasper@jameshoyer.com |
| Email: jholm@wmolaw.com | |

*Attorneys for (Relator) Elin Baklid-Kunz*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing "corrected" version of

RELATOR ELIN BAKLID-KUNZ'S MOTION FOR PARTIAL SUMMARY JUDGMENT

AND SUPPORTING LEGAL MEMORANDUM with the Clerk of Court for the United States

District Court for the Middle District of Florida using the CM/ECF system, which will

automatically serve a copy to counsel for all other parties in this case.

This 12th day of June, 2013.

s/ Jeffrey T. Holm
Jeffrey T. Holm (admitted *pro hac vice*)
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road
Suite 970
Atlanta, GA 30326
Tel.: (404) 814-0200
Fax: (404) 814-0009
E-mail: jholm@wmolaw.com

*Attorney for (Relator) Elin Baklid-Kunz*