**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BAKLID-KUNZ, | § § § § | Civ. Act. No. 6:09-CV-1002- ORL-31GAP-TBS |
| Plaintiffs, | § § § | |
| v. | § § | JUDGE Gregory A. Presnell |
| HALIFAX HOSP. MED. CTR, et al. | § § | |
| Defendants. | § § § | |

**PLAINTIFF UNITED STATES OF AMERICA'S OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

## I.  INTRODUCTION

Halifax Hospital Medical Center and Halifax Staffing, Inc.'s (Halifax) Motion for

Summary Judgment on the United States' Complaint in Intervention on Causes of Action One

Through Six (Dkt. No. 277) (Halifax's MSJ) is an ill-conceived attempt to re-write the law and

facts to allow Halifax to retain millions of dollars in falsely obtained Medicare funds.  In short,

Halifax is asking this Court to ignore the law and the facts and allow Halifax to operate free from

the constraints of federal laws designed to protect the public fisc from improper claims for

payment.

As set forth in the United States' Motion for Partial Summary Judgment (Dkt. No. 272),

the Stark Law, 42 U.S.C. § 1395nn, prohibits providers from having financial relationships with

physicians who refer patients to that provider for designated health services.  The statute was

designed to prevent a doctor's personal financial interests from influencing medical decision-

making, thereby combating overutilization of medical services and the resulting increased costs

to federal health care programs.  To prevent the influence of money in medical decision-making, the Stark Law prohibits a provider having certain types of financial relationships with a physician from submitting claims to Medicare for referred services unless an exception to the Stark Law applies.  If a provider does not satisfy all the requirements of a Stark Law exception, then Medicare cannot pay any claims submitted by that provider for designated health services referred by the physician who has the improper financial relationship.  All claims submitted to Medicare in violation of the Stark Law constitute an overpayment that the United States is entitled to recoup.  If a provider knowingly (that is, with actual knowledge, with deliberate ignorance, or in reckless disregard of the law) violates the Stark Law and submits claims for payment to Medicare, then the claim for payment also violates the False Claims Act (FCA).  31 U.S.C. §§ 3729, *et seq.*

Halifax's MSJ should be denied because Halifax cannot meet its burden and demonstrate that the financial relationships between Halifax and the physicians named in the United States' Complaint in Intervention meet all of the requirements of at least one exception to the Stark Law. In fact, the factual record reveals just the opposite—Halifax knew its financial relationships with certain physicians were suspect, but continued to submit requests for reimbursement to Medicare, creating a situation whereby Halifax violated both the FCA as well as the Stark Law.

## II.     <u>HALIFAX'S MSJ LACKS FACTUAL SUPPORT</u>

Throughout its motion, Halifax cites numerous facts that either lack any support or that it contends are undisputed.  As set forth below, the majority of these facts are in dispute and, to the extent these facts are not supported by evidence, the United States argues that they should not be considered in support of Halifax's MSJ.

### A.  Unsupported Material Facts Should be Stricken

Halifax's MSJ presents as undisputed many statements without any factual support.  This failure is in direct contravention of the requirements of Federal Rule of Civil Procedure 56(c)(1) and Section II.H.1 of the Second Amended Case Management and Scheduling Order (Dkt. No. 189).  The United States therefore requests the following unsupported statements from Halifax's MSJ not be considered by the Court in evaluating the sufficiency of Halifax's motion:

1.      "Halifax provides comprehensive care to the local service area through a network of organizations including a 764-bed hospital with the only Level II Trauma Center in Volusia and Flagler Counties."  Halifax's MSJ, at 3.

2.      "Halifax provides significant charity-based cancer care." *Id.*, at 4.

3.      "Each Physician received a fixed base salary and productivity bonus(es) based on his or her personally performed services, which is what the law requires." *Id.*, at 10.

4.      "Halifax sets the budget for the neurosurgery department and bills Medicare and private payers for Neurosurgeon services." *Id.*, at 12.

5.      "Halifax did not calculate the bonus pool to maximize the inclusion of DHS." *Id.*

6.      "The disconnect between the claims forms and the concept of a Stark Law referral is unsurprising as the claims forms are designed for hospital billing and claims processing purposes, not to identify referrals or referring physicians." *Id.*, at 32.

Halifax also has included references to factual support in statements that appear to be purely argumentative.  For example, Halifax asserts that "[t]he Physicians' agreements do not, factually or as a matter of law, violate the Stark Law because they meet the requirements of the *Bona Fide* Employment exception set forth in Section (IV)(A) [of Halifax's brief]."  Halifax's MSJ, at 9.  Statements of this sort have no citation to the record, and the United States assumes

that Halifax intended such statements to be pure argument, and has not addressed them in this brief.  To the extent these statements are meant to provide a factual basis for granting Halifax's MSJ, they should, for the reasons identified above, similarly not be considered by the Court in deciding Halifax's MSJ.

### B.  Disputed Material Facts

In addition to the unsupported material facts noted above, Halifax's MSJ includes dozens of disputed material facts in both the "Statement of Material Facts and Allegations" and interspersed throughout its motion.  Given that none of these statements are identified in an easily referenced manner, the United States has culled through Halifax's MSJ and, as required by Federal Rule of Civil Procedure 56(c)(1)(A), attempted to set forth all disputed facts with supporting record citations in Appendix A.

### III.   <u>LAW</u>

### A.  Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the non-moving party."  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  A fact is material "if, under the applicable substantive law, it might affect the outcome of the case."  *Id.*, at 1259-60.

The moving party bears the burden of demonstrating that there is no dispute as to any material fact in the case.  *See Celotex*, 477 U.S. at 323; *Hickson Corp.*, 357 F.3d at 1260.  Once

the movant satisfies this burden, the non-moving party must establish "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co*., 32 F.3d 520, 524 (11th Cir. 1994).  The party opposing summary judgment "must come forward with specific factual evidence, presenting more than mere allegations."  *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997); *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla. 1995) (non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception).  Halifax's MSJ should be denied because it mischaracterizes the law and improperly relies on a series of disputed facts.

### B.  The Stark Law

As set forth in both the United States' Motion for Partial Summary Judgment (Dkt. No. 272) and in Halifax's Motion for Summary Judgment (Dkt. No. 277), the Stark Law prohibits: (1) physicians with improper financial relationships with a provider from making referrals for Designated Health Services (DHS) to that provider, and (2) entities from submitting claims to Medicare for DHS that is provided as a result of a prohibited referral.  42 U.S.C. § 1395nn(a)(1)(A)-(B).

### 1.   The Physicians and Halifax had a Financial Relationship

The Stark Law broadly defines prohibited financial relationships to include "compensation arrangements" in which any "remuneration" is paid "directly or indirectly, in cash or in kind," by a hospital to a referring physician.  *See* 42 U.S.C. § 1395nn(a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).  The regulations identify two types of compensation arrangements that are subject to the Stark prohibitions: direct and indirect.  CMS regulations provide that a direct compensation arrangement exists if remuneration passes between the referring physician and the entity furnishing DHS without any intervening persons or entities.  42 C.F.R. § 411.354(c)(1)(i);

*see also* 42 C.F.R. § 411.354(a)(2).  Conversely, the regulations specify that an indirect

compensation arrangement exists if, among other things, there is an unbroken chain of at least

one intervening person or entity between the referring physician and the DHS entity.  42 C.F.R. §

411.354(c)2)(i).  In its motion, Halifax agrees that there is a financial relationship between the

physicians and Halifax Hospital (Halifax's MSJ, at 9), but, contrary to the facts and the law,

characterizes the relationships as direct.

It is clear that Halifax has an indirect compensation arrangement with the physicians.

There is no dispute that Halifax Hospital is an entity that provides DHS to Medicare

beneficiaries.  There is no dispute that the physicians had employment agreements with Halifax

Staffing, Inc.  There is no dispute that the physicians received remuneration directly from a

Halifax Staffing account.  Because Halifax Staffing is a separate legal entity, there existed an

indirect compensation relationship between the physicians and Halifax Hospital.  In fact, in

considering an arrangement similar to Halifax's, CMS stated:

> *Comment*: A commenter inquired whether a physician employed by a hospital-owned management services organization ("MSO") could refer to the hospital if his or her compensation from the management services company fits in the employment exception.
> *Response*: The arrangement described by the commenter is a potential indirect compensation arrangement (hospital-MSO-physician) that would need to be analyzed under the indirect compensation rules . . . .Under the indirect compensation analysis, the physician's compensation would be excepted if it is fair market value and does not reflect the volume or value of referrals to the hospital (that is, the DHS entity).  The employment exception is not applicable in the commenter's example, because the exception applies to direct employment arrangements between a referring physician and an employer that is an entity furnishing DHS (for example, section 1877(e)(2)(C) of the Act: "even if no referrals were made *to the employer*") (emphasis added).  In the example, the hospital—not the employer MSO—is the entity furnishing DHS.  Thus, the referring physician's financial relationship with the hospital is indirect.

69 Fed. Reg. 16089.  As CMS clearly stated in its regulations and in this comment response,

when there is an intervening entity between the physician and the DHS provider, the

employment relationship is indirect.  *Id.*  In fact, Halifax itself acknowledged the relationship

between Halifax Hospital Medical Center and the physicians employed by Halifax Staffing was

indirect in a presentation authored by the Compliance Officer and Associate General Counsel

and reviewed by the General Counsel.  *See* App. A, at ¶¶ 4, 18.  The presentation unequivocally

states "Halifax Staffing, Inc. is an intervening entity, thus our physician arrangements are viewed

through the indirect compensation exception."  *Id.* (Ex. 10, at HAL-1 0512486).

As Halifax has done throughout this case when it does not like the facts, Halifax now

reverses itself and argues that Halifax Hospital, not Halifax Staffing, is the physicians' employer,

based on a multi-factor Internal Revenue Service test.  This analysis is unnecessary, as CMS'

above comment response makes clear.  If there is an intervening entity—even a hospital-owned

management services organization—then the relationship between the physician and the DHS

provider is indirect.

### 2.   Definition of Referral

The Stark Law defines "referral" as "the request or establishment of a plan of care by a

physician which includes the provision of designated health services."  42 U.S.C.

§ 1395nn(h)(5)(A).  The regulations interpreting the statute also broadly define "referral" as,

among other things, "a request by a physician that includes the provision of any designated

health service for which payment may be made under Medicare, the establishment of a plan of

care by a physician that includes the provision of such a designated health service, or the

certifying or recertifying of the need for such a designated health service . . . ."  42 C.F.R

§ 411.351.  A referring physician is "a physician who makes a referral as defined in this section

or who directs another person or entity to make a referral or who controls referrals made to

another person or entity."  *Id*.

When a physician performs a procedure on a Medicare beneficiary at a facility, Medicare receives two bills associated with the procedure: one for the physician's personally performed service and one for the facility fee. The facility fee, also known as the "facility component" or "technical component" is submitted by the entity to Medicare on a Form UB-92 or, depending on the date of service, Form UB-04. In promulgating the Stark regulations, CMS explained that:

> when a physician initiates a designated health service and personally performs it him or herself, that action would not constitute a referral of the service to an entity . . . . However, in the context of inpatient and outpatient hospital services, there would still be a referral of any hospital service, technical component, or facility fee billed by the hospital in connection with the personally performed service. Thus, for example, in the case of an inpatient surgery, there would be a referral of the surgical service, even though the referring physician personally performs the service. If the referring physician has a financial relationship with the hospital, that relationship must fit in an exception.

66 Fed. Reg. 856, 941 (Jan. 4, 2001). Applying CMS's guidance, the Fourth Circuit found that "the facility component of the physicians' personally performed services, and the resulting facility fee billed by [the hospital] based upon that component" was a referral, and was therefore prohibited by the Stark Law if there was a financial relationship between the physician and the entity and no exception is satisfied. *Tuomey Healthcare Sys.*, 675 F.3d at 407.

### 3. The Physicians were Making Referrals to Halifax

The United States alleges that the following improper referrals were made: (1) facility fees for inpatient hospital services which are submitted on a UB-92 or UB-04 claim form; (2) facility fees for outpatient hospital services, which are also submitted on a UB-92 or UB-04 claim form; and (3) other DHS performed at Halifax-owned entities, which are submitted on a form 1500 claim form. United States' Supplemental Initial Disclosures, (Ex. 39). In its motion, Halifax does not dispute that these three services are referrals. Rather, Halifax argues that the physicians identified as attending and operating physicians on the claims forms that it submitted

to Medicare for payment were not referring physicians for the inpatient and outpatient facility fees.  Halifax MSJ, at 31-33.

The United States requests that this Court adopt the holding of *United States v. Rogan* and find as a matter of law that the attending and operating physicians identified by the provider on institutional claims forms are referring physicians within the definition of the Stark Law.[1] 459. F. Supp. 2d 692 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008).  The *Rogan* court properly interpreted the Stark Law and regulations, and, as a factual matter, the manner in which Halifax filled out the claims forms it submitted for payment by Medicare is entirely consistent with *Rogan*.

The Stark Law clearly states "the request or establishment of a plan of care by a physician which includes the provision of the designated health service constitutes a 'referral' by a 'referring physician.'"  42 U.S.C. § 1395nn(h)(5)(B).  Inpatient and outpatient hospital services are DHS.  42 U.S.C. § 1395nn(h)(6)(K).  The facility fees associated with inpatient and outpatient hospital services are referrals.  *Tuomey Healthcare Sys.*, 675 F.3d at 407.

The physician identified on a UB-92 claim form in box 82 ("attending phys. ID") and box 83 ("other phys. ID") is the referring physician under the Stark Law.  *Rogan*, 459 F. Supp. 2d at 713-14.  For inpatient claims, the physician identified in box 82 is "the clinician primarily

---

[1] Halifax once again also misstates the facts when arguing that this Court should reject the finding of the Northern District of Illinois in *United States v. Rogan*, 459. F. Supp. 2d 692 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008) that the attending provider Halifax identified on its Medicare claim forms is the referring provider.  Halifax's MSJ, at 32.  Halifax states in its brief that the *Rogan* court considered this issue *sua sponte* and without arguments by the parties.  *Id.* This is not correct.  Even a cursory review of the docket on PACER shows the parties' filed Proposed Conclusions of Law and Post-Trial Briefs (Case No. 1:02-cv-03310, Dkt. Nos. 201 and 202 (United States) and 206 and 207 (Rogan)).  All four of these documents fully discuss the issue of the attending and operating physician meeting the definition of a referring physician for purposes of the Stark Law.  The Court's opinion in *Rogan* was made following trial and full briefing on this exact question by the parties.

responsible for the care of the patient from the beginning of the inpatient episode"; for outpatient claims, the physician identified in box 82 is "the physician that requested the surgery, therapy, diagnostic tests or other services."  App. A, at ¶ 30 (Ex. 31).  For inpatient claims, an entity is required to fill out box 83 "if a procedure is performed" and must enter identifying information for "the physician who performed the principal procedure."  *Id.*  For outpatient claims, the entity populates box 83 with identifying information for the "operating physician."  *Id.*  "These manual provisions were adopted to meet Congress's requirement that the identification number of referring physicians be reported with claims made to Medicare."  *Rogan*, 459 F. Supp. 2d at 713-14 (*citing* Hospital Manual, Transmittal No. 637, May 1, 1992).

Applying the Stark Law to the current claims manual and form, the physicians identified in boxes 76 and 77 of the UB-04 claim form are referring physicians under the Stark Law.  The physician the entity identifies in box 76 of the UB-04 form is described as "the individual who has overall responsibility for the patient's medical care and treatment reported in this claim/ encounter."  App. A, at ¶ 30 (Ex. 29).  The physician the entity identifies in box 77 of the UB-04 form is "the individual with the primary responsibility for performing the surgical procedure(s)." *Id.*  Like the definitions for the form UB-92, the definitions for the form UB-04 were adopted to implement the requirement that entities identify referring physicians.  *Cf. Rogan*, 459 F. Supp. 2d at 713-14.

On claims for inpatient and outpatient hospital services, the physician identified by Halifax as the attending physician in field 82 of Form UB-92 and field 76 of Form UB-04 was the physician who established a plan of care for the patient.  App. A, at ¶¶ 28, 30 (Ex. 29).  In field 83 of Form UB-92 Halifax indicated any physician performing a principal procedure on a patient.  *See id.*  Halifax indicated any operating physicians in Field 77 of Form UB-04.  *Id.*

Because the physician Halifax identified on its institutional claims forms either established a plan of care for a patient or performed a procedure on a patient at Halifax for which Halifax submitted a claim that included a facility fee, which constitutes a referral under the Stark Law, then the physician identified as the attending or operating physician by Halifax on the claims forms is a referring physician within the meaning of the Stark Law.

Halifax argues that because the United States' 30(b)(6) witness testified that there might not be a referring physician for a specific type of claim, the United States is required to demonstrate through the patient medical records that improper referrals occurred.  Halifax's MSJ, at 30.  In arguing that the United States needs to scour patient medical records to determine the identity of a referring physician, Halifax misconstrues Winnette Sandlin's 30(b)(6) deposition testimony.  Ms. Sandlin's testimony is consistent with CMS manuals and the United States' position in this case.  Ms. Sandlin testified that "[a] situation for an inpatient charge where there might not be any diagnostic test listed on the claim" is a situation in which there is no referring physician.  Halifax's MSJ, at 30.  As Ms. Sandlin further explained, not all claims require a referring physician, but where a referring physician is required for Medicare to pay the claim, the claim would be denied if there is no referring physician identified.  App. A, at ¶ 30 (Ex. 28).  For inpatient and outpatient hospital services, the attending physician is required on the claim form, so there will always be a referring physician for those claims.  App. A, at ¶ 30 (Ex. 31).  On non-institutional claims a referring physician is also required for diagnostic tests.  App. A, at ¶ 30 (Ex. 28).  Therefore, the institutional inpatient and outpatient claims submitted by Halifax and the non-institutional claims submitted by entities in which Halifax has a financial interest are not within the categories of claims that Ms. Sandlin was referring to in her deposition testimony.

11

Furthermore, Ms. Sandlin's deposition testimony makes clear that Medicare is relying on providers to submit accurate claims forms for reimbursement, and that Medicare requires providers to fill out claims forms consistent with the manuals.  App. A, at ¶ 28 (Ex. 28).  When Ms. Sandlin discussed information in medical records, she explained that the records should *verify* what the provider submitted on the claim form, not offer information that is different from what was submitted on the claim form.  App. A, at ¶ 30 (Ex. 28).  Halifax's arguments that the claims forms do not identify referring physicians is not supported by either the law, Halifax's own testimony, or the 30(b)(6) testimony of the United States.

Next, Halifax erroneously argues that the Stark Law prohibition applies to patient referrals, and not referrals for services, and that all patients who present at Halifax through either the emergency department or via transfer from another facility cannot, as a matter of law, be referrals in violation of the Stark Law.  Halifax's MSJ, at 30.  The United States does not dispute that included in its damages are claims for DHS that Halifax submitted where the patient presented to Halifax either via transfer from another facility or through the emergency department.  Halifax's "common sense" argument that the Stark Law prohibits a physician from referring *a patient* to Halifax misstates the law.  Halifax's MSJ, at 30.  The Stark Law prohibits a referral "for the furnishing of designated health services."  42 U.S.C. § 1395nn(a)(1)(A).  The Stark Law makes no mention at all of referrals of patients, only referrals of *services*.  *Id.*  The reason for this difference is that the Stark Law is designed to prevent physicians' financial interests from influencing medical decision-making during the course of a patient's treatment. *See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities with Which They Have Financial Relationships, 66 Fed. Reg. 856, 859 (Jan. 4, 2001).  It is therefore irrelevant how a patient presents to a medical facility because the Stark Law relates to the course

of treatment that a patient receives once in the care of a physician regardless of how a patient comes to be treated by a physician. Halifax's argument, therefore, lacks any legal support for its self-proclaimed "common sense" argument that a physician can make referrals of designated health services that are expressly prohibited by the statute simply because the patient was not initially referred to Halifax by a physician with a prohibited relationship. If such a physician subsequently referred the patient for any DHS, those referrals would violate the Stark Law.

Halifax also mischaracterizes Ms. Sandlin's and Fred Rooke's deposition testimony regarding self-referrals. Halifax's MSJ, at 30. Both Ms. Sandlin and Mr. Rooke testified that where the provider considers the patient to have self-referred, then the provider should indicate the self-referral using the code SLF000 on an outpatient claim. App. A, at ¶ 28 (Exs. 28, 40). Halifax, however, is not contending that it submitted claims using an SLF000 code to indicate that a patient self-referred to the hospital, and neither Ms. Sandlin nor Mr. Rooke ever testified that if a patient self-referred to the hospital and the provider did not indicate the self-referral using the proper code that there was no referral. Halifax's argument that it considered patients to be self-referrals must fail because it has not argued that it submitted claims with the SLF000 code. Moreover, if such a physician subsequently referred any DHS for the patient who self-referred to Halifax, those referrals would violate the Stark Law.

Finally, Halifax states in its motion that the United States is seeking damages for evaluation and management services and personally performed services submitted on Forms 1500 (non-institutional claims forms) as well as seeking damages for entities other than Halifax. Halifax MSJ, at 29-31. The United States agrees that evaluation and management services are not DHS, and the inclusion of evaluation and management services in the non-institutional claims set was inadvertent. There were no evaluation and management services claims included

in either of the institutional data sets (the inpatient or outpatient hospital services) data sets.
Updated Supplemental Rule 26 disclosures have been served on Halifax.  United States'
Supplemental Initial Disclosures (Ex. 39).  Halifax's further contention that the United States'
damages figures include Forms 1500 where the physician is the rendering physician, and not the
referring physician, is inaccurate.  The Supplemental Initial Disclosures served on Halifax prior
to the close of discovery only included physicians identified on Forms 1500 as referring
physicians.

### IV.  HALIFAX'S COMPENSATION AGREEMENTS DO NOT SATISFY AN EXCEPTION

With good reason, Halifax's MSJ does not contest that the Stark Law applies.  Instead,
Halifax claims that it cannot be held liable under the Stark Law because it meets all of the
requirements of either the Bona Fide Employee exception or the Indirect Compensation
exception.  Answer to Complaint in Intervention, Affirmative Defenses (Dkt. No. 112), at ¶ 8.  In
order to avoid the referral and billing prohibitions, a hospital must, by a preponderance of the
evidence, demonstrate that an exception applies.  *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*,
554 F.3d 88, 95 (3rd Cir. 2009); *Rogan*, 459 F. Supp. 2d at 716.  As set forth below, Halifax
cannot meet the requirements of either the Indirect Compensation or Bona Fide Employee
exception for either the Medical Oncologists or the neurosurgeons and Halifax's MSJ should
therefore be denied.

For the reasons set forth in Section III.B.1, it is clear that the compensation arrangement
between the physicians and Halifax Hospital is indirect.  Therefore, the only applicable Stark
Law exception is the Indirect Compensation exception.  The Bona Fide Employment exception
only applies to remuneration between a hospital and a physician and does not apply to
remuneration that passes through any intervening entity.  Here, Halifax Staffing is an intervening

14

entity between Halifax Hospital, the DHS provider, and the physicians who are making referrals to Halifax Hospital.

Where an indirect compensation arrangement exists, referrals are prohibited unless the compensation arrangement satisfies all the following conditions:

>     (a)     "The compensation received by the referring physician . . . is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS."

>     (b)     The compensation arrangement must be in writing, signed by the parties, specifying the services covered by the agreement, except in the case of a bona fide employment relationship, "in which case the agreement need not be in writing, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer."

>     (c)     The compensation does not violate the Anti-Kickback Statute or any other federal or state law regarding billing and claims submission.

42 C.F.R. § 411.357(p).

In Halifax's MSJ, it claims that the agreements would always be permissible under the indirect compensation exception because "the contract is for identifiable services and is commercially reasonable even if no referrals are *made to Halifax Staffing . . . .*"  Halifax MSJ, at 26-27 (emphasis in original).  Halifax brazenly misstates the law to support its arguments—what the Stark Law actually prohibits is compensation that takes into account the volume or value of referrals made to the DHS provider, in this case, Halifax Hospital.  42 C.F.R. § 411.357(p); *see* 69 Fed. Reg. 16089 (explaining that the referrals referenced are those made to the DHS provider).

Halifax's alternative argument also fails.  Assuming that there is a direct compensation arrangement between Halifax Hospital and the physicians, Halifax asserts that it meets the

requirements of the Bona Fide Employee exception.  The Bona Fide Employment exception is available where a direct compensation arrangement exists if the following conditions are met:

    (a)    The employment agreement must be for identifiable services.

    (b)    The remuneration for the employment must be set in advance, consistent with fair market value for the services provided and "not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician."  However, the exception generally allows payment of remuneration in the form of a productivity bonus based on services personally performed by the employed physician.

    (c)    The remuneration must be provided under an agreement that would be commercially reasonable even if no referrals were made to the employer.

42 U.S.C. § 1395nn(e)(3); 42 C.F.R. § 411.357(c).

Both the Indirect Compensation exception and the Bona Fide Employee exception require that the amount of remuneration paid to the physician is not determined in a manner that directly or indirectly takes into account the volume or value of any referrals by the referring physician and that the compensation be fair market value.  42 C.F.R. § 411.357(c), (p).

As discussed below, Halifax cannot meet the requirements of either the Indirect Compensation exception or the Bona Fide Employee exception.  For the Medical Oncologists, there is no question that as a matter of law the bonus pool varied with the volume or value of referrals.  For the neurosurgeons, there is a genuine dispute of material fact as to whether their compensation was within fair market value, commercially reasonable, and based on personally performed services.

### A.  Medical Oncology

Halifax provides a warped reading of the Bona Fide Employee exception to support its argument that while the bonus pool, which, by Halifax's own admission, included DHS, the entire compensation arrangement fits within the Bona Fide Employment exception because the distribution was based on the percentage of personally performed services completed by each

Medical Oncologist.  Halifax provides no support for its argument that the *allocation* of the bonus is what is covered by the personally performed services exception and not the *content* of the bonus.

The parties agree that the Medical Oncologists were paid a bonus based on 15 percent of the medical oncology department's operating margin, and that the components of this bonus included outpatient prescription drugs and facility fees associated with outpatient office visits. Halifax's MSJ, at 25.  Outpatient prescription drugs and hospital services are DHS under the Stark Law.  42 U.S.C. 1395nn(h)(6)(J)-(K).  There is no dispute that once the bonus pool was determined based in part on revenue from DHS, it was distributed according to a formula based on the percentage of work personally performed by the physicians relative to one another. Halifax's MSJ, at 24.  The parties therefore agree that the bonus pool included DHS.  The only matter of dispute is a question of law: whether it is permissible under the Stark Law for a provider to have a bonus pool that includes DHS if that bonus pool is divided using a formula based on personally performed services.

In discussing the Bona Fide Employee exception, CMS has clearly stated, "the employment exception contains a provision that expressly permits productivity bonuses to be paid to employed physicians for *services they personally perform*."  69 Fed. Reg. 16054, 16066 (emphasis added).  Here, the bonus dollars received by the physicians were not for each physicians' personally performed services.  App. A, at ¶¶ 20-22.  In fact, the only element of personal performance was the amount of work each physician did *in relation to one another* as a means of dividing up a pooled amount of money.  Halifax made no effort to determine what services each physician personally performed and then pay the physician a bonus for *only* those services.  App. A, at ¶¶ 20-22.  Instead, Halifax created a bonus pool that included referred DHS

and divided that pool based on the percentage of work each physician performed with respect to the other physicians in the pool.  App. A, at ¶ 17.  The Medical Oncologists were incentivized to increase the amount of outpatient prescription drugs they prescribed and their outpatient office visits, thereby maximizing the overall bonus pool.  *Id*.  This incentivizing of referred services is exactly what the Stark Law was designed to prevent.  *See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities with Which They Have Financial Relationships, 66 Fed. Reg. 856, 859 (Jan. 4, 2001).

Halifax cites to the Federal Register and claims that percentage compensation is permissible if "the methodology is set in advance and does not change over the course of the arrangement."  Halifax's MSJ, at 25 (citing 69 Fed. Reg. 16066).  What Halifax leaves out is that the compensation must not "change over the course of the arrangement in any manner that reflects the volume or value of referrals."  69 Fed. Reg. 16066.  Here, the amount of the bonuses paid changed based in part on the volume or value of referrals made by the Medical Oncologists to Halifax, which is not permitted by the statute or regulations.  App. A, at ¶¶ 17; 21-22.

In short, regardless of how bonus money is distributed, physicians cannot be paid a bonus that varies with the volume or value of referrals.  This is exactly what Halifax did.  App. A, at ¶¶ 21-22.  Thus, under either the Indirect Compensation or the Bona Fide Employee exception, Halifax simply cannot meet the requirements of the exception.

Even if Halifax's construction of the Bona Fide Employment or Indirect Compensation exception is accepted, Halifax cannot meet the terms of either exception because not all of the work was personally performed.  With respect to the Medical Oncologists, a nursing student performed rounds in lieu of one or more of the physicians, and Halifax improperly billed the services as if a Medical Oncologist performed the work.  App. A, at ¶¶ 19-20.  Although Halifax

endeavored to fix the problem prospectively, Halifax did not take any steps to determine what work was done by the non-physician. *See id.*  Instead, it simply calculated the physician bonus payments solely based on all services billed (not necessarily performed) by the physician.  App. A, at ¶¶ 17; 20.  As such, the bonuses included work that was not personally performed, and thus failed to qualify as productivity bonuses based on personally performed services.

### B.  Neurosurgery

Halifax is not entitled to summary judgment with respect to claims regarding the three neurosurgeons named in the United States' Complaint In Intervention because there are disputes of material fact regarding the compensation paid to the neurosurgeons.  There is overwhelming evidence in the record to demonstrate that the neurosurgeons were paid in excess of fair market value, that their compensation was not commercially reasonable, and that the bonus they received was not solely based on personally performed services.  For these reasons, Halifax's MSJ with respect to the neurosurgeons should be denied.

1.  <u>The Compensation Paid to the Neurosurgeons Exceeded Fair Market Value</u>

Halifax's MSJ should be denied because in order to qualify for either the Bona Fide Employment or the Indirect Compensation exception, the remuneration paid must be, among other things, fair market value for the services provided and not determined in a way that takes into account the volume or value of referrals.  42 U.S.C. § 1395nn(e)(3); 42 C.F.R. §§ 411.357(c), (p).  Given that the United States' expert, Ms. Kathy McNamara, determined that the neurosurgeons were compensated in excess of fair market value, a dispute of material fact clearly exists.

"[T]he term 'fair market value' means the value in arms length transactions, consistent with the general market value.  'General market value' means . . . the compensation that would

be included in a service agreement as the result of *bona fide* bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party . . . ." 42 C.F.R. § 411.351 (2006).  CMS gives providers significant latitude in determining fair market value and accepts any method that is commercially reasonable so long as it provides evidence to support the conclusion that the compensation paid was comparable to compensation paid for similar services in an arms length transaction when the parties are not in a position to refer business to one another.  66 Fed. Reg. at 944.  Thus, so long as a provider can demonstrate through a reasonable methodology that its compensation was fair market value, CMS will accept the conclusion.[2]

While CMS is statutorily prohibited from opining on fair market value, it has nevertheless provided some guidance to providers by stating fair market value methodologies that are not acceptable.  App. A, at ¶ 37.  As noted by Halifax, CMS has stated that third party salary survey data alone is insufficient to determine fair market value because the provider has to examine the facts and circumstances of a particular transaction.  Halifax's MSJ at 14; App. A, at ¶ 10.  In other words, CMS does not accept as reasonable a fair market value assessment based on a comparison of salary figures compiled in a spreadsheet.

From 2000 through 2009, Halifax ignored CMS's comments, and based its fair market value determination almost entirely on a haphazard review of physician salary survey data.  App. A, at ¶ 5.  While Halifax states that "it always analyzed the FMV of each physician contract"

---

[2]  Halifax incorrectly argues that "the appropriate inquiry is whether Halifax used a reasonable methodology to conduct its FMV review."  Halifax's MSJ, at 14.  However, the exceptions Halifax raised *require* that the compensation be fair market value.  42 C.F.R. § 411.357(c), (p).  CMS requires not only that a provider use a reasonable methodology, but that the methodology used in fact substantiate the claim that the compensation was consistent with fair market value.  App. A, at ¶ 10.

(Halifax's MSJ, at 14), not a single witness identified anything other than salary data as the basis for concluding the compensation offered was consistent with fair market value.[3]   App. A, at ¶ 6. In those instances where Halifax claims to have relied on facts other than salary data to support a fair market value determination, it could not provide any documentary evidence to substantiate the analysis it undertook.   App. A, at ¶¶ 7-8.

Given that Halifax employed a fair market value methodology that was explicitly rejected by CMS, it would be improper to simply rely on Halifax's contemporaneous methodology to determine whether Halifax paid the neurosurgeons in a manner consistent with fair market value. As set forth in the Expert Report of Kathy McNamara, the United States' expert identified two widely-accepted methodologies for determining fair market value.   App. A, at ¶ 3.   After analyzing the data, however, Ms. McNamara noticed several anomalies that led her to conclude that one of these methodologies— the procedure-based productivity model—was inappropriate because the physician productivity data was grossly inflated.   App. A, at ¶¶ 10-11.   For example, Ms. McNamara noted that the Halifax neurosurgeons reported productivity levels above the 90th percentile of neurosurgeons, but that the level of cash collections associated with this productivity was below that of the median neurosurgeon.   *See id*.   After determining that the low level of collections was not attributable to a poor payor mix (App. A, at ¶ 14), Ms. McNamara concluded it was likely collections were low because the physicians' productivity levels were inflated.   App. A, at ¶¶ 10-11.

---

[3]   Halifax's reference to CMS regulations permitting reliance on salary survey data is incomplete.   Halifax's MSJ, at 15 (*citing* 69 Fed. Reg. 16054, at 16128).   CMS did create a safe harbor, which was subsequently repealed on December 4, 2007, such that health care providers could establish fair market value for hourly wages paid to a physician by averaging the 50th percentile national compensation level from at least four identified surveys for a specific physician specialty.   Halifax has not produced any evidence to suggest it was availing itself of this safe harbor, likely because the compensation it paid the neurosurgeons was in excess of the 50th percentile.   72 Fed. Reg. 51012, at 51015.

Ms. McNamara's conclusion is based on reports authored by Halifax that the neurosurgeons were not properly coding physician office visits, resulting in physicians billing for services they did not actually perform.  App. A, at ¶¶ 1, 10-11.  Based on information produced by Halifax, Ms. McNamara determined that one neurosurgeon, Dr. Khanna, billed twice as many hours to office visits as a family practitioner operating at the 90th percentile of productivity.  *Id*. This means that, even without accounting for any of the time spent in surgery, Dr. Khanna spent over twice as much time conducting office visits as the most productive family practitioners, a physician specialty group that spends the vast majority of its time performing office visits.  *Id*. Furthermore, a report requested by Halifax determined that Dr. Vinas was working almost as many hours (8,749) as exist in an entire year (8,760) despite having taken 38 vacation days. App. A, at ¶¶ 15.

Ms. McNamara also considered evidence produced by Halifax that neurosurgeons were improperly coding for critical care and post-operative care, thus giving the illusion of having spent more time with patients then they actually did.  App. A, at ¶¶ 10-11.  According to Ms. McNamara, these activities would have the effect of improperly inflating a physician's reported productivity relative to the collections attributable to the physician.  *See id*.

Finally, Ms. McNamara also noted that it appeared the neurosurgeons' productivity was inflated by inappropriate billing of work performed by nurses and physician assistants.  *Id*. According to an internal compliance audit, on multiple occasions nurses performed patient checks at the exact time neurosurgeons were performing surgeries.  *Id*.  In addition, the neurosurgeons would frequently have a physician assistant perform various tasks for them, but bill for the encounter as if the neurosurgeon personally performed the work.  *Id*.  This again

would make it seem as if the neurosurgeon was extremely productive even though someone else was actually performing the work.

Halifax contends that summary judgment in its favor is appropriate because it disagrees with Ms. McNamara's expert conclusions.  Halifax's MSJ, at 18.  While the United States believes Ms. McNamara's interpretation of Halifax's own compliance reports and findings are well-founded, it is clear that there is a disputed question of fact regarding this issue that should be resolved by the jury.  Given the differing factual evidence regarding fair market value, it would be inappropriate for the Court to determine this issue on summary judgment.  *Dale v. United States*, No. 6:11-cv-1957-Orl-37GJK, 2013 WL 2920428, at *3 (M.D. Fla. June 13, 2013 (denying motion for summary judgment based on disputed issue of material fact).

        2.   <u>The Compensation Paid to The Neurosurgeons Was Not Commercially Reasonable</u>

With respect to the neurosurgeons at issue, Halifax's MSJ should also be denied because both the Bona Fide Employment and the Indirect Compensation exception require that the remuneration paid must also be commercially reasonable.  42 U.S.C. § 1395nn(e)(3); 42 C.F.R. §§ 411.357(c) and (p).  As was the case with its failure to abide by CMS guidance in performing fair market value analyses, Halifax similarly failed to perform a valid commercial reasonableness analysis of the neurosurgical employment agreements.  App. A, at ¶¶ 12-13.  Given the complete lack of any evidence demonstrating a contemporaneous analysis of the commercial reasonableness of these contracts, Halifax is now attempting to justify these relationships based on nebulous factors such as community need and state regulatory requirements.  Halifax's MSJ, at 19.  While these factors may be important for a hospital in determining the clinical offerings it maintains, they do not establish that the compensation arrangement between a physician and a hospital was commercially reasonable.  App. A, at ¶¶ 12-14.

CMS defines the term commercial reasonableness as an arrangement that would make commercial sense if entered into by an entity of similar type and size and a physician of similar scope and specialty, even if there were no potential designated health service referrals.  69 Fed. Reg. 16,093 (Mar. 26, 2004).  Although similar to fair market value, commercial reasonableness is a separate test that focuses on the nature of the relationship, not simply the total amount of remuneration.  CMS allows health care providers to use any reasonable methodology to determine commercial reasonableness.  66 Fed. Reg. at 919.

Halifax contends that the financial relationship with its neurosurgeons is commercially reasonable because it needs to retain neurosurgeons because of the call coverage requirements of a Level II trauma center in the state of Florida and the need to provide indigent care.  Halifax MSJ, at 20.  Halifax does not, however, provide any rationale for how these two considerations demonstrate the reasonableness of the financial relationship with the neurosurgeons.  App. A, at ¶¶ 13-14.  For example, the level of indigent care provided by the three neurosurgeons at Halifax is on par with neurosurgeons nationally, thus suggesting that they face the same responsibility for providing care for indigent patients as their peers.  App. A, at ¶¶ 13-14.  However, the neurosurgeons at Halifax are paid significantly more than neurosurgeons nationally.

The United States is not disputing the need for neurosurgical call coverage.  Instead, the issue with respect to commercial reasonableness is that Halifax is treating the neurosurgeons differently by paying them far in excess of what any other physician earns.  As noted by Halifax's own General Counsel, all physicians at Halifax are required to take call.  Furthermore, physicians are not paid to take regular call.  App. A, at ¶ 15.  Regular call coverage, which Halifax's General Counsel estimated was seven days a month, is considered part of a physician's responsibility for being granted privileges to work at Halifax.  *See id.*  As such, compensation for

24

normal call coverage is included in a physician's base salary. *See id*. Nevertheless, the neurosurgeons at Halifax are paid $1,100 for every single day of call coverage, resulting in a lucrative benefit no other physician at Halifax receives. App. A, at ¶ 13. Halifax has offered no evidence as to why the neurosurgeon compensation agreements are structured this way. Nor has it offered any evidence to suggest it was commercially reasonable to pay the neurosurgeons for both regular call coverage (which is factored into the base salary of every other physician at Halifax) and excessive call coverage rather than excessive call coverage only. Furthermore, the neurosurgeons are the only physicians at Halifax who receive a car allowance. App. A, at ¶ 12. Halifax has offered no justification for why it is commercially reasonable to offer this benefit, let alone in the amount of $900 to $1100 per month. *Id*. In contrast, while Dr. Kuhn owned his own practice before he joined Halifax, his car allowance was less than $300 per month. App. A, at ¶¶ 24-25 (Ex. 19).

Finally, Halifax has offered no justification for why it is commercially reasonable to pay the neurosurgeons 100 percent of collections above their respective base compensation. In essence, Halifax entered into an agreement whereby it will always lose money. The neurosurgeons receive a guaranteed base salary from Halifax Staffing plus a 100 percent bonus for every dollar collected by Halifax above their respective base salaries. Even though the neurosurgeons keep all of the revenue, Halifax pays all of the expenses associated with operating the practice. The one-sided nature of this agreement is evidenced by the enormous compensation increase Dr. Kuhn received after becoming an Halifax Staffing employee. During his final year in private practice, Dr. Kuhn generated revenue of $1,020,449, but only reported taxable income of $492,309 based on the need to pay practice expenses of $528,140. App. A, at ¶¶ 15, 24. During his first full calendar year of employment at Halifax, Dr. Kuhn generated revenue of

$923,741, but was able to earn $1,078,793 because he did not have to bear any of the costs associated with running his practice.  *See id.*

Halifax was willing to enter into these arrangements because it made millions of dollars annually from the referrals generated by the neurosurgeons.  App. A, at ¶ 13.  Even accounting for the neurosurgeons' salaries, Halifax viewed the neurosurgeons as beneficial to Halifax's bottom line because of the revenue generated from referrals.  App. A, at ¶ 12.  In 2010, for example, Halifax lost $1,772,923 million on the neurosurgeons office practice.  App. A, at ¶ 13.  However, based on the referrals made by the neurosurgeons, Halifax generated a profit of $8,325,904 from services performed at the hospital.  *See id.*  This means that despite incurring a loss of almost $2 million based on physician salaries and expenses, Halifax was still able to generate an operating margin of over $6.5 million from the neurosurgeons.  *See id.*  There is no way Halifax could consider the neurosurgeons to be profitable without taking into consideration their referrals.  Thus, it is abundantly clear that Halifax's neurosurgical agreements were not commercially reasonable *absent consideration of the referrals made by the neurosurgeons to Halifax*.  At a minimum, a dispute of material fact as to whether the neurosurgeons' compensation was commercially reasonable exists for the jury.

> 3.   The Neurosurgeons Were Paid Bonuses For Work Performed By Others

As documented on numerous occasions by Halifax's Compliance Department, Halifax was aware that neurosurgical physician assistants and nurses performed various physician services and Halifax billed for them as if the neurosurgeon performed them himself.  App. A, at ¶¶ 1; 16.  While this has the effect, as described above, of inflating the neurosurgeons' reported productivity and making it appear as if they were more productive, it also inflates the neurosurgeons' compensation because of the structure of the bonus in their employment

26

agreements.  The neurosurgeons all receive a bonus equal to 100 percent of the collections for

their personally performed services.  Thus, when a nurse or physician assistant performed a

service and Halifax billed it as if the physician performed the service, the neurosurgeon received

a bonus equal to the amount Halifax collected for that particular service.

Given that the Indirect Compensation exception only permits compensation that is,

among other things, fair market value for services actually performed (42 C.F.R. § 411.357(p)),

paying remuneration to a physician for work performed by other hospital staff prevents the

arrangement from meeting the requirements of the exception.  CMS has stated that the Bona Fide

Employment exception "contains a provision that expressly permits productivity bonuses to be

paid to employed physicians for services they personally perform."  69 Fed. Reg. 16054, 16066.

The neurosurgeons did not personally perform the services performed by nurses and physicians'

assistants.  Because Halifax compensated the neurosurgeons based on work performed by others,

this is yet another reason that the Bona Fide Employment exception does not apply.  App. A, at

¶¶ 15-16.

## V. HALIFAX IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE UNITED STATES' FCA CLAIMS

In an attempt to avoid liability under the FCA, Halifax's MSJ simply ignores the purpose

and construction of the statute.  From its very inception, the FCA was designed to prevent

financial loss to the government as a result of fraud.  *United States v. Niefert-White*, 390 U.S.

228, 232 (1968).  In order to protect the public fisc, the FCA is construed broadly.  *See e.g.*,

*United States ex rel. Clausen v. Lab. Corp. of America, Inc.*, 290 F.3d 1301, 1307 (11th Cir.

2002).

Most germane to this matter, knowledge under the FCA is defined as: (1) having actual

knowledge of the information; (2) acting in deliberate ignorance of the truth or falsity of the

information; or (3) acting in reckless disregard of the truth or falsity of the information.  31 U.S.C. § 3729(b)(1).  In defining knowledge for FCA purposes, "Congress adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'"  *United States v. Kaman Precision Products, Inc.*, No. 6:09-cv-1911-Orl-31GJK, at *4, 2011 WL 3841569 (M.D. Fla. Aug. 30, 2011) (*quoting* S. Rep. No. 99-345, at 20 (1986)).  This definition insures the knowledge element is applicable in "'ostrich' type situations, where an individual has 'buried his head in the sand' and failed to make any inquiry which would have revealed the false claim." *United States v. Entin*, 750 F. Supp. 512, 518 (S.D. Fla. 1990) (*quoting False Claims Reform Act of 1985*, S. Rep. No. 345, 99th Cong., 2nd Sess., *reprinted in* 1986 U.S. Code Cong. & Admin. News 5266).  Halifax's (at best) minimal efforts to comply with the law shows a reckless disregard for its obligations.  Furthermore, as demonstrated previously, Halifax's argument that the United States has failed to identify the false claims at issue is simply wrong as both a factual and legal matter.

## A.  Halifax Knowingly Submitted Claims for DHS Referred By the Halifax Neurosurgeons in Violation of the Stark Law

Halifax offers no actual evidence to support its argument that it is entitled to summary judgment regarding the United States' claim that Halifax violated the FCA by knowingly submitting claims for payment for DHS referred by the neurosurgeons employed by Halifax. Halifax's MSJ, at 35.  Instead, it simply argues it lacked the requisite scienter that it was violating the law.  *See id.*

Halifax's argument personifies the proverbial ostrich with its head stuck in the sand. Halifax can only avoid Stark Law liability if it can prove that it meets either the Bona Fide Employment or Indirect Compensation exception, both of which require, among other things,

evidence that the compensation was fair market value and commercially reasonable.  Yet from

2000 to 2009, the only documents Halifax can identify as the basis for its neurosurgery fair

market valuations consist of physician survey data, which both the United States and Halifax

agree is not a sufficient basis to make a determination of fair market value.  App. A, at ¶¶ 6-8;

Halifax's MSJ, at 14.  Furthermore, Dan Lang, the former hospital administrator who was

responsible for approving neurosurgery contracts, stated that he was not even familiar with the

term "commercially reasonable" and was not aware of a commercial reasonableness analysis

being done.  App. A, at ¶ 5 (Ex. 11).  In addition, Halifax's General Counsel, whose signature

allegedly represents that every contract he reviewed conforms to the legal requirements, testified

he has no recollection of ever receiving any data to support the commercial reasonableness of a

physician employment agreement.  App. A, at ¶ 12 (Ex. 6).  Halifax's failure to conduct a

reasonable analysis of either the fair market value or commercial reasonableness of the

neurosurgery contracts demonstrates a reckless disregard for the law that establishes the requisite

level of scienter under the FCA.

> **B.  Halifax Knowingly Violated the Stark Law With Respect to the Medical
>       Oncology Agreements**

Halifax's arguments that it is entitled to summary judgment on the FCA claims related to

the Medical Oncologists are equally flawed.  As an initial matter, Halifax's claim that the

meaning of the term "volume and value of referrals" is vague strains credulity given that CMS

issued specific guidance regarding this point.  In addition, Halifax cannot rely on an advice of

counsel defense because it cannot demonstrate it acted in good faith reliance on the advice given.

> 1. <u>The Medical Oncology Agreements Violate the Stark Law Clearly Take
>    Into Account the Volume or Value of Referrals</u>

In an effort to characterize a blatant violation of the Stark Law as an innocent mistake,

Halifax claims that even if its Medical Oncology employment agreements violated the law, it

acted in good faith that its interpretation of the Bona Fide Employment exception was correct.

Halifax MSJ, at 35.  As a threshold matter, this argument ignores the fact that internal Halifax

compliance documents acknowledge that it cannot rely on the Bona Fide Employment exception

because it does not have a direct compensation arrangement with the Medical Oncologists.  App.

A, at ¶ 18.

Even if the Bona Fide Employment exception applies, as noted above, CMS has made

clear that any productively bonus must be limited to personally performed services.  *See supra*

Section IV.  Halifax's bonus structure violated this limitation because it was based on the

operating margin of the medical oncology program.  App. A, at ¶¶ 2; 26-27.  It made no attempt

to segregate revenue based on revenue generated by each individual Medical Oncologist.  App.

A, at ¶¶ 20-22; 25.  As such, the bonus therefore was not based solely on personally performed

services because it included revenue generated from referrals made by each Medical Oncologist,

not to mention revenue generated from ancillary goods and services such as outpatient

prescription drugs and imaging services not performed or administered by the physician.  App.

A, at ¶ 25.  Thus, the Medical Oncologists' agreements provided for remuneration that obviously

violated the Stark Law.  Moreover, as noted above, the incentivizing of referred services is

exactly what the Stark Law was designed to prevent.  *See* Medicare and Medicaid Programs;

Physicians' Referrals to Health Care Entities with Which They Have Financial Relationships, 66

Fed. Reg. 856, 859 (Jan. 4, 2001).  For both of these reasons, Halifax's position is not reasonable

and does not evidence good faith.

2.  <u>Halifax Cannot Demonstrate A Valid Advice of Counsel Defense</u>

As an initial matter, Halifax should be precluded from relying on an advice of counsel

defense because it raised the defense after the close of discovery.  As noted in multiple filings,

throughout discovery Halifax stated it was not asserting an advice of counsel defense, withheld documents from production based on the attorney-client privilege, and instructed multiple witnesses not to answer question regarding conversations with counsel based on the attorney-client privilege. *See, e.g.*, Dkt. Nos. 231 and 271.  Over one month after the close of discovery, and contrary to previously asserted positions, Halifax changed course and advised the Court it now wishes to argue "use or advice of counsel."  Ltr. from T. Stephens to Hon. Thomas B. Smith (May 15, 2013), at 2 (Ex. 32).

When one party actively precludes the taking of discovery regarding a defense, courts have prevented the party from asserting the defense.  In *Immuno Vital, Inc. v. Telemundo Group, Inc.*, the court ruled that the defendant, who blocked discovery regarding an advice of counsel defense throughout discovery, could not then raise the defense at trial.  203 F.R.D. 561, 564-65 (S.D. Fla. 2001); *see also United States ex rel. Matheny and Loveland v. Medco Health Solutions, Inc., et al.*, No. 08-14201-CIV (S.D. Fla. Mar. 15, 2013) (Dkt. No. 258) at 12-13 (precluding defendant from relying on documents produced after the close of discovery to

support advice of counsel defense).  Thus, Halifax should be precluded from arguing it relied

upon the advice of counsel in approving or authorizing any of the contracts at issue in this case.[4]

Even if this Court reaches the merits of Halifax's advice of counsel defense, it should not

be accepted because Halifax cannot demonstrate it meets the criteria set forth by the Eleventh

Circuit.  In this Circuit, establishing a defense of advice of counsel requires a showing that: (1)

the party asserting the defense fully disclosed all material facts relevant to the advice sought; and

(2) the party relied in good faith on that advice.  *United States v. Hill*, 643 F.3d 807, 851 (11th

Cir. 2011); *United States v. Miles*, 290 F.3d 1341, 1354 (11th Cir. 2002).  The party asserting an

advice of counsel defense bears the burden of proving that a reasonable fact-finder could find

each of these elements. *See Hill*, 643 F.3d at 851.

For reliance on advice of counsel to be in good faith, the opinion must be thorough and

must pertain directly to the issue being litigated.  *See LNC Invs., Inc. v. First Fid. Bank, N.A.*,

1997 U.S. Dist. LEXIS 12858, *78 (S.D.N.Y. Aug. 27, 1997).  Status reports and meeting

discussions of "risks and benefits" are not sufficiently formal to constitute "advice of counsel."

---

[4] Given Halifax's belated assertion of a defense of advice of counsel prohibited the United States
from conducting adequate discovery on this defense, it is clear based on the current record that
summary judgment is inappropriate.  Schwartz Declaration (Ex. 34).  Under the Federal Rules, if
a nonmovant shows specific reasons why it cannot present facts essential to justify its opposition,
the court may deny or defer the motion before it, allow additional discovery, or issue any other
appropriate order.  Fed. R. Civ. P. 56(d).  In this Circuit, summary judgment is generally
inappropriate when the party opposing the motion has not had adequate time for discovery.
*Snook v. Trust Co. of Ga.v. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988).  Based
on the case law, district courts therefore may defer ruling on pending summary judgment
motions or deny the motion and allow it to be renewed after sufficient discovery has occurred.
*Howard v. Hartford Life & Accident Insur. Co.*, 769 F. Supp. 2d 1366, 1371 (M.D. Fla. 2011).
In order to test the validity of Halifax's advice of counsel defense, the United States needs
discovery to determine what information Halifax provided counsel, the steps taken by counsel
that Halifax contends demonstrate a thorough legal review, and whether or not Halifax acted in
good faith reliance on the opinion.  *See* Schwartz Decl. (Ex. 34).  Until the United States is able
to gather this information, it cannot fully evaluate the merits of Halifax's belatedly asserted
defense of advice of counsel, thus Halifax's MSJ should be denied or a ruling on the motion
deferred.

*Id.* at *78–79.  This is consistent with the general rule that oral advice is generally not considered to be competent or complete.  *See, e.g.*, *American Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1531 (Fed. Cir. 1993); *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1582 n.13 (Fed. Cir. 1992). In other words, competent legal advice must follow the analytical steps "normally considered to be necessary and proper in preparing an opinion." *Underwater Devices v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983), *overruled on other grounds by In re Seagate Tech.*, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  In contrast, counsel opinions that are superficial and conclusory cannot provide the basis for good faith reliance.  *See, e.g.*, *Critikon, Inc. v. Becton Dickinson Vascular Access*, 120 F.3d 1253, 1259-1260 (Fed. Cir. 1997); *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1117, 1122 (E.D. Cal. 2002).  Opinion letters by counsel that contain "no analysis explaining the conclusion reached" are only "tenuous evidence of advice of counsel." *Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear*, 909 F. Supp. 896, 907 (S.D.N.Y. 1995) (finding that counsel's written opinion were merely efforts to "paper over the obvious" trademark infringement).

With respect to the alleged legal review that took place in 2005, Halifax has not identified a single document constituting a thorough legal review.  App. A, at ¶ 34.  As described by Halifax's General Counsel, his review for compliance with the Stark Law consisted solely of his reading of either the statute or regulation.  App. A, at ¶¶ 33-34 (Ex. 6).  Mr. Davidson stated this review was memorialized by his signature on a contract cover sheet.  *Id*.  Thus, Halifax offers nothing more than a superficial and conclusory statement with no analysis in support of its claim that it acted in good faith in relying on Mr. Davidson's legal review.

Furthermore, the legal analysis obtained by Halifax from outside counsel in 2009 is similarly deficient as the basis for an advice of counsel defense.  Most problematic for Halifax,

33

this advice was not given until the contracts had been in place for several years, and cannot be used as evidence that Halifax acted in good faith at the time that it entered into the contracts.

Nor can the advice given in 2009 establish that Halifax acted in good faith reliance on the advice of counsel after receiving the memorandum.  As set forth in the memorandum, it does nothing more than set out a "reasonable argument" that Halifax's Medical Oncology agreements are legal.  App. A, at ¶ 35 (Ex. 37).  Nevertheless, counsel clearly stated "we cannot provide any assurances that CMS or a court would more likely than not concur with that analysis."  *Id.*

In other words, Halifax's own lawyers told Halifax that the more likely view was that the agreements violated the Stark Law!  Perhaps recognizing this shortcoming, Mr. Davidson claims that he spoke with the lawyers who prepared the memorandum "and confirmed that payment of the incentive bonus would be fine."  Davidson Decl. ¶ 21 (Ex. 105 to Halifax's MSJ).  Given the oral nature of this alleged advice, the fact that it in effect contradicts the written advice and is nowhere documented or noted, Mr. Davidson's claim is not credible.  In any event, this unexplained oral advice suffers from the same deficiency as the unexplained and unsupported 2005 legal review allegedly conducted by Mr. Davidson.

## C.  The United States Has Identified the False Claims At Issue

As previously stated, the Stark Law prohibits providers from having financial relationships with physicians who refer patients to that provider for DHS.  If a provider has a financial relationship with a physician, then the provider cannot submit claims for referred services to Medicare unless an exception to the Stark Law applies.  If a provider fails to satisfy all the requirements of a Stark Law exception, then Medicare cannot pay any claims submitted by that provider for DHS referred by the physician.

As set forth in section III.B.2 and 3, the Stark Law defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services."  42 U.S.C. § 1395nn(h)(5)(A).  In response to a comment seeking clarity on this point, CMS responded by explaining:

> in the context of inpatient and outpatient hospital services, there would still be a referral of any hospital service, technical component, or facility fee billed by the hospital in connection with the personally performed service.  Thus, for example, in the case of an inpatient surgery, there would be a referral of the surgical service, even though the referring physician personally performs the service.  If the referring physician has a financial relationship with the hospital, that relationship must fit in an exception.

66 Fed. Reg. 856, 941 (Jan. 4, 2001).  This position has been endorsed both by the courts, *Tuomey Healthcare Sys.*, 675 F.3d at 407, and by Halifax, when it explained in 30(b)(6) testimony that the physician identified by Halifax as the attending physician in field 82 of Form UB-92 and field 76 of Form UB-04 was the physician who established a plan of care.  App. A, at ¶ 30 (Ex. 29).

Because the physician Halifax identified on its institutional claims forms performed a procedure that included a facility fee, which is a referral, that physician is a referring physician. These claims are false because: (1) a financial relationship existed between Halifax and the Medical Oncologists or the neurosurgeons; (2) the Medical Oncologists and the neurosurgeons referred patients to Halifax for DHS; and (3) the financial relationships do not meet a statutory or regulatory exception.  The United States, based on the criteria Halifax used to complete its Medicare claims forms, identified over 70,000 Medicare claims as having been submitted by Halifax in violation of the Stark Law.  *See* Supplemental Rule 26 Disclosures (Ex. 39).  It is undisputed that Medicare, in turn, reimbursed Halifax for each of these claims.

## VI.    HALIFAX OFFERS NO BASIS TO GRANT SUMMARY JUDGMENT ON THE UNITED STATES' COMMON LAW CLAIMS

Halifax's MSJ on the United States' common law claims rests solely on the argument that there is no evidence to support the United States' claim that Halifax violated the Stark Law. *See* Halifax's MSJ, at 39. As detailed above in sections III.B.2-3 and V.C, the United States has set forth in detail how Halifax violated the Stark Law by requesting payment for DHS referred by physicians with whom Halifax has a prohibited financial relationship. The United States therefore could not have lawfully paid Halifax if it had been apprised of the financial relationship between Halifax and the neurosurgeons and Medical Oncologists. 42 U.S.C. § 1395nn(a)(1). In addition, Halifax was unjustly enriched in the amount of the Medicare reimbursements paid by the United States for DHS ordered by these physicians. Halifax's unsubstantiated assertion that the United States did not mistakenly pay for any items or services because Halifax provided all of the services set forth in its claims for reimbursement is immaterial. *See United States v. Rogan*, 517 F.3d 449, 453 7th Cir. 2008 (whether the patient received the billed-for medical care is irrelevant to the government's damages if the Stark Law was violated); *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) ("The fact that [the] clinic actually performed the physical therapy for which he claimed reimbursement does not eliminate the government's injury. Damages under the FCA flow from the false statement."); *Mt. Vernon Co-op Bank v. Gleason*, 367 F.2d 289, 291 (1st Cir. 1996) ("where the disbursement of public funds is concerned, the government is not under the obligation of showing either that the recipient was unjustly enriched or that the balance of equities otherwise lies in its favor") Halifax is therefore not entitled to summary judgment on any of the United States' common law claims.

## VII.   <u>CONCLUSION</u>

Halifax's MSJ tells a picture-perfect story about a state-chartered hospital doing everything in its power to serve the community.  The actual facts, however, do not support this tale.  Instead, the facts establish that Halifax knowingly paid excessive compensation to physicians to incentivize their referrals of DHS—and this plan succeeded.  It also violated the Stark Law and the FCA.  As a result, for the foregoing reasons, and for the reasons set forth in the United States' Motion for Partial Summary Judgment (Dkt. No. 272), the United States respectfully requests the Court deny Halifax's MSJ in its entirety.


                                                         Respectfully submitted,

ROBERT E. O'NEILL                                        STUART F. DELERY
United States Attorney                                   Acting Assistant Attorney General


                                                         /s Adam J. Schwartz
RALPH E. HOPKINS                                         MICHAEL D. GRANSTON
Assistant United States Attorney                         ADAM J. SCHWARTZ
400 W. Washington Street, Suite 300                      PATRICIA M. FITZGERALD
Orlando, FL 32801                                        Attorneys, Civil Division
(407) 648-7562                                           United States Department of Justice
Fla. Bar # 0972436                                       P.O. Box 261, Ben Franklin Station
Email: ralph.hopkins@usdoj.gov                           Washington, DC 20044
                                                         Telephone:  (202) 514-6831
                                                         Facsimile:  (202) 514-0280
Attorneys for the United States                          Email: Adam.Schwartz2@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 3, 2013, I caused a true and correct copy of the foregoing to be filed with the Court's CM/ECF system, which will send an electronic notice of the filing to all counsel of record.

/s *Adam J. Schwartz*
ADAM J. SCHWARTZ
Trial Attorney