**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | § | |
| ELIN BAKLID-KUNZ, | § | |
| | § | CIVIL ACTION FILE NO. |
| Plaintiffs, | § | 6:09-CV-01002-ORL-31GAP-TBS |
| | § | |
| v. | § | Judge Gregory A. Presnell |
| | § | |
| HALIFAX HOSPITAL MEDICAL | § | |
| CENTER, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

**RELATOR ELIN BAKLID-KUNZ'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Relator Elin Baklid-Kunz ("Relator") respectfully submits this Response in Opposition to the Motion for Summary Judgment on Counts One - Four of Relator's Second Amended Complaint (Doc. 292) filed by Defendant Halifax Hospital Medical Center ("Halifax Hospital") and Defendant Halifax Staffing, Inc. ("Halifax Staffing") (collectively referred to as "Defendants" or "Halifax").

Counts One and Two seek damages under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") based on claims submitted by Halifax Hospital for services that were not medically necessary and for services rendered to prohibited patient referrals via the Stark Law and the Anti-Kickback Statute.  Doc. 29 at 69-71  Count Three alleges that Defendant Halifax Hospital violated the Stark Law, 42 U.S.C. § 1395nn, by paying non-employee psychiatrists and medical directors for referrals to Halifax Hospital.[1]  Doc. 29 at 71-72.  Claims for services to patients referred by those psychiatrists or those medical directors are therefore false claims.  *Id.*

---

[1] The United States' Complaint in Intervention subsumed Relator's Stark Law claims relating to the medical oncologists and neurosurgeons.  (Doc. 73).

1

Count Four alleges that Halifax Hospital violated the Anti-Kickback Statute, 42 U.S.C. 1320a-7(b) ("AKS") based on kickbacks to the involved oncologists, psychiatrists and neurosurgeons. Doc. 29 at 72.  Claims for services to patients referred by those physicians are therefore false claims.

I.      **SUMMARY OF RELATOR'S ARGUMENT.**

        Halifax has not met its burden of showing that that it is entitled to judgment as a matter of law on any set of undisputed facts.  In fact, Defendants ignore the Case Management Order in this case (Doc. 189 at 6) and do not even identify undisputed facts with pinpoint citations.

        A.      **Counts One and Two Under the False Claims Act Are Amply Supported by the Record.**

        Halifax' Motion as to Counts One and Two is premised entirely on its assertion that an FCA action based on claims that are false because the services lacked medical necessity can only be supported by "an expert clinical medical necessity review."  Doc. 292 at 17-18 ("[T]he absence of expert evidence is fatal to Relator's non-intervened causes of action.")  Halifax is wrong. An expert is not required to demonstrate that claims are false.  Medical necessity is a standard that is required to be applied by non-experts/non-physicians every day in hospitals that submit claims to Medicare.  Halifax' Motion on Counts One and Two is really an improper *Daubert* motion to try to exclude Relator's expert report under the guise of a motion for summary judgment and it should be denied.

        B.      **Counts Three & Four under Stark and the Anti-Kickback Statute Are Amply Supported by the Record.**

        Halifax asserts for the first time in its Motion for Summary Judgment that Realtor's AKS allegations in Count Four and her non-intervened Stark causes of action in Count Three fail as a matter of law because the "*Bona Fide* Employment Exception" to AKS and Stark exempts

2

employed physicians from the scope of the prohibitions.  Doc. 292 at 5-6.  This Court has ruled that the "*Bona Fide* Employment Exception" is an affirmative defense that Defendants must plead in their Answer or it would be waived.  Doc. 109 at 8-9.  Defendants did plead the "*Bona Fide* Employment Exception" as the eighth affirmative defense in its Answer to the United States Complaint in Intervention.  Doc. 112 at 13.  Defendants, however, elected not to plead the "*Bona Fide* Employment Exception" as an affirmative defense to Relator's non-intervened Stark causes of actions and Relator's AKS allegations, despite the express admonition and direction of this Court gave about waiver of affirmative defenses which a party does not specifically plead.  Doc. 109 at 8-9.  Defendants' Motion for Summary Judgment as to Relator's Count Three (Stark claims) must be denied as Halifax has waived the "*Bona Fide* Employment Exception."

    Moreover, even if this Court does not find that Defendants waived the "*Bona Fide* Employment Exception," such defense is not supported in this case.  As set forth below, the evidence overwhelmingly shows that the oncologists, psychiatrists and neurosurgeons were not employees of Halifax Hospital.  Thus, Defendants cannot avail themselves of this defense.

    Count Three is also amply supported by the record.  Defendants had financial relationships with the psychiatrists under Stark.  Defendants bear the burden of proving a Stark exception applies.  Defendants cannot satisfy a Stark exception because the compensation to the psychiatrists varied with the volume and value of referrals to Halifax.

    Count Four (AKS) is also amply supported by the record.  Defendants paid the Oncologists a 15% Operating Margin Incentive Bonus, at least one purpose of which was to induce referrals, in violation of the AKS.  Defendants paid the neurosurgeons excessive compensation including incentive compensation encompassing all collections, not limited to services the physicians personally performed and without reduction for collection costs or any

3

other expenses, at least one purpose of such compensation was to induce referrals, in violation of

the AKS.  Defendants paid the psychiatrists excessive compensation including medical director

fees and incentive compensation encompassing all collections, not limited to personally

performed services of the physicians or reduction in compensation for costs of collection and

without reduction for any other expenses, at least one purpose of such compensation was to

induce referrals, in violation of the AKS.  As more particularly set forth in Section IV.C below,

Relator cites to overwhelming evidence in the record refuting Defendants' belated and never-

before-pled claim that the oncologists, neurosurgeons and psychiatrists meet all of the

requirements for the employee exception to the AKS.

Finally, Halifax Hospital and Halifax Staffing acted in conspiracy with each other to

violate the Stark and Anti-kickback laws and presented false claims to the government.

## II.       STATEMENT OF DISPUTED FACTS PRECLUDING SUMMARY JUDGMENT.

Defendants fail to provide the Court with an appropriate statement of undisputed facts to

support their motion as required by the Case Management Order.  Doc. 189 at 6.  However, in

conformance with her obligations under Rule 56 and the Case Management Order, Relator shows

this Court that the evidence in the record establishes genuine issues of material fact as follows:

1.       Halifax submitted 33 claims to Medicare that failed to meet the medical necessity

standard for payment that is mandated by Medicare.  Schmor Report, Doc. 308-2, at 9-10, 12-13

(Table 4).

2.       Halifax Case Management did medical necessity reviews of hundreds of patients

admitted to Halifax Hospital due to chest pain and provided the results of those audits to the

Florida quality improvement organization, Florida Medical Quality Assurance, Inc. Norvik

Declaration, Doc. 160-1 at ¶ 27; Aramayo Deposition, December 12, 2012, selected pages and

deposition exhibit 16 (Exhibit 5 to the SAC) attached hereto as Exhibit 5, at 152:9-25; 153:1-8. The reviews revealed significant numbers of patients admitted without medical necessity for such admissions.  Doc. 160-1 at ¶¶ 8-34; Kunz Declaration dated July 3, 2013, attached hereto as Exhibit 8, at ¶¶ 7, 10-16.  The Halifax case managers used Interqual criteria adopted and used by Halifax Hospital to make the medical necessity determinations in those reviews.  Doc. 160-1 at ¶ 29.

3.       216 claims submitted to Medicare by Halifax Hospital that were deemed to lack medical necessity by Halifax Case Management and/or Compliance employees are reflected in Exhibit 5 to the SAC.  Ex. 8 (Kunz Declaration) at ¶16; Ex. 5 (Aramayo Dep.) at 152:9-23; 153:1-3; Ex. 6 (Halifax Hospital's Amended Objections and Responses to Relator's Request for Admission) at No. 29 (admits Halifax submitted the 216 claims in SAC Exhibit 5 for payment to Medicare).

4.       As of December 10, 2008, Halifax Hospital knew it had submitted claims to Medicare for unnecessary inpatient admissions of Medicare patients and had significant financial exposure due to those improper admissions.    Ex. 4 (Rousis Memorandum to Lewis, dated December 10, 2008); Ex. 3 (Halifax 30(b)(6) (Rousis) Dep., February 19, 2013) at 374:8-25.

5.       Halifax knew that the Case Management reviews sent to FMQAI revealed findings of improper inpatient admissions but failed to take any action to confirm or refute those findings by having a physician review them, the action that Halifax states is required to determine whether any claim meets or lacks medical necessity.  Ex. 2 (Halifax 30(b)(6) Depo. (Rousis) February 20, 2013) at 223:24-25; 224:1-5, 17-24; 225:1-13; 18-25; 229:1-25; 230:1-5.

6.       Relator disputes:  "the *Bona Fide* Employment Exception to the AKS exempts employed physicians from the scope of the prohibition."  Doc. 292 at 8.  See Section IV.B.

7.      Relator disputes:  "Relator has no credible evidence creating a genuine dispute of material fact as to whether Halifax physicians were offered or solicited offers of illegal remuneration for the purpose of steering patient referrals to Halifax or any of its affiliated entities.  Doc. 292 at 8.  See Doc. 295 and Section IV.C below.

8.      Relator disputes: "all of [each physician's] compensation is for services during the course of his or her employment with Halifax."  Doc. 292 at 8.  See Doc. 295 and Section IV.C below.

9.      Relator disputes:  "[each physician's] compensation was based on Fair Market Value ("FMV") considerations at all times."  See Doc. 295 and Section IV.C and D below.

10.     Relator disputes:  "a significant portion of the patients that the physicians treated were charity care patients who would not otherwise be able to receive adequate treatment locally."   Doc. 292 at 8.   Halifax cites only to physician declarations making conclusory statements; Halifax provides no data or foundation for "significant portion."

11.     Relator disputes:  "no physician tracked any referrals related to patients under his or her care."  Doc. 292 at 8. See Section IV.C.3.b below.

12.     Relator disputes:  "Relator fails to provide any expert report in support of Count IV."  Doc. 292 at 8.  Relator intends to rely on her expert reports, United States' expert reports and Halifax expert reports.

13.     Relator disputes:  "Halifax's arrangements with its psychiatrists were direct arrangements that meet the criteria for the *Bona Fide* Employment Exception to the Stark law, as these arrangements were commercially reasonable and based on FMV."  Doc. 292 at 9.  See Sections IV.B and D below.

14.     Relator disputes:  "Relator has not offered any expert report on [Count Three]

and, therefore cannot establish a material dispute of the fact as to whether Halifax's employment arrangements with its psychiatrists and medical directors were based on FMV and were commercially reasonable." Doc. 292 at 9. Relator intends to rely on her expert reports, United States' expert reports and Halifax expert reports. Furthermore, Relator can provide a violation of Count III without an expert. It is Halifax's burden to prove a Stark exception applies. The physician compensation varied with the volume and value of referrals to Halifax, causing Halifax to fail the *Bona Fide* Employment Exception to the Stark law. See Section IV.B and D below.

15.     Relator disputes:  "undisputed evidence shows the compensation paid to the physicians at issue was reasonably related to what competitors in the relevant market were paying and offering to psychiatrists and medical directors. Doc. 292 at 9.   See Section IV.D below.

16.     Relator disputes:  "Relator has offered no evidence disputing the reasonableness of the method used by Halifax or that the psychiatrist agreements and medical director agreements were commercially reasonable. Doc. 292 at 9.  See Section IV.D below.

17.     Relator disputes:  "Relator offered no evidence identifying any actual referrals prohibited by the Stark law by any of the physicians identified in here non-intervened causes of action. Doc. 292 at 9-10.  See Doc. 29-1 at 2 for Dr. Moore.  Halifax admitted Dr. Caliendo and Dr. Frick made referrals in response to Relator's Requests for Admissions.  See Section IV.D.5 below.

18.     Relator disputes Halifax contentions that the Medicare claim forms are not probative, reliable evidence to prove whether referrals were made or which physicians made them, and that "patient medical records are the only reliable evidence of whether a specific physician made a referral."  Doc. 292 at 10.  Relator disputes these contentions for the same

7

reasons as the United States disputes these contentions.  See Doc. 305 at 3-6.

## III.   PROCEDURAL HISTORY

Relator filed her Second Amended Complaint on February 18, 2011 alleging violations of the False Claims Act premised on Defendants' submission of claims that did not meet medical necessity or were the tainted results of Defendants' violations of the Anti-Kickback Statute and the Stark Law.  (Doc. 29.)  The United States intervened in Relator's FCA claims arising out of Defendants' violations of the Stark Law as to Defendants' financial relationships with the medical oncologists (receiving bonuses of 15% of the Hospital's operating profit – more referrals, higher bonus), and with the neurosurgeons (all cash collections) .  (Doc. 73 at 14-16 and 18-21.)

Relator has moved for summary judgment on Defendants' liability for false claims for services rendered to Medicare patients referred by medical oncologists to whom Halifax had been paying kickbacks in violation of the Anti-Kickback Statute.  (Doc. 295).  Relator also moved for summary judgment on Defendants' affirmative defenses and as to the proper measure of damages for which Defendants would be liable as being the entire amount Medicare paid for each of the false claims submitted by Defendants resulting from the referrals from the oncologists who received kickbacks.  (Doc. 295).

The United States has moved for summary judgment on Defendants' liability for false claims for services rendered to Medicare and Medicaid patients referred by medical oncologists with whom Halifax had financial arrangements that violated the Stark Law.  (Doc. 272).

## IV.   ARGUMENT AND CITATION OF AUTHORITY.

The purpose of summary judgment is to identify and dispose of factually unsupported claims. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Halifax bears the burden of

showing the Court there are no genuine issues of material fact that should be decided at trial regarding Relator's Counts 1-4. See *United States ex rel. Bane v Breathe Easy Pulmonary Services, Inc.,* 597 F. Supp. 2d 1280, 1285 (M.D. Fla. 2009) ("Bane") (citing *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex*, 477 U.S. at 323). All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to Relator, the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomm'ns.*, 372 F.3d 1250, 1280 (11th Cir. 2004). Halifax cannot meet its burden as to any of the elements of Relator's FCA clams based on lack of medical necessity (Counts One and Two (conspiracy)) and violations of the Stark Law (Count Three) or the Anti-Kickback Statute (Count Four), and Defendants' Motion should be denied.[2]

**A.    Defendants' Motion for Summary Judgment on Counts One and Two Should be Denied, Because the Record Includes Specific False Claims.**

"To establish a cause of action under the FCA, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States v. R&F Properties of Lake County., Inc*., 433 F.3d 1349, 1355 (11th Cir. 2005). "Knowledge" means "that a person, with respect to information...(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The statute specifically provides that "no proof of specific intent to defraud" is required to show

---

[2] Count Two alleges that Halifax Hospital and Halifax Staffing conspired to submit false claims to Medicare. In their Motion, Defendants seek summary judgment on Count 2 only on the same grounds as Count One, namely, that Relator can only establish claims were submitted without meeting medical necessity with an expert's opinion. Since, according to Defendants, Relator's expert report is deficient in terms of statistical sampling, they are entitled to summary judgment. Relator will, therefore appropriately, respond to Defendants' Motion as to Count 2 with the same arguments she makes as to Count 1. The conspiracy evidence is, however, addressed below.

9

knowledge.  31 U.S.C. § 3729(b)(1)(B).

Claims are false under the FCA "if they are submitted in violation of a controlling rule, regulation or standard." *Bane*, 597 F. Supp. 2d at 1288 (citing *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 674 (5th Cir. 2003).  The parties agree that Medicare authorizes payment only for medical care that is "medically necessary."   Doc. 292 at 18 (citing 42 U.S.C. § 1395y(a)(1)(A)(2008)).  Halifax' Motion as to Counts 1 and 2 is premised on its unsupported assertion that an FCA action based on claims that are false because the services lacked medical necessity can only be supported by "an expert clinical medical necessity review  . . .." Doc. 292 at 17-18 ("[T]he absence of expert evidence is fatal to Relator's non-intervened causes of action.")   Halifax is wrong. An expert is not required to demonstrate that claims are false: Medical necessity is a standard that is applied by case managers and other non-physicians every day for hospitals, including Halifax, that submit claims to Medicare.  See, e.g., 42 U.S.C. § 1320c-5(A) (healthcare practitioners and hospital providers are obligated "to assure, to the extent of his authority that services or items provided [to Medicare beneficiaries]  . . . will be supported by evidence of medical necessity"); see also Ex. 1 ((30(b)(6) Deposition of the United States (Duvall) at 121:6-16 ("Q:  And for medical necessity determinations, do those reviewers have to have a certain level of clinical knowledge?  A:  Again, as we have discussed before, there is for hospital inpatients and for facility provider types a requirement for some clinical knowledge, a clinical professional that includes nursing, physician and actually multiple others, for the review. The additional requirement for physician review exists at the *second level of appeal*."); see also Ex. 1 at 60:14-22; 61:1-22; 62:1-22; 63:1-22; 64:1-4; 65:6-18.  As Halifax well knows, it had a duty to inquire about all claims submitted for lack of medical necessity as determined by the

Halifax employees or contractors that Halifax tasked with making those determinations.[3]

After reviewing patient records, Relator's expert identified 33 claims submitted to Medicare by Halifax Hospital that did not meet medical necessity.  Schmor report, Doc. 308-2 at 9-10, 12-13 (Table 4).  Defendants do not challenge her finding.  This evidence in and of itself is dispositive in that Relator's expert has provided unequivocal evidence that Halifax violated medical necessity standards.  Moreover, the record includes hundreds of other examples of false claims identified as lacking medical necessity by Halifax case managers, compliance personnel and independent consultants in the regular course of their job duties and those claims preclude summary judgment for defendants.

MaryAnn Norvik, a nurse and a Case Management employee, was "regularly asked to examine case records of patients to see if the inpatient admissions were 'medically necessary.'" Norvik Dec., Doc. 160-1, at ¶ 8.  Ms. Norvik participated in 18 reviews on a monthly basis starting in November 2007, of records of patients admitted to the Halifax Hospital for chest pain to determine whether the admissions were medically necessary and should have been billed to Medicare.  *Id.* at ¶¶ 9-11.  Ms. Norvik's reviews/audit findings demonstrated substantial error rates in inpatient chest pain patient admissions.  *Id.*; see also Ex. 2 (Halifax 30(b)(6) deposition (Rousis), February 20, 2012) at 215:24-24; 216:1-7; 217:10-15; 218:14-23; 219:3-12; 222:9-12; 223:24-25; 224:1-21.

Halifax was aware of the results of Ms. Norviks' chest pain claims audits submitted to FMQAI but did not consider them improper admissions that required any further action because

---

[3] Relator is not asserting that it is unlawful to put a person in the hospital for a "short stay," but that short stays are a type of claim that is rife with improper admissions at Halifax as demonstrated by the internal and external audits in the record.  See Ex. 1 (Duvall Dep.) at 158:18-22; 159:1-12 ("CMS is responsible for one of the, if not the, largest chunk of incorrect payments in the government, which is of concern to CMS and to Congress. . . . And the largest error rate is short stay inpatient reviews.")

"they did not undergo proper utilization review by a physician."   Ex. 2 (Halifax 30(b)(6)(Rousis)) at 223:24-25; 224:16-25; 225:1-23.  Halifax has no explanation as to why the Norvik-disclosed improper claims did not "undergo proper utilization review by a physician." *Id.* at 225:9-13.  Ms. Norvik brought her Case Management audit findings to her superiors within Halifax' Patient Billing and Finance Services and to the Halifax Compliance Department.  *Id.* at 225:18-25; 229:1-4.  Although Halifax was alerted to Ms. Norvik's audit results, Halifax took no steps to submit the claims at issue in Ms. Norvik's audits to a physician for review.  *Id.* at 229:24-25; 230:1-5.  According to Halifax, Ms. Norvik's determination that numerous claims lacked medical necessity were not improper admissions because they did not undergo utilization review by a physician.  *Id.* at 225:1-13.  Halifax had its head so far in the sand that it "does not have any knowledge of improper inpatient admissions." *Id.* at 220:18-25; 221:1-5.  That defense FAILS.

There is no Ostrich defense to the FCA.  As this Court has explained, "in defining 'knowingly,' Congress attempted 'to reach what has become known as the ostrich type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.'  S. Rep. No. 99–345, at 21 (1986). Congress adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.' *Id.* at 20; *see also id.* at 7 (discussing the importance of individual responsibility because the government has limited resources to police fraud)."  *United States v. Kaman Precision Products, Inc.*, 6:09-CV-1911-ORL-31, 2011 WL 3841569 (M.D. Fla. Aug. 30, 2011).  If Halifax puts its head in the sand and does not send claims that lack medical necessity identified by Halifax employees in the regular course of their job duties to be reviewed by a physician, they

cannot escape liability for false claims by saying the claims were not reviewed by a physician.

Defendants seek to avoid some of the evidence in the record relating to "quality" reviews of medical necessity by arguing that such reviews are not "medical necessity" reviews.  Doc. 292 at 17-23. That purported distinction is utterly unsupported.  But if there is a distinction between "quality reviews" that determine a lack of medical necessity and "medical necessity reviews" that determine a lack of medical necessity, Halifax Compliance employee Pat Aramayo testified that Halifax's participation via Ms. Norvik's reviews, in the Florida quality improvement organization (FMQAI)'s chest pain admissions audit was a "medical necessity review."  Ex. 5 (Aramayo Dep.) at 152:9-21.

Relator identified in her Second Amended Complaint 216 claims for services that did not meet medical necessity.  Doc. 29-1 at Ex. 5; Ex. 8 (Kunz Declaration) at ¶ 16.  Defendants have admitted that all of those 216 claims were billed to Medicare.  Ex. 6 (Halifax' Amended Objections and Responses to Relator's Request for Admission) at No. 29.  Defendants refunded to Medicare the amount received from Medicare on just 4 of those 216 claims.  Ex. 7 (Halifax' Response to Relator's First Set of Interrogatories) at 9.  Defendants have not produced any evidence that any of the other 212 claims met medical necessity.  Like the 33 claims identified by Expert Schmor, the 212 claims raise a genuine issue of material fact as to whether false claims were submitted, and preclude summary judgment on Counts 1 and 2.

### B. Defendants' Motion for Summary Judgment on Counts Three and Four Based on Their New Assertion of the Bona Fide Employment Exception Should Be Denied.

Halifax, for the first time, asserts the Bona Fide Employment Exception as an affirmative defense to Relator's claims under Counts Three and Four of her Second Amended Complaint. Such defense is unavailing as Defendants waived their ability to raise such a defense and, even if

they are allowed to assert the defense, it is completely inapplicable under the facts of this case.

1.   Halifax Waived the "Bona Fide Employment Exception" to Stark and AKS by Failing to Plead the Affirmative Defenses to Counts Three and Four as Required by Federal Rule of Civil Procedure 8(c).

This Court previously ruled the "*Bona Fide* Employment Exception" was an affirmative defense that Defendants must plead in its Answer or it would be waived, citing *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992 (11th Cir. 1982).  Doc. 109 at 8-9.  Defendants did plead the "*Bona Fide* Employment Exception" as the eighth affirmative defense in its Answer to the United States Complaint in Intervention.  Doc 112 at 13.  In its Answer to Relator's Second Amended Complaint, however, Defendants did not to assert the "*Bona Fide* Employment Exception" as an affirmative defense to Relator's non-intervened Stark causes of actions and Relator's AKS allegations. Doc. 47.  Defendants never sought to amend its Answer.

Despite this decision not to assert this defense in its Answer to Relator's claims, Halifax asserts for the first time in its Motion for Summary Judgment that Realtor's AKS allegations in Count Four and her non-intervened Stark causes of action in Count Three fail as a matter of law because the "*Bona Fide* Employment Exception" to AKS and Stark exempts employed physicians for the scope of the prohibitions.  Doc. 292 at 5-6.  District courts in the Eleventh Circuit may not consider affirmative defenses *sua sponte. Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1240 (11th Cir. 2010)("As previously noted, failure to plead an affirmative defense generally results in a waiver of that defense. *See Jackson v. Seaboard C.L.R. Co..,* 678 F.2d 992, 1012 (11th Cir. 1982); Fed.R.Civ.P. 8(c)").

Eleventh Circuit courts have held that the "failure to include an affirmative defense in the answer or have it included in the pre-trial order of the district court, which supersedes the pleadings, will normally result in waiver of the defense." *F.T.C. v. Nat'l Urological Grp., Inc.*, *supra*, 645 F. Supp. 2d at 1187 (citing *Jackson,* 678 F.2d at 1012); *see also Palmer v. Braun,* 376

F.3d 1254, 1257 n.2 (11th Cir. 2004) (finding that the defendant waived his affirmative defense when he failed to include it in either his answer or the pretrial order). "A party may not revive an available defense that he failed to assert in his answer by arguing it on summary judgment." *Id*. (citing *Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91, 96 (5th Cir. 1976).

Relator has been prejudiced by Defendants failure to plead the "*Bona Fide* Employment Exception" to the claims asserted by Relator. For example, Defendants offer in support of their Motion for Summary Judgment a Declaration by Dr. John Caliendo, a psychiatrist involved in conduct alleged in Relator's non-intervened Stark claims in Count Three and Relator's AKS claims in Count Four.[4]  Without the fair pleading afforded under Rule 8 and after the close of discovery, Dr. Caliendo now claims in his Declaration to be employed by Halifax. Doc 292-7 at 4, Ex. 42, ¶14 ("At no time during my employment with Halifax . . . ").  This claim is directly contradicted by the written agreement between Dr. Caliendo and Halifax Hospital, which states:

> Although working under this Agreement as an agent, the Physician [Dr. Caliendo] is not an employee of Halifax [Halifax Hospital Medical Center] and shall not have any claim either under this Agreement or otherwise, against Halifax for vacation pay, sick leave, retirement benefits, social security, workers compensation, disability, unemployment benefits, or any other benefits.

Ex. 10 at § 2.  Similar language appears in Dr. Moore's written agreement stating "the Hospital shall not be responsible for withholding FICA and state and federal income taxes, etc." Ex. 11 at § 4.  Moreover, Halifax reported to the Internal Revenue Service on Form 1099-MISC for 2008

---

[4] Relator objects to consideration of the Declarations of Dr. John Caliendo (Doc. 292-7 at 4, Ex. 42) and Dr James Moore (Doc. 292-7 at 11, Ex. 44) because, without limitation, neither physician was included in Defendants Rule 26(a)(1)(A) disclosures. See Ex. 9.  Defendants also offer the Declaration of Chuck Flavio, the Service Line Administrator for the Psychiatry Department at Halifax Hospital.  Doc. 292-7 at 6, Ex. 43.  Mr. Flavio's affidavit (or portions thereof) should also not be considered by this Court as Mr. Flavio attempts to aver to the intent of another person, a clearly inappropriate subject.  Relator is, contemporaneously with the filing of this Response, filing an appropriate motion to strike/notice of objection to such declarations, and to other declarations or portions of declarations which should not be considered by the Court.

that Dr. Caliendo received "Nonemployee Compensation."  Doc. 29-3 at 35.  Halifax's own expert report by Ronald Vance refers to the psychiatrists as "Non-Employed" and opines on their "Independent Contractor Compensation."   See Dkt. 311-1 (Relator's Motion to Strike the Psychiatrists' Declarations) at Ex. 10.

Defendants' intentional failure to assert the "Bona Fide Employment Exception" in compliance with Rule 8(c), deprived Relator of the opportunity to conduct appropriate discovery relating to Defendants' newly and belatedly raised affirmative defense, and to probe the obvious inconsistencies in Defendants' positions.  Defendants' Motion for Summary Judgment relating to Counts Three and Four of Relator's Complaint only relies on this defense.  Their Motion must be denied because the ability to rely on the "*Bona Fide* Employment Exception" has been waived.

> 2.    The "Bona Fide Employment Exception" to AKS and Stark Does Not Apply Because the Undisputed Facts Show the Physicians Are Independent Contractors, Not Employees.

Even if the Court considers Defendants' never-before-pled "*Bona Fide* Employment Exception," the undisputed facts show the physicians at issue are independent contractors, not employees, for purposes of AKS and Stark.

As an initial matter, Defendants misstate this exception, claiming "AKS does not apply to compensation arrangements for employed **or contracted** physicians.  See 42 U.S.C. 1320a-7b(b)(3)(B) (2006)."  Doc. 292 at 24 (emphasis supplied).  The cited portion of the AKS actually says nothing about a "contracted" physician. In fact, it would not apply to an independent contractor.[5]  To identify a *Bona Fide* employment relationship, the AKS requires reference to the

---

[5] In the final rule published on July 29, 1991, the HHS OIG specifically declined to extend the Bona Fide Employment Exception under 42 U.S.C. § 1320a-7b(b) to apply to independent contractors and noted that it "[found] no support for the position that Congress intended to cover independent contractors under this exception."  *Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions*, 56 Fed. Reg. 35952, 35981.

definition of "employee" under 26 U.S.C. § 3121(d)(2).   *Id.* fn. 6 (citing 42 C.F.R. § 1001.952(i)).

Defendants also belatedly try to claim the *Bona Fide* Employment Exception to Relator's non-intervened Stark allegations, citing 42 U.S.C. § 1395nn(e)(2).  Doc. 292 at 6.  Like the AKS, the Stark Statute refers to section 3121(d)(2) of the Internal Revenue Code of 1986 for the definition of "employee".   42 U.S.C. § 1395nn(h)(2).   Section 3121(d)(2) of the Internal Revenue Code defines employee for purposes of employment taxes under the Federal Insurance Contributions Act ("FICA") under Chapter 21, Subtitle C of the Internal Revenue Code.

Even if Defendants are allowed to assert this defense, when the facts are reviewed under the appropriate test for AKS and Stark purposes, the physicians at issue cannot be viewed as employees of Halifax Hospital so as to support Defendants' late defense.

> a. *The Appropriate Test to Determine the Employment Status of a Physician under AKS and Stark Is the Common Law Agency Test, Not the Economic Realities or Hybrid Test.*

For purposes of the AKS, Stark Statute and Section 3121(d)(2) of the Internal Revenue Code, the general common law of agency applies.  *U.S. v. Robinson*, 505 F. App'x 385, 387 (5th Cir. 2013) ("When a federal statute such as this one refers to the common law definition of employee, the statute incorporates the 'general common law of agency.'" citing *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 323, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *Hospital Resource Personnel, Inc. v. U. S.,* 68 F.3d 421, 424 (11th Cir. 1995) ("Traditionally, common law rules served as the basis for the classification of particular workers or classes of workers as employees or independent contractors"); *Daughtrey v. Honeywell, Inc.,* 3 F.3d 1488, 1492 (11th Cir. 1993) ("The term 'employee' as used in ERISA incorporates traditional agency law criteria for distinguishing an employment relationship from that of an independent contractor") (citing

*Darden).*

The common law of agency is a distinct test from other heightened tests applied for purposes of other federal remedial statutes, such as Fair Labor Standards Act ("FLSA") and Title VII of the Civil Rights Act of 1964. *Solis v. A± Nursetemps, Inc.,* 5:07-CV-182-OC-10PRL, 2013 WL 1395863, at n.4 (M.D. Fla. Apr. 5, 2013) ("there are three different tests for distinguishing between an employee and an independent contractor, the first being the common law agency test established by the Supreme Court in *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–752, 109 S. Ct. 2166, 2178–2179, 104 L.Ed.2d 811 (1989)."). Because the FLSA is a remedial statute, courts apply an expansive definition of "employee." *Molina v. S. Florida Exp. Bankserv, Inc.,* 420 F. Supp. 2d 1276, 1283 (M.D. Fla. 2006). For FLSA purposes, "[c]ourts look not to the common law definition of employment, but rather to the 'economic reality' of whether the putative employee is economically dependent upon the alleged employer. *Salley v. PBS of Cent. Florida, Inc.,* 6:07-CV-1517-ORL31-KRS, 2007 WL 4365634 (M.D. Fla. Dec. 12, 2007). The definition of "employer" under Title VII is "considerably broader than it is under common law." *Watson v. Adecco Employment Servs., Inc.,* 252 F. Supp. 2d 1347, 1354 (M.D. Fla. 2003).

The United States Supreme Court in *Darden* set forth the common law agency test for determining who qualifies as an "employee" for purposes of the AKS, Stark and Section 3121(d)(2) of the Internal Revenue Code:

> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the

work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." (citatons omitted).  Since the common-law test contains "no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."

*Nationwide Mut. Ins. Co. v. Darden*, *supra*, 503 U.S. at 323-24, 112 S. Ct. at 1348-49, 117 L. Ed. 2d 581.

The *Darden* factors are not exhaustive and the Court may consider additional factors not enumerated in *Darden. U.S. ex rel. Watson v. Connecticut Gen. Life Ins. Co*., 87 F. App'x 257, 262 (3d Cir. 2004) ("*Watson II*") (*affirming U.S. ex rel. Watson v. Connecticut Gen. Life Ins. Co.,* CIV.A. 98-6698, 2003 WL 303142 (E.D. Pa. Feb. 11, 2003) ("*Watson I*").  For example, the District Court in *Watson I* considered the parties' intent upon forming a work agreement by considering the plain text of their contracts. The District Court emphasized that the:

> Agreements between CGLIC and Watson specifically state that "at all times during the term of the agreement" Watson was "an independent contractor and not an employee" of CGLIC. Def. Tab 14; see also Def. Tab 15 ("The relationship between [Watson and CGLIC] is one of agency/independent contractor and not that of employer/employee."). Although not dispositive, the agreement is a strong indicator of Watson's independent contractor status. *Holtzman v. The World Book Co., Inc.,* 174 F.Supp.2d 251, 256 (E.D.Pa.2001).

*Watson I,* 2003 WL 303142, at *15.  The appellant in *Watson* argued that the district court misconstrued the *Darden* factors by considering the text of the contracts, a factor which is not specifically included among the *Darden* factors.  The Third Circuit Court of Appeals, however, affirmed the trial court's decision that appellant was an independent contractor and found appellant's argument that the district court misconstrued the *Darden* factors to be "without merit."  *Watson II*, supra, 87 F. App'x at 262.

In a recent kickback case, *Joint Technology, Inc. v. Weaver,* CIV-11-846-M, 2013 WL 257075 (W.D. Okla. Jan. 23, 2013), the court applied the common law agency test as interpreted

by *Darden* and found no bona fide employment relationship.  Joint Technology, a distributor of durable medical equipment, hired Weaver as an independent agent to solicit referral business. *Id.* at *1.  Joint Technology paid Weaver a commission ranging from 18% to 22% based on the volume of Weaver's sales.   *Id.*   The court analyzed the enumerated *Darden* factors, and the specific terms of the written agreement which provided: "Agent will be an Agent of Company and shall not be deemed a servant or employee.... Company has no control over the operations of Agent or any of his employees, agents, owners [and] managers."  *Id*. at *3.  The Court granted a motion for partial summary judgment and held:  "In assessing the incidents of Joint and Weaver's relationship, and weighing the factors set forth in *Darden* with no one factor being decisive, the Court finds that a rational jury would find that Weaver was not a bona fide employee of Joint." *Id.  See also U.S. v. Job*, 387 F. App'x 445, 455-56 (5th Cir. 2010) (applying the common law agency test as interpreted by *Darden* in affirming a criminal kickback conviction where "there was *not* enough evidence for a reasonable juror to find Avery was an employee."); *U.S. v. Robinson*, supra, 505 F. App'x at 388 (5th Cir. 2013) (applying the common law agency test as interpreted by *Darden* in affirming a criminal kickback conviction where the evidence was insufficient to provide foundation for the affirmative defense that the employment safe-harbor exception applied).[6]

Applying this law to the present facts, the overwhelming evidence in the record supports the conclusion that the physicians at issue are not bona fide employees of Halifax Hospital for purposes of AKS, Stark and Section 3121(d)(2) of the Internal Revenue Code.

   b.   *Applying the Appropriate Common Law Agency Test to the Facts of this Case Shows the Physicians Were Not Employees of  Halifax*

---

[6] Defendants' claim that "[t]he Employment Exception applies equally to employees and independent contractors" (Doc. 292 at 6) is unfounded and just plain wrong.

*Hospital and the Bona Fide Employee Exception Is Not Applicable.*

When the appropriate Common Law Agency Test is applied to the facts of this case, there is no doubt but that the physicians at issue in this case were not and are not employees of Halifax Hospital.  Following are seven (7) reasons supported by overwhelming evidence why this is true.

1.      All Written Agreements State the Physicians Are Independent Contractors of Halifax Hospital.

Halifax Staffing provides oncologists and neurosurgeons to Halifax Hospital as independent contractors pursuant to written agreements.  Ex. 12.  Each written agreement states that Halifax Staffing is the employer of the physicians, not Halifax Hospital.  *Id.*  Furthermore, a separate written agreement dated February 28, 1994 states:  "As of the effective date of this Agreement, the District [Halifax Hospital] shall terminate all its employer/employee relationships, and permit [Halifax] Staffing Corp. to assume all such employment relationships."  Ex. 13.  According to the testimony of Defendants' own general counsel, Halifax Hospital did not employ the oncologists and neurosurgeons after February 28, 1994.  Ex. 14 at 26:7-27:24.

Each written employment agreement with each of the oncologists and the neurosurgeons reflected that Halifax Staffing was the employer, not Halifax Hospital.  Doc. 295-2, Ex. 6A; Doc. 295-3, Ex. 6B; Doc. 295-4, Ex. 6C; Doc. 295-5, Ex. 6D; Doc. 295-6, Ex. 6E; Doc. 295-7, Ex. 6F; Doc. 29-4 at 14-31; Doc. 29-4 at 2-13; Doc. 29-4 at 32-45.

Each written agreement with each of the psychiatrists show they were independent contractors of Halifax Hospital, and not employees of either Halifax Hospital or Halifax Staffing.  Exs. 10, 11, and 15.  Although not dispositive, the written agreements are a strong indicator of the independent contractor status of each physician with respect to Halifax Hospital.  *See Joint Technology, supra; Watson I, supra.*

21

2.      Halifax Hospital Did Not Withhold FICA Taxes on the
        Physicians.

Halifax Staffing, not Halifax Hospital, withheld FICA taxes on each of the oncologists

and neurosurgeons and filed Form W-2s reflecting that Halifax Staffing was the employer for

purposes of Section 3121(d)(2).   Ex. 16.   Halifax Hospital treated the psychiatrists as

independent contractors with no FICA withholding and reported "nonemployee compensation"

on Form 1099.  Doc. 29-3 at 34-35.  Halifax's Chief Financial Officer and 30(b)(6) witness, Eric

Peburn, testified that Halifax Hospital has zero employees for purposes of filing W-2s with the

Internal Revenue Service which reflects withholding of FICA taxes under Section 3121(d)(2) of

the Internal Revenue Code.  Ex. 17 at 239:9-240:2.

3.      Halifax Hospital Did Not Provide Retirement Benefits.

After February 28, 1994, Halifax Hospital did not provide any pension benefits to the

oncologists, neurosurgeons and psychiatrists.   Ex. 14 at 21:19-23:24.  Florida Attorney General

Opinion 93-83 opines that Halifax Staffing employees would not be considered employees of

Halifax Hospital for inclusion in state retirement benefits.  Ex. 18.

4.      Halifax Hospital Did Not Have a Legal Right to
        Terminate Employment of the Physicians.

After February 28, 1994, Halifax Hospital had no legal power to terminate the

oncologists and neurosurgeons.   Ex. 14 at 27:25-30:11.

5.      The Physicians Were and Are Independent Contractors and
        Not Employees of Halifax Hospital Under IRS regulations
        Promulgated under Section 3121 of the Internal Revenue
        Code.

The common law agency notion of control is not helpful in determining

employee/independent contractor distinction in the case of licensed professionals, such as

physicians, who have specialized training, licensing and practice their professions without

22

control over their professional decision-making.  IRS regulations promulgated under Section

3121 of the Internal Revenue Code recognize this limitation and sets forth a special rule relating

to physicians:

> An individual performing services as an independent contractor is not as to such services an employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees.

26 C.F.R. § 31.3121(d)-1(c)(2).  *In re Saint Joseph's Hospital*, 126 B.R. 37 (1991) applied this

special IRS rule to a dentist who operated an oral surgery clinic for a hospital and received

compensation equal to 60% of collections.  The court held the dentist was not a common law

employee of the hospital.  *Id*. at 41.  Likewise, each of the oncologists, neurosurgeons and

psychiatrists are, as physicians, independent contractors of Halifax Hospital under 26 C.F.R. §

31.3121(d)-1(c)(2).

        6.     Halifax Staffing, Inc. Is the Employer of the Physicians under IRS Guidelines for Leased Employees.

Halifax Staffing employs all of the oncologists and neurosurgeons at issue in this case

and leases such physicians to Halifax Hospital pursuant to written agreements.  Ex. 12.  Such

leased employees do not and cannot be considered employees of Halifax Hospital for purposes of

asserting the Bona Fide Employment Exception.

Until 1996, the IRS used a list of 20 significant factors to examine the evidence and

identify an employer-employee relationship.  See Rev. Rul. 87-41.  The IRS simplified this list

when it issued a training manual on worker classifications for IRS agents in 1996 (which the IRS

publicly adopted in 1998).  Ex. 19, IRS Publication 15-A ("IRS Guidelines").  According to the

IRS Guidelines, the factors fall into three categories:

1.   Behavioral Control;
2.   Financial Control; and
3.   Type of Relationship – the parties' perceptions of the employer-worker relationship.

*Id.* at 6.

The IRS Guidelines has special rules for leased employees.  The IRS has recognized that leasing employees has become an increasingly common way for companies to keep their work forces flexible and to manage retirement benefits.  The IRS Guidelines recognize the widespread practice of employee leasing for employment tax purposes:  "Under certain circumstances, a firm furnishing workers to other firms is the employer of those workers for employment tax purposes."  *Id.* at 4.

The history behind the Stark regulatory definition of "employee" includes the following from the preamble to the Stark Phase II regulations published on March 26, 2004:

Comments to the ''employee' exception and our responses follow.

*Comment:* Several commenters asked us to expand the statutory definition of ''employee'' in § 411.351 beyond the common law definition established in the statute to include leased employees as defined by State law.

*Response:* We believe that the statutory definition is clear and that incorporation of State law definitions of employment would be inconsistent with the statute. As noted above in the discussion of group practices, to the extent that a leased employee is a *bona fide* employee of the DHS entity under IRS rules, remuneration paid to that employee would be eligible under the exception. As with all exceptions, the DHS entity would bear the burden of establishing the necessary indicia of employment. **There is no presumption of employment.**

69 Fed. Reg. 16087 (emphasis supplied).

7.   Defendants' Own Analysis by Its Chief Compliance Officer and Inside Counsel Shows that Halifax Hospital Had No Employees for Stark Purposes.

Defendants' Chief Compliance Officer, with oversight and approval of Defendants' General Counsel, David Davidson, created a slide presentation discussing the Physicians'

financial relationship.  Ex. 20 at 215:18-225:24; Ex. 21.  Slide 15 of the presentation diagrams the difference between the direct compensation exception and the indirect compensation to Stark. Ex. 21 at 15.  Slide 19 of the presentation admits that Halifax Staffing "is an intervening entity, thus, our physician arrangements are viewed through the indirect compensation exception [and not through the *Bona Fide* Employment Exception].  *Id*. at 19.

> c.  *Defendants Cite to No Evidence in the Record Whatsoever to Support their Assertion of the Bona Fide Employment Exception and the Facts of this Case Show Otherwise.*

Finally, Defendants cite to no evidence in the record whatsoever supporting their argument that the *Bona Fide* Employment Exception causes Relator's allegations to fail.  Doc. 292 at 5, 11, 24; Doc. 292 at 6, 12-16, 28.  The reason for such a failure is clear, the overwhelming evidence of this case shows otherwise.  As set forth above, the facts show the physicians were not, and were not meant to be employees, common law or otherwise, of Halifax Hospital.  Defendants' attempt to belatedly assert the Bona Fide Employment Exception fails.

**C.  Defendants' Motion as to Count Four Should Also Be Denied, Because the Evidence Shows Defendants Violated the AKS and Submitted Claims for Services Rendered for Kickback-Induced Referrals.**

> 1.  Defendants Knowingly Paid Physicians Remuneration for Referrals in Violation of the AKS and Knowingly Presented Claims Arising out of Such Prohibited Referrals in Violation of the FCA.

Relator, in its Motion for Partial Summary Judgment, has cited to this Court the undisputed facts showing Defendants knowingly paid the Oncologists for referrals in violation of the AKS and knowingly submitted false claims arising out of such prohibited referrals in violation of the FCA. Doc. 295 at 3-13.

The evidentiary record also supports Relator's allegations that Defendants paid the Neurosurgeons excessive compensation including incentive compensation encompassing all collections, not limited to personally performed services and without reduction for collection

25

costs or any other expenses, at least one purpose of such compensation was to induce referrals, in violation of the AKS.  Doc. 29-4 at 2-13, 14-31, 32-44, 46-52, 53-59, 61-62; Ex. 22 (Kuhn Depo., May 2, 2012) at 11:2-12:1; 17:11-35:6; 42:16-44:22; 49:23-52:2; 52:3-61:15; 64:16-66:12; 66:13-68:8; 68:20-70:10; 70:12-72:21; 72:22-75:23; 76:2-77:23; 77:24-80:14; 88:5-90:17; 91:1-94:20; 94:21-99:19; 99:20-100:22; 101:20-102:10; 112:11-117:10; 117:11-121:1; 129:22-136:24; 139:16-140:6; 141:10-143:17; 156:17-165:5; 175:16-178:24; Ex. 23 (Khanna Depo., Sept 28, 2012) at 9:6-12:11; 14:24-15:8; 15:9-16:23; 17:15-21:23; 24:24-27:15; 27:16-28:14; 31:3-32:17; 34:3-35:9; 37:16-40:14; 44:7-45:20; 48:1-49:8; 99:1-100:8; 137:1-139:17; 161:11-162:22; Ex. 24 (Vinas Depo., Sept 27, 2012) at 9:9-10:3; 11:8-13:15; 14:7-16:15; 17:7-11; 19:12-21:24; 22:25-23:19; 24:24-25:9; 25:22-29:7; 29:13-31:12; 32:12-34:1; 34:2-35:22; 36:14-19; 38:2-40:16; 41:16-42:3; 45:23-46:21; 50:24-52:25; 53:1-55:20; 55:21-59:1; 59:15-62:2; 65:23-69:3; 71:15-75:22; 99:4-100:23; 118.8-122:22; 188:25-191:15.)  The record also supports Relator's allegations that Defendants paid the Psychiatrists excessive compensation including medical director fees and incentive compensation encompassing all collections, not limited to personally performed services and reduced for costs of collection only and without reduction for any other expenses, at least one purpose of such compensation was to induce referrals, in violation of the AKS. [Collect Exhibits from C.4 and IV.D below]

2.   The United States' Decision Not to Intervene on Count Four (AKS) (and a Portion of Count Three (Stark)) Has No Bearing on Relator's Claims.

Defendants assert that, somehow, the decision of the United States not to intervene on the same claims brought by Relator entitles Defendants to summary judgment.  Of course, Defendants provide no citations to the evidentiary record to support its exculpatory arguments as such argument is spurious.  Doc. 292 at 4, 25.  The United States' intervention decision has no bearing whatsoever on the legal merit of Relator's AKS claims.  31 U.S.C. § 3730(a)(4)(B) (if

the United States declines to take over the action, the person bringing the action shall have the right to conduct the action).

        3.     <u>The Physician Declarations Are Insufficient Support for Defendants' Motion For Summary Judgment as to Count Four (or Those Portions of Count Three which Are Being Pursued by Relator).</u>

In a final attempt to block Relator's claims, Defendants rely upon declarations they obtained from their physicians, including the oncologists, (Doc. 292-4 at Exs. 8-16 and Exs. 42-44) after the close of discovery. These declarations attempt to show Defendants and the physicians deny they acted wrongfully, or with wrongful intent.

"As a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991).[7] The fact that Defendants and the physicians deny illegal compensation to induce referrals in violation of AKS is unsurprising, since parties to an illegal arrangement rarely acknowledge their wrongful intent, which "often must be inferred from circumstantial evidence." *U.S. v. Nosrati-Shamloo*, 255 F.3d 1290, 1292 (11th Cir. 2001). In considering such circumstantial evidence, "[j]uries may use common sense to evaluate the evidence and make reasonable inferences from it." *U.S. v. Cunningham*, 54 F.3d 295, 299 (7th Cir. 1995). As the Seventh Circuit has noted:

> common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence. Knowledge and specific intent are as susceptible of proof in that manner as is any other criminal requisite. That must be so lest conspirators be permitted to avoid the consequences of their illegal acts because of a factfinder's artificial and unrealistic view of real life.

---

[7] The exception to the general rule is when the movant carries the burden of proving intent at the summary judgment stage by the demonstration of knowledge from the admissions and circumstantial evidence of record. *Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, 6:09-CV-1999, 2011 WL 653524 (M.D. Fla. Feb. 14, 2011); and other cases cited by Doc. 295 at 16-17. Relator, in fact, carried this burden as to the oncologists in her Motion for Partial Summary Judgment.

*U.S. v. Guzzino*, 810 F.2d 687, 697 (7th Cir. 1987).

Such declarations do not support Defendants' attempt to have judgment granted on those claims which are being pursued by Relator against Defendants.

        *a.*      *The Declarations of the Oncologists Provide Evidence that They Had an Impermissible Purpose to Induce Referrals, Actions which Violate AKS.*

The declarations from four of the oncologists support the undisputed fact that at least one purpose of the 15% operating margin incentive paid by Halifax and received by the oncologists was to make the medical oncology practice in the hospital-based setting more equivalent to a medical oncology practice in private practice, so that the physicians would continue to refer their patients to Halifax Hospital oncology centers, instead of opening a competing private practice as Drs. Alexander, Dodd and Doughney did in November 2003.  *See* Doc. 295 at 6; Doc. 295-1 at 9-23; Doc. 295-8 at 15-42; Ex. 25 (Davidson Depo, June 7, 2013) at 102:1-104:2.  Each of Drs. Durkin, Favis, Sorathia and Weiss declared:

> It is my good faith belief that Dr. Doughney, Dr. Alexander and Dr. Dodd terminated employment with Halifax in order to substantially increase their incomes and, since that time have been compensated significantly more for their professional medical oncology services than I have as an employee of Halifax.

Doc. 292-4 at 29 (¶14), 34 (¶14), 39 (¶14) and 44 (¶14).  This admitted purpose for Halifax paying and the oncologists receiving more money by sharing in the operating margin of the outpatient referrals to Halifax so the remaining oncologists would continue to refer to Halifax and not leave for private practice is illegal under AKS.  Doc. 295 at 19-22.

        *b.*      *The Physician Declarations Are Directly Contradicted by Evidence in the Record on the Issue of Referral Tracking, Showing Disputed Material Facts.*

The declarations of the six oncologists are directly contradicted by evidence in the record on the issue of referral tracking.  Each of Drs. Chew, Deveras, Durkin, Favis, Sorathia and Weiss

declared under penalty of perjury:

> At no time during the Employment Period have I tracked or collected data on the number of referrals I have made to Halifax, and to my knowledge Halifax has not tracked the number of referrals I have made to Halifax.

Doc. 292-4 at 20 (¶11), 25 (¶9), 29 (¶9, 34 (¶9), 39 (¶9) and 44 (¶9).  In fact, according to monthly agenda produced by Halifax, a Medical Oncology Physician Practice Meeting was held from January through May 2009, and the following reports were referenced as attachments to the Agenda (although the actual reports have not been produced by Halifax):

- Patient Referral Report – for all locations, inpatient and outpatient – November 2008;

- Patient Referral Report by Physician – for all locations, inpatient and outpatient – December 2008 through March 2009;

- Patient Referral Report by Group – for all locations, inpatient and outpatient – December 2008 through March 2009.

Ex. 26.  These patient referral reports were prepared and distributed after Relator had raised her concerns about the oncology incentive on October 28, 2008 and Associate General Counsel Audrey Pike wrote her November 10, 2008 memorandum clearly and unequivocally concluding that "**the arrangement [was] not permitted under Stark**."  Doc. 295 at 9-10; Doc. 295-8 at 51.  Halifax also tracked the number of referrals made by the oncologists by month for fiscal years 2003 to 2008.  Doc. 295-1 at 51.

    4.  <u>Defendants Paid Medical Directors for Performing No Services, at Least One Purpose of Which Was to Induce Referrals, in Violation of the AKS.</u>

Halifax Hospital has had a contract with a psychiatrist, Dr. Moore, since June 1, 1993 for Medical Directorship of Psychiatric Services.  Ex. 11.  Dr. Moore has been paid $66,150.00 per year or $275.63 per hour since for the last seventeen (17) years.  Ex. 27.  This amount is 190% above MGMA's 2007 90th percentile for psychiatrists.  *Id.*  In addition to this amount, Halifax

Hospital has also provided him with free office space in the hospital and a "free" hospital billing employee paid by Halifax Hospital.  *Id.*  Dr. Moore is not an employee of Halifax Hospital. Ex. 11.  The remuneration in cash compensation exceeding fair market value, the free office space, and the free employees are paid by Halifax for (without limitation) the purpose of inducing referrals for services paid by Federal health programs.  These actions violate the AKS.

     5.     <u>All Claims Presented by Defendants Arising out of Violations of the AKS Were False Claims under the FCA.</u>

Defendants make the straw man argument that Relator's claims ONLY sound in the AKS and the Stark Statute and as there are no private rights of enforcement of such statutes, Relator cannot pursue her claims under Count Three (the Stark claims on which the United States did not intervene) and Count Four (the AKS claims).  (Doc 292 at 27 (AKS), 30 (Stark)).  Defendants purposefully and completely misapprehend Relator's claims.

     a.     *Relator Claims that Defendants Violated the FCA by Submitting Claims for Payment which Arose from Violations of the AKS.*

Compliance with the AKS is a condition of payment for the Medicare program.  *United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1279 (M.D. Fla. 2011). Defendants knew one purpose of the 15% Operating Margin Incentive Bonus was to induce referrals, and Defendants knew this incentive was illegal.  Defendants did not comply with the AKS, so the claims are false.  The direct and circumstantial evidence in the record more than establish Defendants' knowledge these claims were false or, at the very least, that Defendants acted with deliberate indifference or reckless disregard of the truth or falsity of the claims.  *See United States v. Rogan*, 459 F. Supp. 2d 692, 726 (N.D. Ill. 2006) *aff'd*, 517 F.3d 449 (7th Cir. 2008).  As the "knowledge" component of the FCA is satisfied, Relator has met her burden and is entitled to summary judgment on her claims relating to the Oncologists, and Defendants'

motion must be denied in all respects as Relator has shown that issues of material fact exist as to the claims presented relating to the other groups of physicians.

> b.    *Relator Claims that Defendants Violated the FCA by Submitting Claims for Payment which Arose from Violations of the AKS.*

Medicare claims submitted by Halifax in violation of the Stark Law are false because: (1) a financial relationship existed between Halifax and the Psychiatrists, (2) the Psychiatrists referred patients to Halifax for DHS, and (3) the financial relationships do not meet a statutory or regulatory exception.  The Stark Law expressly prohibits Medicare from paying these claims.  42 U.S.C. § 1395nn(g)(1).

Thus, all claims submitted by Halifax which violated Stark, are false claims for which Relator can claim against Defendants.

**D.    Defendants' Motion as to Count Three Should be Denied Because the Record Shows Defendants Violated the Stark Law And Submitted Claims for Stark-Prohibited Services.**

1.    Halifax Hospital Paid Incentive Compensation to the Psychiatrists Without Complying with any Stark Exception.

Halifax Hospital entered into written agreements with two psychiatrists, Dr. John Caliendo and Dr. Gary Frick, providing for incentive payments equal to 100% of gross collections after covering a fixed base compensation, minus collections costs, but with no other expense sharing.   Doc. 29-3 at 4-26.   As explained in *U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394 (4th Cir. 2012), the incentive payments to Dr. Caliendo and Dr. Frick implicate Stark because the arrangement allows the physicians to receive the facility component of the fee. "The facility component of the physicians' personally performed services, and the resulting facility fee billed by Tuomey based upon that component" was a referral, and was therefore prohibited by the Stark Law if there was a financial relationship between the

physician and the entity." *Id.* at 407.

Halifax paid the following incentive payments to the Psychiatrists in fiscal year 2008 and fiscal year 2009:

| **Incentive Payments** | **FY2008** | **FY2009** |
| --- | --- | --- |
| Dr. John Caliendo | $15,633 | $19,979 |
| Dr. Gary Frick | $15,804 | $64,123 |

Doc. 29-3 at 28-33.

Total 2008 Form 1099 Independent Contractor Compensation for Dr. Frick was $257,804.23, which exceeded the 90th percentile benchmark levels.  Doc. 292-6, at 13, 15-16.

Halifax paid all compensation (both base and incentive compensation) to the Psychiatrists as nonemployee compensation reportable on IRS Form 1099-MISC as miscellaneous income not subject to normal payroll taxes and employee withholdings.  Doc 29-3 at 34-35.  The incentive payments to the psychiatrists constitute a direct financial relationship under the Stark Statute between Halifax Hospital and the psychiatrists. The psychiatrists referred patients to Halifax Hospital for the furnishing of designated health services for which payment may be made under the Social Security Act in violation of the Stark Statute.  Ex. 28 at 19-21 (RFA Nos. 25-26); 42 U.S.C. §1395nn(a)(1)(A).  The referrals made by psychiatrists to Halifax Hospital did not qualify for any statutory or regulatory exception from the Stark Statute's referral prohibition.  The burden is on Defendants to show it met an exception to the Stark Statute.  *Armfield, supra.* Defendants have failed to carry that burden.

>2.   Halifax Hospital Paid Compensation to Medical Directors Without Complying with any Stark Exception.

Halifax Hospital had a contract with a psychiatrist, Dr. Moore, since June 1, 1993 for Medical Directorship of Psychiatric Services.  Ex. 11.  Dr. Moore has been paid $66,150.00 per

year or $275.63 per hour since for the last seventeen (17) years.  Ex. 27.  This amount is 190% above MGMA's 2007 90th percentile for psychiatrists.  *Id.*  In addition to this amount, Halifax Hospital has also provided him with free office space in the hospital and a "free" hospital billing employee that is paid by Halifax Hospital. Id.  Dr. Moore is not an employee of Halifax Hospital. Ex. 27.

The remuneration to Dr. Moore in cash compensation exceeding fair market value, the free office space, and the free employees constitutes a direct financial relationship under the Stark Statute between Halifax Hospital and Dr. Moore.  Dr. Moore referred patients to Halifax Hospital for the furnishing of designated health services for which payment may be made under the Social Security Act in violation of the Stark Statute. Doc. 29-1 at 2; 42 U.S.C. §1395nn(a)(1)(A). The referrals made by Dr. Moore to Halifax Hospital did not qualify for any statutory or regulatory exception from the Stark Statute's referral prohibition.  The burden is on Halifax Hospital to show it met an exception to the Stark Statute.  *Armfield, supra.*  Halifax has failed to carry its burden.

### 3.    Halifax Cannot Satisfy All Required Elements of any Applicable Stark Exception.

Halifax erroneously claims Stark compliance based on an expert report opining on fair market value and commercial reasonableness.  Doc. 292 at 34; Doc. 292-6 at 1.  Fair market value is only one element of some Stark exceptions.  Halifax, in fact, has belatedly claimed only one Stark exception, the Bona Fide Employment Exception under 42 U.S.C. § 1395nn(e)(2). Even if this affirmative defense has been appropriately and timely pled, and even if the psychiatrists were employees (and they are not as noted in the referenced expert report (Doc. 292-6 at 3, 15)), Halifax cannot meet the requirements of this exception.  The incentive compensation based on "100% of collections" varies with the volume and value of referrals to

Halifax because the incentive includes facility fees. 42 U.S.C. § 1395nn(e)(2)(B)(ii); *Tuomey Healthcare Sys.*, 675 F.3d at 407.

4.   Halifax Argues Inconsistently About Whether An Expert Is Necessary To Establish Stark Compliance.

Halifax argues on the one hand that "[w]ithout an FMV expert of her own, Relator cannot credibly contradict Halifax's FMV methodology evidence or create a material dispute of fact of this issue."  Doc. 292 at 33.  On the other hand, Halifax argues its process for establishing fair market value which did not involve or rely on experts until 2009 was reasonable.  Doc. 292 at 32; Ex. 29 (Durkin Dep.) at 141:6-18, 174:25-175:7, 178:7-9; Ex. 23 (Khanna Dep.) at 56:12-57:4, 201:22-25; Ex. 22 (Kuhn Dep.) at 152:15-24; Ex. 30 (Sorathia Dep.) at 82:15-18, 127:11-25; Ex. 24 (Vinas Dep.) at 49:12-23, 126:17-127:19.  Halifax cannot have it both ways.  If a FMV expert is required, then Halifax's process for establishing FMV is patently unreasonable.

Furthermore, Halifax' own expert (Vance) found Dr. Frick's compensation exceeded the 90th percentile of benchmarks reviewed.  Doc. 292-6 at 17.  The Vance report even failed to account for the free office space and employees Dr. Moore received.  Doc. 292-6 at 24.[8]  The purported facts and opinions in the Vance report are disputed by Relator due to this failure.

5.   Halifax Admitted The Psychiatrists Referred Patients To Halifax For Designated Health Services.

Halifax admitted that Dr. Frick and Dr. Caliendo referred patients to Halifax Hospital for the furnishing of designated health services for which payment may be made under the Social Security Act.  Ex. 28 (Halifax Hospital Response to Relator's First Request for Admissions) at

---

[8] "Navigant conducted interviews with representatives from Halifax regarding the compensation arrangements and specific financial metrics. It was accepted that this information accurately portrayed the financial performance of the arrangement. Navigant assumes no responsibility for the accuracy or completeness of such information."  Doc. 292-6 at 24.

Nos. 24-25.) Halifax's argument to the contrary is just wrong. Doc. 292 at 35.

    **E.**    **Defendants Acted in Conspiracy, as Halifax Staffing Paid the Kickbacks to the Physicians who Made Referrals to Halifax Hospital, which Submitted False Claims to the Government.**

Halifax Hospital and Halifax Staffing are separate and distinct legal entities. Doc. 29 at ¶ 7; Doc. 47, Defendants' Answer at ¶ 7. At all relevant times, Halifax Hospital had no employees, and Halifax Staffing provided all personnel to Halifax Hospital. Ex. 31 ( Peburn 30(b)(6) Dep.) at 122:7-123:6, 239:15-17. Halifax Staffing employed the physicians who were compensated at least in part based upon the volume or value of referrals they made to Halifax Hospital, and Halifax Hospital in turn billed Medicare for the DHS provided to such referred patients. As such, and as detailed in this Response and in Relator's MPSJ (Doc. 272, corrected at Doc. 295), Defendants conspired with one another to get false and fraudulent claims allowed and paid by the Government in violation of the FCA.

**V.**    **CONCLUSION.**

WHEREFORE, Relator respectfully requests that the Court DENY Defendants' Motion for Summary Judgment as to Counts 1-4.

Respectfully submitted this 3rd day of July, 2013.

<table>
<tr><td>s/ L. Lin Wood</td><td>s/ Marlan B. Wilbanks</td></tr>
<tr><td>L. Lin Wood (admitted <em>pro hac vice</em>)</td><td>Marlan B. Wilbanks (admitted <em>pro hac vice</em>)</td></tr>
<tr><td>Katherine V. Hernacki (<em>pro hac vice</em>)</td><td>Susan S. Gouinlock (admitted <em>pro hac vice</em>)</td></tr>
<tr><td>Amy M. Stewart (admitted <em>pro hac vice</em>)</td><td>WILBANKS & BRIDGES, LLP</td></tr>
<tr><td>WOOD, HERNACKI & EVANS, LLC</td><td>3414 Peachtree Road N.E.</td></tr>
<tr><td>1180 West Peachtree Street N.W.</td><td>Suite 1075</td></tr>
<tr><td>Suite 2400</td><td>Atlanta, GA 30326</td></tr>
<tr><td>Atlanta, GA 30309</td><td>Tel.: (404) 842-1075</td></tr>
<tr><td>Tel.: (404) 891-1402</td><td>Fax: (404) 842-0559</td></tr>
<tr><td>Fax: (404) 506-9111</td><td>Email: mbw@wilbanks-bridges.com</td></tr>
<tr><td>Email: lwood@whetriallaw.com</td><td>Email: ssg@wilbanks-bridgeslaw.com</td></tr>
<tr><td>Email: khernacki@whetriallaw.com</td><td></td></tr>
<tr><td>Email: astewart@whetriallaw.com</td><td></td></tr>
</table>

s/ Terrence McQuade
Scott C. Withrow (admitted *pro hac vice*)
Terrence McQuade (admitted *pro hac vice*)
Jeffrey T. Holm (admitted *pro hac vice*
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road N.E.
Suite 970
Atlanta, GA 30326
Tel.: (404) 814-0200
Fax: (404) 814-0009
Email: swithrow@wmolaw.com
Email: tmquade@wmolaw.com
Email: jholm@wmolaw.com

s/ Christopher C. Casper
Christopher C. Casper
Florida Bar No. 048320
JAMES, HOYER, NEWCOMER, SMILJANICH &
YANCHUNIS, P.A
One Urban Centre
Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2589
Tel.: (813) 286-4109
Fax: (813) 286-4174
E-mail: ccasper@jameshoyer.com

*Attorneys for (Relator) Elin Baklid-Kunz*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States District Court for the Middle District of Florida using the CM/ECF system, which will automatically serve a copy to counsel for all other parties in this case.

This 3rd day of July, 2013.

s/ Scott C. Withrow
Scott C. Withrow (admitted *pro hac vice*)
WITHROW, MCQUADE & OLSEN, LLP
3379 Peachtree Road N.E.
Suite 970
Atlanta, GA 30326
Tel.: (404) 814-0200
Fax: (404) 814-0009
E-mail: swithrow@wmolaw.com

*Attorney for (Relator) Elin Baklid-Kunz*