**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, and ELIN BAKLID-KUNZ, Relator,<br><br>       Plaintiffs,<br><br>       v.<br><br>HALIFAX HOSPITAL MEDICAL CENTER d/b/a HALIFAX HEALTH a/k/a HALIFAX COMMUNITY HEALTH SYSTEM a/k/a HALIFAX MEDICAL CENTER and HALIFAX STAFFING, INC.,<br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO.: 6:09-CV-1002-ORL-31TBS

JUDGE GREGORY A. PRESNELL

[FALSE CLAIMS ACT – QUI TAM]

DISPOSITIVE MOTION

ORAL ARGUMENT REQUESTED

**DEFENDANTS HALIFAX HOSPITAL MEDICAL CENTER AND**
**HALIFAX STAFFING, INC.'S**
**OPPOSITION TO RELATOR ELIN BAKLID-KUNZ'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ........................................................................1
II.  STATEMENT OF UNDISPUTED FACTS ....................................................2
   A.  Halifax's Medical Oncology Program....................................................2
   B.  The Medical Oncologists Are Halifax Hospital Employees .....................3
   C.  Medical Oncologists' Compensation.......................................................4
III. APPLICABLE LEGAL STANDARDS ...........................................................5
   A.  The Anti-Kickback Statute And The Employment Exception.....................5
   B.  The AKS Statutory Employment Exception Obviates The Need For Halifax To Raise
   The Regulatory Employee "Safe Harbor" As An Affirmative Defense...............8
   C.  The False Claims Act.............................................................................9
IV.  HALIFAX'S MEDICAL ONCOLOGISTS ARE EMPLOYED UNDER THE
MEANING OF THE EMPLOYMENT EXCEPTION AND, THEREFORE, THEIR
AGREEMENTS CANNOT UNDER ANY CIRCUMSTANCES VIOLATE THE AKS10
   A.  The Medical Oncologists Are *Bona Fide* Employees Of Halifax Hospital...............10
   B.  The Existence Of Halifax Staffing Does Not Alter The Result For Purposes Of The
   Employment Exception ...............................................................................11
   C.  Relator's Evidence That The Medical Oncologists Are Not Halifax Hospital
   Employees Is Unpersuasive .........................................................................12
   D.  The Medical Oncologists' Compensation Was Based On Fair Market Value And Was
   Commercially Reasonable .........................................................................13
V.   RELATOR'S PURPORTED INTENT EVIDENCE IS IRRELEVANT UNDER
THE AKS DUE TO THE EMPLOYMENT EXCEPTION...........................................14
VI.  RELATOR'S MOTION FOR SUMMARY JUDGMENT BASED ON ALLEGED
FCA VIOLATIONS PREDICATED ON ALLEGED AKS VIOLATIONS FAILS
WITHOUT PROOF OF ANY AKS VIOLATIONS ......................................................17
VII. RELATOR'S MOTION FOR SUMMARY JUDGMENT REGARDING SCOPE
OF DAMAGES SHOULD FAIL AS A MATTER OF LAW .........................................18
   A.  Relator Is Not Entitled To Damages Because There Are No AKS Violations...........18
   B.  Relator Has Not Identified Any False Claims At Issue For Purposes Of Her
   AKS-Derived FCA Count ...........................................................................19
   C.  Relator's Enforcement Of FCA Civil Penalty Claims Violates The Appointments
   Clause Of Article II Of The United States Constitution .....................................20
   D.  The Damages Sought By Relator Are Excessive And Violate The Excessive Fines
   And Due Process Clauses Of The United States Constitution............................25
VIII.    RELATOR'S MOTION FOR SUMMARY JUDGMENT REGARDING
HALIFAX'S AFFIRMATIVE DEFENSES FAILS AS A MATTER OF LAW ............25
   A.  Failure To State A Claim .......................................................................27
   B.  Estoppel Is A Defense Against A Relator In An FCA Case .........................27
   C.  Waiver ..................................................................................................28
   D.  Good Faith............................................................................................28
   E.  Fraud With Particularity.........................................................................30
   F.  Unclean Hands.......................................................................................31

G.    Public Disclosure ..................................................................................................32
H.    Limitation On Damages ..........................................................................................33
I.     Attorney's Fees.......................................................................................................33
J.     No Further Affirmative Defenses ...........................................................................34
**IX.  CONCLUSION** .................................................................................................................34

## TABLE OF AUTHORITIES

### Cases

*Battle v. Bd. of Regents*, 468 F.3d 755 (11th Cir. 2006) ........................................33

*Blonder-Tongue Labs, Inc. v. Univ of Ill. Found.*, 402 U.S. 313 (1971) .............................26

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................ 21, 22, 23

*Centex Homes v. Mr. Stucco, Inc.*, No. 8:07-CV-365-T-27MSS, 2008 WL 793587 (M.D. Fla. Mar. 25, 2008)..................................................................................34

*Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562 (11th Cir. 1994)....................................31

*Edmond v. United States*, 520 U.S. 651 (1997)...............................................20, 22

*Folkerson v. Circus Circus Enters., Inc.* No. 93-17158, 1995 WL 608432 (9th Cir. 1995).....7

*Garcia v. Copenhaver, Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256 (11th Cir. 1997)...........7

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) ...............................................21

*Grant v. Preferred Research, Inc.*, 885 F.2d 795 (11th Cir. 1989)....................................26

*Hernandez, Kroone & Assoc., Inc. v. United States*, 95 Fed. Cl. 395 (Fed. Cl. 2010) ...........32

*Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001)....................................................10

*Morissette v. United States*, 342 U.S. 246 (1952)................................................29

*Morrison v. Olson*, 487 U.S. 654 (1988) ........................................................23, 24

*Navarro v. Santos Furniture Custom Design, Inc.*, 372 Fed. App'x. 24 (11th Cir. 2010)......26

*Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414 (1990)..........................................27, 28

*Ramnarine v. CP RE Holdco 2009-1, LLC*, No. 12-61716-CIV, 2013 WL 1788503 (S.D. Fla. Apr. 26, 2013) .....................................................................................34

*Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001) (en banc) .........................22

*SEC v. Follick*, No. 00 Civ. 4385KMWGWG, 2002 WL 31833868 (S.D.N.Y. Dec. 18, 2002) ......................................................................................32

*Smith v. Wal-Mart Stores*, 2012 U.S. Dist. LEXIS 87347 (N.D. Fla. June 25, 2012) ...........30

*Swigart v. Fifth Third Bank*, 870 F. Supp. 2d 500 (S.D. Ohio 2012) ...................................29

*United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir. 2006) ...........................17

*United States ex rel. Brown v. Walt Disney World Co.*, 361 Fed. App'x 66 (11th Cir. 2010)33

*United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301 (11th Cir. 2002)......31

*United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24 EAJ, 2012 WL 4344199 (M.D. Fla. Sept. 21, 2012)................................................. 19, 27, 28

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993) ...................................22

*United States ex rel. McNutt v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005)......................................................................................19

*United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045 (N.D. Ill. 2002)......................................................................................18

*United States ex rel. Osheroff v. Tenet HealthCare Corp.*, 2013 U.S. Dist. LEXIS 44235 (S.D. Fla. Mar. 27, 2013)...........................................................................17

*United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843 (C.D. Ill. 2003) .18

*United States ex rel. Spay v. CVS Caremark Corp.*, No. 09-4672, 2013 WL 1755214 (E.D. Pa. Apr. 24, 2013) ..................................................................................28

*United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F. Supp. 1247 (S.D. Fla. 1989) ................................................................................................................. 9

*United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787 (10th Cir. 2002) ............... 22

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032 (6th Cir. 1994) ................................................................................................................................. 22

*United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678 (W.D. Ky. 2008) ............... 18

*United States ex rel. Watson v. Conn. Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054 (E.D. Pa. Feb. 11, 2003) ......................................................................... 9

*United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456 (5th Cir. 1977) .................. 10

*United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601 (S.D. Tex. 2001) ....................................................................................................................... 9

*United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763 (N.D. Tex. 2002) 27, 28, 31

*United States v. Germaine*, 99 U.S. 508 (1878) ................................................................... 24

*United States v. Hartwell*, 73 U.S. 385 (1868) ..................................................................... 24

*United States v. Jain*, 93 F.3d 436 (8th Cir. 1996) ............................................................... 29

*United States v. Manhattan-Westchester Med. Servs., P.C.*, No. 06 Civ. 7905, 2008 WL 241079 (S.D.N.Y. Jan. 28, 2008) .................................................................... 27, 31

*United States v. McNinch*, 356 U.S. 595 (1958) ................................................................... 10

*United States v. Rogan,* 517 F. 3d 449 (7th Cir. 2008) ......................................................... 20

*United States v. Starks,*157 F.3d 833 (11th Cir. 1998) ................................................... 15, 28

*United States v. Warning*, No. 93-4541, 1994 U.S. Dist. LEXIS 10402 (E.D. Pa. July 26, 1994) ......................................................................................................................... 9

*Vance v. Westfalia Techs., Inc.*, 2013 U.S. Dist. LEXIS 90159 (M.D. Fla. June 26, 2013) ... 30

**Statutes**

26 U.S.C. § 3121(d)(2) (2006) .............................................................................................. 7

28 U.S.C. §§ 49, 591 et seq. ............................................................................................... 23

29 U.S.C. § 259(a) .............................................................................................................. 30

31 U.S.C. § 3729 (2006) ................................................................................................... 9, 10

31 U.S.C. § 3730 ............................................................................................................... 18

42 C.F.R. § 1001.952(i) (2012) ......................................................................................... 7, 12

42 C.F.R. § 411.351 (2012) ................................................................................................. 7

42 U.S.C. § 1320a-7b(b)(3)(B) (2006) ................................................................................. 6

42 U.S.C. §§ 1320a-7b(b)(1)-(2) (2006) ............................................................................ 6

**Other Authorities**

42 C.F.R. § 1001.952(i) ...................................................................................................... 9

42 C.F.R. § 411.357(c) (2012) ........................................................................................... 13

42 C.F.R. §§ 1001.1, 1001.951-.953 ................................................................................ 8

Fed. R. Civ. P. 12(a)(1)(A)(i) .............................................................................................. 25

Fed. R. Civ. P. 12(b) ........................................................................................................... 27

Fed. R. Civ. P. 12(f)(2) ........................................................................................................ 30

Fed. R. Civ. P. 9(b) ............................................................................................................. 31

OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952 (July 29, 1991) ..................................... 8

Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships
(Phase II), 69 Fed. Reg. 16,054 (Mar. 26, 2004) ...........................................................12
Treas. Reg. § 31.3121(d)-1(c)(2) (2013) ...............................................................................7

**Constitutional Provisions**
U.S. Const. art. II, § 2, cl. 2 ...............................................................................................20

**Secondary Authorities**
5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1274 (1990)
.........................................................................................................................................26

Defendants Halifax Hospital Medical Center ("Halifax Hospital") and Halifax Staffing, Inc. (collectively, "Halifax Defendants" or "Defendants") respectfully submit this Opposition to Relator Elin Baklid-Kunz's Motion for Partial Summary Judgment (Dkt. No. 274) ("Relator's Motion"). Relator's Motion seeks partial summary judgment on three grounds: (1) a determination that Halifax Hospital violated the False Claims Act ("FCA") because it allegedly submitted claims to Medicare with the knowledge that its employment agreements with certain employed Medical Oncologists violated the Anti-Kickback Statute ("AKS");[1] (2) a determination that the proper measure of damages for FCA violations derived from AKS violations is the entire amount paid by Medicare for each allegedly false claim; and (3) summary judgment as to all affirmative defenses raised by the Halifax Defendants and barring Defendants' assertion of additional affirmative defenses. For the reasons outlined below, Relator's Motion should be denied in its entirety and the Halifax Defendants should be granted summary judgment on Relator's entire Second Amended Complaint ("Complaint").

## I.  PRELIMINARY STATEMENT

The allegations underlying Relator's AKS causes of action are irreparably deficient as a matter of law because it is undisputed that the *bona fide* employment exception to the AKS (the "Employment Exception") shields from AKS liability financial arrangements between an entity, such as Halifax Hospital, and its employees. Without conducting any discovery, the

---

[1] Relator's Second Amended Complaint (Dkt. No. 29) makes AKS allegations against the compensation agreements for the following medical oncologists: Dr. Boon Chew, Dr. Ruby Ann Deveras, Dr. Walter Durkin, Dr. Gregory Favis, Dr. Abdul Sorathia, and Dr. Richard Weiss (collectively, the "Medical Oncologists").

United States concluded that there was no merit to Relator's AKS Count and has not intervened in any of Relator's AKS allegations in her Complaint.

The vast majority of Relator's Motion consists of assertions and speculation completely irrelevant to the assessment of the validity of her AKS-derived FCA claims. The only relevant discussion in Relator's Motion is that regarding the identity of the Medical Oncologists' employer for AKS purposes. These facts are not in dispute. Rather, the facts establish that the Medical Oncologists were employees of Halifax Hospital as a matter of law.

In trying to defeat the shield of the Employment Exception, Relator relies erroneously on her argument that the Medical Oncologists are employed by Halifax Staffing, Inc. ("Halifax Staffing"), an instrumentality and corporate alter ego of Halifax Hospital. Halifax Hospital, however, is the employer of each Medical Oncologist for purposes of analysis under the AKS. Indeed, even if the Medical Oncologists were construed to be employees of Halifax Staffing for other limited purposes, for purposes of the Employment Exception they are Halifax Hospital employees. There is, therefore, no factual circumstance under which Relator can prove an AKS violation here.

## II.     STATEMENT OF UNDISPUTED FACTS

### A.     Halifax's Medical Oncology Program

Halifax's Center for Oncology is the second oldest accredited cancer program in the State of Florida, having been accredited through the American College of Surgeons in 1956. *See* Ex. 1, Halifax Health Centers for Oncology Website.[2] In 1984, Halifax built a comprehensive community cancer center with the mission of providing the highest quality

_____

[2] Available at http://www.halifaxhealth.org/center-for-oncology (last visited July 1, 2013).

care to residents of Volusia County regardless of their ability to pay. Ex. 2 to Relator's Mot. at 3. The Center for Oncology was the first radiation oncology facility certified by the American College of Radiology. *See* Ex. 1. As the first and only dedicated inpatient oncology unit in Volusia County, Halifax is a leader in the delivery of medical oncology treatment. *Id.* Halifax's Center for Oncology is also home to Volusia County's first and only full-time Gynecological Oncology program treating multiple counties; the first Stereotactic Radiosurgery program; and the first Nuclear Oncology program. *Id.* In furtherance of the mission of the Center for Oncology, Halifax Hospital has employed the Medical Oncologists to care for its patients.

   B.  <u>The Medical Oncologists Are Halifax Hospital Employees</u>

   The Medical Oncologists are indisputably employees of Halifax Hospital. First, Halifax Hospital sets the budget for the medical oncology department and bills Medicare and private payers for services furnished by the Medical Oncologists. *See, e.g.*, Ex. 2, Sorathia Dep., Sept. 25, 2012, at 165:17-20; Ex. 3, Durkin Dep., Sept. 20, 2012, at 56:12-16. Halifax Hospital's chief of staff and Board of Commissioners have ultimate oversight over each of these physicians. *See* Ex.4, Peburn Dep., Feb. 26, 2013, at 279:6-281:20. The Medical Oncologists are full-time employees at Halifax Hospital, and do not have any separate private practices. *See* Ex. 3, Durkin Dep., at 26:17-24, 119:8-12. Moreover, the Medical Oncologists themselves believe they are employees of Halifax Hospital, not Halifax Staffing. *See, e.g.*, Ex. 3, Durkin Dep., at 113:10-23, 115:13-25.

   Relator's only alleged alternative employer for the Medical Oncologists is Halifax Staffing. However, Halifax Staffing is merely an instrumentality used by Halifax Hospital to

provide benefits to Halifax Hospital employees. *See* Ex 5, 1997 Letter to Fla. Dept. of State re: Second Articles of Incorporation and Amendment, at p. 2, Article II. Halifax Hospital is the employer of the Medical Oncologists under the AKS, as further discussed in Section IV.

    C.    <u>Medical Oncologists' Compensation</u>

The evidence shows that the Medical Oncologists' compensation was Fair Market Value ("FMV"). *See* Ex. 6, Expert Report of Thomas O'Brien, Feb. 11, 2013 ("O'Brien Rep."), at 11, 22; Ex. 4, Peburn Dep., at 110:15-113:5. Neither Relator nor the United States has offered any expert report or testimony contradicting this assertion. Indeed, all compensation adjustments for the Medical Oncologists were made to retain these physicians in the employment of Halifax and ensure that they were each compensated in a manner consistent with the level of his or her personally performed efforts, while still providing cost savings for the medical oncology program. *See* Ex. 7, Garthwaite Dep., May 1, 2012, at 61:5-65:11, 129:12-130:16; Ex. 8, Cason Dep., Nov. 20, 2012, at 72:17-73:19.

In an effort to distract the Court from the Employment Exception's absolute bar to her cause of action, Relator's Motion mischaracterizes the compensation paid to the Medical Oncologists. The Medical Oncologists were eligible for a productivity bonus that totaled 15% of the outpatient medical oncology department's operating margin, distributed among the Medical Oncologists under a formula solely based on each physician's personally performed services, from Fiscal Year 2005 to Fiscal Year 2008. *See* Ex. 4, Peburn Dep., at 199:4-200:2; Ex. 8, Cason Dep., at 108:22-110:21; Ex. 9, Garthwaite Dep., Feb. 19, 2013, at 228:2-10. The operating margin bonus accounted for only 8-12% of the Medical Oncologists' annual compensation. *See* Ex. 10, Chart of Operating Margin Bonus as

Percentage of Annual Compensation for Medical Oncologists During FY 2005-2008. Despite the fact that the bonus constituted a relatively small portion of each Medical Oncologist's salary, and, in any case, is irrelevant for purposes of the Employment Exception, Relator seeks unreasonable and unsubstantiated damages of $300 million in conjunction with her allegations regarding this incentive bonus.

Relator's "Statement of Undisputed Facts" is largely an argument disguised as "fact" intended to distract or mislead the Court. Relator substitutes conspiracy theories for common sense analysis regarding facts such as the loss of revenue to the medical oncology program in 2003-04 after four of eight medical oncologists quit in order to enter private practice and increase their income. Relator's Mot. at 4. This was followed eventually by a natural uptick of patient visits in 2006 after Halifax recruited and employed an additional medical oncologist in late 2005. *Id.* at 5.

## III.   APPLICABLE LEGAL STANDARDS

### A.   The Anti-Kickback Statute And The Employment Exception

The AKS is a *criminal* statute, which prohibits the intentional conduct of knowingly and willfully offering, paying, soliciting, or accepting "remuneration" to induce referrals for items or services paid for by a federal health care program (*e.g.*, Medicare or Medicaid) and states as follows:

**(b) Illegal remuneration**

**(1)** Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

**(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

**(B)** in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

**(2)** Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

**(A)** to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

**(B)** to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. §§ 1320a-7b(b)(1)-(2) (2006).

The AKS includes several statutory carve-outs from the definition of "remuneration." The relevant carve-out here is the Employment Exception, which states that the AKS does not apply to "any amount paid by an employer to an employee (who has a *bona fide* employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B) (2006).

The Employment Exception has also been incorporated into the regulatory "safe harbor" later adopted under the AKS. The regulatory version of the Employment Exception incorporates the Internal Revenue Code definition of "employee." 42 C.F.R. § 1001.952(i)

(2012). This test is the same one adopted for purposes of the Stark Law. 42 C.F.R. § 411.351

(2012). To identify a *bona fide* employment relationship, the AKS requires reference to the

definition of "employee" under 26 U.S.C. § 3121(d)(2) (2006).

Section 3121(d)(2) defines "employee" as "any individual who, under the usual

common law rules applicable in determining the employer-employee relationship, has the

status of an employee." § 3121(d)(2). A common law employer-employee relationship exists

when the person for whom services are performed has the right to "control and direct the

individual who performs the services, not only as to the result to be accomplished by the

work but also as to the details and means by which that result is accomplished." Treas. Reg. §

31.3121(d)-1(c)(2) (2013). The Eleventh Circuit has embraced two common-law tests to

assess such relationship: the "agency" test and the "hybrid" test. *See Garcia v. Copenhaver,*

*Bell & Assocs., M.D.'s, P.A.*, 104 F.3d 1256, 1266 (11th Cir. 1997) (noting that the court has

"relied on both the hybrid and agency tests" to assess common law employer-employee

relationships). Both tests turn upon the "degree of control" the employer holds, and derive a

non-exhaustive set of factors from the Restatement (Second) of Agency, rendering the two

tests "largely indistinguishable." *Folkerson v. Circus Circus Enters., Inc.*, No. 93-17158,

1995 WL 608432, at *3 (9th Cir. Oct. 16, 1995) (noting agreement with Second and Eighth

Circuits on these points).

The Office of Inspector General of the United States Department of Health and

Human Services ("HHS") has explicitly recognized the plain language and effect of the

Employment Exception:

> **Comment**: Two commenters questioned the wisdom of the employee
> exception, stating that health care providers should not be able to refer

patients to other health care providers within their own offices because abuse could be worse than when individuals or entities make referrals to outside sources.

**Response:** The exception for bona fide employment relationships is clear on the face of the statute, and we are not free to ignore that statutory mandate.

OIG Anti-Kickback Provisions, 56 Fed. Reg. 35,952 (July 29, 1991) (codified at 42 C.F.R.

§§ 1001.1, 1001.951-.953 (2012)). The undisputed evidence establishes that the Medical

Oncologists are *bona fide* employees of Halifax Hospital. Therefore, the Employment

Exception applies, meaning that the amounts paid to the Medical Oncologists are not

"remuneration" for purposes of the AKS.

    B.    <u>The AKS Statutory Employment Exception Obviates The Need For Halifax To Raise The Regulatory Employee "Safe Harbor" As An Affirmative Defense</u>

Relator's assertion that Halifax has not identified the AKS Employee "Safe Harbor"

as an affirmative defense is a red herring because the statutory Employment Exception is an

independent, complete defense to her cause of action. Notwithstanding the fact that Halifax

may appropriately seek leave of Court to amend its Answer to Relator's Second Amended

Complaint, Halifax does not need to avail itself of the regulatory Safe Harbor because

Relator's claims fail as a matter of law due to the applicability of the statutory Employment

Exception to the compensation paid to the Medical Oncologists. The regulatory Employment

Exception simply confirms that the relevant test for *bona fide* employee status is the test set

forth at 26 U.S.C. § 3121(d)(2). The AKS Employee Safe Harbor provides:

Employees: As used in section 1128B of the Act, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare health care programs.  For purposes of paragraph

(i) of this section, the term employee has the same meaning as it does in 26
U.S.C. 3121(d)(2).

42 C.F.R. § 1001.952(i) (2012).

Nonetheless, Halifax intends to seek leave of Court to amend its Answer to explicitly

include the AKS Employee Safe Harbor (*i.e.*, the regulatory Employment Exception) as an

affirmative defense.

C.      The False Claims Act

Relator contends – based solely on her alleged AKS violations – that Halifax violated

Sections 3729(a)(1) and (2) of the FCA. To establish a violation of Section 3729(a)(1),

Relator must prove that: (1) Halifax presented or caused to be presented to the government a

claim for payment; (2) the claim was false or fraudulent; and, (3) Halifax knew it was

presenting a false or fraudulent claim for payment. *See United States ex rel. Watson v. Conn.*

*Gen. Life Ins. Co.*, No. 98-6698, 2003 U.S. Dist. LEXIS 2054, at *13-16 (E.D. Pa. Feb. 11,

2003); *United States ex rel. Wilkins v. North Am. Constr. Corp.*, 173 F. Supp. 2d 601, 618-19

(S.D. Tex. 2001); *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F.

Supp. 1247, 1258-59 (S.D. Fla. 1989). Section 3729(a)(2) requires proof that: (1) Halifax

made or caused to be made a record or statement to get a claim against the United States

paid; (2) the record or the statement and the claim were false or fraudulent; and, (3) Halifax

knew the record or statement and the claim were false or fraudulent. *See Stinson*, 721 F. Supp.

at 1259; *United States v. Warning*, No. 93-4541, 1994 U.S. Dist. LEXIS 10402, at *10-11

(E.D. Pa. July 26, 1994). For purposes of the FCA, "knew" means that a person with respect

to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance

of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity

9

of the information. 31 U.S.C. §§ 3729(b)(1)(A)(i)-(iii) (2006). However, the FCA was not

designed to reach "every kind of fraud practiced on the Government." *United States ex rel.*

*Weinberger v. Equifax, Inc.*, 557 F.2d 456, 460 (5th Cir. 1977) (quoting *United States v.*

*McNinch*, 356 U.S. 595, 599 (1958)); *see also Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir.

2001).

### IV.   HALIFAX'S MEDICAL ONCOLOGISTS ARE EMPLOYED UNDER THE MEANING OF THE EMPLOYMENT EXCEPTION AND, THEREFORE, THEIR AGREEMENTS CANNOT UNDER ANY CIRCUMSTANCES VIOLATE THE AKS

A.     The Medical Oncologists Are *Bona Fide* Employees Of Halifax Hospital

The facts establishing Halifax Hospital as the Medical Oncologists' employer are

overwhelming. Every aspect of running the Medical Oncologists' practice is under the

control of Halifax Hospital. Halifax Hospital sets the budget for the medical oncology

department and owns and manages their medical practice. *See, e.g.*, Ex. 2, Sorathia Dep., at

165:17-20; Ex. 3, Durkin Dep., at 56:12-16. Halifax Hospital bills Medicare and private

payers for all professional services furnished by the Medical Oncologists. *Id.* Halifax

Hospital – through the Hospital's chief of staff and its Board of Commissioners – has

ultimate oversight over each of these physicians. Ex. 4, Peburn Dep., at 279:6-281:20. The

Medical Oncologists are full-time employees of Halifax Hospital – performing all of their

medical oncology services on Halifax Hospital's campus solely to patients of Halifax

Hospital – and do not have separate private medical practices. *See, e.g.*, Ex. 3, Durkin Dep.,

at 26:17-24, 119:8-12. Critically, the Medical Oncologists believe that Halifax Hospital is

their employer. *See, e.g., id.* at 113:10-23, 115:13-25. Indeed, Dr. Durkin repeatedly stated

during his deposition that his "employer is Halifax Medical Center," not Halifax Staffing. *Id.*
at 115:20-21.

    B.    <u>The Existence Of Halifax Staffing Does Not Alter The Result For Purposes Of
The Employment Exception</u>

Consistent with Florida law, including 2003 Laws of Florida ch. 2003-374, at 1-13,
and Chapter 617 of the Florida Statutes, the District[3] created Halifax Staffing, a 501(c)(3)
not-for-profit corporation, which leases to Halifax Hospital, a special tax District, the
individuals who staff the District's health care facilities. Ex 5, 1997 Letter to Fla. Dept. of
State re: Second Articles of Incorporation and Amendment. Halifax Staffing is merely an
instrumentality and alter ego of Halifax Hospital established to enable Halifax Hospital to
move its employees from the Florida state retirement system into a self-funded retirement
program. *Id.*; Ex. 4, Peburn Dep., at 122:7-123:6.

The Internal Revenue Service ("IRS") confirmed, in a 1995 ruling letter obtained in
connection with the creation of Halifax Staffing, that the entity is an instrumentality of
Halifax Hospital. Ex. 11, IRS Ruling Letter, at 1; Ex. 4, Peburn Dep., at 271:25-272:5.
Halifax Staffing has no board of its own, instead sharing Halifax Hospital's Board of
Commissioners. Ex. 12, Halifax Hospital Bd. of Comm'rs;[4] Ex. 4, Peburn Dep., at 238:4-21.
Halifax Staffing's sole bank account is a zero-balance sweep account funded solely through

---

[3] Halifax Hospital is a community hospital owned by the residents of the Halifax Special
Taxing District (the "District"). They are one and the same. Halifax Staffing is an
instrumentality of the District.
[4] Available at http://www.halifaxhealth.org/board-of-commissioners (last visited July 3,
2013).

direct transfers from Halifax Hospital's bank accounts in order to satisfy employee payroll. Ex. 13, Halifax Staffing Bank Account Info.; Ex. 4, Peburn Dep., at 272:6-13.

In the context of the Stark Law, CMS uses the same IRS test referenced in the regulatory Employment Exception, and has expressly stated leased employees may qualify as *bona fide* employees under the relevant tests, noting that "to the extent that a leased employee is a *bona fide* employee of the DHS entity under IRS rules, remuneration paid to that employee would be eligible under the [*bona fide* employment] exception." Physicians' Referrals to Health Care Entities With Which They Have Financial Relationships (Phase II), 69 Fed. Reg. 16,054, 16,087 (Mar. 26, 2004). Although this CMS statement relates to the Stark Law, the same test applies to the Employment Exception. *See* 42 C.F.R. § 1001.952(i).

C.   Relator's Evidence That The Medical Oncologists Are Not Halifax Hospital Employees Is Unpersuasive

The weight of the evidence supports Halifax's assertion that the Medical Oncologists are employees of Halifax Hospital for purposes of the Employment Exception. While Relator cites in her Motion a handful of factors, including Halifax Staffing's "pass through" payment of employee salaries from Halifax Hospital's bank accounts, Halifax Staffing's issuance of W-2 tax forms, and that several of the Medical Oncologists' agreements identify Halifax Staffing as the counterparty, this evidence is not dispositive and is minimal compared to the countervailing evidence discussed above.

Moreover, even if the Medical Oncologists are considered to be employees of Halifax Staffing, a wholly owned instrumentality of Halifax Hospital, for some narrow purposes (*e.g.*, issuance of W-2), this is not inconsistent with the fact that these physicians are still considered *bona fide* employees of Halifax Hospital for purposes of the Employment

Exception because all of the requirements of the definition of employee for purposes of the Employment Exception have been met.

> D.    The Medical Oncologists' Compensation Was Based On Fair Market Value And Was Commercially Reasonable

Relator purports to take issue with the FMV status of the Medical Oncologists' compensation, but there is no provision in the AKS requiring that compensation paid to *bona fide* employees be FMV or commercially reasonable. *See* Section III(A), *supra*. Regardless, the evidence in this case produced in connection with the Stark Law allegations[5] demonstrates that the Medical Oncologists' compensation was FMV and commercially reasonable, and neither Relator nor the United States has offered any expert report or testimony to the contrary.

Halifax's expert provided undisputed testimony that the Medical Oncologists' compensation was FMV and commercially reasonable. Ex. 6, O'Brien Rep., at 11, 22; Ex. 4, Peburn Dep., at 110:15-113:5. The United States' FMV/commercial reasonableness expert, Kathleen McNamara, declined to provide any final report on the Medical Oncologists' contracts in her December 21, 2012 report, even though her initial statement of work, dated August 31, 2012, stated that she would perform a FMV and commercial reasonableness analysis of the Medical Oncologists' contracts. Ex. 14, Expert Report of Kathleen McNamara, Aug. 31, 2012; Ex. 15, McNamara Dep., Mar. 14, 2013, at 93:3-13, 99:2-12. Ms. McNamara, moreover, agreed that Exhibit D of her initial report included "many instances where the

---

[5] The Stark Law *Bona Fide* Employment Exception has FMV and commercial reasonableness requirements. 42 U.S.C. § 1395nn(e)(2) (2006 & Supp. 2013); 42 C.F.R. § 411.357(c) (2012).

physician compensation was below what [she] calculated to be the MGMA median cash compensation." Ex. 15, McNamara Dep., at 97:6-13. Relator's FMV assertions are irrelevant and worthy of no weight.

## V.   RELATOR'S PURPORTED INTENT EVIDENCE IS IRRELEVANT UNDER THE AKS DUE TO THE EMPLOYMENT EXCEPTION

Relator's alleged "intent" evidence of an AKS violation is entirely irrelevant because of the protection afforded by the Employment Exception. There is no scenario in which purported "intent" evidence even applies to these arrangements because there is no scienter criterion in the Employment Exception. *See supra* Section III(A). In any event, as set forth below, Halifax's medical oncology agreements were not structured to "induce referrals;" rather, the agreements were designed to provide fair compensation to employed physicians. *See* Ex. 16, Weiss Dep., Oct. 18, 2012, at 96:14-16; Ex. 3, Durkin Dep., at 169:20-170:23; Ex. 8, Cason Dep., at 108:10-110:24.

Relator asserts that there is evidence of an intent to induce referrals because a small portion of the Medical Oncologists' compensation – the incentive based on a pool funded by a percentage of the operating margin – allegedly varied with the value or volume of referrals. There is no evidence in the record, however, to support such a claim that Halifax intended to induce any referrals.

Relator's Motion mischaracterizes the compensation paid to the Medical Oncologists. First, while the Medical Oncologists were eligible for a productivity bonus, the payment of a productivity bonus is not evidence of prohibited intent to induce referrals. Second, while the Medical Oncologists' bonus pool was calculated as a percentage of the operating margin, it is undisputed that the bonus was distributed based on a formula solely determined by each

physician's personally performed services. Ex. 4, Peburn Dep., at 199:4-200:2; Ex. 8, Cason

Dep., at 108:22-110:21; Ex. 9, Garthwaite Dep., at 228:2-10. The formula for the bonus

payments did not take into account the volume or value of referrals made by the physicians.

*See id.* Third, Relator misstates the law in this Circuit by claiming that knowledge of alleged

concerns regarding compliance with the Stark Law can establish evidence of an intent to

induce referrals for purposes of the AKS. Relator's Mot. at 9. This is not the law.

Relator cites to *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998), in support of

her novel theory that alleged concerns regarding compliance with the Stark Law, 42 U.S.C.

§ 1395nn (2006), establish a willful violation of the AKS. The Employment Exception did

not, however, apply to the facts in *Starks*, rendering the case irrelevant here. In *Starks*, the

court inferred willfulness because of the suspicious circumstances under which payments

were made (*e.g.*, payments to state regulators in exchange for referrals, falsely coding checks,

and covertly delivering payments). *Starks*, 157 F.3d at 838-40. In addition to Halifax's

compliance with the statutory Employment Exception, the other facts in this case are vastly

different from those in *Starks*. The undisputed facts establish that the Medical Oncologists

were employed by Halifax Hospital and paid compensation as *bona fide* employees, the

compensation at issue was subject to a legal review by the General Counsel, later reviewed

by outside counsel, and all payments were made in the normal course of business. Ex. 17,

Davidson Dep., at 199:1-200:25. There is no evidence of a willful violation of the AKS.

Second, the undisputed facts establish that Halifax believed it was in compliance with the

Stark Law. These undisputed facts and the applicable Stark Law exceptions are discussed in

detail in Halifax's Response to United States' Motion for Partial Summary Judgment (Dkt. No. 313), which are incorporated by reference here.

As noted above, Relator's litany of self-serving characterizations of the testimony of Halifax Hospital employees and documents is irrelevant to the legal standards applicable to the Court's AKS inquiry. The Employment Exception provides complete protection to the Medical Oncologists' compensation arrangements. Relator asserts melodramatically that Halifax took steps to prevent the Medical Oncologists from "leaving and going into private practice," as if doing so would violate the law. *See* Relator's Mot. at 6-7. Obviously, the breadth of the Employment Exception is intended to facilitate entities in taking steps to retain employed physicians.

Much of Relator's "intent" evidence is simply unsupported argument and speculation by Relator's counsel without any citation to any witness testimony or documentary evidence. *See, e.g.*, Relator's Mot. at 5 (asserting that Halifax was "[c]oncerned about the reduced patient volumes at its oncology centers," and, therefore, "amended the medical oncology agreements in January 2006 to provide additional remuneration . . . ."); *id.* at 6 (asserting that "[t]he admitted purpose of the contract amendments and the additional remuneration (the Incentive Bonus) was to make the medical oncology practice in the hospital-based setting more equivalent to a medical oncology practice in private practice, so the physicians would continue to refer their patients to Halifax Hospital oncology centers, instead of opening a competitive private practice . . . ."). Relator also makes the wild accusation that Ms. Audrey Pike's November 10, 2008 Memorandum (the "Pike Memorandum") is evidence of Halifax's

intent to violate the AKS even though the Pike Memorandum does not reference or analyze any AKS questions. Relator's Mot. at 9-10; *see also* Ex. 18, Pike Memorandum.

The Court should reject Relator's efforts to use irrelevant assertions to recast her baseless AKS theory in order to salvage her FCA Count. The Employment Exception exists as a statement of the United States' intention to give hospitals, including Halifax, the ability to compensate their *bona fide* employee physicians without fear of AKS allegations from FCA relators.

## VI.   RELATOR'S MOTION FOR SUMMARY JUDGMENT BASED ON ALLEGED FCA VIOLATIONS PREDICATED ON ALLEGED AKS VIOLATIONS FAILS WITHOUT PROOF OF ANY AKS VIOLATIONS

As set forth above, Relator's AKS allegations are a legally deficient predicate for her FCA Count. *See* Complaint (Dkt. No. 29). Without evidence of an AKS violation, the FCA Count fails as well because there is no alternative evidence of falsity upon which Relator could rely to establish any false claims.

Relator cannot prove her FCA Count without evidence of the falsity of the claims. *See United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) ("The submission of a [false] claim is . . . the *sine qua non* of a False Claims Act violation.") (quotation and citation omitted). Here, Relator's failure to prove an underlying AKS violation moots all of her derivative FCA claims. *See United States ex rel. Osheroff v. Tenet HealthCare Corp.*, No. 09-22253-CIV-HUCK/SULLIVAN, 2013 U.S. Dist. LEXIS 44235, at *5 (S.D. Fla. Mar. 27, 2013) (noting that "because neither the Anti-Kickback Statute nor Stark arms Relator with a private right of action," such causes of action must be asserted through a derivative FCA claim dependent upon these underlying statutory violations).

Relator is, therefore, not entitled to damages under the FCA as a matter of law. *See, e.g.*, *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1051 (N.D. Ill. 2002) (declining to reach FCA liability questions in wake of finding no AKS violation); *United States ex rel. Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 852 (C.D. Ill. 2003) (holding that because Relator "failed to show any violation of either the AKS or Stark upon which a false claim could be predicated . . . his [FCA] claim is therefore without substance").

Additionally, there is no private right of enforcement of the AKS. *See, e.g.*, *United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 700 (W.D. Ky. 2008) ("As discussed in the Court's prior opinion, neither the [AKS] nor the Stark law provides for a private right of enforcement"). Standing alone, Relator's AKS allegations must also fail because the *qui tam* statute – which allows private persons to bring civil claims for violation of the FCA – does not authorize private persons to bring civil claims for violations of the AKS outside the context of the FCA.  31 U.S.C. § 3730; *see also* Complaint at 69.

## VII.   RELATOR'S MOTION FOR SUMMARY JUDGMENT REGARDING SCOPE OF DAMAGES SHOULD FAIL AS A MATTER OF LAW

### A.   Relator Is Not Entitled To Damages Because There Are No AKS Violations

Relator hinges her FCA damages claim on a "false certification" theory predicated on the existence of an actual violation of the AKS. *See* Relator's Mot. at 23-26. Because application of the Employment Exception renders Relator's AKS allegations meritless as a matter of law, Relator's FCA claim must also fail as a matter of law. This Court need not reach Relator's damages claim.

Moreover, even if this Court were to consider Relator's damages claim, it would find

Relator's reliance on *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933-T-24

EAJ, 2012 WL 4344199 (M.D. Fla. Sept. 21, 2012) misplaced. In *Freedman*, this Court

recognized that its conclusion as to damages "is based on the assumption that the

Government can also prove that had it been aware of the kickback arrangement, it would not

have paid the tainted claims." *Id.*, at *4 n.7 ("The Government has not submitted to the Court

documentation of Wasserman's agreement to comply with all applicable statutory and

regulatory requirements for reimbursement from Medicare . . . ."). Since the payments

implicated by Relator's purported damages were derived from the *bona fide*

employer-employee relationship between Halifax Hospital and the Medical Oncologists,

there is no evidence in the record that the United States would have withheld payments to

Halifax.

This case is also distinguishable from *United States ex rel. McNutt v. Haleyville Med.*

*Supplies, Inc.*, a case in which the United States intervened on a relator's allegations that

kickbacks were paid to induce referrals for various services. 423 F.3d 1256, 1258-59 (11th

Cir. 2005). As such, Relator's claim for damages under the FCA must fail.

B.    Relator Has Not Identified Any False Claims At Issue For Purposes Of Her
       AKS-Derived FCA Count

While the applicability of the Employment Exception precludes the possibility of any

AKS-related false claims, the Court should take note of Relator's attempt, mirrored by the

United States in the Stark Law portion of this case, to sidestep responsibility for putting forth

credible evidence of damages. Relator does not mask the fact that she has done nothing to

identify false claims at issue for her AKS-derived FCA damages. Relator has not identified

any damages expert of her own and, instead, purports to rely on Halifax's own expert, Donald Moran. *See* Relator's Mot. at 12-13, 26-28. While Mr. Moran analyzed the United States' claims summary created by its claims summary expert Ian Dew, Mr. Moran did so only for purposes of the United States' Stark Law allegations, not the AKS.

Relator also relies on *United States v. Rogan*, a case with allegations of conspiracy to defraud, in which the Seventh Circuit held that the damage calculation was dependent on whether the United States would have provided payment had it known about the conspiracy. 517 F. 3d 449, 453 (7th Cir. 2008) ("When the conditions are not satisfied, nothing is due."). Whether the United States would have made payment for alleged false claims is an entirely different question from actually identifying the claims at issue. Relator has taken no steps to identify any claims tainted by kickbacks.

C.      Relator's Enforcement Of FCA Civil Penalty Claims Violates The
        Appointments Clause Of Article II Of The United States Constitution

In regard to Relator's claims for civil penalties under the FCA, Relator's effort to enforce the FCA's civil penalties provisions constitutes a violation of the United States Constitution and should be denied. The Appointments Clause of Article II requires that the President appoint, "by and with the Advice and Consent of the Senate . . . Officers of the United States," but that "Congress may by law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. The Appointments Clause is "among the significant structural safeguards of the constitutional scheme," and supports the separation of powers by "prevent[ing] congressional encroachment upon the Executive and Judicial Branches." *Edmond v. United States*, 520 U.S. 651, 659 (1997).

In *Buckley v. Valeo*, the Supreme Court held that the Federal Election Campaign Act of 1974 violated the Appointments Clause because the Act vested "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights" in persons (members of the Federal Election Commission) appointed by Congress. 424 U.S. 1, 140 (1976). The Supreme Court explained that "[s]uch functions may be discharged only by persons who are 'Officers of the United States' within the language of that section." *Id.* (emphasis added).

The FCA's civil penalty mechanism, like the Federal Election Campaign Act of 1974's civil enforcement mechanism,[6] is indisputably a mechanism for vindicating public rights. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 51 & n.8 (1989) (public rights "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments"). Therefore, to the extent that the FCA deputizes private citizens, such as Relator, with responsibility for conducting civil litigation for the purpose of vindicating public rights, the FCA violates the Appointments Clause.

Four circuits—though not the Eleventh Circuit—have reached the contrary conclusion, holding that the Appointments Clause requires compliance with its strictures only for the appointment of *officeholders*, and does not prevent Congress from vesting Executive functions in private parties. *See, e.g.*, *United States ex rel. Stone v. Rockwell Int'l Corp.*, 282

---

[6] Section 437d(a)(6) of the 1974 Act authorized the Federal Election Commission "to initiate (through civil proceedings for injunctive, declaratory, or other appropriate relief) . . . any civil action in the name of the Commission for the purpose of enforcing the provisions of this Act." *Buckley*, 424 U.S. at 166.

F.3d 787, 805 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757 (5th

Cir. 2001) (en banc); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d

1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 n.21

(9th Cir. 1993). These holdings should not deter this Court's analysis of the issue.

With due respect to those Courts of Appeals, their focus on whether a person

exercising executive authority possesses the trappings of formal office trivializes the

Appointments Clause, elevating form (office) over separation of powers substance (function)

and reducing the Clause "as merely dealing with etiquette or protocol." *Buckley*, 424 U.S. at

125. *Buckley*'s holding emphatically turns not on the trappings of office, but on the functions

exercised by the person: "We hold that these provisions of the Act, vesting in the

Commission primary responsibility for conducting civil litigation in the courts of the United

States for vindicating public rights, violate Art. II, § 2, cl. 2 of the Constitution. Such

functions may be discharged only by persons who are 'Officers of the United States' . . . ."

424 U.S. at 140 (emphasis added); *see also id.* at 137 (stating that "the ultimate question is

which, if any, of those powers may be exercised by the present voting members of the

Commission, none of whom *was* appointed as provided by that Clause") (emphasis in

original).[7]

---

[7] Under the reasoning of the Fifth, Sixth, Ninth, and Tenth Circuits, the statute struck down in *Buckley* could have been upheld if the civil law enforcement function had been delegated to wholly private parties, rather than commissioners holding office. Indeed, under that logic, the Appointments Clause would pose no obstacle to Congress vesting the full authority of the Attorney General of the United States in a private person chosen by Congress, without the necessity for Presidential appointment. That cannot be right, because the Appointments Clause prevents "congressional encroachment upon the Executive and Judicial Branches." *Edmond*, 520 U.S. at 659. Because *Buckley* holds that the function of prosecuting civil

(continued…)

This understanding of *Buckley* is buttressed by the Supreme Court's more recent analysis of the Appointments Clause in *Morrison v. Olson*, 487 U.S. 654 (1988), which involved an Article II challenge to the now-repealed independent counsel provisions of the Ethics in Government Act of 1978, 28 U.S.C. §§ 49, 591 *et seq*. In *Morrison*, the Supreme Court recognized that an independent counsel vested with prosecutorial authority is "an 'officer' of the United States" and not a mere employee, 487 U.S. at 671 n.12 (citing *Buckley*, 424 U.S. at 126), because she "exercis[es] significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126; *see also Morrison*, 487 U.S. at 673 (comparing the independent counsel's function to that of United States commissioners, inferior officers with the power "to institute prosecutions under 'laws relating to the elective franchise and civil rights'").

It was precisely because the independent counsel had the *function* of exercising significant law enforcement authority that her appointment was required to conform with the Appointments Clause. At issue in *Morrison* was whether the independent counsel was a principal officer, requiring Presidential appointment and confirmation by the Senate, or an inferior officer, who may be appointed "by the President alone, by the heads of departments, or by the Judiciary." 487 U.S. at 670. Ultimately, the Supreme Court held that she was an inferior officer, and thus her appointment by an Article III court complied with the Appointments Clause. *See id.* at 670-73. But it was the independent counsel's *function* that triggered application of the Appointments Clause, and had the independent counsel statute

litigation to vindicate public rights is a function that can be exercised only by persons appointed in compliance with the Appointments Clause, the FCA is unconstitutional to the extent that it permits private relators to enforce its civil penalty mechanism.

vested that function in a person appointed by Congress, as in *Buckley*, or in a self-appointed private party, as the FCA allows here, it would have violated the Appointments Clause.

Finally, even if the trappings of office are relevant to whether the FCA's delegation of law enforcement to self-appointed private parties comports with the Appointments Clause, *cf. United States v. Hartwell*, 73 U.S. 385, 393 (1868) (noting the term office "embraces the ideas of tenure, duration, emolument, and duties"), an FCA relator shares most if not all of the trappings of office possessed by an independent counsel, the inferior officer at issue in *Morrison*.

Like the independent counsel, a relator indisputably has prosecutorial *duties*. Like the independent counsel, a relator receives "emolument" from the Government, albeit through sharing in any recovery rather than by salary. Like the independent counsel, a relator is "limited in tenure" and "'temporary' in the sense that [the appointment] is essentially to accomplish a single task." *Morrison*, 487 U.S. at 672. Unlike other prosecutors, but like an independent counsel, a relator "has no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed . . . to undertake." *Id.* "These factors relating to the 'ideas of tenure, duration . . . and duties'" of a relator "are sufficient to establish" that a relator, like an independent counsel, has the attributes of "an 'inferior' officer in the constitutional sense." *Id.* (citing *United States v. Germaine*, 99 U.S. 508, 511 (1878)). But unlike the independent counsel at issue in *Morrison*, who received her

appointment from an Article III court and, therefore, in conformity with the Appointments Clause, FCA relators are self-appointed, in violation of the Appointments Clause.[8]

For these reasons, this Court should deny the Relator's motion for partial summary judgment as to the Relator's unintervened claims for FCA civil penalties.

      D.     The Damages Sought By Relator Are Excessive And Violate The Excessive Fines And Due Process Clauses Of The United States Constitution

Halifax adopts and incorporates here the arguments set forth and authorities cited in Halifax's Response to United States' Motion for Partial Summary Judgment (Dkt. No. 313).

## VIII. RELATOR'S MOTION FOR SUMMARY JUDGMENT REGARDING HALIFAX'S AFFIRMATIVE DEFENSES FAILS AS A MATTER OF LAW

Relator's Motion relating to Halifax's affirmative defenses should be dismissed for several reasons. First, the proper challenge to the adequacy of Halifax's pleading of affirmative defenses would have been a motion to strike filed under Federal Rule of Civil Procedure 12(f). Relator claims in her Motion that Halifax failed to comply with pleading requirements in asserting its affirmative defenses, stating that "Defendants have produced no evidence or information to support any of their nine specific affirmative defenses" thereby entitling Relator to summary judgment. Relator's Mot. at 29. Relator's request is untimely since a Rule 12(f) motion to strike had to have been filed "within 21 days after being served" with Halifax's Answer. Fed. R. Civ. P. 12(a)(1)(A)(i).

---

[8] In deciding whether the FCA violates the Appointments Clause by investing authority in private relators to seek civil penalties, this Court need not reach the question whether the FCA's assignment of the government's proprietary damages claim also violates the Appointments Clause.

Second, even as a motion for summary judgment, Relator's claim fails because Halifax's affirmative defenses meet the pleading requirements of Federal Rule of Civil Procedure 8. Under Rule 8, an affirmative defense need only receive a short and plain statement of the defense being asserted that will give the plaintiff fair notice of the defense. *See, e.g.*, *Blonder-Tongue Labs, Inc. v. Univ of Ill. Found.*, 402 U.S. 313, 350 (1971); *Navarro v. Santos Furniture Custom Design, Inc.*, 372 Fed. App'x. 24, 27 (11th Cir. 2010) ("[T]his Court has noted that 'the purpose of Rule 8(c) is to give the opposing party notice of the affirmative defenses and a chance to rebut it.'") (quoting *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989)). In *Blonder-Tongue Labs*, the Supreme Court explained that the "purpose of such pleading [an affirmative defense] is to give the opposing party notice of the [defense] and a chance to argue, if he can, why the imposition of [the defense] would be inappropriate." 402 U.S. at 350; *see also* 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1274, at 455-56 (1990) ("An affirmative defense may be pleaded in general terms and will be held to be sufficient, and therefore invulnerable to a motion to strike, as long as it gives plaintiff fair notice of the nature of the defense."). Accordingly, the sufficiency of pleading an affirmative defense is determined by whether Relator received fair notice of Halifax's defenses. There is no question that Relator received fair notice of Halifax's affirmative defenses as part of the Answer served.

Lastly, as discussed below, Relator has failed to demonstrate an absence of genuine issues of material facts regarding any of Halifax's affirmative defenses. Relator's Motion repeatedly misapplies case law and attempts to extend the privileges afforded to Government parties to herself. *See* Relator's Mot. at 31-37.

A.    Failure To State A Claim

Halifax properly raised the affirmative defense that Relator has failed to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required."). As discussed above, Relator's AKS claim fails as a matter of law because the Medical Oncologists' contracts are protected by the Employment Exception. Relator has failed to establish that she is entitled to judgment as a matter of law.

B.    Estoppel Is A Defense Against A Relator In An FCA Case

Relator misapplies the law by asserting that the "the affirmative defense of estoppel is not available to a defendant in an FCA case." Relator's Mot. at 31. In fact, every case cited by Relator states that "[e]stoppel is generally not available as a defense against the *government*." *United States v. Cushman & Wakefield, Inc.*, 275 F. Supp. 2d 763, 768 (N.D. Tex. 2002) (emphasis added); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 434 (1990) (noting the Supreme Court "has never upheld an assertion of estoppel *against the Government* by a claimant seeking public funds.") (emphasis added); *Freedman*, 2012 WL 4344199, at *6  ("[T]he Court agrees with the Government and concludes that equitable estoppel is not an available affirmative defense in this case."); *United States v. Manhattan-Westchester Med. Servs., P.C.*, No. 06 Civ. 7905, 2008 WL 241079, at *3 (S.D.N.Y. Jan. 28, 2008) (striking estoppel affirmative defense raised against Government).

Relator has failed to cite to any case law that supports her position that estoppel is unavailable as an affirmative defense against a relator. *See* Relator's Mot. at 31-32. In *Freedman*, this Court specifically recognized this distinction between Government and

27

private litigants, stating "equitable estoppel will not lie against the Government *as it lies against private litigants.*" *Freedman*, 2012 WL 4344199, at *6 (quoting *Richmond*, 496 U.S. at 416) (emphasis added). Relator also cites to *United States ex rel. Spay v. CVS Caremark Corp.*, No. 09-4672, 2013 WL 1755214, at *10 (E.D. Pa. Apr. 24, 2013), in which the court refused to strike the estoppel affirmative defense where "there are a set of inferable circumstances under which Defendants could potentially succeed."

 C. <u>Waiver</u>

Relator relies on *Spay* and *Cushman* in support of her claim that the affirmative defense of waiver is unavailable in an FCA case. Relator's Mot. at 32. However, *Spay* and *Cushman* held that "the unauthorized statements of United States agents may not serve to waive the *Government's claims.*" *Spay*, 2013 WL 1755214, at *11 (emphasis added); *Cushman*, 275 F. Supp. 2d at 771 ("A violation of the rights of the United States may not be waived or ratified by the unauthorized acts of its agents."). Here, the United States chose not to intervene in Relator's AKS allegations as to any physician arrangements identified in her Complaint. Relator has failed to cite to any case law which states that the affirmative defense of waiver is unavailable in a non-intervened *qui tam* case.

 D. <u>Good Faith</u>

Relator's Motion acknowledges that "[c]ourts have recognized a good-faith defense to claims pursuant under AKS and FCA." Relator's Mot. at 33. To violate the AKS, a criminal statute, the alleged act must have been "committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *Starks*, 157 F.3d at 838. If the alleged act was undertaken

without any such bad purpose or illegal motive, however, an actor can avail itself of the good faith defense. *See United States v. Jain*, 93 F.3d 436, 440 (8th Cir. 1996) (endorsing "good faith" defense instruction wherein trial court explained that "Dr. Jain acted in good faith if he believed he was being paid for promoting North Hills, not for referring patients").

Halifax has shown sufficient evidence to avoid summary judgment regarding its good faith. *See, e.g.*, Ex. 4, Peburn Dep., at 198:19-200:8 (stating, on behalf of Halifax, that the Medical Oncologists' operating margin bonuses were created to recruit and retain medical oncologists based upon their "personally performed work"); 204:21-22 (noting that this bonus "distribution was based on [the medical oncologists'] professional services performed"). Relator's effort to distort and misrepresent the testimony of Drs. Durkin and Weiss in advance of her argument on this point should not be accepted by the Court. Relator's Mot. at 33-34; *see supra* pp. 5-6. Additionally, even if accepted, any such arguments are misplaced in the context of summary judgment because "[w]here intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952).

Even if this Court were to reach Relator's argument, however, it would find Relator once again misapplies the law in her analysis of the good faith defense. Relying on *Swigart v. Fifth Third Bank*, Relator states that Halifax must meet a three-part test "to establish a good faith affirmative defense." Relator's Mot. at 34. However, *Swigart* is not an FCA or an AKS case. In *Swigart,* the court applied the statutory good faith test provided in Section 259 of the Fair Labor Standards Act. 870 F. Supp. 2d 500, 509 (S.D. Ohio 2012) ("To establish a good faith affirmative defense under Section 259, an employer must show that it acted in: (1)

reliance on; and (2) conformity with a WHD regulation, Opinion Letter, or Administrator's Interpretation; and (3) in good faith.") (citing 29 U.S.C. § 259(a)). Neither the FCA nor the AKS requires such an analysis of the good faith defense. In fact, Relator also cites to *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.*, which explicitly states that "[c]ourts *do, however, recognize a good-faith defense* to claims pursued under the AKS and FCA." 565 F. Supp. 2d 153, 167 (D.D.C. 2008) (emphasis added).

      E.    <u>Fraud With Particularity</u>

Relator argues that she is entitled to summary judgment on Halifax's fraud with particularity affirmative defense because "Defendants argued this affirmative defense in their Motion to Dismiss, which the Court denied." Relator's Mot. at 36. Through this bare-bones assertion, Relator solely disputes the legal sufficiency of this affirmative defense – not its relative merits or any disputed factual issues therein. This argument more properly belongs in a motion to strike rather than a motion for summary judgment. *See Vance v. Westfalia Techs., Inc.*, No. 8:12-cv-1902-EAK-TGW, 2013 U.S. Dist. LEXIS 90159, at *6 (M.D. Fla. June 26, 2013) (reiterating that a motion to strike determines whether an affirmative defense is 'insufficient as a matter of law'"); *Smith v. Wal-Mart Stores*, No. 1:11-cv-226-MP-GRJ, 2012 U.S. Dist. LEXIS 87347, at *8 (N.D. Fla. June 25, 2012) (finding that under a motion to strike, a court only "evaluates the legal sufficiency of affirmative defenses," whereas "[m]otions for summary judgment are a more appropriate mechanism for contesting the merits of affirmative defenses"). Because Relator's challenge arises well more than twenty-one days after she was served with Halifax's Answer, any such motion to strike is procedurally barred. *See* Fed. R. Civ. P. 12(f)(2) (requiring that a party file such motion

"within 21 days after being served with the pleading"). Her assertion should therefore fail as a matter of law.

Even if Relator's assertion were not procedurally barred, Rule 9(b)'s particularized pleading requirement applies to claims arising under the FCA and requires Relator to allege "'facts as to time, place, and substance of the defendant's alleged fraud', [and] 'the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.'" *United States ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1310 (11th Cir. 2002) (quoting *Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562, 566-68 (11th Cir. 1994) (per curiam)). Relator does not meet the requirements of Rule 9(b) by describing a generalized scheme to commit health care fraud, even if certain details of the scheme are described with particularity. *See id.* at 1311 (holding that Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.").

Relator's claims are not only barred by the Employment Exception, but Relator has failed to identify specific false claims of fraud as they relate to the Medical Oncologists.

F.    Unclean Hands

Relator's claim that the affirmative defense of unclean hands fails as a matter of law is yet another example of Relator attempting to extend the privileges afforded to the Government to herself. *See, e.g.*, *Manhattan-Westchester Med. Servs., P.C.*, 2008 WL 241079, at *4 ("The affirmative defense[] of . . . unclean hands [is] unavailable against the *Government*.") (emphasis added); *Cushman*, 275 F. Supp. 2d at 773-74 (recognizing that the

unclean hands defense "is unavailable against the government"); *SEC v. Follick*, No. 00 Civ. 4385KMWGWG, 2002 WL 31833868, at *8 (S.D.N.Y. Dec. 18, 2002) ("[T]he doctrine of unclean hands may not be invoked against a governmental agency which is attempting to enforce a congressional mandate in the public interest.") (internal quotations omitted).

Relator's reliance on *Hernandez, Kroone & Assoc., Inc. v. United States*, 95 Fed. Cl. 395, 398 (Fed. Cl. 2010) is further misleading. Relator's only support that the unclean hands doctrine is unavailable against her is a quote from the ruling in *Hernandez*, which states that "the defense (of unclean hands) may never be asserted against the government or private parties in suits to vindicate the public interest." Relator's Mot. at 36-37. This, however, was not the rule the court adopted but rather the rule proposed by the Government in its argument. *Hernandez*, 95 Fed. Cl. at 398. The court in *Hernandez* declined to adopt the Government's proposed inclusion of "private parties" (like relators), instead holding that the "cited authority precludes unclean hands as an affirmative defense against the *government* in the fraud counterclaims." *Id.* at 399 (emphasis added).

G.    Public Disclosure

Relator renewed her argument that she is entitled to summary judgment on Halifax's public disclosure affirmative defense because "Defendants argued this affirmative defense in their Motion to Dismiss, which the Court denied." Relator's Mot. at 37. Relator is not entitled to summary judgment simply because Halifax's Motion to Dismiss (Dkt. No. 46) was denied. Relator must still prove that there is no genuine issue of material fact regarding the question of whether her claim fails under the FCA public disclosure bar.

Under the public disclosure bar, the Court should not entertain claims that were based on publically disclosed information in which the Relator was not the original source of the information. *See Battle v. Bd. of Regents*, 468 F.3d 755, 762 (11th Cir. 2006); *United States ex rel. Brown v. Walt Disney World Co.*, 361 Fed. App'x 66, 68 (11th Cir. 2010) (noting that "[t]he FCA precludes suits based in any part on public disclosed information" unless the relator is the original source). Relator's short stay admission allegations were publicly disclosed in the 2008 public statements about the short stay medical necessity allegations in the kyphoplasty *qui tam* case, and Relator was aware of these statements prior to filing her initial complaint in June 2009. *See, e.g.*, Ex. 19, Federal Investigators Will Visit Indiana Hospitals, Post-Tribune, Aug. 31, 2008; HealthEast Reaches Settlement on Kyphoplasty Billing Investigation, Marketwire, May 21, 2009; Ex. 20, Oct. 2, 2008, Email from George Rousis to Elin Baklid-Kunz Re: DOJ Kyphoplasty investigation. Relator has failed to establish sufficient facts to prove that she is the original source of this information.

### H.   Limitation On Damages

Relator cites no legal basis for an award of summary judgment striking Halifax's affirmative defense that damages should be limited. Without determining whether Relator will succeed on her claims, the Court should not make a premature ruling on this defense.

### I.   Attorney's Fees

Relator cites no valid basis for an award of summary judgment striking Halifax's affirmative defense that attorney's fees would be precluded. The Court should not yet make a ruling on this defense at this stage in the case.

J.    No Further Affirmative Defenses

Relator's motion to strike Halifax's right to assert additional affirmative defenses "is unnecessary and serves only to waste this Court's limited resources." *Centex Homes v. Mr. Stucco, Inc.*, No. 8:07-CV-365-T-27MSS, 2008 WL 793587, at *2 (M.D. Fla. Mar. 25, 2008) (denying the motion to strike reservation to plead additional affirmative defenses). "It is not necessary to strike the reservation of rights" where "its presence does not prejudice [Relator] in any way or somehow confer a right to amend on Defendant[] without the Court's approval." *Ramnarine v. CP RE Holdco 2009-1, LLC*, No. 12-61716-CIV, 2013 WL 1788503, at *6 (S.D. Fla. Apr. 26, 2013). Accordingly, the Court should deny this motion.

**IX.    CONCLUSION**

For the foregoing reasons, Halifax respectfully requests that the Court deny Relator's Motion in its entirety.

Dated: July 3, 2013                                    Respectfully submitted,

T. Reed Stephens (admitted *pro hac vice*)          s/ Amandeep S. Sidhu
David O. Crump (admitted *pro hac vice*)             Anthony N. Upshaw
Amy H. Kearbey (admitted *pro hac vice*)             Fla. Bar. No. 0861091
Amandeep S. Sidhu (admitted *pro hac vice*)          MCDERMOTT WILL & EMERY LLP
Emre N. Ilter (admitted *pro hac vice*)              333 Avenue of the Americas
Brandon H. Barnes (admitted *pro hac vice*)          Suite 4500
MCDERMOTT WILL & EMERY LLP                           Miami, FL 33131
The McDermott Building                               Tel: (305) 358-3500
500 North Capitol Street NW                          Fax: (305) 347-6500
Washington, DC 20001                                 Email: aupshaw@mwe.com
Tel: (202) 756-8000
Fax: (202) 756-8087
Email: trstephens@mwe.com

*Counsel to Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Florida using the CM/ECF system on July 3, 2013.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


<u>s/ Amandeep S. Sidhu</u>
Amandeep S. Sidhu