**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*, and ELIN BAKLID-KUNZ, Relator | ) ) ) |
| Plaintiffs | ) ) CASE NO.: 6:09-CV-1002-ORL-31TBS |
| v. | ) ) JUDGE GREGORY A. PRESNELL |
| HALIFAX HOSPITAL MEDICAL CENTER, et ano., | ) ) [FALSE CLAIMS ACT – QUI TAM] ) |
| Defendants | ) ) ) |

**DEFENDANTS' CORRECTED RESPONSE TO UNITED STATES'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.      PRELIMINARY STATEMENT**

This action encompasses three different subjects:  (1) certain employment contracts between Halifax and its full time medical oncologists; (2) other employment contracts between Halifax and its full time neurosurgeons; and (3) various other issues raised by the Relator.  The United States intervened only on with respect to the oncology and neurosurgery employment contracts, and only to extent that those claims were premised upon asserted violations of the Stark Law, 42 U.S.C. § 1395nn. The United States declined to intervene on any other claims, leaving the Relator to prosecute employment related claim premised upon asserted violations of the Anti-Kickback Statute as well as the other claims raised by Relator.

Halifax has moved for summary judgment on all claims—by the United States (D.E. 277) and by the Relator (D.E. 279).  The United States and the Relator have moved for partial summary judgment on their own claims, but only with respect to the oncology contracts (D.E.

272 and 274, respectively).  This brief responds only to the United States' Motion for Partial Summary Judgment.  Halifax responds separately to the Relator's motion.

Because the oncology contracts did not violate Stark, and because, in any event, the undisputed facts support Halifax's good faith efforts to comply, negating any FCA-required knowledge, the United States' Motion for Partial Summary Judgment should be denied.  It is Halifax which should be granted summary judgment on the oncology claims on the undisputed facts of this record.[1]

## II.   <u>MATERIAL UNDISPUTED FACTS</u>

Halifax is a public taxing district providing medical care to the citizens of Volusia County regardless of their ability to pay. 2003-374 Laws of Florida; Halifax Health Community Benefits Factsheet (Ex. 1).  Any citizen diagnosed with cancer can obtain treatment, including chemotherapy, whether or not they can afford it – services made possible only through the oncologists employed by Halifax in its Oncology Center and the taxpayers of Volusia County. Cason Dep. (11/20/12) at 53:13-57:24, 71:20-81 & 108-11; Peburn 30(b)(6) Dep. at 198:4-201:16; Davidson Dep. (6/7/13) at 134:6-21, 138:10-139; Durkin Dep. at 43-44.[2]  Halifax's oncologists during the time period identified by the United States included Drs. Chew, Deveras, Durkin, Favis, Sorathia, and Weiss.  Halifax billed Medicare for oncology services to Medicare-eligible patients, and Halifax was paid for the medical care it provided to them.

It is undisputed that over four fiscal years, 2005-2008, the oncologists received, as part of their employment compensation, a relatively small incremental bonus, paid from a pool of funds

---

[1] The United States and Relator both seek summary judgment on Halifax's affirmative defenses. Because they raise the same arguments, Halifax adopts and incorporates its response to the Relator's motion for partial summary judgment here.  Similarly, because several arguments are common to both motions, other Halifax arguments are incorporated herein to avoid repetition.

[2] Composite Exhibit 11 contains the excerpts from the deposition transcripts referenced herein. The depositions are listed in alphabetical order.

that included fees for services related to the administration of chemotherapy, *i.e.* services that were not personally performed by the oncologists.  However, it is undisputed the bonuses paid from that pool were divided among the oncologists based solely upon their own personally performed services.[3]  Cason Dep. (11/20/12) at 108-110; Peburn 30(b)(6) Dep. at 199-201:21 & 228:1-229:11; Garthwaite Dep. (2/19/13) at 228; Davidson Dep. (6/7/13) at 133-79.

The total bonus pool averaged approximately $250,000 per year, divided among the oncologists based upon their individual work performed that year.  The total amount funded, for all six doctors, over the four-year period was just over $1,000.000.[4]  There is no challenge of any kind to oncologists' contracts after FY2008, when the funding of the incentive bonus was changed from an average of $250,000 per year to a fixed $275,000 per year. Garthwaite Dep. (5/1/12) at 72:10-13.

There is no dispute that the oncologists' total compensation during the four-year period from 2005-2008 was at fair market value and commercially reasonable.  Expert Report of Kevin O'Brien (Ex. 2); Peburn 30(b)(6) Dep. at 73:6-84:11 & 104:9-113:12.  Nor is there any dispute that the bonus provision in the challenged contracts was approved by Halifax General Counsel David Davidson based upon his knowledge of the Stark Law and his opinion that the contracts

---

[3] The United States mistakenly claims that this incentive was paid in the fiscal year 2009. Although the last of the challenged incentive payments was made in March of 2009, they were from the bonus pool for the 2008 fiscal year.  Garthwaite Dep. (5/1/12) at 72:10-13.  Thus, the United States' claims related to the oncologists are limited to the fiscal years 2005 through 2008. Because Halifax's fiscal year runs from October 1 through September 30, the year dates used here denote contract periods ending in those years.  Accordingly, based on its allegations, the United States' alleged damages should be cut off at September 30, 2008, not February 28, 2009 as asserted by the United States.  Moreover, since Dr. Deveras did not receive an incentive bonus in FY2005, there should be no damages for her in FY 2005, as a matter of law.

[4] A table of these payments is set out in Relator's pending motion.  (D.E. 274 at 8).

with this provision were Stark compliant.[5]  Davidson Dep. (6/7/13) at 133-79, 197-202; Peburn

Dep. 30(b)(6) at 201:22-202:2.

Relator raised concerns regarding the oncology incentive bonus in October 2008; and

Associate General Counsel Audrey Pike shared those concerns in a memorandum to General

Counsel Davidson on November 10, 2008 (Ex. 3).[6]  On the same day that Davidson received the

Pike memorandum, he sent an e-mail to Ira Coleman a Miami-based partner of McDermott, Will

& Emery, one of the foremost healthcare law firms in the United States, asking for an

independent opinion whether the subject contract provision was or was not "OK."  Davidson

November 2008 Email to Coleman (Ex. 4).   Coleman introduced Davidson to McDermott

partner and Stark expert Daniel Melvin.  *Id.*  Davidson had Pike work with Melvin to supply him

with all of the information requested by the firm to complete its investigation and review,

culminating in a February 2009 memorandum concluding:

> [W]e believe there is a reasonable argument that the Contingent
> Bonus qualifies for the Stark employment exception.

Davidson Dep. (6/7/13) at 181-213, 220:12-241:15; Pike Dep. (2/25/13) at 133:18-137:16; Pike

Dep. (5/20/13) at 164-216:17, 232:12-236:9, 246:13-247:20 & 275-295:3; McDermott Memo

2/9/09 (Ex. 5).

It is undisputed that, in February and March 2009, Davidson advised Halifax that it was

permissible to pay out a bonus for 2008 based on McDermott's advice.  Davidson Dep. (6/7/13)

---

[5] There were separate contracts entered into with each of the oncologists for each of the subject years, all with the identical bonus provision, beginning with the contracts for fiscal year 2005. Davidson prepared and signed off on each, in all instances determining that they were Stark compliant. Davidson Dep. (6/7/13) at 114-79.

[6] When questioned about this memorandum in her deposition, Pike, now employed at a hospital in Georgia, candidly testified that her memorandum was based upon a "first-time review of an incredibly complicated law," that she "did the best I could," but that "it's very apparent that I did not go through Stark analysis the way that someone who has quite a bit of knowledge in it should."  Pike Dep. (5/20/13) at 196-97.

at 242-259; Davidson February 2009 Email (Ex. 6); Davidson March 2009 Email (Ex. 7). Davidson's advice was provided in two email communications to Tom Garthwaite, the Director of the oncology program, which stated:

> After discussing the situation with outside counsel, we are OK with paying the oncologists their 'margin-based' bonus just as we have in the past. . . . I am OK treating 2008 the same we have in the past; . . .

> and

> We have a memo on the process already. Audrey and I also spoke to the lawyers who drafted the memo, and confirmed that payment of the incentive would be fine. Please let me know if you need more.

(Exs. 6 & 7). Pike testified that she accepted McDermott's analysis and conveyed the authorization of payment of the 2008 bonus accordingly. Pike Dep. (5/20/13) at 164-216:17, 232:12-236:9, 246:13-247:20 & 275-295:3; Pike Dep. (2/25/13) at 133:18-137:16.

As for the future, Davidson counseled changing the contracts in an abundance of caution ("I recommend that we come up with something different for future years, . . ."), not because of any lack of conviction in the propriety of the prior years' treatment, but solely to avoid any unnecessary future controversy.[7]   Davidson Dep. (6/7/13) at 244-59; Peburn Dep. 30(b)(6) at 226:22-227:24.

These undisputed facts notwithstanding, the United States is asking this Court:

> (1) to penalize Halifax by requiring it to forfeit 100% of the payments received for all oncology services rendered over four years, totaling some $34 million, because it

---

[7] In the Government's Motion for Partial Summary Judgment, it informed the Court about the conclusion in Ms. Pike's November 10, 2008 memorandum (D.E. 272 at p. 1), but said nothing of her immediately ensuing involvement in the further consideration of the issue by the outside lawyer Stark experts at McDermott, said nothing about her having changed position and instructed the funding of the bonus in early 2009 in reliance upon the McDermott analysis and advice, said nothing about the corresponding advice of General Counsel Davidson in early 2009, and said nothing about Ms. Pike's later testimony explaining the circumstances of and insufficiency of her own analysis in 2008 with which the United States begins its brief.

does not like the way in which the approximately $250,000 annual bonus funding was calculated over the period (but not the bonus amount), based upon its conflicting interpretation of Stark;

(2) to further penalize Halifax by seeking treble damages under the False Claims Act, to bring the $34 million to a total of $102 million, although the undisputed evidence demonstrates not only a lack of intent, but an affirmative compliance effort, by Halifax's seeking internal legal advice from its general counsel, and when later questioned, from outside counsel, to confirm that its prior legal conclusions were justified; and

(3) to yet further penalize Halifax by seeking another $250-$500 million in penalties for claims submitted by Halifax for the medical services it provided ("$5,500 to $11,000 for each of the 45,442 claims") (D.E. 272, p. 40).

The United States thus seeks total damages of up to $602 million, for "false claims" -- where the claims were undisputedly for medically necessary services, actually performed, based upon a dispute not about the claims themselves but the accompanying certification, and then, over a bona fide disagreement over the highly technical and obscure language of a complex statutory Stark Law exception.  Such a judgment, unjustifiable and grossly punitive, would threaten destruction of a great public hospital and Level II Trauma Center, denying the citizens of Volusia County access to healthcare.[8]

---

[8] Halifax disputes the following assertions in the United States' statement of undisputed facts.  In paragraph 10, the United States asserts that "Halifax undertook no steps to ensure compliance with the requirements of the Medicare Program."  This is not accurate.  The undisputed facts show that Halifax had a Compliance Department and an active Compliance Committee and contract review process.  Rousis Dep. (10/31/12) at 9:17-11:16; Lewis Dep. (3/19/13) at 298:20-298:25; 315:7-316:2;  Peburn 30(b)(6) Dep. at 63:16-64:6, 73:6-84:11 & 104:9-113:12.  The United States cites to information circulated by the Chief Compliance Officer in its motion for summary judgment.  Furthermore, as it relates to the oncologists, the undisputed facts show that the General Counsel reviewed the oncology incentive prior to its implementation and sought an outside opinion when his analysis was questioned in late 2008.  Davidson Dep. (6/7/13) at 133-79, 181-213, 220-59.  For the same reasons, the United States assertions in paragraphs 50-53 are inaccurate because the United States refused to consider all of the record evidence.  Halifax disputes the United States characterizations of the claims forms and related manuals, the plain language of which speak for themselves.  Halifax disputes the United States characterization of Joni Rahn deposition testimony in paragraphs 16-18, 21.  Joni Rahn did not testify that the claim form constitutes referrals for the purposes of the Stark Law, and she was not competent to make that determination since it is a question of law.  Rahn Dep. at 80.  The United States also misstates the testimony of George Rousis and, Dr. Sorathia and Dr. Weiss in paragraphs 24 and

## III.    LEGAL ARGUMENTS

The United States' claims based upon the oncology contracts fail as a matter of law. 1) There are no false claims, because the oncology incentive complied with the Stark Law; 2) there is no evidence of knowledge, as required by the FCA; and 3) there is insufficient evidence of damages under the FCA, absent proof of referrals by the oncologists as required to show damages under the FCA for a violation of the Stark Law.   Furthermore, the penalties sought by the United States are excessive and violate the United States Constitution.

### A.  FCA Standard and Stark Law

To establish a claim under the FCA, the United States must prove three elements: "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 Fed. Appx. 893, 894 (11th Cir. 2008). In order to establish claim based on a false certification, the United States must also show that "that (1) the defendant made a false record or statement for the purpose of getting a false claim

---

30.  None of these witnesses testified that an oncologist made a referral in any specific case; they merely generally testified that a physician may write orders as part of treating patients at Halifax. Rousis Dep. (11/1/12) at 240:9-240:23; Sorathia Dep. at 20:4-21:23; and Weiss Dep. at 98:11-101:20.  We would object on the same basis to the extent paragraph 31 assert anything more than a general observation.  The only way to determine if a referral was made or a plan of care was prepared by an oncologist is to review the medical record.  Sandlin 30(b)(6) Dep. at 153:19-24. It is undisputed that the United States has not reviewed the medical records for any of the claims at issue in this case.  In paragraph 40, the United States also mischaracterizes a memorandum prepared by the Chief Compliance Officer.  The Chief Compliance Officer did not provide legal advice regarding the Stark Law.  The undisputed facts show that Halifax received legal advice from the General Counsel and outside counsel.  Finally, in paragraph 40, the United States asserts that the incentive based on operating margin was paid in the fiscal year 2009.  This is not accurate.  Halifax only paid an incentive based on operating margin from fiscal years 2005 to 2008.  Garthwaite Dep. (5/1/12) at 72:10-72:13.  Even though the last incentive payment was made in March of 2009, the payment was for the 2008 fiscal year.  Accordingly, The United States claims should be limited to the fiscal years of 2005 through 2008, and Halifax is entitled to summary judgment in its favor as matter of law as to any other years identified in the United States Complaint in Intervention or damages requested for claims submitted after September 30, 2008.

paid or approved by the government; and (2) the defendant's false record or statements caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009). In order to prove a reverse false certification claim the United States must prove: "(1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant made, used or caused to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation." *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012) (citing *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008)). [9]

The United States' complaint focuses on the Stark Law, a complex and technical statute that regulates financial relationships between physicians and other healthcare providers such as hospitals. The Stark Law contains a two-part prohibition: (i) a physician may not make a referral to an entity for the furnishing of designated health services ("DHS") if the physician has a "financial relationship" with the entity; and (ii) an entity may not submit a claim to Medicare or bill any party for DHS furnished as a result of a prohibited referral, unless an exception applies. 42 U.S.C. § 1395nn(a)(1)(A)-(B). Because Congress recognizes that there are legitimate business relationships, it created exceptions to the Stark Law prohibition including exceptions for bona fide employment relationships and indirect compensation arrangements.

---

[9] As discussed in more detail below, contrary to the United States' claims, Halifax had no duty to refund any alleged overpayments in the years 2004-2008 (after Kunz notified Halifax of her concerns and Pike sent Davidson her November 2008 memos) because the incentive complied with the plain language of the Stark Law and Halifax acted in good faith based on a reasonable interpretation of the Stark Law. Moreover, there is no evidence Halifax made a certification in order to conceal, avoid or decrease an obligation to pay money. Furthermore, Halifax does not concede that a duty to make refunds of alleged suspected overpayments as opposed to known overpayments existed under the Stark Law in 2008 under any circumstances, or that the Fraud Enforcement and Recovery Act ("FERA") amendments to the FCA seeking to impose such a duty can be applied retroactively. *United States v. Hawley*, 812 F. Supp. 2d 949 (N.D. Iowa 2011).

The United States claims that Halifax submitted false claims to Medicare because Halifax submitted claims for the oncologists' services from FY2005-2008 with the knowledge that the oncologists' bonus compensation did not comply with the Stark Law exception for bona fide employees or indirect compensation arrangements.  Notably, Halifax is only required to meet one of these exceptions.  The United States asserts that Halifax has the burden to prove that it was in compliance with an exception to the Stark Law.  However, the caselaw establishes that once Halifax demonstrates that its incentive falls within the plain language of a Stark Law exception, the United States has the burden to prove that a claim is false, and in order to do so, the United States carries the burden to prove that the facts establish non-compliance with the Stark Law.  *United States v. McLaren Reg'l Med. Ctr.*, 202 F. Supp. 2d 671, 686 (E.D. Mich. 2002) (holding that the United States "has the burden of establishing that the lease rate was determined in a manner that took into account the value of patient referrals" in order to prove allegations that a lease violated the Stark Law and AKS).  The United States should not be permitted to avoid its burden to prove any alleged false claims, which it cannot do here based on the undisputed facts.

**B. Halifax Is Entitled To Summary Judgment Dismissing the United States FCA Claims: There Are No False Claims Because the Oncology Incentive Complies With The Stark Law As A Matter of Law.**

Because the oncology incentive complies with the plain language of Stark, there can be no false claims as a matter of law.  *United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 680 (W.D. Ky. 2008).  Furthermore, where a statue or regulation is ambiguous such that it is capable of two reasonable interpretations, there can be no false claim as a matter of law.  *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 530 (6th Cir. 2012).

The Stark Law exception for bona fide employees allows for the payment of "a productivity bonus <u>based on</u> services performed personally by the physician." 42 C.F.R. §

411.357(c)(4).  The indirect compensation exception would also allow for a bonus that "is not <u>determined</u> in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician or other business generated by the referring physician for the entity furnishing DHS."  It is undisputed that the oncologists received a bonus from a pool of funds that included fees for services that were not personally performed by the oncologists. However, it is also undisputed that the incentive bonus was <u>determined</u> and paid, <u>based on</u> the oncologists' personally performed services.  Thus, the plain language of the Stark Law exception for bona fide employees and indirect compensation allows for the bonus structure used by Halifax, and accordingly there can be no false claims as a matter of law.

> **1.  The Oncology Incentive Complied With The Plain Language Of The Stark Law Exception for <u>Bona Fide Employees</u> Because It was Paid "Based on" Personally Performed Services only.**

The compensation paid to the oncologists complied with the Stark Law exception for bona fide employees as a matter of law.  First, the undisputed facts establish that the oncologists are bona fide employees of Halifax.  This issue is fully briefed in Halifax's Motion for Summary Judgment and Response to Relator's Motion for Summary Judgment, which are incorporated here.  Therefore, the Stark exception for bona fide employees is applicable here.

Second, the oncology incentive complied with the plain language of the exception for bona fide employees, which includes the following requirements (with emphasis added):

| Statutory Exception<br>42 U.S.C. § 1395nn(e)(2) | Regulatory Interpretation<br>42 C.F.R § 411.352(c) |
|---|---|
| 1) The employment is for identifiable services; | 1) The employment is for identifiable services. |
| 2) The amount of the remuneration under the employment-- (i) is consistent with the fair market value of the services, and (ii) is not determined in a manner that takes into account (directly | 2) The amount of the remuneration under the employment is--(i) Consistent with the fair market value of the services; and (ii) <u>Except as provided in paragraph (c)(4) of this section, is not determined in a manner</u> |

| | |
|---|---|
| or indirectly) the volume or value of any referrals by the referring physician; | that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician. |
| 3) The remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer; and | 3) The remuneration is provided under an agreement that would be commercially reasonable even if no referrals were made to the employer. |
| 4) The employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.<br><br>Subparagraph (b)(2)(ii) shall not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician ... | 4) Paragraph (c)(2)(ii) of this section does not prohibit payment of remuneration in the form of a productivity bonus based on services performed personally by the physician ... |

There is no dispute that requirements #1 and #3 of the bona fide employee exceptions are met. The only dispute is whether the oncology incentive complied with the requirement that any productivity bonus is "based on services performed personally by the physician."

The Halifax oncology incentive complied with the requirements of the bona fide employee exception because, even though the bonus pool included funds that were from services that were not personally performed by the oncologists, it is undisputed that the bonus pool was divided up based on the oncologist's personally performed services. The regulatory exception plainly states that "*[e]xcept as provided in paragraph (c)(4) of this section*" compensation may not be "determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." 42 C.F.R § 411.352(c)(2)(ii). Paragraph(c)(4) plainly states that "[p]aragraph (c)(2)(ii) of this section does not prohibit payment of remuneration in the form of a productivity bonus *based on* services performed personally by the physician." *Id.* (emphasis added). Thus, productivity bonuses based on personally performed

services are exempted from the volume-or-value requirement in paragraph (c)(2)(ii) based on the plain language of the regulation. The United States ignores this.

The regulatory exception is consistent with the statutory mandate that the Stark Law "<u>shall not prohibit</u> the payment of remuneration in the form of a productivity bonus <u>based on</u> services performed personally by the physician." 42 U.S.C. § 1395nn(e)(2) (emphasis added). This, too, the United States ignores. But, the United States cannot ignore the plain language of the statute on which it relies for relief and the regulations interpreting it. The United States Department of Health and Human Services ("HHS") has explicitly recognized that its regulations and guidance cannot ignore the plain language of the statutes it is charged with implementing. 56 FR 35952 (noting that "[t]he [AKS] exception for bona fide employment relationships is clear on the face of the statute, and we are not free to ignore that statutory mandate.").

Instead of quoting the Stark Law and regulations in its motion for summary judgment, the United States paraphrased these requirements, and in doing so, misstated the law. D.E. 272 at 20.

| The United States' Summary (42 C.F.R. § 411.357(c) Summary) | The Law (42 C.F.R. § 411.357(c) Text) |
|---|---|
| (a) The employment agreement must be for identifiable services.<br><br>(b) The remuneration for the employment must be set in advance, consistent with fair market value for the services provided and "not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician." However, the exception generally allows payment of remuneration in the form of a productivity bonus based on services personally performed by the employed physician.<br><br>(c) The remuneration must be provided under an agreement that would be commercially reasonable even if no referrals were made to the employer. | 1) The employment is for identifiable services.<br><br>2) The amount of the remuneration under the employment is--(i) Consistent with the fair market value of the services; and (ii) Except as provided in paragraph (c)(4) of this section, is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician.<br><br>3) The remuneration is provided under an agreement that would be commercially reasonable even if no referrals were made to the employer.<br><br>4) Paragraph (c)(2)(ii) of this section does not prohibit payment of remuneration in the form of a productivity bonus based on services performed personally by the physician … . |

Contrary to the summary: (1) there is no Stark requirement, statutory or regulatory, that any compensation to employees be "set in advance;" and (2) productivity bonuses based on a physician's personally performed services are exempted from the volume-or-value prohibition.

The United States also relies on regulatory guidance from the Stark I Final Rule that was repealed and would not apply, in any event. The United States says HHS stated that "Percentage compensation that is determined by calculating a percentage of a fluctuating or indeterminate amount, such as revenues, collections, or expenses" cannot meet the volume-or-value requirement because it "is not fixed in advance" (citing 66 Fed. Reg. 856, 877-78 (Jan. 4, 2001)). This guidance does not apply here because the plain language of the quoted Stark regulations *excepts* productivity bonuses for bona fide employees that are based on personally performed services from the volume-or-value requirement.

In addition, HHS "delayed the effective date" of the guidance relied on by the United States, ultimately concluding that "our original position was overly restrictive."  72 Fed. Reg. 38122, 38184 (July 2, 2007).  In 2004 HHS revised its position and stated "we have modified our interpretation of 'set in advance' to permit some percentage compensation if the methodology for calculating the compensation is <u>set in advance and does not change</u> over the course of the arrangement in any manner that reflects the volume or value of referrals or other business generated by the referring physician."  69 Fed. Reg. 16054, 16066 (March 26, 2004) (emphasis added). The oncology incentive formula in the Halifax contracts was set in advance and never changed.

In 2007, HHS addressed the "set in advance" and volume-or-value requirements again. HHS expressed concern that "percentage compensation arrangements in the context of equipment and office space rentals are potentially abusive." HHS proposed revising the Stark Law regulations to clarify that percentage compensation arrangements may only be "based on the revenues directly resulting from the physician services rather than based on some other factor," as the United States has suggested in this case. 72 Fed. Reg. 38122, 38184 (July 12, 2007).   However, after considering all of the comments, HHS adopted a final rule that is expressly limited to leases, *rejecting* a broader application to all percentage compensation.  73 Fed. Reg. 48433, 48709 (Aug. 19, 2008).  HHS specifically noted that its final rule:

> does <u>not</u> require percentage-based formula used to determine physician compensation for personally performed services to be based on the revenues directly resulting from the physician's services rather than based on some other factor, such as a percentage of the savings by a hospital department. <u>We share the commenters' interest in the permissibility of properly structured,</u> <u>nonabusive incentive payment</u> and shared savings programs.

*Id.* at 48711 (emphasis added).   This guidance, ignored or overlooked by the United States, supports Halifax's conclusion that its bonus, created for the very same purpose, *complied* with the Stark Law.  Cason Dep. (11/20/12) at 71-81, 108-11.

In the Stark Law III Final Rule, HHS stated that "[t]his Phase III final rule retains flexibility for utilizing unit-based and percentage based compensation formulae for [compensation] arrangements."  72 Fed. Reg. 51012, 51030 (Sept. 5, 2007).   When asked whether "percentage-based compensation arrangements" that include "a percentage of the net revenues of a business unit for which the physician is responsible would be considered to vary with the value or volume of services," HHS responded that this is a case-by-case analysis that is dependent on the facts.   *Id.* at 51030-31.  Thus, HHS has not taken a position that this type of incentive compensation would necessarily violate Stark, and has adopted a "flexible" approach.

HHS has also recognized that there will always be some link to funds from a facility fee or referrals when a hospital pays an employed physician an incentive to reward their personally performed services, and HHS has conceded that this standing alone "would not invalidate an employed physician's personally performed work, for which the physician may be paid a productivity bonus (subject to the fair market value requirement)." 69 FR 16054, 16088-89. Thus, contrary to the United States' assertion, HHS guidance *supports* Halifax's interpretation of the Stark Law.   In fact, HHS guidance regarding incentive compensation has intentionally created a "flexible" standard.  73 Fed. Reg. 48711.

Therefore, because the oncology incentive complies with the plain language of Stark exception for bona fide employees, there can be no false claims as a matter of law.  *United States ex rel. Villafane v. Solinger*, 543 F. Supp. 2d 678, 680 (W.D. Ky. 2008).  Furthermore, because the bona fide employee exception is ambiguous such that it is capable of two reasonable

interpretations, there can be no false claim as a matter of law.  *United States ex rel. Williams v. Renal Care Group, Inc.*, 696 F.3d 518, 530 (6th Cir. 2012).  Accordingly, Halifax is entitled to summary judgment in its favor.

> **2.  The Oncology Incentive Complied With The Plain Language Of The Stark Law Exception for <u>Indirect Compensation</u> Because It was Paid "Based on" Personally Performed Services only.**

Because Halifax complies with the bona fide employee exception, the Court does not need to consider the indirect exception.  However, the oncology incentive bonus also complied with the indirect compensation exception for the same reasons.  The indirect compensation exception includes the following requirement: "[t]he compensation received by the referring physician … is fair market value for services and items actually provided and <u>not determined</u> in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS." 42 C.F.R § 411.357(p)(1)(i) (emphasis added).[10]  In this case, as noted above, the compensation was not "determined" in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS since it was divided up based on the oncologists' personally performed services.

Furthermore, the Chief Compliance Officer testified that the operating margin is not directly or indirectly correlated to the volume or value of referrals since it can go up or down for

---

[10] There are additional requirements to qualify for the exception that are not in dispute.  42 C.F.R § 411.357(p) ("(1)The compensation received by the referring physician … is fair market value for services and items actually provided …(2) The compensation arrangement described in § 411.354(c)(2)(ii) is set out in writing, signed by the parties, and specifies the services covered by the arrangement, except in the case of a bona fide employment relationship between an employer and an employee, in which case the arrangement need not be set out in a written contract, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer. (3) The compensation arrangement does not violate the anti-kickback statute (section 1128B(b) of the Act), or any Federal or State law or regulation governing billing or claims submission."

any number of reasons unrelated to the volume or value of a given referral.  Rousis Dep. (2/19/13) at 446-48; *see also* Davidson Dep. (6/7/13) at 160:10-12.  For example, effective management of overhead expenses and equipment purchases could explain any difference.

The incentive compensation pool was 15 percent of the operating margin of the Medical Oncology Program.  The size of the pool depended on a multitude of factors far in excess of the overly simplistic characterization by the United States.  *See* United States Brief, at 26 (D.E. 272). Revenues included patient service revenue and other operating revenue.  United States Brief, Ex. 35.  Further, after calculating revenues, Halifax incorporated into the pool calculation the numerous expenses that went into the Medical Oncology Program (*e.g.*, medical and surgical supplies, professional fees, leases and rentals, salaries for ancillary staff, benefits, other supplies, utilities, purchased services, other direct expenses, leases and rentals, and depreciation of equipment). *Id.*  As such, the oncologists' compensation cannot be said to vary meaningfully with the volume or value of any referrals of DHS that may have been made to Halifax.  The United States has not provided any evidence to refute Rousis' testimony or to demonstrate that the operating margin is in fact correlated to the value or volume of referrals.

Accordingly, Halifax is entitled to summary judgment as to the United States' claims based on the oncology contracts.[11]

## C. Halifax Is Entitled To Summary Judgment Dismissing the United States FCA Claim Because Halifax Did Not Act Knowingly as a Matter of Law.

In order to establish a claim under the FCA, the United States has the burden to prove that the claims were false and that Halifax acted knowingly in submitting them.  "'Knowingly' is

---

[11]  As discussed in more detail below, because the compensation complied with the plain language of the Stark exceptions for bona fide employees and indirect compensation, there cannot be a claim for unjust enrichment or payment by mistake as a matter of law either, although, while these subjects are addressed by the United States in its motion, the relief sought is exclusively under the FCA.

defined by statute as meaning that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C § 3729(b).  "[I]nnocent mistakes and negligence are not offenses under the Act." *United States ex rel. Kersulis v. RehabCare Group, Inc.*, 2010 WL 294122, 5-6 (E.D. Ark. 2007) (internal citations omitted).  The United States' claims under the FCA should be dismissed because the undisputed facts establish Halifax did not act knowingly.

### 1. Statutory Ambiguity Alone Precludes Liability for Any Intentional Stark Law Violation.

It is well established that summary judgment in favor of a FCA defendant is appropriate when the regulations at issue are ambiguous, such that no reasonable jury could find the defendant satisfied the element of "knowingly" submitting a false claim. *United States ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768-69 (8th Cir. 2002); *cf. Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70, n. 20 (2007) (noting, in the context of the Fair Credit Reporting Act, that "[w]here ... the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one interpretation as a knowing or reckless violator").

"The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). A reasonable interpretation of an ambiguous regulation or contract terms can defeat the intent requirement under the FCA.  "To take advantage of a disputed legal question ... is to be neither deliberately ignorant nor recklessly disregardful." *United States ex rel. Hagood v. Sonoma County Water*

*Agency*, 929 F.2d 1416, 1421 (9th Cir.1991); *United States ex rel. Crenshaw v. Degayner*, 622 F. Supp. 2d 1258, 1273-79 (M.D. Fla. 2008) (granting summary judgment in favor of a FCA defendant where the defendant provided evidence that it relied on advice of outside counsel in its interpretation of an ambiguous contract term); *see also United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980 (D.C. Cir. 2008) (affirming summary judgment on relator's FCA claim where allegation of fraud depended on interpretation of ambiguous mortgage note and both parties interpretations were plausible); *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir. 1977) (same); *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 657 F. Supp. 2d 1039, 1057 (S.D. Iowa 2009) (holding that acting according to a reasonable interpretation of regulatory ambiguity does not qualify as knowing or reckless disregard under the FCA); *United States ex rel. Kersulis v. RehabCare Group, Inc.*, 2007 WL 294122, at *13 (E.D. Ark. 2007); *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1048-49 (N.D. Ill. 1998); *United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 884 (D. Md. 1995); *United States v. Napco Int'l Inc.*, 835 F. Supp. 493, 497-98 (D. Minn. 1993).

The Stark Law exceptions for bona fide employees and indirect compensation are ambiguous and capable of multiple reasonable interpretations.  Moreover, the guidance provided by HHS, addressed above, is also ambiguous and capable of multiple reasonable interpretations. HHS has stated that the Stark Law "was not intended to interfere unduly with legitimate employment and health system structures."  69 F.R. 16088.  There is no evidence that the oncologists were paid more than fair market value, and the position of the United States' in this case interferes unduly with legitimate attempts to create physician compensation structures, a result plainly not intended by HHS.  Because these Stark Law exceptions are capable of more

than one reasonable interpretation, and Halifax relied on a reasonable interpretation, no reasonable jury could find that Halifax knowingly submitted a false claim as a matter of law.

### 2. The Undisputed Facts Establish that Halifax Did Not Act Knowingly.

In addition, the undisputed evidence establishes that Halifax did not knowingly submit false claims because Halifax believed in good faith that its compensation complied with Stark. It is well established that a FCA defendant is entitled to summary judgment in their favor based on evidence of good faith reliance on a reasonable interpretation of a regulatory statute or contract including reliance on advice from an expert or outside counsel. *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991) (finding that reliance on advice of general counsel as to ambiguous law defeated knowledge requirement under FCA); *United States ex rel. Crenshaw v. Degayner*, 622 F. Supp. 2d 1258, 1273-79 (M.D. Fla. 2008) (granting summary judgment in favor of a FCA defendant on this basis where the defendant provided evidence that it relied on advice of outside counsel in its interpretation of an ambiguous contract term); *United States ex rel. Kersulis v. RehabCare Group, Inc.*, Case No. , 2007 WL 294122, at *15 (E.D. Ark. 2007); *United States ex rel. Smith v. Yale Univ.*, 2006 WL 566440 (D. Conn. Mar. 7, 2006) (hospital can rely on judgment of physicians that test were medically necessary).[12]

---

[12] This defense is not a traditional advice of counsel defense, although those requirements are met here as well. *United States ex rel. Bidani v. Lewis*, 2001 WL 32868 (N.D. Ill. Jan. 12, 2001) (reliance of advice of counsel defense in FCA case).   The United States erroneously characterizes this defense as being an advice of counsel defense that was not timely disclosed. This is not accurate for several reasons.  First, Halifax has always maintained that it would be providing a good faith defense based on the advice of counsel as noted in its Answer and Interrogatory responses.  Contrary to the United States claims, Halifax is not required to plead advice of counsel as affirmative defense.  *Brown v. Toscano*, 620 F. Supp. 2d 1342, 1349-50 (S.D. Fla. 2008); *In re Hillsborough County Hldgs. Corp.*, 176 B.R. 223, 229 (U.S. Bankr. Ct. 1994).  Second, based on Halifax's disclosures in its Answer and Interrogatories, the United States filed a motion asking the Court to either require Halifax "to produce all information relating to any attorney reviews of the [oncology] contracts at issue" or strike Halifax's good

Former Halifax administrator Laura Cason testified that she came up with the idea of the incentive in the interests of preserving the oncology program by ensuring it was financial viable while paying fair market compensation.   Cason Dep. (11/20/12) at 71-81, 108-11; Peburn 30(b)(6) Dep. at 200:24-201:16; Davidson Dep. (6/7/13) at 134:6-21, 138:10-139.   General Counsel Davidson, presented with the proposed bonus provision as part of the 2005 year contract changes, prepared and approved the proposed contract amendment, concluding that the oncology incentive complied with the Stark Law because the bonus pool was divided up based solely on personally performed services.  Davidson Dep. (6/7/13) at 133-79.  The contract bonus provision was in fact consistent with the plain language of the Stark Law exception for bona fide employees and indirect compensation, as discussed above.

When the compensation structure was questioned in November of 2008, Davidson contacted McDermott, a national law firm specializing in health care.  Davidson Dep. (6/7/13) at 181-213, 220:12-241:15, 242-259.   Associate General Counsel Pike worked with McDermott and provided McDermott with all of the relevant information regarding the incentive.  Davidson Dep. (6/7/13) at 205-06; Pike Dep. (5/20/13) at 175:10-187.  McDermott analyzed the Stark Law and concluded in a memorandum dated February 2009 that "we believe there is a reasonable argument that the Contingent Bonus qualifies for the Stark employment exception."  (Ex. 5). Based on this outside opinion, Halifax's General Counsel concluded its interpretation of the Stark Law was reasonable.  Davidson Dep. (6/7/13) at 181-213, 220:12-241:15, 242-259; Pike Dep. (5/20/13) at 164-216:17, 232:12-236:9, 246:13-247:20 & 275-295:3.

---

faith defense.  [D.E. 231].  The Court granted the United States' motion, and allowed Halifax to elect whether to "argue 'use or advice of counsel' in a reasonable processes defense" and produce privileged information.  [D.E. 266].  Halifax elected to do so within the timeframe allowed by the Court, and has provided additional discovery as ordered by the Court.   The United States is not, and cannot be, prejudiced by receiving the specific relief they requested in their motion.  This Court has rejected any suggestion that the United States has been prejudiced. [D.E. 296].

Davidson communicated to Halifax that it was permissible to pay out the bonus in 2008 based on his interpretation of the Stark Law and the McDermott analysis.  Davidson Dep. at 242-59; Exs. 6 & 7.  Thus, the evidence shows that Halifax believed its compensation structure complied with the Stark Law.  Because the undisputed evidence shows that Halifax believed it complied with the Stark Law, no jury could find the defendant satisfied the element of "knowingly" submitting a false claim as a matter of law.

In its motion for partial summary judgment, the United States highlights one quote out of the deposition of Thomas Garthwaite, in which he testified that the legal department told him there was a "technical" Stark violation.   Garthwaite Dep. (2/19/13) at 333:20-22.   This testimony, presented entirely out of context, does not suffice to raise a genuine issue of fact when the entire line of questioning is reviewed.  *See* Garthwaite Dep. (2/19/13) at 322-337:23.  First, Garthwaite testified that he was uncertain exactly what he was told based on lack of memory (*Id*. at 336:23-337:14), which he recently sought to clarify by errata a copy of which is attached hereto as Exhibit 8.

However, regardless of Garthwaite's characterization of his understanding of any alleged comments, Garthwaite consistently testified that he believed the oncology incentive compiled with the law and that it was his understanding Halifax received a favorable opinion from outside counsel.  *Id.* at 322-30.  Garthwaite plainly stated that he would never authorize payment of a bonus that was not legal. *Id.*  Garthwaite's testimony that he believed the incentive complied with the law is supported by the record evidence.  As discussed above, the testimony and record evidence show that Halifax's General Counsel approved the incentive and that McDermott provided a memo stating that Halifax's interpretation of the Stark Law was reasonable.  It is also undisputed that the General Counsel advised Garthwaite by emails in February and March 2009

that the oncology incentive complied with the law and that he was comfortable authorizing payment. Ex. 6 & 7; Davidson Dep. (6/7/13) at 242-59.

There is no material or genuine dispute of fact based on Garthwaite's characterization of a comment he cannot recall with any specificity. *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (holding that minor conflicts and discrepancies in officers' testimony regarding whether an individual actually pointed a gun out a window or only appeared to point a gun out the window did not create a genuine issue of fact where several officers testified that the individual pointed his gun in the officers' direction). "A genuine dispute requires more than some metaphysical doubt as to the material facts." *Id.* at 1165 (internal quotation marks and citation omitted). "A mere scintilla of evidence is insufficient" to create a genuine issue of fact. *Id.* (internal quotation marks and citation omitted). Garthwaite plainly testified that he thought incentive complied with the law, and his testimony is consistent with the record evidence.

The United States also cites testimony of the Relator Elin Baklid Kunz. First, Kunz was not involved in the matter, and as such, she has no personal knowledge. Second, the record evidence contradicts her claims. Third, the testimony cited by the United States includes inadmissible hearsay that cannot be relied on for summary judgment purposes, Pike's off hand comments and opinions to a friend cannot be attributed to Halifax. *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012); *see, e.g., Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 572 (8th Cir.1989) (in tort suit brought by handicapped minor against airline, trial court did not abuse discretion in refusing to admit derogatory remarks of airline employees as vicarious admissions, where employees were non-management personnel who were not involved in decision to keep minor from boarding aircraft); *Cebula v. General Elec. Co.*, 614 F. Supp. 260, 266 (D.C.Ill.1985) (in age discrimination suit against employer, statements of low-level co-

workers could not be attributable to employer as admissions, and thus constituted inadmissible hearsay, where plaintiff offered no evidence to suggest that any of the co-workers was involved in the termination decision, or was speaking as to a matter within the scope of their agency or employment).

Finally, the United States misstates the record. Kunz conceded that Halifax received an opinion from outside counsel, and that it relied on this opinion. Kunz Dep. at 61:25-64:17. Pike testified about her conversations with Kunz, and while she conceded that she was conflicted as to her own personal opinion and that she may have disagreed with her boss David Davidson, Pike testified that Davidson was not conflicted and that Davidson felt comfortable relying on the opinion from McDermott. Pike Dep. (5/20/13) at 195-216:17, 232:12-236:9 & 246:13-247:20. Pike ultimately authorized payment based on the decision of her boss Dave Davidson. *Id.* Pike stated that at the time she authorized payment she believed it was legal. *Id.* at 246:13-247:20. Thus, the record evidence shows that Pike and Davidson discussed differences of opinion in good faith; the opposite of evidence of a knowing violation of the Stark Law.

The United States also cites a memorandum prepared by George Rousis, the Chief Compliance Officer, in March 2004 (Ex. 9). Contrary to the characterization of the United States, this memorandum did not provide legal advice to Halifax, or address whether the oncology incentive complied with the Stark Law exception for bona fide employees. As discussed above, the undisputed facts show that Davidson and outside counsel analyzed and provided legal advice to Halifax that the incentive complied with the Stark Law. Rousis was merely providing general education to Halifax employees in an effort to ensure compliance with federal regulations. Contrary to the United States allegations, this memorandum demonstrates Halifax's good faith and its efforts to comply with federal regulations.

The United States also cites Rousis's testimony that in his opinion it is an "open question" whether the oncology incentive varies with the value or volume of services. Rousis Dep. (2/19/13) at 446-48. However, this testimony actually demonstrates that Halifax acted in good faith based on a reasonable interpretation of the Stark Law. Rousis's testimony is irrelevant since the plain language of Stark's bona fide exception excepts productivity bonuses based on a physician's personally performed services from this requirement. Rousis testified that he did not believe that the operating margin was directly or indirectly correlated to the volume or value of referrals since it would be possible to increase or decrease the operating margin regardless of the number of referrals made (higher or lower) depending on the effective management of overhead expenses. *Id.* Thus, Rousis did not believe the oncology incentive was necessarily linked to the volume or value of referrals. In fact, he noted that a higher volume of referrals could actually decrease operating margins if overhead expenses were not managed effectively. Notably, the United States has not provided any evidence to refute Rousis's testimony or to demonstrate that the operating margin for the program is in fact correlated to the value or volume of referrals. Instead, the United States asks this Court to assume *ipso facto* that there is a correlation.

Thus, the undisputed evidence shows that Halifax relied on a reasonable interpretation of the Stark Law, and Halifax is entitled to summary judgment in its favor.

### D. Halifax Is Entitled To Summary Judgment Dismissing the FCA Claim Because There Is No Evidence To Establish Referrals For Stark Purposes.

In order to prove a violation of the Stark Law, the United States must show that the oncologists made prohibited referrals for designated health services ("DHS") to Halifax. This evidence is also necessary for the United States to establish the amount of any alleged damages. The United States must "prove all essential elements of the [FCA] cause of action, including

damages, by a preponderance of the evidence." 31 U.S.C. § 3731(d). Thus, the United States has the burden to prove that a prohibited referral for DHS was made to Halifax and the number of any alleged referrals. *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009).

The term "referral" is defined under the Stark Law as "a request by a physician for an item or service for which payment may be made under Medicare Part B… and the request or establishment of a plan of care by a physician that includes the furnishing of DHS." 69 Fed. Reg. 16054, 16063. Thus, as the United States concedes, in order to determine whether an order, request or plan of care was made by a physician, you must examine the medical record to find out if there is an order from an employed oncologist. Sandlin 30(b)(6) Dep. at 153:19-24. It is undisputed that United States has not looked at any medical records. Instead, the United States asks the Court to infer that an order, request or plan of care exists in the medical record based on information on the claim forms submitted to Medicare and general testimony that the oncologists may write orders for chemotherapy and other services as part of treating patients at Halifax. USA MSJ at 24-25. The United States has specifically asked this court for a ruling that the claims forms used to submit claims to Medicare establish the existence of referrals as a matter of law. Such a broad ruling as a matter of law that could be applied in every case without any limitation is not warranted.

The United States in essence seeks to avoid its obligation to prove that a referral actually occurred in cases involving Medicare by citing to the claim form. In other contexts under the FCA, the United States must offer proof or evidence of the amount of its alleged damages. For example, the Supreme Court has cautioned that in determining the number of false claims for which this statutory penalty should be assessed in a particular case "we are actually construing

the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their

literal terms but to the evident purpose of Congress in using those terms." *United States v.*

*Bornstein*, 423 U.S. 303, 313 n. 8 (1976) (quotation omitted).

Courts have granted judgment as a matter of law where a relator or the United States fails

produce evidence of damages or to quantify the alleged loss to the government. *United States ex*

*rel. Hays v. Hoffman*, 325 F.3d 982, (8th Cir. 2003) (holding that United States evidence as to

the number of false claims "was simply an unsubstantiated guess" where the United States

provided testimony as to the number of Medicare cost reports and monthly invoices submitted);

*United States ex rel. Whitten v. Community Health Sys., Inc.*, Case No. CV202-189, 2009 WL

5214308, at *2 (S.D. Ga. July 1, 2009) (holding that "no recovery could be had" under the FCA

where the relator merely "states that he believes that false claims were submitted" or that "such

claims must have been submitted, or were probably submitted."). Courts have also disallowed

efforts to prove damages by statistical sampling because it is unreliable, as Halifax has asserted

in its motion to exclude the United States' damages expert Ian Dew, which is incorporated here.

*United State ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 49 (D.D.C. 2008);

*United States ex rel. Barron v. Deloitte & Touche, LLP*, Case No. SA-99-CA-1093, 2008 WL

7136869, at *2-4 (W.D. Tex. Sept. 26, 2008).

The United States should be required to prove that there was a referral for DHS and the

number of referrals for DHS by reference to each medical record. The claims form standing

alone is insufficient evidence to establish that a referral to Halifax occurred or the total amount

of referrals. The United States' own 30(b)(6) witness acknowledged there may or may not be a

correlation between the terms in the claim form and an actual order in the medical record or

referral, demonstrating that this *per se* approach is flawed. Sandlin 30(b)(6) Dep. at 84-86 &

150-51.  Halifax's expert Donald Moran has testified that 1) based on the development of the claims form and the common understanding in the industry of the terms in the claim form, the information in the Medicare claim form does not establish whether a physician ordered the services or made a referral for purposes of the Stark Law; and 2) the use of the claims forms is not accurate because it captures claims where there would be no referrals for DHS under the Stark Law as a matter of law.  Moran Expert Report at 1-12 (Ex. 10).

For example, Halifax's expert established that the United States' damages calculation based on the claims form includes claims where the oncologist did not make a referral to Halifax because the patient self referred to Halifax's emergency room or the referral were made to a third party such as East Central Florida Outpatient Imaging, LLC as opposed to Halifax.[13]  Moran Expert Report at 12-19 (Ex. 10).  Moran also established that the United States' analysis based on the claims form included evaluation and management services ("E&M") and professional services.  *Id.*  It is undisputed that the term DHS does not include E&M or the physician's personally performed professional services, and therefore, these claims should not be included in any calculation of alleged damages.  42 C.F.R. § 411.351; 66 Fed. Reg. 871; Stone 30(b)(6) Dep. at 34:4-6; Barsky 30(b)(6) Dep. at 150-52.

In addition, the United States also includes claims billed on a Form 1500 in it damages calculation.  The United States concedes that a Form 1500 is only for personally performed professional services (United States Brief at 9), the majority of which are not considered DHS.

---

[13] The United States has not alleged – and cannot show at this point – that any of the Medical Oncologists had an ownership or investment interest in, or compensation arrangement with, ECFOI. In order to prove a violation of the Stark Law, the United States has the burden to prove that a financial relationship existed.  The fact that Halifax has a partial ownership interest in ECFOI does not mean that the Medical Oncologists have a financial relationship with ECFOI, nor can the United States show as much.  Moreover, ECFOI – a separate legal entity – is not listed in the United States' Complaint in Intervention.  Accordingly, this Court should exclude all claims submitted by ECFOI as they are not implicated in this case.

The Stark Law has an exhaustive list of DHS, and the physicians' services at issue in Form 1500 are <u>not</u> DHS.[14]   42 U.S.C. § 1395nn(h)(6); 42 C.F.R. § 411.351.[15]   As such, even if one of the oncologists is listed as a Referring Provider on the Form 1500, these claims are not even implicated by the Stark Law because they do not involve DHS.   Halifax is therefore entitled to judgment as a matter of law that these claims must be excluded from this case.

Notably, the United States is asking this court to establish new precedent in this case that changes the burden of proof in a FCA case.   The only authority the United States' cites to support correlating the fields on a claims form with a referring physician is *United States v. Rogan,* 459 F. Supp. 2d 692 (N.D. Ill. 2006).[16]   As discussed in Halifax's motions for summary judgment, which are incorporated here, the *Rogan* court cited regulatory guidance regarding the claims forms out of context and did not have the benefit of the deposition testimony of a corporate representative from HHS.

The decision of the *Rogan* court misstates the scope of Section 1395l.   459 F. Supp. 2d at 692 n. 11.   The United States also misstates the regulatory guidance in its motion, and fails to provide this Court with the applicable law governing the requirement to identify a referring physician in the claims forms. 42 U.S.C. § 1395l(q) requires institutional providers to identify the Unique Personal Identification Number (now called the National Provider Identifier) on

---

[14] There are only a very limited range of professional services billed on the Form 1500 that are DHS, and the United States has not indicated here that the Form 1500s included these very limited range of services.

[15] "Inpatient hospital services" and "Outpatient hospital services" do not include "professional services performed by physicians . . . if Medicare reimburses the services independently and not as part of the inpatient hospital service (even if they are billed by a hospital under an assignment or reassignment)."   42 C.F.R. § 411.351.

[16] Contrary to the United States' assertion, *United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008), did not hold that that claims forms are sufficient to establish a referral as a matter of law since the court noted that the issue was not preserved on appeal.   Therefore, any statements in *Rogan* are dicta.

hospital <u>outpatient</u> claims of the referring physician, if there is one.  42 U.S.C. § 1395l(1).  The critical limitation is that Congress only made this requirement for hospital outpatient claims, not Part A inpatient claims.  United States Brief, at 19.  Transmittal 637, cited by the court in *Rogan* and in the United States' motion, confirms this fact: "Section 1833(q)(1) [42 U.S.C. § 1395l(1)] of the Act requires that all Part B bills include the name and identification number of the referring physician beginning January 1, 1992."  At no point has Section 1395l(q) applied to claims for inpatient services.

Hospital inpatient claim forms do not have a specific field for "referring physician" and CMS during the relevant time in this case did not give specific instructions to hospitals as to how identify the referring physician for purposes of Section 1395l(q).  During the relevant time in this case, there have been two versions of the hospital claim form, the Form 1450: the UB-92 and UB-04.  The UB-92 was in place until May 23, 2007.  For the "Attending Physician" on inpatient claims, the UB-92 instructs hospitals to list the physician "primarily responsible for the care of the patient from the beginning of the hospital episode."  CTRS. MEDICARE & MEDICAID SERVS., MEDICARE INTERMEDIARY MANUAL, § 3604 (2001); *see also* United States Brief, at 5.  The "Other Provider" field is for the physician who performed the principal procedure.  If there is no principal procedure, the provider enters the physician who performed the surgical procedure most closely related to the principal diagnosis.  *Id.*  The UB-04 instructs hospitals to list in the "Attending Provider" field the physician with "overall responsibility for the patient's medical care and treatment" and in the "Operating Provider" field the individual with "primary responsibility for performing the surgical procedure(s)."  CTRS. MEDICARE & MEDICAID SERVS., MEDICARE CLAIMS PROCESSING MANUAL, ch. 25, § 75.5 (2013).

The United States asserts that every physician listed as the "Attending Provider" or "Other Provider" (UB-92) and "Attending Provider" or "Operating Provider" (UB-04) must have made a referral to Halifax for the furnishing of DHS, *i.e.*, that these fields reflect implementation of 42 U.S.C. § 1395l(q).  The statute governing this requirement plainly illustrates this assertion is untrue.  CMS requires an institution to list an "attending physician" on every claim.  Sandlin Dep., at 96:18-23.  42 U.S.C. § 1395l does not have the same requirement.  Congress requires institutions to list a referring physician only when they know – or have reason to know – that a referral has been made.  It necessarily follows from this language that Congress did not intend for every claim to identify a referring physician, which is contrary to CMS's instructions for the Attending Provider field.  It is therefore illogical to say that the physician listed in this field or the Operating Provider field *must* be a referring physician as well.

Further, the definitions of the fields in the UB-92 and the UB-04 simply do not match the definition of a "referring physician" under the Stark Law.  Accordingly, the fact that a physician is listed in one of these fields does not mean the physician is a referring physician under the Stark Law.  By way of example, suppose Physician A admits Patient Jones to the hospital. Physician A refers Mr. Jones to Physician B, a specialty physician.  Before Physician B orders any tests, requests any services, or establishes Mr. Jones's plan of care, Patient Jones leaves (against medical advice).  Even though Physician B may be listed as the Attending Provider because he last had overall responsibility, Physician B did not make any referrals of DHS to Halifax and therefore is not a "referring physician" for purposes of the Stark Law.  This example illustrates one of many scenarios in which a physician may be listed as an Attending Provider on the claim form but would not be a referring physician under the Stark Law.

The United States fails to provide any authority to expand the scope of Section 1395l(q) to include claims for inpatient encounters.  As Halifax has indisputably shown, the patient medical record – not the claims form – is the only source of information that definitely proves whether a physician ordered, requested, certified or recertified the need for an item or service, or established a plan of care.  Accordingly, the United States' erroneous analysis based the claims forms in this case must be disregarded.

Halifax believes that the summary testimony based on the claims form is insufficient as a matter of law.  However, even if the Court does not conclude it is insufficient as a matter of law, it creates a genuine issue of fact, and the broad legal ruling sought by the United States is unsupported by the law and unnecessary.

**E.  The Damages Sought By The United States Are Excessive And Violate The United States' Constitution Excessive Fines Clause and Due Process Clause.**

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8.  "The Excessive Fines Clause thus limits the government's power to extract payments, whether in cash or in kind, 'as punishment for some offense."  *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (internal citations and quotations omitted).  "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334.

The United States Supreme Court has recognized that damages under the FCA may be considered a fine or punishment that implicates the Eighth Amendment. The United States Supreme Court has noted that "the FCA imposes damages that are essentially punitive in nature." *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785-786 (2000). The Court concluded that "[a]lthough this Court suggested that damages under an earlier version

of the FCA were remedial rather than punitive, that version of the statute imposed only double damages and a civil penalty of $2,000 per claim; the current version, by contrast, generally imposes treble damages and a civil penalty of up to $10,000 per claim." *Id.* (internal citations omitted). "The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers." *Id.*; *see also United States v. Mackby*, 261 F.3d 821 (9th Cir. 2001) (finding that Eighth Amendment applies to damages and penalties assessed under the FCA). For the same reasons, the Due Process Clause may also be implicated if Halifax is not provided with all of the protections of a criminal proceeding. *United States v. Hudson*, 522 U.S. 93, 103 (1997); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).

In this case, the damages sought by the United States violate the Eighth Amendment and Due Process Clause because they are punitive in nature and excessive. Claims for violation of the Stark Law under the FCA are unique. Where FCA liability is based on Halifax's interpretation of the Stark Law, a complex regulatory statute, and it is undisputed that compensation was received from Medicare for actual medical services rendered, the payment of a full refund of the money received from Medicare as damages under the FCA – a forfeiture – is a penalty in and of itself because the United States did not in fact sustain any actual damages; it is undisputed that payment was made for services the patients received. The trebling of damages, then, is a penalty on a penalty. And the per-claim penalty demand of $5,500-$11,000 *each*, for another $250-$500 million is yet another series of penalties upon penalties. The total of just over $600 million on the oncology claims, is not even based on the $1 million bonus pool funding amount (an amount permissibly increased in subsequent years), but only on its source. That there was no real damage to Medicare here, having paid for medically necessary services

performed makes the size of the requested penalties all the more egregious. There was nothing wrong with the gross amount of the compensation paid to the oncologists, only a dispute as to the structure of the last increment of incentive bonus funding based on two reasonable interpretations of the Stark Law.

In short, the penalty sought here is unconstitutionally excessive and divorced from any concept of damages to the United States.

## F.  The United States' Common Law Claims Also Fail.

While it is unclear from the United States' motion that it is even directed to its common claims (because the relief requested is solely under the FCA), the evidence establishes Halifax's entitlement to summary judgment in any event, on both of the United States' federal common law claims -- for unjust enrichment and for payment by mistake -- as a matter of law.[17]

The United States' unjust enrichment claim fails because the evidence shows that Halifax relied on a reasonable interpretation of the Stark Law. *United States ex rel. Roberts v. Aging Care Home Health, Inc. et al.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007) (requiring the United States to prove that: "1) it would be unreasonable for the Government to pay under the circumstances; and 2) defendants reasonably should not have expected payment under the circumstances; or 3) society's reasonable expectation of person and property would be defeated by payment.") (internal citations omitted).

---

[17] The Court should apply Florida law when analyzing the Government's equitable claims. *McDonald v. S. Farm Bureau Life Ins. Co.*, 291 F.3d 718, 722 (11th Cir. 2002); *see also United States v. Applied Pharm. Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999); *H2Ocean, Inc. v. Schmitt*, No. 3:05cv387/RV/EMT, 2006 U.S. Dist. LEXIS 44734, at *8-9 (N.D. Fla. June 30, 2006); *United States v. Bollinger Shipyards*, No. 12-920, Inc., 2013 WL 393037, at * 15 (E.D. La. Jan. 30, 2013). However, the result would be the same under federal and Florida law. Under Florida law, the elements for unjust enrichment and payment by mistake (also referred to as "money had and received") are the same. *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011); *see also O'Gilvie v. United States*, 519 U.S. 79, 91 (1996) ("[M]oney paid by mistake--an action the roots of which can be found in the old common-law claim of 'assumpsit' or 'money had an received'").

"Under the common-law theory of payment by mistake, the government may 'recover money it mistakenly, erroneously, or illegally paid from a party that received the funds without right.'" *LTV Educ. Sys., Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989). Mistakes of law as opposed to mistakes of fact are not a basis for equitable relief. *United States v. Medica Rents Co. Ltd.*, Case Nos. 03-11297, 06-10393, 07-10414, 2008 WL 3876307, at *2-5 (5th Cir. Aug. 19, 2008) (dismissing common law claims for payment by mistake where the evidence show that defendant reasonably believe they complied with "contradictory" and confusing guidance regarding the proper Medicare billing code). Therefore, there is no equitable basis for claiming unjust enrichment or payment by mistake for money Halifax received in exchange for providing medical necessary services. Further, the United States has failed to offer any evidence that the government employees were making Medicare payments to Halifax that should not have been paid.

Furthermore, the United States' equitable claims for unjust enrichment and payment by mistake also fail as a matter of law where there is a contract between the government and a defendant because the existence of a valid contract between the parties negates the need for the court to imply a contract of law. *United States ex. rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1329 n.6 (M.D. Fla. 2003) (granting summary on claims for unjust enrichment and payment by mistake in light of the parties' stipulation as to the existence of a contract."); *United States v. Kellogg Brown & Root Servs.*, Inc., 800 F. Supp. 2d 143, 160 (D.D.C. 2011). Accordingly, because the United States' claims are premised on a contract – the Halifax provider agreement- their equitable claims fail as a matter of law.

Furthermore, courts have dismissed equitable common law claims on the basis that the FCA provides an adequate legal remedy. *United States v. Buckley*, No. Civ. A 0011632RWZ,

2005 WL 164287, at *1 (D. Mass. Jan, 25, 2005); *United States v. Job Res. for Disabled*, No. 97 C 3904, 2000 WL 562444, at * (N.D. Ill. May 9, 2000); *United States v. Hydroaire, Inc.*, No. 94 C 4414, 1995 WL 86733, at *6 (N.D. Ill. Feb. 27, 1995); *see also United States v. Bradley*, 644 F.3d 1213, 1310 (11th Cir. 2011) ("it is well settled law that equitable claims should be dismissed where there is an adequate legal remedy.").

<u>CONCLUSION</u>

The United States' Motion for Partial Summary Judgment under the False Claims Act based upon the oncology contract incentive bonus should be denied and summary judgment granted in favor of Halifax, dismissing these claims as a matter of law.


Dated: July 9, 2013                              Respectfully submitted,

<u>s/Bruce Berman</u>
Bruce J. Berman
Fla. Bar No. 159280
Adam P. Schwartz
Fla. Bar No. 83178
Jennifer Christianson
Fla. Bar No. 589950
Carlton Fields
100 SE Second Street, Suite 4200
Miami, FL 33131
Email: bberman@carltonfields.com
Email: aschwartz@carltonfields.com
Email: jchristianson@carltonfields.com

*Co-Counsel to Defendants Halifax Medical Center and Halifax Staffing, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Middle District of Florida using the CM/ECF system on July 9, 2013. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Bruce Berman_____
Bruce Berman