UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* BAKLID-KUNZ, | § § § § | Civ. Act. No. 6:09-CV-1002- ORL-31GAP TBS |
| Plaintiff, | § § § | JUDGE Gregory A. Presnell |
| v. | § § | |
| HALIFAX HOSP. MED. CTR, et al. | § § | |
| Defendant. | § § § | |

**PLAINTIFF UNITED STATES OF AMERICA'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE THE REPORT OF IAN DEW AND TO <u>EXCLUDE OR LIMIT HIS TESTIMONY</u>**

Halifax Hospital Medical Center and Halifax Staffing, Inc. (Halifax) misstate the United States' proffer of Ian Dew's testimony to support its Motion to Strike the Report of Plaintiff United States' Purported Expert Ian Dew and to Exclude or Limit His Testimony (Dkt. No. 298). Mr. Dew performed an analysis of voluminous Medicare claims data to determine which claims met certain criteria. The analysis performed by Mr. Dew is the same analysis accepted in other Stark Law trials, and Halifax's arguments to strike Mr. Dew's report and testimony do not relate to Mr. Dew's methodology in any way. Rather, Halifax's arguments are legal arguments about how this Court should define who is a referring physician under the Stark Law. Because Halifax has no argument that Mr. Dew's technical methodology or application was improper, its motion should be denied.

## INTRODUCTION

### A. The Stark Law

The Stark Law establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital. *See U.S. ex rel. Drakeford v. Tuomey Healthcare Sys., Inc.*, 675 F.3d 394, 397 (4th Cir. 2012); *United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd* 517 F.3d 449 (7th Cir. 2008). In pertinent part, the Stark Law provides:

> Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then –
>
> > (A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
> >
> > (B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn (a)(1). Designated Health Services (DHS) are listed in section (h) of the statute and include inpatient and outpatient hospital services and radiology services. *See* 42 U.S.C. § 1395nn(h)(6). In addition to prohibiting hospitals from submitting claims for DHS under these circumstances, the Stark Law also prohibits payment by the Medicare program of such claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

The Stark Law defines "referral" as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The regulations interpreting the statute also broadly define "referral" as,

among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service . . . ." 42 C.F.R § 411.351. A referring physician is "a physician who makes a referral as defined in this section or who directs another person or entity to make a referral or who controls referrals made to another person or entity." *Id*.

The United States alleges that the following improper referrals were made: (1) facility fees for inpatient hospital services which were submitted on a UB-92 or UB-04 claim form; (2) facility fees for outpatient hospital services, which were also submitted on a UB-92 or UB-04 claim form; and (3) other DHS performed at Halifax-owned entities, which were submitted on a form 1500 claim form. United States' Supplemental Initial Disclosures (Ex. 1). The United States determined its damages based on the Stark Law and supporting regulations as well as the *Rogan* decision.

The physician identified on a UB-92 claim form in box 82 ("attending phys. ID") and box 83 ("other phys. ID") is the referring physician under the Stark Law. *Rogan*, 459 F. Supp. 2d at 713-14. For inpatient claims, the physician identified in box 82 is "the clinician primarily responsible for the care of the patient from the beginning of the inpatient episode"; for outpatient claims, the physician identified in box 82 is "the physician that requested the surgery, therapy, diagnostic tests or other services." Claims Processing Manual (Exh. 2). For inpatient claims, an entity is required to fill out box 83 "if a procedure is performed" and must enter identifying information for "the physician who performed the principal procedure." *Id.* For outpatient claims, the entity populates box 83 with identifying information for the "operating physician."

*Id.* "These manual provisions were adopted to meet Congress's requirement that the identification number of referring physicians be reported with claims made to Medicare." *Rogan*, 459 F. Supp. 2d at 713-14 (*citing* Hospital Manual, Transmittal No. 637, May 1, 1992).

Applying the Stark Law to the current claims manual and form, the physicians identified in boxes 76 and 77 of the UB-04 claim form are referring physicians under the Stark Law. The physician the entity identifies in box 76 of the UB-04 form is described as "the individual who has overall responsibility for the patient's medical care and treatment reported in this claim/ encounter." Claims Processing Manual (Exh. 3). The physician the entity identifies in box 77 of the UB-04 form is "the individual with the primary responsibility for performing the surgical procedure(s)." *Id.* Like the definitions for the form UB-92, the definitions for the form UB-04 were adopted to implement the requirement that entities identify referring physicians. *Cf. Rogan*, 459 F. Supp. 2d at 713-14.

The manner in which Halifax itself filled out the claims forms supports this legal conclusion. On claims for inpatient and outpatient hospital services, the physician identified by Halifax as the attending physician in field 82 of Form UB-92 and field 76 of Form UB-04 was the physician who established a plan of care for the patient. Rahn 30(b)(6) Dep. (March 19, 2013), 44:1-7, 57:10-17 (Exh. 4). In field 83 of Form UB-92 Halifax indicated any physician performing a principal procedure on a patient. *Id.* at 44:8-15. Halifax indicated any operating physicians in Field 77 of Form UB-04. *Id*. at 57:18-23. Because the physician Halifax identified on its institutional claims forms either established a plan of care for a patient or performed a procedure on a patient at Halifax for which Halifax submitted a claim that included a facility fee, which constitutes a referral under the Stark Law, the physician identified as the attending or

operating physician by Halifax on the claims forms is a referring physician within the meaning of the Stark Law.

   B.  **Methodology Used in *Rogan***

In the *Rogan* case, the court set forth the methodology for determining the claims for hospital services involving the physicians who had financial relationships with the DHS provider that did not satisfy an exception to the Stark Law. *Rogan*, 459 F. Supp. 2d at 709. The court included all UB-92s where the clinic was identified by its provider number and one of the physicians was identified by either his provider number as the attending or operating physician. *Id.* These claims were found in the Centers for Medicare and Medicaid Services' (CMS) official repository of adjudicated claims and a CMS official provided the claims data to the consultant for the United States on a disc. *Id.* at 727 fn. 17. This disc was then provided to counsel for the United States and submitted to the court as an exhibit. *Id.* In making its conclusions of law, the court identified these claims as the false claims for which the United States was entitled to damages and penalties. *Id*. at 727.

   C.  **Mr. Dew's Methodology**

Mr. Dew, at the direction of counsel, applied the exact same analysis that was adopted by the *Rogan* court. Mr. Dew received claims data from counsel for the United States which was obtained from CMS's Office of Information Services, data that was received from the National Claims History file. Dew Dep., 54:1-55:12 (Exh. 5). Mr. Dew was provided with the Halifax Medicare Provider Number and the physician provider numbers. Dew Rep., 3 (Ex. 6). In processing the inpatient and outpatient claims, Mr. Dew identified the claims referencing Halifax and where one of the physicians identified by the United States in its complaint was listed by Halifax as either the attending or operating physician. *Id.* For the non-institutional outpatient

claims, Mr. Dew filtered by referring physician. *Id.* at 5. In short, Mr. Dew performed a complex but mechanical analysis whereby he identified the exact same categories of claims that were identified by the *Rogan* court as improper referrals.

## **LEGAL STANDARD**

Pursuant to Federal Rule of Evidence 702, expert testimony is only admissible if: (1) the expert's scientific, technical, or other specialized knowledge will assist the fact finder in either understanding the evidence or determining a fact in issue; (2) the expert's testimony is based on sufficient facts or data; (3) the expert's testimony is the "product of reliable principles and methods"; and (4) those principles and methods were applied to the facts of the case. Fed. R. Evid. 702.

The district court judge serves as a "gatekeeper" who determines the admissibility of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert*, 509 U.S. 579; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). The party offering the expert testimony has the burden of establishing each of the required elements of Rule 702. *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir.2010); *Rink*, 400 F.3d at 1292. The Eleventh Circuit applies a three-part test to determine whether the expert testimony is admissible: "(1) the expert must be qualified to testify competently regarding the matters he intends to address, (2) the methodology must be reliable under *Daubert*, and (3) the testimony must assist the trier of fact through the application of scientific, technical, or specialized expertise to understand the evidence or determine a fact in issue." *Sumner v. Biomet, Inc.*, 434 Fed.Appx. 834, 841(11th Cir. 2011); (*citing Hendrix*, 609 F.3d at 1194; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). These three elements are referred to as qualifications, helpfulness, and reliability. *R&R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *6 (S.D. Fla.

Sept. 12, 2010) (*citing United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2003); *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)).

## **ARGUMENT**

Halifax's motion is premised on a false idea: that the United States is offering Mr. Dew's testimony to explain who a referring physician is under the Stark Law. That is not accurate. As discussed above, who a referring physician is under the Stark Law is a legal question. The United States is offering Mr. Dew as an expert in counting certain claims and calculating the amounts paid for these claims. Halifax's arguments contend that, despite the applicable law and the court's decision in *Rogan*, the claims forms do not indicate referring physicians and that unless a physician directs a patient to obtain treatment at Halifax, claims associated with that patient can never be considered a referral under the Stark Law. Halifax couches these arguments as reasons that Mr. Dew's proffered testimony is unreliable, but in fact these are legal arguments that go to the question of which claims are tainted, not whether Mr. Dew properly performed his analysis in this case.

Halifax's first argument is that there is no connection between the claims forms and improper referrals because only the medical record is proof or referrals. Mot., 16-17. Halifax argues that because Mr. Dew did not consult the medical records, his testimony should be excluded. This argument, however, does not consider that the *Rogan* court, as set forth above, clearly established that the claims forms identify the referring physician. Halifax claims that the United States' 30(b)(6) witnesses testified that a medical record is "the only determinative evidence of whether a referral has been made[] and by whom" is based on a misrepresentation of the testimony. Mot. at 17. Both Winnette Sandlin and Jean Stone testified that it is the provider's responsibility to make sure that the claims forms the provider submits are accurate.

Sandlin 30(b)(6) Dep., 154:5-19 (Exh. 7); Stone 30(b)(6) Dep., 47:3-12 (Exh. 8). The medical records should *verify* what the provider submitted on the claim form, not offer information that is different from what was submitted on the claim form. *Id.* Halifax directly quoted Ms. Stone's deposition in its brief, but truncated her answer to the question asked. A review of the entire question and answer demonstrates that Ms. Stone was referring to a review of physicians' upcoding for evaluation and management services, nothing related to who is a referring physician under the Stark Law:

> Q. But if you wanted to do an independent review of what happened, you would need to look at the patient medical record, wouldn't you?
> A. On an individual case, yes. If one is looking to know potentially of the existence of a problem, looking at aggregate data, as my example was, if you see a provider that's billing for 99205s and a larger number than could possibly be performed in a time frame when these are all supposed to be an average of 60 minutes, doing that kind of data analysis would lead you to know where to look more closely.

Stone 30(b)(6) Dep., 47:13-23.

Next, Halifax erroneously argues that the Stark Law prohibition applies to patient referrals, and not referrals for services, and that all patients who present at Halifax through either the emergency department or via transfer from another facility cannot, as a matter of law, be referrals in violation of the Stark Law. Mot., 19-20. Halifax argues that because Mr. Dew included claims that Halifax argues are not referrals, the data set is over-inclusive and therefore unreliable. Mot., 17. This argument once again ignores the actual law. The Stark Law prohibits a referral "for the furnishing of designated health services." 42 U.S.C. § 1395nn(a)(1)(A). The Stark Law makes no mention at all of referrals of patients, only referrals of *services*. *Id.* The reason for this difference is that the Stark Law is designed to prevent physicians' financial interests from influencing medical decision-making during the course of a patient's treatment.

*See* Medicare and Medicaid Programs; Physicians' Referrals to Health Care Entities with Which They Have Financial Relationships, 66 Fed. Reg. 856, 859 (Jan. 4, 2001).  It is therefore irrelevant how a patient presents to a medical facility because the Stark Law relates to the course of treatment that a patient receives once in the care of a physician regardless of how a patient comes to be treated by a physician.  If such a physician subsequently referred the patient for any DHS, those referrals would violate the Stark Law.  Furthermore, this argument is a legal question about what should be included in the data set analyzed by Mr. Dew, and does not go to whether Mr. Dew properly performed the analysis requested of him under the *Rogan* opinion.  Halifax therefore does not offer any arguments that Mr. Dew improperly conducted his analysis, only that certain categories of claims that Mr. Dew included at the direction of counsel are not referrals.

Halifax's argument to strike Mr. Dew's testimony appears to be only that there is no evidentiary connection between the claims analysis and summary performed by Mr. Dew and prohibited referrals.  This argument fails.  Damages under the Stark Law, as set forth above, are the full value of every tainted claim.  This analysis requires the government to identify the universe of such tainted claims and the dollar amounts paid to Halifax as a result of these tainted claims.  That is all Mr. Dew is doing: counting claims that are tainted based on information on the claims forms, as directed by counsel and consistent with the applicable law, and calculating the dollar figures associated with those claims.

Mr. Dew is qualified to offer expert testimony on this issue.  As he stated in his deposition, he is being offered as an expert in data analysis of Medicare claims.  Dew Dep. 10:11-14 (Exh. 5).  This is a complex area that relates to a significant number of fields on each claim.  Dew Dep. 10:22-12:1 (Exh. 5).  Mr. Dew has years of experience working in both the

computer programming and healthcare fields. Mr. Dew has been performing data analysis similar to that performed in this case for nine years. Attachment A.1 to Dew Expert Rep., (Exh. 6). In addition to his health care-specific experience, Mr. Dew has over twenty years of experience in computer programming. *Id.* Mr. Dew utilized both of these areas of expertise to write the code he used to count the claims and calculate the claims dollars requested by the United States in this case.

As stated above, Mr. Dew used the same methodology adopted by the court in the *Rogan* case. *Rogan*, 459 F. Supp. 2d at 709, 727 fn. 17. Just as in *Rogan*, the data Mr. Dew used was obtained from CMS Office of Information Services using the CMS official repository of adjudicated claims. Mr. Dew was asked to identify claims that contained identifying information indicating that these claims were referred by a physician in violation of the Stark Law. Mr. Dew did so, and he did so reliably. Even Halifax's own proffered expert, Donald Moran, agreed with Mr. Dew's data analysis. Mr. Moran validated the data set of Mr. Dew to within 0.11 percent for claim counts and -0.66 percent for claim dollars, an amount that Mr. Moran determined to be "typical and not an area for concern." Moran Rep. at 12 (Ex. 9). In fact, Mr. Moran volunteered in his deposition that if there were questions about the accuracy of the data contained in his (Mr. Moran's) report, those questions should be addressed to Mr. Dew:

> Q So if we wanted to talk to -- if we wanted to obtain testimony about the accuracy of the tables and attachments, we would have to talk to Mr. Watson[, your associate]?
> Mr. Sidhu: Objection to form.
> The Witness: Let me put it to you this way. You can also talk to Mr. Dew, because we essentially replicated his data. So, in fact, the claims that we pulled were exactly identical to the claims that he pulled. And so any analysis that we subsequently performed on that should be within the same wheelhouse.

Moran Dep., 102:5-16 (Ex. 10).  Halifax has no objection to the actual methodology employed by Mr. Dew, only complaints about whether certain categories of claims were properly included.  This is a question of law properly addressed to the Court, not a question of the reliability of Mr. Dew's methodology.

## CONCLUSION

Halifax's motion is premised on a misrepresentation of Mr. Dew's proffered testimony.  Mr. Dew is properly qualified to testify to the issues for which the United States is actually proffering him.  Therefore, Halifax's motion to strike the expert report of Ian Dew and exclude or limit his testimony should be denied.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

A. LEE BENTLEY, III
Acting United States Attorney

RALPH E. HOPKINS
Assistant United States Attorney
501 W. Church Street, Suite 800
Orlando, FL 32805
(407) 648-7562
Fla. Bar # 0972436
Email: ralph.hopkins@usdoj.gov


/s *Patricia M. Fitzgerald*
MICHAEL D. GRANSTON
ADAM J. SCHWARTZ
PATRICIA M. FITZGERALD
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 305-3173
Facsimile:  (202) 514-0280

        Email: Patricia.M.Fitzgerald@usdoj.gov

        Attorneys for the United States

## **CERTIFICATE OF SERVICE**

       I hereby certify that on July 15, 2013, I caused a true and correct copy of the foregoing to be filed with the Court's CM/ECF system, which will send an electronic notice of the filing to all counsel of record.

                                        /s *Patricia M. Fitzgerald*
                                        PATRICIA M. FITZGERALD
                                        Trial Attorney