# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

USA and ELIN BAKLID-KUNZ,

        **Plaintiffs,**

v.                              **Case No:  6:09-cv-1002-Orl-31TBS**

HALIFAX HOSPITAL MEDICAL
CENTER and HALIFAX STAFFING,
INC.,

        **Defendants.**

_____

## ORDER

This matter comes before the Court on the corrected Motion for Partial Summary Judgment (Doc. 295) filed by the Relator, Elin Baklid-Kunz ("Baklid-Kunz" or the "Relator"). The Defendants have filed a memorandum in response (Doc. 314), and Baklid-Kunz has filed a reply (Doc. 333).  By way of the instant motion, Relator seeks summary judgment as to the Defendants' liability under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, arising out of the remuneration paid to certain oncologists, allegedly in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320(a)-7b(b).[1]

## I.      Background

Halifax Hospital Medical Center ("Halifax Hospital") is a special taxing district that operates a community hospital of the same name in Volusia County, Florida.  (Doc. 277 at 9). Halifax Staffing, Inc. ("Halifax Staffing") is an instrumentality of Halifax Hospital.  Halifax Staffing employs the individuals who work for Halifax Hospital.  Halifax Hospital pays all of the

_____

[1] This issue is also addressed in Defendants' Motion for Summary Judgment (Doc. 292).

expenses and obligations of Halifax Staffing, including payroll, either directly or by transfer of funds into Halifax Staffing's payroll account.  Baklid-Kunz worked at Halifax Hospital for more than a decade, including serving as Director of Physician Services.  (Doc. 295 at 9).

Halifax Staffing entered into employment agreements with six medical oncologists: Boon Chew, Walter Durkin, Ruby Anne Deveras, Abdul Sorathia, Richard Weiss, and Gregory Favis (collectively, the "Medical Oncologists").  The employment agreements provided that the Medical Oncologists would receive a salary and bonuses.  (Doc. 277 at 11).

In fiscal year 2005, the Medical Oncologists became eligible to receive a bonus (henceforth, the "Incentive Bonus") pursuant to the following provision of their employment agreements:

> Compensation [Halifax Staffing] shall pay to Employee as compensation for services the following:
>
> …
>
> c. Beginning with the fiscal year ending September 30, 2005, an equitable portion of an Incentive Compensation pool which is equal to 15% of the operating margin for the Medical Oncology program as defined by the financial statements produced by the Finance Department on a quarterly basis. The amount of the incentive compensation distributed to the Employee shall be determined by the Medical Oncology Practice Management Group. This compensation shall be paid annually according to the operating margin for the fiscal year.

(Doc. 272-4 at 8-9, 21).[2]  Although Halifax Hospital is a nonprofit entity, the operating margin for the Medical Oncology program was in essence what would be recognized in another context as profit – *i.e.*, the program's revenue less its expenses.  (Doc. 272-8 at 71).  In response to an interrogatory from the Government, the Defendants stated that the operating margin for the

---

[2] While the quoted language comes from the employment agreement with Walter Durkin, the bonus provisions in the agreements with the other Medical Oncologists are identical.

Medical Oncology program was made up of "revenue and direct expenses from outpatient medical oncology services" and that "[r]evenue consisted of outpatient medical oncology services, physician services, and related outpatient oncology pharmacy charges." (Doc. 272-4 at 24). Baklid-Kunz asserts, and the Defendants do not dispute, that the operating margin for the Medical Oncology program (and hence, the 15 percent of that margin that constituted the Incentive Compensation pool) took into account patient referrals by the Medical Oncologists to Halifax Hospital oncology centers. (Doc. 295 at 7).

The Incentive Compensation pool was divided between the six Medical Oncologists based on each individual oncologist's personally performed services. Halifax Staffing paid the Incentive Bonuses to the Medical Oncologists for fiscal years 2005-2008. (Doc. 313 at 3). During this time frame, Halifax Hospital submitted thousands of claim forms to Medicare in which one or more of the Medical Oncologists was identified as an attending physician or an operating physician. (Doc. 272-10 at 54-55).

In her Second Amended Complaint (Doc. 29), the Relator claims that the Incentive Bonus paid to these oncologists violates the Anti-Kickback Statute and therefore the claims submitted by Halifax Hospital to Medicare during this period violated the FCA.

## II.   Legal Standards

### A.   Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

2553, 91 L.Ed.2d 265 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.  Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial.  *Id.*  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts.  *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.  The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments.  *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

B.    The Anti-Kickback Statute

The Anti-Kickback Statute is a criminal statute that prohibits the knowing and willful payment of remuneration to induce referrals for items or services paid for by a federal health care program such as Medicare.[3]  It states:

(b) Illegal remuneration

(1)  Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)  Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

---

[3] The Act contains no private right of action.  Plaintiff seeks to enforce the alleged violation by application of the FCA.

42 U.S.C. § 1320a-7b(b)(1)-(2).

        C.      The False Claims Act

The False Claims Act (henceforth, the "FCA"), 31 U.S.C. § 3729 *et seq.*, was enacted in 1863 as a means of combating frauds perpetrated by private contractors during the Civil War. *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 781, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).[4] *See also Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1237 n. 1 (11th Cir.1999) ("The purpose of the [FCA], then and now, is to encourage private individuals who are aware of fraud being perpetrated against the government to bring such information forward.") (citation omitted); *and see United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496–98 (11th Cir.1991) (tracing history of FCA).

The FCA permits private persons (called "relators") to file a form of civil action (known as *qui tam*) against, and recover damages on behalf of the United States from, any person who:

> (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.

31 U.S.C. § 3729(a)(1)-(2) (2003).[5]

---

[4]See also *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496–98 (11th Cir.1991) (tracing history of Act).

[5] The FCA was amended in May 2009 and changes were made to 31 U.S.C.§ 3729(a)(2); however, the amended version of 31 U.S.C.§ 3729(a)(2) only applies to claims for payment (such as Medicare claims) pending on or after June 7, 2008. *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009). The Government does not allege that any of the Medicare claims at issue here were pending on or after that date, and therefore the previous version of 31 U.S.C.§3729(a)(2) applies here.

To prevail under the first of these two sections, a plaintiff must prove three things:  (1) a false or fraudulent claim (2) was presented, or caused to be presented, by the defendant to the United States for payment or approval (3) with knowledge that the claim was false.  *United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).  When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the False Claims Act, for submission of those claims.  *McNutt ex rel. U.S. v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (holding that violation of Anti-Kickback Statute could form basis for qui tam action under FCA).  The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false under Section 31 U.S.C. § 3729(a)(1).  *Id.  See also U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (stating that, in health care context, FCA liability does not arise from provider's disregard of Government regulations or failure to maintain proper internal policies unless those acts allow provider to knowingly ask Government to pay amounts it does not owe.)

To establish a claim under 31 U.S.C. §3729(a)(2), a plaintiff must demonstrate that

> (1) a "claim" was presented to the government by the defendant, or the defendant "caused" a third party to submit the "claim," (2) the claim was "false or fraudulent," (3) the defendant presented the claim knowing it was "false or fraudulent," and (4) the defendant made or used a false statement which the defendant knew to be false, and which was causally connected to the false claim.

*U.S. ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 682-83 (10th Cir. 1998) (citing cases).

For purposes of the FCA, the terms "knowing" and "knowingly" mean that the person either had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity of the information, or acted in reckless disregard of the truth or falsity of the information.  31

U.S.C. §3729(b)(1)(A).  However, proof of intent to defraud need not be shown.  31 U.S.C.

§3729(b)(1)(B).  The Government must prove all essential elements of an FCA claim, including

damages, by a preponderance of the evidence.  31 U.S.C. § 3731(d).

**III.    Analysis**

As explained in this Court's Order granting in part the Government's Motion for Summary

Judgment, during the period when the Medical Oncologists were receiving the Incentive Bonus,

the compensation arrangement failed to satisfy the Stark Law's exception for bona fide

employment relationships, and therefore the Medical Oncologists' referrals during that time

violated the Stark Law.  (Doc. 396).  The question here is whether that arrangement also violated

the Anti-Kickback Statute.

The "illegal remunerations" section of the Anti-Kickback Statute provides that the

prohibitions against providing compensation in exchange for referrals shall not apply to "any

amount paid by an employer to an employee (who has a bona fide employment relationship with

such employer) for employment in the provision of covered items or services."  42 U.S.C. §

1320a-7b(b)(3)(B).  The Relator argues that the Defendants cannot avail themselves of this

exception – henceforth, the "Bona Fide Employment Exception" – because they did not properly

assert it in their answer.

More particularly, the Relator contends that this Court has already "unequivocally ruled

that the Bona Fide Employment Exception [is] an affirmative defense which Defendants must

plead in their answers or it would be waived."  (Doc. 333 at 1).   This is incorrect.  The Relator

relies on a passage from an order (Doc. 109) in which the Court denied Defendants' motion to

dismiss the Government's complaint in intervention.  The Defendants had argued that to state a

claim the Government was required to plead that certain exceptions did not apply to the financial

relationships between the Medical Oncologists and the Defendants.  (Doc. 109 at 8).  However, the Government had intervened as to certain of the Relator's Stark Law claims, not her Anti-Kickback Statute claims; as such, the exceptions at issue in the cited order were exceptions to the Stark Law rather than, as here, the Anti-Kickback Statute.

More importantly, the Court did not rule that those exceptions were affirmative defenses that were waived if not raised as such.  Instead, the Court noted that the exceptions resembled affirmative defenses more than they did elements of a cause of action, and in the absence of authority to the contrary (which the Defendants did not provide), plaintiffs were not required, in their complaint, to deny that the exceptions applied.  (Doc. 109 at 8).  In other words, the issue of waiver of affirmative defenses to an Anti-Kickback Statute claim was not before the Court.

With that said, the Court finds that though the Defendants did not raise the Bona Fide Employment Exception as an affirmative defense, they did enough to avoid a waiver.  Relator herself raised the issue of the Bona Fide Employment Exception in her Second Amended Complaint:

> Defendant HALIFAX STAFFING and Defendant HALIFAX HOSPITAL are separate and distinct legal entities. The remuneration paid by Defendant HALIFAX HOSPITAL indirectly through Defendant HALIFAX STAFFING to the Recipient Oncologists in the form of the oncology incentive payments did not qualify for the statutory exclusion or regulatory safe harbor from the kickback referral prohibition for amounts paid to an employee because the Recipient Oncologists were not employees of Defendant HALIFAX HOSPITAL. 42 U.S.C. §1320a-7b(b)(3); 42 C.F.R. §1001.952(i).
>
> …
>
> The oncology incentive payments made indirectly by Defendant HALIFAX HOSPITAL to the Recipient Oncologists did not qualify for any other statutory exception or safe harbor from the AKS remuneration prohibition.

(Doc. 29 at 64).  In their answer, the Defendants denied these allegations (other than the allegation that the Defendants were separate legal entities).  (Doc. 47 at 18).  The purpose of Fed.R.Civ.P. 8(c), which requires the pleading of affirmative defenses, is to put opposing parties on notice and to afford them the opportunity to respond.  *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 444 (D.C.Cir. 1994) (citing *Blonder-Tongue Labs, Inc. v. University of Illinois Found.*, 402 U.S. 313, 350 (1971)).  Those purposes were served here.  Although they did not raise it as an affirmative defense, the Defendants put the Relator on notice at the outset of this case that they believed that the Bona Fide Employment Exception applied as to the remuneration paid to the Medical Oncologists.[6]

The Department of Health and Human Services has promulgated regulations establishing a number of safe harbors for certain arrangements between health care providers which remove those arrangements from the scope of the Anti-Kickback Statute.  Those regulations include the following:

> (i) Employees. As used in section 1128B of the [Anti-Kickback Statute], "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2)."

42 C.F.R. § 1001.952.  The cited statute, a portion of the IRS Code, defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."  26 U.S.C. § 3121(d)(2).  The relevant

---

[6] *See also United States v. Job*, 387 Fed.Appx. 445, 454-55 (5th Cir. 2010) (in Anti-Kickback Statute case, analyzing whether evidence at trial of Defendant's employment relationship was sufficient that judge was obligated to give jury instruction *sua sponte* on Bona Fide Employment Exception).

federal regulation, 26 C.F.F. § 31.3121(d)—1(c)(2), notes generally that an employer-employee

relationship exists when the employer "has the right to control and direct the individual who

performs the services, … not only as to what shall be done but how it shall be done."

Courts in deciding this issue have developed a substantial list of
factors to evaluate the relationship.  Included are the following:

1. Instruction

2. Training

3. Integration

4. Services rendered personally

5. Hiring, supervising and paying assistants

6. Continuing relationship

7. Set hours of work

8. Full time required

9. Doing work on employer's premises

10. Order or sequence of work

11. Oral or written reports

12. Payment by hour, week, or month

13. Payment of business and/or travel expenses

14. Furnishing of tools and materials

15. Significant investment

16. Realization of profit or loss

17. Working for more than one firm

18. Making service available to general public

19. Right to discharge

20. Right to terminate

21. Intention of the parties

22. Skill required

23. Providing workers' compensation or other insurance

24. Industry practice or custom

25. Written signed independent contractor agreements

No single factor is determinative of the result. Rather, the court must consider all of the circumstances in making its decision.

*In re Arndt*, 201 B.R. 853, 858-59 (M.D.Fla. 1996) (internal citations omitted).

The Relator argues that the Bona Fide Employment Exception cannot apply to the Medical Oncologists because they were employees of Halifax Staffing rather than the entity providing the Incentive Bonus – Halifax Hospital.  In making this argument, however, the Relator ignores the factors that might indicate control, relying instead on the fact that the Medical Oncologists' employment agreements were with Halifax Staffing, not Halifax Hospital.[7]  The Defendants assert, and the Relator does not dispute, that Halifax Staffing is "merely an instrumentality and alter ego of Halifax Hospital established to enable Halifax Hospital to move its employees from the Florida state retirement system into a self-funded retirement program."  (Doc. 314 at 17). Simply stated, aside from its employment of the people who operate Halifax Hospital, there is no Halifax Staffing.  Halifax Staffing has no employees other than those it leases to Halifax Hospital, and the Board of Commissioners of Halifax Hospital also serves that role for Halifax Staffing. (Doc. 314 at 17).

All of the elements one associates with control reside in Halifax Hospital, not Halifax Staffing.  For example, it is undisputed that Halifax Hospital sets the budget for the medical

---

[7] For example, the Relator points out that Halifax Staffing, not Halifax Hospital, was the entity that was obligated to withhold FICA taxes for the Medical Oncologists.  (Doc. 333 at 3-4).

oncology department, and Halifax Hospital's chief of staff and Board of Commissioners has ultimate oversight over each of the Medical Oncologists. (Doc. 314 at 16). The Medical Oncologists work at Halifax Hospital's campus, solely on Halifax Hospital patients. (Doc. 314 at 16). The money to pay the Medical Oncologists originates with Halifax Hospital and is "passed through" to Halifax Staffing in the exact amount needed to make payroll and pay associated expenses. (Doc. 314 at 17-18). The Relator has not produced any evidence to counter the Defendant's evidence that under the common law test, the Medical Oncologists were employees of Halifax Hospital, not Halifax Staffing.

The Relator's second argument is that the exception cannot apply because the Incentive Bonus was paid, at least in part, to induce referrals. "Payments for referrals," the Relator argues, "are illegal kickbacks under the Anti-Kickback Statute, no matter the amount or whether payor employed the payee." (Doc. 333 at 5).

It is far from clear that the Relator's characterization of the Incentive Bonus is correct. This is not the typical Anti-Kickback Statute case, where one or more of the accused participants in the criminal scheme testifies that the payments he or she received from the defendant were intended to induce referrals. *See*, *e.g.*, *United States v. Rogan*, 459 F.Supp.2d 692, 724 (N.D.Ill. 2006) ("Several credible witnesses, including Barnabas, Cubria, and Ehmen – were presented by the Government, who offered direct evidence of Rogan's knowledge that payments to Barnabas, Cubria and Rao were specifically intended to illegally obtain patient referrals."). In this case, there has been no such testimony.

Despite this, the Relator contends that the Defendants have "admitted that one purpose … for the [Incentive Bonus] was to induce referrals to Halifax Hospital." (Doc. 295 at 19). Relator's evidence on this score does not withstand any sort of scrutiny, however. That evidence consists of

testimony from one Halifax Hospital administrator and two of the Medical Oncologists that the Incentive Bonus was intended to make the Medical Oncologists' hospital-based practice similar, financially, to what it would be in private practice.  (Doc. 295 at 19).  The Relator extrapolates from this testimony that the Incentive Bonus was intended to keep the Medical Oncologists from leaving for private practice and, most importantly, taking their referrals with them.  (Doc. 295 at 20).  But the cited testimony does not address the issue of referrals at all, much less make the sort of admission claimed by the Relator.  Raising their pay so as to keep the Medical Oncologists at Halifax Hospital would also have had the effect of keeping the Medical Oncologists' referrals there, but there is no testimony that the latter was one of the purposes of the former.

The Relator offers a second argument that the Incentive Bonus falls outside the Bona Fide Employment Exception:

> Thus, Defendants' payments to the Oncologists violated the Anti-Kickback Statute even if the Oncologists had been employees of Halifax Hospital, and even if the eventual overall compensation the Oncologists received was, in fact, commercially reasonable and within fair market value. The … Incentive Bonus payments still constituted illegal remuneration prohibited by the Anti-Kickback Statute, **because the payments were derived from a bonus pool that was comprised of profits from the Oncologists' referrals** to Halifax Hospital's outpatient services and not on the physicians' "furnishing of any item or service for which payment may be made in whole or in part under Medicare." 42 C.F.R. § 1001.952(i).

(Doc. 333 at 7) (emphasis added).  In other words, the Relator is arguing that the Incentive Bonus payments were kickbacks from referrals, and kickbacks from referrals cannot qualify as the sort of payments protected by the Bona Fide Employment Exception.  But to accept Relator's argument would result in the rule swallowing the exception.

Simply stated, the Bona Fide Employment Exception provides that the normal prohibition on payments to induce referrals does not apply where the payments are made to a (for lack of a

better word) legitimate employee.[8]  42 U.S.C. § 1320a-7b(b)(3).  The Relator would change that to read that the prohibition on payments to induce referrals does not apply where the payments are made to a legitimate employee *unless they are payments to induce referrals.*  The exceptions set forth in the Anti-Kickback Statute and accompanying regulations "provide immunity from prosecution for behavior that might have violated the Anti-Kickback Statute."  *State v. Harden*, 938 So. 2d 480, 488-89 (Fla. 2006).  The Relator's interpretation of the Bona Fide Employment Exception would eviscerate it.

## IV.    Conclusion

The Relator has not overcome the Defendants' argument (and evidence) that the Bona Fide Employment Exception applies to the Incentive Bonus payments to the Medical Oncologists.  Accordingly, the Relator has not shown that the Defendants violated the Anti-Kickback Statute or, as a result, the False Claims Act.  Given the present posture of this case, the Court declines to reach the issue of the proper measure of damages for the Defendants' (alleged) violations of the False Claims Act or the applicability of the Defendants' remaining affirmative defenses.

In consideration of the foregoing, it is hereby

**ORDERED** that the corrected Motion for Partial Summary Judgment (Doc. 295) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on November 26, 2013.

**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

---

[8] It should be noted that the making referrals for services is part of the normal, legitimate duties of the Medical Oncologists.

Copies furnished to:

Counsel of Record
Unrepresented Party