# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**USA and ELIN BAKLID-KUNZ,**

        **Plaintiffs,**

**v.**                                     **Case No:   6:09-cv-1002-Orl-31TBS**

**HALIFAX HOSPITAL MEDICAL CENTER and HALIFAX STAFFING, INC.,**

        **Defendants.**

_____

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 292) filed by Defendants Halifax Hospital Medical Center ("Halifax Hospital") and Halifax Staffing, Inc. ("Halifax Staffing"), the response (Doc. 312) filed by the Relator, Elin Baklid-Kunz ("Baklid-Kunz" or the "Relator"), and the reply (Doc. 335) filed by the Defendants.

## I.     Background

Halifax Hospital is a special taxing district that operates a community hospital of the same name in Volusia County, Florida.   (Doc. 277 at 9).   Halifax Staffing is an instrumentality of Halifax Hospital.   Halifax Staffing employs the individuals who work for Halifax Hospital. Halifax Hospital pays all of the expenses and obligations of Halifax Staffing, including payroll, either directly or by transfer of funds into Halifax Staffing's payroll account.

The Relator filed this *qui tam* action on June 16, 2009, asserting that the Defendants had committed numerous violations of the Stark Law and the False Claims Act.   (Doc. 1).   On February 18, 2009, the Relator filed her four-count Second Amended Complaint (Doc. 29), asserting claims for violation of the False Claims Act (Count I); conspiracy to violate the False

Claims Act (Count II); violation of the Stark Law (Count III); and violations of the Anti-Kickback Statute (Count IV).   On October 4, 2011, the Government announced that it had elected to intervene as to certain of the Relator's claims.   (Doc. 69, 73).   More particularly, the Government intervened as to Relator's claims that the Defendants' financial relationships with certain medical oncologists and neurosurgeons violated the Stark Law, and that submitting Medicare claims for certain referrals made by those physicians violated the False Claims Act.   (Doc. 73 at 14-23).

By way of the instant motion, the Defendants seek summary judgment as to all of the claims as to which the Government did not intervene.   Specifically, the Defendants seek summary judgment as to (1) Relator's claim that the Defendants unnecessarily admitted Medicare patients, allowing Halifax Hospital to improperly bill Medicare at a higher, inpatient rate; (2) Relator's claim that the Defendants conspired to violate the False Claims Act; (3) Relator's claim that the Defendants violated the Stark Law by submitting claims for payment based on referrals made by psychiatrists and a medical director who had a financial interest in Halifax Hospital; and (4) that the Defendants violated the Anti-Kickback Statute by paying neurosurgeons, oncologists, and psychiatrists for referrals.

## II.    Legal Standards

### A.    Summary Judgment

A party is entitled to summary judgment when the party can show that there is no genuine issue as to any material fact.   Fed.R.Civ.P. 56(c).   Which facts are material depends on the substantive law applicable to the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).   The moving party bears the burden of showing that no genuine issue of material fact exists.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).   In determining whether the moving party has satisfied its burden,

the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Thereafter, summary judgment is mandated against the nonmoving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

The Court must consider all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolve all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. The Court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458-59 (11th Cir 1994).

B.    The Stark Law

In an effort to contain health care costs and reduce conflicts of interest,[1] Congress passed

amendments to the Social Security Act in 1989 and 1993 – known as "Stark I" and "Stark II,"

respectively -- that prohibit physicians from referring their Medicare and Medicaid patients to

business entities in which the physicians or their immediate family members have a financial

interest.   *See* Pub.L. No. 101–239, 103 Stat. 2106 (codified at 42 U.S.C. § 1395nn(a)); Pub.L. No.

103–66, 107 Stat. 312 (codified at 42 U.S.C. § 1395nn(a)).

> The Stark Statute establishes the clear rule that the United States
> will not pay for items or services ordered by physicians who have
> improper financial relationships with a hospital. Violation of the
> Stark Statute may also subject the billing entity to exclusion from
> participation in federal healthcare programs and various financial
> penalties. *See* 42 U.S.C. §§ 1395nn(g)(3), 1320a-7a(a).

*United States v. Rogan*, 459 F.Supp.2d 692, 711 (N.D.Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir.

2008).

Stark I was in effect between January 1, 1992 and December 31, 1994.   It barred

physicians from referring Medicare patients to an entity for clinical laboratory services if the

physician had a prohibited financial relationship with such entity.   42 U.S.C.A. §1395nn(a)(1)(A)

(West 1992).   Stark II became effective on January 1, 1995.   It expanded the list of prohibited

referrals to include the following "designated health services" (henceforth, "DHS"):

---

[1] Stark I and Stark II were passed in the wake of several reports suggesting that physicians with a financial interest in referrals tended to provide excess care.   For example, in 1989 the Office of the Inspector General of for the Department of Health and Human Services ("HHS") issued the results of a study that found that "patients of referring physicians who own or invest in independent clinical laboratories received 45% more clinical laboratory services than … Medicare patients in general."   Steven D. Wales, The Stark Law: Boon or Boondoggle?   An Analysis of the Prohibition on Physician Self-Referrals, 27 Law & Psychol. Review 1, 5 (2003).   Later studies showed significant increases in referrals by physicians with financial interests (either due to ownership or receipt of bonuses) for such things as X-rays (16%), physical therapy and rehabilitation (39-45%), MRI scans (54%) and CT scans (27%).   *Id.* at 6.

(A) Clinical laboratory services.

(B) Physical therapy services.

(C) Occupational therapy services.

(D) Radiology services, including magnetic resonance imaging, computerized axial tomography scans, and ultrasound services.

(E) Radiation therapy services and supplies.

(F) Durable medical equipment and supplies.

(G) Parenteral and enteral nutrients, equipment, and supplies.

(H) Prosthetics, orthotics, and prosthetic devices and supplies.

(I) Home health services.

(J) Outpatient prescription drugs.

(K) Inpatient and outpatient hospital services.

(L) Outpatient speech-language pathology services.

42 U.S.C. § 1395nn(a)(1), (h)(6).

In pertinent part, the Stark Law provides:

(a) Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician (or an immediate family member of such physician) has a financial relationship with an entity specified in paragraph (2), then-

(A) the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B) the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).   In addition to prohibiting the hospital from submitting claims under

these circumstances, the Stark Law also prohibits payment by the Medicare program of such

claims: "No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section." 42 U.S.C. § 1395nn(g)(1).

The Stark Law broadly defines "financial relationships" to include an ownership or investment interest in an entity or a "compensation arrangement." 42 U.S.C. § 1395nn(a)(1). "Compensation arrangement," in turn, is defined as "any arrangement involving any remuneration between a physician (or an immediate family member of such physician) and an entity." 42 U.S.C. § 1395nn(h)(1)(A). "Remuneration," with certain exceptions not applicable to the instant case, includes "any remuneration, directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1395nn(h)(1)(B).

"Referral," for purposes of the Stark Law, is defined as "the request or establishment of a plan of care by a physician which includes the provision of designated health services." 42 U.S.C. § 1395nn(h)(5)(A). The regulations interpreting the statute also broadly define "referral" as, among other things, "a request by a physician that includes the provision of any designated health service for which payment may be made under Medicare, the establishment of a plan of care by a physician that includes the provision of such a designated health service, or the certifying or recertifying of the need for such a designated health service." 42 C.F.R § 411.351.

The Stark Law sets forth several exceptions to its broad prohibition on compensation arrangements between health care entities and referring physicians. To avoid the referral and billing prohibitions in the statute, a hospital's financial relationship with a physician must fall into one of the exceptions. One such exception involves what the Stark Law describes as "bona fide employment relationships." Under this exception – henceforth, the "Bona Fide Employment Exception" -- amounts paid by an employer to a physician will not be considered a compensation arrangement for purposes of the Stark Law if

> (A) the employment is for identifiable services,
>
> (B) the amount of remuneration under the employment –
>
> > (i) is consistent with the fair market value of the services, and
>
> > (ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,
>
> (C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and
>
> (D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. §1395nn(e)(2).

Once the plaintiff has demonstrated proof of each element of a violation of the Stark Law, the burden shifts to the defendant to establish that his conduct was protected by a safe harbor or exception.   The plaintiff need not prove, as an element of its case, that a defendant's conduct does not fit within a safe harbor or exception.   *See Rogan*, 459 F.Supp.2d at 715.

The Stark Law does not create its own cause of action.   *U.S. ex rel. Drakeford v. Tuomey Healthcare Systems, Inc.*, 675 F.3d 394, 396 (4th Cir. 2012) (explaining, in case involving alleged violations of Stark Law, why the United States was seeking relief under the False Claims Act).

C.   The Anti-Kickback Statute

The Anti-Kickback Statute is a criminal statute that prohibits the knowing and willful payment of remuneration to induce referrals for items or services paid for by a federal health care program such as Medicare.[2]   It states:

---

[2] The Act contains no private right of action.   Relator seeks to enforce the alleged violation by application of the FCA.

(b) Illegal remuneration

(1)  Whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe or rebate) directly or indirectly, overtly or covertly, in cash or in kind—

(A)  in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)   Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)  to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)  to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b)(1)-(2).

As with the Stark Law, the Anti-Kickback Statute provides for a "Bona Fide Employment Exception."   However, its requirements differ.   The "Illegal remuneration" section of the Anti-Kickback Statute states that the prohibitions against providing compensation in exchange for referrals shall not apply to "any amount paid by an employer to an employee (who has a bona fide

employment relationship with such employer) for employment in the provision of covered items or services."   42 U.S.C. § 1320a-7b(b)(3)(B).

The Department of Health and Human Services has promulgated regulations establishing a number of safe harbors for certain arrangements between health care providers which remove those arrangements from the scope of the Anti-Kickback Statute.   Those regulations include the following:

> (i) Employees. As used in section 1128B of the [Anti-Kickback Statute], "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. For purposes of paragraph (i) of this section, the term employee has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2)."

42 C.F.R. § 1001.952.   The cited statute, a portion of the IRS Code, defines "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."   26 U.S.C. § 3121(d)(2).   The relevant federal regulation, 26 C.F.F. § 31.3121(d)—1(c)(2), notes generally that an employer-employee relationship exists when the employer "has the right to control and direct the individual who performs the services, … not only as to what shall be done but how it shall be done."

> Courts in deciding this issue have developed a substantial list of factors to evaluate the relationship.   Included are the following:
>
> 1. Instruction
>
> 2. Training
>
> 3. Integration
>
> 4. Services rendered personally
>
> 5. Hiring, supervising and paying assistants

6. Continuing relationship

7. Set hours of work

8. Full time required

9. Doing work on employer's premises

10. Order or sequence of work

11. Oral or written reports

12. Payment by hour, week, or month

13. Payment of business and/or travel expenses

14. Furnishing of tools and materials

15. Significant investment

16. Realization of profit or loss

17. Working for more than one firm

18. Making service available to general public

19. Right to discharge

20. Right to terminate

21. Intention of the parties

22. Skill required

23. Providing workers' compensation or other insurance

24. Industry practice or custom

25. Written signed independent contractor agreements

No single factor is determinative of the result. Rather, the court must consider all of the circumstances in making its decision.

*In re Arndt*, 201 B.R. 853, 858-59 (M.D.Fla. 1996) (internal citations omitted).

D.     The False Claims Act

The False Claims Act (henceforth, the "FCA"), 31 U.S.C. § 3729 *et seq.*, was enacted in

1863 as a means of combating frauds perpetrated by private contractors during the Civil War.

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 781, 120

S.Ct. 1858, 146 L.Ed.2d 836 (2000).[3]   See *also Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235,

1237 n. 1 (11th Cir.1999) ("The purpose of the [FCA], then and now, is to encourage private

individuals who are aware of fraud being perpetrated against the government to bring such

information forward.") (citation omitted); *and see* United *States ex rel. Williams v. NEC Corp.*,

931 F.2d 1493, 1496–98 (11th Cir.1991) (tracing history of FCA).

The FCA permits private persons (called "relators") to file a form of civil action (known as

*qui tam*) against, and recover damages on behalf of the United States from, any person who:

> (1) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval; [or]
>
> (2) knowingly makes, uses, or causes to be made or used, a false
> record or statement to get a false or fraudulent claim paid or
> approved by the Government.

31 U.S.C. § 3729(a)(1)-(2) (2003).[4]

To prevail under the first of these two sections, a plaintiff must prove three things:   (1) a

false or fraudulent claim (2) was presented, or caused to be presented, by the defendant to the

---

[3]See also *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1496–98 (11th Cir.1991) (tracing history of Act).

[4]  The FCA was amended in May 2009 and changes were made to 31 U.S.C.§ 3729(a)(2); however, the amended version of 31 U.S.C.§ 3729(a)(2) only applies to claims for payment (such as Medicare claims) pending on or after June 7, 2008.   *Hopper v. Solvay Pharmaceuticals, Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009).   The Government does not allege that any of the Medicare claims at issue here were pending on or after that date, and therefore the previous version of 31 U.S.C.§3729(a)(2) applies here.

United States for payment or approval (3) with knowledge that the claim was false.   *United States v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005).   When a violator of government regulations is ineligible to participate in a government program and that violator persists in presenting claims for payment that the violator knows the government does not owe, that violator is liable, under the False Claims Act, for submission of those claims.   *McNutt ex rel. U.S. v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (holding that violation of Anti-Kickback Statute could form basis for qui tam action under FCA).   The violation of the regulations and the corresponding submission of claims for which payment is known by the claimant not to be owed make the claims false under Section 31 U.S.C. § 3729(a)(1).   *Id.   See also U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (stating that, in health care context, FCA liability does not arise from provider's disregard of Government regulations or failure to maintain proper internal policies unless those acts allow provider to knowingly ask Government to pay amounts it does not owe.)

Falsely certifying compliance with the Stark Law in connection with a claim submitted to a federally funded insurance program is actionable under 31 U.S.C. §3729(a)(2).   *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009) (citing cases).   To establish a claim under 31 U.S.C. §3729(a)(2), a plaintiff must demonstrate that

> (1) a "claim" was presented to the government by the defendant, or the defendant "caused" a third party to submit the "claim," (2) the claim was "false or fraudulent," (3) the defendant presented the claim knowing it was "false or fraudulent," and (4) the defendant made or used a false statement which the defendant knew to be false, and which was causally connected to the false claim.

*U.S. ex rel. Aakhus v. Dyncorp, Inc.*, 136 F.3d 676, 682-83 (10th Cir. 1998) (citing cases).

For purposes of the FCA, the terms "knowing" and "knowingly" mean that the person either had actual knowledge of the information, acted in deliberate ignorance of the truth or falsity

of the information, or acted in reckless disregard of the truth or falsity of the information.   31 U.S.C. §3729(b)(1)(A).   However, proof of intent to defraud need not be shown.   31 U.S.C. §3729(b)(1)(B).   The Government must prove all essential elements of an FCA claim, including damages, by a preponderance of the evidence.   31 U.S.C. § 3731(d).

## III.   Analysis

### A.  Improper Admissions

In her Second Amended Complaint, the Relator asserts that the Defendants regularly admitted Medicare patients for short periods – one or two days – even when those patients did not meet the medical criteria for admission.   (Doc. 29 at 25-28).   According to the Relator, these improper "short stay" admissions resulted in violations of the False Claims Act when Halifax Hospital billed Medicare at the higher inpatient rate for procedures performed on these patients.

To support these allegations, the Relator primarily relies on expert reports prepared by Jessica Schmor ("Schmor"), which purport to document numerous instances in which patient records show that the patients were admitted despite an absence of medical necessity for such admission.   The Defendants respond that what they term "second-guessing" of a physician's decision to admit a patient can only be done by way of a "clinical medical necessity review by a qualified medical professional".   (Doc. 292 at 20).   They assert that Schmor's reports are insufficient because (1) one was based on an internal compliance audit, rather than a medical necessity review and (2) because Schmor did not examine a statistically sufficient number of randomly selected patients' records so that her findings as to the error rate for admissions can legitimately be extrapolated to encompass *all* short-stay admissions during the time period at issue.   (Doc. 292 at 20).

The Defendants made essentially the same arguments in recent motions (Doc. 429, 430) to strike and/or limit the testimony of Schmor and the statistician who worked with her on her report, Douglas Steinley.   The Court recently denied those motions, (Doc. 449, 450), and rejects those arguments here for the same reasons.

Schmor's report provides sufficient evidence to establish the existence of a genuine issue of material fact as to the medical necessity of at least some of the admissions at issue. Accordingly, Summary judgment will be denied as to this issue.

### B.  Anti-Kickback Statute claims

The Defendants argue, *inter alia*, that the Bona Fide Employment Exception to the AKS, bars all of the Relator's AKS claims.[5]   (Doc. 292 at 8).   The Relator argues that the Defendants waived the Bona Fide Employment Exception by failing to raise it as an affirmative defense. (Doc. 312 at 14-16).   This argument was previously rejected by the Court in its order denying the Relator's Motion for Partial Summary Judgment.   (Doc. 416 at 8-10).

The Relator also argues that the Bona Fide Employment Exception to the AKS does not apply here because the physicians at issue – certain oncologists, neurosurgeons, and psychiatrists – were independent contractors of Halifax Hospital, rather than employees.   (Doc. 312 at 16).   In support, the Relator offers numerous arguments, none of them convincing.   All of Relator's arguments stem from the fact that the physicians at issue were (at least technically) employed by Halifax Staffing rather than Halifax Hospital.   However, as the Court noted in its order denying

---

[5]  The Defendants also argue that the Relator's AKS claims fail because that statute does not include a private cause of action.   However, this argument fails, as the Relator is not attempting to enforce the AKS directly.   The Relator is attempting to establish that the Defendants violated the AKS as a steppingstone to establishing that the Defendants violated the False Claims Act. The same holds true for the Relator's claims under the Stark Law, which also lacks a private right of action.

the Relator's Motion for Partial Summary Judgment (Doc. 416), it is undisputed that Halifax Staffing is merely an instrumentality and alter ego of Halifax Hospital, established to enable Halifax Hospital to move its employees from the Florida state retirement system into a self-funded retirement program.

> Simply stated, aside from its employment of the people who operate Halifax Hospital, there is no Halifax Staffing. Halifax Staffing has no employees other than those it leases to Halifax Hospital, and the Board of Commissioners of Halifax Hospital also serves that role for Halifax Staffing. (Doc. 314 at 17).

(Doc. 416 at 12).

As Relator correctly points out (Doc. 312 at 17), the appropriate test to determine employment status under the Anti-Kickback Statute is the common law agency test.   Although courts have examined a number of different factors to make this determination, generally speaking that test boils down to a question of control.   For example, the relevant federal regulation, 26 C.F.F. § 31.3121(d)—1(c)(2), notes generally that an employer-employee relationship exists when the employer "has the right to control and direct the individual who performs the services, … not only as to what shall be done but how it shall be done."   None of the evidence on which the Relator attempts to rely here suggests (a) that these physicians were actually controlled by Halifax Staffing rather than Halifax Hospital or (b) that they were otherwise independent contractors.[6]

---

[6] For example, the Relator points out that Halifax Staffing, rather than Halifax Hospital, withheld FICA taxes from the physicians, that Halifax Hospital did not provide retirement benefits to the physicians, and that Halifax Hospital did not have a legal right to fire the physicians.   (Doc. 312 at 21-22).   None of these items suggests that Halifax Staffing exerted control over these physicians.   The Relator also argues that under other guidelines, such as "IRS Guidelines for Leased Employees," Halifax Staffing is the physicians' employer.   (Doc. 312 at 23-24).   Even assuming this to be true, it does not suggest that, under the common law guidelines, Halifax Hospital is *not* the physicians' employer.

The Court finds that the Relator has failed to establish the existence of a genuine issue of material fact as to whether the physicians at issue had bona fide employment relationships with Halifax Hospital for purposes of the Anti-Kickback Statute.   Accordingly, the exception applies, and summary judgment will be granted as to all of the Relator's claims under the Anti-Kickback Statute.

### C.  Stark Law

With certain exceptions, the Stark Law prohibits physicians who have financial relationships with an entity from making referrals for designated health services (or "DHS") to that entity, and it prohibits the entity from submitting claims for payment resulting from such referrals.   42 U.S.C. § 1395nn(a)(1).   The Relator asserts that two psychiatrists (Dr. Caliendo and Dr. Frick) and a medical director (Dr. Moore) who had financial relationships with the Defendants violated the Stark Law by making referrals of DHS to Halifax Hospital, and that Halifax Hospital violated the Stark Law by submitting claims to Medicare based on those referrals.   (Doc. 312 at 31-33).   The Relator further argues that because the referrals were prohibited by the Stark Law, Halifax Hospital also violated the False Claims Act when it knowingly submitted claims to Medicare resulting from the referrals.   (Doc. 312 at 31).[7]

There is no dispute that Caliendo, Frick, and Moore had financial relationships with the Defendants.   However, the Defendants argue that they are entitled to summary judgment because Relator has failed to identify any prohibited referrals made by Caliendo, Frick, or Moore.   (Doc. 292 at 36).   As to Moore, the Defendants are correct.   The only evidence of such referrals cited by the Relator is a one-page spreadsheet (Doc. 29-1 at 2) that, based on its title, has something to

---

[7]  In the Relator's words, "all claims by Halifax which violated Stark are false claims for which Relator can claim against Defendants" under the False Claims Act.   (Doc. 312 at 31).

do with short-stay admissions.   The spreadsheet includes, among many other things, the name

"James Moore," but it does not establish that Moore made referrals for DHS to Halifax Hospital.

This spreadsheet, alone and without explanation, is not enough to establish the existence of a

genuine issue of material fact as to this point.   Summary judgment will be granted as to the Stark

Law claims involving Dr. Moore.

Such is not the case with regard to the other two physicians.   The Relator points out that in

response to a request for admissions, Halifax Hospital admitted that Caliendo and Frick made

referrals for DHS.   (Doc. 312 at 32).   More specifically, Halifax Hospital admitted that both

physicians "made referrals to Halifax Hospital for the furnishing of designated health services

between June 17, 2003 and June 16, 2009 (at any time during that period) for which Halifax

Hospital made a claim for payment under Medicare."   (Doc. 312-7 at106-08).

The Defendants argue that such referrals were not prohibited because the financial

relationships between those physicians and Halifax Hospital satisfied the Bona Fide Employment

Exception to the Stark Law.   As set forth above, to satisfy the requirements for this exception, the

employer must show that (a) the physician's employment was for identifiable services; (b) the

physician's remuneration was consistent with fair market value; (c) the remuneration did not take

into account the volume or value of referrals made; and (d) the remuneration was provided

pursuant to an agreement that would be commercially reasonable even if no referrals were made.

42 U.S.C. § 1395nn(e)(2).

There is no dispute that the psychiatrists' employment was for identifiable services, and

though not admitting it, the Relator does not advance any argument that the financial arrangements

at issue would not have been commercially reasonable even in the absence of referrals to Halifax

Hospital.   The Relator does argue that Caliendo and Frank were paid in excess of fair market

value; however, the Relator provides no evidence as to what fair market value actually was, while the Defendants have provided expert reports and other evidence that the remuneration provided was consistent with fair market value.

Thus, the sole remaining point at issue in regard to this exception is whether the amount of remuneration paid to Caliendo and Frick "was determined in a manner that [took] into account the volume or value of any referrals by the referring physicians."   42 U.S.C. §1395nn(e)(2)(B)(ii).

Halifax Hospital's agreements with Caliendo and Frick provided that, in addition to a fixed salary, they would receive incentive payments equal to 100 percent of the hospital's gross collections less the amount of their salary and the hospital's costs for billing and collection. (Doc. 29-3 at 7).   This arrangement would have allowed Caliendo and Frick to increase their incentive payments by making additional referrals for DHS to Halifax Hospital.   (Doc. 312 at 31-23).   Because the remuneration would vary with the amount of referrals, the Bona Fide Employment Exception to the Stark Law would not apply to these compensation agreements.

The Defendants also argue that they are entitled to summary judgment because the Relator has not identified any particular prohibited referrals made by Caliendo and Frick. (Doc. 335 at 9-10).   As to their factual point, the Defendants are correct.   However, for purposes of assessing the applicability of the exception, the question is not whether referrals occurred but whether the physicians' compensation varied with the volume or value of referrals.   Based on this record, the Defendants have failed to meet their burden of showing that the Bona Fide Employment Exception to the Stark Law applies to the compensation arrangement between Halifax Hospital and these psychiatrists.   Summary judgment will therefore be denied as to these Stark Law claims.

**D.  Conspiracy**

The Defendants argue that the Relator's claim fails because her underlying AKS and Stark Law claims fail.   (Doc. 292 at 34-38).   However, Relator's short-stay admissions claims and her Stark Law claims as to the psychiatrists have survived summary judgment.   Because of this, the Defendants are not entitled to summary judgment on this point.[8]

**IV.    Conclusion**

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 292) filed by Defendants Halifax Hospital Medical Center and Halifax Staffing, Inc. is **GRANTED IN PART AND DENIED IN PART** as set forth above.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on January 8, 2014.

_____
**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party

---

[8]  Though it is not obvious to the Court that a defendant can conspire with its alter ego (i.e., with itself), the Defendants did not raise this argument.