UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**USA and ELIN BAKLID-KUNZ,**

   **Plaintiffs,**

**v.**                   Case No:  6:09-cv-1002-Orl-31TBS

**HALIFAX HOSPITAL MEDICAL**
**CENTER and HALIFAX STAFFING,**
**INC.,**

   **Defendants.**

## ORDER

This matter comes before the Court on the Motion for Judgment on the Pleadings (Doc. 496) filed by the Defendants (henceforth, collectively, "Halifax") and the responses thereto (Doc. 505, 511) filed by the Plaintiffs.

### I.  Background

In this matter, the Relator, Elin Baklid-Kunz, alleges that the Defendants violated the False Claims Act, 31 U.S.C. §§ 3729-3733 (henceforth, the "FCA"), by overbilling Medicare.  The FCA permits a private person – a relator – to bring a qui tam action "for the person and for the United States Government" against the alleged violator of the FCA "in the name of the Government".  31 U.S.C. § 3730(b)(1).  Any person found to have violated the FCA is liable to the Government for a civil penalty in the amount of $5500 to $1100 plus three times the amount of damages sustained by the Government.  31 U.S.C. § 3729(a)(1), 28 U.S.C. § 2461.  The relator receives a share of any proceeds of the action.  31 U.S.C. § 3730(b)(1).

Halifax contends that relators lack standing under Article III of the Constitution to seek a civil penalty under the FCA.  (Doc. 496 at 3).  Halifax also contends that the FCA's delegation

of civil law enforcement authority to seek civil penalties to vindicate public rights violates the Appointments Claus of Article II of the Constitution.  (Doc. 496 at 3).  By way of the instant motion, Halifax seeks judgment on the pleadings on both these issues.

**II.     Legal Standard**

Rule 12(c) of the Federal Rules of Civil Procedure provides that

> After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings.  If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.

Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts.  *Horsley v. Rivera*, 292 F.3d 695, 701 (11th Cir.2002).

The standard applied to a Rule 12(c) motion is essentially if not entirely identical to the standard applied to a Rule 12(b)(6) motion.  *See ThunderWave, Inc. v. Carnival Corp.*, 954 F.Supp. 1562, 1564 (S.D.Fla.1997) (citing cases).  In considering a motion to dismiss under Rule 12(b)(6) for failure to state a claim, the court must accept all allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  *Castro v. Sec'y of Homeland Sec.*, 472 F.3d 1334, 1336 (11th Cir.2006).  District courts apply a fairly restrictive standard in ruling on motions for judgment on the pleadings.  *Bryan Ashley Int'l, Inc. v. Shelby Williams Indus.*, Inc., 932 F.Supp. 290, 291 (S.D.Fla.1996) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1368 at 222 (2004)).

**III.     Analysis**

A.  Standing

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies."  The case or controversy requirement defines with respect to the judicial branch the idea of separation of powers on which the federal government is founded.  *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).  The several doctrines that have grown up to elaborate the case or controversy requirement -- standing, mootness, ripeness, political question and the like -- are "founded in a concern about the proper – and properly limited – role of the courts in a democratic society."  *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)).   The doctrine that requires a litigant to have "standing" to invoke the power of a federal court is perhaps the most important of these doctrines.  *Id.*

To establish standing for purposes of Article III, a plaintiff must establish three things.  First, she must demonstrate "injury in fact" – a harm that is both "concrete" and "actual or imminent, not conjectural or hypothetical."  Second, she must demonstrate causation – a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant.  And third, she must demonstrate redressability – a "substantial likelihood" that the requested relief will remedy the alleged injury in fact.  *Vermont Agency of Natural Resources v. U.S. ex. rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 1861-62, 146 L.Ed.2d 836 (2000) (internal citations omitted).

It is settled that Congress cannot erase the standing requirements of Article III by statutorily granting the right to sue to a person who would not otherwise have standing.  *Raines v. Byrd*, 521 U.S. 811, 820 n. 3, 117 S.Ct. 2312, 2318, 138 L.Ed.2d 849 (1997).   Halifax argues that the FCA violates this principle by creating a cause of action that allows private individuals to seek

penalties for the vindication of public rights – something those individuals would not otherwise have standing to do.

In *Vermont Agency of Natural Resources*, the Supreme Court found "no room for doubt that a *qui tam* relator under the FCA has Article III standing." *Id.* at 778, 120 S.Ct. at 1865.   The Supreme Court found support for this conclusion in two separate areas of the law: (1) the well-established principle that the assignee of a claim has standing to assert the injury in fact suffered by the assignor, and (2) the long tradition of *qui tam* actions in England, the American colonies, and the early United States.   *Id.* at 773-74, 120 S.Ct. at 1863.   While addressing the issue of assignee standing, the Supreme Court noted that the FCA "can reasonably be regarded as effecting a partial assignment of the Government's damages claim."   *Id.* at 773, 120 S.Ct. at 1863.   Based largely on this statement, Halifax argues that the *Vermont Agency of Natural Resources* court upheld only "a relator's standing to seek *damages* under the FCA" and did not address "relators' standing to seek *civil penalties* for violation of the sovereign's laws."   (Doc. 496 at 6).

It is true that the *Vermont Agency of Natural Resources* only the addressed the general question of a relator's standing to proceed under the FCA rather than standing to pursue a particular type of claim pursuant to that statute.   However, there is nothing in the opinion to suggest that a relator's standing to pursue recovery of the Government's damages under the FCA differs from a relator's standing to pursue a civil penalty under the FCA.   To the contrary, the analysis utilized in *Vermont Agency of Natural Resources* supports a finding that *qui tam* relators have standing to pursue both of these sorts of claims.

The *Vermont Agency of Natural Resources* court noted that the relator in that case was pursuing both damages and penalties but did not distinguish between them, stating that the complaint "asserts an injury to the United States – both the injury to its sovereignty arising from

the violation of its laws … and the proprietary injury resulting from the alleged fraud."[1]  *Id.* at 771, 120 S.Ct. at 1862.  Ultimately, the court concluded that "the United States' injury in fact suffices to confer standing on respondent Stevens."  *Id.* at 774, 120 S.Ct. at 1863.  In doing so, the court did not intimate that only the Government's proprietary injury, rather than the injury to its sovereignty, could constitute the "injury in fact" to support standing.

The second element considered by the *Vermont Agency of Natural Resources* court – the history of *qui tam* actions in England and America -- more directly rebuts the position taken by Halifax here.  The court stated that Article III's restriction of the judicial power to cases and controversies "must be understood to mean cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."  *Id.* (internal quotations omitted).  In assessing whether the types of suits authorized by the FCA were these sorts of cases and controversies, the court traced the history of *qui tam* suits in England as far back as the end of the 13th century, when individuals who had suffered injury began bringing actions in the royal courts on both their own and the Crown's behalf.  *Id.* at 774, 120 S.Ct. at 1863.  These suits were a device to allow litigants to get their private claims into the respected royal courts, and they began to fall out of favor starting in the 14th century, as the royal courts extended their jurisdiction to suits involving wholly private wrongs.  *Id.* at 775, 120 S.Ct. 1863.

At about this same time, however, Parliament began enacting statutes explicitly providing for *qui tam* suits, including suits permitting relators to recover penalties:

> These [statutes] were of two types: those that allowed injured parties
> to sue in vindication of their own interests (as well as the Crown's),
> see, *e.g*., Statute Providing a Remedy for Him Who Is Wrongfully

---

[1] The relator had asserted that the Vermont Agency of Natural Resources had violated the FCA by overstating the amount of time spent by its employees on federally funded projects, thereby inducing the federal government to disburse more grant money than the agency was entitled to receive.  *Id.* at 770, 120 S.Ct. at 1861.

> Pursued in the Court of Admiralty, 2 Hen. IV, ch. 11 (1400), and — more relevant here — **those that allowed informers to obtain a portion of the penalty as a bounty for their information, even if they had not suffered an injury themselves**, see, *e.g.,* Statute Prohibiting the Sale of Wares After the Close of Fair, 5 Edw. III, ch. 5 (1331); see generally Common Informers Act, 14 & 15 Geo. VI, ch. 39, sched. (1951) (listing informer statutes).

*Vermont Agency of Natural Resources*, 529 U.S. at 775, 120 S.Ct. at 1864 (emphasis added). The Court also noted that several of the American colonies passed statutes expressly authorizing *qui tam* suits, including a 1692 New York statute permitting informers to sue for and receive a share of a fine imposed upon officers who neglected their duties to pursue privateers and pirates. *Id.* at 776, 120 S.Ct. at 1864. Further, the court noted, the First Congress enacted a "considerable number" of so-called "informer statutes," including *inter alia* one that allowed census takers to sue for and receive half of the penalty imposed upon marshals who failed to file census returns and another that allowed informers to receive the full penalty paid by customs officials for failing to post a fee schedule. *Id*. at 777 n. 5, 6, 120 S.Ct. at 1864 (citing Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 102, and Act of July 31, 1789, ch. 5, § 29, 1 Stat. 44-45).

The historical review by the *Vermont Agency of Natural Resources* court establishes, not just what was at issue in that case -- that *qui tam* suits are properly considered to be "cases" or "controversies" and that relators have standing to pursue them -- but that *qui tam* suits *in which the relator recovers a fine* have long been recognized as falling within the judicial power as set forth in Article III. As such, relators would also have standing to pursue civil penalties under the FCA.

Halifax argues that *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) establishes that private citizens have no standing to pursue claims for penalties under circumstances such as those presented in the instant case. In *Steel Co.*, a group of private citizens alleged that the defendant had violated the Emergency Planning and Community Right-To-Know Act of 1986 ("EPCRA") by failing to file chemical inventory forms

and toxic chemical release forms.  *Id.* at 86-88.   The EPCRA had a citizen-suit provision that authorized civil penalties, and the citizens' group in *Steel Co.* sought such penalties.  *Id.* at 88.  Ultimately, the Supreme Court found that the citizens' group lacked standing and dismissed the case.  *Id.* at 107, 118 S.Ct. at 1019.

Halifax reads *Steel Co*. too broadly, as there are several significant distinctions between that case and this one.   For one thing, *Steel Co.* was not a *qui tam* case; the citizens' group was asserting a violation of its *own* interest in receiving the information required by the statute, not the interest of the Government.   Second, *Steel Co.* did not address the issue that, in Halifax's interpretation, lies at the heart of the standing issue in the instant case: whether the violation of a private citizen's interest in seeing federal law obeyed can constitute an "injury in fact" for purposes of standing.

> As appears from the above, respondent asserts petitioner's failure to provide EPCRA information in a timely fashion, and the lingering effects of that failure, as the injury in fact to itself and its members. We have not had occasion to decide whether being deprived of information that is supposed to be disclosed under EPCRA — or at least being deprived of it when one has a particular plan for its use — is a concrete injury in fact that satisfies Article III.  *Cf. Lujan v. Defenders of Wildlife*, 504 U.S., at 578, 112 S.Ct., at 2145–2146. *And we need not reach that question in the present case because, assuming injury in fact, the complaint fails the third test of standing, redressability.*

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105 (1998) (emphasis added).   The Supreme Court found that the civil penalty authorized by the EPCRA – the only form of damages authorized by the act – could not remedy the citizen group's alleged injury, because any such penalty would be paid entirely to the Government.  *Id.* at 106-07, 118 S.Ct. at 1018-19.   Because the relief authorized by the ECPRA could not remedy the citizens' group's alleged injury, the citizens' group lacked standing to proceed.  *Id.* at 107, 118 S.Ct. at 1019.   In contrast, the Relator

here is asserting the Government's interest, and a portion of any penalty would be payable to the Government.  Accordingly, the reasoning behind *Steel Co.* is no bar to standing in this case.[2]

Halifax has not identified any favorable appellate decisions directly on point – *i.e.*, decisions concluding that *qui tam* relators lack standing to pursue civil penalties.   On the other hand, the two appellate courts that have considered this precise issue concluded that relators possess the necessary standing.  *See United States ex rel. Bunk v. Gosselin World Wide Moving*, -- F.3d --, 2013 WL 6671270 (4th Cir. Dec. 19, 2013) (holding that relator possessed standing to pursue civil penalty under FCA even though relator elected not to pursue any claim for damage) *and see Stauffer v. Brooks Brothers, Inc*., 619 F.3d 1321 (Fed. Cir. 2010) (holding that relator possessed standing by way of partial assignment of government's interest to pursue civil penalty claim in false marking *qui tam* action).

For all of the foregoing reasons, the Court concludes that Relator possesses standing to pursue her claim for a civil penalty in the instant case.

### B.  Appointments Clause

The Appointments Clause of Article II of the Constitution provides that the President

> shall nominate, and, by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

---

[2] In fact, the *Steel Co.* court suggested the opposite, stating that "the civil penalties authorized by the [ECPRA] … might be viewed as a sort of compensation or redress to respondent if they were payable to respondent." *Id.* at 106, 118 S.Ct. at 1018.

U.S. Const. Art. II, § 2, cl. 2. Halifax argues that civil litigation vindicating public rights can only be conducted by "Officers of the United States," who must be appointed in accordance with Article II, and that the FCA is unconstitutional insofar as it permits non-appointed private parties to conduct such litigation.

This question is more easily disposed of than the question of standing. As Halifax notes, four courts of appeal have considered this argument, and each has rejected it. *See United States ex rel. Stone v. Rockwell Int'l Corp.,* 282 F.3d 787, 805 (10th Cir. 2002); *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 757-58 (5th Cir. 2001) (*en banc*); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1041 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 758 (9th Cir. 1993).

The decision in *Rockwell Int'l Corp.* is instructive. It rests in large part on the case of *United States v. Germaine*, 99 U.S. 508, 511-12, 25 L.Ed. 482 (1878), in which the Supreme Court stated that the definition of an officer "embraces the ideas of tenure, duration, emolument, and duties, and the latter were continuing and permanent, not temporary." *Rockwell Int'l Corp.*, 282 F.3d at 805. Concluding that relators meet none of these requirements, the *Rockwell Int'l Corp.* determined that *qui tam* relators were not "officers" within the meaning of Article II and that the FCA's *qui tam* provisions therefore did not run afoul of the Appointments Clause. For the same reasons, this Court rejects Halifax's argument to the contrary.

### IV. Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Judgment on the Pleadings (Doc. 496) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 6, 2014.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party